IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:18-CV-646

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

APPROXIMATELY $252,140.00 IN US
CURRENCY SEIZED FROM DARREN
LENNARD COLEMAN ON JUNE 27, 2016
AT CHARLOTTE-DOUGLAS
INTERNATIONAL AIRPORT.

_____

CLAIMS OF ROBERT SHUMAKE AND
INTERNATIONAL HUMAN RIGHTS
COMMISSION

**APPENDIX IN SUPPORT OF THE
UNITED STATES' MOTION FOR
SUMMARY JUDGMENT ON THE
CLAIMS OF SHUMAKE AND IHRC**

**TABLE OF CONTENTS
(EXHIBITS 1-18)**

| Ex. No. | Description | PDF Page No. |
|---------|-------------|-------------:|
| 1 | Coleman Deposition Transcript | 2 |
| 2 | Shumake Deposition Transcript | 9 |
| 3 | IHRC Deposition Transcript | 59 |
| 4 | IHRC Website | 99 |
| 5 | IHRC Diplomatic Immunity Letter | 100 |
| 6 | Shumake and IHRC Interrogatory Responses | 101 |
| 7 | Dept. of State Declaration and Letters | 119 |
| 8 | Judgment State of Michigan v. Shumake | 125 |
| 9 | Settlement Correspondence | 128 |
| 10 | Dr. Rose Expert Report and Rebuttal | 135 |
| 11 | Deposition Transcript Dr. Rose | 143 |
| 12 | Dr. Poupko Expert Report | 164 |
| 13 | Dr. Poupko Deposition Transcript | 167 |
| 14 | Dr. Lareau Expert Report | 208 |
| 15 | Dr. Lareau Deposition Transcript | 223 |
| 16 | FINCEN documents | 247 |
| 17 | Seizure Photos | 251 |
| 18 | ION Scan Results | 261 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA,     )
                              )     CIVIL ACTION FILE NO.:
                              )     3:18CV646
                              )
   vs.                        )
                              )
APPROXIMATELY $252,140.00     )
IN US CURRENCY SEIZED FROM    )
DARREN LENNARD COLEMAN ON     )
JUNE 17, 2016, AT             )
CHARLOTTE-DOUGLAS             )
INTERNATIONAL AIRPORT         )



DEPOSITION OF
DARREN COLEMAN


CERTIFICATE OF NONAPPEARANCE



11:02 a.m.
November 16, 2020



Janice S. Baker & Associates
235 Peachtree Street, Northeast
North Tower, Suite 400
Atlanta, Georgia  30303



ERIC A. EDWARDS, CCR No. 4520-6049-0760-1920

Asheville Reporting
111 McDowell Street
Asheville, NC 28801
(828) 254-9230



EXHIBIT
1

1        APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE

2    On Behalf of the United States of America:
      J. SETH JOHNSON, ESQUIRE
3       Assistant United States Attorneys
      227 West Trade Street
4       Suite 1650
      Charlotte, North Carolina  28202
5       (704) 344-6222
      benjamin.bain-creed@usdoj.gov
6

7    On Behalf of the Witness, Darren Coleman:
      DAVID M. MICHAEL, ESQUIRE
8       Law Offices of Michael & Burch, LLP
      One Sansome Street
9       Suite 3500
      San Francisco, California  94104
10      (415) 946-8996
      (877) 767-3821 (Fax)
11      david@michaelburchlaw.com

12    Also Present:  William Bass

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATIONS

2        DARREN COLEMAN:                              Page

3        Certificate of Nonappearance                4

4

5

6                      INDEX OF EXHIBITS

7    No.   Description                               Page

8          (No exhibits marked/identified.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Remote Deposition of Darren Coleman

2         November 16, 2020

3      CERTIFICATE OF NONAPPEARANCE

4       MR. MICHAEL:  This is David Michael.  I'm the

5    attorney in San Francisco.  I represent the

6    deponent, Darren Lennard Coleman.  I agree that he

7    has been the duly noticed to appear at his

8    deposition today, and he is not able to appear.

9    And the reasons why are the ones I have given to

10   the Government earlier yesterday and the day

11   before.

12       He is -- Mr. Coleman is -- lives in

13   Loganville, Georgia.  That's L-o-g-a-n, Loganville,

14   Georgia.  He is a coach at the -- a football coach

15   at the Grayson High School -- for the Grayson High

16   School football team, which is apparently a

17   nationally famous championship high school football

18   team.

19       He is presently self-quarantined at home where

20   he lives with his wife and two children.  He is

21   experiencing symptoms of COVID-19 included a fever,

22   cough, and weaknesses.  I have talked to him by

23   text yesterday, and he has declined to appear at

24   this deposition for those reasons.

25       I will monitor with him every day to find out

1    when he ends up taking COVID-19 tests to determine

2    whether or not he's testing positive, but for now

3    he is unwilling to participate in this deposition

4    for those reasons.

5         I certainly would be willing to have him

6    submit to his deposition if his symptoms recede or

7    he tests negative for the COVID-19 virus, and I

8    will certainly waive any requirement for any formal

9    notice by the Government to do so so that we can

10   get this on track just as fast as possible.  I will

11   be maintaining contact with him on a daily basis to

12   find out how it progresses with his condition right

13   now.

14        MR. JOHNSON:  Thanks, David.  This is ASA Seth

15   Johnson.  I represent the United States in this

16   case, and we would just note the Government's

17   appearance.

18    (Deposition suspended at 11:04 a.m.)

19

20

21

22

23

24

25

1                    DISCLOSURE

2    STATE OF GEORGIA

3    COUNTY OF FAYETTE

4        Pursuant to Article 10.B of the Rules and

5    Regulations of the Board of Court Reporting of the

6    Judicial Council of Georgia, I make the following

7    disclosure:

8        I am a Certified Court Reporter and an independent

9    contractor.

10       I was contacted to provide court reporting services

11   for this deposition by Asheville Reporting.  I will not

12   be taking this deposition under any contract that is

13   prohibited by the O.C.G.A. 15-14-37(a) and (b) or

14   Article 7.C of the Rules and Regulations of the Board.

15   I have no contract and/or agreement to provide court

16   reporting services with any party to this case or any

17   counsel in this case.

18       I am not disqualified for interest, personal or

19   financial, under O.C.G.A.  9-11-28(c).

20       I will charge my usual and customary rates to all

21   parties in the case.

22       On this date of November 16, 2020.

23

24                          _____
                                    *Eric Edwards*

25                          Eric A. Edwards, CCR

1                    CERTIFICATE

2    STATE OF GEORGIA

3    COUNTY OF FAYETTE

4         I, Eric A. Edwards, Certified Court Reporter,

5    certify that the foregoing pages 1 through 7 of the

6    transcript are a true, correct, and complete record of

7    the testimony given by the deponent, Darren Coleman, who

8    was first duly sworn by me; that I am not a relative,

9    employee, attorney, or counsel of any of the parties nor

10   financially interested in the action; and that the said

11   deponent and counsel in the presence of each other and

12   before me was required to reserve the reading and

13   signing of the examination under oath transcript.

14        This certificate is expressly withdrawn and denied

15   upon disassembly and/or photocopying of the foregoing

16   transcript or any portion thereof unless such

17   disassembly or photocopying is done by the undersigned

18   Certified Court Reporter and signature and seal are

19   attached hereto.

20        On this date of November 28, 2020.

21

22

23

24        _____
                    *Eric Edwards*

25                  Eric Allen Edwards, CCR

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION


UNITED STATES OF AMERICA,


     vs.                           Civil Action

                                     No. 3:18-CV-646

APPROXIMATELY $252,140.00 IN

US CURRENCY SEIZED FROM DARREN

LENNARD COLEMAN ON JUNE 27, 2016

AT CHARLOTTE-DOUGLAS INTERNATIONAL

AIRPORT,

_____/


     The Deposition of ROBERT S. SHUMAKE (Personally),

     Taken via Zoom

     Commencing at 11:03 a.m.,

     Tuesday, November 17, 2020,

     Before Dale E. Rose, CSR-0087.



EXHIBIT
2

1 APPEARANCES:
2
3 MR. BENJAMIN BAIN-CREED
4 MR. J. SETH JOHNSON
5 UNITED STATES DEPARTMENT OF JUSTICE
6 U.S. ATTORNEYS OFFICE
7 Assistant United States Attorneys
8 227 West Trade Street, Suite 1650
9 Charlotte, North Carolina 28202
10 (704) 344-6222
11 benjamin.bain-creed@usdoj.gov
12        Appearing on behalf of the
13        United States of America
14
15 MR. DAVID M. MICHAEL
16 Law Offices of Michael & Burch, LLP
17 One Sansome Street, Suite 3500
18 San Francisco, California 94104
19 (415) 946-8996
20 david@michaelburchlaw.com
21        Appearing on behalf of the Deponent
22
23
24
25

1            INDEX TO EXAMINATIONS
2 Witness                                    Page
3
4 ROBERT S. SHUMAKE
5
6 EXAMINATION BY MR. BAIN-CREED:............... 4
7
8            INDEX TO EXHIBITS
9
10 Exhibit                                    Page
11        (Exhibits attached to transcript)
12    NOTE:  Exhibits listed in order presented.
13

14 DEPOSITION EXHIBIT 20
15    letter, 6-29-18 ........................ 32
16 DEPOSITION EXHIBIT 27
17    Complaint for Declaratory Relief,
18    etc. Shumake v Wilson ................... 40
19 DEPOSITION EXHIBIT 1
20    letter 6-24-16 .......................... 76
21 DEPOSITION EXHIBIT 30
22    petition dated 7-7-17 ................... 99
23
24
25

1 Tuesday, November 17, 2020
2 About 11:03 a.m.
3            (NOTE:  The deponent and reporter
4            appeared in Detroit, all counsel
5            appeared via Zoom.)
6            ROBERT S. SHUMAKE,
7    having first been duly sworn, was examined and
8    testified on his oath as follows:
9            EXAMINATION
10 BY MR. BAIN-CREED:
11 Q.   Good morning, Mr. Shumake.  My name is Ben
12    Bain-Creed, I'm an Assistant U.S. Attorney.  That
13    is a federal prosecutor that handles federal
14    forfeiture cases here in Charlotte.
15        I'm going to do most of the talking for
16    this deposition, but I do have -- I just wanted
17    you to see -- I do have my colleague here Seth
18    Johnson.  He's also a federal prosecutor handling
19    forfeiture cases here in Charlotte.
20        Obviously we are here in the case of
21    U.S. v $252,140 seized from Darren Coleman in
22    2016 at the Charlotte International Airport.
23        And as you can see also on the Zoom
24    you've got your attorney Mr. Michael in San
25    Francisco in case you have any questions.

1        MR. MICHAEL:  Robert, can you see and
2    hear both of us clearly?
3        THE WITNESS:  There's a delay, but I
4    can see both of you.  There's a delay on hearing
5    you.
6 BY MR. BAIN-CREED:
7 Q.   Well, if at any point you can't hear me or Seth
8    or Mr. Michael, you just let us know.
9 A.   Sure.
10 Q.   So we're going to just start with some real
11    background questions and we'll get into the
12    details of this case later.
13        But can you state and spell your name
14    for the record, Mr. Shumake?
15 A.   Robert Shumake, S-h-u-m-a-k-e.
16 Q.   And, Mr. Shumake, do you understand you're under
17    oath?
18 A.   I do.
19 Q.   And you're testifying here under penalty of
20    perjury, do you understand that?
21 A.   I do.
22 Q.   And you understand that anything said here can be
23    used in any case civil or criminal against you?
24 A.   I do not know that part, but I do know about the
25    perjury part.

1  Q.  Okay, but you understand that anything you say
2      here can be used against you, right?  It's
3      under-oath testimony, do you understand that?
4  A.  Based upon what you're telling me right now I
5      understand that.
6  Q.  So you understand that you have to answer
7      verbally, in other words you can't nod your head,
8      you have to actually say "yes" or "no" and answer
9      verbally.
10 A.  Yes, I do understand that.
11 Q.  Now, you understand if a question is unclear you
12     can ask me to clarify the question or you can ask
13     me to repeat it.
14 A.  I understand, yes.
15 Q.  And we want to try to have me finish a question
16     and I'll finish speaking and then you can speak
17     and answer.  We're going to try not to interrupt
18     each other, do you understand that?
19 A.  Yes.
20 Q.  And the reason for that is just the court
21     reporter has to record things here.
22         So, Mr. Shumake, are you able to
23     understand and respond to questions here today?
24 A.  Yes.
25 Q.  Have you taken any alcohol or drugs in the past

1      24 hours that would impair your ability to
2      understand or answer questions here this morning?
3  A.  No that I know of.
4  Q.  But you're able to answer questions, you're not
5      impaired is the basics of this question.  You're
6      not impaired today?
7  A.  Correct.
8  Q.  Did you speak to anyone other than your attorney
9      about the deposition?
10 A.  I did.
11 Q.  Who did you speak to about the deposition?
12 A.  My fiancee.
13 Q.  What's her name?
14 A.  Natalie King.
15 Q.  What's her last name?
16 A.  K-i-n-g.
17 Q.  And, Mr. Shumake, I'm sorry, it's a little bit
18     hard to hear you, so I have to ask you to talk
19     loud.
20         And what did you talk about with
21     Ms. King?
22 A.  That was the time of the deposition today.
23 Q.  And she's your fiancee, is she based in Michigan
24     or elsewhere?
25 A.  Based here, Michigan.

1  Q.  Did you review any documents to prepare for your
2      deposition today?
3  A.  I did.
4  Q.  What did you review?
5  A.  I'm not sure of the name of the document.  The
6      claimant document and the exhibits.
7  Q.  The ones that we just sent to your counsel this
8      morning, did he e-mail those to you?
9  A.  Sure, I reviewed some of them.
10         MR. MICHAEL:  Let the record show that
11     those exhibits consisting of 37 exhibits were
12     sent to me early this morning, at least my time
13     early this morning, and then I downloaded them
14     and I forwarded them to Mr. Shumake, but at the
15     time I was able to forward them to him was I
16     think probably about maybe 1 hour ago.
17         So we talked about the exhibits, but of
18     course it was impossible for us during the short
19     time we had to go through each exhibit.
20         But we talked about them and
21     Mr. Shumake is generally aware of the exhibits,
22     but not of the exact content of each exhibit.  I
23     think that's a fair way to portray what happened
24     regarding the exhibits today.
25 BY MR. BAIN-CREED:

1  Q.  So, okay, Mr. Shumake, following up on what
2      Mr. Michael said, if I'm asking you a question
3      here today and you get confused or you think
4      well, I haven't looked at this exhibit in a while
5      and you need time to review it, you can take time
6      to review it.
7          We're happy to sit here for however
8      long you need to review an exhibit.
9  A.  Okay.
10 Q.  Also if you have questions for your attorney
11     during the deposition you can ask questions of
12     your attorney.
13         Our only request from the government
14     side would be that if you have a question for
15     your attorney, you don't ask him one in the
16     middle of answering a question.
17         So, for example, if I ask you a
18     question, I'd like you to answer it and then you
19     can go ask your attorney questions after that.
20         Really the only reason you would not
21     answer a question that I ask is that if your
22     attorney says there's some kind of privilege
23     issue and he'll chime in if that's the case.
24         Mr. Shumake, have you ever been deposed
25     before?

1  A.  Yes.
2  Q.  When was that?
3  A.  I don't recall.
4  Q.  Like the past 10 years, the past 20 years?
5  A.  Within 20 years, yes.
6  Q.  How many times have you been deposed before?
7  A.  I don't recall, a few.
8  Q.  Would you say like five times or 10 times?
9  A.  Less than five I would think.
10  Q.  And what was the nature of those depositions?
11      Why were you deposed before?
12  A.  Litigation, real estate -- I mean, I don't know,
13      anything, a lot.
14  Q.  Were they a case where you were a Plaintiff or a
15      Defendant?
16  A.  Yes.
17  Q.  So I'd assume you would remember cases if you
18      were a party, so tell me about the cases where
19      you were deposed where you were a Plaintiff or
20      Defendant because you were either being sued or
21      suing someone?
22  A.  I don't remember, I don't -- a couple of real
23      estate cases.
24  Q.  What would be the nature of those?  What were you
25      fighting about?

1  A.  Ownership possibly.
2  Q.  And have you ever testified before in court?
3  A.  I have.
4  Q.  You have not testified in court?
5  A.  I have.
6  Q.  Oh, you have, and how many times have you
7      testified?
8  A.  Twice.
9  Q.  What cases did you testify in?
10  A.  Testified in a California cases.
11  Q.  What case was that?
12  A.  That was a case recently where I was the --
13      thinking of the word what you would call it -- I
14      was on trial.
15          I testified at trial and then I
16      testified in front of the U.S. Attorney for a
17      case involving the ex-mayor Kwame Kilpatrick
18      here.
19  Q.  Is that the Beasley case?
20  A.  Yes.
21  Q.  And the California case, is that the Shasta
22      County case that you're talking about, the
23      criminal one?
24  A.  Yes, yes.
25  Q.  So we'll talk about those in a bit, Mr. Shumake.

1       Let's get back to the basic background.
2           Where do you currently reside?  Where
3       do you live, Mr. Shumake?
4  A.  Bloomfield Hills, Michigan.
5  Q.  What's your address there?
6  A.  4676 Avondale Terrace.
7  Q.  And how long have you lived there, Mr. Shumake?
8  A.  Four years.
9  Q.  Where did you -- is that a house or an apartment
10      or what kind of place is that?
11  A.  A house.
12  Q.  Do you own that or rent it?
13  A.  Own it.
14  Q.  Where did you live before that?
15  A.  I had a couple of properties, like live-live or I
16      spend a lot of time overseas.
17  Q.  What would you consider your primary place of
18      residence in the past five years other than the
19      Avondale Terrace?
20  A.  I've spent time overseas in Tanzania, Kenya.  351
21      Keswick.
22  Q.  Is that also in Bloomfield Hills?
23  A.  Bloomfield Hills.  I spend a lot of time
24      traveling, that's why --
25  Q.  I'm not super familiar with Michigan.  Is that a

1       Detroit suburb?
2  A.  Yes.
3  Q.  Are you from the Detroit area?
4  A.  I am.
5  Q.  Have you lived there your whole life?
6  A.  Detroit, Atlanta, California, Tanzania, Botswana,
7      been a lot of places.
8  Q.  Are you from Nassau, did I see that somewhere?
9  A.  Nassau, no, not --
10  Q.  I must be thinking of somebody else.
11      Mr. Shumake, there is -- give me just a second
12      here -- there's an address listed on one of your
13      -- one of the things that we do, I'm looking at
14      Exhibit 11.  It's not super important that you
15      look at it unless you really need to.
16          You responded to some questions that
17      the United States asked called special
18      interrogatories and you said that your address in
19      response to those was 18530 Mack Avenue, Grosse
20      Pointe Farms, Michigan.
21  A.  That's accurate.
22  Q.  What is that address?
23  A.  Office address.
24  Q.  Is that a UPS store?
25  A.  Yes.

1 Q. What office -- what business or office? Is that
2 just your personal like business address
3 essentially?
4 A. Right -- well, no, my office, my business
5 address, where I have all my mail go to. I fill
6 out all documents relating to that address.
7 Q. That's just a UPS store where you go pick up
8 things, pick up your mail basically?
9 A. Correct.
10 Q. And, Mr. Shumake, just going through my topics
11 here I think you said you're -- how long have you
12 been engaged to Ms. King who you mentioned
13 earlier?
14 A. About a year.
15 Q. Have you -- I don't want to delve too much into
16 your personal business, but have you ever been
17 married?
18 A. Yes.
19 Q. Who were you married to before?
20 MR. MICHAEL: I would object on the
21 grounds of relevancy.
22 MR. BAIN-CREED: That's fine, David.
23 BY MR. BAIN-CREED:
24 Q. Withdraw that question, Mr. Shumake. Did you go
25 to college anywhere?

1 A. I did.
2 Q. Can you tell us a little bit about where you went
3 to college and what your major or majors was and
4 what degrees you obtained?
5 A. I went to Ferris State University, Northern
6 Michigan and then I went to Morehouse College.
7 Q. Okay. And did you get a degree from either of
8 those institutions?
9 A. I did not. I have an honorary doctorate degree
10 from Lewis College of Business.
11 Q. Just backing up for a second, we'll go to Lewis
12 College in a second, Mr. Shumake.
13 How long were you with Ferris and how
14 long were you at Morehouse and what was your
15 major?
16 A. I don't recall. Say two years each place maybe.
17 My major was psychology.
18 Q. You did not obtain degrees from there, but you
19 said you got an honorary doctorate from Lewis
20 College?
21 A. Of business, a historical black college,
22 university.
23 Q. What was the circumstances of them awarding you
24 an honorary doctorate? What caused -- why did
25 they tell you we want to give you an honorary

1 doctorate?
2 A. Based upon my work I had done in the community.
3 Based upon work I've done in my community.
4 Q. Roughly when was that that they awarded you the
5 honorary doctorate?
6 A. Wow, between 2001 and 2003 maybe, I don't recall.
7 Q. Roughly in the past 20 years you would say, is
8 that accurate?
9 A. That's correct.
10 Q. Do you have any kind of degree or certification
11 from something called the Larry Pino Institute of
12 Finance, is that familiar?
13 A. Yeah, that was some entity that no longer exists.
14 It was a -- Larry Pino was the -- I can't
15 remember that far back, but he was -- it was his
16 school.
17 Q. Did you attend school there?
18 A. I took some courses there.
19 Q. What kind of courses were those?
20 A. Courses on factoring, PO financing, underwriting
21 PO -- purchase order financing, underwriting. I
22 learned about basis points and finance there.
23 Q. Was that in the past 20 years, was it a fairly
24 long time ago?
25 A. Yeah, long long time ago. The actual name if

1 you're reading off where you're going, I think --
2 I can't remember, it's something Cash Flow
3 Institute. The founder of that school was Larry
4 Pino.
5 Q. Is that kind of like a continuing education or
6 professional education program?
7 A. No, it's like -- has nothing to do with
8 continuing education, just something I wanted to
9 learn how to underwrite deals, how to finance
10 deals.
11 Actually the building I'm sitting in
12 right now, I almost bought this building, so I
13 learned all of that at that school.
14 Q. Let's fast forward away from education. Are
15 there any other colleges or universities or any
16 other education that you can remember in the
17 past, say, 20 years?
18 A. What do you mean by that?
19 Q. Well, did you attend any other colleges, any
20 other universities, any other continuing
21 education courses?
22 A. Not in 20 -- well, no colleges in that 20-year
23 time period that I can think of.
24 I can't remember. I've taken classes -- I
25 wouldn't remember, I don't remember.

1  Q.  Do you take like continuing education?
2  A.  No, I study a lot so I wouldn't know.  None that
3      I can think of.
4  Q.  And let's talk about your employment,
5      Mr. Shumake.  Where are you currently employed?
6  A.  Self-employed.
7  Q.  How are you self-employed?  What's the nature of
8      your business?
9  A.  What's the nature of my business?
10 Q.  Yeah, what do you do for a living?
11 A.  Real estate.
12 Q.  What do you do in real estate?
13 A.  Buy property, consult with property, underwrite
14     property, finance companies, structure deals,
15     consult.  I'm an entrepreneur, I do a lot of
16     different things.
17 Q.  Do you have like a business name that you operate
18     under?
19 A.  Not particularly.  I haven't had a business card
20     in 20 years, so I don't pass out cards.  Most of
21     the things that I do are relationship driven.
22 Q.  That was going to be my next question.  Do you
23     advertise or is it word of mouth?
24 A.  No advertisement, word of mouth.
25 Q.  When you say property are you talking about

1      commercial property?
2  A.  Commercial, residential.
3  Q.  So you do any kind of property?
4  A.  Commercial, residential, industrial.  The
5      building we're sitting in right now was property
6      that I had under contract years ago to acquire,
7      so --
8  Q.  Do you have a real estate license?
9  A.  I used to have a broker's license.  Never used it
10     though.  Well, I did use it for a contract many
11     years ago and I don't need a license to do what I
12     do.
13 Q.  How do you make money off your real estate
14     consulting, purchasing, financing business?  How
15     do you make a living off of that?
16 A.  What do you mean by that?
17 Q.  How do you get paid from a deal?
18 A.  Consulting fees.  Someone calls me and wants to
19     know how to -- I teach a course on it.  I'm sure
20     you've done some research.  I've written books on
21     business and real estate and those things, so
22     I've taught courses.  People pay me for that.
23         I introduce people to finance
24     opportunities and so they do the financing, I
25     receive fees off financing.

1         I understand what tax foreclosures are,
2      so I identify properties and I acquire those
3      properties or I consult for those properties.
4         It's limitless.  Right now I'm overseas
5      doing projects in Africa developing and building
6      properties, so it's just -- it's a gamut of
7      different things, finance, development,
8      consulting, it's limitless.
9  Q.  How much would you say on average per year let's
10     say from 2015 to now, how much would you say you
11     make -- you net per year?
12 A.  I don't know.  It's been a rough couple of years
13     lately.
14 Q.  How about 2015 let's say?
15 A.  I don't remember.
16 Q.  Would you say more than $100,000 you netted?
17 A.  I don't recall, I'm not sure.
18 Q.  Well, how about this, in 2015 would you say you
19     made $50,000 or less?
20 A.  2015 -- I was just coming out of a bankruptcy in
21     2015 -- wait a minute; I don't remember.
22 Q.  How about 2016, do you remember if you made
23     $50,000 or less that year?
24 A.  Nope, I don't remember.
25 Q.  $100,000 or less?

1  A.  I don't remember.
2  Q.  Any years from 2015 to now do you have a rough
3      idea of how much you made like say within $50,000
4      just give us a range of how much money you netted
5      at any point in the past five years?
6  A.  In 2015 I was mostly doing consulting work
7      overseas.  I'm lost, my dates are off.  Let's
8      see, I filed bankruptcy in 2013 -- '14?  I don't
9      recall.  My taxes would know.  I did other
10     projects too.
11 Q.  Before you --
12 A.  Go ahead.
13 Q.  Well, who files your taxes for you, Mr. Shumake?
14 A.  I do.
15 Q.  You prepare and file your own taxes?
16 A.  No, I don't prepare them.  UHY accounting firm,
17     top 20 accounting firms in the country -- or in
18     the world I think.
19 Q.  And do you currently owe back taxes?
20 A.  I do.
21 Q.  Do you know how much you owe?
22 A.  Oh, I don't know a specific amount, but it's a
23     few hundred thousand range.
24 Q.  Few hundred thousand?
25 A.  Yes.

1 Q. And do you know what tax years you owe the few
2 hundred thousand dollars from?
3 A. Oh, man. 2016, 2017 I think, I'm not sure.
4 Q. And what kind of business were you in in those
5 years that you owe the back taxes from?
6 A. Oh, real estate and cannabis.
7 Q. Tell me about the cannabis industry that you were
8 in, what kind of cannabis business were you in?
9 A. Licensed in California brokering cannabis deals.
10 Q. Can you elaborate, what kind of cannabis deals
11 would they be?
12 A. What do you mean by that?
13 Q. Well, I mean when you say brokering cannabis
14 deals, to me that could mean brokering people to
15 purchase and sell a bunch of marijuana or it
16 could be real estate related to marijuana. I
17 don't know, could be something else.
18 Can you kind of just explain how you
19 got involved -- how about this, we'll back up.
20 Explain how you got involved in the
21 cannabis business? When did you get involved in
22 the cannabis business?
23 A. 2015 I believe.
24 Q. And how did that come about? Did somebody
25 introduce the business to you? Did you seek it

1 out? Explain to us how you got involved in this?
2 A. I got involved in it -- well, you're asking the
3 history of it. My secretary got me involved in
4 it back in 2010. She -- when Michigan went
5 medical she started working -- when she worked
6 for me I think I was paying her about $40,000 a
7 year with no education and she had a son that had
8 a rare disorder, so she started growing cannabis
9 to help her son.
10 And it went from growing cannabis to
11 help her son to becoming a cannabis dealer and
12 cannabis broker in that space. I started
13 studying real estate deals that were in a
14 cannabis space that were unlicensed and then
15 licensed in those real estate deals for
16 significant growth and expansion.
17 And inside of doing that, that's kind
18 of how I got tied into the cannabis space.
19 Q. So correct me if I'm wrong, but you were
20 essentially if someone wanted to invest in
21 cannabis in some way you were helping them find
22 investment opportunities?
23 A. Not necessarily specifically helping them find
24 investment opportunities. I did it during that
25 time period was kind of a solo deal.

1 I identified a property that was in the
2 process of being licensed or in the process of
3 being licensed or quietly grandfathered in, tied
4 up that asset, and got that asset restructured
5 for greater value.
6 In addition to that particular asset I
7 would broker deals through a non-profit benefit
8 corporation. This is in California by the way
9 before -- I forget -- Prop 64. I don't know the
10 specific prop or law.
11 Individuals that were a part of the
12 non-profit could give donations to the
13 organization or to an individual in that space
14 and broker transactions because of the
15 relationships that I had at the time through my
16 resources or relationships.
17 I filed taxes on that. That's kind of
18 what created this tax obligation.
19 Q. Mr. Shumake, just so I make sure I cut through
20 all the things you just mentioned, let's start
21 with the real estate.
22 You said you identified a real estate
23 and something about a license. What piece of
24 real estate did you identify?
25 A. I think I saw one of the exhibits, Louis

1 Armstrong and Associates is an entity that I
2 created for the specific purpose. Louis
3 Armstrong, a jazz musician, was a cannabis
4 activist if you will and I created a company, not
5 for profit and a for profit specific for that
6 purpose initially.
7 Then I found a property and tied up
8 that property as Louis Armstrong and Associates
9 and acquired an asset as Louis Armstrong and
10 Associates, so that's a name of the entity that I
11 used to acquire the asset and to broker the
12 transaction.
13 That asset right now is licensed with
14 the State of California in cannabis.
15 Q. And so to make sure the record is clear, we're
16 talking about 3500 Via Real, Carpinteria,
17 California?
18 A. Yep, that's correct.
19 Q. So was Louis Armstrong and Associates a
20 for-profit entity that you set up?
21 A. For profit and non-profit, two separate.
22 Q. And a non-profit?
23 A. Louis Armstrong and Associates, Incorporated and
24 Louis Armstrong and Associates -- I don't know if
25 it's LLC, I'm not sure of the legal structure,

1  but there's a for profit and non profit.
2  Q.  Can you explain that to me, Mr. Shumake, how does
3  it have a for profit and a non-profit side and
4  what does each one do?
5  A.  The for-profit side deals with things that do not
6  have anything to do with the actual plant itself,
7  like the land and the actual asset is in a
8  for-profit side, the farm on 3500 Via Real Road
9  is on the for-profit side.
10     The non for profit side based upon
11  California law at the time were in -- things that
12  touched the actual plant.
13  Q.  So what would be things that touch the actual
14  plant, can you elaborate for me?
15  A.  Could be nutrients, could be materials, could be
16  potting, all those various different things that
17  were in the plant world.
18  Q.  So just so I understand because I am actually a
19  little bit confused.  So the non-profit side, how
20  you would -- you were soliciting donors or how is
21  it a non-profit?
22     I guess are you developing medical
23  marijuana?  Like what makes a non-profit side?
24  A.  In the California law at the time they had -- I'm
25  trying to think of the word for it -- it's

1  collectives.
2     So people that joined your collective,
3  they're part of your collective and they had
4  their cannabis license if you will, then they
5  could -- you could interact and do trading as
6  long as you guys were a part of the same
7  collective organization.  That's called a
8  non-profit mutual benefit corporation.
9  Q.  And was this all medicinal or was some of it
10  recreational or --
11  A.  At the time it was all medicinal.  There was not
12  recreational during that time period.
13  Q.  And were you the CEO of Louis Armstrong and
14  Associates?
15  A.  I was, founder and CEO.
16  Q.  And did you have to invest money -- did you
17  personally or anybody else have to invest money
18  to purchase that Via -- I'm sorry, I've forgotten
19  the address, but the Carpinteria, California
20  property that we mentioned earlier?
21  A.  Yes, I raised capital to buy it.
22  Q.  How did you raise the capital?
23  A.  Through relationships or resources.
24  Q.  And when was that that you raised the capital?
25  A.  I don't remember.

1  Q.  Was it 2015 or 2016?
2  A.  I don't remember, I'm not sure.  I think it was
3  2016, I don't know, I can't -- it's foggy, I
4  can't remember the dates.  I just know what I
5  did.
6  Q.  How much capital did you raise?
7  A.  About $5 million, $4 or $5 million.
8  Q.  Who did you raise that from?
9  A.  George, I forget his actual name.
10  Q.  George is the first name?
11  A.  Uh-huh.
12  Q.  Is that the only person or did you raise it from
13  other people?
14  A.  One group brought the bulk of the capital.
15  Q.  Is this the -- George, was that someone
16  associated with G Boys or is that a different
17  group?
18  A.  Yes, that's correct, G Boys, they brought the
19  capital to the table.
20  Q.  I'm sorry, Mr. Shumake, could you repeat that?
21  A.  I said the G Boys group brought George to the
22  table who put up all the money.  I found the
23  asset.
24  Q.  How would you go about raising capital, meaning
25  did you approach people in person or how do you

1  promote this is a manner that people decided they
2  wanted to give you capital for this project?
3  A.  How did I promote it, what do you mean?
4  Q.  Well, I mean somebody had to know that you were
5  looking at cannabis real estate, they had to
6  decide I want to give money to this gentleman to
7  start a a business, so how did you come about
8  meeting the people who gave capital?
9  A.  I've known him for 20 years, long-term
10  relationships.
11  Q.  So these were long-term people when you said I
12  have this business opportunity, would you like to
13  invest?
14  A.  Yes.
15  Q.  Did you put any of your own money into the
16  purchase of this -- let me back up a little bit.
17     Do you own this or does Louis Armstrong
18  and Associates own this Carpinteria property?
19  A.  It's a lease option.
20  Q.  Did you put any of your own money in there?
21  A.  I did.
22  Q.  How much of your own money?
23  A.  I don't remember.
24  Q.  Like hundreds of thousands of dollars or --
25  A.  I don't remember.

1  Q. Let me just go through since we're talking about
2     this property, is the case Robert S. Shumake
3     Living Trust versus Jason Q. Wilson, that's the
4     case out of Superior Court in California in Santa
5     Barbara County, is that the case in regard to
6     this property?
7  A. It is.
8  Q. Can you tell us how that case came about, what
9     happened to prompt that lawsuit?
10 A. What prompted the lawsuit was -- a unique way of
11    explaining it -- those guys or I put together the
12    deal on the asset and they wanted to find a way
13    to take me out of the property.
14        So they put up all the money and they
15    created a fraudulent corporation to transfer all
16    of our ownership into another corporation that I
17    had recorded the information, had it on tape.
18        And I got another group that they were
19    going to transfer the company into. The guy
20    called me and told me what they were trying to
21    do, and so I sued them.
22 Q. So you had put together Louis Armstrong and
23    Associates, the profit and non-profit side, and
24    recruited all these individuals that are involved
25    in this lawsuit, is that correct?

1  A. Correct, and they tried to steal the property
2     from underneath me to go out and partner with
3     someone else.
4  Q. And then you -- did you thereafter have another
5     entity that was going to try to buy the property
6     and exercise your option to buy out these folks
7     who were wronging you?
8  A. I did. I put together a -- I sort of flipped the
9     asset by itself to a publicly traded company --
10    what's the name of that company -- and pay the
11    guys off.
12 Q. Was it Trans-Atlantic?
13 A. No, it was GreenGro.
14 Q. GreenGro, I think we have a -- give me just a
15    second, Mr. Shumake.
16        MR. MICHAEL: That's one of your
17    exhibits.
18        MR. BAIN-CREED: I think it is too.
19 BY MR. BAIN-CREED:
20 Q. So, anyway, Mr. Shumake, while we're looking for
21    that, you put together GreenGro to try to
22    exercise your option to purchase all of the
23    remaining shares of the Louis Armstrong and
24    Associates?
25 A. Essentially, yes.

1  Q. How did you -- did you have to put money into
2     GreenGro? Like how did you raise money to fund
3     GreenGro to exercise your option?
4  A. I didn't own GreenGro. GreenGro was owned by
5     another company. They signed an LOI with me and
6     my interest or my option in the company to buy it
7     for, I want to say, $40 million, which is what
8     the property appraised for after I tied it up.
9        So I tied the property up for $5
10    million, I raised $4 million or $5 million and
11    after the property was licensed or stabilized it
12    appraised at $40 million, so I was going to sell
13    the whole asset for $40 million, pay off the
14    property, pay back all the investors and then
15    move on down the road.
16    DEPOSITION EXHIBIT 20
17        letter, 6-29-18
18    WAS MARKED FOR IDENTIFICATION.
19 Q. So, Mr. Shumake, if you'd turn to Exhibit 20, you
20    should have a binder or some kind of paper
21    exhibits there that you can look at.
22        (A short recess was taken).
23 BY MR. BAIN-CREED:
24 Q. We're back on the record, Mr. Court Reporter.
25    We're on Exhibit 20. Mr. Shumake, we took a

1     brief break here. Did you talk to anybody about
2     the deposition during that time?
3  A. No, I did not.
4        MR. MICHAEL: Exhibit 20?
5        MR. BAIN-CREED: Yeah, David, that's
6     the GreenGro Technologies --
7        MR. MICHAEL: I just had to open that
8     up, I'm ready.
9  BY MR. BAIN-CREED:
10 Q. Mr. Shumake, this Exhibit 20, is this the
11    document you were referring to a moment ago in
12    regard to the letter of intent?
13 A. I believe so. Is this the one that you guys got
14    off the OTC platform, public information? It was
15    multiple documents, I don't know, that's why I'm
16    asking.
17 Q. I believe this is probably public information,
18    Mr. Shumake. Can you tell me what is the OTC
19    platform?
20 A. OTC is over the counter, it's for publicly traded
21    companies, so over the counter, this company
22    GreenGro it says publicly traded, so it would
23    have been in their filings.
24 Q. And this is an accurate copy of an agreement
25    signed by you with GreenGro on June 29, 2018?

1 A. That is correct.
2 Q. And just trying to back up and figure out where
3 we were. GreenGro was essentially, you were in
4 an agreement to buy out your partners with whom
5 you had a dispute in Louis Armstrong, is that
6 correct?
7 A. That's correct.
8 Q. And were you able to buy out those partners
9 ultimately?
10 A. I did not.
11 Q. So tell us about this, I guess give us the rest
12 of the story about the Shumake Living Trust
13 versus Jason Q. Wilson Trust case.
14 What was the resolution of that case?
15 Was it resolved?
16 A. Still ongoing right now.
17 Q. Okay. Tell me about the Defendants in that case
18 if you would. Who is -- is there a Mr. Wilson?
19 A. Jason Wilson, Michael DeSalvo, John Goldstein,
20 George -- I don't know George's last name, but
21 that's Lone Star Properties.
22 So there are multiple owners of this
23 company. I started Louis Armstrong and I was a
24 partner in Louis Armstrong along with Jason
25 Wilson, G Boys and Pacific First Capital, Lone

1 Star Properties.
2 Okay, I got it. This was a company,
3 the Pacific First company, that was a group that
4 they tried to do an underhanded deal with and
5 this guy called me.
6 Q. And then the other folks you named, G Boys, De
7 Salvo, Wilson, these are people who you were
8 partnering in Louis Armstrong with?
9 A. Correct.
10 Q. And we got a little thrown off by our break there
11 so we're going to try not to take breaks like
12 that again, Mr. Shumake.
13 But did you answer the question, where
14 did you derive money for this Louis Armstrong
15 investment or for the Via Real investment?
16 A. The G Boys and Lone Star Properties brought the
17 capital to the table.
18 Q. Right and I believe you probably answered this,
19 but did you put any of your own personal money
20 in?
21 A. Yes, I just don't know the amount, I don't
22 recall.
23 Q. Is the International Human Rights Commission
24 aware of this dispute that you have in the
25 Shumake Living Trust v Jason Q. Wilson Trust

1 case?
2 A. No, not that I know of. I don't know why they
3 would be a part of that. Why would they be aware
4 of that, I'm lost?
5 Q. Have you told them about it?
6 A. Tell myself about it? I'm confused.
7 Q. Well, we'll get to the International Human Rights
8 Commission in a moment, but they are not aware of
9 this case? You were aware of it of course
10 because you filed it.
11 So is there actually cannabis being
12 grown at the Via Real property?
13 A. Yes.
14 Q. Who's growing the cannabis?
15 A. Louis Armstrong and Associates.
16 Q. How many employees are there?
17 A. Probably about 30.
18 Q. And did Louis Armstrong and Associates sell that
19 to retailers or what happens to the cannabis
20 that's grown there?
21 A. Based upon the laws in California now it's sold
22 to -- it's all recreational. Retail
23 dispensaries, medical, it's the whole gamut of
24 it, wholesalers.
25 Q. And does that net a profit for Louis Armstrong

1 and Associates?
2 A. It hasn't in years, it's been a loss.
3 Q. Do you take the money from that sales and pay for
4 the employees there?
5 A. We do. Remind you, I'm not as involved in the
6 project directly because we're in litigation so
7 some of the things that you may ask me I wouldn't
8 know all the answers to presently.
9 Q. Does Louis Armstrong and Associates bank with a
10 bank out there or how does it handle its money?
11 A. We used to bank with a few banks, but those banks
12 shut us down.
13 Q. So let's say you have to pay for something on you
14 take in some money, is that just handled in cash?
15 A. Cash.
16 Q. Why did the banks shut you down, Mr. Shumake,
17 shut down Louis Armstrong and Associates?
18 A. They -- there's a big issue between banks and
19 cannabis, so -- and what's interesting we went to
20 the bank and shared with the bank that this is a
21 cannabis business, are we able to deposit funds
22 into the bank and the bank allowed for that to
23 happen.
24 Then as you move forward the compliance
25 people now were just higher than the general

10 (Pages 34 to 37)

```
1     manager of the bank, because of their own
2     compliance issues they shut down the account.
3     This has happened on numerous occasions in the
4     cannabis industry.
5  Q.  So you're dealing in cash in this business.  I
6     don't want to cause you security problems, but
7     how do you deal -- is it 10s of thousands of
8     dollars in cash every month or hundreds of
9     thousands or thousands?  Roughly what amount?
10 A.  All of the above.
11 Q.  So it can be a large amount of money in the
12    hundreds in a given month?
13 A.  Absolutely.
14 Q.  And how does the business Louis Armstrong
15    transport that cash and how do they store it
16    generally?  Is there a safe?  Do you contract
17    with Loomis, is there a safe, is there a safe
18    deposit box?
19 A.  There are transportation companies that are
20    licensed to move money around the state for you
21    if you drop off -- use as an example 100 pounds
22    of cannabis to a dispensary, they are licensed
23    armored car facilities that look like regular
24    vehicles that pick up your capital and bring it
25    back to you.
```

```
1     It's a standard practice.  Some of the
2     largest cannabis companies that -- Kiva
3     Chocolates which is now a worldwide phenomenon
4     pays in cash.  So we would supply them cannabis
5     or trip of a cannabis and they pay in cash.  This
6     is a major, major, major corporate that pays in
7     cash, so that's just industry standard.  They're
8     the largest chocolate company in California
9  Q.  So, Mr. Shumake, your customers are in California
10    and there would be retailers -- do you have
11    customers anywhere else?
12 A.  I wouldn't, no, not for the California property.
13    You can only do cannabis in California.
14 Q.  So what percentage would you say in recreational
15    and what percentage in medical?
16 A.  I have no idea, I don't dig that deep into it.
17    At one time it was all medical and now, of
18    course, it's all recreational.  It's
19    recreational, so you don't -- it's totally
20    different and I know you guys are in North
21    Carolina, it's a different world than California
22    literally.
23 Q.  Mr. Shumake, I'd like to -- yeah, it is a
24    different place for sure.  I'd like to look at
25    your declarations from that case really quickly
```

```
1     and just have you kind of explain the statements
2     to me.  Give me just a second, I'll tell you
3     where I want you to go.
4          If you will look at Exhibit 27.
5          MR. MICHAEL:  I also have Exhibit 27 in
6     front of me also on my screen.
7          DEPOSITION EXHIBIT 27
8          Complaint for Declaratory Relief,
9          etc. Shumake v Wilson
10         WAS MARKED FOR IDENTIFICATION.
11 Q.  Mr. Shumake, you're going to have to rifle
12    through this exhibit for a bit to get to where I
13    want you to go, but if you go -- let me count how
14    many pages you need you to go into it.
15         MR. MICHAEL:  Can you describe it,
16    Mr. Bain-Creed?
17 BY MR. BAIN-CREED:
18 Q.  Mr. Shumake, what is this document I've put in
19    front of you, will you describe it to me?
20 A.  It's a lawsuit.
21 Q.  Is that your Shumake v Wilson lawsuit?
22 A.  Correct.
23 Q.  Can you go to Exhibit -- there are some exhibits
24    to that Complaint, correct, Mr. Shumake, that's
25    the Complaint in front of you?
```

```
1  A.  I don't know what exhibit -- I haven't seen
2     anything yet, so you have to be more specific.
3  Q.  You got to go about 30 or 40 pages in and there's
4     an Exhibit G?
5  A.  Exhibit G.
6  Q.  It's literally about halfway through that
7     document that you have.  It's your declaration.
8  A.  Exhibit G.
9  Q.  Take your time and read it if you need to.
10         MR. MICHAEL:  Mr. Bain-Creed, I don't
11    see Exhibit G being a -- oh, here it is, it's the
12    second part of Exhibit G.
13         THE WITNESS:  I don't see that.  It's
14    a number that says Exhibit G.
15         MR. MICHAEL:  And at the end of the
16    letter is your declaration.
17 BY MR. BAIN-CREED:
18 Q.  It's going to be titled "Declarations of Robert
19    Shumake and Robert Shumake and Rafael Bernardino,
20    Jr In Support of Motion for Preliminary
21    Injunction".
22         If you were sitting in the room with me
23    I would put it in front of you, but unfortunately
24    we have to do it this way.
25 A.  I don't see it.  Can you show it to me?  If you
```

1    lift it up, I can look for it.
2  Q.  Gentlemen, this is what it looks like
3    (indicating.)
4         MR. MICHAEL:  Part of Exhibit G,
5    Mr. Shumake, part of Exhibit G so keep going
6    through Exhibit G and you'll find your
7    declaration after the letter from the person that
8    received your declaration, it's still part of
9    Exhibit G.
10  BY MR. BAIN-CREED:
11  Q.  Mr. Shumake, it's okay, I can just read you the
12    statement if you want.  Let me just show you on
13    Exhibit G, it's a declaration and it's got a
14    signature on it.  I'm holding it up for you right
15    now, it's a signature page, Page 12 of the
16    declaration on Exhibit G (Indicating).
17  A.  Okay.
18  Q.  Just generally the thing I'm holding on the
19    screen, does that look like your signature
20  A.  Who knows, could be.
21  Q.  Could be your signature?
22  A.  Yeah.  It doesn't 100 percent look like my
23    signature, but it may be an electronic signature.
24  Q.  Did you prepare a declaration or did you sign a
25    declaration in your Shumake v Wilson case?

1  A.  I believe so, the attorney would have drafted it
2    for me.  Let's see here.
3  Q.  And is Rafael Bernardino one of the attorneys?
4  A.  That's correct.
5  Q.  Mr. Shumake, I just want to figure out what you
6    meant in a sentence in this declaration, that's
7    all.  If you don't find the declaration, it's
8    fine, it's a properly filed document in court in
9    a case that you initiated.
10        So essentially there's a sentence in
11    here, a couple of sentences --
12        (TECHNICAL VIDEO PROBLEMS.)
13  BY MR. BAIN-CREED:
14  Q.  Mr. Shumake, we just took a brief break there
15    because Mr. Michael was having some problems with
16    his Internet provider, but he's re-joined us on
17    his cell phone and we're able to see him and he
18    is able to hear us.
19        So we'll just continue here.  I was in
20    the process of asking you about this declaration
21    and really you don't need to find it and look at
22    it, but essentially what I was going to ask you
23    about is there's a statement in your declaration
24    in the Shumake Trust v Wilson case that says if
25    the federal government -- and this is a quote,

1    "If the federal government decides to
2    enforce federal narcotics laws in
3    states where cannabis is currently
4    lawful, the value of the property will
5    be significantly reduced".
6        Could you explain what that statement
7    means?
8  A.  That came out of a business plan, some real
9    research that I had studied from -- what's the
10    name -- Innovative Industrial Properties that are
11    traded on the New York Stock Exchange.  And it's
12    a part of their disclosure statement and so
13    that's a direct quote from that vantage point.
14        From the federal laws of course it's
15    like -- when it's 100 percent legalized from a
16    federal standpoint the property values depreciate
17    and it changed based upon states that it's
18    legalized.
19        So as an example in California in Santa
20    Barbara that farm specifically used to be a tulip
21    farm, but in Santa Barbara they passed cannabis
22    legislation in that particular are and there are
23    only so many tulip farms.  And so when you start
24    to identify real estate it's highest and best
25    usage of that asset.

1        So the highest and best usage 20 years
2    ago was a tulip farm.  The highest and best usage
3    today is cannabis because you can generate more
4    value based upon that asset being a cannabis
5    piece of real estate than a tulip farm.
6        And so if you legalize the entire
7    platform, that means all property in Santa
8    Barbara, all properties in California, all
9    properties across the country are now just
10    regular assets.
11        So it doesn't give it any true value,
12    no different than having a hospital license.  A
13    hospital that's now licensed in a particular area
14    has a specific license on that hospital.  It's a
15    piece of real estate that is worth X if you build
16    it, but if you put a hospital license on it it
17    has more value.
18        No different than a cannabis, that
19    property is worth X, but if you put a cannabis
20    license on top of it it's now worth Y which is an
21    example of, as I was sharing earlier, the
22    property was worth $6 million and now it's
23    licensed as a cannabis property, it's worth $40
24    million.
25  Q.  So kind of flushing this out, setting aside state

```
1   law, under federal law at the time that you wrote
2   this declaration and you were selling cannabis
3   out of this property selling cannabis was
4   illegal?
5 A. Federally cannabis is still a Schedule 1 right
6   now federally.  Presently it's still that way
7   which is why the banks would not allow you to
8   deposit money because most of your banks are
9   federally chartered.
10 Q. Thank you, Mr. Shumake.  Moving to a related
11   topic, did you ever use this property in
12   Carpinteria, California, the Via Real property,
13   did you ever use it for fundraising purposes?
14 A. Are you asking me about the Trans Atlantic real
15   estate that is registered on the same property?
16       Is that what you're asking me about?
17 Q. Well, you tell me, what happened with the Trans
18   Atlantic real estate, what is that?
19 A. Trans Atlantic was a crowdfund that was utilized
20   to raise capital to acquire -- one of the ways to
21   raise capital to acquire multiple assets, one of
22   which was the property in Carpinteria.
23       That property of course is now in
24   litigation or became in litigation so you
25   couldn't utilize it for that specific purpose.
```

```
1 Q. So tell me if you would how a conversation with
2   someone about Trans Atlantic would go or tell me
3   did you go out and solicit investors in Trans
4   Atlantic?
5 A. No, I didn't, I was not the owner of Trans
6   Atlantic Real Estate.
7 Q. Okay, so --
8 A. So what I did -- and I see it -- I don't know if
9   it's in the documents, but my ownership interest
10   allowed me to meet any and all offers against
11   that property.
12       And so -- and I believe Pacific First
13   properties, I don't know the -- Pacific First
14   Capital Group put an offer in that was accepted
15   by the other parties in the company, so I had the
16   ability to match or meet that offer.
17       So in having an ability to match or
18   meet the offer I created an LOI with GreenGro
19   Technologies, one, and also an agreement with
20   Trans Atlantic Real Estate.
21 Q. So the GreenGro and the Trans Atlantic were ways
22   that you were trying to raise money to buy out
23   the other partners?
24 A. Correct, one of the ways.
25 Q. And the collateral that people who were giving
```

```
1   money would have with some interest in Louis
2   Armstrong or the real estate or both?
3 A. It wouldn't be collateral, it's not collateral,
4   it's a member interest, it's an option.  So I had
5   an option to buy out my partners and through that
6   pledge I guess then I could leverage that option
7   to buy out the partners.
8 Q. And I think we're going to move on a bit,
9   Mr. Shumake, but do you have any interest,
10   management, ownership, any other interest in any
11   other cannabis business?
12 A. What do you mean?
13 Q. Well, you got this Louis Armstrong and Associates
14   which sounds like owns property and sells
15   cannabis.  Are there any other cannabis
16   businesses that you have any kind of interest in,
17   management, investing, own any other cannabis
18   businesses?
19 A. Several.  I just don't know -- I can't say --
20   mostly on a consultancy basis.  I'm in Michigan
21   now, I consult with groups on how to set up a
22   cannabis business.
23 Q. But are those groups based on Michigan or are
24   they based in other states?
25 A. Right now that's in Michigan.  I have consulted
```

```
1   with groups in Africa, Ghana, Tanzania, Jamaica.
2 Q. Are these -- sorry, go ahead.
3 A. St. Vincent -- just all over, across the world.
4 Q. How about in 2016 were you engaged in any of this
5   other cannabis business in addition to Louis
6   Armstrong and Associates?
7 A. I don't know.  You got to give me more specifics.
8 Q. Well, sounds like you're a consultant for
9   cannabis businesses.  Were you doing any
10   consulting work for cannabis businesses in 2016?
11 A. Possibly.
12 Q. You don't --
13 A. I don't have a specific answer to that question
14   because you got to --
15 Q. Okay, let me --
16 A. As an example, in the cannabis industry a
17   consultant could just, say call this guy as an
18   example; that's consulting.
19       And, you know, this is where you go to
20   go buy your materials; that's consulting.  It's
21   an open-ended industry so it's not like any other
22   business that you would frame and organize.
23       Not all the time are there contracts,
24   they're handshake deals.  It's a whole different
25   industry.  Reminds me of businesses over in
```

1  Africa where it's cash and it's handshakes and
2  that's how things are done.
3      And that's a plus and a minus.  The
4  minus is you're not going to remember all the
5  people you've interacted with and so when I say
6  possibly, you'd have to ask me a specific
7  question because it's such an open-ended
8  statement.
9  Q.  How about this, Mr. Shumake, and I'm not asking
10 you about any particular business, but have you
11 been engaged in some form in the cannabis
12 business, either consulting or with Louis
13 Armstrong, for more than five years?
14 A.  Yes, or five years or longer.
15 Q.  Five years or longer, got it.  Mr. Shumake, thank
16 you for that.  Let's talk a little bit about a
17 different topic.  Give me just a second.
18      Let's talk about the seized currency in
19 this case, it was seized in June, 2016.
20      When did you find out that -- I'm just
21 going to refer to it as "the currency", but just
22 for the record it's $252,140 that's a Defendant
23 in the civil forfeiture case.
24      When did you find out that that
25 currency was seized?

1  A.  When I got a telephone call.
2  Q.  Who called you?
3  A.  I want to believe it was Darren Coleman.  I don't
4  know if he called me or the officer called me, I
5  can't remember, but --
6  Q.  Was that around June 27, 2016, does that sound
7  right?
8  A.  I believe so.
9  Q.  And where were you when you got that call?
10 A.  I don't remember.
11 Q.  Do you remember what city you were in?
12 A.  I have no idea.  I was either in Georgia,
13 California -- I don't know, Detroit, I don't
14 remember where I was at.
15 Q.  What was the nature -- this is a discussion from
16 for Mr. Coleman or from a member of law
17 enforcement?
18 A.  I think we were on speaker phone.
19 Q.  So Mr. Coleman and a member of law enforcement
20 maybe?
21 A.  I believe so, yes.
22 Q.  And that's how you found out that this currency
23 was first seized.  Where had you been in, let's
24 say, a day or two prior to finding out that the
25 currency was seized?

1      Where had you been?
2  A.  I don't remember.  That part I don't know.  I
3  travel a lot, I do not recall.
4  Q.  Did you possess the currency prior to its
5  seizure?  Did you ever lay your hands on the
6  currency?
7  A.  Some of it, yes.
8  Q.  Can you explain what currency you had your hands
9  on and the circumstances of that?
10 A.  The circumstances I had organized a few
11 fundraisers in the Atlanta marketplace and I
12 believe you have that.
13 Q.  Tell me about those if you would, Mr. Shumake,
14 because part of the purpose of today is for us to
15 hear from you, you get to explain in a
16 conversation with us about that fundraiser and
17 you tell us -- you answer questions.
18      So can you tell us where did you have a
19 fundraiser in the Atlanta area, where was that?
20 A.  It was multiple fundraisers.  I think when the
21 officer called me he asked me about the two party
22 fundraiser in the hotel room.  That wasn't -- of
23 course no one is comfortable with talking to law
24 enforcement, but the totality of it there were
25 basketball games that were happening in --

1  pick-up games in Atlanta and some of the artists,
2  rappers and individuals who were contributing to
3  those projects.
4      I had met Young Thug and part of my
5  resources with the International Human Rights
6  Commission, my specific mandate was to do water
7  -- I had been doing this long before the
8  International Human Rights Commission -- water
9  treatment facilities, housing and so developing
10 housing in Africa to build homes in these third
11 world countries.  That was kind of my pitch and
12 been talking with people about doing that work
13 and so that's how I was able to raise the
14 capital.
15 Q.  So basketball games in the Atlanta area, were
16 these in June, 2016?
17 A.  I don't specifically remember the timeline that
18 they were happening in.  I think it was
19 throughout the entire -- as I understand it the
20 entire year of games.
21 Q.  Did you attend any of the games?
22 A.  No, I didn't -- well, I think I went to one of
23 the games.  No, I'll just say no.
24 Q.  You did not attend any of the games?
25 A.  No, I did not.

1 Q. Did Young Thug -- what's his given name?
2 A. I have no idea.
3 Q. Did Young Thug, did he tell you what he had told
4 the people who attended these basketball games
5 about the charity that he was supporting?
6 A. I don't remember, I don't remember. I met him in
7 his office and talked about and thanked him for
8 his contribution and what we're about and what
9 we're doing and what we're a part of.
10 He was happy to help out helping in the
11 Caribbean and also in the African marketplace in
12 Africa.
13 Q. Mr. Shumake, did you seek him out, seek out Young
14 Thug, or did he seek you out?
15 A. I sought out people to help me with this project.
16 He was one of the individuals that came to the
17 table.
18 Q. When did you first meet him, was it just before
19 the seizure or for a long time before?
20 A. Shortly -- sometime before I would think, I don't
21 remember.
22 Q. Would you have met him in --
23 A. In Atlanta, yes.
24 Q. -- just before?
25 A. A few months before I would think. I can't

1 remember, I don't know.
2 Q. Did he talk with you about setting up the
3 basketball games?
4 A. No, it was just something he was already a part
5 of and mostly he had an intermediary -- gosh,
6 what is that lady's name -- your agent talked to
7 her. I don't know her name, I can't remember her
8 name.
9 Q. Nicole Birch?
10 A. No, a young lady that -- Nicole Birch is my
11 attorney.
12 Was it Marie Ali?
13 A. Yes, I think that's Marie Ali, yes.
14 Q. What was Ms. Ali's role?
15 A. She was kind of the coordinator over the games
16 and working directly with Young Thug.
17 Q. Was it your understanding that all the money from
18 those games was given to the International Human
19 Rights Commission or was the donations split up
20 in some way?
21 What do you mean?
22 Q. I mean if Young Thug had basketball games, are
23 you saying you're not sure what he was telling
24 donors at those games?
25 A. I don't know anything about that part of it, what

1 he told the donors at the games. That part I'm
2 unaware of.
3 All I know when I met with him he was
4 happy to be a part of what we were doing. I took
5 a photo with him, I gave him an award from the
6 International Human Rights Commission, that's the
7 long and short of it.
8 Q. So you reached out to him at some point in 2015,
9 2016 and you said I've got water treatment
10 facilities I'm trying to fund, are you
11 interested?
12 A. Correct.
13 Q. And then he did basketball games and raised
14 money, but you're not sure --
15 A. I don't know how many games he had, I don't know
16 any of that. My primary indirect person was
17 Marie Ali and when I met him he was just happy to
18 be a part of what we were doing.
19 Q. Do you have any pictures of the wells or any kind
20 of documents or anything like that that you
21 provided to him?
22 A. Yes, I got pictures, videos, all on my Facebook
23 page.
24 Q. Did you provide those to him when you met with
25 him?

1 A. He seen them, yes.
2 Q. Were those produced in this case?
3 A. I want to say yes. I'm almost certain that he's
4 seen everything that we've done up to that point
5 and what we were trying to work on. On the
6 housing side we were not able to -- at the time
7 to complete that process because the monies were
8 seized.
9 And so we had acquired a contract for
10 technology to build homes on the content of
11 Africa on undervalued property. It's like you
12 build a house in less than 30 days and so it was
13 technology that we're raising this capital in
14 order to build the property and we never had the
15 opportunity to do that.
16 Q. So I would ask you to consult with your attorney
17 because if there's documents that has something
18 to do with what you told Mr. Thug, Young Thug, we
19 haven't seen those in this case, so I'd like to
20 see those.
21 How does Young --
22 MR. MICHAEL: I've made a note of that,
23 Mr. Bain-Creed and if there's some documents that
24 we can produce that will assist the government in
25 terms of what Mr. Shumake has testified to, we'll

1     provide them to you.
2  A.  The documents that I gave to Young Thug or I know
3     there's a donation letter that he received, a
4     donor's letter.  Is that what you're referring
5     to?
6  BY MR. BAIN-CREED:
7  Q.  Mr. Shumake, we have the donor's letter, but I'm
8     asking you what did you tell Young Thug before he
9     gave any money, what did you provide to him
10    before he gave any money and what materialized
11    out of those projects that you told him about and
12    it sounds like you're saying that the projects
13    did not materialize, is that correct?
14  A.  The water project materialized, that was ongoing,
15    but in order to do the housing project required a
16    lot more capital and so when those funds were
17    seized we were not able to complete the total
18    project.
19  Q.  Mr. Shumake, were you aware that Young Thug was
20    arrested in Georgia around the time of him
21    purportedly turning over the currency to you?
22  A.  I just recently found -- not just recently, but
23    several years back I found out that he was
24    charged with some kind of crime.  I don't know
25    the specifics of that.

1  Q.  Sounds like -- do you recall him being charged
2    with drug trafficking?
3  A.  I don't -- I thought it was smoking or something
4    else that he had.  I don't know all the specifics
5    of it.  When did that happen by the way?  I'm not
6    sure -- in fact, it was after that took place.
7  Q.  I'm not sure, Mr. Shumake.  I don't have the
8    exact date in front of me.  Did you meet anybody
9    else from -- that's YSL Group that Mr. Young Thug
10    is affiliated with, correct?
11  A.  Correct.
12  Q.  Did you meet any other people from YSL Group?
13  A.  I wouldn't remember their names and I met the
14    lady Maria.  I met him in a studio, music studio.
15  Q.  That's in Atlanta?
16  A.  Yes.
17  Q.  So Young Thug, was he the only person who gave
18    you -- I'm trying to -- back up here a little
19    bit, Mr. Shumake.
20       You obtained the currency where in
21    Atlanta?
22  A.  In Atlanta.
23  Q.  Where in Atlanta?
24  A.  Oh, in the hotel.
25  Q.  What hotel?

1  A.  Ritz Carlton at the time.
2  Q.  Who booked the room?
3  A.  I think I did.  I'm not sure, me or my secretary,
4    I don't recall.
5  Q.  What's your secretary's name?
6  A.  Who would have booked that room at the time?  Was
7    that 2016?
8  Q.  Yes.
9  A.  I don't recall, I'm not sure.
10  Q.  Would it be booked in your name?
11  A.  Maybe, I'm not sure.  Could have been in Mickey
12    Mouse, I'm not sure, like literally.
13  Q.  Can you just tell me a list of what
14    names you think it might have been booked under
15    so that we can figure that out?
16  A.  Darren Coleman had a room, I had a room.  I can't
17    remember it's been so long ago, I don't recall.
18    I know I stayed there, I do know that.
19       I'm sure if you pull up your video
20    footage, I was there, I spent the night in the
21    hotel.
22  Q.  So tell me about the individuals who gave you the
23    money.  They gave you the money in the hotel?
24  A.  Yes.
25  Q.  In your hotel room?

1  A.  Correct.
2  Q.  How many people was it?
3  A.  Two people, maybe a small group of people.
4  Q.  I'm sorry, two or three, is that what you said?
5  A.  Yes.
6  Q.  And how did that come about?  Did you invite them
7    up for drinks, did they say we're coming up with
8    money?
9       How did it come about that these people
10    visited your room?
11  A.  How did it come about?  I got -- before that from
12    the basketball games that they were having at the
13    time beforehand they had already collected the
14    money, so they brought me the capital to the
15    room.
16       That's what I mean by the fundraisers.
17  Q.  Did they invite you to come to Atlanta to collect
18    the money?
19  A.  I've been in Atlanta before that time period.  I
20    may have been there before then.  I don't
21    remember.  The question, the details of that time
22    period, I could have been in Atlanta two or three
23    days before then or after that.  That part I do
24    not recall.
25       I just know that I stayed at the Ritz

828-254-9230        ASHEVILLE REPORTING SERVICE       800-357-5007
ars@ashevillereporting.com

1   Carlton and I collected the money there and
2   picked the money there. He left from there I
3   think early in the morning. I could have left
4   that night or the next day or before, I don't
5   remember.
6   Q. What would be some reasons you would be in
7   Atlanta around that time period?
8   A. Projects I'm working on.
9   Q. What kind of projects?
10  A. Real estate.
11  Q. Was this the cannabis real estate?
12  A. No, Georgia wasn't legal, so it would have been
13  regular real estate consulting, could have been a
14  myriad of things.
15  Q. Did you do any projects with Nicole Birch there?
16  A. She was my attorney. I didn't know her. I don't
17  think I knew her at the time. 2016, no.
18  Q. Can you tell us who she is?
19  A. She's my lawyer.
20  Q. How did you first meet her?
21  A. I met her -- he was a securities lawyer. I met
22  her through another gentleman, I needed a
23  securities lawyer.
24  Q. Did she have any role -- just stepping back for a
25  second -- did she have any role in Louis

1   Armstrong and Associates?
2   A. As my lawyer and helping me -- she represented me
3   in going after the guys that had wronged me
4   related to the property.
5   Q. Did she play any role in setting up -- initially
6   setting up Louis Armstrong and Associates?
7   A. Not at all, no.
8   Q. Is she based in the Atlanta area?
9   A. She's in Atlanta.
10  Q. Going back to the hotel room -- we're skipping
11  around here -- you said two or three people came.
12  Was one of them Young Thug?
13  A. No.
14  Q. Who were the people?
15  A. I don't know those people. They're his
16  surrogates so to speak. I wouldn't know their
17  names or anything along those lines.
18  Q. Can you just walk me through to the best to your
19  recollection what happened? Are you sitting in
20  your hotel room and three guys knock on the door
21  and they got a bag of money or what happened?
22  A. Essentially I got a call that they were coming to
23  drop off the monies that they had raised. I
24  believe I talked to Darren around that -- I want
25  to say he met them. I don't remember.

1   Q. That's a lot of money, Mr. Shumake. I'm just
2   kind of trying to pick your brain here.
3   A. Not for real estate.
4   Q. Well, that's true?
5   A. That's relative.
6   Q. So you got a call about Young Thug. Was there
7   somebody else that gave money as well? Was there
8   any other people who gave money to you at that
9   time?
10          MR. MICHAEL: Object to the question.
11  You're assuming that he testified that Young Thug
12  had given him some of that money that's part of
13  this case. I don't think that he testified to
14  that.
15          MR. BAIN-CREED: I'll rephrase the
16  question.
17  BY MR. BAIN-CREED:
18  Q. Mr. Shumake, did you say that Young Thug reached
19  out to you about having money that he wanted to
20  give you in Atlanta?
21  A. No, I think I said I reached out to -- well, I
22  got through him to other people. He was doing
23  basketball games and that's how they raised the
24  capital, the funds raised.
25  Q. That was Marie Ali?

1   A. Yes.
2   Q. Who works with Young Thug?
3   A. Yes.
4   Q. You awarded a -- kind of a glass plaque to Young
5   Thug for his support, is that correct?
6   A. That is correct.
7   Q. But you do not remember exactly who showed up at
8   the room -- at your room with --
9   A. I don't know them. I wouldn't remember if I walk
10  past them in the hallway.
11  Q. Did you just open the door and they hand you
12  $250,000 or how did this transpire?
13  A. More or less.
14  Q. Did you ask where is this money from or --
15  A. I had already heard it was from games, basketball
16  games, but I don't think he have me $250,000, I
17  think it only gave $100,000; I'm not sure.
18  Q. Did you get money from any other people on that
19  trip to Atlanta?
20  A. I got money from John Goldstein.
21  Q. Who is Mr. Goldstein?
22  A. Goldstein is actually one of my partners in the
23  farm.
24  Q. In the Via Real cannabis industry farm?
25  A. Yes, uh-huh. I think he spoke to the agent as

1    well that they gave the money, his CPA gave a
2    letter related to the capital, so --
3    Q.   How did Mr. Goldstein tell you that he obtained
4    that money?
5    A.   Casino, he's in the casino business, bingo halls.
6    Q.   So did he represent to you that this was money
7    from bingo halls or from investors or --
8    A.   Bingo parlors, bingo.
9    Q.   Is he affiliated with a company called Stax?
10   A.   Yeah, Stax Entertainment.
11   Q.   What is Stax?
12   A.   Bingo.
13           MR. MICHAEL:  Gentlemen, I've gone off
14   video, but I can hear everything on audio, so I'm
15   still participating.
16           MR. BAIN-CREED:  Okay, thanks, David.
17   BY MR. BAIN-CREED:
18   Q.   Have you ever heard, Mr. Shumake, of Swanky
19   Consultants?
20   A.   Doesn't ring a bell.  I know I heard of Stax.
21   Q.   And Stax is the bingo hall company?
22   A.   I believe so.
23   Q.   Now, when you said some people showed up at your
24   hotel room earlier you said you can't remember
25   who they are, was Mr. Goldstein one of them that

1    showed up to your hotel room?
2    A.   No, not at all.
3    Q.   So how did you obtain money from Mr. Goldstein?
4    A.   Probably picked up at an earlier time period.
5    Q.   Where would you have picked that up?
6    A.   Detroit, could have been -- I don't remember.  He
7    had bingo parlors in Florida, he's got bingo in
8    Detroit, many places.
9    Q.   How long have you known Mr. Goldstein?
10   A.   Fifteen, 20 years, a long period of time.
11   Q.   Based on your recollection you believe
12   Mr. Goldstein gave his money in Atlanta and that
13   was part of the money that was seized?
14   A.   No, no, I don't think he gave me money in
15   Atlanta.  I think I picked it up from somewhere;
16   I don't remember.
17   Q.   What was the denominations of the money that
18   Mr. Goldstein gave you?
19   A.   I do not remember if they were $20s or $50s, I
20   would not remember that.
21   Q.   How much do you think you got from Mr. Goldstein?
22   A.   About -- over $100,000.
23   Q.   And what did he tell you he wanted you to -- did
24   he tell you --
25   A.   I believe the same projects.  He's got a donation

1    letter as well.  I believe your agent spoke to
2    him as well.
3    Q.   Right, but what did he tell you, Mr. Shumake?
4    What do you remember him telling you?
5    A.   I don't remember, I can't specifically remember
6    what he said.  We had a myriad of conversations.
7    I'm not going to be able to pull that one thing
8    out.
9    Q.   What kind of things did you usually discuss with
10   Mr. Goldstein?
11   A.   All kinds of stuff.
12   Q.   Give me some examples if you would in the
13   2015/2016 time frame?
14   A.   We talked about food, we talked about women, we
15   talked about politics, we talked about business,
16   we talked about a lot of different things.
17   Q.   Would you say he's both a friend and a business
18   associate?
19   A.   Mostly a business associate.  I can't rightfully
20   say -- we're in litigation right now for separate
21   different projects, so we've kind of -- it's kind
22   of going left if you will.
23   Q.   Mr. Shumake, jumping back to your hotel room, who
24   paid for your hotel room at the Ritz Carlton in
25   June, 2016?

1    A.   I want to say I did.  I don't recall.  It was
2    either in cash or a credit card or something.
3    Q.   Would that have been a business expense for you
4    or personal expense?
5    A.   It would have been a business expense I would
6    think.  I don't know specifically, I just know I
7    stayed there.
8    Q.   Well, did you ever travel for International Human
9    Rights Commission?
10   A.   All the time.  You can't extract personal and
11   business.  This is what you do all the time.  You
12   represent the title no matter where you're at.
13   Q.   So if you were on a trip and you collected money
14   for the International Human Rights Commission
15   would they reimburse you for your expenses?
16   A.   No one would reimburse me.  The International
17   Human Rights Commission was an appointment.  I
18   raised the capital, I did everything, I helped
19   build the organization.
20   Q.   So there's no reimbursement for really anything
21   -- there's no salary and there's no reimbursement
22   of travel expenses for your role with
23   International Human Rights Commission?
24   A.   Although then if I raise the capital I extract it
25   out of that, but what I was trying to do is -- I

1  would have never received that refund per se.
2  International Human Rights Commission,
3  it's an intergovernmental organization so it's a
4  little different than your average for profit or
5  not for profit.
6  It's an IGO just like the United
7  Nations, so it's got its own Vienna Convention,
8  it's got its own diplomatic resources and powers.
9  Q.  Mr. Shumake, I can't recall if I asked you this.
10  How was the money packaged when it was handed to
11  you in the hotel room?
12  A.  I don't even recall.  I never even looked at it.
13  I think it went right to Darren, I'm not sure.  I
14  didn't look at it.
15  Q.  So as soon as you got the money did you call
16  Darren into your room and did you go to his room
17  or what happened as soon as you got the money?
18  A.  I don't remember if he came to my room or I went
19  to his room.  That I do not know.
20  I don't recall, I don't recall, either
21  they came to my room or his room, I'm not sure
22  whose room it happened in.  I just know that
23  there was an exchange.  I don't remember the
24  guys, I don't know who they are.
25  Q.  So did you thereafter kind of combine the money

1  that Mr. Goldstein had given you and the other
2  money?
3  A.  Darren combined them, he may have combined the
4  two together.
5  Q.  Darren combined them?
6  A.  I think so.
7  Q.  Mr. Coleman?
8  A.  Mr. Coleman, excuse me.
9  Q.  And by the way, why was Mr. Coleman there at the
10  Ritz Carlton staying in a room next to you or in
11  the same hotel room?
12  Why was he there?
13  A.  Why was he there?
14  Q.  At the Ritz Carlton?
15  A.  We were trying to put all the capital together
16  and that's why he was there.  We were in the same
17  hotel.
18  Q.  Did he live in the Atlanta area?
19  A.  He did.
20  Q.  But he had a hotel room there for purposes of --
21  A.  He was going to be flying out the next day or
22  somewhere in that time period.
23  Q.  So --
24  A.  And I was supposed to meet him in California
25  after I got finished with my work.

1  Q.  So tell us about that.  You were supposed to go
2  to California the same day that Mr. Coleman was
3  flying to California?
4  A.  No, I don't know if it was the same day, I don't
5  recall, I don't remember.  I don't know if it was
6  the same day or if it were the next day or two
7  days.  That I don't know.
8  I just know that I eventually would
9  make it over to California.
10  Q.  So, Mr. Shumake, it sounds like you had already
11  been in possession of the money from
12  Mr. Goldstein and then you met Mr. Coleman at the
13  hotel, you were staying at the same hotel and you
14  combined -- you or he combined the money and he
15  was going to travel to California with it, is
16  that correct?
17  A.  Correct.
18  Q.  So if you had already been carrying the money
19  from Mr. Goldstein why didn't you just carry it
20  to California?
21  A.  Why didn't I carry it to California?  I was going
22  to -- I still had some additional work I was
23  doing.  I read something in your documents or the
24  document that I don't want to carry the capital.
25  I've traveled around the world with

1  money myself, but Darren was traveling within
2  that short time window.
3  Q.  Had Darren carried money for you -- I should say
4  Mr. Coleman -- had Mr. Coleman carried money for
5  you before?
6  A.  Yes, he's traveled overseas for me to help
7  deliver that money for those projects.  I think
8  he traveled to Ethiopia and Kenya, I'm not sure,
9  but if you've got the travel records you would
10  see that.
11  Q.  Roughly how many times would you say in the past
12  10 years, roughly how many times would you say
13  Mr. Coleman has carried money for you?
14  A.  I don't recall.
15  Q.  Would you say it's at least few times, at
16  least more than three?
17  A.  Don't recall.
18  Q.  With this particular trip what did you tell
19  Mr. Coleman to do with the money?
20  A.  He was supposed to meet one of the groups of my
21  team.  We had an office over in -- an office in
22  -- like these small Regis offices in California
23  -- I'm sorry, in San Francisco and in LA.
24  He was supposed to drop it off there to
25  whoever I appointed there and then I would meet

1  up and either send it to Africa or wait until
2  I've raised enough money to send it over.
3  Q.  When you say we had an office, do you mean
4  International Human Rights Commission?
5  A.  International Human Rights Commission.
6  Q.  So would the office be like a -- like you'd rent
7  an office in a building or --
8  A.  Yeah, office in a building.
9  Q.  Would there be --
10  A.  Be what, an office?
11  Q.  Would there be a person there, like a staff
12  member who was paid there all the time?
13  A.  Not all the time.  I was building this whole
14  system if you can kind of imagine.  I was
15  building to have an office with a full-time staff
16  member.
17      When the funds were seized, of course
18  all that kind of just died -- part of it -- a lot
19  of it died on the vine there including the
20  offices, so I no longer have those offices.
21  Q.  How did you fund those offices initially?
22  A.  Initially?  Out of my pocket.  Then I started
23  raising capital to try to keep things going.
24  When I got the funds seized I was no longer able
25  to do that.

1  Q.  Were you storing any currency at those offices?
2  A.  I had, yes.
3  Q.  How did you store it?
4  A.  In a safe.
5  Q.  So each office had a safe?
6  A.  Yes.
7  Q.  What if Mr. Coleman had stolen the currency, did
8  you have any recourse against him?
9  A.  No, nor did I ever have a belief that he would
10  steal the currency.  I've been knowing him for 30
11  years.
12  Q.  Where did you first meet Mr. Coleman?
13  A.  Federal Express, 1990.
14  Q.  Were you working with him there?
15  A.  I worked there.
16  Q.  Did he work there as well?
17  A.  No, he just dropped off some packages.
18  Q.  Did you have a social relationship with him or is
19  it just all business?
20  A.  Social primarily.  We've done business.  We've
21  been all over the world together.  He served when
22  I was the honorary ambassador to Botswana and
23  Tanzania he was the executive director over the
24  Botswana American Chamber of Commerce, so he's
25  traveled the world and has taken money for me,

1  with me.
2      He's been a part of many of the
3  projects, the school in Ethiopia, the water
4  projects in Africa, he's done all that.  He's
5  well aware of the work.
6  Q.  When you're communicating with Mr. Coleman about
7  transporting money for you, for example in this
8  case, would you normally talk to him on the phone
9  or would you text him or would you e-mail him or
10  all of the above?
11  A.  Probably could be anything, any of the above, all
12  of the above, texts, e-mails, calls, who knows, I
13  don't --
14  Q.  Is it pretty normal for you to text him?
15  A.  We text a lot, yeah.
16  Q.  Would you have been texting -- would you say
17  you've been texting with him for the past five
18  years?
19  A.  Yeah, I would say so.
20  Q.  Mr. Shumake, if you would look at Exhibit 1.
21      MR. BAIN-CREED:  And, David, just for
22  your purposes since you're on the phone, Exhibit
23  1 is the letter.
24      MR. MICHAEL:  Okay, I've got it.
25      DEPOSITION EXHIBIT 1

1  letter 6-24-16
2      WAS MARKED FOR IDENTIFICATION.
3  Q.  Mr. Shumake, can you just tell us about this
4  letter?  Does this look familiar to you?
5  A.  It does, yes.
6  Q.  What is it?
7  A.  It's a letter for him being a courier, diplomatic
8  courier, of the work that we were doing and the
9  cash that we were collecting.
10  Q.  And you signed this letter?
11  A.  I did.
12  Q.  Did you provide it to Mr. Coleman?
13  A.  I did.
14  Q.  And is this your letterhead that you were using
15  at the time?
16  A.  Yes, uh-huh.
17  Q.  And I think, Mr. Shumake, you said you might have
18  had some other business at the time.  What was
19  the -- if you recall, what was the direction to
20  Mr. Coleman as far as what he was going to do
21  with the money when he arrived in San Francisco?
22  A.  I'm not particularly sure on that trip.  He could
23  have taken it and given it to -- he could have
24  taken it and dropped it off at the office or
25  could have given it to someone, I'm not sure, or

1    he could have been going overseas.

2          I can't remember that specifically. I

3    just know what he's done in the past. He'd done

4    a whole myriad of things for me.

5    Q.  If he had made it to San Francisco with this

6    money and put it in a safe, would it have been

7    insured against loss?

8          Did you have any kind of insurance or

9    anything?

10   A.  No, nothing like that.

11   Q.  Have you told YSL, Young Thug or Mr. Goldstein

12   that the money was seized?

13   A.  Yes.

14   Q.  What was their reaction?

15   A.  It's terrible, saddened.

16   Q.  Have you told them about your plans for the

17   currency if you get it back?

18   A.  Plans for the currency if I got it back, what do

19   you mean?

20   Q.  If you would get it back in this case --

21   A.  Yeah, I'm going to go there and do the work. I'm

22   funding the work right now out of my pocket

23   presently right now.

24         I've built the water parks, I have

25   expanded the International Human Rights

1    Commission. It's now part of the United Nations

2    environmental program. I was able to capitalize

3    and do that.

4          I'm in the process of getting all of

5    this -- the housing equipment out of the port so

6    that I can do the work.

7    Q.  Have you discussed with them whether you could

8    use the money to pay taxes?

9    A.  Have I discussed with them that?

10   Q.  Yes.

11   A.  No, I wouldn't ever need to discuss with them

12   that area.

13   Q.  Would you use the money to pay taxes if you

14   could?

15   A.  Would I use it? Yeah, what they've donated to me

16   I've spent additional funds to do the work. I've

17   raised additional funds, so it's a loss so I will

18   be recouping back what I've already invested to

19   do the work.

20   Q.  So you would be recouping and using it to pay

21   your personal taxes, is that --

22   A.  What I personally paid to do the work I just

23   shared with you.

24   Q.  How did you obtain the money to personally pay to

25   do the work?

1   A.  It could have been through other donations, it

2      could have been through consulting fees. I do

3      the consulting work domestically and

4      international.

5   Q.  All right, Mr. Shumake, have you ever used anyone

6      other than -- or asked anyone I should say other

7      than Mr. Coleman to transport money at your

8      direction?

9   A.  Yes.

10   Q.  Who else have you asked?

11   A.  Have I asked or have worked with? Maybe I'm not

12      understanding.

13   Q.  Who else have you worked with to transport money?

14   A.  Attorney Douglas Hampton and attorney Daniel

15      Flint.

16   Q.  Tell us how many times Mr. Hampton has moved

17      currency for you?

18   A.  I don't recall.

19   Q.  How much money would you say that he's moved for

20      you?

21   A.  I don't recall.

22   Q.  What have you asked him to do with currency?

23   A.  Same thing, take it to the office, put it in the

24      safe, pick up the money, those types of things.

25   Q.  How have you paid him?

1   A.  I pay him a flat fee.

2   Q.  Who sets the fee?

3   A.  I have.

4   Q.  How much would you usually pay him?

5   A.  A few percentage points, a few thousand dollars.

6   Q.  Is that the same way that you pay Mr. Coleman,

7      just a flat fee?

8   A.  Correct.

9   Q.  What about Mr. Flint, how many times has he moved

10   currency for you?

11   A.  I don't recall.

12   Q.  How much has he moved?

13   A.  I have no idea.

14   Q.  You pay him a flat fee too?

15   A.  Yes.

16   Q.  Does Mr. Hampton also -- did he represent you in

17   a case?

18   A.  He did.

19   Q.  What case was that?

20   A.  A case in Michigan.

21   Q.  What's the nature of that case?

22   A.  I got a misdemeanor for violating the Consumer's

23   Services Act -- I think that's what it's called.

24   Q.  What was the nature of the charges there? Like

25   what were you accused of?

1  A.  Accepting the funds before providing the service.
2  Q.  Can you give us some background what led to that
3      case, what facts?
4  A.  I was an investor in a company.  I was not
5      handling the company.  In a time period where the
6      real estate market crashed people were -- a lot
7      of the mortgage companies overcharged people, so
8      we did forensic audits, you go in and audit a
9      mortgage file and find out discrepancies in the
10     RESPA laws and TILA laws, these mortgage laws and
11     then you would notify and/or sue the bank in
12     order to save your property.
13          And so not knowing that particular law
14     and I had lawyers that worked for me and they ran
15     the business.  My role was mostly as an investor.
16     And so being high profile entity in Michigan they
17     came at me hard for that and -- but that's what
18     it was, it was a 90-day misdemeanor, accepting
19     monies prior to providing the services.
20          Did not say the services were not
21     provided and they were provided.  I shut the
22     company down, I continued to provide the
23     services.  When I realized that this business
24     model, the goal posts kept moving based upon
25     where we were at in the country that was -- the

1  markets were crashing all around us.
2       And Douglas Hampton was my lawyer.
3  Q.  Mr. Shumake, the other IHRP, the other
4      International Human Rights Commission -- are
5      there other ambassadors?
6  A.  Are there other International Human Rights
7      Commission ambassadors?
8  Q.  Right.
9  A.  There's many.
10 Q.  Do they use couriers?
11 A.  I don't know.  Some of them have.  It's based
12     upon Vienna Convention laws.  It's pretty direct
13     cut and dry.  You're able to use couriers.
14          The IHRC other office I think I saw it
15     in some exhibit, that was a clandestine
16     organization.  I sued them and won.  I got their
17     sites taken down, so they were -- what you're
18     reviewing is not accurate.  They could not have
19     had any deference or any explanation of my role
20     or anything because they were a fraudulent
21     organization.
22 Q.  Mr. Shumake, is the International Human Rights
23     Commission, the one that you're affiliated with,
24     is it still called International Human Rights
25     Commission?

1  A.  It is, yes.
2  Q.  Is it called Ebony Foundation?
3  A.  No, those are two different things.  The
4      International Human Rights Commission is
5      registered and trademark in Islamabad, Pakistan.
6  Q.  Why Pakistan?
7  A.  That's where it was chartered.  I have no idea.
8      That's where it was chartered well before I
9      became a member.
10 Q.  When did you first find out about this entity
11     chartered in Pakistan?
12 A.  2012, I'm not sure.
13 Q.  When did you start being involved with the entity
14     doing fundraising?
15 A.  2015 -- I'm not sure, I don't recall.
16 Q.  How many folks would you say are involved in this
17     organization?
18 A.  Hundreds.
19 Q.  Where are they based?
20 A.  All over the world.
21 Q.  What's your role in the organization?
22 A.  Right now I'm the acting chairman, world chairman
23     of the organization presently.
24 Q.  So how many people would you say kind of work
25     under you in this organization?

1  A.  Hundreds.  It's kind of -- it's on -- I'm trying
2      to use the right word -- it's not being operated
3      presently right now.
4       I took the organization over a year and
5      a half ago as the world chairman.  I'm trying to
6      rebuild it.  I'm going to raise capital and
7      rebuild the organization and do work around the
8      world.
9       The first thing is to getting this
10     housing part established.  We got offices in
11     Pakistan, offices in South Africa, in Kenya.
12     There's people all over the world.
13 Q.  How did you come to be the world chairman, how
14     did that come about?
15 A.  The past world chairman, his time expired and he
16     transferred the organization over to me.
17 Q.  Has the organization, International Human Rights
18     Commission, ever disclaimed affiliation with you?
19 A.  The clandestine organization, yes, they have.
20 Q.  So what is your understanding as to why there was
21     a clandestine organization?  Why would someone
22     set up a clandestine organization for one that
23     you're involved in?
24 A.  When the acting world chairman or the past world
25     chairman, he had organized a national conference

1  and to bring other presidents and dignitaries to
2  that conference he wrote some checks based on
3  monies that he was supposed to raise and those
4  checks bounced.
5      In Pakistan, other parts of the
6  country, it's -- you have Debtor's Prison, so if
7  you owe money they put you in jail.  And so he
8  owed money based upon checks that were written on
9  those organizations and he was put in jail for a
10  couple of years.
11      After he was put in jail the No. 2 guy
12  at the time just took over, and there was no
13  appointment, he just took over the organization.
14  I was able to help to get the acting -- the world
15  chairman out of prison by helping to pay some of
16  those debts.
17      And then I became the world chairman
18  and that's where I sit right now.  I hired a
19  lawyer in Pakistan to go after the clandestine
20  organization.  After hiring that lawyer he sued
21  the members of the clandestine organization and I
22  got an injunction against them in the Court.
23  Q.  How does the entity -- how do the other
24  ambassadors or other people involved in this
25  entity throughout the world, how do they collect

1  money and how do they store money?
2      Do they only deal in cash like you or
3  --
4  A.  It's across the board, checks, cash, but in the
5  United States we're so used to wires and checks
6  on a world perspective, you know, people aren't
7  going to take wires from you, they're not taking
8  checks from you from a U.S. entity.
9      So cash is the way that people interact
10  and operate on a global basis, which is quite
11  foreign to how we operate in the United States.
12      But in other parts of the world if I
13  want to do a water well, I'm not going to be able
14  to do that through a wire.  The guy that is doing
15  the well doesn't even have a bank account.  He
16  gets paid in cash to go and drill that well.
17      The same thing on the housing side.
18  It's a total foreign psychology as to how people
19  operate over there.  So the other ambassadors on
20  a worldwide perspective usually operate in cash,
21  especially in some of the third world countries.
22      It may be different in Europe in some
23  of those areas where they operate differently,
24  but if you're talking about the continent of
25  Africa, cash is it.

1  Q.  Mr. Shumake, why would you move a bunch of cash
2  from Atlanta to San Francisco and then back over
3  to Africa?
4      Were you planning to immediately take
5  it over to Africa?
6  A.  Some days it was immediate, sometimes I wanted to
7  raise so much money and I would take it over.  I
8  usually flew on Ethiopian Airlines.
9      Ethiopian Airlines had a -- they got a
10  faster flight -- well, they have two flights.
11  They've got one that comes out of California and
12  one that comes out of DC.  I've been to DC as
13  well to do the same thing.
14  Q.  Let's talk a little bit about just a few other
15  topics, Mr. Shumake.  Have you ever heard of
16  Inheritance Investments?
17  A.  Inheritance Investments, yes.
18  Q.  Is that an entity that you're familiar with?
19  A.  Yes, I am.
20  Q.  What is that?
21  A.  Inheritance Investments was a company I owned
22  many years ago.
23  Q.  What did that company do?
24  A.  Buy real estate.
25  Q.  Is it still in existence or --

1  A.  No.
2  Q.  Some other topics here, Mr. Shumake.  How about
3  Fifth Third Bank, ever do business with Fifth
4  Third Bank?
5  A.  I did.
6  Q.  What kind of business did you do with them?
7  A.  They were a lender.
8  Q.  Do you know someone named Robert Hantz (sp)?
9  A.  Vaguely, that name rings a bell.
10  Q.  How did you know Mr. Hantz?
11  A.  He was a broker at Fifth Third Bank.
12  Q.  Were you ever sued by Fifth Third Bank?
13  A.  Of course, yes, I was.  You have that
14  information.
15  Q.  What were you sued for?
16  A.  They sued me for -- I don't remember what they
17  sued me for.  I just know we settled.  I don't
18  know what the lawsuit specifically entailed.
19      Mr. Hantz was a broker there and he did
20  some unsavory deals with the bank and he got
21  deals financed.  Some of the properties that I
22  had financed he financed them for me and he went
23  to prison for it and Fifth Third sued many people
24  that had borrowed money from their banks.
25  Q.  And you settled that one?

1  A.  I did and then of course when the real estate
2      markets crashed I wasn't able to pay that
3      settlement, but yes, that's what that is about.
4  Q.  Is that one of the cases that led to you -- I
5      think you mentioned you had filed bankruptcy at
6      some point?
7  A.  I did.  I didn't mention that, but I did.  That
8      led me to file bankruptcy.
9  Q.  Yeah, is this one of the cases that led you into
10     bankruptcy?
11 A.  No, not at all.
12 Q.  What was the nature of that bankruptcy by the
13     way, was it to get some debts erased or what led
14     you to file bankruptcy?
15 A.  Had $100 million worth of debt.  I had a lot
16     going on at the time.  The markets had crashed, I
17     lost millions of dollars and I was heavily
18     involved in real estate.
19 Q.  Roughly when did you file bankruptcy, do you
20     remember?
21 A.  Either 2012, '13 or '14, I don't remember.
22 Q.  Mr. Shumake, let me ask you a few more questions
23     here.  Skipping around a bit, in the State of
24     Michigan v Shumake case, the one that Mr. Hampton
25     represented you in, you said that there was some

1  credit service violations and you pled guilty?
2  A.  I did.
3  Q.  Were you placed on probation or supervised
4      release in that case?
5  A.  Yes.
6  Q.  What were the -- did you ever violate probation
7      or supervised release, the terms?
8  A.  What do you mean?
9  Q.  Well, usually when you're on probation or
10     supervised release you have some kind of terms
11     like you can't handle people's money or you can't
12     travel.
13 A.  I did all that.  Yeah, I traveled while I on
14     probation, I did do that.
15 Q.  Did anyone ever accuse you of violating probation
16     I think is what I'm getting at?
17 A.  No.  I think what you're talking about, I think
18     it was on bond and I -- it was political.  I went
19     to jail for a week for bond violation.
20 Q.  I do think you're correct and thanks for
21     reminding me.  What was the bond violation?
22 A.  I didn't test -- I had a machine that I was
23     supposed to blow in twice a week or twice or day
24     and the machine was faulty and I blew in it late
25     and broke -- and that judge threw me in jail for

1  a week.  It was foolishness.
2  Q.  And going back to the basis for that prosecution,
3      was Mr. Coleman involved, Mr. Darren Coleman,
4      involved in any of the activity that led to that
5      prosecution of you and the police for that
6      misdemeanor --
7  A.  Nothing at all.
8  Q.  He wasn't involved in that at all?
9  A.  At all.
10 Q.  I'd like to talk to you a little bit about your
11     involvement in cases, U.S. v Jeffrey Beasley.  Can
12     you tell us what this case was about?
13         This is a Michigan federal criminal
14     case.
15 A.  Yeah, it was under the Kwame Kilpatrick -- I
16     don't know if you know anything about that, the
17     mayor of Detroit.  That was the largest criminal
18     investigation in Michigan where they interviewed
19     over 400 people and it just built from his
20     involvement with pension funds and just all kinds
21     of activities.
22 Q.  So what role did you play in that prosecution,
23     Mr. Shumake?  In other words, how were you
24     involved in that case?
25 A.  I was a witness.

1  Q.  Did you testify?
2  A.  I did.
3  Q.  What did you testify about?
4  A.  I don't recall specifically.
5  Q.  Was it having to do with the ICG lease-back deal?
6  A.  Correct.
7  Q.  Was it your testimony --
8  A.  That was my -- as I said, I own GM real estate.
9      We're in General Motors World Headquarters right
10     now and I own 2 million square feet of General
11     Motors real estate across the country.
12         Actually property there in North
13     Carolina is one of them.
14 Q.  And were you involved in deals with the Firemen
15     and Employees Pension Fund and the general
16     pension fund --
17 A.  Yes.
18 Q.  -- people trying to make investments with you?
19 A.  Correct.
20 Q.  And you testified about essentially paying
21     kickbacks or paying for entertainment for some of
22     the pension board trustees?
23 A.  I testified that I wined and dined trustees.  I
24     testified that I had been extorted to pay so much
25     money.  There was no kickbacks.

1  Q.  Do you know why you were offered an immunity
2      agreement for that testimony?
3  A.  They offered everybody immunity agreements to
4      tell the truth.  It was a far-reaching case
5      against the pension funds, and trustees and the
6      mayor as to what took place.
7          You couldn't get a deal unless you were
8      extorted or you would lose your business.
9  Q.  So were the terms of that agreement essentially
10     that if you testified truthfully you would not be
11     prosecuted?
12 A.  Correct.
13 Q.  What about Detroit police and fire retirement
14     versus ICG, that's a Michigan state civil case?
15 A.  Yes.
16 Q.  Is that on the same subject matter?
17 A.  Same subject matter, yes, correct.
18 Q.  In that case you were involved in a company and
19     you were at some point removed from your role, is
20     that correct?
21 A.  Yeah, I wouldn't pay bribes and the general
22     counsel for that company -- or for the pension
23     board wound up getting indicted and charged and
24     committed suicide, Ronald Zajac.  And so when I
25     stopped doing -- being in the payola they sued me

1      and manipulated the actions.
2          The general counsel, the of counsel,
3      was disbarred -- I forget the guy's name.  It was
4      a big fiasco and the guy got indicted and charged
5      and committed suicide.
6  Q.  Were you accused of somehow mishandling money $29
7      million of the police and fire retirement fund?
8  A.  I don't recall.  They probably made up a whole
9      bunch of stuff but I never got charged with
10     anything.  I never got -- nothing happened.
11         I didn't get sued for it, there was no
12     repayment, it was all made up, it was a farce.
13     That still generates money to this day with those
14     properties, they never lost a dime.
15 Q.  ICG does, is that what you're saying?
16 A.  It does.
17 Q.  Tell me about what you know about United States
18     versus $148,145, that's a California federal
19     forfeiture case.  Tell me about the facts that
20     led to -- are you familiar with that case first
21     of all?
22 A.  I believe that's Dan Flint, that forfeiture case,
23     same thing, similar to this one.  I don't know
24     all the details on it though.
25 Q.  But you had directed Mr. Flint to carry money in

1      that case?
2  A.  I did.
3  Q.  And the temporary restraining order case that you
4      mentioned in regard to International Human Rights
5      Commission, is that in a Pakistan court?
6  A.  Yes, Pakistan.
7  Q.  Do you recall a roadside stop, being pulled over
8      in Michigan in November, 2016?
9  A.  Do I recall a roadside stop?
10 Q.  Yeah, do you recall that?
11 A.  For me or somebody else?
12         MR. MICHAEL:  I'm sorry, who was pulled
13     over?
14         MR. BAIN-CREED:  Mr. Shumake and some
15     other folks.
16         MR. MICHAEL:  Okay.
17 BY MR. BAIN-CREED:
18 Q.  Do you recall that?  It would have been --
19     Mr. Shumake, it would have been in the Portage,
20     Michigan area?
21 A.  Oh, yeah, yeah, that led to me finding out about
22     the whole Michigan case, yes.  I had a warrant
23     out for my --
24 Q.  You found out about what?
25 A.  The Michigan case you just talked about.

1  Q.  Oh, the State of Michigan v Shumake?
2  A.  Yes.
3  Q.  Tell us about the circumstances of that roadside
4      stop, what happened?
5  A.  I pulled over to go use the restroom.  I got -- a
6      cop asked for my driver's license.  I give him my
7      driver's license and I had a warrant for my
8      arrest that I was unaware of.
9  Q.  Who were you with during the time of that stop?
10 A.  Oh, I don't remember.
11 Q.  The name Blevins (sp) ring a bell?
12 A.  Yeah, it does ring a bell.
13 Q.  Who is Mr. Blevins?
14 A.  He was -- project -- we done projects before
15     together, deals.
16 Q.  Real estate deals?
17 A.  Real estate deals.
18 Q.  The name Scif ring a bell?
19 A.  No, what is that?
20 Q.  Does the name Sutter ring a bell?
21 A.  Sutter, no.
22 Q.  So Mr. Blevins was with you during this stop?
23 A.  Yes.
24 Q.  Was there any currency or anything seized by the
25     police during this stop?

1   A.  I don't recall.  Whatever it was, it was
2       something insignif -- I would remember.  I don't
3       remember.
4   Q.  Were there any drugs in the car when you were
5       stopped?
6   A.  Drugs?
7   Q.  Yeah, narcotics?
8   A.  I don't deal in drugs, I've never seen a drug in
9       my life.
10  Q.  You were with Mr. Blevins, so --
11  A.  Okay, I got it and that means what?
12  Q.  Well, I'm just wondering if he had any drugs?
13  A.  Not that I'm aware of.  I've never seen a drug.
14  Q.  Well, you've seen cannabis presumably?
15  A.  That's not a drug.
16  Q.  Mr. Shumake, do you use a bank account?
17  A.  Do I use a bank account?
18  Q.  Yeah.
19  A.  I do.
20  Q.  Do you have a bank account at Community Choice
21      Credit Union?
22  A.  I do not.
23  Q.  Let me ask you a question, let me show you
24      something.
25          Can you look at Exhibit 30.

1           DEPOSITION EXHIBIT 30
2           petition dated 7-7-17
3           WAS MARKED FOR IDENTIFICATION.
4   Q.  Mr. Shumake, if you go towards the end of this
5       Exhibit 30 there's something -- and Exhibit 30
6       is, just for the record, that is a petition for
7       remission or mitigation of forfeiture that was
8       filed by the Abady Law Firm by Robert Shumake on
9       behalf of the International Human Rights
10      Commission.
11          It was filed on July 7, 2017 and it
12      references $170,130 seized in Atlanta.  This is
13      basically a petition in regard to some money that
14      was seized in Atlanta in another case that I know
15      Mr. Michael is familiar with.
16          Mr. Shumake, are you familiar with the
17      seizure in that case?
18  A.  Yes, vaguely.
19  Q.  So do you see there is a Community Choice bank
20      account statement attached to that petition?
21  A.  Yes, I do.
22          MR. MICHAEL:  Is that an exhibit?
23          MR. BAIN-CREED:  Yeah, it's Exhibit H,
24      David.
25  A.  So I no longer have an account there.

1           MR. MICHAEL:  H as in  --
2           MR. BAIN-CREED:  H as in hamburger.
3           MR. MICHAEL:  Okay, I found it.
4   BY MR. BAIN-CREED:
5   Q.  So you no longer have an account there,
6       Mr. Shumake?
7   A.  No.
8   Q.  I'm just wondering how did this Community Choice
9       bank account statement come to be attached to
10      this petition?  What does this bank account have
11      to do with that seizure in Atlanta?
12  A.  Oh, I took out some of the money.  Some of it was
13      my capital.
14  Q.  So some of the money that was seized came out of
15      this bank account?
16  A.  Yes.
17  Q.  Was that related to the International Human
18      Rights Commission?
19  A.  My money to do the projects I was working on.
20  Q.  So you were going to send your money from this
21      bank account from Atlanta to San Francisco and
22      then to projects?
23  A.  Correct.
24  Q.  Did you consider just putting the money in
25      Atlanta that was seized in this case into your

1       bank account and then taking it out when you
2       needed it for the project?
3   A.  I was sending money over to Africa and that was
4       the objective.  I did take it out in cash and the
5       Community Choice Credit Union is a Michigan
6       credit union, it doesn't apply to California.
7   Q.  So you didn't think you could take it out in
8       California or take it out at a big bank in Africa
9       somehow or anything like that?
10  A.  Have you ever been to Africa?
11  Q.  Well, I've also never carried $250,000 in an
12      airport?
13  A.  I got it, I'm just sharing with you that it
14      doesn't work that way.  And I understand where
15      you're going and I appreciate you guys doing your
16      due diligence, but cash is king over there.
17          That's how the process -- they're now
18      getting more comfortable with bank wires today,
19      but four years ago they weren't.
20          Ten years ago your money would get lost
21      in the abyss.  Twenty years ago you couldn't even
22      wire it.
23  Q.  Have you ever sent money by MoneyGram to Africa,
24      Mr. Shumake?
25  A.  I have.

1 Q. How much would you say you sent by MoneyGram?
2 A. I have no idea, a lot of money, but I can't send
3 money to MoneyGram any longer for that same
4 reason.
5 Q. As a suspicious transaction or what do you mean?
6 A. It's a suspicious transaction. If I go to send
7 money to employees or consultants there I no
8 longer can send money via MoneyGram.
9 MoneyGram automatically sees the
10 continent of Africa as suspicious dark people and
11 you can't send money there.
12 Q. How about Western Union?
13 A. All of the above, Western Union, MoneyGram, I
14 can't send any money anywhere in the continent.
15 Q. Are there any banks in the larger cities in
16 Africa in the countries where you visit?
17 A. Yeah, banks are there, absolutely.
18 Q. Is there a means to transport money via one bank
19 in the U.S. to a bank over in Africa?
20 A. What do you mean by that?
21 Q. Can you wire money to a bank account in Africa
22 and then take it out when you get there?
23 A. That's starting now to become more of a -- it's
24 happening now, but back then it was very frowned
25 upon because your money can get stuck. I've

1 experienced that before.
2 Q. What do you mean "stuck"?
3 A. It will take you a month to get it out of the
4 bank.
5 Q. And jumping around a little bit, Mr. Shumake, we
6 discussed earlier a conversation with law
7 enforcement at the Charlotte Airport when the
8 money in this case was seized, the $252,000 and
9 it sounded like you could not really recall the
10 nature of those conversations or the details of
11 them, is that correct?
12 A. Correct, but if you show me the document I could
13 review it.
14 Q. I don't have like, for example, a transcript of
15 the call or anything like that, but you're saying
16 it's been long enough that you have trouble
17 recalling what you discussed?
18 A. Correct or what actually took place.
19 Q. You did speak with Mr. Coleman on the phone
20 during the seizure, correct?
21 A. I did.
22 Q. Have you had -- other than the conversations at
23 the airport have you had any other conversations
24 with law enforcement about the seizure in this
25 case in the Western District of North Carolina

1 case?
2 A. Yes.
3 Q. When were those and with whom?
4 A. I want to say when I was in trial in Shasta
5 County I was asked about it.
6 Q. You were asked about it while you were
7 testifying?
8 A. Yes. Hold on -- I think -- no, it wasn't. I'm
9 fuzzy. I don't remember, I don't remember.
10 Q. Okay, just a wrap-up question, Mr. Shumake and
11 just for the record we've discussed we're going
12 to do our IHRC deposition next and maybe just
13 have a brief break between this deposition and
14 the next one and if the witness needs a break
15 he's going to let us know.
16 Mr. Shumake, just final question. Has
17 any money that purportedly belongs to IHRC that
18 you raised, has it ever been seized before other
19 than in this Western District of North Carolina
20 case, the Central District of California case
21 with Mr. Flint or the Atlanta seizure case that
22 we discussed a while back?
23 Other than those three seizures, the
24 other Atlanta seizure that we already discussed,
25 the seizure in this case and the California

1 seizure, has there been any other circumstances
2 where money that you raised for IHRC has been
3 seized?
4 A. No.
5 Q. Any other circumstances where your money has been
6 seized or some money that you were in some way
7 involved with has been seized?
8 A. Shasta County when the cops stole my money.
9 Q. I'm sorry?
10 A. When the police officers stole my money in Shasta
11 County, California.
12 Q. How much money was that?
13 A. $200,000.
14 Q. And what was the circumstances of that seizure?
15 A. They pulled me over for a routine -- I don't
16 know, some stop, and gave me a receipt for
17 $120,000 and then I sued to get my money back and
18 they indicted me, so I went to trial and won and
19 got those doctors back.
20 MR. MICHAEL: And just to make the
21 record clear, it probably wasn't an indictment, I
22 think it was probably just a criminal complaint.
23 THE WITNESS: I was acquitted.
24 MR. MICHAEL: Were you charged by
25 criminal complaint or were you charged by

1  indictment?
2          THE WITNESS:  I don't know the answer
3  to that question.
4          MR. BAIN-CREED:  I have the records
5  somewhere and I don't know that -- yeah, I have
6  the records somewhere.  So I'm happy to just
7  stipulate that the records will speak for
8  themselves.
9          MR. MICHAEL:  Okay, let's just
10  stipulate that he was charged, whether by
11  indictment or criminal complaint, the record will
12  show that.
13  BY MR. BAIN-CREED:
14  Q.   Any other seizures, Mr. Shumake?
15  A.   No.
16          MR. BAIN-CREED:  I think that's all I
17  have for you as far as the personal deposition.
18  David, anything you wanted to add by the way?
19          MR. MICHAEL:  No, I'm fine.
20      (The deposition was concluded at 1:51 p.m.,
21  signature of the witness was not requested by
22  counsel for the respective parties hereto)
23
24
25

1                   CERTIFICATE OF NOTARY
2
3  STATE OF MICHIGAN   )
4                      ) SS
5  COUNTY OF  WAYNE    )
6     I, DALE E. ROSE, Certified Shorthand
7  Reporter, a Notary Public in and for the above
8  county and state, do hereby certify that the
9  above deposition was taken before me at the time
10  and place hereinbefore set forth; that the
11  witness was by me first duly sworn to testify to
12  the truth, and nothing but the truth, that the
13  foregoing questions asked and answers made by the
14  witness were duly recorded by me stenographically
15  and reduced to computer transcription; that this
16  is a true, full and correct transcript of my
17  stenographic notes so taken; and that I am not
18  related to, nor of counsel to either party nor
19  interested in the event of this cause.
20
21      _____
22      DALE E. ROSE  CSR-0087
23      Notary Public,
24      Wayne County, Michigan
25  My Commission expires:  7-15-24

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                      ars@ashevillereporting.com

**A**

a.m 1:19 4:2
Abady 99:8
ability 7:1
  47:16,17
able 6:22
  7:4 8:15
  34:8 37:21
  43:17,18
  53:13 57:6
  58:17 68:7
  74:24 79:2
  83:13
  86:14
  87:13 90:2
absolutely
  38:13
  102:17
abyss 101:21
accepted
  47:14
accepting
  82:1,18
account 38:2
  87:15
  98:16,17
  98:20
  99:20,25
  100:5,9,10
  100:15,21
  101:1
  102:21
accounting
  21:16,17
accurate
  13:21 16:8
  33:24
  83:18
accuse 91:15
accused
  81:25 95:6
acquire 19:6
  20:2 25:11
  46:20,21
acquired
  25:9 57:9
acquitted
  105:23
Act 81:23

acting 84:22
  85:24
  86:14
Action 1:7
actions 95:1
activist
  25:4
activities
  92:21
activity
  92:4
actual 16:25
  26:6,7,12
  26:13 28:9
add 106:18
addition
  24:6 49:5
additional
  72:22
  79:16,17
address 12:5
  13:12,18
  13:22,23
  14:2,5,6
  27:19
advertise
  18:23
advertis...
  18:24
affiliated
  59:10 66:9
  83:23
affiliation
  85:18
Africa 20:5
  49:1 50:1
  53:10
  54:12
  57:11 74:1
  76:4 85:11
  87:25 88:3
  88:5 101:3
  101:8,10
  101:23
  102:10,16
  102:19,21
African
  54:11
agent 55:6
  65:25 68:1

ago 8:16
  16:24,25
  19:6,11
  33:11 45:2
  60:17 85:5
  88:22
  101:19,20
  101:21
agreement
  33:24 34:4
  47:19 94:2
  94:9
agreements
  94:3
ahead 21:12
  49:2
Airlines
  88:8,9
airport 1:13
  4:22
  101:12
  103:7,23
alcohol 6:25
Ali 55:12,13
  56:17
  64:25
Ali's 55:14
allow 46:7
allowed
  37:22
  47:10
ambassador
  75:22
ambassadors
  83:5,7
  86:24
  87:19
America 1:5
  2:13
American
  75:24
amount 21:22
  35:21 38:9
  38:11
and/or 82:11
answer 6:6,8
  6:17 7:2,4
  9:18,21
  35:13
  49:13

52:17
  106:2
answered
  35:18
answering
  9:16
answers 37:8
  107:13
anybody
  27:17 33:1
  59:8
anyway 31:20
apartment
  12:9
APPEARANCES
  2:1
appeared 4:4
  4:5
Appearing
  2:12,21
apply 101:6
appointed
  73:25
appointment
  69:17
  86:13
appraised
  32:8,12
appreciate
  101:15
approach
  28:25
APPROXIM...
  1:9
area 13:3
  45:13
  52:19
  53:15 63:8
  71:18
  79:12
  96:20
areas 87:23
armored
  38:23
Armstrong
  25:1,3,8,9
  25:19,23
  25:24
  27:13
  29:17

30:22
  31:23 34:5
  34:23,24
  35:8,14
  36:15,18
  36:25 37:9
  37:17
  38:14 48:2
  48:13 49:6
  50:13 63:1
  63:6
arrest 97:8
arrested
  58:20
arrived
  77:21
artists 53:1
aside 45:25
asked 13:17
  52:21 70:9
  80:6,10,11
  80:22 97:6
  104:5,6
  107:13
asking 9:2
  23:2 33:16
  43:20
  46:14,16
  50:9 58:8
asset 24:4,4
  24:6 25:9
  25:11,13
  26:7 28:23
  30:12 31:9
  32:13
  44:25 45:4
assets 45:10
  46:21
assist 57:24
Assistant
  2:7 4:12
associate
  68:18,19
associated
  28:16
Associates
  25:1,8,10
  25:19,23
  25:24
  27:14

| | | | | |
|---|---|---|---|---|
| 29:18 | 2:6,7 43:3 | 4:10,12 | 7:23,25 | 104:17 |
| 30:23 | **audio** 66:14 | 5:6 8:25 | 16:2,3 | **Ben** 4:11 |
| 31:24 | **audit** 82:8 | 14:22,23 | 26:10 | **benefit** 24:7 |
| 36:15,18 | **audits** 82:8 | 31:18,19 | 36:21 | 27:8 |
| 37:1,9,17 | **automati...** | 32:23 33:5 | 44:17 45:4 | **BENJAMIN** 2:3 |
| 48:13 49:6 | 102:9 | 33:9 40:16 | 48:23,24 | **benjamin...** |
| 63:1,6 | **Avenue** 13:19 | 40:17 | 63:8 67:11 | 2:11 |
| **assume** 10:17 | **average** 20:9 | 41:10,17 | 82:24 | **Bernardino** |
| **assuming** | 70:4 | 42:10 | 83:11 | 41:19 43:3 |
| 64:11 | **Avondale** | 43:13 | 84:19 86:2 | **best** 44:24 |
| **Atlanta** 13:6 | 12:6,19 | 57:23 58:6 | 86:8 | 45:1,2 |
| 52:11,19 | **award** 56:5 | 64:15,17 | **basic** 12:1 | 63:18 |
| 53:1,15 | **awarded** 16:4 | 66:16,17 | **basically** | **big** 37:18 |
| 54:23 | 65:4 | 76:21 | 14:8 99:13 | 95:4 101:8 |
| 59:15,21 | **awarding** | 96:14,17 | **basics** 7:5 | **binder** 32:20 |
| 59:22,23 | 15:23 | 99:23 | **basis** 16:22 | **bingo** 66:5,7 |
| 61:17,19 | **aware** 8:21 | 100:2,4 | 48:20 | 66:8,12 |
| 61:22 62:7 | 35:24 36:3 | 106:4,13 | 87:10 92:2 | 66:21 67:7 |
| 63:8,9 | 36:8,9 | 106:16 | **basketball** | 67:7 |
| 64:20 | 58:19 76:5 | **bank** 37:9,10 | 52:25 | **Birch** 55:9 |
| 65:19 | 98:13 | 37:11,20 | 53:15 54:4 | 55:10 |
| 67:12,15 | | 37:20,22 | 55:3,22 | 62:15 |
| 71:18 88:2 | ———————— | 37:22 38:1 | 56:13 | **bit** 7:17 |
| 99:12,14 | **B** | 82:11 | 61:12 | 11:25 15:2 |
| 100:11,21 | **back** 12:1 | 87:15 89:3 | 64:23 | 26:19 |
| 100:25 | 16:15 | 89:4,11,12 | 65:15 | 29:16 |
| 104:21,24 | 21:19 22:5 | 89:20 | **Beasley** | 40:12 48:8 |
| **Atlantic** | 22:19 23:4 | 98:16,17 | 11:19 | 50:16 |
| 46:14,18 | 29:16 | 98:20 | 92:11 | 59:19 |
| 46:19 47:2 | 32:14,24 | 99:19 | **becoming** | 88:14 |
| 47:4,6,20 | 34:2 38:25 | 100:9,10 | 23:11 | 90:23 |
| 47:21 | 58:23 | 100:15,21 | **behalf** 2:12 | 92:10 |
| **attached** | 59:18 | 101:1,8,18 | 2:21 99:9 | 103:5 |
| 3:11 99:20 | 62:24 | 102:18,19 | **belief** 75:9 | **black** 15:21 |
| 100:9 | 63:10 | 102:21 | **believe** | **Blevins** |
| **attend** 16:17 | 68:23 | 103:4 | 22:23 | 97:11,13 |
| 17:19 | 78:17,18 | **bankruptcy** | 33:13,17 | 97:22 |
| 53:21,24 | 78:20 | 20:20 21:8 | 35:18 43:1 | 98:10 |
| **attended** | 79:18 88:2 | 90:5,8,10 | 47:12 51:3 | **blew** 91:24 |
| 54:4 | 92:2 | 90:12,14 | 51:8,21 | **Bloomfield** |
| **attorney** | 102:24 | 90:19 | 52:12 | 12:4,22,23 |
| 4:12,24 | 104:22 | **banks** 37:11 | 63:24 | **blow** 91:23 |
| 7:8 9:10 | 105:17,19 | 37:11,16 | 66:22 | **board** 87:4 |
| 9:12,15,19 | **background** | 37:18 46:7 | 67:11,25 | 93:22 |
| 9:22 11:16 | 5:11 12:1 | 46:8 89:24 | 68:1 95:22 | 94:23 |
| 43:1 55:11 | 82:2 | 102:15,17 | **bell** 66:20 | **bond** 91:18 |
| 57:16 | **backing** | **Barbara** 30:5 | 89:9 97:11 | 91:19,21 |
| 62:16 | 15:11 | 44:20,21 | 97:12,18 | **booked** 60:2 |
| 80:14,14 | **bag** 63:21 | 45:8 | 97:20 | 60:6,10,14 |
| **attorneys** | **Bain-Creed** | **based** 6:4 | **belongs** | **books** 19:20 |
| | 2:3 3:6 | | | |

**borrowed**
89:24
**Botswana**
13:6 75:22
75:24
**bought** 17:12
**bounced** 86:4
**box** 38:18
**Boys** 28:16
28:18,21
34:25 35:6
35:16
**brain** 64:2
**break** 33:1
35:10
43:14
104:13,14
**breaks** 35:11
**bribes** 94:21
**brief** 33:1
43:14
104:13
**bring** 38:24
86:1
**broke** 91:25
**broker** 23:12
24:7,14
25:11
89:11,19
**broker's**
19:9
**brokering**
22:9,13,14
**brought**
28:14,18
28:21
35:16
61:14
**build** 45:15
53:10
57:10,12
57:14
69:19
**building**
17:11,12
19:5 20:5
74:7,8,13
74:15
**built** 78:24
92:19

**bulk** 28:14
**bunch** 22:15
88:1 95:9
**Burch** 2:16
**business**
14:1,2,4
14:16
15:10,21
18:8,9,17
18:19
19:14,21
22:4,8,21
22:22,25
29:7,12
37:21 38:5
38:14 44:8
48:11,22
49:5,22
50:10,12
66:5 68:15
68:17,19
69:3,5,11
75:19,20
77:18
82:15,23
89:3,6
94:8
**businesses**
48:16,18
49:9,10,25
**buy** 18:13
27:21 31:5
31:6 32:6
34:4,8
47:22 48:5
48:7 49:20
88:24

———————
**C**
**California**
2:18 11:10
11:21 13:6
22:9 24:8
25:14,17
26:11,24
27:19 30:4
36:21 39:8
39:9,12,13
39:21
44:19 45:8

46:12
51:13
71:24 72:2
72:3,9,15
72:20,21
73:22
88:11
95:18
101:6,8
104:20,25
105:11
**call** 11:13
49:17 51:1
51:9 63:22
64:6 70:15
103:15
**called** 13:17
16:11 27:7
30:20 35:5
51:2,4,4
52:21 66:9
81:23
83:24 84:2
**calls** 19:18
76:12
**cannabis**
22:6,7,8,9
22:10,13
22:21,22
23:8,10,11
23:12,14
23:18,21
25:3,14
27:4 29:5
36:11,14
36:19
37:19,21
38:4,22
39:2,4,5
39:13 44:3
44:21 45:3
45:4,18,19
45:23 46:2
46:3,5
48:11,15
48:15,17
48:22 49:5
49:9,10,16
50:11
62:11

65:24
98:14
**capital**
27:21,22
27:24 28:6
28:14,19
28:24 29:2
29:8 34:25
35:17
38:24
46:20,21
47:14
53:14
57:13
58:16
61:14
64:24 66:2
69:18,24
71:15
72:24
74:23 85:6
100:13
**capitalize**
79:2
**car** 38:23
98:4
**card** 18:19
69:2
**cards** 18:20
**Caribbean**
54:11
**Carlton** 60:1
62:1 68:24
71:10,14
**Carolina** 1:2
2:9 39:21
93:13
103:25
104:19
**Carpinteria**
25:16
27:19
29:18
46:12,22
**carried** 73:3
73:4,13
101:11
**carry** 72:19
72:21,24
95:25

**carrying**
72:18
**case** 4:20,25
5:12,23
9:23 10:14
11:11,12
11:17,19
11:21,22
30:2,4,5,8
34:13,14
34:17 36:1
36:9 39:25
42:25 43:9
43:24
50:19,23
57:2,19
64:13 76:8
78:20
81:17,19
81:20,21
82:3 90:24
91:4 92:12
92:14,24
94:4,14,18
95:19,20
95:22 96:1
96:3,22,25
99:14,17
100:25
103:8,25
104:1,20
104:20,21
104:25
**cases** 4:14
4:19 10:17
10:18,23
11:9,10
90:4,9
92:11
**cash** 17:2
37:14,15
38:5,8,15
39:4,5,7
50:1 69:2
77:9 87:2
87:4,9,16
87:20,25
88:1 101:4
101:16
**casino** 66:5

66:5
cause 38:6
  107:19
caused 15:24
cell 43:17
Central
  104:20
CEO 27:13,15
certain 57:3
CERTIFICATE
  107:1
certific...
  16:10
Certified
  107:6
certify
  107:8
chairman
  84:22,22
  85:5,13,15
  85:24,25
  86:15,17
Chamber
  75:24
changed
  44:17
charged
  58:24 59:1
  94:23 95:4
  95:9
  105:24,25
  106:10
charges
  81:24
charity 54:5
Charlotte
  1:3 2:9
  4:14,19,22
  103:7
CHARLOTT...
  1:12
chartered
  46:9 84:7
  84:8,11
checks 86:2
  86:4,8
  87:4,5,8
chime 9:23
chocolate
  39:8

Chocolates
  39:3
Choice 98:20
  99:19
  100:8
  101:5
circumst...
  15:23 52:9
  52:10 97:3
  105:1,5,14
cities
  102:15
city 51:11
civil 1:7
  5:23 50:23
  94:14
claimant 8:6
clandestine
  83:15
  85:19,21
  85:22
  86:19,21
clarify 6:12
classes
  17:24
clear 25:15
  105:21
clearly 5:2
Coleman 1:11
  4:21 51:3
  51:16,19
  60:16 71:7
  71:8,9
  72:2,12
  73:4,4,13
  73:19 75:7
  75:12 76:6
  77:12,20
  80:7 81:6
  92:3,3
  103:19
collateral
  47:25 48:3
  48:3
colleague
  4:17
collect
  61:17
  86:25
collected

61:13 62:1
  69:13
collecting
  77:9
collective
  27:2,3,7
collectives
  27:1
college
  14:25 15:3
  15:6,10,12
  15:20,21
colleges
  17:15,19
  17:22
combine
  70:25
combined
  71:3,3,5
  72:14,14
come 22:24
  29:7 61:6
  61:9,11,17
  85:13,14
  100:9
comes 88:11
  88:12
comfortable
  52:23
  101:18
coming 20:20
  61:7 63:22
Commencing
  1:19
Commerce
  75:24
commercial
  19:1,2,4
Commission
  35:23 36:8
  53:6,8
  55:19 56:6
  69:9,14,17
  69:23 70:2
  74:4,5
  79:1 83:4
  83:7,23,25
  84:4 85:18
  96:5 99:10
  100:18

107:25
committed
  94:24 95:5
communic...
  76:6
community
  16:2,3
  98:20
  99:19
  100:8
  101:5
companies
  18:14
  33:21
  38:19 39:2
  82:7
company 25:4
  30:19 31:9
  31:10 32:5
  32:6 33:21
  34:23 35:2
  35:3 39:8
  47:15 66:9
  66:21 82:4
  82:5,22
  88:21,23
  94:18,22
complaint
  3:17 40:8
  40:24,25
  105:22,25
  106:11
complete
  57:7 58:17
compliance
  37:24 38:2
computer
  107:15
concluded
  106:20
conference
  85:25 86:2
confused 9:3
  26:19 36:6
consider
  12:17
  100:24
consisting
  8:11
consult

18:13,15
  20:3 48:21
  57:16
consultancy
  48:20
consultant
  49:8,17
consultants
  66:19
  102:7
consulted
  48:25
consulting
  19:14,18
  20:8 21:6
  49:10,18
  49:20
  50:12
  62:13 80:2
  80:3
Consumer's
  81:22
content 8:22
continent
  57:10
  87:24
  102:10,14
continue
  43:19
continued
  82:22
continuing
  17:5,8,20
  18:1
contract
  19:6,10
  38:16 57:9
contracts
  49:23
contribu...
  53:2
contribu...
  54:8
Convention
  70:7 83:12
conversa...
  47:1 52:16
  103:6
conversa...
  68:6

103:10,22
103:23
**coordinator**
55:15
**cop** 97:6
**cops** 105:8
**copy** 33:24
**corporate**
39:6
**corporation**
24:8 27:8
30:15,16
**correct** 7:7
14:9 16:9
23:19
25:18
28:18
30:25 31:1
34:1,6,7
35:9 40:22
40:24 43:4
47:24
56:12
58:13
59:10,11
61:1 65:5
65:6 72:16
72:17 81:8
91:20 93:6
93:19
94:12,17
94:20
100:23
103:11,12
103:18,20
107:16
**counsel** 4:4
8:7 94:22
95:2,2
106:22
107:18
**count** 40:13
**counter**
33:20,21
**countries**
53:11
87:21
102:16
**country**
21:17 45:9

82:25 86:6
93:11
**county** 11:22
30:5 104:5
105:8,11
107:5,8,24
**couple** 10:22
12:15
20:12
43:11
86:10
**courier** 77:7
77:8
**couriers**
83:10,13
**course** 8:18
19:19 36:9
39:18
44:14
46:23
52:23
74:17
89:13 90:1
**courses**
16:18,19
16:20
17:21
19:22
**court** 1:1
6:20 11:2
11:4 30:4
32:24 43:8
86:22 96:5
**CPA** 66:1
**crashed** 82:6
90:2,16
**crashing**
83:1
**created**
24:18 25:2
25:4 30:15
47:18
**credit** 69:2
91:1 98:21
101:5,6
**crime** 58:24
**criminal**
5:23 11:23
92:13,17
105:22,25

106:11
**crowdfund**
46:19
**CSR-0087**
1:21
107:22
**currency**
1:10 50:18
50:21,25
51:22,25
52:4,6,8
58:21
59:20 75:1
75:7,10
78:17,18
80:17,22
81:10
97:24
**currently**
12:2 18:5
21:19 44:3
**customers**
39:9,11
**cut** 24:19
83:13

--- **D** ---

**Dale** 1:21
107:6,22
**Dan** 95:22
**Daniel** 80:14
**dark** 102:10
**Darren** 1:10
4:21 51:3
60:16
63:24
70:13,16
71:3,5
73:1,3
92:3
**date** 59:8
**dated** 3:22
99:2
**dates** 21:7
28:4
**David** 2:15
14:22 33:5
66:16
76:21
99:24

106:18
**david@mi...**
2:20
**day** 51:24
62:4 71:21
72:2,4,6,6
91:23
95:13
**days** 57:12
61:23 72:7
88:6
**DC** 88:12,12
**De** 35:6
**deal** 19:17
23:25
30:12 35:4
38:7 87:2
93:5 94:7
98:8
**dealer** 23:11
**dealing** 38:5
**deals** 17:9
17:10
18:14 22:9
22:10,14
23:13,15
24:7 26:5
49:24
89:20,21
93:14
97:15,16
97:17
**debt** 90:15
**Debtor's**
86:6
**debts** 86:16
90:13
**decide** 29:6
**decided** 29:1
**decides** 44:1
**declaration**
41:7,16
42:7,8,13
42:16,24
42:25 43:6
43:7,20,23
46:2
**declarat...**
39:25
41:18

**Declaratory**
3:17 40:8
**deep** 39:16
**Defendant**
10:15,20
50:22
**Defendants**
34:17
**deference**
83:19
**degree** 15:7
15:9 16:10
**degrees** 15:4
15:18
**delay** 5:3,4
**deliver** 73:7
**delve** 14:15
**denomina...**
67:17
**DEPARTMENT**
2:5
**deponent**
2:21 4:3
**deposed** 9:24
10:6,11,19
**deposit**
37:21
38:18 46:8
**deposition**
1:17 3:14
3:16,19,21
4:16 7:9
7:11,22
8:2 9:11
32:16 33:2
40:7 76:25
99:1
104:12,13
106:17,20
107:9
**depositions**
10:10
**depreciate**
44:16
**derive** 35:14
**DeSalvo**
34:19
**describe**
40:15,19
**details** 5:12

61:21
95:24
103:10
**Detroit** 4:4
13:1,3,6
51:13 67:6
67:8 92:17
94:13
**developing**
20:5 26:22
53:9
**development**
20:7
**died** 74:18
74:19
**different**
18:16 20:7
26:16
28:16
39:20,21
39:24
45:12,18
49:24
50:17
68:16,21
70:4 84:3
87:22
**differently**
87:23
**dig** 39:16
**dignitaries**
86:1
**diligence**
101:16
**dime** 95:14
**dined** 93:23
**diplomatic**
70:8 77:7
**direct** 44:13
83:12
**directed**
95:25
**direction**
77:19 80:8
**directly**
37:6 55:16
**director**
75:23
**disbarred**
95:3

**disclaimed**
85:18
**disclosure**
44:12
**discrepa...**
82:9
**discuss** 68:9
79:11
**discussed**
79:7,9
103:6,17
104:11,22
104:24
**discussion**
51:15
**disorder**
23:8
**dispensa...**
36:23
**dispensary**
38:22
**dispute** 34:5
35:24
**District** 1:1
1:2 103:25
104:19,20
**DIVISION** 1:3
**doctorate**
15:9,19,24
16:1,5
**doctors**
105:19
**document** 8:5
8:6 33:11
40:18 41:7
43:8 72:24
103:12
**documents**
8:1 14:6
33:15 47:9
56:20
57:17,23
58:2 72:23
**doing** 20:5
21:6 23:17
49:9 53:7
53:12 54:9
56:4,18
64:22
72:23 77:8

84:14
87:14
94:25
101:15
**dollars** 22:2
29:24 38:8
81:5 90:17
**domestic...**
80:3
**donated**
79:15
**donation**
58:3 67:25
**donations**
24:12
55:19 80:1
**donor's** 58:4
58:7
**donors** 26:20
55:24 56:1
**door** 63:20
65:11
**Douglas**
80:14 83:2
**downloaded**
8:13
**drafted** 43:1
**drill** 87:16
**drinks** 61:7
**driven** 18:21
**driver's**
97:6,7
**drop** 38:21
63:23
73:24
**dropped**
75:17
77:24
**drug** 59:2
98:8,13,15
**drugs** 6:25
98:4,6,8
98:12
**dry** 83:13
**due** 101:16
**duly** 4:7
107:11,14
_____
**E**
_____
**E** 1:21 107:6

107:22
**e-mail** 8:8
76:9
**e-mails**
76:12
**earlier**
14:13
27:20
45:21
66:24 67:4
103:6
**early** 8:12
8:13 62:3
**Ebony** 84:2
**education**
17:5,6,8
17:14,16
17:21 18:1
23:7
**either** 10:20
15:7 50:12
51:12 69:2
70:20 74:1
90:21
107:18
**elaborate**
22:10
26:14
**electronic**
42:23
**employed**
18:5
**employees**
36:16 37:4
93:15
102:7
**employment**
18:4
**enforce** 44:2
**enforcement**
51:17,19
52:24
103:7,24
**engaged**
14:12 49:4
50:11
**entailed**
89:18
**entertai...**
66:10

93:21
**entire** 45:6
53:19,20
**entity** 16:13
25:1,10,20
31:5 82:16
84:10,13
86:23,25
87:8 88:18
**entrepre...**
18:15
**environm...**
79:2
**equipment**
79:5
**erased** 90:13
**especially**
87:21
**essentially**
14:3 23:20
31:25 34:3
43:10,22
63:22
93:20 94:9
**established**
85:10
**estate** 10:12
10:23
18:11,12
19:8,13,21
22:6,16
23:13,15
24:21,22
24:24 29:5
44:24 45:5
45:15
46:15,18
47:6,20
48:2 62:10
62:11,13
64:3 82:6
88:24 90:1
90:18 93:8
93:11
97:16,17
**Ethiopia**
73:8 76:3
**Ethiopian**
88:8,9
**Europe** 87:22

event 107:19
eventually
  72:8
everybody
  94:3
ex-mayor
  11:17
exact 8:22
  59:8
exactly 65:7
EXAMINATION
  3:6 4:9
EXAMINAT...
  3:1
examined 4:7
example 9:17
  38:21
  44:19
  45:21
  49:16,18
  76:7
  103:14
examples
  68:12
exchange
  44:11
  70:23
excuse 71:8
executive
  75:23
exercise
  31:6,22
  32:3
exhibit 3:10
  3:14,16,19
  3:21 8:19
  8:22 9:4,8
  13:14
  32:16,19
  32:25 33:4
  33:10 40:4
  40:5,7,12
  40:23 41:1
  41:4,5,8
  41:11,12
  41:14 42:4
  42:5,6,9
  42:13,16
  76:20,22
  76:25

83:15
98:25 99:1
99:5,5,22
99:23
exhibits 3:8
  3:11,12
  8:6,11,11
  8:17,21,24
  24:25
  31:17
  32:21
  40:23
existence
  88:25
exists 16:13
expanded
  78:25
expansion
  23:16
expense 69:3
  69:4,5
expenses
  69:15,22
experienced
  103:1
expired
  85:15
expires
  107:25
explain
  22:18,20
  23:1 26:2
  40:1 44:6
  52:8,15
explaining
  30:11
explanation
  83:19
Express
  75:13
extorted
  93:24 94:8
extract
  69:10,24
—————
      F
Facebook
  56:22
facilities
  38:23 53:9

56:10
fact 59:6
factoring
  16:20
facts 82:3
  95:19
fair 8:23
fairly 16:23
familiar
  12:25
  16:12 77:4
  88:18
  95:20
  99:15,16
far 16:15
  77:20
  106:17
far-reac...
  94:4
farce 95:12
farm 26:8
  44:20,21
  45:2,5
  65:23,24
farms 13:20
  44:23
fast 17:14
faster 88:10
faulty 91:24
federal 4:13
  4:13,18
  43:25 44:1
  44:2,14,16
  46:1 75:13
  92:13
  95:18
federally
  46:5,6,9
fee 81:1,2,7
  81:14
fees 19:18
  19:25 80:2
feet 93:10
Ferris 15:5
  15:13
fiancee 7:12
  7:23
fiasco 95:4
Fifteen
  67:10

Fifth 89:3,3
  89:11,12
  89:23
fighting
  10:25
figure 34:2
  43:5 60:15
file 21:15
  82:9 90:8
  90:14,19
filed 21:8
  24:17
  36:10 43:8
  90:5 99:8
  99:11
files 21:13
filings
  33:23
fill 14:5
final 104:16
finance
  16:12,22
  17:9 18:14
  19:23 20:7
financed
  89:21,22
  89:22
financing
  16:20,21
  19:14,24
  19:25
find 23:21
  23:23
  30:12 42:6
  43:7,21
  50:20,24
  82:9 84:10
finding
  51:24
  96:21
fine 14:22
  43:8
  106:19
finish 6:15
  6:16
finished
  71:25
fire 94:13
  95:7
Firemen

93:14
firm 21:16
  99:8
firms 21:17
first 4:7
  28:10
  34:25 35:3
  47:12,13
  51:23
  54:18
  62:20
  75:12
  84:10 85:9
  95:20
  107:11
five 10:8,9
  12:18 21:5
  50:13,14
  50:15
  76:17
flat 81:1,7
  81:14
flew 88:8
flight 88:10
flights
  88:10
Flint 80:15
  81:9 95:22
  95:25
  104:21
flipped 31:8
Florida 67:7
Flow 17:2
flushing
  45:25
flying 71:21
  72:3
foggy 28:3
folks 31:6
  35:6 84:16
  96:15
following
  9:1
follows 4:8
food 68:14
foolishness
  92:1
footage
  60:20
for-profit

25:20 26:5
26:8,9
foreclos...
20:1
foregoing
107:13
foreign
87:11,18
forensic
82:8
forfeiture
4:14,19
50:23
95:19,22
99:7
forget 24:9
28:9 95:3
forgotten
27:18
form 50:11
forth 107:10
forward 8:15
17:14
37:24
forwarded
8:14
found 25:7
28:22
51:22
58:22,23
96:24
100:3
Foundation
84:2
founder 17:3
27:15
four 12:8
101:19
frame 49:22
68:13
Francisco
2:18 4:25
73:23
77:21 78:5
88:2
100:21
fraudulent
30:15
83:20
friend 68:17

front 11:16
40:6,19,25
41:23 59:8
frowned
102:24
full 107:16
full-time
74:15
fund 32:2
56:10
74:21
93:15,16
95:7
funding
78:22
fundraiser
52:16,19
52:22
fundraisers
52:11,20
61:16
fundraising
46:13
84:14
funds 37:21
58:16
64:24
74:17,24
79:16,17
82:1 92:20
94:5
fuzzy 104:9

—— G ——
G 28:16,18
28:21
34:25 35:6
35:16 41:4
41:5,8,11
41:12,14
42:4,5,6,9
42:13,16
games 52:25
53:1,15,20
53:21,23
53:24 54:4
55:3,15,18
55:22,24
56:1,13,15
61:12

64:23
65:15,16
gamut 20:6
36:23
general
37:25 93:9
93:10,15
94:21 95:2
generally
8:21 38:16
42:18
generate
45:3
generates
95:13
gentleman
29:6 62:22
Gentlemen
42:2 66:13
George 28:9
28:10,15
28:21
34:20
George's
34:20
Georgia
51:12
58:20
62:12
getting 79:4
85:9 91:16
94:23
101:18
Ghana 49:1
give 13:11
15:25 21:4
24:12 29:2
29:6 31:14
34:11 40:2
45:11 49:7
50:17
60:13
64:20
68:12 82:2
97:6
given 38:12
54:1 55:18
64:12 71:1
77:23,25
giving 47:25

glass 65:4
global 87:10
GM 93:8
go 8:19 9:19
14:5,7,24
15:11
21:12
28:24 30:1
31:2 40:3
40:13,14
40:23 41:3
47:2,3
49:2,19,20
70:16 72:1
78:21 82:8
86:19
87:16 97:5
99:4 102:6
goal 82:24
going 4:15
5:10 6:17
14:10 17:1
18:22
30:19 31:5
32:12
35:11
40:11
41:18 42:5
43:22 48:8
50:4,21
63:3,10
68:7,22
71:21
72:15,21
74:23
77:20 78:1
78:21 85:6
87:7,13
90:16 92:2
100:20
101:15
104:11,15
Goldstein
34:19
65:20,21
65:22 66:3
66:25 67:3
67:9,12,18
67:21
68:10 71:1

72:12,19
78:11
Good 4:11
gosh 55:5
government
9:13 43:25
44:1 57:24
grandfat...
24:3
greater 24:5
GreenGro
31:13,14
31:21 32:2
32:3,4,4
33:6,22,25
34:3 47:18
47:21
Grosse 13:19
grounds
14:21
group 28:14
28:17,21
30:18 35:3
47:14 59:9
59:12 61:3
groups 48:21
48:23 49:1
73:20
growing 23:8
23:10
36:14
grown 36:12
36:20
growth 23:16
guess 26:22
34:11 48:6
guilty 91:1
guy 30:19
35:5 49:17
86:11
87:14 95:4
guy's 95:3
guys 27:6
30:11
31:11
33:13
39:20 63:3
63:20
70:24
101:15

**H**

H 99:23
  100:1,2
half 85:5
halfway 41:6
hall 66:21
halls 66:5,7
hallway
  65:10
hamburger
  100:2
Hampton
  80:14,16
  81:16 83:2
  90:24
hand 65:11
handed 70:10
handle 37:10
  91:11
handled
  37:14
handles 4:13
handling
  4:18 82:5
hands 52:5,8
handshake
  49:24
handshakes
  50:1
Hantz 89:8
  89:10,19
happen 37:23
  59:5
happened
  8:23 30:9
  38:3 46:17
  63:19,21
  70:17,22
  95:10 97:4
happening
  52:25
  53:18
  102:24
happens
  36:19
happy 9:7
  54:10 56:4
  56:17
  106:6

hard 7:18
  82:17
he'll 9:23
head 6:7
Headquar...
  93:9
hear 5:2,7
  7:18 43:18
  52:15
  66:14
heard 65:15
  66:18,20
  88:15
hearing 5:4
heavily
  90:17
help 23:9,11
  54:10,15
  73:6 86:14
helped 69:18
helping
  23:21,23
  54:10 63:2
  86:15
hereinbe...
  107:10
hereto
  106:22
high 82:16
higher 37:25
highest
  44:24 45:1
  45:2
Hills 12:4
  12:22,23
hired 86:18
hiring 86:20
historical
  15:21
history 23:3
Hold 104:8
holding
  42:14,18
homes 53:10
  57:10
honorary
  15:9,19,24
  15:25 16:5
  75:22
hospital

  45:12,13
  45:14,16
hotel 52:22
  59:24,25
  60:21,23
  60:25
  63:10,20
  66:24 67:1
  68:23,24
  70:11
  71:11,17
  71:20
  72:13,13
hour 8:16
hours 7:1
house 12:9
  12:11
  57:12
housing 53:9
  53:10 57:6
  58:15 79:5
  85:10
  87:17
Human 35:23
  36:7 53:5
  53:8 55:18
  56:6 69:8
  69:14,17
  69:23 70:2
  74:4,5
  78:25 83:4
  83:6,22,24
  84:4 85:17
  96:4 99:9
  100:17
hundred
  21:23,24
  22:2
hundreds
  29:24 38:8
  38:12
  84:18 85:1

**I**

ICG 93:5
  94:14
  95:15
idea 21:3
  39:16
  51:12 54:2

  81:13 84:7
  102:2
IDENTIFI...
  32:18
  40:10 77:2
  99:3
identified
  24:1,22
identify
  20:2 24:24
  44:24
IGO 70:6
IHRC 83:14
  104:12,17
  105:2
IHRP 83:3
illegal 46:4
imagine
  74:14
immediate
  88:6
immediately
  88:4
immunity
  94:1,3
impair 7:1
impaired 7:5
  7:6
important
  13:14
impossible
  8:18
including
  74:19
Incorpor...
  25:23
INDEX 3:1,8
indicating
  42:3,16
indicted
  94:23 95:4
  105:18
indictment
  105:21
  106:1,11
indirect
  56:16
individual
  24:13
individuals

  24:11
  30:24 53:2
  54:16
  60:22
industrial
  19:4 44:10
industry
  22:7 38:4
  39:7 49:16
  49:21,25
  65:24
information
  30:17
  33:14,17
  89:14
Inheritance
  88:16,17
  88:21
initially
  25:6 63:5
  74:21,22
initiated
  43:9
injunction
  41:21
  86:22
Innovative
  44:10
inside 23:17
insignif
  98:2
Institute
  16:11 17:3
institut...
  15:8
insurance
  78:8
insured 78:7
intent 33:12
interact
  27:5 87:9
interacted
  50:5
interest
  32:6 47:9
  48:1,4,9
  48:10,16
interested
  56:11
  107:19

interesting 37:19
intergov... 70:3
intermed... 55:5
internat... 1:12 4:22 35:23 36:7 53:5,8 55:18 56:6 69:8,14,16 69:23 70:2 74:4,5 78:25 80:4 83:4,6,22 83:24 84:4 85:17 96:4 99:9 100:17
Internet 43:16
interrog... 13:18
interrupt 6:17
interviewed 92:18
introduce 19:23 22:25
invest 23:20 27:16,17 29:13
invested 79:18
investig... 92:18
investing 48:17
investment 23:22,24 35:15,15
investments 88:16,17 88:21 93:18
investor 82:4,15
investors

32:14 47:3 66:7
invite 61:6 61:17
involved 22:19,20 22:21 23:1 23:2,3 30:24 37:5 84:13,16 85:23 86:24 90:18 92:3 92:4,8,24 93:14 94:18 105:7
involvement 92:11,20
involving 11:17
Islamabad 84:5
issue 9:23 37:18
issues 38:2

J
J 2:4
jail 86:7,9 86:11 91:19,25
Jamaica 49:1
Jason 30:3 34:13,19 34:24 35:25
jazz 25:3
Jeffrey 92:11
John 34:19 65:20
Johnson 2:4 4:18
joined 27:2
Jr 41:20
judge 91:25
July 99:11
jumping 68:23

103:5
June 1:11 33:25 50:19 51:6 53:16 68:25
JUSTICE 2:5

K
K-i-n-g 7:16
keep 42:5 74:23
Kenya 12:20 73:8 85:11
kept 82:24
Keswick 12:21
kickbacks 93:21,25
Kilpatrick 11:17 92:15
kind 9:22 12:10 16:10,19 17:5 19:3 22:4,8,10 22:18 23:17,25 24:17 32:20 40:1 45:25 48:16 53:11 55:15 56:19 58:24 62:9 64:2 65:4 68:9,21,21 70:25 74:14,18 78:8 84:24 85:1 89:6 91:10
kinds 68:11 92:20
king 7:14,21 14:12 101:16
Kiva 39:2

knew 62:17
knock 63:20
know 5:8,24 5:24 7:3 10:12 18:2 19:19 20:12 21:9 21:21,22 22:1,17 24:9 25:24 28:3,4 29:4 33:15 34:20 35:21 36:2 36:2 37:8 39:20 41:1 47:8,13 48:19 49:7 49:19 51:4 51:13 52:2 55:1,7,25 56:3,15,15 58:2,24 59:4 60:18 60:18 61:25 62:16 63:15,16 65:9 66:20 69:6,6 70:19,22 70:24 72:4 72:5,7,8 78:3 83:11 87:6 89:8 89:10,17 89:18 92:16,16 94:1 95:17 95:23 99:14 104:15 105:16 106:2,5
knowing 75:10 82:13
known 29:9 67:9
knows 42:20

76:12
Kwame 11:17 92:15

L
100,000 20:16 65:17 67:22
LA 73:23
lady 55:10 59:14
lady's 55:6
land 26:7
large 38:11
larger 102:15
largest 39:2 39:8 92:17
Larry 16:11 16:14 17:3
late 91:24
lately 20:13
law 2:16 24:10 26:11,24 46:1,1 51:16,19 52:23 82:13 99:8 103:6,24
lawful 44:4
laws 36:21 44:2,14 82:10,10 82:10 83:12
lawsuit 30:9 30:10,25 40:20,21 89:18
lawyer 62:19 62:21,23 63:2 83:2 86:19,20
lawyers 82:14
lay 52:5
learn 17:9
learned

16:22
17:13
lease 29:19
lease-back
93:5
led 82:2
90:4,8,9
90:13 92:4
95:20
96:21
left 62:2,3
68:22
legal 25:25
62:12
legalize
45:6
legalized
44:15,16
legislation
44:22
lender 89:7
LENNARD 1:11
let's 12:1
17:14 18:4
20:9,14
21:7 24:20
50:16,18
51:23
88:14
106:9
letter 3:15
3:20 32:17
33:12
41:16 42:7
58:3,4,7
66:2 68:1
76:23 77:1
77:4,7,10
letterhead
77:14
leverage
48:6
Lewis 15:10
15:11,19
license 19:8
19:9,11
24:23 27:4
45:12,14
45:16,20

97:6,7
licensed
22:9 23:15
24:2,3
25:13
32:11
38:20,22
45:13,23
life 13:5
98:9
lift 42:1
limitless
20:4,8
lines 63:17
list 60:13
listed 3:12
13:12
literally
39:22 41:6
60:12
litigation
10:12 37:6
46:24,24
68:20
little 7:17
15:2 26:19
29:16
35:10
50:16
59:18 70:4
88:14
92:10
103:5
live 12:3,14
71:18
live-live
12:15
lived 12:7
13:5
living 18:10
19:15 30:3
34:12
35:25
LLC 25:25
LLP 2:16
LOI 32:5
47:18
Lone 34:21
34:25
35:16

long 9:8
12:7 14:11
15:13,14
16:24,25
16:25 27:6
53:7 54:19
56:7 60:17
67:9,10
103:16
long-term
29:9,11
longer 16:13
50:14,15
74:20,24
99:25
100:5
102:3,8
look 13:15
32:21
38:23
39:24 40:4
42:1,19,22
43:21
70:14
76:20 77:4
98:25
looked 9:4
70:12
looking
13:13 29:5
31:20
looks 42:2
Loomis 38:17
lose 94:8
loss 37:2
78:7 79:17
lost 21:7
36:4 90:17
95:14
101:20
lot 10:13
12:16,23
13:7 18:2
18:15 52:3
58:16 64:1
68:16
74:18
76:15 82:6
90:15
102:2

loud 7:19
Louis 24:25
25:2,8,9
25:19,23
25:24
27:13
29:17
30:22
31:23 34:5
34:23,24
35:8,14
36:15,18
36:25 37:9
37:17
38:14 48:1
48:13 49:5
50:12
62:25 63:6

M
M 2:15
machine
91:22,24
Mack 15:9
mail 14:5,8
major 15:3
15:15,17
39:6,6,6
majors 15:3
man 22:3
management
48:10,17
manager 38:1
mandate 53:6
manipulated
95:1
manner 29:1
Maria 59:14
Marie 55:12
55:13
56:17
64:25
marijuana
22:15,16
26:23
MARKED 32:18
40:10 77:2
99:3
market 82:6
marketplace

52:11
54:11
markets 83:1
90:2,16
married
14:17,19
match 47:16
47:17
materialize
58:13
material...
58:10,14
materials
26:15
49:20
matter 69:12
94:16,17
mayor 92:17
94:6
mean 10:12
17:18
19:16
22:12,13
22:14 29:3
29:4 48:12
55:21,22
61:16 74:3
78:19 91:8
102:5,20
103:2
meaning
28:24
means 44:7
45:7 98:11
102:18
meant 43:6
medical 23:5
26:22
36:23
39:15,17
medicinal
27:9,11
meet 47:10
47:16,18
54:18 59:8
59:12
62:20
71:24
73:20,25
75:12

meeting 29:8
member 48:4
  51:16,19
  74:12,16
  84:9
members
  86:21
mention 90:7
mentioned
  14:12
  24:20
  27:20 90:5
  96:4
met 53:4
  54:6,22
  56:3,17,24
  59:13,14
  62:21,21
  63:25
  72:12
Michael 2:15
  2:16 4:24
  5:1,8 8:10
  9:2 14:20
  31:16 33:4
  33:7 34:19
  40:5,15
  41:10,15
  42:4 43:15
  57:22
  64:10
  66:13
  76:24
  96:12,16
  99:15,22
  100:1,3
  105:20,24
  106:9,19
Michigan
  7:23,25
  12:4,25
  13:20 15:6
  23:4 48:20
  48:23,25
  81:20
  82:16
  90:24
  92:13,18
  94:14 96:8
  96:20,22

96:25 97:1
  101:5
  107:3,24
Mickey 60:11
middle 9:16
million 28:7
  28:7 32:7
  32:10,10
  32:10,12
  32:13
  45:22,24
  90:15
  93:10 95:7
millions
  90:17
minus 50:3,4
minute 20:21
misdemeanor
  81:22
  82:18 92:6
mishandling
  95:6
mitigation
  99:7
model 82:24
moment 33:11
  36:8
money 19:13
  21:4 27:16
  27:17
  28:22 29:6
  29:15,20
  29:22
  30:14 32:1
  32:2 35:14
  35:19 37:3
  37:10,14
  38:11,20
  46:8 47:22
  48:1 55:17
  56:14 58:9
  58:10
  60:23,23
  61:8,14,18
  62:1,2
  63:21 64:1
  64:7,8,12
  64:19
  65:14,18
  65:20 66:1

66:4,6
  67:3,12,13
  67:14,17
  69:13
  70:10,15
  70:17,25
  71:2 72:11
  72:14,18
  73:1,3,4,7
  73:13,19
  74:2 75:25
  76:7 77:21
  78:6,12
  79:8,13,24
  80:7,13,19
  80:24 86:7
  86:8 87:1
  87:1 88:7
  89:24
  91:11
  93:25 95:6
  95:13,25
  99:13
  100:12,14
  100:19,20
  100:24
  101:3,20
  101:23
  102:2,3,7
  102:8,11
  102:14,18
  102:21,25
  103:8
  104:17
  105:2,5,6
  105:8,10
  105:12,17
MoneyGram
  101:23
  102:1,3,8
  102:9,13
monies 57:7
  63:23
  82:19 86:3
month 38:8
  38:12
  103:3
months 54:25
Morehouse
  15:6,14

morning 4:11
  7:2 8:8,12
  8:13 62:3
mortgage
  82:7,9,10
Motion 41:20
Motors 93:9
  93:11
Mouse 60:12
mouth 18:23
  18:24
move 32:15
  37:24
  38:20 48:8
  88:1
moved 80:16
  80:19 81:9
  81:12
moving 46:10
  82:24
multiple
  33:15
  34:22
  46:21
  52:20
music 59:14
musician
  25:3
mutual 27:8
myriad 62:14
  68:6 78:4

_____
| **N** |
_____

name 4:11
  5:13 7:13
  7:15 8:5
  16:25
  18:17
  25:10 28:9
  28:10
  31:10
  34:20
  44:10 54:1
  55:6,7,8
  60:5,10
  89:9 95:3
  97:11,18
  97:20
named 35:6
  89:8

names 59:13
  60:14
  63:17
narcotics
  44:2 98:7
Nassau 13:8
  13:9
Natalie 7:14
national
  85:25
Nations 70:7
  79:1
nature 10:10
  10:24 18:7
  18:9 51:15
  81:21,24
  90:12
  103:10
necessarily
  23:23
need 9:5,8
  13:15
  19:11
  40:14 41:9
  43:21
  79:11
needed 62:22
  101:2
needs 104:14
net 20:11
  36:25
netted 20:16
  21:4
never 19:9
  57:14 70:1
  70:12 95:9
  95:10,14
  98:8,13
  101:11
New 44:11
Nicole 55:9
  55:10
  62:15
night 60:20
  62:4
nod 6:7
non 26:1,10
non-profit
  24:7,12
  25:21,22

26:3,19,21
26:23 27:8
30:23
**Nope** 20:24
**normal** 76:14
**normally**
76:8
**North** 1:2
2:9 39:20
93:12
103:25
104:19
**Northern**
15:5
**Notary** 107:1
107:7,23
**note** 3:12
4:3 57:22
**notes** 107:17
**notify** 82:11
**November**
1:20 4:1
96:8
**number** 41:14
**numerous**
38:3
**nutrients**
26:15

___ O ___

**oath** 4:8
5:17
**object** 14:20
64:10
**objective**
101:4
**obligation**
24:18
**obtain** 15:18
67:3 79:24
**obtained**
15:4 59:20
66:3
**Obviously**
4:20
**occasions**
38:3
**offer** 47:14
47:16,18
**offered** 94:1

94:3
**offers** 47:10
**office** 2:6
13:23 14:1
14:1,4
54:7 73:21
73:21 74:3
74:6,7,8
74:10,15
75:5 77:24
80:23
83:14
**officer** 51:4
52:21
**officers**
105:10
**offices** 2:16
73:22
74:20,20
74:21 75:1
85:10,11
**oh** 11:6
21:22 22:3
22:6 41:11
59:24
96:21 97:1
97:10
100:12
**okay** 6:1 9:1
9:9 15:7
34:17 35:2
42:11,17
47:7 49:15
66:16
76:24
96:16
98:11
100:3
104:10
106:9
**ones** 8:7
**ongoing**
34:16
58:14
**open** 33:7
65:11
**open-ended**
49:21 50:7
**operate**
18:17

87:10,11
87:19,20
87:23
**operated**
85:2
**opportun...**
19:24
23:22,24
**opportunity**
29:12
57:15
**option** 29:19
31:6,22
32:3,6
48:4,5,6
**order** 3:12
16:21
57:14
58:15
82:12 96:3
**organiza...**
24:13 27:7
69:19 70:3
83:16,21
84:17,21
84:23,25
85:4,7,16
85:17,19
85:21,22
86:13,20
86:21
**organiza...**
86:9
**organize**
49:22
**organized**
52:10
85:25
**OTC** 33:14,18
33:20
**overcharged**
82:7
**overseas**
12:16,20
20:4 21:7
73:6 78:1
**owe** 21:19,21
22:1,5
86:7
**owed** 86:8

**owned** 32:4
88:21
**owner** 47:5
**owners** 34:22
**ownership**
11:1 30:16
47:9 48:10
**owns** 48:14

___ P ___

**p.m** 106:20
**Pacific**
34:25 35:3
47:12,13
**packaged**
70:10
**packages**
75:17
**page** 3:2,10
42:15,15
56:23
**pages** 40:14
41:3
**paid** 19:17
68:24
74:12
79:22
80:25
87:16
**Pakistan**
84:5,6,11
85:11 86:5
86:19 96:5
96:6
**paper** 32:20
**parks** 78:24
**parlors** 66:8
67:7
**part** 5:24,25
24:11 27:3
27:6 36:3
41:12 42:4
42:5,8
44:12 52:2
52:14 53:4
54:9 55:4
55:25 56:1
56:4,18
61:23
64:12

67:13
74:18 76:2
79:1 85:10
**particip...**
66:15
**particular**
24:6 44:22
45:13
50:10
73:18
82:13
**particul...**
18:19
77:22
**parties**
47:15
106:22
**partner** 31:2
34:24
**partnering**
35:8
**partners**
34:4,8
47:23 48:5
48:7 65:22
**parts** 86:5
87:12
**party** 10:18
52:21
107:18
**pass** 18:20
**passed** 44:21
**pay** 19:22
31:10
32:13,14
37:3,13
39:5 79:8
79:13,20
79:24 81:1
81:4,6,14
86:15 90:2
93:24
94:21
**paying** 23:6
93:20,21
**payola** 94:25
**pays** 39:4,6
**penalty** 5:19
**pension**
92:20

93:15,16
93:22 94:5
94:22
**people** 19:22
19:23
22:14 27:2
28:13,25
29:1,8,11
35:7 37:25
47:25 50:5
53:12 54:4
54:15
59:12 61:2
61:3,3,9
63:11,14
63:15 64:8
64:22
65:18
66:23 82:6
82:7 84:24
85:12
86:24 87:6
87:9,18
89:23
92:19
93:18
102:10
**people's**
91:11
**percent**
42:22
44:15
**percentage**
39:14,15
81:5
**period** 17:23
23:25
27:12
61:19,22
62:7 67:4
67:10
71:22 82:5
**perjury** 5:20
5:25
**person** 28:12
28:25 42:7
56:16
59:17
74:11
**personal**

14:2,16
35:19 69:4
69:10
79:21
106:17
**personally**
1:17 27:17
79:22,24
**perspective**
87:6,20
**petition**
3:22 99:2
99:6,13,20
100:10
**phenomenon**
39:3
**phone** 43:17
51:18 76:8
76:22
103:19
**photo** 56:5
**pick** 14:7,8
38:24 64:2
80:24
**pick-up** 53:1
**picked** 62:2
67:4,5,15
**pictures**
56:19,22
**piece** 24:23
45:5,15
**Pino** 16:11
16:14 17:4
**pitch** 53:11
**place** 12:10
12:17
15:16
39:24 59:6
94:6
103:18
107:10
**placed** 91:3
**places** 13:7
67:8
**Plaintiff**
10:14,19
**plan** 44:8
**planning**
88:4
**plans** 78:16

78:18
**plant** 26:6
26:12,14
26:17
**plaque** 65:4
**platform**
33:14,19
45:7
**play** 63:5
92:22
**pled** 91:1
**pledge** 48:6
**plus** 50:3
**PO** 16:20,21
**pocket** 74:22
78:22
**point** 5:7
21:5 44:13
56:8 57:4
90:6 94:19
**Pointe** 13:20
**points** 16:22
81:5
**police** 92:5
94:13 95:7
97:25
105:10
**political**
91:18
**politics**
68:15
**port** 79:5
**Portage**
96:19
**portray** 8:23
**possess** 52:4
**possession**
72:11
**possibly**
11:1 49:11
50:6
**posts** 82:24
**potting**
26:16
**pounds** 38:21
**powers** 70:8
**practice**
39:1
**Preliminary**
41:20

**prepare** 8:1
21:15,16
42:24
**presented**
3:12
**presently**
37:8 46:6
78:23
84:23 85:3
**presidents**
86:1
**presumably**
98:14
**pretty** 76:14
83:12
**primarily**
75:20
**primary**
12:17
56:16
**prior** 51:24
52:4 82:19
**prison** 86:6
86:15
89:23
**privilege**
9:22
**probably**
8:16 33:17
35:18
36:17 67:4
76:11 95:8
105:21,22
**probation**
91:3,6,9
91:14,15
**problems**
38:6 43:12
43:15
**process** 24:2
24:2 43:20
57:7 79:4
101:17
**produce**
57:24
**produced**
57:2
**professi...**
17:6
**profile**

82:16
**profit** 25:5
25:5,21
26:1,1,3
26:10
30:23
36:25 70:4
70:5
**program** 17:6
79:2
**project** 29:2
37:6 54:15
58:14,15
58:18
97:14
101:2
**projects**
20:5 21:10
53:3 58:11
58:12 62:8
62:9,15
67:25
68:21 73:7
76:3,4
97:14
100:19,22
**promote** 29:1
29:3
**prompt** 30:9
**prompted**
30:10
**prop** 24:9,10
**properly**
43:8
**properties**
12:15 20:2
20:3,3,6
34:21 35:1
35:16
44:10 45:8
45:9 47:13
89:21
95:14
**property**
18:13,13
18:14,25
19:1,3,5
24:1 25:7
25:8 27:20
29:18 30:2

30:6,13
31:1,5
32:8,9,11
32:14
36:12
39:12 44:4
44:16 45:7
45:19,22
45:23 46:3
46:11,12
46:15,22
46:23
47:11
48:14
57:11,14
63:4 82:12
93:12
**prosecuted**
94:11
**prosecution**
92:2,5,12
**prosecutor**
4:13,18
**provide**
56:24 58:1
58:9 77:12
82:22
**provided**
56:21
82:21,21
**provider**
43:16
**providing**
82:1,19
**psychology**
15:17
87:18
**public** 33:14
33:17
107:7,23
**publicly**
31:9 33:20
33:22
**pull** 60:19
68:7
**pulled** 96:7
96:12 97:5
105:15
**purchase**
16:21

22:15
27:18
29:16
31:22
**purchasing**
19:14
**purportedly**
58:21
104:17
**purpose** 25:2
25:6 46:25
52:14
**purposes**
46:13
71:20
76:22
**put** 28:22
29:15,20
30:11,14
30:22 31:8
31:21 32:1
35:19
40:18
41:23
45:16,19
47:14
71:15 78:6
80:23 86:7
86:9,11
**putting**
100:24

___

**Q**

**question**
6:11,12,15
7:5 9:2,14
9:16,18,21
14:24
18:22
35:13
49:13 50:7
61:21
64:10,16
98:23
104:10,16
106:3
**questions**
4:25 5:11
6:23 7:2,4
9:10,11,19

13:16
52:17
90:22
107:13
**quickly**
39:25
**quietly** 24:3
**quite** 87:10
**quote** 43:25
44:13

___

**R**

**Rafael** 41:19
43:3
**raise** 27:22
28:6,8,12
32:2 46:20
46:21
47:22
53:13
69:24 85:6
86:3 88:7
**raised** 27:21
27:24
32:10
56:13
63:23
64:23,24
69:18 74:2
79:17
104:18
105:2
**raising**
28:24
57:13
74:23
**ran** 82:14
**range** 21:4
21:23
**rappers** 53:2
**rare** 23:8
**re-joined**
43:16
**reached** 56:8
64:18,21
**reaction**
78:14
**read** 41:9
42:11
72:23

**reading** 17:1
**ready** 33:8
**real** 5:10
10:12,22
18:11,12
19:8,13,21
22:6,16
23:13,15
24:21,22
24:24
25:16 26:8
29:5 35:15
36:12 44:8
44:24 45:5
45:15
46:12,14
46:18 47:6
47:20 48:2
62:10,11
62:13 64:3
65:24 82:6
88:24 90:1
90:18 93:8
93:11
97:16,17
**realized**
82:23
**really** 9:20
13:15
39:25
43:21
69:20
103:9
**reason** 6:20
9:20 102:4
**reasons** 62:6
**rebuild** 85:6
85:7
**recall** 10:3
10:7 15:16
16:6 20:17
21:9 35:22
52:3 59:1
60:4,9,17
61:24 69:1
70:9,12,20
70:20 72:5
73:14,17
77:19
80:18,21

81:11
84:15 93:4
95:8 96:7
96:9,10,18
98:1 103:9
**recalling**
103:17
**receipt**
105:16
**receive**
19:25
**received**
42:8 58:3
70:1
**recess** 32:22
**recollec...**
63:19
67:11
**record** 5:14
6:21 8:10
25:15
32:24
50:22 99:6
104:11
105:21
106:11
**recorded**
30:17
107:14
**records** 73:9
106:4,6,7
**recouping**
79:18,20
**recourse**
75:8
**recreati...**
27:10,12
36:22
39:14,18
39:19
**recruited**
30:24
**reduced** 44:5
107:15
**refer** 50:21
**references**
99:12
**referring**
33:11 58:4
**refund** 70:1

regard 30:5
  33:12 96:4
  99:13
regarding
  8:24
Regis 73:22
registered
  46:15 84:5
regular
  38:23
  45:10
  62:13
reimburse
  69:15,16
reimburs...
  69:20,21
related
  22:16
  46:10 63:4
  66:2
  100:17
  107:18
relating
  14:6
relation...
  18:21
  75:18
relation...
  24:15,16
  27:23
  29:10
relative
  64:5
release 91:4
  91:7,10
relevancy
  14:21
Relief 3:17
  40:8
remaining
  31:23
remember
  10:17,22
  16:15 17:2
  17:16,24
  17:25,25
  20:15,21
  20:22,24
  21:1 27:25
  28:2,4

29:23,25
  50:4 51:5
  51:10,11
  51:14 52:2
  53:17 54:6
  54:6,21
  55:1,7
  59:13
  60:17
  61:21 62:5
  63:25 65:7
  65:9 66:24
  67:6,16,19
  67:20 68:4
  68:5,5
  70:18,23
  72:5 78:2
  89:16
  90:20,21
  97:10 98:2
  98:3 104:9
  104:23
Remind 37:5
reminding
  91:21
Reminds
  49:25
remission
  99:7
removed
  94:19
rent 12:12
  74:6
repayment
  95:12
repeat 6:13
  28:20
rephrase
  64:15
reporter 4:3
  6:21 32:24
  107:7
represent
  66:6 69:12
  81:16
represented
  63:2 90:25
request 9:13
requested
  106:21

required
  58:15
research
  19:20 44:9
reside 12:2
residence
  12:18
residential
  19:2,4
resolution
  34:14
resolved
  34:15
resources
  24:16
  27:23 53:5
  70:8
RESPA 82:10
respective
  106:22
respond 6:23
responded
  13:16
response
  13:19
rest 34:11
restraining
  96:3
restroom
  97:5
restruct...
  24:4
Retail 36:22
retailers
  36:19
  39:10
retirement
  94:13 95:7
review 8:1,4
  9:5,6,8
  103:13
reviewed 8:9
reviewing
  83:18
rifle 40:11
right 6:2,4
  14:4 17:12
  19:5 20:4
  25:13
  34:16

35:18
  42:14 46:5
  48:25 51:7
  68:3,20
  70:13
  78:22,23
  80:5 83:8
  84:22 85:2
  85:3 86:18
  93:9
rightfully
  68:19
Rights 35:23
  36:7 53:5
  53:8 55:19
  56:6 69:9
  69:14,17
  69:23 70:2
  74:4,5
  78:25 83:4
  83:6,22,24
  84:4 85:17
  96:4 99:9
  100:18
ring 66:20
  97:11,12
  97:18,20
rings 89:9
Ritz 60:1
  61:25
  68:24
  71:10,14
road 26:8
  32:15
roadside
  96:7,9
  97:3
Robert 1:17
  3:4 4:6
  5:1,15
  30:2 41:18
  41:19 89:8
  99:8
role 55:14
  62:24,25
  63:5 69:22
  82:15
  83:19
  84:21
  92:22

94:19
Ronald 94:24
room 41:22
  52:22 60:2
  60:6,16,16
  60:25
  61:10,15
  63:10,20
  65:8,8
  66:24 67:1
  68:23,24
  70:11,16
  70:16,18
  70:19,21
  70:21,22
  71:10,20
Rose 1:21
  107:6,22
rough 20:12
  21:2
roughly 16:4
  16:7 38:9
  73:11,12
  90:19
routine
  105:15

─────── S ───────

S 1:17 3:4
  4:6 30:2
S-h-u-m-...
  5:15
saddened
  78:15
safe 38:16
  38:17,17
  75:4,5
  78:6 80:24
salary 69:21
sales 37:3
Salvo 35:7
San 2:18
  4:24 73:23
  77:21 78:5
  88:2
  100:21
Sansome 2:17
Santa 30:4
  44:19,21
  45:7

**save** 82:12
**saw** 24:25
  83:14
**saying** 55:23
  58:12
  95:15
  103:15
**says** 9:22
  33:22
  41:14
  43:24
**Schedule**
  46:5
**school** 16:16
  16:17 17:3
  17:13 76:3
**Scif** 97:18
**screen** 40:6
  42:19
**se** 70:1
**second** 13:11
  15:11,12
  31:15 40:2
  41:12
  50:17
  62:25
**secretary**
  23:3 60:3
**secretary's**
  60:5
**securities**
  62:21,23
**security**
  38:6
**see** 4:17,23
  5:1,4 13:8
  21:8 41:11
  41:13,25
  43:2,17
  47:8 57:20
  73:10
  99:19
**seek** 22:25
  54:13,13
  54:14
**seen** 41:1
  57:1,4,19
  98:8,13,14
**sees** 102:9
**seized** 1:10

  4:21 50:18
  50:19,25
  51:23,25
  57:8 58:17
  67:13
  74:17,24
  78:12
  97:24
  99:12,14
  100:14,25
  103:8
  104:18
  105:3,6,7
**seizure** 52:5
  54:19
  99:17
  100:11
  103:20,24
  104:21,24
  104:25
  105:1,14
**seizures**
  104:23
  106:14
**self-emp...**
  18:6,7
**sell** 22:15
  32:12
  36:18
**selling** 46:2
  46:3
**sells** 48:14
**send** 74:1,2
  100:20
  102:2,6,8
  102:11,14
**sending**
  101:3
**sent** 8:7,12
  101:23
  102:1
**sentence**
  43:6,10
**sentences**
  43:11
**separate**
  25:21
  68:20
**served** 75:21
**service** 82:1

  91:1
**services**
  81:23
  82:19,20
  82:23
**set** 25:20
  48:21
  85:22
  107:10
**Seth** 2:4
  4:17 5:7
**sets** 81:2
**setting**
  45:25 55:2
  63:5,6
**settled**
  89:17,25
**settlement**
  90:3
**shared** 37:20
  79:23
**shares** 31:23
**sharing**
  45:21
  101:13
**Shasta** 11:21
  104:4
  105:8,10
**short** 8:18
  32:22 56:7
  73:2
**Shorthand**
  107:6
**Shortly**
  54:20
**show** 8:10
  41:25
  42:12
  98:23
  103:12
  106:12
**showed** 65:7
  66:23 67:1
**Shumake** 1:17
  3:4,18 4:6
  4:11 5:14
  5:15,16
  6:22 7:17
  8:14,21
  9:1,24

  11:25 12:3
  12:7 13:11
  14:10,24
  15:12 18:5
  21:13
  24:19 26:2
  28:20 30:2
  31:15,20
  32:19,25
  33:10,18
  34:12
  35:12,25
  37:16 39:9
  39:23 40:9
  40:11,18
  40:21,24
  41:19,19
  42:5,11,25
  43:5,14,24
  46:10 48:9
  50:9,15
  52:13
  54:13
  57:25 58:7
  58:19 59:7
  59:19 64:1
  64:18
  66:18 68:3
  68:23 70:9
  72:10
  76:20 77:3
  77:17 80:5
  83:3,22
  88:1,15
  89:2 90:22
  90:24
  92:23
  96:14,19
  97:1 98:16
  99:4,8,16
  100:6
  101:24
  103:5
  104:10,16
  106:14
**shut** 37:12
  37:16,17
  38:2 82:21
**side** 9:14
  26:3,5,8,9

  26:10,19
  26:23
  30:23 57:6
  87:17
**sign** 42:24
**signature**
  42:14,15
  42:19,21
  42:23,23
  106:21
**signed** 32:5
  33:25
  77:10
**significant**
  23:16
**signific...**
  44:5
**similar**
  95:23
**sit** 9:7
  86:18
**sites** 83:17
**sitting**
  17:11 19:5
  41:22
  63:19
**skipping**
  63:10
  90:23
**small** 61:3
  73:22
**smoking** 59:3
**social** 75:18
  75:20
**sold** 36:21
**solicit** 47:3
**soliciting**
  26:20
**solo** 23:25
**somebody**
  13:10
  22:24 29:4
  64:7 96:11
**son** 23:7,9
  23:11
**soon** 70:15
  70:17
**sorry** 7:17
  27:18
  28:20 49:2

61:4 73:23
96:12
105:9
**sort** 31:8
**sought** 54:15
**sound** 51:6
**sounded**
103:9
**sounds** 48:14
49:8 58:12
59:1 72:10
**South** 85:11
**sp** 89:8
97:11
**space** 23:12
23:14,18
24:13
**speak** 6:16
7:8,11
63:16
103:19
106:7
**speaker**
51:18
**speaking**
6:16
**special**
13:17
**specific**
21:22
24:10 25:2
25:5 41:2
45:14
46:25
49:13 50:6
53:6
**specific...**
23:23
44:20
53:17 68:5
69:6 78:2
89:18 93:4
**specifics**
49:7 58:25
59:4
**spell** 5:13
**spend** 12:16
12:23
**spent** 12:20
60:20

79:16
**split** 55:19
**spoke** 65:25
68:1
**square** 93:10
**SS** 107:4
**St** 49:3
**stabilized**
32:11
**staff** 74:11
74:15
**standard**
39:1,7
**standpoint**
44:16
**Star** 34:21
35:1,16
**start** 5:10
24:20 29:7
44:23
84:13
**started** 23:5
23:8,12
34:23
74:22
**starting**
102:23
**state** 5:13
15:5 25:14
38:20
45:25
90:23
94:14 97:1
107:3,8
**statement**
42:12
43:23 44:6
44:12 50:8
99:20
100:9
**statements**
40:1
**states** 1:1,5
2:5,7,13
13:17 44:3
44:17
48:24 87:5
87:11
95:17
**Stax** 66:9,10

66:11,20
66:21
**stayed** 60:18
61:25 69:7
**staying**
71:10
72:13
**steal** 31:1
75:10
**stenogra...**
107:17
**stenogra...**
107:14
**stepping**
62:24
**stipulate**
106:7,10
**Stock** 44:11
**stole** 105:8
105:10
**stolen** 75:7
**stop** 96:7,9
97:4,9,22
97:25
105:16
**stopped**
94:25 98:5
**store** 13:24
14:7 38:15
75:3 87:1
**storing** 75:1
**story** 34:12
**Street** 2:8
2:17
**structure**
18:14
25:25
**stuck** 102:25
103:2
**studied** 44:9
**studio** 59:14
59:14
**study** 18:2
**studying**
23:13
**stuff** 68:11
95:9
**subject**
94:16,17
**suburb** 13:1

**sue** 82:11
**sued** 10:20
30:21
83:16
86:20
89:12,15
89:16,17
89:23
94:25
95:11
105:17
**suicide**
94:24 95:5
**suing** 10:21
**Suite** 2:8,17
**super** 12:25
13:14
**Superior**
30:4
**supervised**
91:3,7,10
**supply** 39:4
**support**
41:20 65:5
**supporting**
54:5
**supposed**
71:24 72:1
73:20,24
86:3 91:23
**sure** 5:9 8:5
8:9 19:19
20:17 22:3
24:19
25:15,25
28:2 39:24
55:23
56:14 59:6
59:7 60:3
60:9,11,12
60:19
65:17
70:13,21
73:8 77:22
77:25
84:12,15
**surrogates**
63:16
**suspicious**
102:5,6,10

**Sutter** 97:20
97:21
**Swanky** 66:18
**sworn** 4:7
107:11
**system** 74:14

―――――――
T
―――――――

**table** 28:19
28:22
35:17
54:17
**take** 9:5
18:1 30:13
35:11 37:3
37:14 41:9
80:23 87:7
88:4,7
101:4,7,8
102:22
103:3
**taken** 1:18
6:25 17:24
32:22
75:25
77:23,24
83:17
107:9,17
**talk** 7:18,20
11:25 18:4
33:1 50:16
50:18 55:2
76:8 88:14
92:10
**talked** 8:17
8:20 54:7
55:6 63:24
68:14,14
68:15,15
68:16
96:25
**talking** 4:15
11:22
18:25
25:16 30:1
52:23
53:12
87:24
91:17
**Tanzania**

12:20 13:6
49:1 75:23
tape 30:17
taught 19:22
tax 20:1
22:1 24:18
taxes 21:9
21:13,15
21:19 22:5
24:17 79:8
79:13,21
teach 19:19
team 73:21
TECHNICAL
43:12
Technolo...
33:6 47:19
technology
57:10,13
telephone
51:1
tell 10:18
15:2,25
22:7 30:8
33:18
34:11,17
36:6 40:2
46:17 47:1
47:2 52:13
52:17,18
54:3 58:8
60:13,22
62:18 66:3
67:23,24
68:3 72:1
73:18 77:3
80:16
92:12 94:4
95:17,19
97:3
telling 6:4
55:23 68:4
temporary
96:3
Ten 101:20
terms 57:25
91:7,10
94:9
Terrance
12:6,19

terrible
78:15
test 91:22
testified
4:8 11:2,4
11:7,10,15
11:16
57:25
64:11,13
93:20,23
93:24
94:10
testify 11:9
93:1,3
107:11
testifying
5:19 104:7
testimony
6:3 93:7
94:2
text 76:9,14
76:15
texting
76:16,17
texts 76:12
thank 46:10
50:15
thanked 54:7
thanks 66:16
91:20
thing 42:18
68:7 80:23
85:9 87:17
88:13
95:23
things 6:21
13:13 14:8
18:16,21
19:21 20:7
24:20 26:5
26:11,13
26:16 37:7
50:2 62:14
68:9,16
74:23 78:4
80:24 84:3
think 8:16
8:23 9:3
10:9 14:11
17:1,23

18:3 21:18
22:3 23:6
24:25
26:25 28:2
31:14,18
48:8 51:18
52:20
53:18,22
54:20,25
55:13 60:3
60:14 62:3
62:17
64:13,21
65:16,17
65:25
67:14,15
67:21 69:6
70:13 71:6
73:7 77:17
81:23
83:14 90:5
91:16,17
91:17,20
101:7
104:8
105:22
106:16
thinking
11:13
13:10
third 53:10
87:21 89:3
89:4,11,12
89:23
thought 59:3
thousand
21:23,24
22:2 81:5
thousands
29:24 38:7
38:9,9
three 61:4
61:22
63:11,20
73:16
104:23
threw 91:25
thrown 35:10
Thug 53:4
54:1,3,14

55:16,22
57:18,18
58:2,8,19
59:9,17
63:12 64:6
64:11,18
65:2,5
78:11
tied 23:18
24:3 25:7
32:8,9
TILA 82:10
time 7:22
8:12,15,19
9:5,5
12:16,20
12:23
16:24,25
17:23
23:25
24:15
26:11,24
27:11,12
33:2 39:17
41:9 46:1
49:23
54:19 57:6
58:20 60:1
60:6 61:13
61:19,21
62:7,17
64:9 67:4
67:10
68:13
69:10,11
71:22 73:2
74:12,13
77:15,18
82:5 85:15
86:12
90:16 97:9
107:9
timeline
53:17
times 10:6,8
10:8 11:6
73:11,12
73:15
80:16 81:9
title 69:12

titled 41:18
today 6:23
7:6,22 8:2
8:24 9:3
45:3 52:14
101:18
told 30:20
36:5 54:3
56:1 57:18
58:11
78:11,16
top 21:17
45:20
topic 46:11
50:17
topics 14:10
88:15 89:2
total 58:17
87:18
totality
52:24
totally
39:19
touch 26:13
touched
26:12
Trade 2:8
traded 31:9
33:20,22
44:11
trademark
84:5
trading 27:5
trafficking
59:2
Trans 46:14
46:17,19
47:2,3,5
47:20,21
Trans-At...
31:12
transaction
25:12
102:5,6
transact...
24:14
transcript
3:11
103:14
107:16

transcri... 107:15
transfer 30:15,19
transferred 85:16
transpire 65:12
transport 38:15 80:7 80:13 102:18
transpor... 38:19
transpor... 76:7
travel 52:3 69:8,22 72:15 73:9 91:12
traveled 72:25 73:6 73:8 75:25 91:13
traveling 12:24 73:1
treatment 53:9 56:9
trial 11:14 11:15 104:4 105:18
tried 31:1 35:4
trip 39:5 65:19 69:13 73:18 77:22
trouble 103:16
true 45:11 64:4 107:16
Trust 30:3 34:12,13 35:25,25 43:24
trustees 93:22,23

94:5
truth 94:4 107:12,12
truthfully 94:10
try 6:15,17 31:5,21 35:11 74:23
trying 26:25 30:20 34:2 47:22 56:10 57:5 59:18 64:2 69:25 71:15 85:1 85:5 93:18
Tuesday 1:20 4:1
tulip 44:20 44:23 45:2 45:5
turn 32:19
turning 58:21
Twenty 101:21
twice 11:8 91:23,23
two 15:16 25:21 51:24 52:21 61:3 61:4,22 63:11 71:4 72:6 84:3 88:10
types 80:24

U
U.S 2:6 4:12 4:21 11:16 87:8 92:11 102:19
uh-huh 28:11 65:25 77:16
UHY 21:16
ultimately 34:9

unaware 56:2 97:8
unclear 6:11
under-oath 6:3
underhanded 35:4
underneath 31:2
understand 5:16,20,22 6:1,3,5,6 6:10,11,14 6:18,23 7:2 20:1 26:18 53:19 101:14
understa... 55:17 80:12 85:20
undervalued 57:11
underwrite 17:9 18:13
underwri... 16:20,21
unfortun... 41:23
union 98:21 101:5,6 102:12,13
unique 30:10
United 1:1,5 2:5,7,13 13:17 70:6 79:1 87:5 87:11 95:17
universi... 17:15,20
university 15:5,22
unlicensed 23:14
unsavory 89:20
UPS 13:24 14:7

usage 44:25 45:1,2
use 19:10 38:21 46:11,13 79:8,13,15 83:10,13 85:2 97:5 98:16,17
usually 68:9 81:4 87:20 88:8 91:9
utilize 46:25
utilized 46:19

V
v 3:18 4:21 35:25 40:9 40:21 42:25 43:24 90:24 92:11 97:1
vaguely 89:9 99:18
value 24:5 44:4 45:4 45:11,17
values 44:16
vantage 44:13
various 26:16
vehicles 38:24
verbally 6:7 6:9
versus 30:3 34:13 94:14 95:18
video 43:12 60:19 66:14
videos 56:22
Vienna 70:7 83:12
Vincent 49:3

vine 74:19
violate 91:6
violating 81:22 91:15
violation 91:19,21
violations 91:1
visit 102:16
visited 61:10
vs 1:7

W
wait 20:21 74:1
walk 63:18 65:9
want 6:15 14:15 15:25 29:6 32:7 38:6 40:3,13 42:12 43:5 51:3 57:3 63:24 69:1 72:24 87:13 104:4
wanted 4:16 17:8 23:20 29:2 30:12 64:19 67:23 88:6 106:18
wants 19:18
warrant 96:22 97:7
wasn't 52:22 62:12 90:2 92:8 104:8 105:21
water 53:6,8 56:9 58:14 76:3 78:24 87:13
way 8:23 23:21 24:8 30:10,12

41:24 46:6
55:20 59:5
71:9 81:6
87:9 90:13
101:14
105:6
106:18
**Wayne** 107:5
107:24
**ways** 46:20
47:21,24
**we'll** 5:11
11:25
15:11
22:19 36:7
43:19
57:25
**we're** 5:10
6:17 9:7
19:5 25:15
30:1 31:20
32:24,25
35:11 37:6
43:17 48:8
54:8,9,9
57:13 61:7
63:10
68:20 87:5
93:9
104:11
**we've** 57:4
68:21
75:20,20
104:11
**week** 91:19
91:23 92:1
**wells** 56:19
**went** 15:2,5
15:6 23:4
23:10
37:19
53:22
70:13,18
89:22
91:18
105:18
**weren't**
101:19
**West** 2:8
**Western** 1:2

102:12,13
103:25
104:19
**wholesalers**
36:24
**Wilson** 3:18
30:3 34:13
34:18,19
34:25 35:7
35:25 40:9
40:21
42:25
43:24
**window** 73:2
**wined** 93:23
**wire** 87:14
101:22
102:21
**wires** 87:5,7
101:18
**Withdraw**
14:24
**witness** 3:2
5:3 41:13
92:25
104:14
105:23
106:2,21
107:11,14
**women** 68:14
**won** 83:16
105:18
**wondering**
98:12
100:8
**word** 11:13
18:23,24
26:25 85:2
**words** 6:7
92:23
**work** 16:2,3
21:6 49:10
53:12 57:5
71:25
72:22
75:16 76:5
77:8 78:21
78:22 79:6
79:16,19
79:22,25

80:3 84:24
85:7
101:14
**worked** 23:5
75:15
80:11,13
82:14
**working** 23:5
55:16 62:8
75:14
100:19
**works** 65:2
**world** 21:18
26:17
39:21 49:3
53:11
72:25
75:21,25
84:20,22
85:5,8,12
85:13,15
85:24,24
86:14,17
86:25 87:6
87:12,21
93:9
**worldwide**
39:3 87:20
**worth** 45:15
45:19,20
45:22,23
90:15
**wouldn't**
17:25 18:2
37:7 39:12
48:3 59:13
63:16 65:9
79:11
94:21
**wound** 94:23
**Wow** 16:6
**wrap-up**
104:10
**written**
19:20 86:8
**wrong** 23:19
**wronged** 63:3
**wronging**
31:7
**wrote** 46:1

86:2

_____
**X**
_____
**X** 45:15,19

_____
**Y**
_____
**Y** 45:20
**yeah** 16:13
16:25
18:10 33:5
39:23
42:22
66:10 74:8
76:15,19
78:21
79:15 90:9
91:13
92:15
94:21
96:10,21
96:21
97:12 98:7
98:18
99:23
102:17
106:5
**year** 14:14
20:9,11,23
23:7 53:20
85:4
**years** 10:4,4
10:5 12:8
12:18
15:16 16:7
16:23
17:17
18:20 19:6
19:11
20:12 21:2
21:5 22:1
22:5 29:9
37:2 45:1
50:13,14
50:15
58:23
67:10
73:12
75:11
76:18
86:10

88:22
101:19,20
101:21
**Yep** 25:18
**York** 44:11
**young** 53:4
54:1,3,13
55:10,16
55:22
57:18,21
58:2,8,19
59:9,17
63:12 64:6
64:11,18
65:2,4
78:11
**YSL** 59:9,12
78:11

_____
**Z**
_____
**Zajac** 94:24
**Zoom** 1:18
4:5,23

_____
**0**
_____

_____
**1**
_____
**1** 3:19 8:16
46:5 76:20
76:23,25
**1:51** 106:20
**10** 10:4,8
73:12
**100** 38:21
42:22
44:15
90:15
**100,000**
20:25
**10s** 38:7
**11** 13:14
**11:03** 1:19
4:2
**12** 42:15
**120,000**
105:17
**13** 90:21
**14** 21:8
90:21
**148,145**

95:18
**1650** 2:8
**17** 1:20  4:1
**170,130**
99:12
**18530** 13:19
**1990** 75:13

---
**2**
---
**2** 86:11
93:10
**20** 3:14  10:4
10:5  16:7
16:23
17:17,22
18:20
21:17  29:9
32:16,19
32:25  33:4
33:10  45:1
67:10
**20-year**
17:22
**200,000**
105:13
**2001** 16:6
**2003** 16:6
**2010** 23:4
**2012** 84:12
90:21
**2013** 21:8
**2015** 20:10
20:14,18
20:20,21
21:2,6
22:23  28:1
56:8  84:15
**2015/2016**
68:13
**2016** 1:11
4:22  20:22
22:3  28:1
28:3  49:4
49:10
50:19  51:6
53:16  56:9
60:7  62:17
68:25  96:8
**2017** 22:3
99:11

**2018** 33:25
**2020** 1:20
4:1
**20s** 67:19
**227** 2:8
**24** 7:1
**250,000**
65:12,16
101:11
**252,000**
103:8
**252,140** 4:21
50:22
**252,140.00**
1:9
**27** 1:11  3:16
40:4,5,7
51:6
**28202** 2:9
**29** 33:25
95:6

---
**3**
---
**3:18-CV-646**
1:8
**30** 3:21
36:17  41:3
57:12
75:10
98:25  99:1
99:5,5
**32** 3:15
**344-6222**
2:10
**3500** 2:17
25:16  26:8
**351** 12:20
**37** 8:11

---
**4**
---
**4** 3:6  28:7
32:10
**40** 3:18  32:7
32:12,13
41:3  45:23
**40,000** 23:6
**400** 92:19
**415** 2:19
**4676** 12:6

---
**5**
---
**5** 28:7,7
32:9,10
**50,000** 20:19
20:23  21:3
**50s** 67:19

---
**6**
---
**6** 45:22
**6-24-16** 3:20
77:1
**6-29-18** 3:15
32:17
**64** 24:9

---
**7**
---
**7** 99:11
**7-15-24**
107:25
**7-7-17** 3:22
99:2
**704** 2:10
**76** 3:20

---
**8**
---

---
**9**
---
**90-day** 82:18
**94104** 2:18
**946-8996**
2:19
**99** 3:22

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION


UNITED STATES OF AMERICA,


      vs.                          Civil Action

                               No. 3:18-CV-646

APPROXIMATELY $252,140.00 IN

US CURRENCY SEIZED FROM DARREN

LENNARD COLEMAN ON JUNE 27, 2016

AT CHARLOTTE-DOUGLAS INTERNATIONAL

AIRPORT,

_____/



      The Deposition of ROBERT S. SHUMAKE [30(b)(6)],

      Taken via Zoom

      Commencing at 2:23 p.m.,

      Tuesday, November 17, 2020,

      Before Dale E. Rose, CSR-0087.



EXHIBIT
3

1  APPEARANCES:
2
3  MR. BENJAMIN BAIN-CREED
4  MR. J. SETH JOHNSON
5  UNITED STATES DEPARTMENT OF JUSTICE
6  U.S. ATTORNEYS OFFICE
7  Assistant United States Attorneys
8  227 West Trade Street, Suite 1650
9  Charlotte, North Carolina 28202
10  (704) 344-6222
11  benjamin.bain-creed@usdoj.gov
12      Appearing on behalf of the
13      United States of America
14
15  MR. DAVID M. MICHAEL
16  Law Offices of Michael & Burch, LLP
17  One Sansome Street, Suite 3500
18  San Francisco, California 94104
19  (415) 946-8996
20  david@michaelburchlaw.com
21      Appearing on behalf of the Deponent
22
23
24
25

1              INDEX TO EXAMINATIONS
2  Witness                           Page
3
4  ROBERT S. SHUMAKE
5
6  EXAMINATION BY MR. JOHNSON:.................. 4
7
8              INDEX TO EXHIBITS
9
10  Exhibit                           Page
11      (Exhibits attached to transcript)
12  NOTE:  Exhibits listed in order presented.
13
14  DEPOSITION EXHIBIT 37
15      Third Amended Notice of Deposition ....... 6
16  DEPOSITION EXHIBIT 22
17      IHRC agreement, etc...................... 33
18  DEPOSITION EXHIBIT 10
19      answer of IHRC .......................... 83
20
21
22
23
24
25

1  Tuesday, November 17, 2020
2  About 2:23 p.m.
3          (NOTE:  The deponent and reporter
4          appeared in Detroit, all counsel
5          appeared via Zoom.)
6          ROBERT S. SHUMAKE,
7  having first been duly sworn, was examined and
8  testified on his oath as follows:
9              EXAMINATION
10  BY MR. JOHNSON:
11  Q.  Could you please state your name?
12  A.  Robert Shumake.
13  Q.  My name is Seth Johnson and I'm an Assistant
14      United States Attorney.  I represent the United
15      States in this case, do you understand that?
16  A.  I do now.
17  Q.  And you've just been deposed in your personal
18      capacity, correct?
19  A.  Correct.
20          MR. MICHAEL:  Mr. Johnson, just to set
21      the record straight, this is David Michael.  I'm
22      also appearing via Zoom audio, although I can see
23      everybody on video, so I'm appearing on behalf of
24      Mr. Shumake at this deposition.
25          MR. JOHNSON:  Thanks, David.

1  BY MR. JOHNSON:
2  Q.  Mr. Shumake, you were just deposed by AUSA
3      Bain-Creed in your personal capacity, correct?
4  A.  Yes, I believe so.
5  Q.  And you understand that in this deposition you're
6      testifying as the corporate representative of
7      Claimant International Human Rights Commission,
8      right?
9  A.  When you say "corporate", it's not a corporation.
10  Q.  Your counsel, I'm sure, has talked to you about
11      what a 30(b)(6) depo is, right?
12  A.  No, I don't know what a 30(b)(6) deposition is.
13      I've never heard of that term before.
14  Q.  I will explain it to you.  So Federal Rules of
15      Civil Procedure 30(b)(6) allows a party to depose
16      a corporation or other organization including
17      governmental entity.
18          The rule requires that an entity
19      designate one or more individuals to testify on
20      its behalf and it places the burden on the
21      organization to designate the individuals that
22      are reasonably educated to testify on those
23      matters that are listed in the Notice.
24          Have you seen the government 30(b)(6)
25      notice for IHRC in this case?

1  A.  I don't know, I'm not sure.
2  Q.  Let's turn to Exhibit 37.
3         DEPOSITION EXHIBIT 37
4         Third Amended Notice of Deposition
5         WAS MARKED FOR IDENTIFICATION.
6  Q.  So Mr. Shumake, you're looking at Exhibit 37
7  which is a document entitled Third Amended Notice
8  of Deposition, it's directed to Claimant IHRC and
9  it's a deposition notice that lists 22 specific
10  topics, do you see that?
11  A.  Yes.
12  Q.  Have you ever seen this document before?
13  A.  I don't recall.
14  Q.  You don't remember?
15  A.  I don't remember.
16  Q.  Have you ever seen any document like this before?
17  A.  I don't recall.
18  Q.  Did you review this document in preparation for
19  your testimony here today?
20  A.  I don't recall. I got some e-mails this morning
21  about an hour before the deposition, so I would
22  not have seen all the documents.
23         There's no way I would have been able
24  to review them.
25  Q.  So if you would have seen this document it would

1  been in the e-mail that you received an hour
2  before the deposition, correct?
3  A.  Correct. I was not able to review all the
4  documents.
5  Q.  Fair enough and I'm not asking you which ones
6  you reviewed or did not review. I'm just trying
7  to understand you did not see this 30(b)(6)
8  notice prior to those e-mails coming in in the
9  morning, correct?
10  A.  Correct, at least I don't recall. I'm not sure,
11  I don't think so.
12  Q.  I see it tells me the date that we're supposed to
13  be here, tomorrow, I'm supposed to be here
14  tomorrow.
15         MR. JOHNSON: David, have you given him
16  the 30(b)(6) Notice?
17         MR. MICHAEL: I assume that, you know,
18  the package of material, that stuff was
19  transported between myself and Robert.
20         Had we discussed -- I can tell you that
21  I've discussed with him the content of the
22  inquiry, but I don't know if I actually told him
23  that this was a Rule 30(b)(6) deposition.
24         I don't know that I needed to get into
25  the weeds with him about that, but I mean you can

1  ask him if he's able to testify on behalf of the
2  International Human Rights Commission now in a
3  deposition.
4         MR. JOHNSON: Well, David, a 30(b)(6)
5  depo requires that the entity both designate
6  someone who can testify to the topics and also
7  educate themselves on the topics and it sounds
8  like here Mr. Shumake has done nothing to prepare
9  for the 30(b)(6) depo or educate himself on the
10  22 enumerated topics which is your burden under
11  Rule 30(b)(6).
12         MR. MICHAEL: Well, we are not
13  admitting that he's not educated on the topics
14  that are covered under that 30(b)(6) deposition
15  notice.
16         If you have an issue whether or not
17  International Human Rights Commission has
18  designated him as authorized to speak on behalf
19  of the International Human Rights Commission, is
20  that what you're asking?
21         MR. JOHNSON: Well, I mean that might
22  be a separate issue, but I guess we can phrase
23  it this way. Let's start talking about the
24  topics and we'll see if Mr. Shumake has educated
25  himself on the particular topics or that hasn't

1  been done.
2         MR. MICHAEL: Okay, go forward.
3  BY MR. JOHNSON:
4  Q.  All right, Mr. Shumake, as I was explaining, in
5  this deposition you understand that you're
6  testifying as the representative of IHRC,
7  correct?
8  A.  Correct.
9  Q.  You understand that you're still under oath?
10  A.  Correct.
11  Q.  Under penalty of perjury?
12  A.  Yes, I do.
13  Q.  And I won't go over all the deposition ground
14  rules again, but they kind of apply. Let's try
15  not to talk over each other. There's a court
16  reporter taking down everything you say.
17         If you don't understand the question I
18  ask feel free to ask me to rephrase it and I
19  will, fair?
20  A.  Fair.
21  Q.  Along those lines, the court reporter can't take
22  down head nods or "uh-huh" or "uh-uh", so I want
23  to ask that you give me --
24  A.  I got it.
25  Q.  -- verbal responses.

1 A. Yes or no. We're on the same page.
2 Q. On the same page and along those lines like let's
3 try not to speak over each other, fair enough?
4 A. Fair enough.
5 Q. If you don't ask me to clarify a question, I'm
6 going to assume that you understood my question,
7 fair?
8 A. What do you mean by that if I don't -- I can go
9 back and --
10 Q. If you don't understand a question I ask you,
11 feel free to ask me to clarify and I'll do the
12 best I can.
13 However, if you don't ask me to clarify
14 the question, I'm going to assume that you
15 understood the question I was asking, fair
16 enough?
17 A. Is that like a canned statement? I'm trying --
18 so if I don't understand a question, I may not
19 even know how to ask you that I don't understand
20 it, so -- because you just asked me about 30
21 something.
22 I can't even understand to ask you
23 about it because I don't know what it is.
24 Q. Right, but in that circumstance, Mr. Shumake, you
25 told me you didn't understand what a 30(b)(6)

1 depo was, right?
2 A. Correct.
3 Q. That's what I'm driving at.
4 A. Right.
5 Q. If I ask you a question that you do not
6 understand part or all of it, just let me know.
7 A. Got it.
8 Q. And if you don't let me know, then you answer yes
9 or no, then I'm going to assume that you
10 understood the question as posited, fair?
11 A. I don't agree with that part because if I don't
12 understand it to ask, that's what we miss each
13 other on.
14 Q. Right, well --
15 A. But I'm not incompetent, I understand that, and
16 if you say something that I don't understand I
17 may or may not know how to respond to it to even
18 say I don't understand.
19 Q. I gotcha.
20 A. Depends on if you're talking over my head or not.
21 Q. Well -- and I'm -- also on the other end I'm not
22 a mind reader, Mr. Shumake. And unless you tell
23 me that you don't understand it, then I have to
24 assume that you did in fact understand my
25 question, fair?

1 A. I'm not sure if that's fair or not, that's what
2 I'm trying to get a gauge on.
3 Q. Fair enough, we can move on.
4 What type of organization is IHRC?
5 A. It's an intergovernmental organization.
6 Q. Where was it founded?
7 A. Islamabad, Pakistan.
8 Q. Who founded it?
9 A. I do not know the answer to that question.
10 Q. Do you know when it was founded?
11 A. I don't recall.
12 Q. Can you give me a ballpark?
13 A. I wouldn't know, I don't have a ballpark at all.
14 Q. How long has IHRC been in existence?
15 A. I do not know. It's been around for a long
16 period of time, I would say north of 10, maybe 20
17 years.
18 Q. What are you basing that answer on?
19 A. Just a recollection.
20 Q. Is that your personal recollection?
21 A. Yes.
22 Q. What facts are you recalling that leads you to
23 believe that IHRC has been around for north of 10
24 to 20 years?
25 A. I don't think it's been around north of 20 years,

1 but north of 10 years based upon some documents
2 I've seen, but I'm not sure on the dates, so it's
3 between 10 and 20 years.
4 Q. What documents are you referencing?
5 A. The registration documents in the articles of
6 organization in Islamabad.
7 Q. And this is one of the weird things about a
8 corporate rep depo because technically your
9 testimony is IHRC's testimony, but you yourself
10 are someone who is kind of involved in this case,
11 so I gets a little weird.
12 And I'll try and be clear on if I'm
13 using you to refer to yourself as Robert Shumake
14 or you as IHRC. If that ever gets unclear, let
15 me know, but were you, Robert Shumake, involved
16 in the founding of IHRC?
17 A. No, I wasn't.
18 Q. Do you know who was involved in the founding?
19 A. I do not know.
20 Q. When did you, Robert Shumake, become involved
21 with IHRC?
22 A. I'm not sure. I want to say 2013.
23 Q. How did you become involved with IHRC?
24 A. What do you mean by how, I'm not sure I
25 understand.

1    Q.   Sure.  So as a question posited to IHRC how did
2         Robert Shumake become involved with the
3         organization?
4    A.   I met one of the ambassadors, Ethiopian
5         ambassador to the IHRC.  Either I was in Ethiopia
6         or we were in Dar es Salaam, Tanzania.
7    Q.   Was this an ambassador for the country of
8         Ethiopia?
9    A.   Yeah, the country of Ethiopia to the IHRC.
10   Q.   The person you met who was a "ambassador" who was
11        that person an ambassador for?
12   A.   The IHRC for Ethiopia.
13   Q.   So he was an IHRC representative?
14   A.   Correct, like United Nations representative or
15        American Organization of States representative.
16        There's many IGOs which is different than a
17        non-profit.  An IGO is just like the United
18        Nations.
19   Q.   We can get into that, but just to be clear the
20        person you met with in either Dar es Salaam -- I
21        forget the other country you mentioned, but the
22        person you met with, that was someone associated
23        with IHRC who had a role with the country of
24        Ethiopia, correct?
25   A.   Correct.

1    Q.   And did that person -- who was that person?
2    A.   I don't recall.
3    Q.   Was that the person that brought Robert Shumake
4         in to IHRC?
5    A.   No, maybe he introduced me to the world chairman.
6    Q.   Who was the world chairman at the time?
7    A.   Mohamed Khan.
8    Q.   What was the first name?
9    A.   Mohamed Khan.
10   Q.   And where is Mr. Khan located?
11   A.   Islamabad, Pakistan.
12   Q.   You mentioned that Mr. Khan was the world
13        chairman.  Is the world chairman the top position
14        in IHRC?
15   A.   Yes.
16   Q.   What's the No. 2 position in IHRC called?
17   A.   It's tricky.  You have the vice-chairman, you
18        have the deputy chairman, you have the secretary
19        of state -- or, excuse me, the secretary of state
20        is the terminology -- secretary general, excuse
21        me.
22   Q.   So is there one world chairman?
23   A.   One world chairman.
24   Q.   And then it sounds like there's several other
25        high ranking members under that world chairman,

1         correct?
2    A.   Correct.
3    Q.   Where are those members located?
4    A.   The secretary general was located in Austria.
5         He's no longer secretary general at this time.
6    Q.   Let's take those in turn.
7              Who is the current vice-chairman of
8         IHRC?
9    A.   No one right now.
10   Q.   Who's the current deputy chairman?
11   A.   No one right now.
12   Q.   Who is the current secretary general?
13   A.   No one right now.
14   Q.   Who is the current world chairman?
15   A.   I am.
16             MR. MICHAEL:  I'm sorry, current what,
17        world chairman?
18             MR. JOHNSON:  World chairman, yes,
19        sir.
20             MR. MICHAEL:  And his answer was
21        himself, right?
22             MR. JOHNSON:  Right, his answer was "I
23        am".
24   A.   Yes, myself.
25   BY MR. JOHNSON:

1    Q.   How many employees does IHRC currently have?
2    A.   We don't have any direct employees.  Primarily
3         mostly a volunteer basis.
4    Q.   Has IHRC ever had any direct employees?
5    A.   I want to say yes.
6    Q.   When did IHRC have direct employees?
7    A.   '14, '15, '16, somewhere in that time period.
8    Q.   So you testified IHRC had direct employees from
9         2014 to 2016?
10   A.   Or '17.
11   Q.   Why did IHRC stop having any direct employees?
12   A.   World chairman went to jail, the organization
13        kind of shifted to a bunch of rogue individuals.
14   Q.   Were those rogue individuals people who were
15        employed by IHRC?
16   A.   Not 100 percent direct employees, but it could
17        have been appointees.  As an example, the
18        secretary general was an appointee who went rogue
19        and started a clandestine organization on his
20        own.
21   Q.   What do you mean by a clandestine organization?
22   A.   Clandestine organization -- the way you become
23        world chairman, you're appointed by the chairman.
24             The way that you become -- you can't
25        take on a role that you weren't appointed through

```
 1      the bylaws of the organization.
 2              You can't take the logo and the logo,
 3      the trademark or the usage of the organization,
 4      and use it for your own -- use it outside of the
 5      world chairman's blessing if you will.
 6   Q.  So the path of succession between world chairman
 7      is that the prior world chairman would appoint
 8      the next world chairman, correct?
 9   A.  Correct.
10   Q.  What about the vice-chairman, deputy chairman and
11      the secretary positions, how was the path of
12      succession for those?
13   A.  All appointed by the world chairman.
14   Q.  I want to go back to what you termed using a
15      clandestine organization.  Who is -- strike that.
16              You mentioned there was a clandestine
17      organization.  What does that clandestine
18      organization do?
19   A.  What were they doing?
20   Q.  Yeah, are they currently in existence?
21   A.  They may be in existence right now under a
22      different name.  They were in existence under the
23      IHRC -- I want to say the ihrchq.com or .org, I
24      don't specifically remember and they used IHRC's
25      logo, they appointed new ambassadors from around
```

```
 1      the world that was not sworn in by the world
 2      chairman or appointed by the world chairman.
 3              Raised funds to their own benefit and
 4      then they acknowledged the organization.  All
 5      this was done when the world chairman was in
 6      Debtor's Prison.
 7   Q.  So --
 8   A.  So I took over.  I sued the organization, I sued
 9      the clandestine group in Pakistan for trademark
10      infringement, for copyright infringement, for
11      breach of contract and got an injunction in a
12      lawsuit against them.
13              That information of course went to
14      Google, it went to Facebook, it went to all these
15      different places and they just took the
16      organization's information down.
17   Q.  Let's unpack that.  So this clandestine
18      organization you claim took the IHRC ogo and
19      trademark and began using it to their own
20      purposes?
21   A.  Correct, that's correct.
22   Q.  And then if you would turn to Exhibit 1 for me.
23      This is the letter to Mr. Coleman dated June 24,
24      2016.
25              Is the logo at the top of what's
```

```
 1      Exhibit 1 the IHRC logo that you were
 2      referencing?
 3   A.  Yes.
 4   Q.  And same logo at the bottom of the letter?
 5   A.  Right, that's correct.
 6   Q.  And this is the logo that you allege this
 7      clandestine organization took and began using
 8      inappropriately?
 9   A.  Correct.
10   Q.  So they're not clandestine to the extent they're
11      doing this openly, correct?
12   A.  Yeah, they're doing it openly, right.
13   Q.  When I think of the word "clandestine", it's
14      someone doing something undercover.  These guys
15      are doing it open?
16   A.  They took the website as their own, repopulated
17      with new ambassadors without any jurisdiction or
18      agreement to do it.
19              It was clandestine, it wasn't -- they
20      didn't legally do it.
21   Q.  Fair enough.  So what is IHRC's current website?
22   A.  Right now it's kind of -- it's dark right now.  I
23      don't even know what the current website is.
24      There hasn't been any new activity.
25   Q.  Was the prior website www.ihrchq.org the web
```

```
 1      address that's listed?
 2   A.  Yes, it was.  Then that website got hacked if you
 3      will by the other organization.
 4   Q.  So there was a bit of a technology lag.  The
 5      IHRC's prior website was www.ihrchq.org, correct?
 6   A.  That was one of them.  They had a few, maybe
 7      three or four.
 8   Q.  What were the other ones?
 9   A.  ihrcheadquarters.org, ihrc -- I don't know, I
10      can't remember all of them.
11   Q.  Why did IHRC have multiple websites?
12   A.  Why did they have multiple websites?  I can't
13      answer the question.
14   Q.  You mentioned that IHRC currently does not have
15      any employees.  Does IHRC have any physical
16      office locations?
17   A.  Islamabad, Pakistan, it's still headquartered
18      there.  The world chairman, I have done zero
19      activities in the organization other than
20      dismantling the entire board for the whole
21      purpose of restructuring it.
22   Q.  Who is in the Islamabad, Pakistan office?
23   A.  It's held through the general counsel for IHRC.
24      Not an office -- it's an office that -- with the
25      lawyer that represents everything.  He's now
```

1  ==managing the IHRC.== ==The probable better way of==
2  ==saying it, it's in a document form right now.==
3  Q.   Fair enough, so there are no physical IHRC
4       locations as we currently speak?
5  A.   Not -- well, I'm not sure.  There may be -- as
6       an example a person is still appointed as an
7       ambassador.  I didn't take the ambassadorships
8       away, so there's still ambassadors, so they could
9       have an office in Ghana, that's their office
10      that's there.
11              You could have an office in -- these
12      offices still exist around the world, but as far
13      as the headquarters there isn't a headquarters at
14      this present moment.
15 Q.   These offices that may exist around the world,
16      does IHRC own them?
17 A.   No, they don't own the offices.  You're
18      appointed, so no different than you're appointed
19      as honorary counsel in the United States.
20              You can be honorary counsel out of your
21      home and you still do the work for that country.
22 Q.   So by offices you just mean locations where the
23      ambassador may work out of?
24 A.   Correct.
25 Q.   That would be owned or leased by that specific

1       ambassador?
2  A.   Correct.
3  Q.   And that brings me to my next question.  What is
4       an IHRC ambassador?
5  A.   What is -- what do you mean by that?
6  Q.   Right, what is that position?
7  A.   It's no different than a U.S. ambassador for a
8       specific country.  You represent a specific
9       subject matter like United Nations had -- there's
10      an ambassador to extraterrestrial life in the UN,
11      and for people that believe in aliens and have
12      the connectivity there, but the United Nations
13      does have a role for the ambassador for
14      extraterrestrial life.
15              There are ambassadors for countries
16      that people have never gone to or never go to,
17      but they're still ambassadors.  There are
18      ambassadors for business, business development
19      issues.  There's ambassadors for -- business is
20      limitless, it's just not country specific, they
21      are task specific as well.
22 Q.   So an IHRC ambassador is someone that IHRC
23      appoints to represent the organization in
24      specific subject areas, is that right?
25 A.   Subject areas and/or countries, correct.

1  Q.   How does a person become an IHRC ambassador?
2  A.   They're appointed by the world chairman.
3  Q.   What is -- any other vetting process other than
4       the world chairman appoints the ambassador?
5  A.   Interview, resume.  There's a process between the
6       ambassador and the minister of foreign affairs.
7  Q.   Is the minister of foreign affairs another
8       position within IHRC?
9  A.   Yes.
10 Q.   I'm going to go back to IHRC's website.  Does
11      IHRC have a current legitimate website?
12 A.   I do not know the answer to that question right
13      now.  Since I'm been managing the actual legal
14      websites if there's something that's up there
15      it's clandestine unless you bring something to my
16      attention I would say this is legitimate or it's
17      not.
18 Q.   Fair enough.  Let me ask you this.
19              Does Robert Shumake as world chairman
20      have control over any website affiliated with
21      IHRC?
22 A.   Yes, I do.
23 Q.   Which website is that?
24 A.   I believe IHRC headquarters, I have ihrchq.org.
25      I think there a third one, I forget what it is.

1       I'm rusty with it, so I don't know the answer.
2  Q.   Would it be ihrc-hq?
3  A.   That one as well, yes.
4  Q.   Any other websites?
5  A.   I believe so.  It's so many websites.  When this
6       clandestine organization took the first website I
7       tried to get it back, weren't able to get it back
8       at first so we set up another website and it
9       might by -hq or headquarters -- I don't know, but
10      I do know that this was the main one and this
11      this the one I was able to get back from Google
12      or the host group.
13 Q.   So it's your testimony here today that Robert
14      Shumake is the owner and/or controller of the
15      www.ihrchq.org website?
16 A.   It wouldn't be Robert Shumake, it would be --
17      it's as an agent for the organization.  I don't
18      own it, Robert doesn't own it.
19 Q.   Fair enough.  So I'll break that question up into
20      pieces.  Is it your testimony here today that the
21      official website for IHRC is the www.ihrchq.org
22      website?
23 A.   That's the official website to the best of my
24      knowledge.  I can't remember, it could be -- I
25      don't remember.

1  Q.  And that is the website that as world chairman
2      Robert Shumake would be able to direct -- put
3      this on the website --
4  A.  Presently, yes, I can do that now.  I had to get
5      it back from Google in order to do that.  I don't
6      think it was Google, it was something comparable
7      that's in that country, like a host -- not
8      GoDaddy, it's not Google, it's a host comparable
9      to it.
10  Q.  The domain name?
11  A.  Domain name.
12  Q.  Right, so I believe you testified earlier that
13      you had gotten the domain name for IHRC websites
14      back, is that not true?
15  A.  That is true, but what I'm saying is I don't know
16      if it's a .org or hq or which one it is, but I
17      was able to get the -- whatever one I sued on I
18      got it back.
19  Q.  You don't remember which website domain name you
20      got back?
21  A.  No, I don't, it's fuzzy, I don't recall.  It
22      could look it up, but I don't have information
23      right now.
24  Q.  Maybe we can do it during a break.
25  A.  Okay.

1      MR. MICHAEL:  Mr. Johnson, could you
2      inquire as to what date that he got it back when
3      he says he got it back?  I'm a little fuzzy about
4      the timeline.
5      MR. JOHNSON:  Who's speaking?
6  Q.  Attorney David Michael.
7      MR. JOHNSON:  David, I'm conducting my
8      deposition.  If you want to ask questions in your
9      portion you can ask questions in your portion,
10     but you can't direct me how I'm going to question
11     the witness?
12     MR. MICHAEL:  I wasn't directing you, I
13     was just making an inquiry.
14     MR. JOHNSON:  Well, the way this
15     format works is I ask the questions, you can
16     object if you have an objection to form and then
17     I'll pass the witness, but you cannot direct the
18     other side or interject in our questioning.
19     MR. MICHAEL:  Okay, go forward.
20  BY MR. JOHNSON:
21  Q.  Mr. Shumake, if you could turn to Exhibit 38.
22      (An off-the-record discussion was
23        held).
24  Q.  And, Mr. Shumake, when you were on a break
25      looking for Exhibit 38 you mentioned that you had

1      found what you believe to be the official website
2      and that was www.ihrchq.org, correct?
3  A.  Correct.
4  Q.  In your interrogatory responses you listed the
5      website of IHRC as www.ihrchedquarters.org?
6  A.  Correct.
7  Q.  So that is not the official website of IHRC,
8      correct?
9  A.  They're all official.
10  Q.  Your testimony as IHRC's representative is that
11     all three IHRC websites, the www.ihrchq.org,  the
12     www.ihrc-hq.org and the www.ihrcheadquarters.org
13     are all the official websites of IHRC?
14  A.  Correct.
15  Q.  Why would an organization have three separate
16     websites?
17  A.  I can't answer why they would do that.  I mean,
18     it happens in business all across the nation, the
19     world.  There are multiple websites for a main
20     organization.
21  Q.  Mr. Shumake, you are designated as the
22     representative of IHRC, so as a representative of
23     IHRC you can't answer that question?
24  A.  What you're asking is -- and maybe another
25     question, the organization when the world

1      chairman was in Debtor's Prison a clandestine
2      organization stole the main headquarters and you
3      still had people that were working in the
4      organization.
5      I believe the ihrc-hq, another
6      gentleman out of New York, they managed that
7      particular group.  I started the other one
8      headquarters to do the work.
9      So that's kind of what had happened.
10     But there's no reason -- that's what was going
11     on.  The website, some of the sites kept not --
12     the websites were going down and so by we
13     providing capital or putting capital in an
14     organization I needed to make sure that the IT
15     was operating properly.
16  Q.  Thank you for that answer.  That's not the
17     question I asked.  The question I asked you is,
18     as the representative of IHRC you testified that
19     all three websites were the official website of
20     IHRC.
21     My question is, why does IHRC as an
22     organization have three separate websites?
23  A.  I think I answered that for you.
24  Q.  You did not.
25  A.  What I said was the world chairman was in

1    Debtor's Prison which meant that he was not able
2    to operate the headquarters site, that was
3    clandestine, it was taken, was stolen.
4    And the group out of New York had
5    ihrc-hq that represented another part of the
6    organization and I was over the Americas.  That
7    is why it was set up.
8    Q.    And you started the website ihrcheadquarters.org?
9    A.    That's correct.
10   Q.    And by "you" --
11   A.    Subsequently I went out and sued and I got all
12   the sites.
13   Q.    So it's your testimony that you, Robert Shumake,
14   have the legal right to the three domain names
15   for the websites we've been discussing?
16   A.    Correct, I do.
17   Q.    What about the trademark for IHRC's logo, who
18   controls that right now?
19   A.    The world chairman.
20   Q.    And is that yourself, Robert Shumake?
21   A.    Yes.
22   Q.    Have you ever received any legal order granting
23   Robert Shumake as IHRC world chairman the right
24   to the logo?
25   A.    Yes.

1    Q.    What court issued that order?
2    A.    Islamabad, Pakistan.
3    Q.    And to be clear, that was an order issued from
4    the court, correct?
5    A.    Correct.
6    Q.    A physical copy of that order exists somewhere in
7    the world, correct?
8    A.    It does.
9    Q.    We have asked for that in discovery and you have
10   not provided it.
11   A.    You're asking me a question?
12   Q.    Yes, I guess my question is why has that not been
13   provided in response to our discovery request?
14   A.    I don't know, I can't answer that question.  I
15   don't know what you're asking for.
16   Q.    Have you taken -- since you have allegedly gained
17   control of the three IHRC websites have you taken
18   any action with regards to those three websites?
19   A.    No, other than getting the headquarters one shut
20   down.
21   Q.    So you got the www.ihrchq.org website shut down?
22   A.    Yes.
23   Q.    How did you do that?
24   A.    My lawyer submitted the court order to the host
25   of that website.

1    Q.    And then the company  --
2          MR. MICHAEL:  Excuse me, I did not --
3    this is David Michael.  I did not hear his exact
4    answer.  His lawyer submitted the court order to
5    where?
6          THE WITNESS:  The host.
7          MR. JOHNSON:  The company who had
8    hosted the website.
9          MR. MICHAEL:  Okay.
10   BY MR. JOHNSON:
11   Q.    You asked your lawyer to submit the court order
12   to the company that hosted the www.ihrchq.org
13   website and your testimony is that company took
14   down the website?
15   A.    Right.
16   Q.    Is that correct?
17   A.    Yes, that is correct.
18   Q.    Did you take any action with regard to the other
19   two websites we've been discussing?
20   A.    Did I take any action?  Well, the other one was
21   in my possession.  Did not take any action there.
22   Q.    By "the other one" you mean the --
23   A.    Headquarters.org.
24   Q.    What about the website with the - between ihrc
25   and hq?

1    A.    I'm not sure, I don't recall.  I may have taken
2    action against that one as well, I'm just not
3    sure.  My main focus was to take possession of
4    the clandestine site.
5    Q.    Let's take a look at Exhibit 22.
6          DEPOSITION EXHIBIT 22
7          IHRC agreement, etc.
8          WAS MARKED FOR IDENTIFICATION.
9    Q.    Mr. Shumake, Exhibit 22 is several IHRC related
10   documents that have been produced to us in this
11   case, the first being an agreement pertaining to
12   the programs and status of the International
13   Human Rights Commission, do you see that?
14   A.    I see it.
15   Q.    And the website on the cover page of this
16   document is the www.ihrc-hq.org website we're
17   been talking about, correct?
18   A.    Correct.
19   Q.    Can you tell me what this agreement is?
20   A.    This would be -- well, there's a lot of stuff in
21   here.  You got the accession agreement.  When you
22   develop an IGO, intergovernmental organization
23   you're -- just like United Nations you have
24   contractual agreements between countries and
25   other intergovernmental organizations.

1        Those are what you call accession
2  agreements.  So I see that.
3  Q.  Can you say that again, you call them what type
4  of agreement?
5  A.  Accession agreements.
6  Q.  What generally is an accession agreement?
7  A.  It's an agreement between two organizations.
8  Q.  To what end?
9  A.  An example of that would be United Nations has an
10  accession agreement with South Sudan which became
11  a country less than seven years ago to become a
12  member of the South Sudan.
13        These are agreements based upon the
14  Vienna Convention, there's legal ramifications of
15  the Vienna Convention that is if you're going to
16  do business with another organization you create
17  an accession agreement.
18        Benjamin Franklin was an ambassador, he
19  took accession agreements and created
20  relationships between Europe and France.  Those
21  are what those agreements are about.
22  Q.  So an accession agreement governs the
23  relationship between either a country and an
24  entity or two entities?
25  A.  Correct, two intergovernmental organizations.

1  Q.  The agreement that is in Exhibit 22, with whom is
2  this an agreement between the IHRC and?
3  A.  This here in a generic agreement that could be
4  with any organization.  It lists the bylaws,
5  articles, how the organization governs itself,
6  the subsidiary organizations.
7  Q.  So this is a template agreement that would be
8  used with specific entities that IHRC would want
9  to contract with, correct?
10  A.  Correct and vice-versa.
11  Q.  If you could turn to the end of the agreement,
12  seven or eight pages in, you'll see a document
13  titled MOU/Instrument of Accession?
14  A.  Correct, that's the agreement that I was talking
15  about.
16  Q.  So this is kind of the signature page for the
17  prior agreement, correct?
18  A.  It's a little more meatier than this.  I'm not
19  sure the group that put that on there.  It has
20  more meat and potatoes on it than this one-page
21  document.
22  Q.  And Mr. Khan whose signature is there, that's the
23  Mr. Khan you were referencing who was the world
24  chairman before that went to Debtor's Prison in
25  Pakistan?

1  A.  Correct.
2  Q.  And then this MOU is unsigned, but on the
3  signature block that's corresponding to Mr. Khan
4  it has for the participant parties/the state/
5  organization United Nations Security Council and
6  lists Andrej Verity as a signatory for the United
7  Nations Security Council, is that right?
8  A.  Yes, I'm looking at it.  I don't know who Andrej
9  Verity is.  I don't know who that is.
10  Q.  You weren't involved with -- let me ask you this.
11        Were you ever -- was Robert Shumake
12  ever involved with getting one of these accession
13  agreements in place with any entity?
14  A.  Recently, I forget the name of the organization.
15  It's an organization similar to the African
16  Union.  I was able to get an accession agreement
17  between that organization, I don't know the name
18  of the organization, I can't -- it slips me right
19  now, and so it would be countries that are new
20  countries and an example of that would be like a
21  South Sudan.
22  Q.  Other than the accession agreement you just
23  mentioned has Robert Shumake ever been a
24  signatory for any other accession agreement for
25  IHRC?

1  A.  No, not that I can recall.  There might have been
2  -- yeah --
3  Q.  Could you repeat that, Mr. Shumake, I couldn't
4  hear you?
5  A.  No, not that I can recall, nothing around this
6  time period.  These are all -- I don't even know
7  what this is.  2018, unaware of it.
8  Q.  You're unaware of what agreements IHRC would have
9  been entering into in 2018, fair?
10  A.  Not all of them.  Some of them I had knowledge
11  of.
12  Q.  What agreements did you have knowledge of in
13  2018?
14  A.  The agreement when the IHRC became a member of
15  the UNEP, United Nations Environmental Program.
16  Q.  Were you involved in that agreement?
17  A.  Yes.
18  Q.  What was Robert Shumake's role in that agreement?
19  A.  I organized the deal between IHRC and the United
20  Nations Environmental Program.
21  Q.  Were you the signatory for IHRC for that
22  agreement?
23  A.  There wasn't a signature needed, just documents
24  and they issue their agreement, the United
25  Nations.

1 Q. That agreement was something that was
2 unilaterally issued by the United Nations,
3 correct?
4 A. When you say unilaterally an issue, what do you
5 mean by that.
6 Q. The United Nations was the only party that issued
7 something?
8 A. Correct. You send your documents in, they do due
9 diligence on your organization, determine if you
10 meet the standards of an IGO or NGO and then they
11 issue their -- they issue their document to you.
12     So now you become a member of the
13 United Nations program. We're also members of
14 economic -- United Nations EP -- UNEP is more
15 prestigious than the other, way more prestigious.
16 Q. What UN program is IHRC a member of currently?
17 A. UNEP and ECOSOS.
18 Q. You said ECSOS?
19 A. ECOSOS, I can look it up.
20 Q. What is that?
21 A. That's economic subsidiary of the United Nations.
22 Q. Other than those two programs is IHRC involved in
23 any other UN programs?
24 A. No, not to my knowledge.
25 Q. In 2016 what UN programs was IHRC involved in?

1 A. ECOS.
2 Q. Just the ECOS?
3 A. Yes, ECOSOS.
4 Q. ECOSOS, okay, and I'm sure that's something that
5 we could just --
6 A. It's public and actually it's in a document that
7 I submitted, it should be.
8 Q. I've seen what you've referencing.
9 A. Here it is, ECOSOC.
10 Q. Okay, ECOSOC, all right.
11     And in Exhibit 22 there's also a
12 charter, correct?
13 A. Say that one more time.
14 Q. Sure. If you'll flip -- we were talking about
15 the MOU instrument of accession. If you'll flip
16 another page the kind of document starting from
17 the back in is the charter of IHRC?
18 A. Correct.
19 Q. Does this charter -- is this the document that
20 governs IHRC's operations?
21 A. This and the bylaws.
22 Q. Any other document that govern their operations?
23 A. Bylaws, this charter and I want to say there's
24 another document. I just can't -- I'm a little
25 foggy right now.

1 Q. What is IHRC's charitable mission?
2 A. It's not necessarily set up to be a charity by
3 itself, it's set up to be an intergovernmental
4 organization that does charitable work.
5     In and of itself it's not a charity.
6 Q. Has IHRC ever applied for any type of license to
7 conduct business in the United States?
8 A. License? What do you mean?
9 Q. Any type of license with any governmental entity
10 in the United States?
11 A. I'm still lost. What do you mean by license,
12 like a construction license or something like
13 that or --
14 Q. Any type of license?
15 A. No, there hasn't been a license to IHRC. I did a
16 name change on a not for profit 501(c)(3) to get
17 not for profit designation in the U.S.
18     That's the only thing that IHRC has
19 done domestically here. The IHRC is a worldwide
20 organization, so when I got appointed it was to
21 raise capital and do the work that I had been
22 doing independent of the IHRC.
23     At times donors or individuals want to
24 have a tax write-off. The IHRC would not have a
25 U.S. tax deduction criteria.

1 Q. So it's your testimony that IHRC has applied for
2 tax exempt status as a 501(c)(3) organization
3 with the IRS?
4 A. No, IHRC did not apply. I controlled a 501(c)(3)
5 independent of that and I did a name change.
6 Q. What entity was that that you controlled?
7 A. The 501(c)(3)?
8 Q. Yes.
9 A. It's called a SHU foundation.
10 Q. SHU?
11 A. S-H-U.
12 Q. And you changed the SHU Foundation's name to what
13 name?
14 A. The International Human Rights Commission.
15 Q. You changed the SHU Foundation's name to IHRC's
16 name?
17 A. I did.
18 Q. Did you submit any documentation to the IRS in
19 conjunction with that?
20 A. Wasn't necessary, it's how it works, it's a state
21 name change.
22 Q. What state was the SHU Foundation registered in?
23 A. Georgia.
24 Q. So you changed the SHU Foundation's name with the
25 Georgia Secretary of State to International Human

1 Rights Commission, correct?
2 A. That's correct.
3 Q. And that's all the steps you took with regard to
4 that name change and the entity's 501(c)(3)
5 status, right?
6 A. Correct.
7 Q. As an intergovernmental organization does IHRC
8 have to register with the United States
9 Department of State or any other governmental
10 agency?
11 A. No, it does not.
12 Q. So it's your testimony that IHRC does not have to
13 register with either any state or federal
14 authorities before conducting fundraising in the
15 United States, correct?
16 A. Two different conversations you're asking me
17 about.
18 Q. Well, let me ask you that question. Does the
19 IHRC have to register with any federal or state
20 governmental entity prior to conducting
21 fundraising activities in the United States?
22 A. It does not, no different than an embassy that's
23 in the United States in DC, or the chancelleries
24 in New York.
25 You're able to raise money and people

1 can contribute to those causes, but they will not
2 receive a tax write-off for it.
3 Q. And to be clear, IHRC has never registered with
4 any federal or state governmental entity prior to
5 conducting fundraising?
6 A. I have no idea, I don't know the answer to that
7 question.
8 Q. To your knowledge it has not though, right?
9 A. I don't know.
10 Q. Well, as you sit here today, Mr. Shumake, you
11 would know if it had, correct?
12 A. No, I wouldn't know if it had. I'm looking at a
13 document you just sent me that was in 2018 which
14 I was a member and that document was signed -- I
15 had no knowledge of, so I can't speak on that.
16 What I can say is -- what I've done
17 independent of that I just shared with you I did
18 a name change so that I could receive funds and
19 people could receive a tax benefit for it.
20 Q. And other than that 501(c)(3) name change, you're
21 not aware to your knowledge as you sit here today
22 of any other registration with any state or
23 federal entity -- in the United States?
24 A. I wouldn't know anything about it, nor do I
25 believe that you would have to have that to do

1 that.
2 It's not a U.S. entity.
3 Q. Regardless of whether you would or would not have
4 to have that, you're not aware of IHRC doing
5 that, correct?
6 A. Nope, I'm not.
7 Q. How does IHRC raise funds?
8 A. How does it raise funds?
9 Q. Yes.
10 A. From a world perspective?
11 Q. Sure.
12 A. People believe in what IHRC represents and they
13 contribute to it across the globe. I don't know,
14 I'm trying to remember, 20,000 members. It's
15 massive -- or it was massive in its heyday.
16 Q. Is it your testimony that at one point IHRC had
17 20,000 separate members?
18 A. Correct.
19 Q. How many members does it have now?
20 A. I have no idea. It's kind of flatlined based
21 upon all the in-fighting and I'm going to
22 restructure it in a way that it's sustainable.
23 Q. Is there a membership registry?
24 A. There has been one.
25 Q. Is there one now?

1 A. I don't know.
2 Q. Do you know who would control the membership
3 registry if there was one?
4 A. Asra Khan.
5 Q. Who is Asra Khan?
6 A. She was the past minister of foreign affairs.
7 Q. If he was the past minister of foreign affairs
8 why would he control IHRC's current membership
9 registry?
10 A. She, she.
11 Q. Sorry, I apologize. If Ms. Khan was IHRC's past
12 minister of foreign affairs why would she control
13 IHRC's current membership registry?
14 A. That fell under the auspices of foreign affairs.
15 Bringing members on, managing ambassadors and
16 people that went out around the world to do the
17 work.
18 Q. Right, and, Mr. Shumake, my question is directed
19 towards the current membership registry?
20 And you testified that Ms. Khan was the
21 past minister and my question is, why would a
22 past minister control the current membership
23 registry?
24 A. There's another trick word. There's no new
25 members, so past and current are one in the same.

1  Q.  When is the last time that IHRC gained a new
2      member?
3  A.  I have no idea, I don't know.
4  Q.  Has IHRC gained a new member since you've been
5      world chairman?
6  A.  Not to my knowledge.
7  Q.  Who is in charge of raising funds for IHRC?
8  A.  Everyone, all leadership.
9  Q.  Currently who does that consist of?
10 A.  It doesn't consist of anyone.  The whole
11     organization is in flatline.  That would be me if
12     I chose to do it right now.  There isn't anyone
13     else that's operating.
14 Q.  In 2016 who was in charge of raising funds for
15     IHRC?
16 A.  That would have been myself, that would have been
17     Mohamed Khan, it would have been Asra Khan, a lot
18     of people.  Anyone that had a position
19     responsible for raising money.
20 Q.  Would each ambassador have a duty to raise funds?
21 A.  That's what's supposed to happen.
22 Q.  You said that was supposed to happen,
23     Mr. Shumake?
24 A.  Yes, uh-huh.
25 Q.  Each ambassador was supposed to be out involved

1      in collecting and raising funds, correct?
2  A.  Correct.
3  Q.  So does IHRC keep records of its fundraising?
4  A.  I don't know the answer to that question.  This
5      organization, prior to me coming, it was not run
6      very properly and I came in and put some
7      structure around it.
8  Q.  In 2016 when an ambassador raised funds -- let's
9      say I'm an ambassador, I raised $10,000 for IHRC.
10     Who would they report that fact to?
11 A.  The world chairman.
12 Q.  So every dollar raised would be reported to the
13     world chairman?
14 A.  Yes.
15 Q.  How would that fact be reported to the world
16     chairman?
17 A.  I don't know the answer to that question.
18 Q.  Well, Mr. Shumake, you yourself were an
19     ambassador at one point, correct?
20 A.  Correct and still an ambassador.
21 Q.  You're still an ambassador, so in 2016 as an
22     ambassador how would Robert Shumake report
23     raising funds to the IHRC world chairman?
24 A.  We would talk about it.
25 Q.  Would that be by phone?

1  A.  Phone, text message, e-mail, WhatsApp across the
2      board.
3  Q.  Was there any formal policies and procedures in
4      2016 for reporting the raising of funds?
5  A.  What do you mean by that, reporting the raising
6      of funds, no.
7  Q.  Did IHRC have any written documentation,
8      guidance, policies or procedures that governed
9      how ambassadors would report funds that they
10     raised?
11 A.  No, not to my knowledge.  It was just a role
12     we're supposed to do, raise capital.  My role was
13     a little different in that I had a specific
14     purpose, to go out to the Africa and the Americas
15     in specific areas.
16 Q.  Who kept the books for IHRC in 2016?
17 A.  There were -- that's a trick -- no one, I'll just
18     say no one kept the books.
19 Q.  Were any books kept?
20 A.  I don't know.  I never was a part of any of that.
21 Q.  By "books" you understand that I mean financial
22     records, right?
23 A.  I have no idea.  I don't know.  I doubt it,
24     possibly, maybe, I'm not sure.
25 Q.  Sure and my question was just making sure that

1      you understood that I was referring to financial
2      records as books.
3  A.  Yeah.  I don't know if IHRC actually had any
4      books or they're required to have books.
5      Definitely I do know that those books are not
6      required to be shown out to the world.
7          It's an IGO so it's a private
8      organization that is above penetration.
9          Like United Nations does not give their
10     books and records.  The Organization of American
11     States does not give their books and records.
12     Intergovernmental organizations don't do that,
13     nor are they required.
14 Q.  Sure.  So you don't know what financial records
15     were kept in 2016, correct?
16 A.  I do not.
17 Q.  Do you know what financial records for IHRC are
18     presently kept?
19 A.  No.  They're one in the same.  There isn't
20     anything happening in IHRC presently right now.
21          I have to put you in pause, I have to
22     use the restroom.
23 Q.  Sure, we can take a break.
24          (A recess was taken).
25 BY MR. JOHNSON:

1  Q.   In 2016 when IHRC raised money, what forms of
2       donation did IHRC accept?
3  A.   Cash.
4  Q.   What about checks?
5  A.   Never got any checks.
6  Q.   What about -- wouldn't IHRC accept a check?
7  A.   It never received any.
8  Q.   What about electronic deposits?
9  A.   Didn't have an account open at the time.
10 Q.   So your testimony is that IHRC did not have a
11      bank account open in 2016?
12 A.   Not that I'm aware of.
13 Q.   Does IHRC have a bank account currently?
14 A.   Not any longer, I closed it all down.
15 Q.   For what time period did IHRC have a bank
16      account?
17 A.   I think from 2018 to 2020.
18 Q.   Were those accounts held in IHRC's name?
19 A.   For a brief moment.
20 Q.   Was that for the 2018 to 2020 time period?
21 A.   Yes.
22 Q.   Were they ever held in any other name?
23 A.   How do I explain this?  Actually there -- there
24      may still be an IHRC account.
25 Q.   Which bank is that account with?

1  A.   I think it's with Wells Fargo.
2  Q.   Who has control over that bank account?
3  A.   Attorney Nicole Birch.
4  Q.   Does Robert Shumake have any control or signatory
5       authority over that Wells Fargo bank account?
6  A.   I don't think so, I'm not sure, I doubt it.
7  Q.   Are there any other IHRC accounts that you were
8       referencing from the 2018 to 2020 time period or
9       was it just that one Wells Fargo account?
10 A.   No, just that.
11 Q.   Do you know who opened that IHRC account?
12 A.   Attorney Nicole Birch.
13 Q.   In 2018 when the account was opened who was the
14      world chairman of IHRC?
15 A.   I think the world chairman was still the world
16      chairman.
17 Q.   And who was that individual?
18 A.   Mohamed Khan.
19 Q.   When did Robert Shumake become the world chairman
20      of IHRC?
21 A.   I don't remember.  I want to say January of 2019.
22      I'm not sure, I can't remember, I'm just
23      exhausted right now.
24           Yeah, January of 2019 is when I -- no,
25      I became the chairman in February of 2019 and I

1  was appointed back in October or November.  I'm
2  not sure when the appointment actually took
3  place, but I became -- at a certain date the last
4  chairman stepped down, I became the world
5  chairman.
6  Q.   If the last chairman stepped down and you
7       testified earlier that the prior chairman always
8       appointed the new chairman, by what operation did
9       you then become the new chairman?
10 A.   He signed an agreement with me, he appointed me,
11      documented it.
12 Q.   Mr. Khan signed an agreement with you appointing
13      you as world chairman?
14 A.   Correct.
15 Q.   Can a donor donate to IHRC through their website?
16 A.   Not presently.  What do you mean through their
17      website?  Through IHRC's website?
18 Q.   Correct.
19 A.   So the clandestine website allowed for like Visa
20      and Mastercard payments, that kind of thing,
21      which I have no -- I wouldn't know anything about
22      that.
23           And if they started another website I
24      wouldn't know about that either.  But no, we've
25      -- there's never been a dollar raised through my

1  platform with that.
2  Q.   In 2016 could a donor donate to IHRC through
3       IHRC's website?
4  A.   Not to my knowledge.
5  Q.   Does IHRC provide donation receipts to donors?
6  A.   I don't know; I did.
7  Q.   You don't know if other ambassadors who were
8       raising money did so?
9  A.   No, I don't know what they did.
10 Q.   Fair to say then that there was no formal policy
11      or guidance at IHRC regarding donation receipts?
12 A.   Correct.  Based upon my training a guy gives a
13      sizable amount of money, give him a receipt.
14           You can't give him a tax write-off for
15      it, but you can give him a receipt.
16 Q.   So there would have been nowhere at IHRC where
17      records of donation receipts were stored,
18      correct?
19 A.   No.
20 Q.   In 2016 when IHRC received cash donations where
21      were those donations stored?
22 A.   Where were they stored?
23 Q.   Yes.
24 A.   Safes, book bags.
25 Q.   You mentioned safes and bags.  Anywhere else?

1  A.  No, not that I know of.
2  Q.  Where were -- let's take the safes first.  Where
3      were the safes located that IHRC stored cash in
4      2016?
5  A.  Atlanta.  I don't know if 2016 my dates were off.
6      I'm wondering out right now.  So I don't know --
7      Atlanta, California, I had a safe in Detroit,
8      those three places.
9  Q.  And, Mr. Shumake, I'm using 2016 because that's
10     the year of the seizure.  If it helps you better
11     to think of that reference as the time of the
12     seizure, that's fine too.
13         But what I'm driving at is during the
14     time period of the seizure which was in 2016
15     where did IHRC have safes that stored the cash?
16         So I've got Atlanta, California and
17     potentially Detroit?
18 A.  Yes.  Remember I just started raising capital in
19     that year.
20 Q.  So prior to 2016 Robert Shumake had not been
21     raising any capital for IHRC, correct?
22 A.  No.  I was raising capital to develop this
23     housing project and water facilities.
24 Q.  Does IHRC ever deposit cash donations it has
25     received into a bank account?

1  A.  Not to my knowledge.
2  Q.  For the Wells Fargo bank account that did exist
3      do you know where the money to set up that bank
4      account came from?
5  A.  Came from me.
6  Q.  Was that your personal funds?
7  A.  Yes.
8  Q.  So you put some of Robert Shumake's personal
9      funds into the IHRC Wells Fargo bank account,
10     correct?
11 A.  Yes.
12 Q.  How much?
13 A.  $100 maybe, whatever the minimum was to open the
14     account.  I don't know what it was.
15 Q.  Nothing more than kind of the account minimum
16     balance?
17 A.  Correct.
18 Q.  Were there -- did anyone else put any funds into
19     that bank account to your knowledge?
20 A.  I don't know.
21 Q.  In 2016 did IHRC ever transfer money
22     electronically?
23 A.  I don't recall.
24 Q.  Did Robert Shumake working for IHRC ever transfer
25     IHRC's money electronically?

1  A.  I may have sent a transfer to Ireland as a
2      deposit on a housing factory, but I also believe
3      they came over -- they came to visit me in the
4      U.S. to collect cash, but I don't recall.
5  Q.  Has IHRC ever sent money by MoneyGram?
6  A.  Yes.
7  Q.  Where was that money sent?
8  A.  Pakistan, Kenya, Tanzania, Ghana.
9  Q.  How often would IHRC send money by MoneyGram?
10 A.  A lot.
11 Q.  Who in -- just generally who in those countries
12     would IHRC be sending the money to?
13 A.  Mohamed Khan, Asra Khan -- I forget the other
14     names.
15 Q.  What about in Kenya, who was the IHRC sending
16     money by MoneyGram to in Kenya?
17 A.  Amos Meara (sp).  He was a representative in
18     Kenya helping us organize.
19 Q.  So Amos was an IHRC representative in Kenya,
20     correct?
21 A.  Correct, Tanzania.
22 Q.  Did IHRC have any representatives in Tanzania?
23 A.  Yes.
24 Q.  Who were they?
25 A.  I don't recall their names, but I would have sent

1      money --
2  Q.  Roughly how many -- say that again, Mr. Shumake.
3  A.  I would have sent money for the purpose of doing
4      projects over there.  If you got the Western
5      Union report you would see that I've sent a lot
6      of money over through Western Union.
7  Q.  You would have sent money, IHRC's money, through
8      either MoneyGram, Western Union, another money
9      service to IHRC representatives in both Kenya and
10     Tanzania, correct?
11 A.  Kenya, Tanzania -- I've sent them everywhere, all
12     over the world doing the work.
13 Q.  And with respect to Kenya and Tanzania you
14     testified that was a fair amount of money,
15     correct?
16 A.  What do you mean "fair amount of money"?  I'm
17     lost with that word.
18 Q.  Sure.  I think you testified it was a substantial
19     amount of money?
20 A.  Over time?  I don't know.
21 Q.  Yes.
22 A.  I sent enough money that they -- the agent asked
23     me about suspicious activity, but I sent money to
24     people that were working in third world
25     countries.

1        And so as you can realize -- well,
2 however they set the system up that these
3 countries are not supposed to receive capital, so
4 how else do you get it there?  You take it in
5 cash.
6        And the example of that is having a
7 problem with Western Union to send money.
8 Q.  Was it hundreds of thousands of dollars that you
9 were sending?
10 A.  I don't recall.
11 Q.  Do you know if it was over or under $100,000 that
12 you sent electronically to Kenya and Tanzania?
13 A.  I don't recall.
14 Q.  Did IHRC also use couriers to transport cash?
15 A.  Yes.
16 Q.  How were couriers employed by IHRC?  Were they
17 employees, 1099 contractors?
18 A.  IHRC would not have a 1099, that's IRS code.  As
19 an intergovernmental organization we're not a
20 part of that same system.
21 Q.  Fine.  Were the couriers that IHRC used paid as
22 employees of IHRC or were they paid as
23 independent contractors?
24 A.  Diplomatic couriers.
25 Q.  We can break this down part by part.  Was a

1 courier that IHRC used an employee of IHRC?
2 A.  They're diplomatic couriers.  They don't -- if
3 you study the Vienna Convention it doesn't work
4 that way.
5        There is a diplomatic courier body that
6 is independent of any of that and these are
7 people that are a part of the whole diplomatic
8 community.  They're not employees, nor are they
9 independent contractors, they're specific to the
10 work that they do.
11        And in this case they were appointees
12 volunteers if you will to the IHRC.
13 Q.  Were the couriers paid for their work?
14 A.  They got fees at times, not all of the time.
15 Q.  When a courier was paid for his or her work how
16 did they receive the fees?
17 A.  In cash.
18 Q.  Would that be a portion of the cash that they
19 were transporting?
20 A.  Not necessarily.
21 Q.  They would transport a certain amount of cash and
22 then they would also be paid in cash for
23 transporting that cash, correct?
24 A.  Yes, you could say that.
25 Q.  How much would they be paid in cash?

1 A.  $500 to a few thousand dollars.
2 Q.  How was that rate set?
3 A.  I don't recall, just depends on what we were
4 trying to do at the time.
5 Q.  How did IHRC select its couriers?
6 A.  What do you mean?
7 Q.  If IHRC is looking for people to courier cash for
8 them are there any criteria that they used?
9 A.  I wouldn't know about any other person as it
10 related to IHRC.  I can just talk about the
11 people that I work with.
12        I recommend to the world chairman, he
13 vetted them and he appointed them directly
14 himself.
15 Q.  For the couriers that you, Robert Shumake, were
16 involved in how were those couriers selected?
17 A.  I recommended them to the world chairman, he
18 vetted them and then he would appoint them.
19        The world chairman at the time did all
20 the appointees.  I did not have any jurisdiction
21 over who he appointed, but I recommended them and
22 he appointed them.
23 Q.  Sure.  Prior to recommending them what would you
24 look for in a courier?
25 A.  Honesty.  In this specific case if that's what

1 you're asking me, I've been knowing Mr. Coleman
2 for years.  Very honest, reliable.  He spent time
3 going to Africa with me and so as you've checked
4 his travel records he's been all over the world.
5        He's the perfect candidate that
6 understands the diplomatic platform and the laws
7 thereof.  The others were attorneys.
8 Q.  Does Mr. Coleman have a military background?
9 A.  He does.
10 Q.  He does?
11 A.  He does.
12 Q.  What branch did he serve in?
13 A.  U.S. Army.
14 Q.  Do you know how long he served?
15 A.  Four years.
16 Q.  Do you know what this role in the Army was?
17 A.  Sergeant.
18 Q.  Do you know what type of job he did in the Army?
19 A.  I do not know.
20 Q.  Do you know if Mr. Coleman had any prior
21 experience as a cash courier prior to his work at
22 IHRC?
23 A.  Yes, he was executive director of the Botswana
24 American Chamber of Commerce.
25 Q.  And in that role he served as a courier for cash?

1　A.　Maybe at times.  He was at the appointment of the
2　　　honorary counsel which was myself.
3　Q.　You would know whether or not Mr. Coleman as
4　　　executive director worked as a cash courier in
5　　　that role, correct?
6　A.　In that role he did multiple things other than
7　　　that in that role, but yes, he could take cash.
8　　　As I've said to the other gentleman, when you're
9　　　overseas your credit cards don't work.
10　　　　　　　90 percent of the time -- we did a lot
11　　　of trade missions and so we needed cash to make
12　　　sure we had cash to pay for the hotel room to pay
13　　　for our retreat centers and those types of
14　　　things.
15　　　　　　　Your credit cards, they usually got
16　　　stopped or turned off because of where we were
17　　　going.  You couldn't be overseas in another
18　　　country and your credit cards don't work and you
19　　　don't have any cash.
20　Q.　Does IHRC have any policies governing couriers or
21　　　the performance of their duties as couriers?
22　A.　Just through the Vienna Convention law that says
23　　　what a diplomatic courier can do.  It's not a
24　　　cash courier, it's a diplomatic courier by the
25　　　way.

1　Q.　Are you familiar with what a diplomatic bag or
2　　　pouch is?
3　A.　I am.
4　Q.　Does IHRC have any diplomatic bags or pouches?
5　A.　Yes.
6　Q.　Does IHRC use those diplomatic bags or pouches to
7　　　courier cash?
8　A.　They have.
9　Q.　Who issues those diplomatic bags or pouches?
10　A.　Who issues those?  What do you mean by that?
11　Q.　Sure.  I mean if IHRC has a diplomatic bag is
12　　　that just a bag that IHRC has, does it come from
13　　　somewhere?
14　A.　IHRC would appoint -- so if you're appointed as a
15　　　diplomatic courier you could get a bag.  The IHRC
16　　　would not be a part of that process other than
17　　　the appointee of the courier.
18　　　　　　　So all the diplomatic couriers have
19　　　diplomatic cards, diplomatic courier cards based
20　　　upon what they were supposed to do.
21　　　　　　　And then if you go further into the
22　　　Vienna Convention laws it says what a diplomatic
23　　　courier is supposed to do.  It talks about the
24　　　diplomatic pouch.  If you go into your Secretary
25　　　of State's website it determines what you're able

1　　　to do as a diplomatic courier.
2　　　　　　　Some of them are supposed to have
3　　　diplomatic passports, but usually U.S. citizens
4　　　do not, but you can have a diplomatic ID card
5　　　which is what they had.
6　Q.　And diplomatic identification cards are issued by
7　　　the United States Department of State, correct?
8　A.　No, the diplomatic ID cards, diplomatic courier
9　　　cards specific to this section we're talking
10　　　about, are issued by the intergovernmental
11　　　organization.  It has nothing to do with -- it's
12　　　a worldwide organization.
13　　　　　　　We just happen to be -- we just happen
14　　　to have our first -- I was a first ambassador in
15　　　the U.S., so all those things were not created
16　　　and secure yet, but based upon --
17　Q.　Does anyone at IHRC have a diplomatic
18　　　identification card issued by the United States
19　　　Department of State?
20　A.　I do not know in relation to IHRC.  I used to
21　　　have a diplomatic card from the Secretary of
22　　　State as the honorary counsel for the two
23　　　countries that I represented and you have copy of
24　　　that.
25　Q.　Yes, and what years did you have that diplomatic

1　　　identification card?
2　A.　2013 to 2018 I think, I'm not sure.
3　Q.　And that diplomatic identification card was not
4　　　for your role at IHRC, correct?
5　A.　They're interconnected.  Not as my role as IHRC
6　　　deputy chairman at the time, but it's -- how do
7　　　you not be an ambassador once you're appointed.
8　　　You don't ever lose a title, you always have that
9　　　designation.
10　Q.　And my question was, to the extent that the
11　　　United States Department of State may have issued
12　　　you a diplomatic identification card, that was
13　　　not based on your role with IHRC?
14　A.　IHRC had nothing to do with that.  IHRC was not a
15　　　U.S. organization, so Secretary of State specific
16　　　was for countries that were doing -- had
17　　　accession agreements with the United States and
18　　　the United States would give their membership ID
19　　　cards in their system.
20　Q.　Does anyone at IHRC have a diplomatic
21　　　identification card issued by any other country
22　　　or governmental entity?
23　A.　Yes.
24　Q.　Who?
25　A.　The world chairman -- there are probably a few

1 people. Their IDs, they're moving around,
2 countries give those identification, diplomatic
3 passports. Equatorial Guinea, there are many --
4 it's limitless.
5 Q. You mentioned the prior world chairman, Mr. Khan,
6 correct?
7 A. Yes.
8 Q. With what country was he issued a diplomatic
9 identification card?
10 A. That would be a passport. I think it was
11 Equatorial Guinea or Guinea-Conakry, I'm not
12 sure.
13 Q. Earlier you were talking about using MoneyGram.
14 What were MoneyGram's fees for electronically
15 transferring cash?
16 A. I don't know; too much.
17 Q. You don't remember how much it cost to send, say,
18 $100,000 by MoneyGram?
19 A. Way too much money.
20 Q. Do you recall how much it cost to use Western
21 Union?
22 A. Same amount of money, too much. With the
23 invention of M-Pesa, Mobile Money, MoneyGram and
24 Western Union are now trying to compete because
25 they were overcharging for brick and mortar.

1 So now money is moving differently and
2 you have the Hawala money movement for certain
3 countries as well.
4 Q. You would agree with me that now it's fairly easy
5 to move money electronically with Venmo and Zelle
6 and companies like that, correct?
7 A. Moving money where?
8 Q. Anywhere between two people electronically?
9 A. Yes, they took that from East Africa. PayPal
10 took the idea from M-Pesa, so Cash App, Zelle,
11 Venmo.
12 Q. These are all current services where money can be
13 transferred electronically, right?
14 A. Yes, for smaller amounts for the most part, yes.
15 Q. How many times has Darren Coleman transported
16 money for IHRC?
17 A. I do not know. He asked me that question
18 earlier.
19 Q. Did Darren Coleman ever transport money for any
20 other ambassador at IHRC other than Robert
21 Shumake?
22 A. No, not that I know of.
23 Q. Who supervised Darren Coleman at IHRC?
24 A. Supervised him? It doesn't work like that. He's
25 a diplomatic courier. He has no supervision.

1 He's appointed, he does the work. He's at the
2 behest of the world chairman.
3 Q. So if Darren Coleman was going to report to
4 anyone at IHRC in 2016 it would have been the
5 world chairman?
6 A. He was under the jurisdiction of the world
7 chairman. Of course because I had a relationship
8 with him, it remains to be seen that we would
9 have discussion about what his role was and what
10 he was doing, but I didn't appoint him.
11 Q. Who at the IHRC had the authority to tell Darren
12 Coleman to either do or not do something?
13 A. The world chairman or I could do it as a deputy
14 chairman as well.
15 Q. Was that the case in 2016?
16 A. Yeah. I just didn't have the power to appoint.
17 Q. Right and that's why I'm asking you about the
18 supervision.
19 A. There's no supervision.
20 Q. Who had the power to tell Darren Coleman take
21 this money from here to here?
22 A. Well, in that case it would be me and the world
23 chairman could have done that as well or the
24 minister of foreign affairs.
25 Q. Let's say someone didn't like the way Darren

1 Coleman did his job taking money from X place to
2 Y place, like who would have the power to tell
3 him to do it differently?
4 A. The world chairman.
5 Q. Anyone else?
6 A. I could do it.
7 Q. Anyone other than the two of you?
8 A. I didn't have the ability to appoint or
9 disappoint him.
10 Q. And I understand that concept and you testified
11 to that, Mr. Shumake. I'm -- my question is
12 after he is appointed in terms of the day-to-day
13 operations who had the authority to tell a
14 courier such as Mr. Coleman, you know, go here,
15 pick up this money there, that kind of thing?
16 A. That would be under my role on fundraisers. I
17 was in direct communication with him.
18 Q. When Mr. Coleman was traveling on behalf of IHRC
19 transporting money who paid for his travel
20 experiences?
21 A. I did, he did.
22 Q. It's your testimony that both yourself and
23 Mr. Coleman would pay for his travel expenses?
24 A. Sometimes, yes. He would be reimbursed for them.
25 Q. So at the end of the day Mr. Coleman himself was

1       not putting up the money for his travel?

2  A.  He has, yes, on a couple of occasions.

3  Q.  But then if I did that he would be ultimately

4      reimbursed?

5  A.  Correct.

6  Q.  So kind of what I'm driving at is that ultimately

7      after the dust settled Mr. Coleman's travel

8      expenses were paid by yourself, correct?

9  A.  IHRC.  Sometimes I would advance the money at

10     times and I would be reimbursed.

11  Q.  So either if Mr. Coleman was taking a flight from

12     Atlanta to San Francisco for example, either

13     yourself or Mr. Coleman would advance the money

14     for the flight originally, correct?

15  A.  Correct.

16  Q.  And then at some point IHRC would reimburse

17     Mr. Coleman for that flight expense or reimburse

18     yourself for that flight expense if you were the

19     one who funded the money?

20  A.  Correct.

21  Q.  Same thing with hotel, rental car and other

22     travel expenses?

23  A.  Yes.

24  Q.  Who at IHRC was in charge of travel

25     reimbursement?

1  A.  Excuse me, that would have been myself.

2  Q.  So --

3  A.  If it cost him $1,100 for a flight I would give

4     the money for the flight, reimburse.

5  Q.  So where would you get that money from to

6     reimburse Mr. Coleman?

7  A.  Maybe some of the donations or I would have cash

8     or it could be several ways, on my credit card,

9     many ways.  It wasn't one specific way.

10  Q.  What about the fees that were paid to Mr. Coleman

11     and other couriers to transport cash, where did

12     that money come from?

13  A.  Out of the donations.

14  Q.  In the instant case with the $252,140 in U.S.

15     currency was any portion of that meant as a fee

16     to Mr. Coleman for transporting the currency?

17  A.  I think he never got compensated.  I think it was

18     $250,000 and he had $2,000 of his own money that

19     you guys took from him.

20  Q.  And my question is for Mr. Coleman's fee for --

21     let me back up.

22        Mr. Coleman was to be paid a fee for

23     transporting the $252,140 in cash from Atlanta to

24     San Francisco, correct?

25  A.  Correct.  Was he going to San Francisco or going

1     to LA, I don't recall.

2  Q.  He was going to San Francisco.  But we can just

3     say California.  For Mr. Coleman transporting the

4     cash to California he was going to be paid a fee,

5     right?

6  A.  Correct.

7  Q.  How much was that fee?

8  A.  I don't recall.

9  Q.  Where was that fee going to come from?

10  A.  You already asked me, from the donations.

11  Q.  So that would have been from that $252,140 that

12     was seized, correct?

13  A.  $250,000.

14  Q.  Yeah, $252,140?

15  A.  The $2,000 was his money that was --

16  Q.  The $2,000 was his fee for transporting the case?

17  A.  No, that was his money, his own personal money,

18     had nothing to do with any of this money.

19  Q.  And I'm not asking you about that $2,000 then.

20     I'm asking you where his fee for transporting the

21     currency that was seized in this case was coming

22     from?

23  A.  It would have come from the $250,000.

24  Q.  Had that fee been taken out at that time?

25  A.  I have no idea.

1  Q.  You don't know whether Mr. Coleman had taken his

2     cut out of the donations for transporting them or

3     not prior to --

4  A.  I don't know, I doubt it.  $252,000 he would have

5     had that money.  The $2,000 was his money before

6     anything happened.  Had nothing to do with

7     transporting money.

8  Q.  Right and, Mr. Shumake, I'm not asking about his

9     $2,000.  I'm asking you about the fee he was to

10     be paid for transporting the money.

11        And my question is, you don't know

12     whether or not he took that fee for transporting

13     the money out of the $252,140 prior to showing up

14     at the Atlanta Airport, correct?

15  A.  No, I don't know what he would have done, I don't

16     know anything about it.

17  Q.  And you don't remember how much that fee would

18     have been, correct?

19  A.  No, I don't.

20  Q.  What was the $252,140 to be used for?

21  A.  You saw the letter, it says housing, water,

22     healthcare, youth causes.

23  Q.  Let's take those in turn.  You mentioned housing.

24     Were there any specific housing projects --

25  A.  The purpose of developing -- I'm sorry, I didn't

1    mean to cut you off.
2  Q.  That's okay.  Were there any specific projects
3      that -- housing projects that this currency was
4      to be used for?
5  A.  Yes, to develop a housing factory to build low
6      income housing on the continent of Africa.
7  Q.  Where was this housing factory to be located?
8  A.  Tanzania.
9  Q.  So there would be a factory in Tanzania that
10     would produce low income housing, correct?
11 A.  Correct.
12 Q.  What percentage of the $252,000 that was seized
13     was going to go to that project?
14 A.  A small portion or the major project, about
15     several million dollars.
16 Q.  So was all of the $252,000 that was seized going
17     to go to that project, like what cut of --
18 A.  I don't have a percentile breakdown if that's
19     what you're trying to ask me.
20         But I can say that the project was
21     north of a few million dollars to develop the
22     housing project.  To do a water well, it would
23     cost us between $8,000 and $20,000 to do water
24     wells.  That's another specific thing.
25         I saw in your documentation for youth

1    causes, books and materials for children that
2      need to study.  That could be $10,000.  It's all
3      across the gamut.
4  Q.  Was the housing factory in Tanzania ever built?
5  A.  No, it was never able to be built because you
6      guys took the money.
7  Q.  And you mentioned that was going to be a several
8      million dollar project, correct?
9  A.  Correct.
10 Q.  So you would agree with me that this currency in
11     in this case would not have funded that project
12     alone, correct?
13 A.  No, not that specific amount.  It would have
14     taken more capital to do it.
15 Q.  Was any other capital towards that project
16     raised?
17 A.  Yes.
18 Q.  How much capital towards that project was raised?
19 A.  Well, you've got another $171,000.
20 Q.  Are you referencing money that was seized from
21     the government?
22 A.  Yes.
23 Q.  By the government, sorry?
24 A.  Yes.
25 Q.  Outside of currency that has been seized by the

1    government has there been any monies raised for
2      that housing factory in Tanzania?
3  A.  No.  Well, let me take that back.  Not raised,
4      but -- yeah, that's not accurate.  I've been
5      funding it myself over time.
6  Q.  So nothing outside, no donations outside of your
7      own personal contributions, correct?
8  A.  I've had a few people contribute that's helped
9      out.  I've got some people on the continent
10     that's helping out right now.
11 Q.  How much have their contributions totaled?
12 A.  About $400,000.
13 Q.  How much have your personal contributions
14     totaled?
15 A.  I don't know.
16 Q.  You don't know how much money you personally have
17     put towards the housing factory in Tanzania?
18 A.  Sent a couple thousand dollars two weeks ago, and
19     I'm in the last process of identifying a
20     warehouse, getting the containers.
21         So as an example these monies were
22     supposed to be -- part of the monies were
23     supposed to be used for the tariffs and it's been
24     in a port since this time period.  Those tariffs
25     are north of $280,000.

1  Q.  The couple of thousand of dollars that you sent a
2      few weeks ago, how did you send that money?
3  A.  What do you mean how did I send it?
4  Q.  You said you sent it to Africa.  How did you send
5      it to Africa?
6  A.  Oh, Wave or whatever you call it.
7  Q.  So you sent it electronically, right?
8  A.  Yeah, I think it was like Wave or -- what else
9      would I have sent it through?
10 Q.  Are you thinking of Zelle?
11 A.  No, you can't send Zelle money there, doesn't
12     work.
13 Q.  Regardless of the specific name, Mr. Shumake, you
14     sent it through some type of electronic transfer,
15     correct?
16 A.  Yeah, I've done it that way, I've given money to
17     people to take over there that were traveling,
18     it's all done across the board.
19 Q.  Has IHRC ever sent money to Africa by courier?
20 A.  Define what you mean by that?  The answer would
21     be yes, Darren Coleman has gone to Africa as a
22     courier.
23 Q.  Let me -- let's back up to the 2016 time frame.
24     In 2016 did IHRC ever send currency to Africa by
25     courier?

1  A.  Yes, Darren Coleman.
2  Q.  How much currency did Darren Coleman transport to
3      Africa for IHRC?
4  A.  I don't know the answer to your question.
5  Q.  Do you have a ballpark of what that was?
6  A.  No, I don't.
7  Q.  Was it more than $10,000?
8  A.  It was definitely more than $10,000.
9  Q.  Was that currency ever declared with Customs?
10  A.  You don't have to declare monies with Customs
11      leaving the country, you declare it when you're
12      coming back.
13  Q.  Has IHRC -- was that money declared with Customs
14      in whichever country, I assume Tanzania or Kenya,
15      that Mr. Coleman arrived in?
16  A.  There's zero requirement to declare monies coming
17      into another nation unless that nation requires
18      it.
19  Q.  Has IHRC ever declared with any Customs agency
20      for any governmental entity currency that it is
21      transporting internationally?
22  A.  It's not required to do that as intergovernmental
23      organization. It's a private organization. You
24      bypass all that as an intergovernmental
25      organization.

1          By law no one is supposed to go through
2      your diplomatic pouches without your permission
3      and all those things. You violate the Vienna
4      Convention by doing so.
5  Q.  So is the answer to that question no?
6  A.  You're not supposed to do that.
7  Q.  Right and so is the answer to that question no,
8      IHRC has not?
9  A.  I can't speak on other officers and
10      organizations. I'm just speaking based upon my
11      training and my jurisdiction no, I would not have
12      notified anyone related to it and by law I'm not
13      supposed to.
14  Q.  Fair enough, so is it fair to say that for any
15      currency courier on behalf of IHRC at Robert
16      Shumake's direction?
17  A.  Not Robert Shumake's direction, IHRC. Let's be
18      clear in that area, IHRC is an intergovernmental
19      organization which would mean that the federal
20      government does not have jurisdiction over those
21      dollars.
22          We're having a discussion right now
23      based upon jurisdiction and reality is the IHRC
24      is an intergovernmental like the United Nations.
25      They're just like the United Nations.

1  Q.  The federal government might have a disagreement
2      with you on that, but that being aside, my
3      question is I just want to know whether or not
4      any reporting has occurred and my understanding
5      of your testimony is that for any currency
6      transferring overseas that you've been a part of
7      or had knowledge of there has not been any
8      reporting, correct?
9  A.  No.
10  Q.  And you can't speak to anyone else at IHRC,
11      right?
12  A.  Right, correct.
13  Q.  You understand that you're here today as IHRC's
14      designated representative, correct?
15  A.  Correct, I understand that part.
16  Q.  You testified earlier in your personal depo as to
17      kind of the facts that led to IHRC's ownership in
18      the seized currency which is one of the 30(b)(6)
19      dep topics.
20          I don't want to waste everyone's time
21      like going back through them as you did with
22      Mr. Bain-Creed, but I just want to confirm that
23      there's nothing from IHRC's standpoint regarding
24      its ownership interest in the currency that you
25      didn't cover with Mr. Bain-Creed.

1          So just quickly, this money was
2      received as donations, correct?
3  A.  These monies, yeah, they were in my possession
4      for the benefit of IHRC which of course I never
5      had an opportunity to transfer those dollars to
6      the IHRC.
7  Q.  And a portion of that money came at -- was given
8      to you in a bag at the Ritz Carlton, correct?
9  A.  Correct.
10  Q.  And then a portion of that money you had in your
11      possession before the representative from YSL
12      Group gave you that sum at the Ritz Carlton,
13      correct?
14  A.  Correct.
15  Q.  And then just real quick for the record, what
16      source did that money come from?
17  A.  According to them, basketball games.
18  Q.  The representatives that came to the hotel were
19      representatives of Young Thug and YSL, correct?
20  A.  Correct.
21  Q.  And they gave you a sum of money as donations to
22      IHRC, correct?
23  A.  Correct.
24  Q.  And then you also got the money -- you also got a
25      portion of the money from another individual,

1  right?
2  A.  Correct.
3  Q.  And that individual's name is?
4  A.  John Goldstein.
5  Q.  And Mr. Goldstein is associated with Stax
6  Entertainment, correct?
7  A.  Correct.
8  Q.  And that money was raised from bingo proceeds?
9  A.  I believe so, yes.
10  Q.  And then there's no other sources of the currency
11  other than those two, correct?
12  A.  To the best of my knowledge, no.
13  Q.  And at some point either yourself or Mr. Coleman
14  combined the money and that is what Mr. Coleman
15  was taking through the airport in Atlanta, right?
16  A.  Correct.
17  Q.  Who made the decision as to how to package the
18  money?
19  A.  I don't know the answer to that question.
20  Q.  Is the IHRC's humanitarian mission -- that's a
21  term that's been used in your answer, in IHRC's
22  answer -- is that a separate component of IHRC?
23  A.  What do you mean, the humanitarian work?  The
24  IHRC deals with human rights, humanitarian
25  causes.

1  It's not a charitable organization, but
2  it does do charitable work.
3  Q.  Let's look at IHRC's answer.  This will be
4  Exhibit  10.
5  DEPOSITION EXHIBIT 10
6  answer of IHRC
7  WAS MARKED FOR IDENTIFICATION.
8  Q.  If you will turn to Page 8 of this document for
9  me, Mr. Shumake.  If you will look at the very
10  last paragraph which is numbered Paragraph 10, it
11  says, "As the Ambassador and Head of Mission for
12  the IHRC Humanitarian Mission, Ambassador Shumake
13  acts on their behalf" and "IHRC Humanitarian
14  Mission" is capitalized.
15  My question is, is this something that
16  is different than IHRC generally?
17  A.  Yes.
18  Q.  So what is the IHRC Humanitarian Mission?
19  A.  The work that I discussed that I was doing.
20  Q.  This is not an organization independent in and of
21  itself, correct?
22  A.  No, it is not, it's just a wing of the IHRC.
23  Q.  What about IHRC Relief Trust Fund?
24  A.  It's another wing underneath the IHRC, no
25  different than the United Nations may have 30 or

1  40 of them, UNICEF, UNEP.
2  Q.  The IHRC Trust Fund, IHRC Relief Trust Fund and
3  the IHRC Humanitarian Mission would be controlled
4  by IHRC, correct?
5  A.  Correct.
6  Q.  Do you know how much IHRC raised worldwide in
7  2015?
8  A.  No.  I do not.
9  Q.  What about 2016?
10  A.  I do not.
11  Q.  2017?
12  A.  I do not.
13  Q.  Any other year?
14  A.  No.  We're an intergovernmental agency, so I
15  wouldn't know.
16  MR. JOHNSON:  Let's take five minutes,
17  I might be about done.  Let me look through my
18  notes.
19  (A recess was taken).
20  BY MR. JOHNSON:
21  Q.  A couple of questions to wrap up, Mr. Shumake.
22  Who at IHRC would have to approve using
23  charitable donations to satisfy Robert Shumake's
24  personal tax liability?
25  A.  I'm not sure I understand that question.

1  Q.  Sure.  One of the things that has been proposed
2  is that the seized currency be used to satisfy
3  your personal tax liability with the IRS, do you
4  understand that?
5  A.  Sure.  You would talk to -- the independent party
6  is the general counsel for IHRC, attorney Quasir
7  Jan.
8  Q.  And why would Mr. Jan be involved in that
9  approval?
10  A.  He's independent, he's the attorney for the IHRC.
11  Q.  What do you mean by he's independent?
12  A.  He's the lawyer, he has personal knowledge of the
13  paying for completing the projects.  So this
14  money was supposed to go towards the projects and
15  never got done.
16  In my own went out and did it, some
17  of it I did personally, some of them I raised.
18  He's aware of it and I think that he would be the
19  person to do that.
20  He's the only sworn person that's there
21  right now is the lawyer.
22  Q.  Is it your testimony then that the only two
23  people at IHRC right now are yourself and
24  Mr. Jan?
25  A.  There's some other -- the ambassadors are still

1    there, they're still in position.
2 Q. These ambassadors that are still there, can you
3    name one?
4 A. No, I can't, I'm foggy right now.
5 Q. In terms of the funds that you have put towards
6    the project, do you have any documentation of
7    that?
8 A. I do.
9 Q. What form would that documentation be?
10 A. What do you mean "form", invoices or --
11 Q. Would it be invoices, would it be bank statements
12    like --
13 A. Invoices.
14 Q. Would those payments also be reflected in your
15    bank statements?
16 A. No.
17 Q. Why not?
18 A. What do you mean?  It's cash, I don't -- we keep
19    going back to bank statements.
20 Q. Sure, so all of the funds that you put towards
21    the factory project in Tanzania were in cash?
22 A. Not all of them.  Some of them were monies that I
23    raised.
24 Q. Was the money that you raised in cash?
25 A. Other individuals that would put something

1    towards it in cash.
2 Q. So the monies you raised and your personal funds
3    that you put towards the factory in Tanzania, all
4    that was in cash, correct?
5 A. Pretty much.  There were some electronic
6    invoices, I'm sure there are some.
7 Q. Who would those electronic transfers have been
8    to?
9 A. Contractors over on the continent.
10 Q. Do you know how many contractors on the continent
11    were paid electronically?
12 A. No, I don't, I don't.
13 Q. Who else at IHRC other than yourself knows that
14    you're testifying here today as IHRC's corporate
15    representative?
16 A. The attorney Quasir Jan.
17 Q. Anyone else?
18 A. No, there's -- I'm the head of the organization.
19    Everyone else I have -- what do you call it --
20    fired.
21 Q. Since becoming world chairman have you spoken
22    with any of IHRC's ambassadors?
23 A. A couple of them.  I just don't know their names,
24    it escapes me.
25 Q. When would you have spoken with then?

1 A. Right after my appointment.
2 Q. You've spoken with them --
3 A. Almost two years ago.
4 Q. Anytime since then?
5 A. No.
6        MR. JOHNSON:  I'll pass the witness.
7    I've passed, if you're there.
8        MR. MICHAEL:  Are you finished?
9        MR. JOHNSON:  Yes.
10        MR. MICHAEL:  I have no questions.
11        THE REPORTER:  Okay, Ben or Seth,
12    you're ordering I assume?
13        MR. BAIN-CREED:  Yes, we are, just
14    electronic.
15        THE REPORTER:  David, same for you?
16        MR. MICHAEL:  Same thing for me.
17        THE REPORTER:  All right, folks, thank
18    you very much.
19        (The deposition was concluded at 4:39 p.m.,
20    signature of the witness was not requested by
21    counsel for the respective parties hereto)
22
23
24
25

1            CERTIFICATE OF NOTARY
2
3 STATE OF MICHIGAN  )
4                    ) SS
5 COUNTY OF  WAYNE   )
6    I, DALE E. ROSE, Certified Shorthand
7    Reporter, a Notary Public in and for the above
8    county and state, do hereby certify that the
9    above deposition was taken before me at the time
10    and place hereinbefore set forth; that the
11    witness was by me first duly sworn to testify to
12    the truth, and nothing but the truth, that the
13    foregoing questions asked and answers made by the
14    witness were duly recorded by me stenographically
15    and reduced to computer transcription; that this
16    is a true, full and correct transcript of my
17    stenographic notes so taken; and that I am not
18    related to, nor of counsel to either party nor
19    interested in the event of this cause.
20
21    _____
22    DALE E. ROSE  CSR-0087
23    Notary Public,
24    Wayne County, Michigan
25 My Commission expires:  7-15-24

**A**

ability 69:8
able 6:23
  7:3 8:1
  25:7,11
  26:2,17
  30:1 36:16
  42:25
  63:25 75:5
accept 50:2
  50:6
accession
  33:21 34:1
  34:5,6,10
  34:17,19
  34:22
  35:13
  36:12,16
  36:22,24
  39:15
  65:17
account 50:9
  50:11,13
  50:16,24
  50:25 51:2
  51:5,9,11
  51:13
  54:25 55:2
  55:4,9,14
  55:15,19
accounts
  50:18 51:7
accurate
  76:4
acknowle...
  19:4
action 1:7
  31:18
  32:18,20
  32:21 33:2
activities
  21:19
  42:21
activity
  20:24
  57:23
acts 83:13
actual 24:13
address 21:1

admitting
  8:13
advance 70:9
  70:13
affairs 24:6
  24:7 45:6
  45:7,12,14
  68:24
affiliated
  24:20
Africa 48:14
  61:3 67:9
  74:6 77:4
  77:5,19,21
  77:24 78:3
African
  36:15
agency 42:10
  78:19
  84:14
agent 25:17
  57:22
ago 34:11
  76:18 77:2
  88:3
agree 11:11
  67:4 75:10
agreement
  3:17 20:18
  33:7,11,19
  33:21 34:4
  34:6,7,10
  34:17,22
  35:1,2,3,7
  35:11,14
  35:17
  36:16,22
  36:24
  37:14,16
  37:18,22
  37:24 38:1
  52:10,12
agreements
  33:24 34:2
  34:5,13,19
  34:21
  36:13 37:8
  37:12
  65:17
airport 1:13

  73:14
  82:15
aliens 23:11
allege 20:6
allegedly
  31:16
allowed
  52:19
allows 5:15
ambassador
  14:5,7,10
  14:11 22:7
  22:23 23:1
  23:4,7,10
  23:13,22
  24:1,4,6
  34:18
  46:20,25
  47:8,9,19
  47:20,21
  47:22
  64:14 65:7
  67:20
  83:11,12
ambassadors
  14:4 18:25
  20:17 22:8
  23:15,17
  23:18,19
  45:15 48:9
  53:7 85:25
  86:2 87:22
ambassad...
  22:7
Amended 3:15
  6:4,7
America 1:5
  2:13
American
  14:15
  49:10
  61:24
Americas
  30:6 48:14
Amos 56:17
  56:19
amount 53:13
  57:14,16
  57:19
  59:21

  66:22
  75:13
amounts
  67:14
and/or 23:25
  25:14
Andrej 36:6
  36:8
answer 3:19
  11:8 12:9
  12:18
  16:20,22
  21:13
  24:12 25:1
  28:17,23
  29:16
  31:14 32:4
  43:6 47:4
  47:17
  77:20 78:4
  79:5,7
  82:19,21
  82:22 83:3
  83:6
answered
  29:23
answers
  89:13
Anytime 88:4
apologize
  45:11
App 67:10
APPEARANCES
  2:1
appeared 4:4
  4:5
appearing
  2:12,21
  4:22,23
applied 40:6
  41:1
apply 9:14
  41:4
appoint 18:7
  60:18
  63:14
  68:10,16
  69:8
appointed
  17:23,25

  18:13,25
  19:2 22:6
  22:18,18
  24:2 40:20
  52:1,8,10
  60:13,21
  60:22
  63:14 65:7
  68:1 69:12
appointee
  17:18
  63:17
appointees
  17:17
  59:11
  60:20
appointing
  52:12
appointment
  52:2 62:1
  88:1
appoints
  23:23 24:4
approach
  8:22
approval
  85:9
approve
  84:22
APPROXIM...
  1:9
area 79:18
areas 23:24
  23:25
  48:15
Army 61:13
  61:16,18
arrived
  78:15
articles
  13:5 35:5
aside 80:2
asked 10:20
  29:17,17
  31:9 32:11
  57:22
  67:17
  72:10
  89:13
asking 7:5

8:20 10:15
28:24
31:11,15
42:16 61:1
68:17
72:19,20
73:8,9
Asra 45:4,5
46:17
56:13
Assistant
2:7 4:13
associated
14:22 82:5
assume 7:17
10:6,14
11:9,24
78:14
88:12
Atlanta 54:5
54:7,16
70:12
71:23
73:14
82:15
attached
3:11
attention
24:16
attorney
4:14 27:6
51:3,12
85:6,10
87:16
attorneys
2:6,7 61:7
audio 4:22
AUSA 5:2
auspices
45:14
Austria 16:4
authorities
42:14
authority
51:5 68:11
69:13
authorized
8:18
aware 43:21
44:4 50:12

85:18

_____
B
back 10:9
18:14
24:10 25:7
25:7,11
26:5,14,18
26:20 27:2
27:3 39:17
52:1 71:21
76:3 77:23
78:12
80:21
86:19
background
61:8
bag 63:1,11
63:12,15
81:8
bags 53:24
53:25 63:4
63:6,9
Bain-Creed
2:3 5:3
80:22,25
88:13
balance
55:16
ballpark
12:12,13
78:5
bank 50:11
50:13,15
50:25 51:2
51:5 54:25
55:2,3,9
55:19
86:11,15
86:19
based 13:1
34:13
44:20
53:12
63:19
64:16
65:13
79:10,23
basing 12:18
basis 17:3

basketball
81:17
becoming
87:21
began 19:19
20:7
behalf 2:12
2:21 4:23
5:20 8:1
8:18 69:18
79:15
83:13
behest 68:2
believe 5:4
12:23
23:11
24:24 25:5
26:12 28:1
29:5 43:25
44:12 56:2
82:9
Ben 88:11
benefit 19:3
43:19 81:4
Benjamin 2:3
34:18
benjamin...
2:11
best 10:12
25:23
82:12
better 22:1
54:10
bingo 82:8
Birch 51:3
51:12
bit 21:4
blessing
18:5
block 36:3
board 21:20
48:2 77:18
body 59:5
book 53:24
books 48:16
48:18,19
48:21 49:2
49:4,4,5
49:10,11
75:1

Botswana
61:23
bottom 20:4
branch 61:12
breach 19:11
break 25:19
26:24
27:24
49:23
58:25
breakdown
74:18
brick 66:25
brief 50:19
bring 24:15
Bringing
45:15
brings 23:3
brought 15:3
build 74:5
built 75:4,5
bunch 17:13
Burch 2:16
burden 5:20
8:10
business
23:18,18
23:19
28:18
34:16 40:7
bylaws 18:1
35:4 39:21
39:23
bypass 78:24

_____
C
California
2:18 54:7
54:16 72:3
72:4
call 34:1,3
77:6 87:19
called 15:16
41:9
candidate
61:5
canned 10:17
capacity
4:18 5:3
capital

29:13,13
40:21
48:12
54:18,21
54:22 58:3
75:14,15
75:18
capitalized
83:14
car 70:21
card 64:4,18
64:21 65:1
65:3,12,21
66:9 71:8
cards 62:9
62:15,18
63:19,19
64:6,8,9
65:19
Carlton 81:8
81:12
Carolina 1:2
2:9
case 4:15
5:25 13:10
33:11
59:11
60:25
68:15,22
71:14
72:16,21
75:11
cash 50:3
53:20 54:3
54:15,24
56:4 58:5
58:14
59:17,18
59:21,22
59:23,25
60:7 61:21
61:25 62:4
62:7,11,12
62:19,24
63:7 66:15
67:10 71:7
71:11,23
72:4 86:18
86:21,24
87:1,4

cause 89:19
causes 43:1
73:22 75:1
82:25
centers
62:13
certain 52:3
59:21 67:2
CERTIFICATE
89:1
Certified
89:6
certify 89:8
chairman
15:5,6,13
15:13,18
15:22,23
15:25
16:10,14
16:17,18
17:12,23
17:23 18:6
18:7,8,10
18:13 19:2
19:2,5
21:18 24:2
24:4,19
26:1 29:1
29:25
30:19,23
35:24 46:5
47:11,13
47:16,23
51:14,15
51:16,19
51:25 52:4
52:5,6,7,8
52:9,13
60:12,17
60:19 65:6
65:25 66:5
68:2,5,7
68:13,14
68:23 69:4
87:21
chairman's
18:5
Chamber
61:24
chancell...

42:23
change 40:16
41:5,21
42:4 43:18
43:20
changed
41:12,15
41:24
charge 46:7
46:14
70:24
charitable
40:1,4
83:1,2
84:23
charity 40:2
40:5
Charlotte
1:3 2:9
CHARLOTT...
1:12
charter
39:12,17
39:19,23
check 50:6
checked 61:3
checks 50:4
50:5
children
75:1
chose 46:12
circumst...
10:24
citizens
64:3
Civil 1:7
5:15
claim 19:18
Claimant 5:7
6:8
clandestine
17:19,21
17:22
18:15,16
18:17 19:9
19:17 20:7
20:10,13
20:19
24:15 25:6
29:1 30:3

33:4 52:19
clarify 10:5
10:11,13
clear 13:12
14:19 31:3
43:3 79:18
closed 50:14
code 58:18
Coleman 1:11
19:23 61:1
61:8,20
62:3 67:15
67:19,23
68:3,12,20
69:1,14,18
69:23,25
70:11,13
70:17 71:6
71:10,16
71:22 72:3
73:1 77:21
78:1,2,15
82:13,14
Coleman's
70:7 71:20
collect 56:4
collecting
47:1
combined
82:14
come 63:12
71:12 72:9
72:23
81:16
coming 7:8
47:5 72:21
78:12,16
Commencing
1:19
Commerce
61:24
Commission
5:7 8:2,17
8:19 33:13
41:14 42:1
89:25
communic...
69:17
community
59:8

companies
67:6
company 32:1
32:7,12,13
comparable
26:6,8
compensated
71:17
compete
66:24
completing
85:13
component
82:22
computer
89:15
concept
69:10
concluded
88:19
conduct 40:7
conducting
27:7 42:14
42:20 43:5
confirm
80:22
conjunction
41:19
connecti...
23:12
consist 46:9
46:10
construc...
40:12
containers
76:20
content 7:21
continent
74:6 76:9
87:9,10
contract
19:11 35:9
contractors
58:17,23
59:9 87:9
87:10
contract...
33:24
contribute
43:1 44:13

76:8
contribu...
76:7,11,13
control
24:20
31:17 45:2
45:8,12,22
51:2,4
controlled
41:4,6
84:3
controller
25:14
controls
30:18
Convention
34:14,15
59:3 62:22
63:22 79:4
conversa...
42:16
copy 31:6
64:23
copyright
19:10
corporate
5:6,9 13:8
87:14
corporation
5:9,16
correct 4:18
4:19 5:3
7:2,3,9,10
9:7,8,10
11:2 14:14
14:24,25
16:1,2
18:8,9
19:21,21
20:5,9,11
21:5 22:24
23:2,25
28:2,3,6,8
28:14 30:9
30:16 31:4
31:5,7
32:16,17
33:17,18
34:25 35:9
35:10,14

35:17 36:1
38:3,8
39:12,18
42:1,2,6
42:15
43:11 44:5
44:18 47:1
47:2,19,20
49:15
52:14,18
53:12,18
54:21
55:10,17
56:20,21
57:10,15
59:23 62:5
64:7 65:4
66:6 67:6
70:5,8,14
70:15,20
71:24,25
72:6,12
73:14,18
74:10,11
75:8,9,12
76:7 77:15
80:8,12,14
80:15 81:2
81:8,9,13
81:14,19
81:20,22
81:23 82:2
82:6,7,11
82:16
83:21 84:4
84:5 87:4
89:16
**correspo...**
36:3
**cost** 66:17
66:20 71:3
74:23
**Council** 36:5
36:7
**counsel** 4:4
5:10 21:23
22:19,20
62:2 64:22
85:6 88:21
89:18

**countries**
23:15,25
33:24
36:19,20
56:11
57:25 58:3
64:23
65:16 66:2
67:3
**country** 14:7
14:9,21,23
22:21 23:8
23:20 26:7
34:11,23
62:18
65:21 66:8
78:11,14
**county** 89:5
89:8,24
**couple** 70:2
76:18 77:1
84:21
87:23
**courier** 59:1
59:5,15
60:7,24
61:21,25
62:4,23,24
62:24 63:7
63:15,17
63:19,23
64:1,8
67:25
69:14
77:19,22
77:25
79:15
**couriers**
58:14,16
58:21,24
59:2,13
60:5,15,16
62:20,21
63:18
71:11
**course** 19:13
68:7 81:4
**court** 1:1
9:15,21
31:1,4,24

32:4,11
**cover** 33:15
80:25
**covered** 8:14
**create** 34:16
**created**
34:19
64:15
**credit** 62:9
62:15,18
71:8
**criteria**
40:25 60:8
**CSR-0087**
1:21 89:22
**currency**
1:10 71:15
71:16
72:21 74:3
75:10,25
77:24 78:2
78:9,20
79:15 80:5
80:18,24
82:10 85:2
**current** 16:7
16:10,12
16:14,16
20:21,23
24:11 45:8
45:13,19
45:22,25
67:12
**currently**
17:1 18:20
21:14 22:4
38:16 46:9
50:13
**Customs** 78:9
78:10,13
78:19
**cut** 73:2
74:1,17

—————————
**D**
**Dale** 1:21
89:6,22
**Dar** 14:6,20
**dark** 20:22
**Darren** 1:10

67:15,19
67:23 68:3
68:11,20
68:25
77:21 78:1
78:2
**date** 7:12
27:2 52:3
**dated** 19:23
**dates** 13:2
54:5
**David** 2:15
4:21,25
7:15 8:4
27:6,7
32:3 88:15
**david@mi...**
2:20
**day** 69:25
**day-to-day**
69:12
**DC** 42:23
**deal** 37:19
**deals** 82:24
**Debtor's**
19:6 29:1
30:1 35:24
**decision**
82:17
**declare**
78:10,11
78:16
**declared**
78:9,13,19
**deduction**
40:25
**Define** 77:20
**definitely**
49:5 78:8
**dep** 80:19
**Department**
2:5 42:9
64:7,19
65:11
**depends**
11:20 60:3
**depo** 5:11
8:5,9 11:1
13:8 80:16
**deponent**

2:21 4:3
**depose** 5:15
**deposed** 4:17
5:2
**deposit**
54:24 56:2
**deposition**
1:17 3:14
3:15,16,18
4:24 5:5
5:12 6:3,4
6:8,9,21
7:2,23 8:3
8:14 9:5
9:13 27:8
33:6 83:5
88:19 89:9
**deposits**
50:8
**deputy** 15:18
16:10
18:10 65:6
68:13
**designate**
5:19,21
8:5
**designated**
8:18 28:21
80:14
**designation**
40:17 65:9
**determine**
38:9
**determines**
63:25
**Detroit** 4:4
54:7,17
**develop**
33:22
54:22 74:5
74:21
**developing**
73:25
**development**
23:18
**different**
14:16
18:22
19:15
22:18 23:7

42:16,22
48:13
83:16,25
**differently**
67:1 69:3
**diligence**
38:9
**diplomatic**
58:24 59:2
59:5,7
61:6 62:23
62:24 63:1
63:4,6,9
63:11,15
63:18,19
63:19,22
63:24 64:1
64:3,4,6,8
64:8,17,21
64:25 65:3
65:12,20
66:2,8
67:25 79:2
**direct** 17:2
17:4,6,8
17:11,16
26:2 27:10
27:17
69:17
**directed** 6:8
45:18
**directing**
27:12
**direction**
79:16,17
**directly**
60:13
**director**
61:23 62:4
**disagree...**
80:1
**disappoint**
69:9
**discovery**
31:9,13
**discussed**
7:20,21
83:19
**discussing**
30:15

32:19
**discussion**
27:22 68:9
79:22
**dismantling**
21:20
**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**document** 6:7
6:12,16,18
6:25 22:2
33:16
35:12,21
38:11 39:6
39:16,19
39:22,24
43:13,14
83:8
**document...**
41:18 48:7
74:25 86:6
86:9
**documented**
52:11
**documents**
6:22 7:4
13:1,4,5
33:10
37:23 38:8
**doing** 18:19
20:11,12
20:14,15
40:22 44:4
57:3,12
65:16
68:10 79:4
83:19
**dollar** 47:12
52:25 75:8
**dollars** 58:8
60:1 74:15
74:21
76:18 77:1
79:21 81:5
**domain** 26:10
26:11,13
26:19
30:14
**domestic...**

40:19
**donate** 52:15
53:2
**donation**
50:2 53:5
53:11,17
**donations**
53:20,21
54:24 71:7
71:13
72:10 73:2
76:6 81:2
81:21
84:23
**donor** 52:15
53:2
**donors** 40:23
53:5
**doubt** 48:23
51:6 73:4
**driving** 11:3
54:13 70:6
**due** 38:8
**duly** 4:7
89:11,14
**dust** 70:7
**duties** 62:21
**duty** 46:20

—————————
**E**
**E** 1:21 89:6
89:22
**e-mail** 7:1
48:1
**e-mails** 6:20
7:8
**earlier**
26:12 52:7
66:13
67:18
80:16
**East** 67:9
**easy** 67:4
**economic**
38:14,21
**ECOS** 39:1,2
**ECOSOC** 39:9
39:10
**ECOSOS** 38:17
38:19 39:3

39:4
**ECSOS** 38:18
**educate** 8:7
8:9
**educated**
5:22 8:13
8:24
**eight** 35:12
**either** 14:5
14:20
34:23
42:13
52:24 57:8
68:12
70:11,12
82:13
89:18
**electronic**
50:8 77:14
87:5,7
88:14
**electron...**
55:22,25
58:12
66:14 67:5
67:8,13
77:7 87:11
**embassy**
42:22
**employed**
17:15
58:16
**employee**
59:1
**employees**
17:1,2,4,6
17:8,11,16
21:15
58:17,22
59:8
**entering**
37:9
**Entertai...**
82:6
**entire** 21:20
**entities**
34:24 35:8
**entitled** 6:7
**entity** 5:17
5:18 8:5

34:24
36:13 40:9
41:6 42:20
43:4,23
44:2 65:22
78:20
**entity's**
42:4
**enumerated**
8:10
**Environm...**
37:15,20
**EP** 38:14
**Equatorial**
66:3,11
**es** 14:6,20
**escapes**
87:24
**Ethiopia**
14:5,8,9
14:12,24
**Ethiopian**
14:4
**Europe** 34:20
**event** 89:19
**everybody**
4:23
**everyone's**
80:20
**exact** 32:3
**EXAMINATION**
3:6 4:9
**EXAMINAT...**
3:1
**examined** 4:7
**example**
17:17 22:6
34:9 36:20
58:6 70:12
76:21
**excuse** 15:19
15:20 32:2
71:1
**executive**
61:23 62:4
**exempt** 41:2
**exhausted**
51:23
**Exhibit** 3:10
3:14,16,18

6:2,3,6
19:22 20:1
27:21,25
33:5,6,9
35:1 39:11
83:4,5
**Exhibits** 3:8
3:11,12
**exist** 22:12
22:15 55:2
**existence**
12:14
18:20,21
18:22
**exists** 31:6
**expense**
70:17,18
**expenses**
69:23 70:8
70:22
**experience**
61:21
**experiences**
69:20
**expires**
89:25
**explain** 5:14
50:23
**explaining**
9:4
**extent** 20:10
65:10
**extrater...**
23:10,14

_____
F
**Facebook**
19:14
**facilities**
54:23
**fact** 11:24
47:10,15
**factory** 56:2
74:5,7,9
75:4 76:2
76:17
86:21 87:3
**facts** 12:22
80:17
**fair** 7:5

9:19,20
10:3,4,7
10:15
11:10,25
12:1,3
20:21 22:3
24:18
25:19 37:9
53:10
57:14,16
79:14,14
**fairly** 67:4
**familiar**
63:1
**far** 22:12
**Fargo** 51:1,5
51:9 55:2
55:9
**February**
51:25
**federal** 5:14
42:13,19
43:4,23
79:19 80:1
**fee** 71:15,20
71:22 72:4
72:7,9,16
72:20,24
73:9,12,17
**feel** 9:18
10:11
**fees** 59:14
59:16
66:14
71:10
**fell** 45:14
**financial**
48:21 49:1
49:14,17
**fine** 54:12
58:21
**finished**
88:8
**fired** 87:20
**first** 4:7
15:8 25:6
25:8 33:11
54:2 64:14
64:14
89:11

**five** 84:16
**flatline**
46:11
**flatlined**
44:20
**flight** 70:11
70:14,17
70:18 71:3
71:4
**flip** 39:14
39:15
**focus** 33:3
**foggy** 39:25
86:4
**folks** 88:17
**follows** 4:8
**foregoing**
89:13
**foreign** 24:6
24:7 45:6
45:7,12,14
68:24
**forget** 14:21
24:25
36:14
56:13
**form** 22:2
27:16 86:9
86:10
**formal** 48:3
53:10
**format** 27:15
**forms** 50:1
**forth** 89:10
**forward** 9:2
27:19
**found** 28:1
**foundation**
41:9,22
**Foundati...**
41:12,15
41:24
**founded** 12:6
12:8,10
**founding**
13:16,18
**four** 21:7
61:15
**frame** 77:23
**France** 34:20

**Francisco**
2:18 70:12
71:24,25
72:2
**Franklin**
34:18
**free** 9:18
10:11
**full** 89:16
**Fund** 83:23
84:2,2
**funded** 70:19
75:11
**funding** 76:5
**fundraisers**
69:16
**fundraising**
42:14,21
43:5 47:3
**funds** 19:3
43:18 44:7
44:8 46:7
46:14,20
47:1,8,23
48:4,6,9
55:6,9,18
86:5,20
87:2
**further**
63:21
**fuzzy** 26:21
27:3

_____
G
**gained** 31:16
46:1,4
**games** 81:17
**gamut** 75:3
**gauge** 12:2
**general**
15:20 16:4
16:5,12
17:18
21:23 85:6
**generally**
34:6 56:11
83:16
**generic** 35:3
**gentleman**
29:6 62:8

**Georgia**
41:23,25
**getting**
31:19
36:12
76:20
**Ghana** 22:9
56:8
**give** 9:23
12:12 49:9
49:11
53:13,14
53:15
65:18 66:2
71:3
**given** 7:15
77:16 81:7
**gives** 53:12
**globe** 44:13
**go** 9:2,13
10:8 18:14
23:16
24:10
27:19
48:14
63:21,24
69:14
74:13,17
79:1 85:14
**GoDaddy** 26:8
**going** 10:6
10:14 11:9
24:10
27:10
29:10,12
34:15
44:21 61:3
62:17 68:3
71:25,25
72:2,4,9
74:13,16
75:7 80:21
86:19
**Goldstein**
82:4,5
**Google** 19:14
25:11 26:5
26:6,8
**gotcha** 11:19
**gotten** 26:13

govern 39:22
governed
  48:8
governing
  62:20
government
  5:24 75:21
  24:24 25:9
  75:23 76:1
  79:20 80:1
governme...
  5:17 40:9
  42:9,20
  43:4 65:22
  78:20
governs
  34:22 35:5
  39:20
granting
  30:22
ground 9:13
group 19:9
  25:12 29:7
  30:4 35:19
  81:12
guess 8:22
  31:12
guidance
  48:8 53:11
Guinea 66:3
  66:11
Guinea-C...
  66:11
guy 53:12
guys 20:14
  71:19 75:6

H

hacked 21:2
happen 46:21
  46:22
  64:13,13
happened
  29:9 73:6
happening
  49:20
happens
  28:18
Hawala 67:2
head 9:22
  11:20

83:11
  87:18
headquar...
  21:17
headquar...
  22:13,13
  24:24 25:9
  29:2,8
  30:2 31:19
Headquar...
  32:23
healthcare
  73:22
hear 32:3
  37:4
heard 5:13
held 21:23
  27:23
  50:18,22
helped 76:8
helping
  56:18
  76:10
helps 54:10
hereinbe...
  89:10
hereto 88:21
heyday 44:15
high 15:25
home 22:21
honest 61:2
Honesty
  60:25
honorary
  22:19,20
  62:2 64:22
host 25:12
  26:7,8
  31:24 32:6
hosted 32:8
  32:12
hotel 62:12
  70:21
  81:18
hour 6:21
  7:1
housing
  54:23 56:2
  73:21,23
  73:24 74:3

74:5,6,7
  74:10,22
  75:4 76:2
  76:17
hq 25:9
  26:16
  32:25
human 5:7
  8:2,17,19
  33:13
  41:14,25
  82:24
humanita...
  82:20,23
  82:24
  83:12,13
  83:18 84:3
hundreds
  58:8

I

ID 64:4,8
  65:18
idea 43:6
  44:20 46:3
  48:23
  67:10
  72:25
identifi...
  6:5 33:8
  64:6,18
  65:1,3,12
  65:21 66:2
  66:9 83:7
identifying
  76:19
IDs 66:1
IGO 14:17
  33:22
  38:10 49:7
IGOs 14:16
ihrc 3:17,19
  5:25 6:8
  9:6 12:4
  12:14,23
  13:14,16
  13:21,23
  14:1,5,9
  14:12,13
  14:23 15:4

15:14,16
  16:8 17:1
  17:4,6,8
  17:11,15
  18:23
  19:18 20:1
  21:9,11,14
  21:15,23
  22:1,3,16
  23:4,22,22
  24:1,8,11
  24:21,24
  25:21
  26:13 28:5
  28:7,11,13
  28:22,23
  29:18,20
  29:21
  30:23
  31:17
  32:24 33:7
  33:9 35:2
  35:8 36:25
  37:8,14,19
  37:21
  38:16,22
  38:25
  39:17 40:6
  40:15,18
  40:19,22
  40:24 41:1
  41:4 42:7
  42:12,19
  43:3 44:4
  44:7,12,16
  46:1,4,7
  46:15 47:3
  47:9,23
  48:7,16
  49:3,17,20
  50:1,2,6
  50:10,13
  50:15,24
  51:7,11,14
  51:20
  52:15 53:2
  53:5,11,16
  53:20 54:3
  54:15,21
  54:24 55:9

55:21,24
  56:5,9,12
  56:15,19
  56:22 57:9
  58:14,16
  58:18,21
  58:22 59:1
  59:1,12
  60:5,7,10
  61:22
  62:20 63:4
  63:6,11,12
  63:14,15
  64:17,20
  65:4,5,13
  65:14,14
  65:20
  67:16,20
  67:23 68:4
  68:11
  69:18 70:9
  70:16,24
  77:19,24
  78:3,13,19
  79:8,15,17
  79:18,23
  80:10 81:4
  81:6,22
  82:22,24
  83:6,12,13
  83:16,18
  83:22,23
  83:24 84:2
  84:2,3,4,6
  84:22 85:6
  85:10,23
  87:13
IHRC's 13:9
  18:24
  20:21 21:5
  24:10
  28:10
  30:17
  39:20 40:1
  41:15 45:8
  45:11,13
  50:18
  52:17 53:3
  55:25 57:7
  80:13,17

80:23
82:20,21
83:3 87:14
87:22
**ihrc-hq** 25:2
29:5 30:5
**ihrchead...**
21:9 30:8
**ihrchq.com**
18:23
**ihrchq.org**
24:24
**in-fighting**
44:21
**inapprop...**
20:8
**including**
5:16
**income** 74:6
74:10
**incompetent**
11:15
**independent**
40:22 41:5
43:17
58:23 59:6
59:9 83:20
85:5,10,11
**INDEX** 3:1,8
**individual**
51:17
81:25
**individu...**
82:3
**individuals**
5:19,21
17:13,14
40:23
86:25
**information**
19:13,16
26:22
**infringe...**
19:10,10
**injunction**
19:11
**inquire** 27:2
**inquiry** 7:22
27:13
**instant**

71:14
**instrument**
39:15
**intercon...**
65:5
**interest**
80:24
**interested**
89:19
**intergov...**
12:5 33:22
33:25
34:25 40:3
42:7 49:12
58:19
64:10
78:22,24
79:18,24
84:14
**interject**
27:18
**Internat...**
1:12 5:7
8:2,17,19
33:12
41:14,25
**internat...**
78:21
**interrog...**
28:4
**Interview**
24:5
**introduced**
15:5
**invention**
66:23
**invoices**
86:10,11
86:13 87:6
**involved**
13:10,15
13:18,20
13:23 14:2
36:10,12
37:16
38:22,25
46:25
60:16 85:8
**Ireland** 56:1
**IRS** 41:3,18

58:18 85:3
**Islamabad**
12:7 13:6
15:11
21:17,22
31:2
**issue** 8:16
8:22 37:24
38:4,11,11
**issued** 31:1
31:3 38:2
38:6 64:6
64:10,18
65:11,21
66:8
**issues** 23:19
63:9,10

_____
**J**

**J** 2:4
**jail** 17:12
**Jan** 85:7,8
85:24
87:16
**January**
51:21,24
**job** 61:18
69:1
**John** 82:4
**Johnson** 2:4
3:6 4:10
4:13,20,25
5:1 7:15
8:4,21 9:3
16:18,22
16:25 27:1
27:5,7,14
27:20 32:7
32:10
49:25
84:16,20
88:6,9
**June** 1:11
19:23
**jurisdic...**
20:17
60:20 68:6
79:11,20
79:23
**JUSTICE** 2:5

_____
**K**

**keep** 47:3
86:18
**Kenya** 56:8
56:15,16
56:18,19
57:9,11,13
58:12
78:14
**kept** 29:11
48:16,18
48:19
49:15,18
**Khan** 15:7,9
15:10,12
35:22,23
36:3 45:4
45:5,11,20
46:17,17
51:18
52:12
56:13,13
66:5
**kind** 9:14
13:10
17:13
20:22 29:9
35:16
39:16
44:20
52:20
55:15
69:15 70:6
80:17
**know** 5:12
6:1 7:17
7:22,24
10:19,23
11:6,8,17
12:9,10,13
12:15
13:15,18
13:19
20:23 21:9
24:12 25:1
25:9,10
26:15
31:14,15
36:8,9,17

37:6 43:6
43:9,11,12
43:24
44:13 45:1
45:2 46:3
47:4,17
48:20,23
49:3,5,14
49:17
51:11
52:21,24
53:6,7,9
54:1,5,6
55:3,14,20
57:20
58:11 60:9
61:14,16
61:18,19
61:20 62:3
64:20
66:16
67:17,22
69:14 73:1
73:4,11,15
73:16
76:15,16
78:4 80:3
82:19 84:6
84:15
87:10,23
**knowing** 61:1
**knowledge**
25:24
37:10,12
38:24 43:8
43:15,21
46:6 48:11
53:4 55:1
55:19 80:7
82:12
85:12
**knows** 87:13

_____
**L**

**LA** 72:1
**lag** 21:4
**law** 2:16
62:22 79:1
79:12
**laws** 61:6

63:22
lawsuit
  19:12
lawyer 21:25
  31:24 32:4
  32:11
  85:12,21
leadership
  46:8
leads 12:22
leased 22:25
leaving
  78:11
led 80:17
legal 24:13
  30:14,22
  34:14
legally
  20:20
legitimate
  24:11,16
LENNARD 1:11
let's 6:2
  8:23 9:14
  10:2 16:6
  19:17 33:5
  47:8 54:2
  68:25
  73:23
  77:23
  79:17 83:3
  84:16
letter 19:23
  20:4 73:21
liability
  84:24 85:3
license 40:6
  40:8,9,11
  40:12,14
  40:15
life 23:10
  23:14
limitless
  23:20 66:4
lines 9:21
  10:2
listed 3:12
  5:23 21:1
  28:4
lists 6:9

35:4 36:6
little 13:11
  27:3 35:18
  39:24
  48:13
LLP 2:16
located
  15:10 16:3
  16:4 54:3
  74:7
locations
  21:16 22:4
  22:22
logo 18:2,2
  18:25
  19:25 20:1
  20:4,6
  30:17,24
long 12:14
  12:15
  61:14
longer 16:5
  50:14
look 26:22
  33:5 38:19
  60:24 83:3
  83:9 84:17
looking 6:6
  27:25 36:8
  43:12 60:7
lose 65:8
lost 40:11
  57:17
lot 33:20
  46:17
  56:10 57:5
  62:10
low 74:5,10
                    ─────────
                        M
                    ─────────
M 2:15
M-Pesa 66:23
  67:10
main 25:10
  28:19 29:2
  33:3
major 74:14
making 27:13
  48:25
managed 29:6

managing
  22:1 24:13
  45:15
MARKED 6:5
  33:8 83:7
massive
  44:15,15
Mastercard
  52:20
material
  7:18
materials
  75:1
matter 23:9
matters 5:23
mean 7:25
  8:21 10:8
  13:24
  17:21
  22:22 23:5
  28:17
  32:22 38:5
  40:8,11
  48:5,21
  52:16
  57:16 60:6
  63:10,11
  74:1 77:3
  77:20
  79:19
  82:23
  85:11
  86:10,18
meant 30:1
  71:15
Meara 56:17
meat 35:20
meatier
  35:18
meet 38:10
member 34:12
  37:14
  38:12,16
  43:14 46:2
  46:4
members
  15:25 16:3
  38:13
  44:14,17
  44:19

45:15,25
membership
  44:23 45:2
  45:8,13,19
  45:22
  65:18
mentioned
  14:21
  15:12
  18:16
  21:14
  27:25
  36:23
  53:25 66:5
  73:23 75:7
message 48:1
met 14:4,10
  14:20,22
Michael 2:15
  2:16 4:20
  4:21 7:17
  8:12 9:2
  16:16,20
  27:1,6,12
  27:19 32:2
  32:3,9
  88:8,10,16
Michigan
  89:3,24
military
  61:8
million
  74:15,21
  75:8
mind 11:22
minimum
  55:13,15
minister
  24:6,7
  45:6,7,12
  45:21,22
  68:24
minutes
  84:16
mission 40:1
  82:20
  83:11,12
  83:14,18
  84:3
missions

62:11
Mobile 66:23
Mohamed 15:7
  15:9 46:17
  51:18
  56:13
moment 22:14
  50:19
money 42:25
  46:19 50:1
  53:8,13
  55:3,21,25
  56:5,7,9
  56:12,16
  57:1,3,6,7
  57:7,8,14
  57:16,19
  57:22,23
  58:7 66:19
  66:22,23
  67:1,2,5,7
  67:12,16
  67:19
  68:21 69:1
  69:15,19
  70:1,9,13
  70:19 71:4
  71:5,12,18
  72:15,17
  72:17,18
  73:5,5,7
  73:10,13
  75:6,20
  76:16 77:2
  77:11,16
  77:19
  78:13 81:1
  81:7,10,16
  81:21,24
  81:25 82:8
  82:14,18
  85:14
  86:24
MoneyGram
  56:5,9,16
  57:8 66:13
  66:18,23
MoneyGram's
  66:14
monies 76:1

76:21,22
78:10,16
81:3 86:22
87:2
**morning** 6:20
7:9
**mortar** 66:25
**MOU** 36:2
39:15
**MOU/Inst...**
35:13
**move** 12:3
67:5
**movement**
67:2
**moving** 66:1
67:1,7
**multiple**
21:11,12
28:19 62:6

---

**N**

**name** 4:11,13
15:8 18:22
26:10,11
26:13,19
36:14,17
40:16 41:5
41:12,13
41:15,16
41:21,24
42:4 43:18
43:20
50:18,22
77:13 82:3
86:3
**names** 30:14
56:14,25
87:23
**nation** 28:18
78:17,17
**Nations**
14:14,18
23:9,12
33:23 34:9
36:5,7
37:15,20
37:25 38:2
38:6,13,14
38:21 49:9

79:24,25
83:25
**necessarily**
40:2 59:20
**necessary**
41:20
**need** 75:2
**needed** 7:24
29:14
37:23
62:11
**never** 5:13
23:16,16
43:3 48:20
50:5,7
52:25
71:17 75:5
81:4 85:15
**new** 18:25
20:17,24
29:6 30:4
36:19
42:24
45:24 46:1
46:4 52:8
52:9
**NGO** 38:10
**Nicole** 51:3
51:12
**nods** 9:22
**non-profit**
14:17
**Nope** 44:6
**north** 1:2
2:9 12:16
12:23,25
13:1 74:21
76:25
**Notary** 89:1
89:7,23
**NOTE** 3:12
4:3
**notes** 84:18
89:17
**notice** 3:15
5:23,25
6:4,7,9
7:8,16
8:15
**notified**

79:12
**November**
1:20 4:1
52:1
**numbered**
83:10

---

**O**

**oath** 4:8 9:9
**object** 27:16
**objection**
27:16
**occasions**
70:2
**occurred**
80:4
**October** 52:1
**off-the-...**
27:22
**office** 2:6
21:16,22
21:24,24
22:9,9,11
**officers**
79:9
**offices** 2:16
22:12,15
22:17,22
**official**
25:21,23
28:1,7,9
28:13
29:19
**ogo** 19:18
**Oh** 77:6
**okay** 9:2
26:25
27:19 32:9
39:4,10
74:2 88:11
**once** 65:7
**one-page**
35:20
**ones** 7:5
21:8
**open** 20:15
50:9,11
55:13
**opened** 51:11
51:13

**openly** 20:11
20:12
**operate** 30:2
**operating**
29:15
46:13
**operation**
52:8
**operations**
39:20,22
69:13
**opportunity**
81:5
**order** 3:12
26:5 30:22
31:1,3,6
31:24 32:4
32:11
**ordering**
88:12
**org** 18:23
26:16
**organiza...**
5:16,21
12:4,5
13:6 14:3
14:15
17:12,19
17:21,22
18:1,3,15
18:17,18
19:4,8,18
20:7 21:3
21:19
23:23 25:6
25:17
28:15,20
28:25 29:2
29:4,14,22
30:6 33:22
34:16 35:4
35:5 36:5
36:14,15
36:17,18
38:9 40:4
40:20 41:2
42:7 46:11
47:5 49:8
49:10
58:19

64:11,12
65:15
78:23,23
78:25
79:19 83:1
83:20
87:18
**organiza...**
19:16
**organiza...**
33:25 34:7
34:25 35:6
49:12
79:10
**organize**
56:18
**organized**
37:19
**originally**
70:14
**outside** 18:4
75:25 76:6
76:6
**overchar...**
66:25
**overseas**
62:9,17
80:6
**owned** 22:25
**owner** 25:14
**ownership**
80:17,24

---

**P**

**p.m** 1:19 4:2
88:19
**package** 7:18
82:17
**page** 3:2,10
10:1,2
33:15
35:16
39:16 83:8
**pages** 35:12
**paid** 58:21
58:22
59:13,15
59:22,25
69:19 70:8
71:10,22

72:4 73:10
87:11
**Pakistan**
12:7 15:11
19:9 21:17
21:22 31:2
35:25 56:8
**paragraph**
83:10,10
**part** 11:6,11
30:5 48:20
58:20,25
58:25 59:7
63:16
67:14
76:22 80:6
80:15
**participant**
36:4
**particular**
8:25 29:7
**parties**
88:21
**parties/the**
36:4
**party** 5:15
38:6 85:5
89:18
**pass** 27:17
88:6
**passed** 88:7
**passport**
66:10
**passports**
64:3 66:3
**path** 18:6,11
**pause** 49:21
**pay** 62:12,12
69:23
**paying** 85:13
**payments**
52:20
86:14
**PayPal** 67:9
**penalty** 9:11
**penetration**
49:8
**people** 17:14
23:11,16
29:3 42:25

43:19
44:12
45:16
46:18
57:24 59:7
60:7,11
66:1 67:8
76:8,9
77:17
85:23
**percent**
17:16
62:10
**percentage**
74:12
**percentile**
74:18
**perfect** 61:5
**performance**
62:21
**period** 12:16
17:7 37:6
50:15,20
51:8 54:14
76:24
**perjury** 9:11
**permission**
79:2
**person** 14:10
14:11,20
14:22 15:1
15:1,3
22:6 24:1
60:9 85:19
85:20
**personal**
4:17 5:3
12:20 55:6
55:8 72:17
76:7,13
80:16
84:24 85:3
85:12 87:2
**personally**
76:16
85:17
**perspective**
44:10
**pertaining**
33:11

**phone** 47:25
48:1
**physical**
21:15 22:3
31:6
**pick** 69:15
**pieces** 25:20
**place** 36:13
52:3 69:1
69:2 89:10
**places** 5:20
19:15 54:8
**platform**
53:1 61:6
**please** 4:11
**point** 44:16
47:19
70:16
82:13
**policies**
48:3,8
62:20
**policy** 53:10
**port** 76:24
**portion** 27:9
27:9 59:18
71:15
74:14 81:7
81:10,25
**posited**
11:10 14:1
**position**
15:13,16
23:6 24:8
46:18 86:1
**positions**
18:11
**possession**
32:21 33:3
81:3,11
**possibly**
48:24
**potatoes**
35:20
**potentially**
54:17
**pouch** 63:2
63:24
**pouches** 63:4
63:6,9

79:2
**power** 68:16
68:20 69:2
**preparation**
6:18
**prepare** 8:8
**present**
22:14
**presented**
3:12
**presently**
26:4 49:18
49:20
52:16
**prestigious**
38:15,15
**Pretty** 87:5
**Primarily**
17:2
**prior** 7:8
18:7 20:25
21:5 35:17
42:20 43:4
47:5 52:7
54:20
60:23
61:20,21
66:5 73:3
73:13
**Prison** 19:6
29:1 30:1
35:24
**private** 49:7
78:23
**probable**
22:1
**probably**
65:25
**problem** 58:7
**Procedure**
5:15
**procedures**
48:3,8
**proceeds**
82:8
**process** 24:3
24:5 63:16
76:19
**produce**
74:10

**produced**
33:10
**profit** 40:16
40:17
**program**
37:15,20
38:13,16
**programs**
33:12
38:22,23
38:25
**project**
54:23
74:13,14
74:17,20
74:22 75:8
75:11,15
75:18 86:6
86:21
**projects**
57:4 73:24
74:2,3
85:13,14
**properly**
29:15 47:6
**proposed**
85:1
**provide** 53:5
**provided**
31:10,13
**providing**
29:13
**public** 39:6
89:7,23
**purpose**
21:21
48:14 57:3
73:25
**purposes**
19:20
**put** 26:2
35:19 47:6
49:21 55:8
55:18
76:17 86:5
86:20,25
87:3
**putting**
29:13 70:1

## Q

Quasir 85:6
 87:16
question
 9:17 10:5
 10:6,10,14
 10:15,18
 11:5,10,25
 12:9 14:1
 21:13 23:3
 24:12
 25:19
 27:10
 28:23,25
 29:17,17
 29:21
 31:11,12
 31:14
 42:18 43:7
 45:18,21
 47:4,17
 48:25
 65:10
 67:17
 69:11
 71:20
 73:11 78:4
 79:5,7
 80:3 82:19
 83:15
 84:25
questioning
 27:18
questions
 27:8,9,15
 84:21
 88:10
 89:13
quick 81:15
quickly 81:1

## R

raise 40:21
 42:25 44:7
 44:8 46:20
 48:12
raised 19:3
 47:8,9,12
 48:10 50:1
 52:25

75:16,18
76:1,3
82:8 84:6
85:17
86:23,24
87:2
raising 46:7
46:14,19
47:1,23
48:4,5
53:8 54:18
54:21,22
ramifica...
34:14
ranking
15:25
rate 60:2
reader 11:22
real 81:15
reality
79:23
realize 58:1
reason 29:10
reasonably
5:22
recall 6:13
6:17,20
7:10 12:11
15:2 26:21
33:1 37:1
37:5 55:23
56:4,25
58:10,13
60:3 66:20
72:1,8
recalling
12:22
receipt
53:13,15
receipts
53:5,11,17
receive 43:2
43:18,19
58:3 59:16
received 7:1
30:22 50:7
53:20
54:25 81:2
recess 49:24
84:19

recollec...
12:19,20
recommend
60:12
recommended
60:17,21
recommen...
60:23
record 4:21
81:15
recorded
89:14
records 47:3
48:22 49:2
49:10,11
49:14,17
53:17 61:4
reduced
89:15
refer 13:13
reference
54:11
referencing
13:4 20:2
35:23 39:8
51:8 75:20
referring
49:1
reflected
86:14
regard 32:18
42:3
regarding
53:11
80:23
Regardless
44:3 77:13
regards
31:18
register
42:8,13,19
registered
41:22 43:3
registra...
13:5 43:22
registry
44:23 45:3
45:9,13,19
45:23
reimburse

70:16,17
71:4,6
reimbursed
69:24 70:4
70:10
reimburs...
70:25
related 33:9
60:10
79:12
89:18
relation
64:20
relation...
34:23 68:7
relation...
34:20
reliable
61:2
Relief 83:23
84:2
remains 68:8
remember
6:14,15
18:24
21:10
25:24,25
26:19
44:14
51:21,22
54:18
66:17
73:17
rental 70:21
rep 13:8
repeat 37:3
rephrase
9:18
repopulated
20:16
report 47:10
47:22 48:9
57:5 68:3
reported
47:12,15
reporter 4:3
9:16,21
88:11,15
88:17 89:7
reporting

48:4,5
80:4,8
represent
4:14 23:8
23:23
represen...
5:6 9:6
14:13,14
14:15
28:10,22
28:22
29:18
56:17,19
80:14
81:11
87:15
represen...
56:22 57:9
81:18,19
represented
30:5 64:23
represents
21:25
44:12
request
31:13
requested
88:20
required
49:4,6,13
78:22
requirement
78:16
requires
5:18 8:5
78:17
respect
57:13
respective
88:21
respond
11:17
response
31:13
responses
9:25 28:4
responsible
46:19
restroom
49:22

restructure 44:22
restruct... 21:21
resume 24:5
retreat 62:13
review 6:18
6:24 7:3,6
reviewed 7:6
right 5:8,11
9:4 10:24
11:1,4,14
16:9,11,13
16:21,22
18:21 20:5
20:12,22
20:22 22:2
23:6,24
24:12
26:12,23
30:14,18
30:23
32:15 36:7
36:18
39:10,25
42:5 43:8
45:18
46:12
48:22
49:20
51:23 54:6
67:13
68:17 72:5
73:8 76:10
77:7 79:7
79:22
80:11,12
82:1,15
85:21,23
86:4 88:1
88:17
rights 5:7
8:2,17,19
33:13
41:14 42:1
82:24
Ritz 81:8,12
Robert 1:17
3:4 4:6,12

7:19 13:13
13:15,20
14:2 15:3
24:19
25:13,16
25:18 26:2
30:13,20
30:23
36:11,23
37:18
47:22 51:4
51:19
54:20 55:8
55:24
60:15
67:20
79:15,17
84:23
rogue 17:13
17:14,18
17:25
23:13
37:18
48:11,12
61:16,25
62:5,6,7
65:4,5,13
68:9 69:16
room 62:12
Rose 1:21
89:6,22
Roughly 57:2
rule 5:18
7:23 8:11
rules 5:14
9:14
run 47:5
rusty 25:1

—————
S
S 1:17 3:4
4:6
S-H-U 41:11
safe 54:7
safes 53:24
53:25 54:2
54:3,15
Salaam 14:6
14:20

San 2:18
70:12
71:24,25
72:2
Sansome 2:17
satisfy
84:23 85:2
saw 73:21
74:25
saying 22:2
26:15
says 27:3
62:22
63:22
73:21
83:11
secretary
15:18,19
15:20 16:4
16:5,12
17:18
18:11
41:25
63:24
64:21
65:15
section 64:9
secure 64:16
Security
36:5,7
see 4:22
6:10 7:7
7:12 8:24
33:13,14
34:2 35:12
57:5
seen 5:24
6:12,16,22
6:25 13:2
39:8 68:8
seized 1:10
72:12,21
74:12,16
75:20,25
80:18 85:2
seizure
54:10,12
54:14
select 60:5
selected

60:16
send 38:8
56:9 58:7
66:17 77:2
77:3,4,11
77:24
sending
56:12,15
58:9
sent 43:13
56:1,5,7
56:25 57:3
57:5,7,11
57:22,23
58:12
76:18 77:1
77:4,7,9
77:14,19
separate
8:22 28:15
29:22
44:17
82:22
Sergeant
61:17
serve 61:12
served 61:14
61:25
service 57:9
services
67:12
set 4:20
25:8 30:7
40:2,3
55:3 58:2
60:2 89:10
Seth 2:4
4:13 88:11
settled 70:7
seven 34:11
35:12
shared 43:17
shifted
17:13
Shorthand
89:6
showing
73:13
shown 49:6
SHU 41:9,10

41:12,15
41:22,24
Shumake 1:17
3:4 4:6,12
4:24 5:2
6:6 8:8,24
9:4 10:24
11:22
13:13,15
13:20 14:2
15:3 24:19
25:14,16
26:2 27:21
27:24
28:21
30:13,20
30:23 33:9
36:11,23
37:3 43:10
45:18
46:23
47:18,22
51:4,19
54:9,20
55:24 57:2
60:15
67:21
69:11 73:8
77:13 83:9
83:12
84:21
Shumake's
37:18 55:8
79:16,17
84:23
shut 31:19
31:21
side 27:18
signatory
36:6,24
37:21 51:4
signature
35:16,22
36:3 37:23
88:20
signed 43:14
52:10,12
similar
36:15
sir 16:19

sit 43:10,21
site 30:2
  33:4
sites 29:11
  30:12
sizable
  53:13
slips 36:18
small 74:14
smaller
  67:14
sorry 16:16
  45:11
  73:25
  75:23
sounds 8:7
  15:24
source 81:16
sources
  82:10
South 34:10
  34:12
  36:21
sp 56:17
speak 8:18
  10:3 22:4
  43:15 79:9
  80:10
speaking
  27:5 79:10
specific 6:9
  22:25 23:8
  23:8,20,21
  23:24 35:8
  48:13,15
  59:9 60:25
  64:9 65:15
  71:9 73:24
  75:13
  77:13
specific...
  18:24
spent 61:2
spoken 87:21
  87:25 88:2
SS 89:4
standards
  38:10
standpoint

80:23
start 8:23
started
  17:19 29:7
  30:8 52:23
  54:18
starting
  39:17
state 4:11
  15:19,19
  41:20,22
  41:25 42:9
  42:13,19
  43:4,22
  64:7,19,22
  65:11,15
  89:3,8
State's
  63:25
state/ 36:4
statement
  10:17
statements
  86:11,15
  86:19
States 1:1,5
  2:5,7,13
  4:14,15
  14:15
  22:19 40:7
  40:10 42:8
  42:15,21
  42:23
  43:23
  49:11 64:7
  64:18
  65:11,17
  65:18
status 33:12
  41:2 42:5
Stax 82:5
stenogra...
  89:17
stenogra...
  89:14
stepped 52:4
  52:6
steps 42:3
stole 29:2
stolen 30:3

stop 17:11
stopped
  62:16
stored 53:17
  53:21,22
  54:3,15
straight
  4:21
Street 2:8
  2:17
strike 18:15
structure
  47:7
study 59:3
  75:2
stuff 7:18
  33:20
subject 23:9
  23:24,25
submit 32:11
  41:18
submitted
  31:24 32:4
  39:7
Subseque...
  30:11
subsidiary
  35:6 38:21
substantial
  57:18
succession
  18:6,12
Sudan 34:10
  34:12
  36:21
sued 19:8,8
  26:17
  30:11
Suite 2:8,17
sum 81:12,21
supervised
  67:23,24
supervision
  67:25
  68:18,19
supposed
  7:12,13
  46:21,22
  46:25
  48:12 58:3

63:20,23
  64:2 76:22
  76:23 79:1
  79:6,13
  85:14
sure 5:10
  6:1 7:10
  12:1 13:2
  13:22,24
  14:1 22:5
  29:14 33:1
  33:3 35:19
  39:4,14
  44:11
  48:24,25
  48:25
  49:14,23
  51:6,22
  52:2 57:18
  60:23
  62:12
  63:11 65:2
  66:12
  84:25 85:1
  85:5 86:20
  87:6
suspicious
  57:23
sustainable
  44:22
sworn 4:7
  19:1 85:20
  89:11
system 58:2
  58:20
  65:19

_____
T
_____
take 9:21
  16:6 17:25
  18:2 22:7
  32:18,20
  32:21 33:3
  33:5 49:23
  54:2 58:4
  62:7 68:20
  73:23 76:3
  77:17
  84:16
taken 1:18

30:3 31:16
  31:17 33:1
  49:24
  72:24 73:1
  75:14
  84:19 89:9
  89:17
talk 9:15
  47:24
  60:10 85:5
talked 5:10
talking 8:23
  11:20
  33:17
  35:14
  39:14 64:9
  66:13
talks 63:23
Tanzania
  14:6 56:8
  56:21,22
  57:10,11
  57:13
  58:12 74:8
  74:9 75:4
  76:2,17
  78:14
  86:21 87:3
tariffs
  76:23,24
task 23:21
tax 40:24,25
  41:2 43:2
  43:19
  53:14
  84:24 85:3
technically
  13:8
technology
  21:4
tell 7:20
  11:22
  33:19
  68:11,20
  69:2,13
tells 7:12
template
  35:7
term 5:13
  82:21

termed 18:14
terminology 15:20
terms 69:12 86:5
testified 4:8 17:8 26:12 29:18 45:20 52:7 57:14,18 69:10 80:16
testify 5:19 5:22 8:1,6 89:11
testifying 5:6 9:6 87:14
testimony 6:19 13:9 13:9 25:13 25:20 28:10 30:13 32:13 41:1 42:12 44:16 50:10 69:22 80:5 85:22
text 48:1
thank 29:16 88:17
Thanks 4:25
thereof 61:7
thing 40:18 52:20 69:15 70:21 74:24 88:16
things 13:7 62:6,14 64:15 79:3 85:1
think 7:11 12:25 20:13 24:25 26:6

29:23
50:17 51:1
51:6,15
54:11
57:18 65:2
66:10
71:17,17
77:8 85:18
thinking 77:10
third 3:15 6:4,7 24:25 57:24
thousand 60:1 76:18 77:1
thousands 58:8
three 21:7 28:11,15 29:19,22 30:14 31:17,18 54:8
Thug 81:19
time 12:16 15:6 16:5 17:7 37:6 39:13 46:1 50:9,15,20 51:8 54:11 54:14 57:20 59:14 60:4 60:19 61:2 62:10 65:6 72:24 76:5 76:24 77:23 80:20 89:9
timeline 27:4
times 40:23 59:14 62:1 67:15 70:10
title 65:8
titled 35:13
today 6:19

25:13,20
43:10,21
80:13
87:14
told 7:22 10:25
tomorrow 7:13,14
top 15:13 19:25
topics 6:10 8:6,7,10 8:13,24,25 80:19
totaled 76:11,14
trade 2:8 62:11
trademark 18:3 19:9 19:19 30:17
training 53:12 79:11
transcript 3:11 89:16
transcri... 89:15
transfer 55:21,24 56:1 77:14 81:5
transferred 67:13
transfer... 66:15 80:6
transfers 87:7
transport 58:14 59:21 67:19 71:11 78:2
transported 7:19 67:15
transpor... 59:19,23 69:19 71:16,23

72:3,16,20
73:2,7,10
73:12
78:21
travel 61:4 69:19,23 70:1,7,22 70:24
traveling 69:18 77:17
trick 45:24 48:17
tricky 15:17
tried 25:7
true 26:14 26:15 89:16
Trust 83:23 84:2,2
truth 89:12 89:12
try 9:14 10:3 13:12
trying 7:6 10:17 12:2 44:14 60:4 66:24 74:19
Tuesday 1:20 4:1
turn 6:2 16:6 19:22 27:21 35:11 73:23 83:8
turned 62:16
two 32:19 34:7,24,25 38:22 42:16 64:22 67:8 69:7 76:18 82:11 85:22 88:3
type 12:4 34:3 40:6 40:9,14 61:18 77:14

types 62:13

___

U

U.S 2:6 23:7 40:17,25 44:2 56:4 61:13 64:3 64:15 65:15 71:14
uh-huh 9:22 46:24
uh-uh 9:22
ultimately 70:3,6
UN 23:10 38:16,23 38:25
unaware 37:7 37:8
unclear 13:14
undercover 20:14
underneath 83:24
understand 4:15 5:5 7:7 9:5,9 9:17 10:10 10:18,19 10:22,25 11:6,12,15 11:16,18 11:23,24 13:25 48:21 69:10 80:13,15 84:25 85:4
understa... 80:4
understands 61:6
understood 10:6,15 11:10 49:1
UNEP 37:15 38:14,17 84:1

UNICEF 84:1
unilater...
  38:2,4
Union 36:16
  57:5,6,8
  58:7 66:21
  66:24
United 1:1,5
  2:5,7,13
  4:14,14
  14:14,17
  22:19 23:9
  23:12
  33:23 34:9
  36:5,6
  37:15,19
  37:24 38:2
  38:6,13,14
  38:21 40:7
  40:10 42:8
  42:15,21
  42:23
  43:23 49:9
  64:7,18
  65:11,17
  65:18
  79:24,25
  83:25
unpack 19:17
unsigned
  36:2
usage 18:3
use 18:4,4
  49:22
  58:14 63:6
  66:20
usually
  62:15 64:3

---
**V**

Venmo 67:5
  67:11
verbal 9:25
Verity 36:6
  36:9
vetted 60:13
  60:18
vetting 24:3
vice-cha...
  15:17 16:7

18:10
vice-versa
  35:10
video 4:23
Vienna 34:14
  34:15 59:3
  62:22
  63:22 79:3
violate 79:3
Visa 52:19
visit 56:3
volunteer
  17:3
volunteers
  59:12
vs 1:7

---
**W**

want 9:22
  13:22 17:5
  18:14,23
  27:8 35:8
  39:23
  40:23
  51:21 80:3
  80:20,22
warehouse
  76:20
wasn't 13:17
  20:19
  27:12
  37:23
  41:20 71:9
waste 80:20
water 54:23
  73:21
  74:22,23
Wave 77:6,8
way 6:23
  8:23 17:22
  17:24 22:1
  27:14
  38:15
  44:22 59:4
  62:25
  66:19
  68:25 71:9
  77:16
Wayne 89:5
  89:24

ways 71:8,9
we'll 8:24
we're 7:12
  10:1 33:16
  38:13
  48:12
  58:19 64:9
  79:22
  84:14
we've 30:15
  32:19
  52:24
web 20:25
website
  20:16,21
  20:23,25
  21:2,5
  24:10,11
  24:20,23
  25:6,8,15
  25:21,22
  25:23 26:1
  26:3,19
  28:1,5,7
  29:11,19
  30:8 31:21
  31:25 32:8
  32:13,14
  32:24
  33:15,16
  52:15,17
  52:17,19
  52:23 53:3
  63:25
websites
  21:11,12
  24:14 25:4
  25:5 26:13
  28:11,13
  28:16,19
  29:12,19
  29:22
  30:15
  31:17,18
  32:19
weeds 7:25
weeks 76:18
  77:2
weird 13:7
  13:11

wells 51:1,5
  51:9 55:2
  55:9 74:24
went 17:12
  17:18
  19:13,14
  19:14
  30:11
  35:24
  45:16
  85:16
weren't
  17:25 25:7
  36:10
West 2:8
Western 1:2
  57:4,6,8
  58:7 66:20
  66:24
WhatsApp
  48:1
whichever
  78:14
wing 83:22
  83:24
witness 3:2
  27:11,17
  32:6 88:6
  88:20
  89:11,14
wondering
  54:6
word 20:13
  45:24
  57:17
work 22:21
  22:23 29:8
  40:4,21
  45:17
  57:12 59:3
  59:10,13
  59:15
  60:11
  61:21 62:9
  62:18
  67:24 68:1
  77:12
  82:23 83:2
  83:19
worked 62:4

working 29:3
  55:24
  57:24
works 27:15
  41:20
world 15:5,6
  15:12,13
  15:22,23
  15:25
  16:14,17
  16:18
  17:12,23
  18:5,6,7,8
  18:13 19:1
  19:1,2,5
  21:18
  22:12,15
  24:2,4,19
  26:1 28:19
  28:25
  29:25
  30:19,23
  31:7 35:23
  44:10
  45:16 46:5
  47:11,13
  47:15,23
  49:6 51:14
  51:15,15
  51:19 52:4
  52:13
  57:12,24
  60:12,17
  60:19 61:4
  65:25 66:5
  68:2,5,6
  68:13,22
  69:4 87:21
worldwide
  40:19
  64:12 84:6
wouldn't
  12:13
  25:16
  43:12,24
  50:6 52:21
  52:24 60:9
  84:15
wrap 84:21
write-off

| | | | | |
|---|---|---|---|---|
| 40:24 43:2 | **zero** 21:18 | **2016** 1:11 | **3:18-CV-646** | **946-8996** |
| 53:14 | 78:16 | 17:9 19:24 | 1:8 | 2:19 |
| **written** 48:7 | **Zoom** 1:18 | 38:25 | **30** 10:20 | |
| **www.ihrc...** | 4:5,22 | 46:14 47:8 | 83:25 | |
| 28:12 | | 47:21 48:4 | **30(b)(6)** | |
| 33:16 | **0** | 48:16 | 1:17 5:11 | |
| **www.ihrc...** | | 49:15 50:1 | 5:12,15,24 | |
| 28:12 | **1** | 50:11 53:2 | 7:7,16,23 | |
| **www.ihrc...** | **1** 19:22 20:1 | 53:20 54:4 | 8:4,9,11 | |
| 28:5 | **1,100** 71:3 | 54:5,9,14 | 8:14 10:25 | |
| **www.ihrc...** | **10** 3:18 | 54:20 | 80:18 | |
| 20:25 21:5 | 12:16,23 | 55:21 68:4 | **33** 3:17 | |
| 25:15,21 | 13:1,3 | 68:15 | **344-6222** | |
| 28:2,11 | 83:4,5,10 | 77:23,24 | 2:10 | |
| 31:21 | **10,000** 47:9 | 84:9 | **3500** 2:17 | |
| 32:12 | 75:2 78:7 | **2017** 84:11 | **37** 3:14 6:2 | |
| | 78:8 | **2018** 37:7,9 | 6:3,6 | |
| **X** | **100** 17:16 | 37:13 | **38** 27:21,25 | |
| **X** 69:1 | 55:13 | 43:13 | | |
| | **100,000** | 50:17,20 | **4** | |
| **Y** | 58:11 | 51:8,13 | **4** 3:6 | |
| **Y** 69:2 | 66:18 | 65:2 | **4:39** 88:19 | |
| **yeah** 14:9 | **1099** 58:17 | **2019** 51:21 | **40** 84:1 | |
| 18:20 | 58:18 | 51:24,25 | **400,000** | |
| 20:12 37:2 | **14** 17:7 | **2020** 1:20 | 76:12 | |
| 49:3 51:24 | **15** 17:7 | 4:1 50:17 | **415** 2:19 | |
| 68:16 | **16** 17:7 | 50:20 51:8 | | |
| 72:14 76:4 | **1650** 2:8 | **22** 3:16 6:9 | **5** | |
| 77:8,16 | **17** 1:20 4:1 | 8:10 33:5 | **500** 60:1 | |
| 81:3 | 17:10 | 33:6,9 | **501(c)(3)** | |
| **year** 54:10 | **171,000** | 35:1 39:11 | 40:16 41:2 | |
| 54:19 | 75:19 | **227** 2:8 | 41:4,7 | |
| 84:13 | | **24** 19:23 | 42:4 43:20 | |
| **years** 12:17 | **2** | **250,000** | | |
| 12:24,25 | **2** 15:16 | 71:18 | **6** | |
| 13:1,3 | **2,000** 71:18 | 72:13,23 | **6** 3:15 | |
| 34:11 61:2 | 72:15,16 | **252,000** 73:4 | | |
| 61:15 | 72:19 73:5 | 74:12,16 | **7** | |
| 64:25 88:3 | 73:9 | **252,140** | **7-15-24** | |
| **York** 29:6 | **2:23** 1:19 | 71:14,23 | 89:25 | |
| 30:4 42:24 | 4:2 | 72:11,14 | **704** 2:10 | |
| **Young** 81:19 | **20** 12:16,24 | 73:13,20 | | |
| **youth** 73:22 | 12:25 13:3 | **252,140.00** | **8** | |
| 74:25 | **20,000** 44:14 | 1:9 | **8** 83:8 | |
| **YSL** 81:11,19 | 44:17 | **271** 1:11 | **8,000** 74:23 | |
| | 74:23 | **280,000** | **83** 3:19 | |
| **Z** | **2013** 13:22 | 76:25 | | |
| **Zelle** 67:5 | 65:2 | **28202** 2:9 | **9** | |
| 67:10 | **2014** 17:9 | | **90** 62:10 | |
| 77:10,11 | **2015** 84:7 | **3** | **94104** 2:18 | |



International
# Human Rights Commission
La Commission Internationale des Droits de l'Homme


Transparency Register




*Because what we do today, we do for Generatio*

G Select Language | ▼

Szukaj

Home
Abouth
Management
Departments
Members
Cooperation
Conference
United Nations
Reports
Humanitarian
Monitoring
**Press note**
Application
Info
Offices



## IMPORTANT NOTICE
### IHRC HQ

I like to inform you that: **Mr.Robert Shumake** do not belong to our organization. IHRC on the American Region. He never received authorization from the organization to represent the IHRC. He did not receive an appointment as an IHRC member. The person authorized to sign the nomination documents in the IHRC is the Secretary General of IHRC Sir Rafal Marcin Wasik.

All Ambassadors, Commissioners and other members are published on this website. IHRC from the Czech Republic has a copyright logo. You will receive all information via direct mail to the Secretary General of the IHRC; info@ihrchq.org

Copyright © 2018, Created by IHRC Czech Republic





**International**
**Human Rights** Commission
La Commission Internationale des Droits de L'homme

*Via Hand Delivery*

June 24, 2016

Attn: Darren Coleman
Director of Business Development
Honorary Consul General Republic of Botswana

### RE: Confidential IHRC Diplomatic Communication
### Cash Transportation and Deposit Direction Letter

Dear Mr. Coleman:

You are being entrusted with up to One Hundred Fifty-Thousand ($150,000.00) Dollars, in cash, as Designated Agent pursuant to your appointment as Business Development Officer to the Office of International Human Rights Commission.

The $150,000.00 in cash is of legal origin and is being transported and utilized for purposes of cash deposit to fund housing development, health care, water purification, youth causes and other philanthropic projects on behalf of the International Human Rights Commission throughout Africa and the Caribbean markets. As you are aware, cash deposits are not uncommon for purposes of infrastructure investment on the African Continent.

Please be advised that this is a confidential matter and our projects and contacts are of a proprietary nature. Your assignment may not be disclosed or disseminated to anyone without the expressed written consent of this office.

*If you have any questions, please contact my office at (313) 942-6576 or General Counsel Natalie King, Esq. at (248) 943-9244.*

Sincerely,

H.E. R.S. Shumake
Ambassador at Large
International Human Rights Commission
Americas, African Union, and United Nations Designee



www.ihrchq.org, info@ihrchq.org

EXHIBIT
5

DAVID M. MICHAEL, CSBN 74031
EDWARD M. BURCH, CSBN 255470
LAW OFFICES OF MICHAEL & BURCH LLP
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone:    (415) 946-8996
Facsimile:    (877) 538-6220
E-mail:    david@michaelburchlaw.com

Attorneys for Claimant ROBERT SHUMAKE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

APPROXIMATELY $252,140.00 IN US
CURRENCY SEIZED FROM DARREN
LENNARD COLEMAN ON JUNE 27, 2016 AT
CHARLOTTE-DOUGLAS INTERNATIONAL
AIRPORT,

      Defendant.

_____/

INTERNATIONAL HUMAN RIGHTS
COMMISSION,

      Claimant.

_____/

CIVIL NO. 3;18 CV 646

CLAIMANT ROBERT
SHUMAKE'S RESPONSE TO
PLAINTIFF'S FIRST SET OF
INTERROGATORIES

REQUESTING PARTY:  Plaintiff UNITED STATES OF AMERICA
RESPONDING PARTY:  Claimant ROBERT SHUMAKE
SET NO:                        FIRST SET OF INTERROGATORIES

## PRELIMINARY STATEMENT

    1.    Claimant has not completed his investigation of the facts, witnesses, or documents

relating to this case, nor has Claimant completed discovery in this action, including the receipt

EXHIBIT
6

1

from plaintiff of documents and records, nor has Claimant completed an analysis of all available data. Furthermore, Claimant has not completed any preparations for trial. Accordingly, the responses herein are given without prejudice to Claimant's right to provide further responses, which Claimant may subsequently discover, or which Claimant will obtain from plaintiff or may obtain elsewhere, or which may be contained in Claimant's possessions but not determined to be relevant at this time. Claimant reserves his right to alter, amend, supplement, or otherwise modify these responses if and when additional information is known or obtained.

2.     The responses are given herein without prejudice to Claimant's right to present information which may hereafter be discovered during the course of continued discovery and investigation by Claimant. These responses are made without prejudice to Claimant's right to produce any evidence which may have been omitted from this response and only subsequently discovered because of oversight, inadvertence, and/or good faith error, or a mistake, or which may have been known to Claimant or in Claimant's possession, but not considered at the time of these responses to be relevant to this case.

3.     Claimant, **ROBERT SHUMAKE**, objects to all definitions, instructions, and terms, to the extent that they purport to impose any different or additional obligations beyond those required by the Federal Rules of Civil Procedure or any other rules that may apply to these proceedings.

4.     Claimant, **ROBERT SHUMAKE**, objects to each request to the extent that it seeks information protected by the attorney/client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

5.     Claimant, **ROBERT SHUMAKE**, objects to each request to the extent it requires a violation of any individual's right to privacy and/or the right to be free from unreasonable searches and seizures under any applicable state, federal, or constitutional provisions or laws, including the Fourth Amendments to the United States Constitution.

6.     Claimant, **ROBERT SHUMAKE**, objects to each request to extent that it seeks the disclosure of information exempt from disclosure under any applicable evidentiary, statutory, or common-law privilege.

2

1    7.    Claimant, **ROBERT SHUMAKE**, objects to each request to the extent that it calls

2    for information outside of the time period relevant to this action.

3        Subject to, and without waiving the foregoing general objections and statements,

4    Claimant, **ROBERT SHUMAKE**, hereby responds to Plaintiff's First Set of Interrogatories as

5    follows:

6    **INTERROGATORY NO. 1:**

7        In your claim dated December 31, 2018, you state under penalty of perjury that you have

8    an ownership and possessory interest in the $252,140.00 at issue in this case (the "Seized

9    Currency"). Please describe the nature of your ownership interest in the Seized Currency.

    **RESPONSE TO INTERROGATORY NO. 1:**

10

11        The currency had been collected as donations during an International Human Rights

    Commission (IHRC) fundraiser by me the day before the seizure at the Ritz-Carlton in Atlanta,

12    GA, where I had been staying. I provided Claimant Coleman, as authorized agent, with an

13    official direction letter to explain his transportation of the currency for the International Human

14    Rights Commission (IHRC) and the purpose for its transportation. When the letter was written,

15    the amount of currency that was to be produced and transported was estimated to be

16    $150,000.00; however, we were able to produce $252,140.00 by June 27, 2016, the date for

17    transportation. Both myself and Claimant IHRC have an ownership interest in the seized

18    currency. There is no talismanic rule or definition that distinguishes that ownership.

19    **INTERROGATORY NO. 2:**

20        Describe whether you contend that you own the Seized Currency or whether Claimant

21    IHRC owns the Seized Currency.

22    **RESPONSE TO INTERROGATORY NO. 2:**

23        Both myself and Claimant IHRC have an ownership interest in the seized currency.

24    There is no talismanic rule or definition that distinguishes that ownership.

25    **INTERROGATORY NO. 3:**

26        Please state in detail the circumstances in which you acquired your possessory or

27    ownership interest in the Seized Currency, including: (1) the date, time, and place in which you

3

acquired the currency; (2) the reason you acquired the currency; (3) the manner in which the currency was delivered to your possession or ownership; (4) the identity of the person(s) from whom you acquired the currency; and (5) all persons who were present when you obtained the currency.

**RESPONSE TO INTERROGATORY NO. 3:**

All this information is set out in the Abady Law Firm, P.C. letters of November 29, 2016, August 24, 2017, and December 13, 2017, all of which are again provided in response to the government's document request. Furthermore, the government has identified those persons from whom the currency was acquired and has previously interviewed them.

**INTERROGATORY NO. 4:**

Identify by name, address and telephone number each person who attended the "fundraiser" in which the Seized Currency was allegedly raised.

**RESPONSE TO INTERROGATORY NO. 4:**

Please see Answer to Interrogatory No. 3.

**INTERROGATORY NO. 5:**

Identify any business, association, or commercial enterprise related to the growth, sale, or purchase of marijuana or cannabis that you have any involvement in, investment in, association with, or any role whatsoever in.

**RESPONSE TO INTERROGATORY NO. 5:**

Please see Preliminary Statement the Objections stated therein, all incorporated herein.

**Objection:** This request requires production of information that is neither relevant nor likely to lead to the discovery of relevant evidence.

**INTERROGATORY NO. 6:**

Identify by name, address and telephone number each person who has transported cash at your behest since January 1, 2015.

**RESPONSE TO INTERROGATORY NO. 6:**

Daniel Flint, c/o Craig Harbaugh, 321 East 2d Street, Los Angeles, CA 90012 in *U.S. v.*

4

*$148,145 in U.S. Currency*, Case No. CV 18-670, US District Court Central District of California. Michigan Attorney Douglas Hampton, on August 22, 2016, *in IHRC v. US Customs and Border Protection, et. al,* Case No. 18-CV-0065, US District Court, Northern District of Georgia. Abdul Rahman, Michigan real estate broker, stopped either in late 2015 or early 2016 in Washington, DC and California with a sum of monies on behalf of myself for the purchase of real estate in California, (approximately $100,000). The money was not seized.

All this requested information is well known to the government as all three matters were either fully litigated both administratively and judicially or fully investigated.

**INTERROGATORY NO. 7:**

Describe in detail each time that Claimant Coleman has transported cash for you, including the amount of cash transported, the dates the cash was transported, the route of the transportation, and the amount that Coleman was compensated for the transportation of cash.

**RESPONSE TO INTERROGATORY NO. 7:**

Only this one time.

**INTERROGATORY NO. 8:**

Describe in detail each time since January 1, 2015 that any individual has transported cash for you, including the amount of cash transported, the dates the cash was transported, the route of the transportation, and the amount that such individual was compensated for the transportation of cash

**RESPONSE TO INTERROGATORY NO. 8:**

Please see Response to Interrogatory No. 6, above, incorporated herein.

**INTERROGATORY NO. 9:**

Describe in detail each time you have either transported, directed or supervised the transportation of, or arranged for the transportation of cash for IHRC, including the amount of cash transported, the dates the cash was transported, the route of the transportation, and the amount paid to any courier for the transportation of cash.

**RESPONSE TO INTERROGATORY NO. 9:**

5

**Objection:** This request requires production of information that is neither relevant nor likely to lead to the discovery of relevant evidence.

**Objection:** This request calls for information outside of the time period relevant to this action.

**Objection:** This request is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 10:**

Describe whether you have any role or involvement in a licensed or registered money transmitting business, including but not limited to, ownership of, control over, or authorization to act as an agent for such business.

**RESPONSE TO INTERROGATORY NO. 10:**

None.

**INTERROGATORY NO. 11:**

Explain your association or relationship with Claimant Darren Coleman, including but not limited to details of when that association/relationship began, the circumstances in which it began, the nature of the association/relationship, if the association/relationship is going, or if terminated, the time and circumstances the association/relationship ended.

**RESPONSE TO INTERROGATORY NO. 11:**

**Objection:** Claimant Darren Coleman has worked with me for over 25 years. He is the executive director of a nonprofit and member of the Botswana Chamber of Commerce.

**INTERROGATORY NO. 12:**

Explain your association or relationship Claimant IHRC, including but not limited to details of when that association/relationship began, the circumstances in which it began, the nature of the association/relationship, if the association/relationship is going, or if terminated, the time and circumstances the association/relationship ended.

**RESPONSE TO INTERROGATORY NO. 12:**

All this information is set out in the 125-page document provided in response to the government's document request.

All this information is additionally set out in the Abady Law Firm, P.C. letters of November 29, 2016, August 24, 2017, and December 13, 2017, all of which are again provided in response to the government's document request.

**INTERROGATORY NO. 13:**

State whether law enforcement has ever seized currency from you, or a courier acting on behalf of you or IHRC, on any other occasion. If so, state the date and place of such seizure, the circumstances of the seizure, the amount of currency seized, the caption and identifying information of any proceeding that resulted from the seizure and, if applicable, the court where such proceeding was filed, and the disposition of the seizure (i.e., whether you recovered the currency, defaulted or did not contest the seizure, or litigated but failed to recover the currency).

**RESPONSE TO INTERROGATORY NO. 13:**

All the information requested is set out in *U.S. v. $148,145 in U.S. Currency*, Case No. CV 18-670, US District Court Central District of California and *IHRC v. US Customs and Border Protection, et. al,($170,130)*, Case No. 18-CV-0065, US District Court, Northern District of Georgia. There are no other seizures.

**INTERROGATORY NO. 14:**

Please state if you have ever been a party, either plaintiff, claimant, petitioner, defendant, or respondent, in a lawsuit or any other type of legal or administrative proceeding other than the present matter, and if so, whether you were the plaintiff, claimant, petitioner, defendant, or respondent, the nature of the action, and the date and court or administrative body in which such action was filed.

**RESPONSE TO INTERROGATORY NO. 14:**

**Objection:** This request requires production of information that is neither relevant nor likely to lead to the discovery of relevant evidence.

7

**Objection:** This request calls for information outside of the time period relevant to this action.

**Objection:** This request is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 15:**

Identify every instance in which you have been arrested, charged, indicted, convicted, or plead nolo contendere for any offense or violation, including misdemeanors and felonies, and for each such instance, state the date of its occurrence, describe the offense for which you were charged, state the jurisdiction (e.g. type of court and location) of the matter, describe the disposition of the matter (whether arrested, charged, indicted, convicted or nolo contendere; and any punishment issued); and state the dates and places of any incarceration, probation, or parole.

**RESPONSE TO INTERROGATORY NO. 15:**

**Objection:** This request requires production of information that is neither relevant nor likely to lead to the discovery of relevant evidence.

Without waiving said objection, attached to my production of document is the 6-page criminal docket in *People v. Shumake*, Case No. CR F 16-0003572-004, County of Shasta, CA, in which I was acquitted.

In addition, I have never been convicted of a felony.

Respectfully submitted,

Dated: 17 December 2019

<div style="margin-left:40%">

*s/David M. Michael*
DAVID M. MICHAEL
EDWARD M. BURCH
LAW OFFICE OF MICHAEL & BURCH, LLP
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone: (415) 946-8996
E-Mail: david@michaelburchlaw.com

Attorneys for Claimant ROBERT SHUMAKE

</div>

8

## VERIFICATION

The undersigned declares under penalty of perjury that he is a Claimant in the above-entitled matter, that he has read the foregoing CLAIMANT ROBERT SHUMAKE'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, that he knows the contents thereof, and that the same is true of his own knowledge, except as to those matters which he states on information and belief and, as to those matters, he believes them to be true.

Dated: 17 December 2019

ROBERT SHUMAKE
Claimant

## CERTIFICATE OF SERVICE

I hereby certify that, on 18 December 2019, I caused the foregoing to be served by . mail to the following:

AUSA Benjamin Bain-Creed
Florida Bar # 0021436
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Email: benjamin.bain-creed@usdoj.gov

s David M. Michael
DAVID M. MICHAEL

9

DAVID M. MICHAEL, CSBN 74031
EDWARD M. BURCH, CSBN 255470
LAW OFFICES OF MICHAEL & BURCH LLP
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone:  (415) 946-8996
Facsimile:  (877) 538-6220
E-mail:  david@michaelburchlaw.com

Attorneys for Claimant
INTERNATIONAL HUMAN RIGHTS COMMISSION

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

APPROXIMATELY $252,140.00 IN US
CURRENCY SEIZED FROM DARREN
LENNARD COLEMAN ON JUNE 27, 2016 AT
CHARLOTTE-DOUGLAS INTERNATIONAL
AIRPORT,

      Defendant.

_____/

INTERNATIONAL HUMAN RIGHTS
COMMISSION,

      Claimant.

_____/

CIVIL NO. 3;18 CV 646

**CLAIMANT INTERNATIONAL
HUMAN RIGHTS
COMMISSION'S RESPONSE TO
PLAINTFF'S FIRST SET OF
INTERROGATORIES**

REQUESTING PARTY:  Plaintiff UNITED STATES OF AMERICA

RESPONDING PARTY:  Claimant INTERNATIONAL HUMAN RIGHTS COMMISSION

SET NO:  FIRST SET OF INTERROGATORIES

1

## PRELIMINARY STATEMENT

1.  Claimant has not completed its investigation of the facts, witnesses, or documents relating to tits case, nor has Claimant completed discovery in this action, including the receipt from plaintiff of documents and records, nor has Claimant completed an analysis of all available data. Furthermore, Claimant has not completed any preparations for trial. Accordingly, the responses herein are given without prejudice to Claimant's right to provide further responses, which Claimant may subsequently discover, or which Claimant will obtain from plaintiff or may obtain elsewhere, or which may be contained in Claimant's possessions but not determined to be relevant at tits time. Claimant reserves its right to alter, amend, supplement, or otherwise modify these responses if and when additional information is known or obtained.

2.  The responses are given herein without prejudice to Claimant's right to present information which may hereafter be discovered during the course of continued discovery and investigation by Claimant. These responses are made without prejudice to Claimant's right to produce any evidence which may have been omitted from its response and only subsequently discovered because of oversight, inadvertence, and/or good faith error, or a mistake, or which may have been known to Claimant or in Claimant's possession, but not considered at the time of these responses to be relevant to its case.

3.  Claimant, INTERNATIONAL HUMAN RIGHTS COMMISSION, objects to all definitions, instructions, and terms, to the extent that they purport to impose any different or additional obligations beyond those required by the Federal Rules of Civil Procedure or any other special rules that may apply to these proceedings.

4.  Claimant, INTERNATIONAL HUMAN RIGHTS COMMISSION, objects to each request to the extent that it seeks information protected by the attorney/client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

5.  Claimant, INTERNATIONAL HUMAN RIGHTS COMMISSION, objects to each request to the extent it requires a violation of any individual's right to privacy and/or the right to be free from unreasonable searches and seizures under any applicable state, federal, or

2

1  constitutional provisions or laws, including the Fourth Amendments to the United States
2  Constitution.

3     6.    Claimant, INTERNATIONAL HUMAN RIGHTS COMMISSION, objects to
4  each request to extent that it seeks the disclosure of information exempt from disclosure under
5  any applicable evidentiary, statutory, or common-law privilege.

6     7.    Claimant, INTERNATIONAL HUMAN RIGHTS COMMISSION, objects to
7  each request to the extent that it calls for information outside of the time period relevant to tits
8  action.

9        Subject to, and without waiving the foregoing general objections and statements,
10  Claimant, INTERNATIONAL HUMAN RIGHTS COMMISSION, hereby responds to
11  Plaintiff's First Set of Interrogatories as follows:

12  **INTERROGATORY NO. 1:**

13       State your current organization name, officers and/or board members, date of
14  formation, places of operation, articles of incorporation or formation, current addresses and
15  addresses for the last five (5) years including but not limited to website domains and physical
16  locations. For each address, please list the inclusive months and years you operated at each
17  address.

18  **RESPONSE TO INTERROGATORY NO. 1:**

19       All such relevant information is set forth in the official website for Claimant
20  INTERNATIONAL HUMAN RIGHTS COMMISSION - http://www.ihrcheadquarters.org.

21  **INTERROGATORY NO. 2:**

22       In your claim dated December 31, 2018, you state under penalty of perjury that you have
23  an ownership and possessory interest in the in the $252,140.00 at issue in this case (the
24  "Seized Currency"). Please describe the nature of your ownership interest in the Seized
25  Currency.

26  **RESPONSE TO INTERROGATORY NO. 2:**

27       The currency had been collected as donations during an International Human Rights
28  Commission (IHRC) fundraiser by Claimant Robert Shumake the day before the seizure at the

3

Ritz-Carlton in Atlanta. GA, where he had been staying. Claimant Shumake provided Claimant Coleman, as authorized agent, with an official direction letter to explain his transportation of the currency for the International Human Rights Commission (IHRC) and the purpose for its transportation. When the letter was written, the amount of currency that was to be produced and transported was estimated to be $150.000.00; however, we were able to produce $252,140.00 by June 27, 2016, the date for transportation. Both Claimant Shumake and Claimant IHRC have an ownership interest in the seized currency. There is no talismanic rule or definition that distinguishes that ownership.

**INTERROGATORY NO. 3:**

Please state in detail the circumstances in which you acquired your ownership interest in Seized Currency, including: (1) the date, time, and place in which you acquired the currency; (2) the reason you acquired the currency; (3) the manner in which the currency was delivered to your possession; (4) the identity of the person(s) from whom you acquired the currency; and (5) identify all persons who were present when you obtained the currency.

**RESPONSE TO INTERROGATORY NO. 3:**

All this information is set out in the Abady Law Firm, P.C. letters of November 29, 2016, August 24, 2017, and December 13, 2017, all of which are again provided in response to the government's document request. Furthermore, the government has identified those persons from whom the currency was acquired and has previously interviewed them.

**INTERROGATORY NO. 4:**

Describe whether you contend that the IHRC owns the Seized Currency or whether Robert Shumake and/or Darren Coleman owns the Seized Currency.

**RESPONSE TO INTERROGATORY NO. 4:**

Both IHRC and Robert Shumake have an ownership interest in the seized currency. There is no talismanic rule or definition that distinguishes that ownership.

**INTERROGATORY NO. 5:**

Describe whether Robert Shumake is currently affiliated with IHRC.

4

**RESPONSE TO INTERROGATORY NO. 5:**

He is

**INTERROGATORY NO. 6:**

Describe in detail the nature of Robert Shumake's affiliation with IHRC (past or present), including when any such affiliation began, the nature of the affiliation, the extent of any authority for Shumake to act on behalf of IHRC, and the circumstances of any dissociation with IHRC.

**RESPONSE TO INTERROGATORY NO. 6:**

All this information is set out in the 125-page document provided in response to the government's document request.

All this information is additionally set out in the Abady Law Firm, P.C. letters of November 29, 2016, August 24, 2017, and December 13, 2017, all of which are again provided in response to the government's document request.

**INTERROGATORY NO. 7:**

Describe in detail who at IHRC-both now and in June of 2016-oversaw, supervised, or directed any activities by Robert Shumake on behalf of IHRC, and the nature of any such oversight, supervision, or direction.

**RESPONSE TO INTERROGATORY NO. 7:**

All this information is set out in the 125-page document provided in response to the government's document request.

**INTERROGATORY NO. 8:** Identify by name, address and telephone number each person whose purported donations to IHRC comprised the $252,140.00 at issue, and list the amount and nature (i.e. by cash, check, etc...) of each donation.

**RESPONSE TO INTERROGATORY NO. 8:**

All this information is additionally set out in the Abady Law Firm, P.C. letters of November 29, 2016, August 24, 2017, and December 13, 2017, all of which are again provided in response to the government's document request.

5

| | |
|---|---|
| 1 | All this information is also set out in the 125-page document provided in response to the |
| 2 | government's document request. |
| 3 | **INTERROGATORY NO. 9:** |
| 4 | Describe in detail how records of any fundraising-including but not limited to the |
| 5 | collection of cash funds and donations-for IHRC in the United States are collected and |
| 6 | maintained by IHRC. |
| 7 | **RESPONSE TO INTERROGATORY NO. 9:** |
| 8 | For every donation we issue a donor letter which records the amounts, the date of |
| 9 | donation and who has made the donation. The government has many copies of these kinds of |
| 10 | letters. |
| 11 | **INTERROGATORY NO. 10:** |
| 12 | Explain why a human rights organization that purportedly raises money to aid |
| 13 | charity efforts in foreign countries deals in large amounts of currency and employs couriers, at |
| 14 | a cost of thousands of dollars per trip, as opposed to depositing purported donations into banks |
| 15 | and executing wire transfers to donees. |
| 16 | **RESPONSE TO INTERROGATORY NO. 10:** |
| 17 | The people and organizations in countries that we make donations to and provide aid for |
| 18 | mostly do not have the capacity to deal with wire transfers or bank transfers. Our donations |
| 19 | are made in cash. |
| 20 | **INTERROGATORY NO. 11:** |
| 21 | You assert in your answer that: "There are many American and foreign businesses such |
| 22 | as landlords, property owners, goods suppliers, service providers, and shippers who demand |
| 23 | cash advances and deposits before agreeing to conduct business with the IHRC Humanitarian |
| 24 | Mission and its representatives." Please identify by name, address and telephone number all |
| 25 | businesses that have demanded a cash advance or deposit before agreeing to conduct business |
| 26 | with IHRC from the year 2013 to 2018. |
| 27 | **RESPONSE TO INTERROGATORY NO. 11:** |
| 28 | |

1     **Objection:** This request requires production of information that is neither relevant nor

2 likely to lead to the discovery of relevant evidence.

3     **Objection:** This request calls for information outside of the time period relevant to this

4 action.

5     **Objection:** This request is overly broad, unduly burdensome, or not reasonably

6 calculated to lead to the discovery of admissible evidence.

7     **INTERROGATORY NO. 12:**

8     State whether law enforcement has ever seized currency from a person transporting

9 currency for IHRC on any other occasion. If so, state the date and place of such seizure, the

10 circumstances of the seizure, the amount of currency seized, the caption and

11 identifying information of any proceeding that resulted from the seizure and, if applicable, the

12 court where such proceeding was filed, and the disposition of the seizure (i.e., whether you

13 recovered the currency, defaulted or did not contest the seizure, or litigated but failed to

14 recover the currency).

15     **RESPONSE TO INTERROGATORY NO. 12:**

16     All the information requested is set out in *U.S. v. $148,145 in U.S. Currency*, Case No.

17 CV 18-670, US District Court Central District of California and *IHRC v. US Customs and*

18 *Border Protection, et. al,($170,130)*, Case No. 18-CV-0065, US District Court, Northern

19 District of Georgia. There were no other seizures within the past 5 years.

20     **INTERROGATORY NO. 13:**

21     Identify by name, address and telephone number each person who has any knowledge

22 that supports any claim or allegation asserted or to be asserted by the IHRC in this litigation

23 and include a summary of such knowledge.

24     **RESPONSE TO INTERROGATORY NO. 13:**

25     All those identified in this case, in *U.S. v. $148,145 in U.S. Currency*, Case No. CV 18-

26 670, US District Court Central District of California and *IHRC v. US Customs and Border*

27 *Protection, et. al,($170,130)*, Case No. 18-CV-0065, US District Court, Northern District of

28 Georgia.

| 1 | In addition, all those identified in the 125-page document provided in response to the |
| 2 | government's document request and the Abady Law Firm, P.C. letters of November 29, 2016, |
| 3 | August 24, 2017, and December 13, 2017, all of which are provided in response to the |
| 4 | government's document request. |

5 **INTERROGATORY NO. 14:**

6 Please state if you have ever been a party, either plaintiff, claimant, petitioner,
7 defendant, or respondent, in a lawsuit or any other type of legal or administrative proceeding
8 other than the present matter, and if so, whether you were the plaintiff, claimant, petitioner,
9 defendant, or respondent, the nature of the action, and the date and court or administrative
10 body in which such action was filed.

11 **RESPONSE TO INTERROGATORY NO. 14:**

12 See answer to Interrogatory No. 13, above

13 **INTERROGATORY NO. 15:**

14 State the names and addresses of all persons, including IHRC personnel, who were
15 involved in the preparation of the answers to these interrogatories (except clerical personnel),
16 and specify the interrogatory numbers each person assisted you with.

17 **RESPONSE TO INTERROGATORY NO. 15:**

18 Attorney David Michael and Claimant Shumake assisted in the preparation of the
19 answers to these interrogatories.

20 Respectfully submitted,

21 Dated: 18 December 2019

22 *s David M. Michael*_____
   DAVID M. MICHAEL
23 EDWARD M. BURCH
   LAW OFFICE OF MICHAEL & BURCH, LLP
24 One Sansome Street, Suite 3500
25 San Francisco, CA 94104
   Telephone: (415) 946-8996
26 E-Mail: david@michaelburchlaw.com

27
   Attorneys for Claimant INTERNATIONAL
28 HUMAN RIGHTS COMMISSION

8

## VERIFICATION

The undersigned declares under penalty of perjury that he is the authorized agent for the INTERNATIONAL HUMAN RIGHTS COMMISSION, a Claimant in the above-entitled matter, that he is authorized to verify the above responses by the INTERNATIONAL HUMAN RIGHTS COMMISSION, that he has read the foregoing CLAIMANT INTERNATIONAL HUMAN RIGHTS COMMISSION'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, that he knows the contents thereof, and that the same is true of his own knowledge, except as to those matters which he states on information and belief and, as to those matters, he believes them to be true.

Dated: 18 December 2019



_____

ROBERT SHUMAKE
Authorized Agent for INTERNATIONAL
HUMAN RIGHTS COMMISSION
Claimant

## CERTIFICATE OF SERVICE

I hereby certify that, on 18 December 2019, I caused the foregoing to be served by mail to the following:

AUSA Benjamin Bain-Creed
Florida Bar # 0021436
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Email: benjamin.bain-creed@usdoj.gov

_s David M. Michael_
DAVID M. MICHAEL

9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

UNITED STATES OF AMERICA,    )
                                    )
      v.                           )
                                    )      CIVIL NO. 3:18cv646
APPROXIMATELY $252,140.00 IN US   )
CURRENCY SEIZED FROM DARREN     )
LENNARD COLEMAN ON JUNE 27, 2016  )
AT CHARLOTTE-DOUGLAS          )
INTERNATIONAL AIRPORT.         )
                                    )

## DECLARATION OF CLIFTON C. SEAGROVES

I, Clifton C. Seagroves, in accordance with 28 U.S.C. § 1746, state as follows:

1.     I am the Acting Director of the Office of Foreign Missions, United States Department of State, and in that role I am responsible for overseeing the registration of, and maintaining the official records of, certain diplomatic agents, consular officers, and other employees of foreign governments and international organizations in the United States and its territories, and their family members.

2.     The official records of the Department of State, Office of Foreign Missions, contain no record of an organization called the International Human Rights Commission, the International Human Rights Commission - Relief Trust Fund, or the IHRC Humanitarian Mission. Accordingly, the official records of the Department of State, Office of Foreign Missions indicate that the "International Human Rights Commission," including the "International Human Rights Commission – Relief Trust Fund" and the "IHRC Humanitarian Mission" does not enjoy any privileges and immunities in the United States, including with respect to its property and assets. Nor did the "International Human Rights Commission," including the "International Human Rights Commission – Relief Trust Fund" and the "IHRC Humanitarian Mission," enjoy any such privileges and immunities in the United States as of June 27, 2016.

3. The official records of the Department of State, Office of Foreign Missions, contain no record of an individual named Robert S. Shumake being associated with an organization called the International Human Rights Commission. The official records of the Department of State, Office of Foreign Missions, indicate that Robert Samuel Shumake, born July 29, 1968, was previously registered with the Department as an Honorary Consul for the Government of the Republic of Botswana from July 25, 2012, to September 8, 2015, and as an Honorary Consul for the Government of the United Republic of Tanzania from January 11, 2013, to September 8, 2015. Pursuant to the Vienna Convention on Consular Relations (VCCR), Mr. Shumake enjoys immunity from jurisdiction with respect to acts performed in the exercise of his honorary consul functions for the Republic of Botswana and the Government of the United Republic of Tanzania

1

EXHIBIT 7

during the time periods specified above. Mr. Shumake does not enjoy immunity in the United States with respect to any acts undertaken after September 8, 2015, and thus did not enjoy any privileges or immunities as of June 26, 2016.

4. The official records of the Department of State, Office of Foreign Missions, contain no record of an individual named Darren Lennard Coleman being associated with an organization called the International Human Rights Commission, or enjoying privileges and immunities in the United States, or having enjoyed any such privileges or immunities as of June 26, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 29 day of January 2021, in Washington, D.C.

Clifton C. Seagroves



United States Department of State

*Office of Foreign Missions*

*Washington, D.C. 20520*

February 6, 2017

REF: 17-147

Re: Darren Leonard Coleman

This is to certify that I, Clifton C. Seagroves, Director (Acting) of the Office of Foreign Missions, United States Department of State, am responsible for overseeing the registration and maintaining the official records of certain diplomatic agents, consular officers and other employees of foreign governments and international organizations in the United States and its territories, and their family members.

The official records of the United States Department of State, Office of Foreign Missions, indicate that Darren Leonard Coleman, born August 9, 1968, was never registered with the Department as a member of a foreign mission and would not have been accorded the associated privileges and immunities.

Clifton C. Seagroves
Director (Acting)

USA000199



February 6, 2017

REF: 17-148

Re: Robert Samuel Shumake

This is to certify that I, Clifton C. Seagroves, Director (Acting) of the Office of Foreign Missions, United States Department of State, am responsible for overseeing the registration and maintaining the official records of certain diplomatic agents, consular officers and other employees of foreign governments and international organizations in the United States and its territories, and their family members.

The official records of the United States Department of State, Office of Foreign Missions, indicate that Robert Samuel Shumake, born July 29, 1968, was registered with the Department as an Honorary Consul for the Government of the Republic of Botswana from July 25, 2012, to September 8, 2015, and as an Honorary Consul for the Government of the United Republic of Tanzania from January 11, 2013, to September 8, 2015. Following his termination as Honorary Consul, he was no longer accorded official acts immunity.

Clifton C. Seagroves
Director (Acting)



United States Department of State

*Office of Foreign Missions*

*Washington, D.C. 20520*

February 6, 2017

REF: 17-148

Re: Robert Samuel Shumake

This is to certify that I, Clifton C. Seagroves, Director (Acting) of the Office of Foreign Missions, United States Department of State, am responsible for overseeing the registration and maintaining the official records of certain diplomatic agents, consular officers and other employees of foreign governments and international organizations in the United States and its territories, and their family members.

The official records of the United States Department of State, Office of Foreign Missions, indicate that Robert Samuel Shumake, born July 29, 1968, was registered with the Department as an Honorary Consul for the Government of the Republic of Botswana from July 25, 2012, to September 8, 2015, and as an Honorary Consul for the Government of the United Republic of Tanzania from January 11, 2013, to September 8, 2015. Following his termination as Honorary Consul, he was no longer accorded official acts immunity.

                                                            Clifton C. Seagroves
                                                            Director (Acting)

USA000201



October 9, 2018

REF: 18-1560

Re: Daniel Flint

This is to certify that I, Clifton C. Seagroves, Director (Acting) of the Office of Foreign Missions, United States Department of State, am responsible for overseeing the registration and maintaining the official records of certain diplomatic agents, consular officers and other employees of foreign governments and international organizations in the United States and its territories, and their family members.

The official records of the Department of State, Office of Foreign Missions, indicate that Daniel Flint has never been registered with the Department of State. In addition, there is no indication in the official records of the Department that the International Human Rights Commission, including the International Human Rights Commission – Relief Trust Fund, has privileges and immunities in the United States. As such, the Department of State, Office of Foreign Missions, is not aware of any basis for Daniel Flint to enjoy diplomatic or related privileges and immunities in the United States such as immunity from the criminal or civil jurisdiction of the United States. The Department of State, Office of Foreign Missions, is also not aware of a basis for the use of a diplomatic pouch by either Daniel Flint or by the International Human Rights Commission, including the International Human Rights Commission – Relief Trust Fund.

Clifton C. Seagroves
Director (Acting)
Office of Foreign Missions

| STATE OF MICHIGAN<br>6th JUDICIAL CIRCUIT<br>COUNTY OF OAKLAND | *** AMENDED 01/31/2018 ***<br>JUDGMENT OF SENTENCE<br>COMMITMENT TO JAIL | OAKLAND<br>COUNTY 17-261752-FH |
|---|---|---|

JUDGE JAMES M. ALEXANDER

**ORI: MI-630015J** · **Court Address:** 1200 N. Telegraph Rd., Pontiac, MI 48341   PEOPLE v SHUMAKE,ROBER
Police Report No.                                                                                        248-858-5284

| THE PEOPLE OF THE STATE OF<br>MICHIGAN | **V** | Defendant's name, address, and telephone no.<br>SHUMAKE,ROBERT,SAMUEL,JR<br>18530 MACK AVE SUITE 339<br>GROSSE POINTE FARMS   MI   48236 |
|---|---|---|

| | | | CTN/TCN<br>96-15-900877-01 | SID | DOB<br>07/29/1968 |
|---|---|---|---|---|---|

| Prosecuting Attorney Name<br>NORMAN W. DONKER | Bar No.<br>P31732 | Defendant Attorney Name<br>DOUGLAS D. HAMPTON | Bar No.<br>P46378 |
|---|---|---|---|

## THE COURT FINDS:

1. Defendant plead / found guilty on  12/20/2017   of the crime(s) stated below:

| Count | CONVICTED BY | | | Crime | CHARGE CODE(S)<br>MCL citation/PACC Code | |
|---|---|---|---|---|---|---|
| | Plea | Court | Jury | | | |
| 1 | | | | FALSE PRETENSES >1,000<20,000 | 750.2184A | DISMISSED |
| 2 | | | | FALSE PRETENSES >1,000<20,000 | 750.2184A | DISMISSED |
| 3 | G | | | CREDIT SERV VIOLATIONS | 445.1823 | |
| 4 | G | | | CREDIT SERV VIOLATIONS | 445.1823 | |
| 5 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 6 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 7 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 8 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 9 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 10 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 11 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 12 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 13 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 14 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |
| 15 | | | | CREDIT SERV VIOLATIONS | 445.1823 | DISMISSED |

*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill. For dismissal, insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

2. Defendant  [x] represented by an attorney:   DOUGLAS D. HAMPTON   P46378
             [ ] advised of right to counsel and appointed counsel and knowingly, intelligently, and voluntarily waived that right.
[ ] 3. Conviction is reportable to the Secretary of State**. Defendant's driver license number is : _____

[ ] 4. Licensing sanction reportable to State Police**. [ ] Revoked  [ ] Suspended _____  [ ] Restricted _____
[ ] 5. HIV testing and sex offender registration is completed.
[ ] 6. Defendant has been fingerprinted according to MCL 28.243.
**IT IS ORDERED:**
[ ] 7. Probation is revoked.

8. Defendant is sentenced to jail as follows:

| Count | SENTENCE<br>DATE | SENTENCE<br>BEGINS | Probation<br>Time | JAIL<br>Days | CREDIT<br>Days | Other Information |
|---|---|---|---|---|---|---|
| 3 | 01/31/2018 | 01/31/2018 | 018M | 9 | 9 | |
| 4 | 01/31/2018 | 01/31/2018 | 018M | 9 | 9 | |

9. Defendant shall pay as follows:
**MC 219 (6/05) JUDGMENT OF SENTENCE/ COMMITMENT TO JAIL**
*Page 1*
**COURT FILE**

EXHIBIT
8

STATE OF MICHIGAN
6th JUDICIAL CIRCUIT
COUNTY OF OAKLAND

\*\*\* AMENDED 01/31/2018 \*\*\*
JUDGMENT OF SENTENCE
COMMITMENT TO JAIL

CASE NO.
2017-261752-FH

ORI: **MI-630015J**   Court Address: 1200 N. Telegraph Rd., Pontiac, MI 48341

Court telephone no:
248-858-5284

Police Report No.

| THE PEOPLE OF THE STATE OF MICHIGAN | V | Defendant's name, address, and telephone no. SHUMAKE, ROBERT, SAMUEL, JR 18530 MACK AVE SUITE 339 GROSSE POINTE FARMS   MI   48236 |
|---|---|---|

| CTN/TCN | SID | DOB |
|---|---|---|
| 96-15-900877-01 | | 07/29/1968 |

| Prosecuting Attorney Name | Bar No. | Defendant Attorney Name | Bar No. |
|---|---|---|---|
| NORMAN W. DONKER | P31732 | DOUGLAS D. HAMPTON | P46378 |

RESTITUTION: $28,970.33. PAY $075.00 ASSESSMENT FOR THE CRIME VICTIM RIGHTS FUND.
SUPERVISION FEES: $1,800.00 AT $100.00 A MONTH. COSTS: $500.00. FINE: $1,000.00. $100.00
FOR STATE MINIMUM COSTS.

Fines, Costs, and Fees not paid within 56 days of the date of this judgment are subject to a 20% late penalty on the amount owed.

☒ 10. Defendant shall be placed on probation for _____ (see above) _____ and abide by the terms of probation.

☐ 11. Defendant shall complete the following rehabilitative services.
    ☐ Alcohol Highway Safety Education    ☐ Treatment (☐ outpatient, ☐ inpatient, ☐ residential, ☐ mental health.)
    ☐ Specify: 

☐ 12. The vehicle used in the offense shall be immobilized or forfeited. (See separate order.)

☐ 13. The concealed pistol license shall be ☐ suspend for _____ days ☐ permanently revoke the concealed
    weapon license, permit number _____ , issued by _____ County.

14. Other:

MAINTAIN AND/OR SEEK EMPLOYMENT AS DIRECTED BY P.O. MUST PERFORM 100
HOURS COMMUNITY SERVICE SHALL NOT USE, PURCHASE OR POSSESS ANY ALCOHOLIC
BEVERAGE OR ENTER ESTABLISHMENTS THAT DISPENSE THEM. SHALL SUBMIT TO
ALCOHOL TESTING AS DIRECTED BY P.O. SHALL SUBMIT TO DRUG TESTING AS
DIRECTED BY P.O. SHALL NOT USE ANY CONTROLLED SUBSTANCE W/O PRESCRIPTION.
NO ASSAULTIVE OR THREATENING BEHAVIOR. NOT USE OR POSSESS ANY FIREARM OR
OTHER DEADLY WEAPON. NO CONTACT WITH VICTIM(S). PRESERVE ALL FINES & FEES
PURSUANT TO STATUTE.THE DEFENDANT SHALL PAY RESTITUTION, CRIME VICTIM FEES,
COSTS, ATTORNEY FEES AND/OR FINES OWING TO THE OAKLAND COUNTY
REIMBURSEMENT. (4.2) YOU MUST NOT LEAVE THE STATE OF MICHIGAN FOR ANY
REASON EXCEPT IN RELATION TO YOU CRIMINAL MATTER PENDING IN CALIFORNIA.
YOU ARE NOT TO LEAVE THE UNITED STATES FOR ANY REASON. (6.3) YOU MUST NOT
WORK IN A POSITION WHERE YOU HAVE DIRECT CONTROL OVER, OR ACCESS TO,
ANOTHER PERSON'S MONEY. MAY NOT CHANGE RESIDENCE WITHOUT ADVISING P.O.
MAY NOT ASSOCIATE WITH ANYONE WHO HAS FELONY RECORD. AMENDED TO
CORRECT SENTENCING. DEFENDANT MUST SURRENDER U.S. PASSPORT TO OAKLAND
COUNTY CLERK WITHIN 24 HOURS.

| STATE OF MICHIGAN<br>6th JUDICIAL CIRCUIT<br>COUNTY OF OAKLAND | *** AMENDED 01/31/2018 ***<br>JUDGMENT OF SENTENCE<br>COMMITMENT TO JAIL | CASE NO.<br>2017-261752-FH |
|---|---|---|

ORI: **MI-630015J**  **Court Address:** 1200 N. Telegraph Rd., Pontiac, MI 48341       **Court telephone no:**
Police Report No.                                                                                                    248-858-5284

| THE PEOPLE OF THE STATE OF<br>MICHIGAN | V | Defendant's name, address, and telephone no.<br>SHUMAKE,ROBERT,SAMUEL,JR<br>18530 MACK AVE SUITE 339<br>GROSSE POINTE FARMS   MI    48236 | | |
|---|---|---|---|---|
| | | CTN/TCN<br>96-15-900877-01 | SID | DOB<br>07/29/1968 |

| Prosecuting Attorney Name | Bar No. | Defendant Attorney Name | Bar No. |
|---|---|---|---|
| NORMAN W. DONKER | P31732 | DOUGLAS D. HAMPTON | P46378 |

A TRUE COPY
LISA BROWN
Oakland County Clerk - Register of Deeds
By _____
Deputy

DATED: 01/31/2018

HON. JAMES M. ALEXANDER       P23289

Under MCL 769.16A the court clerk shall send a copy of this order to the Michigan State Police Criminal History Record.

MCL 765.15(2), MCL 769.16a, MCL 775.22, MCL 780.766
MCL 780.826, MCR 6.427(A)

**MC 219 (6/05) JUDGMENT OF SENTENCE/ COMMITMENT TO JAIL**
*Page 3*
**COURT FILE**

**From:** Bain-Creed, Benjamin (USANCW)
**To:** David Michael
**Cc:** Johnson, Seth (USANCW); Edward Burch
**Subject:** Re: US v $252,140 US Currency - IHRC
**Date:** Monday, September 14, 2020 6:05:21 PM

David,

We disagree with many of your observations about this case.

Thanks,
Ben

Sent from my iPhone

> On Sep 14, 2020, at 12:55 PM, David Michael <david@michaelburchlaw.com> wrote:

Ben and Seth:

I have established a good working relationship with many government attorneys over the past 25 years in litigating federal forfeiture cases. It has actually been an honor to always proceed in good faith. So, I just want to be clear about our dealings in this case and my observations as to what has transpired:

1. In the normal course of settlement discussions, the parties would have proceeded in the same way that every AUSA I have dealt with in the past proceeds, which is to stay further proceedings during the settlement process. Obviously, during this coronavirus crisis time, the Court would have had no problem agreeing with that, especially since there is no trial date set in the case. You did not choose that process which would have saved a lot of time.

2. You knew that Claimant Shumake was in negotiations with the IRS to resolve his tax liability in order to pursue a settlement in this case with all or part of the seized funds to be used to satisfy his tax liabilities. This was another reason to agree to stay further proceedings until that was resolved. I really do not understand why you had refused to allow that process to be completed before going forward with the litigaion. Quite frankly, it led me to believe that you were really not interested in settlement.

3. When you wanted to interview the attorney for IHRC International, who we voluntarily identified for you, my reading of your email in that regards, let

EXHIBIT
9

me to believe that your purpose was not to confirm that Mr. Shumake had any right to use those funds to satisfy his tax liability, but to attempt to have that attorney say that the funds were NEVER collected for IHRC, while at the same time and in the same paragraph of your message, you accused Mr. Shumake of being a "convicted fraudster".  So,  the inference I drew from those comments was that  your interest in that process was not to facilitate settlement, but to lay a perjury or other trap for Mr. Shumake, despite that the true facts would not have assisted you in that endeavor.  It was just additional evidence to me that you were really not going forward with a possible settlement.

4. Lastly, your completely unacceptable refusal to allow my office to perfect our expert witness disclosure was the final and major reason for my office to stop any further discussions or negotiations with your office.  Apparently, you believed, and  probably still do,  that, at trial or summary judgment, you would then win your case with your experts while my office had to stand silent and unable to controvert that alleged expert testimony, false as it may be?  Once again, my office has NEVER refused such a request nor has any other AUSA ever refused me such a request.  Things happen out of sequence for multitude of reasons.  To try to take advantage of litigation in the manner you have as to that issue, was, to me, not proceeding in good faith.

No need to respond to any of the above.  The issues are now up to the Court to decide.  I just wanted to be clear about our litigation position in the case.

Take care.

**DAVID MICHAEL**
*Law Offices of Michael & Burch, LLP*
*One Sansome Street, Suite 3500*
*San Francisco, CA 94104*
*(415) 946-8996 - Office*
*(510) 388-2970 - Mobile*
*david@michaelburchlaw.com*

| | |
|---|---|
| **From:** | Johnson, Seth (USANCW) |
| **To:** | David Michael; Bain-Creed, Benjamin (USANCW) |
| **Cc:** | Edward Burch |
| **Subject:** | RE: Shumake |
| **Date:** | Monday, March 23, 2020 6:47:00 PM |
| **Attachments:** | Response Letter re $180K offer.pdf |

David – please see the attached letter regarding your settlement offer. Ben and I are both primarily teleworking, but if you would like to discuss, let us know, and we can set up a call.

Seth Johnson

AUSA | Western District of North Carolina

704-338-3159

---

**From:** David Michael <david@michaelburchlaw.com>
**Sent:** Monday, March 9, 2020 4:57 PM
**To:** Bain-Creed, Benjamin (USANCW) <BBain-Creed@usa.doj.gov>
**Cc:** Johnson, Seth (USANCW) <SJohnson5@usa.doj.gov>; Edward Burch <edward@michaelburchlaw.com>; David Michael <david@michaelburchlaw.com>
**Subject:** Re: Shumake

Benjamin, it looks good to me. Good idea to not provide a (Proposed) Order until or unless the Court requests one. You have my consent to e/sign my name and e/file the pleading.

David Michael


> On Mar 9, 2020, at 13:48, Bain-Creed, Benjamin (USANCW) <Benjamin.Bain-Creed@usdoj.gov> wrote:
>
>
> David-Please let me know if you approve of affixed proposed joint motion.  We would like to file soon just so that we can cancel pending reservations for San Francisco travel.
>
> Thanks,
> -Ben
>
> **Benjamin Bain-Creed | Assistant United States Attorney**
> United States Attorney's Office | Western District of North Carolina
> ☎ Tel 704-338-3123 | ✉Email: benjamin.bain-creed@usdoj.gov
>
> ---
> **From:** David Michael <david@michaelburchlaw.com>
> **Sent:** Monday, March 9, 2020 2:21 PM

**To:** Bain-Creed, Benjamin (USANCW) <BBain-Creed@usa.doj.gov>
**Cc:** Johnson, Seth (USANCW) <SJohnson5@usa.doj.gov>; Edward Burch
<edward@michaelburchlaw.com>; David Michael <david@michaelburchlaw.com>
**Subject:** Re: Shumake

==Agree. I understand the complexities of dealing with the IRS.== I'm sure my client will
cooperate with any issues involving that agency.

Go ahead and draw up a stop/order to continue and let's see where this takes us.

David Michael



On Mar 9, 2020, at 09:05, Bain-Creed, Benjamin (USANCW)
<Benjamin.Bain-Creed@usdoj.gov> wrote:


David,

==Thanks for your call last Friday. As I understood the call, you
suggested that we might be able to settle the case for forfeiture of
$180,000, return of the remainder of the money, and an agreement
that, if necessary, the $180k in forfeited money could be applied
toward a tax debt that you mentioned.==

Seth and I have discussed this proposal and believe that the proposal
merits serious discussion with our chief. However, we think that,
whatever our chief decides, if we are advised to accept or counter,
we will have to do so in writing in a way that (1) ensures that the
court is offered a path forward on how to deal with all three
(somewhat conflicting) claims and (2) ensures that we are all
appropriately coordinating with IRS so that we do not promise Mr.
Shumake something that we cannot deliver. In short, we will need at
least a couple of days to write-up either a counter or just the logistics
that would be required to be able to accept your offer, and, in light of
restrictions on tax information, we may need information from you
before we can write a counter or paper your offer.

In light of that, would you agree to (1) a motion to extend all
discovery and motions deadlines for 90 days and (2) both sides
canceling all scheduled depositions for now and agreeing to
reconvene to conduct fact depositions in May (if we do not settle)?

-Ben

**Benjamin Bain-Creed**
Assistant United States Attorney
United States Attorney's Office
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, NC 28202
Phone: (704) 338-3123
Fax: (704) 344-6629

<Joint Motion re Pretrial Order.3-9-20.docx>



# U.S. Department of Justice

*United States Attorney*
*Western District of North Carolina*

---

| Headquarters: | Branch: |
|---|---|
| Suite 1650, Carillon Building | Room 233, U.S. Courthouse |
| 227 West Trade Street | 100 Otis Street |
| Charlotte, North Carolina 28202 | Asheville, North Carolina 28801 |
| (704) 344-6222 | (828) 271-4661 |
| FAX (704) 344-6629 | FAX (828) 271-4670 |

*Reply to: Charlotte Office*

March 23, 2020

<u>**Via email**</u>

David Michael (david@michaelburchlaw.com)
Edward Burch (edward@michaelburchlaw.com)
Law Offices of Michael & Burch, LLP
One Sansome Street, Suite 1300
San Francisco, CA 94101

   **Re:**  *United States of America v. Approximately $252,140 / 3:19-cv-646 in the WDNC*

David:

   We write in response to your offer to settle this case for the forfeiture of $180,000 of the $252,140 seized by law enforcement, with the agreement that the remainder of the currency ($72,140) be returned, and if necessary, the $180,000 in forfeited currency be applied to a tax debt of Shumake.

   Before we can negotiate any specific numerical settlement terms, there is one threshold issue applicable to the entirety of the seized currency that must be addressed. Each Claimant in this case—whether Shumake, Coleman, or IHRC—has filed an answer stating that the "$252,140.00 US currency belongs to the IHRC Humanitarian Mission" and that the full amount of the seized currency constituted charitable donations "intended for the development of housing and water wells in East Africa." This presents an obvious hurdle on our end as to your settlement offer: the USAO cannot be a part of taking alleged charitable donations to an organization and using them to satisfy an individual's tax liability.

   To be blunt, we do not believe that Shumake's purported position as an "Ambassador" with IHRC has any more legitimacy than the "diplomatic immunity" letters he issues his couriers or he himself claims to have (as a simple matter, US citizens—even if they are an actual United States Ambassador appointed by the President and confirmed by the Senate—are not entitled to diplomatic immunity in their own country). Rather, we believe any purported affiliation with IHRC is merely used as a cover for Shumake's activities. And nothing produced in this case to date would indicate that IHRC does any actual charity work.

Nevertheless, that is the theory that Claimants have chosen to plead, and in light of that, while we can certainly "agree to disagree" for purposes of trying to achieve a settlement, we cannot ask the Court to approve—nor do we believe that the Court would approve—any proposed order of forfeiture with the settlement agreement absent confirmation the seized currency is not in fact charitable donations.

Thus, any future negotiation of monetary terms must necessarily be subject to one simple condition: written confirmation by an IHRC representative—separate from Shumake—with authority to confirm the seized currency was not, in fact, comprised of charitable donations to IHRC and can be returned to Shumake. Also, given that Shumake is a convicted fraudster, we will need permission to speak directly to the IHRC representative providing the written confirmation to confirm its veracity.

Finally, we would note one other issue that you may not have considered that may separately impact any potential resolution of this case. It is our understanding that, as of March 12, 2020, Claimant Robert Shumake owed the IRS $270,900 in personal income tax liability—an amount in excess of the $252,140 seized in this case. Further, settlements of forfeiture cases and Government payments generally are processed through the Treasury Offset Program ("TOP"), a system for the Government to collect moneys owed before Treasury issues payments to recipients who owe money. Accordingly, even if the United States Attorney's Office agreed to the return of $72,140 in this case, that payment likely would be subject to a TOP offset before it ever reached Claimant Shumake and he would receive nothing but a credit—albeit a valuable credit—against his tax liability. Therefore, in order for us to effectuate the settlement that you propose, Mr. Shumake would have to either (1) negotiate his tax liability with the IRS down to the $180,000 amount that you propose or (2) agree in writing that TOP may offset and collect the $72,140 that we would agree to return.

In sum, we believe that these two operative facts/issues—largely within your control and not ours—dictate any resolution of this case going forward, and we welcome a discussion with you about these facts/issues. Please let us know should you have any questions on the above. We genuinely wish to move forward with you to settle this case, but are concerned about these significant hurdles that are largely in your hands to resolve.

Sincerely,

**R. ANDREW MURRAY**
**UNITED STATES ATTORNEY**

/s *Ben Bain Creed*

Ben Bain-Creed
Assistant United States Attorney

/s *Seth Johnson*

J. Seth Johnson
Assistant United States Attorney



Stefan Rose, M.D.
UMFC, LLC.
2740 SW Martin Downs Blvd
Suite 400
Palm City, FL 34990
Phone: (561)-795-4452
E-mail: toxdoc@umfc.com

August 25, 2020

Benjamin Bain-Creed
Assistant United States Attorney
United States Attorney's Office
Western District of North Carolina
227 W. Trade Street; Suite 1650
Charlotte, NC 28202

**Re.: US v. Darren Lennard Coleman**

**Report of Stefan Rose, M.D.**

      I have been retained as an expert in Forensic Toxicology and Psychiatry in the above-styled case. I am a physician trained in Forensic Toxicology, Clinical Pathology and General Psychiatry. I earned my Doctor of Medicine degree from the University of Miami School of Medicine in 1985. I also earned my Bachelor of Arts with a major in Biological Sciences from Florida Atlantic University in Boca Raton, Florida, in 1981.

      I trained as a Resident Physician for two years in Clinical Pathology (Laboratory Medicine) at the University of Alabama, Birmingham, Alabama from 1985 to 1987. From 1988-1989, I was in graduate school in Exercise Physiology at the University of Miami, Miami, Florida. I trained as an Associate Medical Examiner Physician in Training in the Forensic Toxicology Laboratory at the Dade County Medical Examiner's Department in Miami, Florida from 1989 to 1991. From 1990-1991, I was a clinical research fellow in the Department of Neurology, Experimental Toxicology-Neurotoxicology at the University of Miami, School of Medicine in Miami, Florida. Additionally, I trained as a resident physician in the Department of Psychiatry at the University of Miami, School of Medicine in Jackson Memorial Hospital from 1995 to 1998.



EXHIBIT
10

From 1992 to 1994, I served as an Assistant Professor in the Department of Epidemiology at Public Health at the University of Miami, School of Medicine. I served as the Director of the Forensic Toxicology Laboratory in that position at the University of Miami School of Medicine. I have had a Courtesy Faculty appointment at Florida International University, Miami, Florida in the Department of Chemistry and Biochemistry since 1997.

I have taught Forensic Toxicology at Florida International University, University Park, in the Department of Chemistry. I was also a Course Coordinator/Instructor in the Chemical Dependency Training Institute, University of Miami School of Continuing Studies, Miami Florida, 1991.

I have received formal training in the forensic laboratory analysis of blood and urine samples (ante-mortem and post-mortem) for alcohol and drugs and hospital laboratory analysis of blood, serum and urine samples. I have personally performed screening and confirmation tests on thousands of samples including serum ethanol by enzyme assay, blood ethanol by static headspace gas chromatography-FID and blood drugs and urine drugs by gas chromatography-mass spectrometry.

During my tenure as Laboratory Director of the University of Miami Forensic Toxicology Laboratory I started researching the detector dog's ability to discriminate the odor of cocaine from other odors. I performed the first experiment in 1993 in the toxicology laboratory with Sgt. Wes Dallas and his narcotics detector dog of the Metro Dade Police Department. That dog alerted to the odor of cocaine, methyl benzoate, and did not alert to the odor of pure cocaine. That experiment initiated a line of research and body of published work in collaboration with Kenneth G. Furton, Ph.D. of the Department of Chemistry at Florida International University, Miami, Florida. Please see my cv for selected publications on this research.

I am also formally trained and experienced in the clinical diagnosis and treatment of people under the acute influence of alcohol and drugs as well as the administration of therapeutic medications to patients.

I have written various papers in the subject matter of toxicology which are attached hereto and the attached curriculum vitae. I am Board Certified and a Diplomat of the National Board of Medical Examiners and a Diplomat of the American Board of Forensic

Examiners, and I currently hold a Florida Medical License and DEA license as well. I have been retained on numerous forensic cases and I have testified as an expert in various courts of law including State, Federal, civil and criminal.

## Materials reviewed

1. K-9 team training records of 2015 to 2019 (339 pages).
2. K-9 team deployment records of 2015 to 2020 (1350 pages).
3. Pineville Police Dept report of 6-27-2016 regarding $252,140.00 seizure.
4. Teleconferences with K-9 handler Officer Lee Stanley on 8-5-2020 and 8-12-2020.

## Opinions

1. It is my opinion that the K-9 team of Officer Lee Stanley and detector dog Ciro are properly trained in the detection of the narcotics odors they are certified to detect, that is methamphetamine, heroin, cocaine and marijuana. The team trained on large amounts of narcotics odor, multi gram amounts, and they used blanks in the certification process to show no alert when the narcotics odor was not present. Also there are many "no alerts" in the deployment records, again demonstrating that K-9 Ciro does not alert simply because he is making a search.
2. It is my opinion that K-9 Ciro does not alert to innocent circulated paper currency but does alert to currency containing the odor of large amounts of narcotics he was trained on. This is demonstrated by the non-alerts to circulated paper currency when training in public places such as auto dealerships, auto repair shops, and the local JAARS Mission retail shop. Also K-9 Ciro has not alerted to paper currency bundles that were on the person searched by K-9 Ciro or in a vehicle searched by K-9 Ciro.
3. It is my opinion that K-9 Ciro did not alert to any odor of cocaine on innocent circulated paper currency in this case.
4. My opinions are within reasonable medical and forensic toxicologic certainty.

Signed,

Stefan Rose, M.D.



**Stefan Rose, M.D.**
**UMFC, LLC**
**2740 SW Martin Downs Blvd**
**Suite 400**
**Palm City, FL 34990**
**Phone: (561)-795-4452**
**E-mail:  toxdoc@umfc.com**

January 4, 2021

Benjamin Bain-Creed
Assistant United States Attorney
United States Attorney's Office
Western District of North Carolina
227 W. Trade Street; Suite 1650
Charlotte, NC 28202

**Re.: US v. Darren Lennard Coleman**

Supplemental Report of Stefan Rose, M.D.

This report is in response to the December 3, 2020 report of Jay M. Poupko, Ph.D. and
subsequent to my report of August 25, 2020, my deposition of December 15, 2020 and my
review of materials received on December 15, 2020.

Additional materials reviewed:

- 1 - Rose CV- PALM CITY FLORIDA  2020  v. 1.01.pdf
- 2 - Testimony List-Past Four Years-Rose.pdf
- 3 - ROSE REPORT COLEMAN 2020.pdf
- 4 - Furton et al Identification Odor Sig 2002 F in Garcia.pdf
- 5 - Furton Depo in Garcia 2018 05-07.pdf
- 6 - SWGDOG 2011 03-31 resp to Lit study.pdf
- 7 - Pineville PD Report Stanley and Ciro Deployment re 252k.pdf
- 8 - DHS Incident Report re 252k NC Shumake.pdf
- 9 - Deposit Docs to Loomis.pdf
- 10 - Poupko Opinion $252,140 US Currency Forfeiture Case 12-4-20.pdf
- 11 - Poupko_et_al-2018-JofForensicSciences.pdf
- 12 - Furton et al Field and Lab Comp K9s 1998 - G from Garcia mtn.pdf
- 13 - Furton et al Odor Sig 1997 H in Garcia.pdf
- 14 - Rose Decl from prev case I in Garcia.pdf
- 15 - Chart Cocaine MB Dog Currency.pdf

The report of Jay M. Poupko, Ph.D. contains ten paragraphs. I will respond to each one, numbered, as necessary.

Paragraph one to three:

It is important to distinguish small amounts (one microgram, ten micrograms) of cocaine hydrochloride and/or cocaine base present as background contamination on individual, innocent (not drug traffic involved) circulated currency bills (microgram amounts with a microgram equal to one millionth of a gram) compared to large amounts (hundreds or thousands of micrograms) of cocaine hydrochloride and/or cocaine base present as gross contamination on individual currency bills involved in the illicit trafficking of cocaine.

I agree that innocent circulated currency may contain small, background amounts of cocaine hydrochloride and/or cocaine base up to "several micrograms per bill" as stated in the report of Jay M. Poupko, Ph.D.

However this is not enough cocaine hydrochloride and/or cocaine base to have caused K-9 Ciro to alert to the $252,140 US seized currency in this case.

The odor of cocaine is dependent on the total surface area of the currency exposed to the air. The total surface area is calculated by measuring the height, width and depth of each stack of bills. It is unknown how many stacks were in this case, but it seems that about 24 stacks of bills were present based on the photos of the currency seized. If 24 stacks of bills are used to calculate the square surface area 12,147 bills in 24 stacks equals about 500 bills per stack and based on the dimensions of a single bill, 24 stacks of bills would equal about 11 square feet of surface area for methyl benzoate to be given off.

It takes 11 bills to make 1 square foot of surface area, so 11 times 11 square feet of total surface area equals about 121 bills of surface area for methyl benzoate to be given off and detected. Using Jay M. Poupko, Ph.D. numbers in his report of 15 milligrams of cocaine per the 12,147 bills, that equals about 1.235 micrograms cocaine per bill. (1.235 micrograms times 12,147 bills equal about 15 milligrams).

However, total amount of exposed cocaine for the release of methyl benzoate is only about 121 bills, so 121 bills times 1.235 micrograms cocaine per bill equals about 150 micrograms exposed cocaine for the release of methyl benzoate.

So by using Jay M. Poupko, Ph.D. values of 0.01% to 0.036% of methyl benzoate by cocaine weight that would be 150 micrograms cocaine times 0.01% equals 0.015 micrograms methyl benzoate available for detection, and 150 micrograms cocaine times 0.036% equals 0.054 micrograms methyl benzoate available for detection.

Using the largest amount of methyl benzoate as described by Jay M. Poupko, Ph.D. 0.054 micrograms of methyl benzoate would be, in terms of volume, about 0.05 microliters, a very small volume. In fact that volume would be about six times smaller than the smallest blood volume in the example photograph below, underlined in blue. That small volume would probably not be visible to the naked eye.



**Figure 7.** Comparison chart of blood volume (µL) compared to a visual chart of the same blood drop size shown to patients before responding to the survey of blood sampling practices.

Using Jay M. Poupko, Ph.D. values from his report the amount of methyl benzoate available would be 18 to 66 times less than the one microgram methyl benzoate minimum threshold of detection by the drug dogs.

And that would be 180 times to 660 times less than the amount of methyl benzoate needed for 50% of drug dogs to alert.

And that would be 1800 times to 6600 times less than the amount of methyl benzoate needed for 100% of drug dogs to alert.

The amount of methyl benzoate present on circulated currency, using the estimations of Jay M. Poupko, Ph.D., is not enough for K-9 Ciro to have alerted. Much more methyl benzoate would have to have been present, consistent with recent exposure to large amounts of cocaine or cocaine odor, gram quantities and above. Innocent circulated currency does not fit that profile.

Paragraph 4:

Methyl benzoate is produced spontaneously from illicit cocaine at various rates depending on ambient temperature, humidity, and the presence of residual solvents from the manufacturing process.

However methyl benzoate is rapidly evaporated from circulated currency as opposed to bundled currency, and one would expect circulated currency to also evaporate any residual solvents and water.[1] (see experimental results of **figure 1** in the second page of the first listed reference) Therefore one would expect regular circulated currency to have a much lower amount of methyl benzoate compared to currency not circulated and involved in illicit cocaine transactions.

In this case the K-9 Ciro was shown to not alert to circulated currency while deployed in the field.

Paragraph 5:

The evidence shows that methyl benzoate is the dominant odor of illicit cocaine that detector dogs alert to and other odors associated with methyl benzoate are expected to be present but are not necessary for the drug dog to reliably alert.

Paragraph 6:

My opinions are limited to the odor of cocaine, cocaine, detector dogs and currency in this case.


Paragraph 7 (listed as the second paragraph 6):

This is a contradictory argument. Wrapping of currency bundles will impede the evaporation of methyl benzoate and thus the concentration of the odor in the air around the currency. Therefore much more methyl benzoate (and it follows, much more cocaine) would have to be present in wrapped currency bundles to cause a drug dog to alert.

Paragraph 8:

My opinions are limited to the odor of cocaine, cocaine, detector dogs and currency in this case. I did not address any of the analytical testing in this case.

Paragraph 9:

Many scientific experimental protocols start with small groups of individuals. This argument is a false argument. The scientific method was followed for all experiments, and many more detector dogs were tested over the years in hundreds of experimental trials,

Further, Jay M. Poupko, Ph.D. and his colleagues may use our protocols and repeat any of the experiments we have published in order to determine if their results are consistent or not consistent with our published work that has been done over the last 25 years.

Paragraph 10:

Not relevant to my opinions.

References

1. K.G. Furton, Y.-L. Hsu, T. Luo, J. Wang and S. Rose," Odor Signature of Cocaine Analyzed by GC/MS and Threshold Levels of Detection for Drug Detection Canines", Curr. Top. Forensic Sci., Proc. Meet. Int. Assoc. Forensic Sci., 14th, vol. 2, 1997, 329-332

2. K.G. Furton, Y.-L. Hsu, T. Luo, A. Norelus and S. Rose, " Field and Laboratory Comparison of the Sensitivity and Reliability of Cocaine Detection on Currency Using Chemical Sensors, Humans, K-9's and SPME/GC/MS/MS Analysis" in Investigation and Forensic Science Technologies, K. Higgins, V.M. Baylor, and LI Rudin, Editors, Proc. SPIE Vol. 3576, (1999)

3. Furton, KG et al. Identification of odor signature chemicals in cocaine using solid-phase rnicroextraction-gas chromatography and detector dog response to isolated compounds spiked on US paper currency. J. Chromatograph Sci. 2002;40(3):147-155.

4. Lorenzo N, Wan T, Harper RJ, Hsu YL, Chow M, Rose S, Furton KG, "Laboratory and field experiments used to identify Canis lupus var. familiaris active odor signature

chemicals from drugs, explosives, and humans", Anal Bioanal Chem. 2003 Aug;376(8):1212-24. Epub 2003 Jul 04.

5. Grady et al, A Clinical Evaluation of Routine Blood Sampling Practices in Patients With Diabetes: Impact on Fingerstick Blood Volume and Pain, J Diabetes Sci Technol, 2014 Jul;8(4):691-8.

All of my opinions are within reasonable scientific, medical and toxicological certainty.

Signed,

Stefan Rose, M.D.

 1                IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                       CHARLOTTE DIVISION

 3                   CIVIL NO. 3:18CV646

 4   UNITED STATES OF AMERICA,

 5        Plaintiff,

 6   v.

 7   APPROXIMATELY $252,140.00 IN US
     CURRENCY SEIZED FROM DARREN
 8   LENNARD COLEMAN ON JUNE 27, 2016
     AT CHARLOTTE-DOUGLAS INTERNATIONAL
 9   AIRPORT,

10        Defendant.
     _____/
11
     INTERNATIONAL HUMAN RIGHTS COMMISSION
12   and ROBERT SHUMAKE,

13        Claimants.
     _____/
14

15

16

17                   DEPOSITION OF STEFAN ROSE, M.D.
                        (via Zoom videoconference)
18

19

20

21
     DATE:            December 15, 2020
22
     TIME:            2:14 p.m. - 4:10 p.m. EDT
23
     TAKEN BY:        Deborah Carmela Dew, RPR, FPR,
24                    Notary Public, State of Florida

25   JOB NO.:         696769

Page 2

```
 1   APPEARANCES VIA ZOOM VIDEOCONFERENCE
 2
     FOR THE PLAINTIFF
 3
         BENJAMIN BAIN-CREED, ESQ.
 4       Assistant United States Attorney
         United States Attorney's Office
 5       227 West Trade Street, Suite 1650
         Charlotte, North Carolina 28202
 6       704-344-6222
         benjamin.bain-creed@usdoj.gov
 7
 8   FOR THE CLAIMANTS INTERNATIONAL HUMAN RIGHTS
     COMMISSION AND ROBERT SHUMAKE:
 9
         EDWARD M. BURCH, ESQ.
10       Law Offices of Michael & Burch LLP
         One Sansome Street, Suite 3500
11       San Francisco, California 94104
         415-946-8996
12       edward@michaelburchlaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    C O N T E N T S
 2
     WITNESS                                      PAGE
 3
     STEFAN ROSE, M.D.
 4
         Direct Examination by Mr. Burch            5
 5       Cross-Examination by Mr. Bain-Creed       72
 6
     CERTIFICATE OF OATH                           74
 7   CERTIFICATE OF REPORTER                       75
     ERRATA PAGES                                76-77
 8
 9                      EXHIBITS
10   CLAIMANTS' EXHIBITS            PREMARKED ON PAGE
11   No. 1    Stefan Rose, M.D. Curriculum Vitae    5
12   No. 2    Rose Testimony List, Past Four Years  5
13   No. 3    Report of Stefan Rose, M.D.           5
              Re:  US v Darren Lennard Coleman
14            August 25, 2020
15   No. 4    (Exhibit F) Identification of Odor    5
              Signature Chemicals in Cocaine using
16            Solid-Phase Microextraction Gas
              Chromatography and Detector-Dog Response
17            to Isolated Compounds Spiked on U.S.
              Paper Currency
18
     No. 5    Deposition of Kenneth G. Furton, PhD  5
19            May 7, 2018
20   No. 6    SWGDOG March 31, 2011 document        5
21   No. 7    Pineville Police Department           5
              K-9 Deployment Report
22
     No. 8    DHS Incident Report Re: $251,140      5
23
     No. 9    Deposit Docs to Loomis                5
24
     No. 10   Jay M. Poupko Opinion, PhD            5
25            Re: $252,140, December 3, 2020
```

Page 4

```
 1                  EXHIBITS (cont'd)
 2   CLAIMANTS' EXHIBITS            PREMARKED ON PAGE
 3   No. 11   2018 Journal of Forensic Sciences Review  5
              (Poupko)
 4
     No. 12   (Exhibit G) Field and Laboratory     5
 5            Comparison of the Sensitivity and
              Reliability of Cocaine Detection on
 6            Currency Using Chemical Sensors, Humans,
              K-9s and SPME/GC/MS/MS Analysis (Furton)
 7
     No. 13   (Exhibit H) 1997 Odor Signature of   5
 8            Cocaine Analyzed by GC/MS and Threshold
              Levels of Detection for Drug Detection
 9            Canines (Furton)
10   No. 14   (Exhibit I) Rose Decision from Previous  5
              Case
11
     No. 15   Chart Cocaine of MB Dog Currency     5
12
13
14
15
16
17
18
19
20
21
22                    STIPULATION
23         It is hereby stipulated, by and between counsel
24   for the respective parties and the witness, that the
25   reading and signing of this deposition is hereby reserved.
```

Page 5

```
 1        (Claimants' Exhibit Nos. 1 - 15 marked.)
 2        THE REPORTER:  For the deposition of Stefan Rose,
 3   Dr. Stefan Rose, will all counsel please stipulate on
 4   the record to the witness being sworn in remotely.
 5        MR. BURCH:  Yes, stipulated.
 6        MR. BAIN-CREED:  United States stipulates.
 7        THE REPORTER:  Doctor, can you please raise your
 8   right hand to be sworn?
 9   AND THEREUPON,
10             STEFAN ROSE, M.D.
11   having been first duly sworn, testified as follows:
12        THE WITNESS:  Yes, I do.
13        THE REPORTER:  You may begin.
14        MR. BAIN-CREED:  Before you get flowing, can I
15   just reserve my objections except as to form?
16        MR. BURCH:  Yes.
17        MR. BAIN-CREED:  Okay, great.
18        MR. BURCH:  Duly noted.
19             DIRECT EXAMINATION
20   BY MR. BURCH:
21        Q.  Okay.  Hello, Dr. Rose.  My name is Edward
22   Burch -- that's B-u-r-c-h, Debbie -- and I represent the
23   Claimant, Robert Shumake, in this case, United States
24   versus 252 some odd thousand dollars that was seized from a
25   Darren Coleman in 2016.
```

1          Dr. Rose, is that familiar to you when I say
2    that?
3          A.   Yeah, the case sounds familiar.
4          Q.   Okay.  Now the first some initial questions, have
5    you been deposed before?
6          A.   Yes.
7          Q.   Okay.  So I'm only briefly going to cover some of
8    the kind of preliminary things I normally cover.  But just
9    a reminder that you're under oath, and so it's just like in
10   court where everything you say is under penalty of perjury.
11   Does that make sense?
12         A.   Yes.
13         Q.   And one thing I like to mention at the onset is
14   that, you know, we have a court reporter here, and I'm
15   going to do my best to let you finish your answers and ask,
16   respectfully, that you let me finish my question.
17   Sometimes I do little pauses so I have an issue with that
18   every once in a while, but just so that we can get a good
19   clean record with the court reporter.  Is that fair enough,
20   make sense?
21         A.   Yes.
22         Q.   Okay.  And then I'll probably ask a number of
23   questions that seem sort of obvious.  I probably know the
24   answer to a lot of the questions I'm going to ask, but I
25   remind you that, you know, I have to make my record.  And,

1    you know, you don't necessarily -- I wouldn't read too much
2    into a question.
3          But with that said, if there's a question that's
4    unclear, please definitely, rather than trying to answer
5    it, make me restate it and ask it a little bit better.
6    Does that make sense?
7          A.   Certainly.
8          Q.   Okay.  The last kind of preliminary question is
9    are you ill or on any medication or anything like that that
10   would prevent you from understanding the questions and
11   giving your best testimony today?
12         A.   No.
13         Q.   Okay.  So I guess let's get started into a little
14   bit more of the substance.
15         In this case you put together a report, an
16   opinion report -- let me see what the date is on it --
17   August 25, 2020, and you titled the report of U.S. versus
18   Darren Lennard Coleman.  I have it premarked as No. 3.
19         Do you have that document with you?
20         A.   I do.
21         Q.   Okay.
22         A.   I have it up now on my screen.
23         Q.   Okay.  And this is -- this is your opinion report
24   in this case?
25         A.   I generated the report, they're my opinions.

1          Q.   Great.  So in this case, I mean, is it accurate
2    or fair that you would consider yourself being offered as
3    an expert in chemistry and toxicology for this case?
4          A.   Well, I would say that I'm offered in the areas
5    of expertise that I'm formally educated and trained in, and
6    that's outlined in detail in -- in my curriculum.  I'll be
7    happy to provide that to you if you'd like.
8          Q.   I think I have the curriculum.  I have it
9    premarked as Number 1, and that's -- but I have -- well,
10   maybe you can confirm.  Is Number 1 your curriculum?
11         A.   Are we talking about the exhibits now?
12         Q.   Yeah.  Well, I mean, I have it marked as a file
13   named Number 1 there.
14         A.   Yes.  Yes.  Well, I have -- I have a list of
15   exhibits, and Number 1 is -- is my curriculum.
16         Q.   Okay.  So in this CV, when I go through it, I
17   don't necessarily -- I don't -- I didn't see any formal
18   degrees or education in animal behavior or that type of
19   thing, is that correct?
20         A.   That's correct.
21         Q.   Okay.  And have you ever been a law enforcement
22   drug dog detection handler?
23         A.   No.
24         Q.   And have you ever been a handler of any type of
25   detection dog?

1          A.   My own personal dogs.
2          Q.   Okay.  And so have you ever had any formal
3    training for sort of law enforcement drug detection dogs?
4          A.   Not in law enforcement, no.
5          Q.   Okay.  Is there some other training vis-a-vis
6    drug dog detection that you have had or any kind of law
7    enforcement detection?
8          A.   Yes.  I would answer that my formal training
9    would include my education in the chemical sciences, in the
10   pharmacology sciences, in the toxicology sciences, and in
11   the behavioral sciences that would envelope the scope of my
12   formal education and training that would have to do with
13   animal behavior, although not animal behavior per se.
14         Q.   Okay.  And have you ever certified a detection
15   dog, any type of law enforcement detection dog in terms
16   of -- maybe I should be more specific -- so that if -- for
17   instance, a dog detection team with a handler and a dog,
18   have you ever been sort of the certification person who's
19   saying, okay, this is a well-qualified dog that you can go
20   out in the field?
21         A.   Well, for a number of years I was -- the answer
22   is yes.  For a number of years I was on a committee at
23   Florida International University that did exactly that,
24   certified K-9 handlers and dogs, the team if you will.
25         Q.   What was the name of that committee?

1    A.   I don't know at the moment, but it was part of
2  IFRI, International Forensic Research Institute, at Florida
3  International University in the Department of Chemistry and
4  Biochemistry.
5    Q.   Okay.  And so the certifications that you were
6  part of issuing, was that -- would some dog team get
7  certified and then they would go out in the field somewhere
8  and be able to work in the field?
9    A.   Yes.  These were law enforcement K-9 teams or,
10  let's see if I recall correctly, civilian K-9 teams that
11  were subcontracting for law enforcement.  I think that's
12  what they did.
13    Q.   Okay.  And, let's see, was it drug detection?
14    A.   Drug detection, yes, was the area that I was in.
15    Q.   Okay.  So in this case, do you consider that
16  you're offering your opinion in regard to the quality and
17  sufficiency of this particular dog's training that was
18  involved in this case?
19    A.   Well, I think that I'm offering my opinions
20  pretty much as stated in my report.  So I think it's a
21  relatively narrow focus.  I think it's a, you know,
22  relatively, you know, well-defined scope.  So I think, you
23  know, that's where, you know, you would find the --
24  answer to that question, you know, in my report.
25    Q.   So I guess you're saying is that the report

1  speaks for itself in regard to the scope of your opinion?
2    A.   I think that based on what I was asked to do in
3  this case for the U.S. Attorney's Office, that my report
4  defines, you know, the scope of what I was asked to do.
5  Now if I'm asked other questions, you know, by other
6  lawyers, you know, in other venues, you know, I certainly
7  have other things to say, but I was not asked to do that in
8  this case other than what's published in my report.
9       So that's -- at this time right now, I've been
10  asked to provide a rebuttal to Jay Poupko's report, which
11  I'll be working on, you know, between now and January.
12    Q.   Okay.  So I might jump ahead just to get us
13  focused here.  When I look at your ultimate I guess it's
14  called opinions here, and this is page 3 of your report, it
15  says opinions and you have 1 through 4.  Are you with me
16  there?
17    A.   Yes, I am.
18    Q.   Okay.  So when I look at number 1 and 2, I read
19  this as more of a -- this is an opinion about the quality
20  of the -- the K-9 detection team's training in this case,
21  is that fair?
22    A.   Well, you know, I think that the characterization
23  of my opinions 1 and 2 go to what we would call sensitivity
24  and specificity, that's false negatives and false
25  positives.  And what's especially important would be false

1  positives.  That is an alert by a K-9 when there's no odor
2  present that they're trained to alert to.  I think, you
3  know, that's where, you know, the big problem is in, you
4  know, this type of work.
5       So then the idea of circulated paper currency
6  having enough narcotics odor of cocaine on it to cause a
7  properly trained K-9 to alert, that goes to false
8  positives.  And that's what those two opinions really
9  relate to directly.
10    Q.   Okay.  And then is it fair that number 3, which
11  is, "It is my opinion that K-9 Ciro did not alert to any
12  odor of cocaine on innocent circulated paper currency in
13  this case," that numbered item, that opinion, that's more
14  of a question of chemistry than it is than 1 and 2, would
15  you agree with that?
16    A.   Well, you know, I would say it's more than that.
17  The alerting to an odor really encompasses, you know, all
18  the areas of my education, training and experience;
19  chemistry, pharmacology, toxicology, and animal and human
20  behavior when it comes to olfaction or the sense of smell.
21    Q.   Okay.  I think I -- I think I get the flavor
22  there.  So let me -- with that in -- with those answers, I
23  think your opinion again, like we just talked about, sort
24  of delves into training insofar as you talk about the
25  blanks used and things like this.

1       So part of that opinion is influenced by you had
2  telephone discussions with this particular dog handler, Lee
3  Stanley, correct?
4    A.   Yes.
5    Q.   Did you make any notes of those conversations?
6    A.   I believe I do have a file with handwritten notes
7  in it.
8    Q.   Okay.
9       MR. BURCH:  Okay.  Ben, I might request those,
10  but I don't want to take up time in this deposition.
11  But just to give the heads up that I --
12       MR. BAIN-CREED:  Sure.
13       MR. BURCH:  We can talk about whether you're
14  willing to give it, but just to put that on the record
15  that I might want to see those notes.
16       MR. BAIN-CREED:  I'll talk about it with Stefan,
17  Dr. Rose.  Thanks.
18       MR. BURCH:  Okay.
19  BY MR. BURCH:
20    Q.   So moving on from that, I guess I want to talk a
21  little bit about first was just what the dog's training.
22  Did you talk with -- I see that also in your report it
23  indicates that you reviewed the -- the dog's training and
24  certification records, Dr. Rose, is that correct?
25    A.   Yes, that's correct.

1    Q.   Okay.  Now in terms of the dog -- if I say "the
2  dog team's maintenance training," does that mean anything
3  to you?
4    A.   Well, that would be ongoing training after
5  initial certification.
6    Q.   Okay.  So that's my understanding also.
7         So with that, is it your understanding of this
8  particular Officer Stanley and Ciro, was there maintenance
9  training -- well, maybe I should back up.
10        You are familiar with single blind and double
11  blind training in the context of dogs?
12    A.   Well, I'm familiar with single blind, double
13  blind, and no blinded experimental protocols generally
14  speaking using the scientific method for experimental
15  research.  So it would have application here, you know, in
16  some circumstance.
17    Q.   Okay.  Well, let's -- maybe it's a good way --
18  maybe it's a good way to start if we talk about the dog's
19  certification because we do have some certification records
20  in the -- in the dog -- dog materials, correct?
21    A.   I know I have them.  The name of the file --
22    Q.   Yeah, and I -- I didn't provide those as an
23  exhibit, a marked exhibit, so I think I'm just going to
24  have to go basically off of your recollection.  And if you
25  have them, you can refer to them, but I won't have them.

1    A.   Yeah.  I think I have the complete record set
2  that was sent to me, 339-page record set that's labeled
3  Ciro's Training Docs, so that's what I have in my
4  possession.
5    Q.   Okay.  So if I focus on the certification of Ciro
6  and Lee Stanley, what this -- this was -- is it fair to say
7  that these are sort of like some tests of drug detection
8  that this team goes through to say okay, here, we're going
9  to issue you your certification, you can go in the field
10  and be a drug detection dog, fair?
11    A.   Well, it's -- it's a little more than that.
12  First the K-9 has to be conditioned to detect the odor of
13  interest.  Then it has to be trained to alert to the odor
14  of interest, you know, one way or the other, passive alert
15  or active alert.  And then it has to be trained to
16  discriminate between other odors and no odors.
17        So that should all be part of the, you know, the
18  training process that would be not proprietary, but it
19  would be perhaps unique to a given, you know, training
20  department or training entity depending on how they, you
21  know, assembled the syllabus of training.  So there's
22  multiple pathways to reach the same result when it comes to
23  this kind of training.
24        So if one wants to know more details about that,
25  then, you know, you'd have to, you know, dive into all of

1  the paper records and perhaps, you know, get testimony from
2  the trainers and the supervisors and so on.
3    Q.   Okay.  So, yeah.  And I don't want to go too deep
4  into that stuff, but your opinion does touch on it.  But
5  ultimately there's some kind of -- with the certification
6  for a dog to be certified, as this dog was, there's a test
7  at some point, correct?
8    A.   Generally there's an evaluation of the team, that
9  is the K-9 and the human handler, that is ongoing from day
10  one until day end.  And I agree that, you know, there's
11  usually some kind of formal field examination, perhaps
12  paper examination, you know, that signifies the successful
13  completion of an initial training of the team.
14    Q.   Okay.  So with that, what you just referred to,
15  whatever you want to call it, I'm going to -- let's just
16  say this, I'm going to call that a certification test just
17  so that we know what we're going to talk about, there's
18  some test that happened.
19        In the certification test, do you know if that
20  was done as a no blind, single blind, or double blind?
21    A.   At the moment I do not.  I'd have to dig into the
22  records and look that up.
23    Q.   No, that's okay.  I don't want you to dig into it
24  too much.  Did you have that information at the time you
25  completed your report, whether it was, you know, what

1  type of -- whether it was blind or not for the
2  certifications?
3    A.   Again, I don't know the answer to that.  The
4  answer to your question, I would have to look back into the
5  records.  I did not address it in my report specifically,
6  so I would have to go back and, you know, and address that
7  question specifically.
8    Q.   Okay.  And so then I want to shift back over to
9  the maintenance training.  And just so that we're on the
10  same page, for me maintenance training means like what the
11  dog handler is going to do with his dog sort of on a daily
12  basis in terms of presenting him with different drugs that
13  the dog is trained to alert to keep him in sort of in
14  shape.  Is that a fair simplistic way to say it?
15    A.   Well, I mean, I guess that's one way to look at
16  it.  The purpose of ongoing training is to continue to
17  reinforce the behaviors that are desired, then to
18  de-enforce, you know, any behaviors that arise that need to
19  be corrected for.  So, you know, it's like a program of
20  continuous quality improvement or continuous quality
21  control.
22    Q.   Okay.  So for the ongoing training, what I'm kind
23  of calling the maintenance training, you said -- I think
24  you referred to it as ongoing training, with that type of
25  training where the handler is mostly responsible for doing

1  that on a regular basis, do you know if the records or
2  other information that you have in forming this report, do
3  you know if that was no blind, single blind, or double
4  blind?
5      A.  Well, I think Handler Stanley was in a small
6  department and so I think that he did a lot of his training
7  solo.  So I guess -- I guess it could be single blind
8  because the K-9 did not know where the hides were.  But,
9  you know, in a circumstance like that, you know, with a
10  small department, you still want to conduct, you know,
11  training, then it would not be blinded because the handler
12  obviously would know where the hides were and what the
13  hides consisted of.
14      Q.  Okay.  And so in the report, I'm still on this
15  page 3, let's see, sticking with paragraph 1 on the bottom
16  of page 3, it says the team trained on large amounts of
17  narcotics odor and they used blanks in the certification
18  process.  With that, that's referring to the ongoing
19  training or --
20      A.  I'm sorry, go ahead.
21      Q.  Go ahead.  Is that specifically in regards to the
22  ongoing training that we were just talking about?
23      A.  I think if one reviews their initial
24  certification and the ongoing training, you'll find that
25  they use multi gram quantities in both circumstances.

1      Q.  Okay.  And from your either information -- your
2  discussions with Stanley and your review of the records,
3  did he use blanks in the ongoing training, excluding what
4  happened at certifications?
5      A.  Yes.
6      Q.  Okay.  Now do you know if in his ongoing
7  training, if Stanley and Ciro did line-ups so that perhaps
8  you would have a couple things that were presented that
9  maybe one is a blank and one's a drug, do you know if he
10  did that?
11      A.  Are you talking about having several hides in one
12  place, like in a line, and some have narcotics in it and
13  some don't?
14      Q.  Exactly.
15      A.  In other words, positive controls and negative
16  controls or blanks in the -- in the same line-up?
17      Q.  Yes.
18      A.  I don't know the answer to that.
19      Q.  Okay, fair enough.
20          Then I want to get into going to paragraph two.
21      A.  Well, just in response to that, that just
22  previous answer, I have a -- a training report that is
23  dated 12/16/2005, it's my page 38 and 39 of the 339-page
24  PDF document.  And here's a situation where, let's see, he
25  had one room with 15 blank suitcases and one with the --

1  the positive training aid.
2          And so, you know, without looking through the
3  entire document, the answer to your question is yes, at
4  least once.
5      Q.  Okay, great.  Fair enough.  Yeah, I certainly
6  don't want you to go through 1,300 pages of records right
7  now.
8      A.  It's your nickel.  I'll do what I'm required to
9  do, so.
10      Q.  Right.  So I want to focus on a particular part
11  of paragraph 2 there, sticking with your report on page 3,
12  paragraph 2.  It talks about that the dog team demonstrated
13  non-alerts to circulated paper currency when training in
14  public places such as auto dealerships, auto repair shops,
15  the local JAARS Mission retail shop.
16          So is that something you gathered from going over
17  the training records or the dog records?
18      A.  I believe that information was revealed through
19  my telephone interview with the K-9 handler.
20      Q.  Okay.  And could you provide more information
21  about those non-alerts to the circulated paper currency,
22  how was it set up, et cetera?
23      A.  Well, look, I don't know the exact answer to the
24  specifics of that question.  But, you know, generally
25  speaking, as I understood the -- the discussion, that when

1  this particular K-9 team would be training in a place or
2  inspecting a place, you know, the K-9 is encouraged to
3  check, you know, all of the, you know, objects, the things
4  in his face, you know, when he's going around, you know, in
5  the room or the building.
6          And so, you know, the whole point of not alerting
7  to circulated currency that's in, say, a retail
8  establishment is that that's a real word scenario, you
9  know.  Either the odor is there or it's not, and either the
10  K-9 alerts or he doesn't.
11          So my information is that the K-9 was exposed and
12  had the opportunity to inspect circulated currency on a
13  number of occasions in a number of places and did not
14  alert.  And so that's one of the most important events in
15  the history, you know, of a K-9 team and a K-9, you know,
16  detection dog, per se, because that would -- if the K-9 did
17  alert, then it may be a false positive or, you know, there
18  may be some drug activity going on, you know, in the
19  register.
20          But, you know, generally speaking, circulated
21  currency, you know, is just that, it's circulated currency.
22  We would not expect the odor of methyl benzoate to be above
23  the threshold for the K-9 to alert, so that's how that
24  would be interpreted.
25      Q.  Okay.  So am I understanding you correctly that

Page 22

1  the information that you have is that he went to these
2  places to do some training and there was presumably some
3  cash on hand in the register, or what have you, at these
4  various places and then the dog didn't alert?  Is that my
5  understanding correctly?
6       A.  Well, I mean, it's as I'm stating it in my
7  report.  That when this handler and this K-9 were training
8  in public places and, you know, doing whatever the training
9  protocol was for the day or the night, the K-9 had the
10  opportunity to inspect and alert to circulated currency
11  that would have been, you know, in plain view and, you
12  know, openly available.  And, you know, the testimony of
13  the handler is that the K-9 did not alert.
14       Q.  Okay.  And for the record, you don't know how
15  much currency was on hand at any of these places at the
16  time the dog was there, correct?
17       A.  I don't have that level of detail.
18       Q.  Okay.  So the last -- hopefully the last question
19  about training, because I could -- probably, as you know,
20  we go on and on about training in this type of stuff
21  because I find it fascinating.  But as far as you know, has
22  this dog team ever been tested in a double blind,
23  controlled double blind situation for drug detection?
24       A.  I don't know the answer to that.
25       Q.  Okay.  So I'm going to take a step back and just

Page 23

1  speak generally about your experience now in terms of
2  testimony in cases.
3       How many times would you say that you've been
4  retained to testify as a drug dog detection deployment
5  expert?
6       A.  Well, I would say less than a hundred.
7       Q.  Okay.  In that regard, have you ever testified
8  for the defense or are you always for the prosecution?
9       A.  I'm not called by the defense.  I'm called by
10  the -- by the state at the county level or the federal
11  level, the government.
12       Q.  Always, right?
13       A.  Well, you know, yes.  That's who calls me.  I've
14  not been called by the defense.
15       Q.  Okay.  So, yeah, maybe I should ask that question
16  a little bit better.  So you've never been called by a
17  defense attorney to say, hey, I want you to testify for me
18  in this particular case?
19       A.  Well, I think I've been called a few times to
20  explore, you know, my position on these issues.  And, you
21  know, I give the same responses I'm essentially giving now.
22  And so, you know, then I guess that's the end of the
23  interview on the phone.
24       Q.  Right, gotcha.  So have you ever been approached
25  to testify and I'll say vouch for a drug dog team but you

Page 24

1  declined to testify in their favor on behalf of the
2  prosecution, or the prosecuting agency, because the dog
3  team had inadequate training?
4       A.  Well, look, I don't know -- I don't know the
5  answer to that question.  The answer is perhaps.  But I do
6  know that when there are inadequacies when I'm reviewing a
7  case, I point them out, you know, to whomever the -- the
8  person in charge is.  And I -- I believe there have been
9  more than one time when a K-9 team did not certify because
10  the performance of the K-9 was inadequate or substandard
11  and had to go back for remedial training.
12       So, you know, either the team performs correctly
13  and they don't alert when there's no odor there and they do
14  alert when there is an odor there, you know, just on a
15  general basis, you know.  If that doesn't happen, then, you
16  know, everybody's going to hear about it from me.
17       Q.  But have you, in fact, told some dog handler or
18  prosecuting attorney, hey, this training, this
19  certification's no good, I'm not going to vouch for this
20  dog, have you ever done that?
21       A.  Again, I don't know specifically that -- that
22  I've done that.  But when there are inadequacies and, you
23  know, there are inadequacies from time to time, you know,
24  team to team, agency to agency, I point it out, you know,
25  right away because, you know, I'm not going to get stuck on

Page 25

1  the horns of that dilemma, you know.
2       Q.  And with that, if -- if that were the case, you
3  said it's been a couple times, would that make it into your
4  written report if there was one?
5       A.  Look, generally speaking, when, you know, there's
6  a deficiency that's serious enough for me to -- to say
7  that, they've got to go back and restructure their training
8  program and they have to re-evaluate what they're doing.
9  So, you know, that's the way it works.  I'm not going to
10  testify about the reliability of a detector team if the --
11  the K-9 is inadequate or substandard or giving false alerts
12  so, you know.
13       Q.  And are you saying that that's happened, that
14  you've seen something bad and you're, like, tell them I'm
15  not going to testify, has that happened?
16       A.  Hey, look, I'm not -- I'm not putting a label on
17  it, you know, good, bad.  I'm saying, you know, substandard
18  in the sense that the dog is alerting when it should not or
19  it's not alerting when it should.  So when the dog is not
20  alerting when it should, okay, that's, you know, the error
21  is on the government and the, you know, the Defendant gets
22  a pass, right, if you will.
23       The most serious error, though, is when the dog
24  alerts and there's no odor there, okay.  And so, you know,
25  that has to be taken care of right away.

1    Q.   Okay.  So the specific question I'm asking you,
2  though, is have you, in fact, seen that in a dog team and
3  told them that?
4    A.   I believe that -- that I have seen circumstances
5  where -- now this would be at some point in the, you know,
6  the K-9 team's history.  It could be, you know, in the --
7  in the initial training, it could be right after training,
8  it could be in ongoing training, or it could be in
9  deployment.
10        But, look, you know, I'm not the only one that
11  sees this, right?  I mean, everybody sees this if they're
12  running controls in the training of the K-9.  So, you know,
13  I don't -- I don't get a lot of opportunity to see it.  But
14  when I see problems, I point them out wherever it might be.
15  In initial training, in ongoing training, or, you know, in
16  the deployment.
17        And so what I look for in deployment, and this is
18  really important, is I look to see, as I've done in this
19  case, if the K-9 is alerting to circulated currency in
20  public places, you know.  Some teams train in banks where,
21  you know, there's usually a lot of circulated currency and,
22  you know, when they have access to the vault, right, so
23  there's a lot of stacks of currency in the vault and so on,
24  and so I look for that in every case
25    Q.   Okay.  And you don't -- but you don't have any

1  specific recollection of any specific dog team that you've
2  said, right now as we speak, that, hey, go back to the
3  drawing board, you don't have any specific recollection
4  right now?
5    A.   I don't have a log of, you know, individual cases
6  where that's happened, you know.  It comes up one case at a
7  time, you know.  I do my thing, I communicate my opinions
8  and, you know, I finish the case and go on to the next one.
9    Q.   Okay.  I'll move on.
10        You're familiar with Dr. Kenneth Furton, correct?
11    A.   Yes, I am.
12    Q.   Okay.  Could you describe your professional
13  relationship with Dr. Furton?
14    A.   So in 1993 I conducted the first experiment with
15  Metro Dade County K-9 dogs, you know, drug dogs to start
16  this line of research on, you know, what are they smelling
17  and how much is it that it takes for them to alert
18  regarding specifically cocaine.
19        And, you know, I actually ran the first
20  experiment in the DUI lab that I was running at the time
21  after hours.  And from that point on, the -- the research
22  question was interesting to myself but I needed more
23  resources, which I didn't have the resources.  You kind of
24  need graduate students and rooms and equipment and funding
25  and so on.

1        And so I'd known Dr. Furton for, oh, I guess it
2  was the past few years, you know, regarding some other
3  chemistry questions and ideas.  And so I approached him
4  with this idea to, you know, set up an experiment or series
5  of experiments to test to try to determine what the K-9s
6  are alerting to and how much it's required for them to
7  alert, you know, kind of the minimum threshold.
8        And so my relationship with Dr. Furton was, you
9  know, academic, you know, research oriented, collegial, and
10  ongoing from, you know, about 1993 with this work to date.
11    Q.   Okay.  And so the research that you were just
12  referring to with Dr. Furton, this research influenced your
13  opinion in this case, correct?
14    A.   Well, that research is -- is part of the basis of
15  my opinion.  The other parts of the basis of my opinion are
16  my formal education, my formal training, and my formal
17  experience in the fields as I described at the beginning of
18  this deposition.  So it's part of the several, you know,
19  pieces that would, you know, comprise my area of expertise
20  regarding detector dogs.
21    Q.   Okay, gotcha.  So you mentioned I think you said
22  a threshold amount of, I don't know if you said methyl
23  benzoate or cocaine, but a threshold amount on paper
24  currency that would trigger a dog alert.  Is that a fair
25  characterization of what some of the research uncovered in

1  your mind is?
2    A.   Well, it would be a threshold amount of methyl
3  benzoate under controlled conditions.  And so that's
4  different, that's a different question and answer than, you
5  know, the amount of methyl benzoate on paper currency in
6  the field if you will.
7    Q.   That's a different question than in the field
8  because you're saying that the research didn't necessarily
9  emulate real world conditions?
10    A.   Well, it's that real world conditions don't
11  emulate research where one is able to control the important
12  variables.  So, you know, one has to take into account the
13  variables that may be in play in the field, and the
14  research is an avenue of understanding to then carry the
15  knowledge forward into the field.
16    Q.   Okay.  So tell me if this is -- if this is fair,
17  that there are at least kind of like two main parts of
18  some of the research that informs on your opinion in this
19  domain.
20        One, you determined the time it takes for methyl
21  benzoate to dissipate from paper currency; and, two, you
22  determined the amounts of methyl benzoate that dogs were
23  alerting to in the lab, is that fair?
24    A.   That -- that's part of, you know, what goes into,
25  you know, the process of understanding this.

1    Q.   Okay.  So the part with the dogs where you
2  basically had a number of dog teams, you exposed them to
3  different varying amounts of methyl benzoate and perhaps
4  there was also cocaine base that they were presented with,
5  too, correct?
6    A.   Yes.  It would be cocaine base, cocaine
7  hydrochloride and methyl benzoate and some of the other
8  constituents of illicit cocaine.
9    Q.   Okay.  So what I'm getting at, or what I'm trying
10 to get at, is that that research with those dogs that we're
11 talking about, if I have -- the exhibits that I provided to
12 you, if you look at Number 4, there -- there is a paper
13 that was authored by Dr. Furton and you're on there as I
14 guess a co-author at least, it's called Identification of
15 Odor Signature Chemicals, dot, dot, dot, is that -- that's
16 kind of a culmination of, or I should say, that's where the
17 research with these dogs gets put on paper and published,
18 correct?
19   A.   That's one publication.  There's several
20 publications and there's also many presentations that would
21 include the scientific method, the experimental,
22 protocol -- well, the hypothesis, the experimental
23 protocol, the data, and the interpretation of the data.
24 So, you know, there's a couple of different sources.  But
25 this is one of -- this is one of the publications that I

1  was involved in.
2    Q.   Okay.  So what I'm trying to get to is when I
3  look at this one, it talks about the Miami-Dade Police
4  Department.  The question I'm ultimately getting at is the
5  data that's used in this paper, let's start with this
6  paper, is from -- how many dog teams did you test in
7  this -- for this paper?
8    A.   Well, for this -- this single publication?
9    Q.   Yeah.
10   A.   Well, let's see -- let's see if that is detailed.
11   Q.   It looks like 15.
12   A.   Fifteen different K-9s in this experimental set,
13 yeah.
14   Q.   Okay.  So with those 15, were all those dog teams
15 from the Metro Dade Police Department?
16   A.   I believe so.  Let's take a look here.  Maybe --
17 let's see, if we go to page 7 of the document, maybe I need
18 to correct my prior answer.  It looks like we may have
19 had -- they have 29 dog teams, so that would have been
20 more.  I don't have a finite number.
21        But in exploring the issue of how many different
22 dog teams over the years for these experiments, I believe
23 that we're somewhere between 50 and 100 different K-9s that
24 have been tested.
25        And, you know, that information is contained in,

1  you know, these peer reviewed publications as well as the
2  dissertation of the graduate students that worked on the
3  project.  So, you know, there's much more information.  It
4  looks like -- okay, so they only acknowledge Metro Dade,
5  let's see.
6        Well, yeah.  Okay.  Go to page 8 of 9 on the
7  right-hand column.  The middle of the first paragraph it
8  says, "Overall, more than 120 field tests have been
9  performed in a similar manner testing more than 28
10 different detector dogs from 10 different local, state and
11 federal agencies."
12        So I think that's what's going to be the referral
13 for what's on page 7 showing all the different K-9 detector
14 teams.  I think there's, again, 28, 29.  I think 29 is the
15 highest number.  But that may be a conglomerate of, you
16 know, several, you know, research sessions.
17   Q.   Okay.
18   A.   Yeah.  That -- that would -- if you want, you
19 know, finer granularity of that information, I would have
20 to go research that for you, which I'll be happy to do.
21   Q.   Well, no.  What I'm really trying to get at is I
22 just want to make sure that with this data, and we're
23 talking about maybe 29 dogs, you mentioned that there were
24 other papers or presentations that happened on -- on this
25 general subject, dogs alerting to cocaine on currency.

1        Was there more data than these 29 that are
2  reflected in this paper that ended up in other papers or is
3  this basically exhaustive of -- of the data you have in
4  terms of experimenting on dogs to cocaine on paper
5  currency?
6    A.   No, I don't -- I don't believe that this is
7  exhaustive.  I think there's a number of papers that are,
8  you know, in the public domain.  And, again, there are
9  graduate publications.  They're available through ProQuest
10 for Master's thesis and PhD dissertations.  I have not been
11 asked to provide them.  But if I am asked, I will
12 diligently research all the graduate students that were
13 involved in the project since 1994-ish and -- and provide
14 them.  Am I being asked to do that?
15   Q.   I don't think I want to have anything done like
16 that on the spot.  But I would --
17        MR. BURCH:  I mean, Ben, maybe you have a
18 suggestion.  But if there are -- if there is other
19 data, if I could get pointed to the papers and the
20 publications that could let me see that other data.
21        MR. BAIN-CREED:  I think it's all on ProQuest
22 probably like Dr. Rose said.  I mean, we don't have
23 all that.  If you want, you know, if he has a list of
24 the people involved with these articles, it may
25 actually be on the articles, all the authors

1  themselves, I mean, you know.
2      That might -- but I think that's going to be a
3  major undertaking for whoever goes and searches
4  ProQuest.  But, I mean, he can probably -- it sounds
5  like Dr. Rose can fairly easily tell us like who
6  helped write, you know, these articles.
7      MR. BURCH:  Yeah.  Well, I mean, I'm not
8  concerned -- I'm trying to think about the best way to
9  do this.  But I'm not really concerned with like the
10  articles necessarily as I just want to know if there
11  was other dogs, like if there's data.  Because,
12  well --
13      MR. BAIN-CREED:  Are you looking for the title
14  dogs in all of these studies?
15      MR. BURCH:  Well, because -- like let me -- let
16  me try to ask Dr. Rose maybe another question, maybe
17  this will help clear it up.
18  BY MR. BURCH:
19      Q.  Because if I have -- if you look at what's -- you
20  did like an SPIE presentation at some point talking about
21  this subject, correct, Dr. Rose, or Furton did?
22      A.  What type of presentation?
23      Q.  S-P-I-E.  It's like a --
24      A.  Oh, SPIE, the SPIE journal.
25      Q.  Yeah.

1      A.  Yeah, there's a couple of publications under
2  SPIE.  Dr. Furton and I have both given talks on this
3  subject matter, Furton more than I over the last I guess
4  from '90 -- again, '94-ish, you know, to date.  And there's
5  been a number of graduate students that have gone through
6  the system and worked on the project.  And, you know,
7  again, I think I understand the question.
8      You want to know what the total envelope is of
9  the number of K-9 teams and their performance that have
10  been tested regarding this issue if I understand your
11  question.
12      Q.  Yeah.  Regarding the specific -- sorry to
13  interrupt.  But regarding the specific issue of drug dog
14  detection teams that were presented with methyl benzoate or
15  cocaine on paper currency to determine what a threshold
16  amount was.
17      A.  Right.
18      Q.  I just want to know that I have all of, if I can
19  get it, all of the raw data in paper form or whatever.
20      A.  Right.  So, you know, paper currency, I mean,
21  there's a lot of research that was done with stainless
22  steel boxes and -- and metal cans, not just paper currency,
23  you know.  The breadth of the research, you know, took us
24  to ask and answer several different types of questions.
25      But, again, if I'm tasked with, you know,

1  answering, you know, your question for the entire scope of
2  the research that would have been put in writing in a
3  formal way and, you know, thesis and dissertations, they're
4  peer reviewed, they're reviewed by the faculty, so if I'm
5  tasked with doing that, then, you know, I'll do it to the
6  best of my ability.
7      It's just that, you know, the two lawyers, you
8  know, would have to come to agreement about, you know, what
9  the -- what the scope is and who's going to pay for it for
10  time and so forth.
11      MR. BAIN-CREED:  I think it's a pretty big
12  hearsay kind of field where he's like reviewing other
13  people's journals to tell you what other people said
14  that they did that he wasn't involved in.  I mean,
15  maybe the solution is he tells you how many dogs have
16  been involved in the studies in which he's been a
17  co-author or something like that.
18      MR. BURCH:  Yeah.  I mean, I think that's what I
19  was getting after --
20      MR. BAIN-CREED:  Okay.
21      MR. BURCH:  -- I mean, the one.  Because
22  obvious -- yeah.
23      MR. BAIN-CREED:  That seems like a surmountable,
24  you know, hill to climb for the dogs to study -- the
25  amount of dogs in the studies that he's a co-author

1  on.  Can you do that, Dr. Rose?
2      THE WITNESS:  Okay.  So, all right, I have a
3  better idea on the -- the requirements.  So, you
4  know, I can, you know, to the best of my ability, look
5  at the history of all of this work and answer, you
6  know, a few fundamental questions.
7      How many dog teams, you know, do we have data
8  sets, you know, that are published?  And they would be
9  in some of the, like I say, some of the sources that
10  we discussed.  And then I could, you know, I can
11  present that, you know, I could deliver that as a
12  document or a series of documents that would have
13  memorialized what you're asking.
14      MR. BAIN-CREED:  Ed, I don't want to tell you how
15  to do your deposition, but do you think you could
16  simplify the question for him such like, you know,
17  that more than a hundred or less than 200, something
18  like that?
19      MR. BURCH:  Yeah, that's what I was just going to
20  ask.
21  BY MR. BURCH:
22      Q.  So off the top of your head, do you think that
23  there's a bunch of other dog groups that formulated the raw
24  data of your own research?
25      A.  Well, you know, I was part of a group, right?  I

1  was involved in this research for about 20 years one way or
2  another.  So I believe that there was somewhere between 50
3  and 100 different K-9s.  Now there may have been more than
4  one K-9 per human handler.  But in terms of, you know, the
5  K-9, okay, I think, you know, that's a fair estimate right
6  now.
7       To give you a firm number, I got to go back and
8  look through the historical records.  Which, like I say,
9  I'll be happy to do as long as, you know, you two, you
10  know, come to some kind of agreement as to breadth and
11  depth and scope and time and so on.
12      Q.   Okay.  And that's specifically with dogs,
13  cocaine/methyl benzoate and currency?
14      A.   Right.
15      Q.   Okay.
16      A.   I would not include, you know, amphetamine or
17  methamphetamine or any of the other narcotics.  So it's
18  just cocaine and methyl benzoate.
19      Q.   Okay, gotcha.  So I think -- well, let's table
20  that, and Ben and I can have a conversation after the
21  deposition or something because I don't want to take up our
22  time here.  We'll figure it out or agree to not figure it
23  out.
24       I think what I'll do is I'll focus my questions
25  that I'd like to ask then on just this Number 4, we have a

1  specific data set with maybe about 29 dogs that were used.
2  I'm going to ask my next set of questions just about this
3  specific experiment with these specific dogs that made it
4  in this paper.  Does that make sense?
5      A.   I have Exhibit No. 4 open.
6      Q.   All right.  So I just want to know about, confirm
7  a couple things.  The dogs in this experiment, for you to
8  kind of get to the papers kind of conclusion about the
9  threshold amounts, they were presented with a single dollar
10  bill with varying amounts of substance on it, correct?
11      A.   Hang on, let me check the material in the method
12  section here.  Okay.  So it looks like the experimental
13  protocol of the testing for the -- K-9s themselves,
14  this is on page, let's see -- well, yeah, it's page 5 of 9
15  on the left-hand column, it looks like the last paragraph.
16       So this was an experimental protocol with steel
17  boxes with holes and containing one dollar denominations of
18  U.S. Currency.
19      Q.   Okay.  Now are you aware of -- let's start with
20  your own research that you were involved in.
21       Did you ever do any experiments with drug dogs
22  and stacks of currency that possibly had varying amounts of
23  cocaine on it?
24      A.   You're talking about bundles?
25      Q.   Yeah, instead of a single bill.

1      A.   Bundles were used in with some of the teams doing
2  their training and certification.  I don't know if it's
3  published, that I would have to search.
4      Q.   Now going back to the methyl benzoate -- and we
5  probably didn't even cover this because we just dived in
6  really quickly -- in your opinion, methyl benzoate is the
7  dominant odor of cocaine that dogs noses actually detect,
8  correct?
9      A.   Well, the evidence from the research shows that
10  that is true.
11      Q.   So you did -- I hope it's part of this paper
12  because that would make things easier.  But you did an
13  experiment where you put varying amounts of methyl benzoate
14  on a dollar bill and you basically timed to see how long
15  that would take to dissipate, is that correct?
16      A.   That -- that was the evaporation study, yes.
17      Q.   Right, okay.  Is that -- is that this paper or is
18  that another paper?
19      A.   I don't -- I don't see it here.
20      Q.   Okay.
21      A.   Let's see.
22      Q.   Maybe it's just referred to or something.
23      A.   Okay.  The experimental data is on a different
24  publication.  You want me to show it to you?
25      Q.   Or if you could just name it, name the first

1  title of the first couple words and year I'll probably --
2  I'll probably know it.
3      A.   Okay.  Well, it's this one right here
4  (indicating.)
5      Q.   Field and Lab, okay.  Oh, yeah that's -- that's
6  my Number 12.  Okay, I gotcha.  All right.
7       So in that one --
8      A.   Here's the experimental data right here.
9      Q.   Gotcha.  So could you -- let's see, simply put,
10  you're putting different amounts of methyl benzoate on the
11  currency and finding out how long it takes to go away, is
12  that fair?
13      A.   Well, the interpretation of -- of this graph is
14  that the evaporation rate is very fast on the open and --
15  and it's much slower for -- it's very fast in the open for
16  a single bill, it's very slow with a stack of bills because
17  the -- the important variable is total surface area that's
18  exposed for evaporation.
19       So, you know, that would be the fundamental idea
20  for understanding how methyl benzoate, you know, may or may
21  not be present with, you know, one big stack of bills or
22  multiple stacks of bills.  Then one would, you know, start
23  to understand that by calculating the total surface area
24  and relating that to, say, a single bill or group of bills
25  that were, you know, flat out on the open and able to

Page 42

1  evaporate.  So that's the -- the basic idea there.
2  　　Q.  All right.  So going back to Number 4 with the
3  study where you're talking about, more talking about the
4  dogs alerting to different threshold amounts I guess I'll
5  say it.  But in that -- in that study, or I should say in
6  that experience that underlies that paper, there was
7  multiple dogs that were hitting on -- let me start.
8  　　　　Ultimately you did conclude that the threshold
9  amount that most dogs would hit on is one microgram of
10 methyl benzoate, correct?
11 　　A.  One microgram?
12 　　Q.  Yeah.
13 　　A.  I think if -- if you look at the evidence, the
14 evidence shows that we start to get somewhere in the
15 neighborhood of 50 percent response, depending on the group
16 of dogs, 50 percent of the group of dogs responding at one
17 microgram and then you get close to 100 percent with 10
18 micrograms.
19 　　　　So there's a -- there's a range, you know,
20 there's a threshold of olfaction.  Some dogs are a little
21 better at detecting smaller amounts; and other dogs, they
22 need a larger amount in order to give a positive alert.
23 　　Q.  Okay.  And multiple of the dogs in that
24 experiment actually alerted on .1 micrograms, correct?  Or
25 at least I should -- let me rephrase it this way.

Page 43

1  　　　　There were multiple alerts on .1 micrograms of
2  methyl benzoate, correct?
3  　　A.  We'd have -- you'd have to go to the -- the
4  section of the paper that had that data.  I'd have to
5  review that data.
6  　　Q.  Okay, no problem.  Like I said, I don't want to
7  make you dig through your papers.  I'm just trying to get
8  some context.
9  　　A.  Well, I think -- I think what, you know,
10 prevailed throughout was, you know, the idea, you know, in
11 the test -- the experimental protocol and the test methods
12 that we use, okay, and so that -- that's very important to
13 know that, you know, under the controlled conditions that
14 we use, we found that 1 microgram of methyl benzoate
15 appeared to be the threshold and then 10 was the -- was the
16 amount in that experimental protocol where most of the
17 detector dogs reliably alerted.
18 　　Q.  All right.  So with methyl benzoate, is it -- do
19 you agree with this statement that cocaine is constantly
20 generating methyl benzoate?
21 　　A.  Well, that statement is partially true.  Cocaine
22 is constantly generating methyl benzoate when the
23 conditions are ideal for that occur.  And those conditions
24 would include that the cocaine be in the base form, not the
25 hydrochloride form; that there be a methylating agent

Page 44

1  present.
2  　　　　Like methanol, for instance, is a -- is a
3  methylating agent, okay, and that the temperature and
4  humidity be favorable for that chemical reaction to occur.
5  So that would be the answer to your question.
6  　　Q.  Okay.  I guess I just want to -- bear with me.
7  Still sticking with this Number 4, Exhibit No. 4, that is
8  your paper with the dogs and the methyl benzoate on
9  currency, there's a line in there on page 9 --
10 　　A.  Okay.
11 　　Q.  -- and it says that most dogs alerted to a
12 15-year-old gram of street cocaine.  Do you remember that?
13 　　A.  That's on page 9?
14 　　Q.  Yeah, page 9.  And it's on the first paragraph,
15 four lines from the bottom of that first paragraph.
16 　　A.  Yes, I see that.
17 　　Q.  So if dogs are alerted -- they smell -- they
18 detect methyl benzoate and a gram of street cocaine is just
19 sitting there and it makes them alert because methyl
20 benzoate is present, is that accurate?
21 　　A.  Could you say that again, please?
22 　　Q.  Yeah, let's see.  Dogs alert to methyl benzoate
23 in your opinion, and there's a 15-year-old gram of street
24 cocaine hanging around that has generated enough methyl
25 benzoate that most dogs are actually alerting to it, is

Page 45

1  that -- that's accurate?
2  　　A.  Well, okay, the answer is partially.  It appears
3  from the evidence that methyl benzoate is the dominant odor
4  that the K-9s are trained to alert to.  So, in other words,
5  if one takes a look at illicit cocaine and the odor profile
6  that illicit cocaine has, illicit cocaine is manufactured
7  in a clandestine way differently, depending on the
8  clandestine laboratory, and the composition of the cocaine
9  varies from lab to lab and even from batch to batch.
10 　　　　So the odor profile varies from, you know,
11 illicit batch to illicit batch.  But, universally, methyl
12 benzoate is found.  So there are other odor, we call them
13 odorants, there are other odor characters in illicit
14 cocaine that may be associated with the K-9 being trained
15 and alerting to the odor of cocaine, but methyl benzoate
16 would then be the dominant odor.
17 　　　　So there may be some secondary tertiary odors
18 that they'll associate with methyl benzoate and go, ah, it
19 smells a little different, but, you know, it's good enough,
20 right?  Because we smell the methyl benzoate and, you know,
21 it's the right -- it's the right odor profile that the dog
22 was trained to, okay.
23 　　　　So in this case, you know, one gram of a
24 15-year-old street cocaine sample, and I don't see that
25 there's anymore detail here how it was stored, what

Page 46

1  temperature, you know, if it was powder or rock or some
2  combination, so, you know, this would, though, confirm that
3  cocaine can have the characteristic odor of what the
4  detector dogs are alerting to, you know, if it's stored in
5  a manner that preserves the odor, you know.  That's all
6  that's saying.
7      Q.  Okay.  So the -- the paper we were talking about
8  earlier where you were -- what was that number, it was the
9  Field and Lab, Number 12, you determined that methyl
10  benzoate dissipates at a certain rate, I believe you said
11  like to below detectable levels in an hour and a half or
12  two hours or something like that, correct?
13      A.  Well, the evidence -- the evidence in that
14  experiment shows I think clearly, you know, what was
15  happening.  On a single bill it shows within two hours, 90
16  percent of the amount that was put on the bill evaporated.
17  Where, depending if the methyl benzoate was placed on a
18  stack of ten bills or in between ten bills, the rate of
19  evaporation was much slower.
20      Q.  Right.  So I guess I -- not from this case
21  necessarily, but I've heard you opine that dogs won't alert
22  to gen -- they wouldn't alert to currency unless it had
23  recently been in contact with cocaine because it's your
24  opinion that the methyl benzoate dissipates by an hour and
25  a half, two hours, is that fair that you -- that you hold

Page 47

1  that opinion?
2      A.  Well, you know, without agreeing to some prior
3  testimony that I haven't had a chance to review, I guess I
4  would respond by saying that depending on the
5  circumstances, circulated currency that is innocent
6  circulated currency has been shown to not have the odor of
7  methyl benzoate, plus any other odor of illicit cocaine
8  that properly trained K-9s alert to.
9      So if they're alerting, then that means that
10  there's enough odor present to trigger the alert in the
11  K-9.  And, you know, based on what we know about the
12  physical chemistry of methyl benzoate out in the open on
13  currency, that recency is important, okay.
14      So we would not expect circulated currency that's
15  been laying, you know, out in the open for, you know, weeks
16  and months to have enough odor for a properly trained K-9
17  to alert to.  And I think, you know, perhaps that's the
18  prior testimony you're alluding to.
19      Q.  Okay, yeah.  So the flip of that, though, is that
20  then, if I'm following you, if it's been kind of contained,
21  you might expect it to retain that odor, correct?
22      A.  Well, under certain circumstances and depending
23  on the container and the length of time and the temperature
24  and the humidity and those other variables we discussed, I
25  would expect the odor to be retained for a longer period of

Page 48

1  time than, you know, currency that's not in a container.
2      But, you know, the whole concept of circulated
3  currency is, you know, is that it's in circulation and
4  it's, you know, not in a container, so that's the idea.
5      Q.  Okay, I gotcha.  So I want to do -- I hope you
6  can bear with me on this one.  I'm going to ask you to -- I
7  want to kind of wind -- wind-up for a
8  hypothetical question based on getting into some numbers
9  with methyl benzoate, so I'm going to ask you to open up
10  what I've marked as Exhibit 15.
11      A.  Okay.
12      Q.  And I'll just tell you and everybody that this is
13  just -- this is just charts that I've had from other
14  briefing that I've done.  And this basically takes the
15  numbers that are in the research of amounts of cocaine and
16  your own studies about the relationship to cocaine amounts
17  and methyl benzoate to kind of ultimately determine like
18  what a hypothetical amount of bills would be to have a
19  certain amount of methyl benzoate.
20      So if we start from the beginning, that first
21  part I'm just going to ask you to kind of follow along with
22  me, and then I'm going to ask you at the end, you know,
23  like what's wrong -- is there -- do you agree or do you
24  disagree, do you take issues with something I've done in
25  this calculation let's say.

Page 49

1      So if you start at that Roman Numeral I, I have
2  taken the numbers of these publications by Hearn, Oyler,
3  Jenkins, Zuo, and Negrusz, and those are -- maybe I should
4  start just by looking at that and saying those names.
5      Do those mean anything to you if I told you those
6  were the authors of papers on this subject?
7      A.  Yeah.  I'm familiar with, you know, the authors
8  that have published that work.
9      Q.  Okay.
10      A.  I'm familiar with the names.
11      Q.  Okay.  So are you familiar with a paper by Jay
12  Poupko and others where he kind of did a review of the
13  publications on cocaine and paper currency and methyl
14  benzoate?
15      A.  Are you talking about the 2017 opinion paper?
16      Q.  Yes.  And I have it -- I have it marked as Number
17  11 if you want to look.
18      A.  I guess if I know the date, I'm familiar with it.
19      Q.  Yeah, fair enough.  So we're talking about the
20  same thing.  So, anyways, I think probably these numbers
21  are laid out in that paper because it's a review paper.
22      So is that your recollection of that paper?
23      A.  I reviewed the, you know, that opinion paper when
24  it first came out, yes.
25      Q.  Okay.  So this -- so number one gives you

Page 50

1  basically what these different studies have showed you,
2  gives you the amount of cocaine found in just circulated
3  currency, and they ultimately give you that, as I say
4  below, that the contamination was from .4 -- .14 micrograms
5  to 1327, which gives you a mean of 5.25 to 663.
6          You follow me so far, microgram amount?
7  A.   That -- that's an incorrect statement.
8  Q.   Okay. Tell me where I screwed up.
9  A.   Well, a mean -- a mean is a single number, so
10 pick your mean. A mean doesn't have a range.
11 Q.   Yeah. Well, actually, then let's just stick to
12 the -- the range being what they found is .14 to 1327
13 micrograms. Follow me?
14 A.   Sure.
15 Q.   Then we go to Roman Numeral II. And these
16 numbers of methyl benzoate and cocaine hydrochloride is
17 point .01 to .036% weight to weight, that's from your
18 study. Does that ring a bell or do you agree that that's
19 the weight to weight relationship?
20 A.   I understand where you got the numbers from, it's
21 the interpretation of what the numbers mean. But, you
22 know, go ahead. We'll get to the question and then I'll
23 give you my answer.
24 Q.   Yeah. You can lay into me and tell me how messed
25 up I am. But I just want to make sure you're following as

Page 51

1  we go along.
2  A.   Look, that's not -- that's not my -- that's not
3  my intention, you know, or goal. This is a fairly complex
4  area --
5  Q.   Yeah.
6  A.   -- that's interdisciplinary. And, unfortunately,
7  there's been a lot of miscommunication about this
8  information from other authors in the field. And perhaps
9  I'll have an opportunity here today to, you know, respond,
10 you know, in a meaningful way that will, you know, set the
11 record straight a little bit.
12 Q.   Okay, great. Yeah. So if we go to number three,
13 we're just using those numbers of that percentage that we
14 got from your research and applying it to the numbers from
15 the different studies of what they found cocaine on the
16 circulated currency, and it gives you this, you know,
17 different varying microgram amounts for each of the
18 different studies that found cocaine on currency.
19          You follow me there?
20 A.   Yeah.
21 Q.   Does it make sense what I did there?
22 A.   Sure.
23 Q.   All right. And then we go to number four and
24 then we kind of fuse that all. And so if we follow that,
25 knowing that you have determined the threshold amount for

Page 52

1  dogs to alert is one microgram of methyl benzoate and if we
2  take all those numbers that we just talked about, you have
3  as low as, looking at the Oyler, that you would only need
4  one bill to have enough methyl benzoate to the high of a
5  thousand bills or let's say 667 in the Hearn, for example,
6  okay, but there's a range, and it's a relatively small
7  amount of bills.
8          And so in this case, I want to say we had I
9  believe it was 12,000 and some odd bills that were seized
10 and alerted to. So tell me -- so let me -- how do I want
11 to phrase the question.
12          Do you disagree with that assessment that
13 potentially general circulation you would only need way
14 less than just than a few thousand that you would expect a
15 dog to alert given that amount of methyl benzoate that I've
16 gone through in this chart?
17 MR. BAIN-CREED:  Ed, I'm just going to object to
18      the form because I'm not sure I understand where we
19      are in the Roman Numbers IV and V, and it looks four
20      refers to 15 dogs as opposed to 29. And, frankly,
21      could you just rephrase the question for all of us?
22      That would be my objection.
23 MR. BURCH:  Sure.
24 BY MR. BURCH:
25 Q.   Well, I think maybe ignore my commentary, Dr.

Page 53

1  Rose. But did you follow me at least on the charts and to
2  how we got to this number that allows you to say that you
3  would only need 67 bills from the Hearn study to give you
4  the appropriate amount of methyl benzoate for an alert,
5  does that make sense?
6  A.   Yeah. The -- the analysis here on these two
7  pages is, it's all wrong.
8  Q.   Okay.
9  A.   And for -- for a number of reasons, okay. The
10 first reason is that circulated currency is like a stream
11 of paper bills on a conveyor belt. And it's a different
12 population of bills, you know, every time the Fed takes in
13 the old beat-up, used currency and destroys it and then
14 puts new currency into circulation.
15          And so, you know, taking an outlier of 1327
16 micrograms, which, you know, that's probably visible
17 amounts of cocaine, okay, because that would be 1.3
18 milligrams, and, you know, that would be falling off in
19 chunks on a table. So although -- although it's been
20 measured and that's what they found, that's a rarity.
21          And this is -- this is a lesson in statistics.
22 This is how one outlier can skew the mean so that when the
23 mean is used to calculate, you know, other -- other
24 measurements and outcomes, it skews the results. What's
25 typically found on circulated currency are very small

1 amounts, okay, microgram amounts in single digits, maybe
2 double digits, okay. And so in the world of
3 reasonableness, then that's the number that has to be used,
4 okay. That's number one.
5     Number two, what has to be determined in any
6 population of bills if -- if one is arguing that there is
7 prolonged presence of methyl benzoate odor because of
8 ongoing production of methyl benzoate from illicit cocaine,
9 then one has to show that the cocaine is cocaine based, not
10 cocaine hydrochloride. That's -- that's already been
11 established multiple times. That's not a disputed
12 scientific fact, okay.
13     Then what would have to be shown is that these
14 bills, you know, were not exposed in circulation for any
15 great length of time because whatever methyl benzoate was
16 present would evaporate, you know, very quickly, okay.
17     Then we talk about the amount -- the number of
18 bills that would be required with a given amount of cocaine
19 producing a certain amount of methyl benzoate, and that is
20 probably the most inaccurate calculation because the
21 production of methyl benzoate gas, because that's what the
22 dogs are smelling, they're smelling a gas, not a liquid and
23 not a solid, the production of methyl benzoate gas is
24 dependant in part on temperature and surface area, total
25 surface area of the bills that are exposed to the air,

1 okay.
2     So if we take a look at -- if we use -- and I
3 did -- I did a little hand calculation here before the depo
4 I have on a worksheet. So if we take a look at my -- my
5 example is if every bill had one microgram on it, and
6 that's 12,147 individual bills, if each bill had one
7 microgram on it, okay, then that would be around 12
8 milligrams of cocaine. And that's assuming -- that's
9 assuming that the cocaine was all on the surface of the
10 bill, not imbedded in the interior of the bill.
11     That's another variable, which you can have very
12 little on the surface of the bill and most of it on the
13 interior of the bill. But I'll give it the benefit of the
14 doubt and let's just say it's all on the exterior surface
15 of the bill, so that would give us about 1.2 micrograms of
16 methyl benzoate.
17     So if -- if we had all 12,147 bills spread out on
18 a table or the floor, there -- there might be enough methyl
19 benzoate if all the cocaine -- if all the bills were
20 contaminated with cocaine and all the cocaine was on the
21 surface and all the cocaine was a base and -- and there was
22 enough methylating agent to produce methyl benzoate. So
23 you'd have to satisfy all of those prerequisites, okay, and
24 have it spread out, you know, all over the floor. But
25 that's not how this currency was found, this currency was

1 found in bundles.
2     So let's take a look at bundles. So it takes --
3 it takes if we have 222 bills in a stack, there's about 29
4 square inches of surface area. So that gives us about 55
5 stacks, okay, of the 12,147 individual bills, or about
6 1,587 square inches, which gives us about 11 square feet of
7 surface area, okay.
8     And then -- and then, let's see, 11 bills --
9 let's see, 11 bills gives us about 121 square feet of
10 surface area, times 11 bills is a square foot, times 11
11 square feet, so we get about 121 square feet of surface
12 area that would be required of the stacks, and that would
13 be approximately 90,000 square feet necessary of surface
14 area for one microgram per bill.
15     And so it's just not possible for that small
16 amount of methyl benzoate, even if it were being produced
17 by cocaine base with the presence of a methylating agent
18 like methanol, okay, to cause the properly trained drug dog
19 to alert. So it just doesn't add up.
20     When you take a look at the reality, you know, in
21 the field, you know, compared to the -- this is kind of a
22 patchwork quilt piecemeal assembly of facts, you know, from
23 one publication to another to another and not taking into
24 account these variables. So it just doesn't make -- it
25 just doesn't make, you know, any sense.

1     And if this were true, if this were true, you'd
2 have every drug dog in America alerting on every little bit
3 of paper currency that they come into contact with. I
4 mean, it would be an epidemic of false alerts. And in my
5 experience, I don't see that.
6 Q. So your notes, is it possible to -- normally if
7 we were all in the same room, I would just say let's burn a
8 copy and can we mark that as Exhibit 16?
9 A. Well, what I have to do -- sure. In response to
10 your question, what I have to do is I have to finesse it a
11 little bit because I have some crossouts and some things
12 that aren't clear. So what I have to do is I have to turn
13 this into a more formal document, which I'll be happy to do
14 and -- and provide to you.
15     MR. BAIN-CREED: Ed, Dr. Rose is writing a
16 rebuttal report, which we had planned to provide, that
17 will be fairly simple. But would that satisfy your
18 request?
19     MR. BURCH: I mean, if it has the calculations.
20 Only because as he's talking, it's pretty fast and
21 it's got a lot of numbers I obviously wasn't able to
22 write down everything. So I just would like to see
23 the numbers that he's talking about.
24     MR. BAIN-CREED: Yeah. I don't know if Dr. Rose
25 has just like a scratch sheet in front of him, if it

1  just has a bunch of numbers that he's crossed out.  It
2  may not mean anything to you.  But, you know, if Dr.
3  Rose doesn't consider it a draft report, then I'm
4  comfortable with him putting it up on the screen for
5  the court reporter to screen shot it if he wants to.
6       MR. BURCH:  Okay.
7       THE WITNESS:  Just in response, this is not my
8  final work product, and I haven't had time to label it
9  or proof it.  But the concept is the same, that
10  there's not enough surface area in the stacks of bills
11  to provide enough methyl benzoate, as we've discussed,
12  for the K-9 to alert.
13       So, you know, what I'd prefer to do so this
14  doesn't work its way into the record is to, you know,
15  let me produce a final copy that's labeled, that's a
16  proper worksheet.  So that way, you know, there's no
17  confusion that prevails upon the Court or anybody else
18  looking at this versus my rebuttal report.
19       MR. BAIN-CREED:  Ed, do you -- I mean, would you
20  be satisfied if he affixed his, you know, cleaned up
21  copy of his sheet there to his rebuttal report?
22       MR. BURCH:  Yeah, I think so.  Like I said, as
23  long as I get the numbers and just so -- I didn't
24  scribble them down.  You're saying he's going to
25  attach it to his rebuttal report and not as sort of an

1  addendum to the deposition?
2       MR. BAIN-CREED:  Well, either way.  I mean, we
3  can do it either way.  I think he's got a paper there
4  that he's been going over and we would be sitting in
5  person, you know, going through these numbers with him
6  writing it out.
7       MR. BURCH:  Yeah, okay.  All right, that's fine.
8       MR. BAIN-CREED:  I'll talk to him about it
9  afterwards and see, you know, just to help you make
10  sense of what he just said.  I mean, it may be
11  something that's not helpful until you can actually
12  look at the transcript and then look at the piece of
13  paper, I guess.
14       MR. BURCH:  Okay.
15       THE WITNESS:  Yeah.  And I have to label
16  everything so that everybody knows where the number
17  comes from, what the calculation means, and how I get
18  to the next step, you know.  It's a show your work
19  kind of thing.
20       MR. BURCH:  Okay.  All right.  Let's move --
21  that's fine, we'll do that and I'll wait for a --
22       MR. BAIN-CREED:  Dr. Rose, just keep that piece
23  of paper and just talk about it with me after the
24  deposition.
25       THE WITNESS:  Okay.

1  BY MR. BURCH:
2       Q.  All right.  Just a couple of follow-up questions
3  on all that, it was a lot.
4           You mentioned that essentially that the bills
5  would need to be spread out on the table.  Is there some
6  published research that tells you that?
7       A.  That was in the previous publication that we
8  discussed that showed the evaporation rate on a single bill
9  versus a stack of ten with the methyl benzoate put on top
10  or in the middle of the stack, that evaporation rate.
11      Q.  That's what we have labeled as No. 12, and it's
12  Field -- Field and Lab, dot, dot, dot from '98, I think,
13  correct?
14      A.  Yeah.  On page -- page 5 of 7, figure three
15  describes that phenomenon.
16      Q.  All right.  And then the next question is when we
17  were talking about in the other paper the number four, the
18  identification odor paper from '02, I believe, we were
19  talking about 15-year-old gram of cocaine that was causing
20  dogs to alert.
21          Was there a methylating agent involved there that
22  contributed to the generation of methyl benzoate in that
23  gram, 15-year-old gram sample?
24      A.  I don't know the analysis of that example.
25      Q.  Okay.  All right, let's -- let's move on a little

1  bit.  That methyl benzoate is a heavy subject.  It's like
2  the micrograms and everything sometimes gets my brain
3  scrambled.  But let's move on to non-cocaine drugs.
4          Just -- well, do we have -- the dog in this case
5  was trained to alert to other drugs, correct?
6       A.  That's my understanding, yes.
7       Q.  And just dog alerts, you don't know which drug
8  he's alerting to, correct?
9       A.  That's right.  In this case, you know, there's
10  not a separate alert for you, you know, each different drug.
11  So it's the same alert for all the drug odors.
12      Q.  Okay.  And is there any published research that
13  you know about that talks about the dominant odor of these
14  non-cocaine drugs?  I'll just end the question there.
15          Do you know any published studies that talk about
16  what the dominant odor is of non-cocaine drugs?
17      A.  I'm aware -- I'm aware that there's a line of
18  research that has investigated the odor signature of other
19  narcotic substances or illicit substances that K-9s will
20  alert to, but that's not my expertise for the purpose of
21  working this case.
22      Q.  Okay.  And one more follow-up on that.
23          Do you know of any research that talks about the
24  dissipation rates of those dominant odor chemicals of the
25  non-cocaine drugs?

1    A.   Yeah.  I'll give you the same answer, it's not
2   the subject of my expertise in this case.
3        Q.   Okay.  And sorry to make this record, but do you
4   know of any studies of threshold amounts of these
5   non-cocaine dominant odors that would trigger a dog alert?
6        A.   Yeah, I'm aware of lines of research exploring
7   that question.  But, again, not the purpose of my work on
8   this case.
9        Q.   Okay.  So then I want to move on, I'm nearing the
10  end here.  What time is it?  All right, let me see if it can
11  knock this out really quick.
12            MR. BURCH:  Is everybody okay if I can just plow
13       of plow through the last few minutes here?
14            MR. BAIN-CREED:  (Nods head.)
15  BY MR. BURCH:
16       Q.   All right.  Are you familiar with an organization
17  called I'm going to call it SWGDOG, S-W-G-D-O-G?
18       A.   Yes.
19       Q.   Okay.  Are you a part of that organization or
20  were you?
21       A.   I was initially on that committee but then
22  withdrew.
23       Q.   When did you withdraw?
24       A.   Sometime after I was on the committee initially.
25       Q.   Do you know approximately what year?

1    A.   No.
2        Q.   Were you on the committee in 2011?
3        A.   I don't -- I don't recall the dates.
4        Q.   Okay.  Well, let me just cut to the chase then.
5             If you open up what I have marked as Exhibit 6,
6   are you familiar with that document?
7        A.   I may have seen it before.
8        Q.   Okay.  So I notice that Dr. Furton is on here,
9   his name is on here as I guess presumably somebody who --
10  it says he's a subcommittee chair.  So the fact that you're
11  not listed, does that suggest to you that you were not part
12  of the subcommittee that had anything to do with writing
13  this?
14       A.   Yeah, it may -- it may be.  Curiously, at that
15  time, it required a lot of travel for everybody to
16  actually, you know, leave their work and go someplace and
17  sit at a table and have these discussions.  And, you know,
18  I -- I brokered, I mean oddly enough, online video meetings
19  to accomplish the goal because the traveling was an
20  interruption to my other professional activities, so that's
21  why I withdrew from the committee.
22       Q.   Okay.  I'm sorry.  Are you familiar with this
23  particular document, the substance of it?
24       A.   I may have seen it before.  I mean, I don't have
25  this committed to memory, so I'd have to review it.

1        Q.   Well, let me see how I want to do it.  It's not
2   so long, it's two pages.  But there's a couple things in
3   there, and I just want to get whether or not you agree with
4   the general concept.  So I wonder if -- I mean, is it too
5   burdensome to ask you to read over it really quickly and
6   let me know when you're done?
7        A.   Here's the thing, why don't you just -- I'm
8   familiar with the standards that have been discussed and
9   promulgated.  Why don't you just get to the part of
10  interest and I'll -- and I'll take a look at that
11  paragraph.
12       Q.   All right, that's fair.  Let me -- the first
13  thing I'm kind of curious about is the gist of what this
14  is.  Let me set this up.
15            Lisa Lit out of UC Davis did this study.  Are you
16  familiar with that study?
17       A.   Who is the researcher?
18       Q.   Lisa Lit at UC Davis?
19       A.   That name -- that name sounds familiar.  That's
20  L-i-t-t, I think, right?
21       Q.   Yeah.  So, no, just a single T.
22            Anyhow, Lisa Lit did a study with some other
23  people and published a peer review paper.  Basically, a
24  bunch of drug dogs -- drug dogs and explosive dogs did an
25  experiment, and it showed that they were basically falsely

1   alerting when the handler believed that there was something
2   that the dog should be alerting to.  So it's called, you
3   know, "handler beliefs affect working dog outcomes."
4             So the SWGDOG paper that we're looking at here is
5   just a critique of that study.
6        A.   Uh-huh.
7        Q.   So one of the main critiques is that they say we
8   don't really know if these dogs were well-trained because
9   training of dogs vary, so you shouldn't necessarily
10  extrapolate from these couple dozen dog teams to say that
11  this applies to all dog teams everywhere.
12            Do you agree with that?
13       A.   Which section is it in this SWGDOG document?
14       Q.   Well, let me see.  It's the very last -- very
15  last paragraph on page 2.
16       A.   Okay.  Okay.
17       Q.   And so I'm just asking if you agree with their
18  critique that you shouldn't extrapolate from 18 dog teams
19  to say that that's going to -- their behavior is going to
20  say that every dog team in the world is going to do the
21  same thing.
22       A.   Well, I don't think I've every suggested that the
23  performance of one team or 18 teams or 180 teams would
24  apply to every K-9 team on the planet.  I think my position
25  is that every K-9 team has to prove their performance.  And

1  the way that they prove their performance, you know, from
2  my point of view is to provide the documentation and the
3  testimony and the records of the K-9 team's performance on
4  an individual, you know, one-by-one basis.
5          I don't think that I've suggested at all in, you
6  know, either my report or my testimony today that some
7  other team's performance somehow predicates the performance
8  of, you know, the incident K-9 team in any given case like
9  this case.
10     Q.  Yeah, okay.  The other part of it is that I want
11  to just get your -- see whether you agree with the
12  sentiment on page 2 and it's the last paragraph, and I'll
13  just read the specific part that I'm interested in.
14          It says, "The failure to evaluate the proficiency
15  of the canine teams in a controlled blind setting at the
16  time of testing prevents scientifically valid conclusions."
17  Do you agree with that?
18     A.  Okay.  Where is that in the last paragraph on
19  page 2?
20     Q.  Yeah.  Oh, I'm sorry.  It's page 1, but for
21  whatever reason it's marked as -- the stamp on the top is
22  page 2.  So it's page 1 of the two-page document, last
23  paragraph about three lines down.
24     A.  I see it.  Let me read it, please.  (Reviews
25  document.)  So you're asking if I agree with that

1  statement?
2     Q.  Yeah.
3          MR. BAIN-CREED:  Ed, can you repeat the question
4      because I don't -- go ahead.
5          MR. BURCH:  Yeah.
6  BY MR. BURCH:
7     Q.  The statement is, "The failure to evaluate the
8  proficiency of the canine teams in a controlled blind
9  setting at the time of testing prevents scientifically
10  valid conclusions."
11     A.  Okay.  So, you know, look, I'm not sure, you
12  know, exactly what that means, you know.  In my experience
13  locally here in Florida, you know, the K-9 teams would
14  undergo training and then certification or testing.  And
15  during the testing phase, it was blinded.  The K-9 handler
16  would not know -- a number -- a number of hides would be
17  set up, and the handler would not know which of the hides
18  had the blank, the negative control, you know, or the
19  positive control, the actual find.
20          So, you know, from that point of view, you know,
21  I'm in agreement that -- that the K-9 and the handler
22  should not know when they're being tested, they should not
23  know which is the blank and which is not the blank.  I
24  mean, you know, for instance, we did a lot of work with
25  Florida Highway Patrol and that's how they did their

1  testing, that was their program.
2     Q.  Okay.  So to be -- so do you agree that -- well,
3  how do I want to put this.  I'm only on my last couple of
4  question or two, so I'm trying to make sure I get it right.
5          So blind testing then -- well, you just defined
6  blind testing.  So I guess my question is, you said
7  ideally, to be confident that you get really scientifically
8  sound conclusions with the dog alert, you want to know that
9  at least the dog handler doesn't know what or whether there
10  is something to alert to when evaluating an alert, is that
11  what I heard you say?
12     A.  No, not -- not entirely.  So, you know, I'm going
13  to have to give a -- a more than brief, less than very
14  lengthy answer on this one.  You know, when training --
15  when training, you know, these -- these K-9s, you know,
16  initially the K-9s have to be familiarized with the odor
17  that they're supposed to alert to.
18          So initially they should be trained so that
19  whoever is handling the dog knows, okay, in that box you're
20  supposed to scratch it or sit down, okay, and the box next
21  to it they're supposed to ignore it and move on to the next
22  box, for instance, okay.
23          So the handler, or maybe it's the trainer, they
24  know initially when they're -- when they're familiarizing
25  the K-9 with the odor, okay, they know what the dog is

1  supposed to do so that they can correct the dog if the dog
2  makes a mistake.  That's all part of the basic learning
3  process for the dog.
4          So then once the dog achieves proficiency in
5  identifying the positive odors and ignoring the negative
6  either the zero odors like the blank or some other odor,
7  you know, like -- like an old nasty basketball sneaker,
8  okay, then -- then they would go to testing.
9          And so testing then it could be unblinded or it
10  could be blinded.  It could be a combination of both where
11  the team goes through an unblinded course of inspection and
12  detection and then sometime later, it could be a day, a
13  week or more, then they do a similar test but it's blinded,
14  okay.
15          And so the performance of the K-9 team should be
16  evaluated during all of these stages so that if the handler
17  makes a mistake, the handler gets corrected; and then if
18  the K-9 makes a mistake, the K-9 gets corrected, you know.
19  So with the appropriate, you know, correction.
20          Usually it's a pull off the thing and they don't
21  get a reward, you know, if they make a mistake.  If they're
22  not making a mistake, then they get some type of positive
23  reward, verbal or a toy or both.  So it just -- it just
24  depends.
25          But, you know, just to say well, it should all be

Page 70

1  blind, otherwise the training, the certification is
2  invalid, that's not a true statement or a correct idea
3  about how, you know, training, you know, these dogs works.
4  You know, they're intelligent beings that have to go
5  through a process of learning and assimilating new
6  information.  So, you know, they have to be shown how to do
7  it and then they have to be tested in how they're doing it.
8     Q.  Right.  So then what I'm hearing then is that you
9  wouldn't necessarily share that critique of the Lit study
10  or, let me say, you would want to be -- you would want to
11  be certain that -- well, no, I'm sorry.  There's a lot of
12  double negatives in here.
13        I think I'll leave your answer as it is and I
14  think I don't -- I'll look through my notes real quick, but
15  that might be my -- my last question if you'd give me one
16  second.  Okay, I do have one more question.
17        I believe that the paper talks about using
18  dual-trained dogs that were trained in drugs and
19  explosives, and they say that that's sort of problematic
20  for purposes of doing tests that ultimately gets published
21  and that you're going to extrapolate results therefrom.
22        So would you agree that, as a general
23  proposition, it's problematic to have a dual-trained dog if
24  you're going to be -- if you want to extrapolate some
25  results only about drugs in terms of the dog alerting or do

Page 71

1  you think that that's not a problem?
2     A.  I don't think I can answer the question the way
3  you posed it.  I think it depends on the dog, it depends on
4  the training program.  It depends, you know, on what
5  questions you're trying to get answered or what
6  extrapolations you're trying to make.  So, you know, it
7  depends.
8        It's kind of a blanket -- you know, you're asking
9  for a blanket answer on a specific topic and I don't think
10  I can do that.
11     Q.  Well, let me just as a -- I'll just bounce off
12  what they say and just get your -- get your interpretation
13  or your assessment.
14     A.  Who is the "they" you're describing right now?
15     Q.  I'm still on this SWGDOG, their critique of the
16  Lit study.  And if I'm on the first page, at the very
17  bottom, second to the last -- third to the last sentence it
18  starts, I'm going to read it verbatim.
19        "The use of two dual-trained drug/explosive
20  canines described in this study as "certified" is
21  problematic.  This is universally recognized as an unsafe
22  practice."
23        So give me your reaction to that sentence.
24     A.  Well, I'm not sure grammatically what they mean,
25  that this is universally recognized as an unsafe practice.

Page 72

1  Do they mean that training a dog to be dual-trained in
2  drugs and explosives or describing the K-9 team as
3  certified?  So, you know, it's not clear.
4        The next sentence, you know, almost seems to
5  state and imply that because they didn't describe the
6  certification standard, that that was the unsafe practice.
7  So I don't know what that means, and that would require --
8  in order for me to answer your question more completely,
9  I'd have to go back to that Lit study, study it, and then
10  come back and address it based on your questions you're
11  asking me here.
12     Q.  Okay, fair enough.  I get it.  Well, I don't have
13  anything else.
14        MR. BURCH:  Ben, do you have follow-up?
15        MR. BAIN-CREED:  I just have one question just
16     for the record here.
17              CROSS-EXAMINATION
18  BY MR. BAIN-CREED:
19     Q.  And, Dr. Rose, just one question for me.
20        Did you read this SWGDOG, which is Exhibit 6,
21  paper or the study that it seems to be discussing, did you
22  read those in recent days in preparation for this
23  deposition?
24     A.  I received it, but I did not study it or read it.
25  I was actually working on, you know, my own papers that I

Page 73

1  published, so this I did not.
2        MR. BAIN-CREED:  Okay.  That's all I got, Ed.
3        MR. BURCH:  All right.  Well, thank you for your
4     time, Dr. Rose.  I appreciate you answering my
5     questions, and that's all I have for this deposition.
6        THE WITNESS:  Okay, thank you.
7        (The deposition concluded at 4:10 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 74

## CERTIFICATE OF OATH

STATE OF FLORIDA      )
                      )
COUNTY OF ST. LUCIE )

I, Deborah Carmela Dew, RPR, FPR in my capacity as a Notary Public of the State of Florida at Large, authorized to administer oaths on this 15th day of December, 2020, at 2:14 p.m., certify that STEFAN ROSE, M.D. appeared remotely and took an oath or affirmation for the purpose of giving testimony in this matter of:  United States of America v. Approximately $252,140.00 in U.S. Currency Seized from Darren Lennard Coleman on June 27, 2016 at Charlotte-Douglas International Airport, International Human Rights Commission and Robert Shumake

PERSONALLY KNOWN _____ OR PRODUCED IDENTIFICATION_____

TYPE OF IDENTIFICATION PRODUCED:  Florida Driver's License

_____
DEBORAH CARMELA DEW, RPR, FPR
Commission No.:  GG128177
Expires:  August 21, 2021

Page 75

## CERTIFICATE OF REPORTER

STATE OF FLORIDA     )
                     )
COUNTY OF ST. LUCIE )

I, Deborah Carmela Dew, RPR, FPR and Notary Public of the State of Florida at Large, certify that the foregoing deposition of STEFAN ROSE, M.D., pages 1 through 73, was stenographically reported remotely by me and is a true and accurate transcription of said; and that a review of the transcript was requested.

I FURTHER CERTIFY that I am not a relative nor employee of any counsel, nor any of the parties in said suit, nor am I financially interested in the action.

DATED this 30th day of December, 2020, at Port St. Lucie, St. Lucie County, Florida.

_____
Deborah Carmela Dew, RPR, FPR

Page 76

## ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _____ pages of my testimony, taken on _____ (date) at _____(city), _____(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

Page  Line  Should read:              Reason for Change:

Page 77

## ERRATA SHEET

Page  Line  Should read:              Reason for Change:

Date: _____

Signature of Witness

Name Typed or Printed

1      HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

2   Litigation Services is committed to compliance with applicable federal

3   and state laws and regulations ("Privacy Laws") governing the

4   protection and security of patient health information. Notice is

5   hereby given to all parties that transcripts of depositions and legal

6   proceedings, and transcript exhibits, may contain patient health

7   information that is protected from unauthorized access, use and

8   disclosure by Privacy Laws. Litigation Services requires that access,

9   maintenance, use, and disclosure (including but not limited to

10   electronic database maintenance and access, storage, distribution/

11   dissemination and communication) of transcripts/exhibits containing

12   patient information be performed in compliance with Privacy Laws.

13   No transcript or exhibit containing protected patient health

14   information may be further disclosed except as permitted by Privacy

15   Laws. Litigation Services expects that all parties, parties'

16   attorneys, and their HIPAA Business Associates and Subcontractors will

17   make every reasonable effort to protect and secure patient health

18   information, and to comply with applicable Privacy Law mandates,

19   including but not limited to restrictions on access, storage, use, and

20   disclosure (sharing) of transcripts and transcript exhibits, and

21   applying "minimum necessary" standards where appropriate. It is

22   recommended that your office review its policies regarding sharing of

23   transcripts and exhibits - including access, storage, use, and

24   disclosure - for compliance with Privacy Laws.

25      © All Rights Reserved. Litigation Services (rev. 6/1/2019)

U.S v. Darren Lennard Coleman
Scientific Opinion
Jay M. Poupko, Ph.D.
December 3, 2020

The purported alert of the dog Ciro-handler drug detector team to $252,140 US currency and cocaine-positive results by Ionscan 500DT of samples of said currency does not conclusively establish that said currency was directly and recently exposed to illicit cocaine and other controlled substances.

This opinion is based upon the following peer-reviewed, published scientific studies regarding the contamination of US currency in general circulation with cocaine and other controlled substances as well as established, internationally-accepted and required forensic drug testing standard procedures and quality control practices:

1) Several published studies demonstrate that between 67-100% of US banknotes in the general circulation are contaminated with cocaine and that the amount of cocaine present per banknote ranges from approximately 0 .1 to over 100 micrograms (1). Based upon these studies, the average level of contamination is most probably several micrograms per bill. It is highly unlikely that this widespread contamination of circulated currency is a result of widespread direct contact of currency with illicit cocaine. It is, however, highly-probable that it is a result of either physical transfer of cocaine from relatively few banknotes that have come in direct contact with cocaine to other erstwhile uncontaminated banknotes or a result of transfer from contaminated currency counting machines to erstwhile uncontaminated banknotes. Nevertheless, there is a lack of data to definitively-distinguish between contaminated currency as a result of direct contact with illicit cocaine and currency that became contaminated as a result of contact with currency in direct contact with the drug.

3) The total number of banknotes in this case as documented by the bank deposit slip for the seized currency is 12,147 banknotes. Considering that the average level of contamination per banknote is several micrograms, it is reasonable to assume that $252,140 of currency in general circulation contains a total of at least 15 milligrams of cocaine. A study by Furton et al. (2) reported that, on the average, illicit cocaine contains 0.01%-.036% methyl benzoate, the purported signature odor of cocaine. Assuming the above, $252,140 would contain a total of 1.5-5.2 micrograms of methyl benzoate. The same study reported that most of their drug detecting dogs alerted to as low as 1 microgram of methyl benzoate while 10% alerted to 0.1 microgram.

4) Studies demonstrate that cocaine constantly generates methyl benzoate (3,4). Therefore, there is no reason to assume that cocaine found on currency in the general circulation will cease generating methyl benzoate after a given period of time. Hence, methyl benzoate will be present and will not significantly dissipate as long as cocaine is present on the currency.

5) Studies demonstrate that unidentified, cocaine-associated volatile substances other than methyl benzoate, probably contribute to triggering a dog alert to cocaine (5). Therefore, it can not be assumed that alert to cocaine is solely dependent on the amount of methyl benzoate present.

6) There are two published studies (6,7) that found the presence of other controlled substances such as heroin, amphetamine, methamphetamine and marijuana-associated cannabinoids on US currency in general circulation. Approximately 10% of currency was contaminated with


EXHIBIT
12

2

cannabinoids present in marijuana, about 14% contaminated with heroin, 6% contaminated with methamphetamine and 2% contaminated with amphetamine.

6) There is no published data regarding the permeability of US banknotes and plastic packaging such as polyethylene wrapping material to: methyl benzoate, yet-unidentified, cocaine-associated volatile substances and volatile substances arising from other drugs that may elicit a purported positive test result. Therefore, there is no way to determine how much methyl benzoate and/or any other possible positive-eliciting substances were volatilized from the currency in this case.

7) There is a lack of universally-accepted, required quality control for the drug testing in this case for the following two reasons:

a) No positive controls containing varying amounts of cocaine were tested in this case. This is necessary to determine the sensitivity of this particular test. An appropriate positive control in this case would be currency contaminated with varying amounts of cocaine and/or other appropriate controlled substances. A particular test result generated without positive controls is not valid as there is no data to determine the minimum drug level (e.g. threshold) that will give a positive result. Thus, for example, it is not known whether the purported positive test result is due the presence of 1 nanogram, 1 milligram or 1 gram of cocaine, etc. on the currency.

b) No negative controls were employed in this test to exclude the possibility of a false positive result. An appropriate negative control would be lab-certified, drug-free currency which should test negative by the very same method used for testing $252,140. Therefore, there is no way to rule out a false-positive test result.

8) Any non-specific, non-quantitative purportedly-positive field test requires confirmation by a reliable, specific laboratory chemical test (e.g. GC/MS). This is required to definitively identify controlled substances. It universally-accepted that before employing and relying upon a given drug test d it must first be validated by comparing the results with an already validated, established test method (e.g. GC/MS). Since there is no documented validation for this particular test, the results of this test may not be relied upon.

9) It is not scientifically-acceptable to rely upon tests performed in a single study carried out by only one group of investigators using a specific, small set of test animals under in a specific environmental setting to generalize about all other sets of test animals in all settings. Thus, Furton et al. (2) is the only peer-reviewed publication that has presented data regarding the lowest amount of illicit cocaine and methyl benzoate that could be detected by this test. Furthermore, their observations concern a specific and relatively-small group of 11-14 drug detector dogs from the Miami-Dade Police Department in a particular environmental setting. Consequently, there is no scientifically-valid reason to extrapolate their findings to all drug detector dogs in all environmental settings.

10) The cocaine-positive Ionscan 500DT results of samples of the $252,140 seized in this case do not conclusively establish that said currency was directly and recently exposed to illicit cocaine for the following reasons:

a) The Ionscan 500DT utilizes a technology called ion mobility spectrometry (IMS). The instrument as employed in the field is only capable of yielding qualitative results (i.e. the detection or lack of detection of an analyte such as cocaine). It is not capable of determining the quantity of an analyte such as cocaine present in a test sample.

b) IMS, as employed in the Ionscan 500DT, is a highly-sensitive technology capable of detecting the presence of an analyte such as cocaine at low nanogram levels.

In consideration of the above, it is highly-likely that the greater majority of US currency in general circulation known to be contaminated with microgram quantities of cocaine will test

positive for cocaine by Ionscan 500DT. Therefore, the cocaine positive Ionscan 500DT results of samples of the $252,140 seized in this case do not conclusively establish that said currency was directly and recently exposed to illicit cocaine.

References

1) Poupko, JM., Hearn, WL, Rossano, F. Drug contamination of U.S. paper currency and forensic relevance of cocaine alert to paper currency: A critical review of the scientific literature. Journal of Forensic Sciences, electronically published 2018.
2) Furton, KG et al. Identification of odor signature chemicals in cocaine using solid-phase rnicroextraction-gas chromatography and detector dog response to isolated compounds spiked on US paper currency. J. Chromatograph Sci. 2002;40(3):147-155.
3) Grant FW, Martin, WC, Quackenbush, RW. A sensitive field test for cocaine based on the odor of methyl benzoate. Bulletin of Narcotics 1975:27(2):33-35.
4) Dejarme, LE, Gooding, RE, Lawhon, SJ, Ray, P, Kuhlman, MR. Formation of methyl benzoate from cocaine hydrochloride under different temperatures and humidities. Proceedings SPIE Chemistry-and Biology-Based Technologies for Contraband Detection 1997:2937
5) Waggoner, LP et al. Canine olfactory sensitivity to cocaine hydrochloride and methyl benzoate, Proceedings SPIE l 997;2937:216-226.
6) Jenkins, AJ. Drug contamination of US paper currency. Forensic Sciences International 2001;12(3):189-193.
7) Lavins, ES, Lavins, BD, Jenkins, AJ. Cannabis (marijuana) contamination of United States and foreign currency. J. Anal. Toxicol. 2004;28(6):439-442.

This scientific opinion and its bases is rendered within a reasonable degree of scientific certainty.

Jay M. Poupko, Ph.D.

December 3, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:18CV646

_____
                                       )
UNITED STATES OF AMERICA,              )
                                       )
            Plaintiff,                 )
      vs.                              )
                                       )        DEPOSITION OF
APPROXIMATELY $252,140.00 IN U.S.      )
CURRENCY SEIZED FROM DARREN            )    JAY M. POUPKO, Ph.D.
LENNARD COLEMAN ON JUNE 27, 2016,      )
AT CHARLOTTE-DOUGLAS INTERNATIONAL     )
AIRPORT                                )
            Defendant,                 )
_____)

        On Monday, December 21, 2020, commencing at 8:03 a.m.,

the deposition of Jay M. Poupko, Ph.D., was taken via Zoom on

behalf of the Plaintiff, and was attended by Counsel as follows:

APPEARANCES VIA ZOOM:


        J. SETH JOHNSON, ESQ.
        BENJAMIN BAIN-CREED, ESQ.
        Assistant U.S. Attorneys
        U.S. Attorney's Office
        227 West Trade Street, Suite 1650
        Charlotte, North Carolina  28202
        on behalf of the Plaintiff


        EDWARD BURCH, ESQ.
        Law Offices of Michael & Burch, LLP
        One Sansome Street, Suite 3500
        San Francisco, California  94104
        on behalf of the Defendant


EXHIBIT
13


REPORTED VIA ZOOM BY:  Mai-Beth Ketch, CCR, CVR-M
                ASHEVILLE REPORTING SERVICE

1 (Document LI2314)
2                    INDEX
3 Stipulations . . . . . . . . . . . . . . . . .    3
4 Direct Examination By Mr. Johnson . . . . . .     3
5 Certificate of Notary Public . . . . . . . .     86
6 EXHIBITS:
7 Exhibit No. 1 Introduced . . . . . . . . . .     7
8    (Deponent's resume)
9 Exhibit No. 2 Introduced . . . . . . . . . .    19
10    (Case materials reviewed)
11 Exhibit No. 3 Introduced . . . . . . . . . .    48
12    (Deponent's report 12/3/20)
13 Exhibit No. 7 Introduced . . . . . . . . . .    57
14    ("Critical Review" article, 2018)
15 Exhibit No. 6 Introduced . . . . . . . . . .    61
16    (Jourdan article)
17 Exhibit No. 5 Introduced . . . . . . . . . .    73
18    (Photographs)
19 Exhibit No. 4 Deemed Marked . . . . . . . .    85
20    (Declaration of Oath)
21
22
23
24
25

1    PURSUANT TO NOTICE and/or Agreement to Take
2 Depositions, the within Deposition was taken by me,
3 MAI-BETH KETCH, CCR, CVR-M, a Notary Public as
4 required in Rules 26 and 30 of the North Carolina
5 Rules of Civil Procedure.
6 STIPULATIONS:
7    IT WAS STIPULATED AND AGREED by and between
8 Counsel for the Plaintiff and Counsel for the
9 Defendant that each question in this Deposition is
10 deemed to be followed by an objection and that each
11 answer or portion thereof is deemed to be followed by
12 a motion to strike; and that the objections and
13 motions to strike may be ruled upon by the presiding
14 Judge at any hearing or trial of this cause,
15 provided, however, that any objections as to the form
16 of the question must be made at the time the question
17 is propounded or else the same is waived.
18 DIRECT EXAMINATION BY MR. JOHNSON:
19 Q    Good morning or I guess good afternoon there,
20    Dr. Poupko.  Could you please state your full
21    name for the record.
22 A    Dr. Jay Poupko.  It's spelled P-O-U-P-K-O.
23 Q    My name is ---
24 A    Middle initial M.
25 Q    My name is Seth Johnson, I'm an assistant

1    United States Attorney and I represent the
2    Government in this case.  Do you understand
3    that?  Dr. Poupko, are you there?
4 A    I'm having trouble hearing you.
5 Q    Sure.  Can you hear me now?
6 BY MR. JOHNSON:
7    Ed, can you hear me?
8 BY MR. BURCH:
9    I'm hearing you fine, but it does look like
10    there is sort of a slight video problem with
11    Dr. Poupko.
12 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
13 Q    Dr. Poupko, can you hear us?
14 A    I can hear you now, yes.
15 Q    If it gets too bad we just might have you
16    reconnect.  I think that's happened before and
17    that's how ---
18 A    Okay.
19 Q    We will try and forge on.  So I think where we
20    left it was I'm Seth Johnson, I'm one of the
21    AUSAs on this case for the United States
22    representing the Government.  Do you
23    understand that?
24 A    Yes.
25 Q    And you've been retained as an expert in this

1    case; correct?
2 A    Correct.
3 Q    And you've formed expert opinions in this
4    case; correct?
5 A    Correct.
6 Q    And you've provided a report; right?
7 A    Yes.
8 Q    Have you ever been deposed before?
9 A    Yes.
10 Q    Can you repeat that, Dr. Poupko, you didn't
11    come through.
12 A    Yes.
13 Q    How many times have you been deposed before?
14    Dr. Poupko, how many times have you been
15    deposed before?
16 A    Yes, I have been deposed before.
17 Q    How many times?
18 A    Oh, I don't really keep count, but I'm sure
19    it's at least a hundred.
20 Q    So even though you're an old hat at it, I'll
21    go over some of the basic ground rules.  The
22    first is you understand that your testimony
23    here today will be under oath; correct, under
24    penalty of perjury, and that it could be used
25    in ---

1   A   Yes.

2   Q   --- front of the judge or jury just as if you

3        were testifying live in court?

4   A   Yes.

5   Q   You're doing a good job of this so far, but

6        especially now because there's kind of a lag

7        with a cross-Atlantic connection, let's try

8        not to speak over each other, and wait till

9        the end of a sentence and answer before the

10       other one starts talking; fair enough? And

11       along those lines, the court reporter can't

12       take down head nods or huh-uhs or uh-huhs, and

13       again it's going to be particularly hard here

14       where you know, we won't be able to tell

15       whether there's just an Internet lag or you

16       didn't answer. So if you could give a verbal

17       answer to every question, that would be very

18       helpful; fair enough?

19   A   Okay. You're cutting out from time to time.

20   Q   And along those lines, if you don't understand

21       a question I ask or can't hear a question I

22       ask, feel free to ask me to ask it again and

23       I'll rephrase it, and I'll do my best to

24       clarify it. Fair enough?

25   A   Okay.

1   Q   It's not an endurance contest. If you need to

2       take a break at any time just let me know and

3       we can do that. The only thing I would ask is

4       that if we have a question pending on the

5       table, you answer the question before a break;

6       fair enough?

7   A   Sure.

8   Q   Could you look at Exhibit 1, which is your

9       resume.

10   A   Yes.

11   (EXHIBIT NO. 1 INTRODUCED)

12   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

13   Q   You have a Ph.D.; correct?

14   A   Correct.

15   Q   Where is that from?

16   A   Albert Einstein College of Medicine, that's in

17       New York, New York City.

18   Q   What did you get your Ph.D. in?

19   A   Well, officially my diploma says in medical

20       sciences. I was a graduate student at the

21       Department of Pharmacology so I listed that on

22       my resume as pharmacology because health

23       sciences or medical science is a very broad

24       area.

25   Q   What is pharmacology?

1   A   It's the study of drugs, medicines,

2       pharmaceuticals, controlled substances.

3   Q   What did you do your dissertation on?

4   A   Sorry, I didn't hear you.

5   Q   What did you do your dissertation on?

6   A   Actually it was in physiology; it was on the

7       molecular development and changes in

8       chromosomal proteins associated with the

9       development.

10   Q   You were breaking up a little bit there,

11       Dr. Poupko, associated with the development of

12       what?

13   A   It was a physiology dissertation having to do

14       with the development, early development of the

15       embryo and the molecular changes that occur

16       during development.

17   Q   Is that human embryos?

18   A   No, it was actually frog embryo.

19   Q   After you got your Ph.D., what areas of

20       research have you focused on?

21   A   I did research in cancer, particularly

22       chemicals that cause cancer and toxic

23       substances, and that was at Columbia

24       University, at the Institute of Cancer

25       Research.

1   Q   After you left Columbia, what did you do?

2   A   Well, my first academic position after --

3       Columbia was a postdoctoral fellowship. It's

4       similar to a doctor, someone who graduated

5       medical school and then does a residency, or

6       internship or residency. So you're not

7       totally independent, you work in someone

8       else's laboratory with a certain amount of

9       supervision. So after that, I got my first

10       position, academic position at the University

11       of Miami School of Medicine Department of

12       Pharmacology.

13   Q   What types of research did you focus on while

14       at the University of Miami?

15   A   It was in the field of toxicology.

16   Q   After Miami, what did you do?

17   A   Well, academically I did one year as a

18       visiting scientist at Tel Aviv University at

19       the Institute of Occupational Health, also

20       working in the field of toxicology,

21       particularly toxic substances in the

22       workplace.

23   Q   I mean just simply put, would that be studying

24       people taking drugs in the workplace?

25   A   Oh no, it's not -- no, not drugs. These are

1 various toxic substances that someone might
2 encounter as a result of their employment or
3 their work.
4 Q So things like asbestos, lead, stuff like
5 that?
6 A Yes.
7 Q Then after that what did you do in terms of
8 either research or employment?
9 A After that I took the position, a teaching
10 position, at Southeastern Osteopathic School
11 of Medicine where I taught pharmacology. Did
12 minimal research there.
13 Q Then take me through after that, what did you
14 do?
15 A After that I took a position at a drug testing
16 laboratory, North American Biologicals, and I
17 managed the department, the drug testing
18 department.
19 Q Was this like medical patient drug testing?
20 A This is testing for drugs of abuse.
21 Q Can you repeat that, Dr. Poupko. Dr. Poupko,
22 I didn't get your last answer, could you
23 repeat that.
24 A It was testing for drugs of abuse.
25 Q So to see if someone was abusing oxycodone,

1 something like that.
2 A I'm sorry, I didn't hear what you said.
3 Q Sure. So it would be like testing patient
4 samples to see if someone was abusing
5 oxycodone, something like that?
6 A Yeah, it wasn't necessarily patients, most of
7 them were employees or preemployment testing,
8 or drugs of abuse like cocaine and marijuana,
9 heroin, amphetamines, etcetera.
10 Q So drug screening both potential employees or
11 employees?
12 A Yes.
13 Q After that what did you do?
14 A After that I worked at SmithKline Beecham
15 clinical laboratories where I managed the drug
16 testing laboratory, again we did testing for
17 drugs of abuse. We also did testing for
18 alcohol and some other toxic substances.
19 Q Then after that what did you do?
20 A After that I started teaching part-time at --
21 well, there are two but I think it was a -- I
22 taught pharmacology at Barry University. Then
23 I taught anatomy and physiology and chemistry
24 at Broward Community College, at the same time
25 I started to do consulting work.

1 Q So where were you doing consulting work?
2 A My consulting was in again the area of drug
3 abuse and alcohol.
4 Q What type of people, companies, organizations
5 were you doing consulting work for?
6 A Primarily attorneys. This was forensic work.
7 Q So were you serving as like an expert witness?
8 A Yeah, if need be. I was consulted and I would
9 write opinions such as in this case, and if
10 need be testify in a trial or a hearing.
11 Q Just give me kind of a broad overview of what
12 types of cases those were and what you were
13 specifically doing?
14 A Well, there were criminal cases, might be a
15 possession of controlled substance or
16 trafficking controlled substances. But most
17 of them I'd say over the years were civil
18 cases where, say, a vehicular collision, and I
19 was brought in to render opinion as to the --
20 to review the drug testing or the alcohol
21 testing, and then to render an opinion as to
22 what effect this would have on the person.
23 Q You mentioned there were some criminal cases
24 dealing with possession of controlled
25 substances. In those cases, what types of

1 opinions would you be rendering?
2 A Well, there were some that were involved in
3 terms of determining the quantities of the
4 drug as I can recall. There were a number of
5 DUI cases, or sometimes called DWI cases.
6 Q Any other types?
7 A Within the criminal area?
8 Q Yes.
9 A That was the main -- those were the main types
10 of cases.
11 Q For the cases where you would determine the
12 quantities of the drug, how would you go about
13 doing that?
14 A On the few occasions I did that, I would go
15 into the laboratory, into the crime lab, weigh
16 the material, physical inspection of it.
17 Q Would the only type of ---
18 A Then there were cases like that came up --
19 sorry.
20 Q Go ahead, you finish your answer then I'll ---
21 A I was just going to say, and then I would say
22 starting in the late '80s there were cases
23 that I testified in that were forfeiture cases
24 such as this case, similar to this case,
25 currency forfeitures.

1 Q I would view those as kind of -- in the same
2 category. Let's go back to when you went into
3 the crime lab for determining the quantities
4 of the drug, you mentioned that you would
5 weigh the material and inspect it. Did you do
6 any other type of testing on the narcotics
7 material?
8 A I don't recall actually doing testing within
9 the crime lab, myself, that was really open
10 only to crime lab employees, but I may have
11 observed the testing.
12 Q You mentioned after that you started rendering
13 opinions in forfeiture cases. Could you tell
14 me what types of opinions you were rendering
15 in those?
16 A Primarily where a narcotics detecting dog
17 alerted to a large quantity of currency.
18 There were also some IONSCAN cases as well.
19 Q Similar to this case?
20 A Excuse me?
21 Q So similar to this case?
22 A Yes.
23 Q Do you have any experience with drug detection
24 canines?
25 A I've had some experience with it, some studies

1 that I conducted in Fayetteville, Arkansas,
2 back in I believe it was the early '90s. I
3 published a small publication on a pilot study
4 I did with a group of dogs from the law
5 enforcement there in Fayetteville.
6 Q Tell me about that study.
7 A Well, the question that I addressed was what
8 is the detection level of a narcotics
9 detecting dog, what is the sensitivity. What
10 is the lowest level it can pick up, that was
11 the original reason why the study was
12 conducted.
13 Q How many dogs did you use in the study?
14 A I don't recall the exact number, but it was
15 less -- maybe five dogs altogether, something
16 like that.
17 Q I guess how did you do the study; what was the
18 methodology?
19 A Well, you work together with the police there,
20 with the narcotics detecting teams, of course
21 the dog and the handler. And we actually set
22 it up in a school that was not being used at
23 the time, and we prepared spiked samples of
24 currency spiked with cocaine, different
25 amounts of cocaine. And we also spiked plain

1 paper as well in the study because the initial
2 results showed that dogs were alerting to
3 currency that had not been in circulation,
4 fresh currency, so we switched over to the use
5 of plain paper other than currency, itself.
6 Q Did you put the currency and paper and like
7 hide throughout the school and then have the
8 dogs go find them; is that how it worked?
9 A They were hidden in the lockers. They were
10 placed in the lockers and dogs were brought in
11 one at a time and given the opportunity to do
12 their thing, sniff and to alert, if they did
13 alert.
14 Q So what did you use as I guess the control in
15 that study?
16 A Well, the control ended up, you know, giving a
17 false positive result. Control was fresh
18 money that I received from the bank packaged,
19 sealed. As I mentioned, it turned out that
20 these dogs were falsely alerting to the money
21 which was drug free. We just tested the money
22 also using GC/MS, gas chromatography-mass
23 spectrometry and indeed the money was negative
24 for cocaine. So that's when we switched over
25 to using plain bond paper.

1 Q Did the dogs alert to the plain paper?
2 A I'd have to check my notes on that. There was
3 a lot of variability as I can recall, if I can
4 refresh my memory from my publication in the
5 General Forensic Sciences.
6 Q This study you're mentioning, is this the one
7 that's listed on your resume as -- studies ---
8 A Sorry?
9 Q The study we've been discussing, you've got a
10 study listed on your resume from 1994 as item
11 12 in your publications entitled "Studies on
12 Canine Specificity and Sensitivity for
13 Detection of Cocaine on Currency." Is that
14 the study we've been talking about?
15 A Yes.
16 Q Was that ever published? Was that study ever
17 published, Dr. Poupko?
18 A Sorry, I'm not hearing you.
19 Q Sure. Was that study ever published?
20 A It was published in the proceedings -- I think
21 it was the Society of Forensic Toxicology may
22 have been a joint meeting with the
23 International I think Forensic Toxicology
24 Association.
25 Q Was that study ever peer reviewed?

1  A   Yes, it's peer reviewed.  In order to be
2      accepted it had to be peer reviewed.
3  Q   Would you mind providing us a copy of that
4      study?
5  A   Sure, I can do that.
6  Q   Thank you.  So other than we were I think
7      discussing generally your experience with drug
8      detection canines, any other experience other
9      than the study we've been discussing?
10 A   That's the one study.
11 Q   You've never been a canine handler; correct?
12 A   No.
13 Q   And you've never trained drug detection dogs;
14     correct?  You never trained drug detection
15     dogs; correct?
16 A   No, I have not.
17 Q   Never worked with the certification of drug
18     detection dogs?
19 A   No.  I've read all the manuals but I have not
20     directly worked with the certification
21     process.
22 Q   If you could look at Exhibit 2, which is the
23     Rule 26 materials in this case, or a document
24     I guess that was produced.
25 A   Please hold on.

1  (EXHIBIT NO. 2 INTRODUCED)
2  BY THE DEPONENT:
3      Okay.  Which document is that?
4  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
5  Q   Exhibit 2.  It should start with case
6      materials reviewed.
7  A   Okay.
8  Q   Are you there with me, Dr. Poupko?
9  A   Yeah, I'm looking for it.  I'm having trouble
10     finding it, hold on a minute please.
11 Q   Sure.  Hopefully it's in the e-mail with all
12     the other exhibits.
13 A   We got it, okay.  So which exhibit are you
14     referring to?
15 Q   Number two.
16 A   Okay.
17 Q   This Exhibit 2 was produced to us as
18     containing some of the required information by
19     Rule 26, and one of those categories is case
20     materials reviewed; do you see that?
21 A   Yes.
22 Q   And it lists five things that you reviewed in
23     preparation for your report in this case;
24     correct?
25 A   Yes.

1  Q   Did you review any other materials from this
2      case in preparation for your report?
3  A   No.  Since then I've reviewed some materials,
4      but not before I wrote the report.
5  Q   What have you reviewed since then?
6  A   A transcript, I think they were depositions in
7      a case called U.S. versus Lackey, and the
8      deposition or testimony of a Sergeant Boltz,
9      and the testimony of Dr. Lareau.
10 Q   But to be clear, these transcripts were
11     something you reviewed after you prepared your
12     report containing your opinions; correct?
13 A   Correct.
14 Q   So your opinions aren't in any way based on
15     these transcripts; right?
16 A   My opinion is not based on these transcripts
17     that I recently -- after I wrote the report.
18 Q   Do these transcripts impact your opinions in
19     this case at all?
20 A   No.
21 Q   Then we do not need to talk about them.  The
22     drug detection canine in this case was named
23     Ciro.  Did you review any of Ciro's training
24     records or certifications?
25 A   No, I was not furnished with that.

1  Q   Do you have any opinions on Ciro's reliability
2      as a drug detection dog?
3  A   I can't say I know how Ciro was rated as
4      excellent, good, satisfactory or poor.
5  Q   The answer would be no you don't have any
6      opinions on Ciro's reliability as a drug
7      detection dog?
8  A   Insofar as what it's designed for no, as a
9      field test, preliminary test no.
10 Q   Let me see if I can understand your testimony
11     correctly.  It sounds like you don't have any
12     opinions about Ciro specifically, but maybe
13     you do have opinions about field tests
14     generally; is that fair?
15 A   Narcotic detecting dogs as a field test, yes.
16 Q   What are your opinions about the use of drug
17     detection dogs as a field test?
18 A   Well, it's a good start I would say.  It may
19     point in a certain direction, which needs
20     further testing.  It's kind of like, let's
21     say, I go to the doctor and I tell the doctor
22     I think I have corona, you know.  And he asks
23     me well, why do you say that, and I say
24     because I have a sore throat and I have a
25     headache, and I'm feeling kind of feverish.

1 At that point can the doctor say that I have
2 corona, obviously not. He may entertain the
3 possibility and look further through, say,
4 examination of the patient. And that would be
5 sort of the next level to go. But ultimately
6 only a definitive very specific test for
7 corona would determine whether I'm infected
8 with corona. So in the same sense, the dog is
9 kind of like a patient who's going to the --
10 he's communicating, obviously not verbally, to
11 the handler that perhaps there's something
12 there and needs to be looked into further.
13 Q Thank you for that answer, let's break that
14 down. In the beginning you mentioned that
15 drug detection dogs can be a good start; why
16 is that?
17 A Well, first of all, in drug testing basically
18 the first thing you want to do is determine if
19 the result is negative and then you just drop
20 it at that. If it gives you what's called a
21 presumptive positive, then you can go on to
22 more specific and more sensitive testing.
23 Q So a drug dog would give you a presumptive
24 positive.
25 A Yes. I say you know, it's something that

1 merits looking further into this.
2 Q Just since a somewhat of a technical term,
3 what do you mean by presumptive positive?
4 A Well, it may be positive. In fact, that term
5 presumptive positive I think is not the
6 appropriate term. I would say, you know, it's
7 a preliminary result rather than using that
8 term presumptive positive, because I don't
9 think we can presume that it is positive at
10 that point, the fact that a dog alerted to a
11 particular object.
12 Q Why not?
13 A It's not what -- it's not a -- it's not
14 specific enough and it's not sensitive enough.
15 It's not -- it's not well controlled. It
16 doesn't meet any of the criteria for drug
17 testing, which I'm more familiar with, which
18 require a lot of quality control in order to
19 even arrive at that preliminary result.
20 Q Let's break that down. I think you first
21 mentioned that it's not specific enough; is
22 that right?
23 A Yes.
24 Q Why is a drug dog alert not specific enough?
25 A Well, we're dealing basically with a

1 biological tech, using an animal to detect a
2 drug, and we're talking about an animal
3 presumably trained in order to detect drugs.
4 But any biological system is very, very
5 complex, and there's so many variables that
6 would come to play as to whether or not, say,
7 a canine will behave in a particular way. So
8 that alone is not the same thing as a
9 laboratory test where you have an instrument
10 which has been basically certified, you've
11 gone through all of the quality control. In
12 the case of a dog you don't have that.
13 Q You would agree with me that drug detection
14 dogs are trained for a specific number of
15 substances; correct?
16 A I'm sorry, you said number of substances?
17 Q Sure. You'd agree with me that it can vary by
18 dog, but generally drug detection dogs are
19 trained for, you know, and certified for
20 certain substances; right?
21 A Yes. Some of them are certified for more than
22 one substance.
23 Q So a dog might be certified for cocaine,
24 methamphetamine, marijuana and so on; three,
25 four, five, however many substances that

1 particular dog is trained to look for.
2 A Yes. Depends on the training.
3 Q So what a dog alerts to is going to depend on
4 its training and certification; right? Do you
5 agree with that statement, Dr. Poupko?
6 A I didn't hear the full sentence, full
7 question.
8 Q Fair enough. So what a drug dog will alert to
9 is going to depend on its individual training
10 and certification; right?
11 A Yes.
12 Q Let's say a drug dog has been trained to alert
13 to four different types of drugs, and a drug
14 dog alerts, then the presumption would be that
15 he alerted to one of those four types of
16 drugs; correct?
17 A Or more than one, we don't really know.
18 Q You don't know which of ---
19 A Or if there is very specific behaviors
20 associated with alerting to each drug.
21 Q Absent that, you wouldn't know which of the
22 drugs he alerted to, but you would know it
23 would have been one of those; correct?
24 A Yeah, or no drugs at all, it's a false
25 positive result.

7 (Pages 22 to 25)

1 Q Assuming it's not a false alert, it would be
2   one of the drugs he was trained on; correct?
3 A Yes. I mean it's -- unless you've got other
4   substances, but we're assuming that it's one
5   of the drugs the dog is trained on, one or
6   more.
7 Q Do you have any opinions on whether dogs alert
8   to substances they're not trained on?
9 A Honestly I don't know one way or the other. I
10  don't think that there's sufficient evidence
11  to be definitive about the ability of a dog,
12  any given dog, and certainly dogs in general
13  that are trained, narcotics detecting dogs, I
14  don't think that there's enough scientific
15  evidence to establish that it is a reliable
16  way of detecting a particular drug.
17 Q Other than the study we talked about earlier,
18  have you done any scientific study into that
19  area?
20 A Well, I published a paper about three years,
21  two or three years ago, which was a critical
22  review on the topic, which was published in
23  the Journal of Forensic Sciences, where I
24  review a lot of the studies.
25 Q In that paper did you just review other

1   people's studies? Did you conduct any study,
2   yourself?
3 A No, other than the one pilot study that I
4   mentioned, that I did, Fayetteville, Arkansas.
5 Q Earlier when you were talking about the
6   preliminary results that drug detection
7   canines can give, you mentioned that it's not
8   sensitive. Could you expound on that?
9 A I'm not sure, did I say sensitive or specific?
10 Q I wrote down that you said not specific, not
11  sensitive and doesn't meet the same criteria
12  as laboratory testing.
13 A That's correct, yes.
14 Q So let's take the not sensitive, what did you
15  mean by that?
16 A I'm sorry, I thought you said specific rather
17  than sensitive. Those are two different words
18  that have completely different meanings.
19 Q Sure. So I have that you had said kind of
20  three things it sounds like. You know, your
21  opinions about the preliminary result a drug
22  detection canine would be, would just be kind
23  of two part, it's A not specific and then B it
24  doesn't meet the criteria for laboratory drug
25  testing; correct?

1 A Correct.
2 Q So nothing -- we can forget anything about
3   sensitive one way or the other.
4 A I didn't address that.
5 Q Fair enough.
6 A Not in this deposition.
7 Q So let's go to -- sure. Let's go to your
8   opinion that a drug detection canine's
9   preliminary result doesn't meet any of the
10  criteria for drug testing; what do you mean by
11  that?
12 A I wouldn't say doesn't meet any, but it
13  doesn't meet the major criteria that are
14  needed in order for a test to be reliable. It
15  tests for the presence of a controlled
16  substance, field test.
17 Q Let's start with the criteria -- sure. Let's
18  start with the criteria that it does meet;
19  what criteria are those?
20 A It meets the criteria of the field test as I
21  said. It merits further investigation, that's
22  the way I view it.
23 Q What are the criteria of a field test; what do
24  you mean by that?
25 A Well, it should be sufficiently sensitive, be

1   able to pick up the presence of the substance.
2   That would be basically it, you know, some
3   degree of specificity but certainly not
4   meeting the criteria of specificity for drug
5   testing.
6 Q What would be the degree of specificity you
7   believe will be required for drug testing?
8 A You have to establish proper quality control
9   program which whenever you test for example,
10  for a sample you test also controls. And the
11  controls are two types of controls. There's
12  positive controls and there's negative
13  controls regarding specificity. The negative
14  control should not test positive, it should be
15  negative.
16 Q And presumably the positive control should
17  test positive?
18 A And the positive control should test positive,
19  yes.
20 Q Anything else in terms of establishing
21  control?
22 A Well, before you start out, you know, you have
23  to validate the test. That's the first thing
24  you need to do, and there's various things you
25  need to do for validation. You have to show

1    that the test, for example, is linear; that
2    is, for a given response that you get, that is
3    proportional to a certain amount of material
4    that's there.  So that we get into, you know,
5    the ultimate determination, which is a
6    quantitative test.  It has to be quantitative
7    and you have to establish that the test shows
8    linearity.
9  Q  And by quantitative you mean it gives you a
10    specific numerical quantity of whatever you're
11    testing for?
12  A  It gives you a response which is proportional
13    to the amount of material that you're testing
14    for.
15  Q  Essentially with quantitative you can tell how
16    much; is that accurate?
17  A  Yes.
18  Q  And conversely qualitative would be just kind
19    of a binary yes/no.
20  A  Correct.
21  Q  Would you say that drug detection dogs yield
22    qualitative results?
23  A  I would say yield preliminary qualitative
24    results.
25  Q  Why do you say those qualitative results are

1    preliminary?
2  A  Because you haven't really established a
3    specificity.
4  Q  By that you mean what specific type of drug.
5  A  Sorry?
6  Q  By they haven't established a specificity you
7    mean what specific type of drug the drug dog
8    has alerted to?
9  A  Not just what type, whether or not there is
10    drug there at all.
11  Q  I mean isn't that what ---
12  A  This -- sorry?
13  Q  Sure.  Isn't that what qualitative results
14    are, the drug is there yes or no?
15  A  Sorry, I don't hear you.
16  Q  Sure.  You mentioned -- I believe you
17    testified that drug dogs don't establish a
18    specificity of whether or not the drug is
19    there; is that correct?
20  A  Yes, and whether the dog is falsely alerting
21    or not.
22  Q  Whether the dog is falsely alerting is
23    different than whether the dog is giving a
24    yes/no answer for whether or not drugs are
25    there; correct?

1  A  Well, that really speaks to whether or not
2    there is drugs there or not.  Because if the
3    dog for example alerts to, for example, I'll
4    give you the example of currency that has not
5    been in circulation and certified to be drug
6    free, and a dog alerts to that, you know, then
7    that's a false alert.  And obviously it hasn't
8    met the criteria for even a qualitative test.
9  Q  Well, it would give you an incorrect yes
10    answer; right?
11  A  For what it's worth, yes.
12  Q  But that is still -- that yes answer is still
13    a qualitative result; right?
14  A  I wouldn't consider it a qualitative -- I
15    wouldn't consider it any result at all.
16  Q  So an incorrect result is no result at all?
17  A  It doesn't really -- it doesn't really
18    accomplish what you're trying to do.  You're
19    trying to determine is there drugs there or is
20    there not drugs there.  You take the control,
21    a negative control, and the dog alerts to
22    that, so obviously you have nothing.
23  Q  The dog is still giving you a binary yes or
24    no; correct?
25  A  Yes, but it's incorrect.

1  Q  Okay, and a binary yes or no result is a
2    qualitative test; correct?
3  A  That's correct, yes.
4  Q  So regardless of whether the results are
5    ultimately correct or incorrect, the dog is
6    giving a qualitative result; right?
7  A  Of a preliminary nature, yes.
8  Q  That's what a field test is.  Then you
9    mentioned it's preliminary because of
10    specificity; right?
11  A  That's what -- that's one of the reasons, yes.
12  Q  So with a dog alert that doesn't tell you
13    anything more than what drugs the dog was
14    trained on; right?
15  A  If indeed it's, you know, an accurate result,
16    yes.
17  Q  Then the other reason you believe it's
18    preliminary is it doesn't meet the kind of
19    drug testing criteria we talked about earlier;
20    right?
21  A  Yeah, that's one of the criteria is establish
22    the specificity so that you can rely on a
23    positive result.
24  Q  I guess what else other than the specificity
25    makes a dog alert preliminary?

1 A You should also have -- you should also have
2 positive controls and be able to establish a
3 relationship between the response and the
4 amount of material in that positive control.
5 So you've got to basically establish your
6 sensitivity of your test, what's the lowest
7 amount that a dog will alert to for example,
8 for that particular dog in that particular
9 setting.
10 Q Anything else as to why you believe those
11 results are preliminary?
12 A As I mentioned before, we're dealing with an
13 animal, it's a biological test. It's not a
14 chemical test as you would do in a laboratory,
15 and there are numerous variables that can
16 affect the biological system, which you
17 wouldn't have in a chemical test in a
18 laboratory for example, or even outside the
19 laboratory.
20 Q What variables are those?
21 A Sorry, I didn't hear you.
22 Q What variables are those?
23 A Well, to begin with individual variability
24 from one dog to the next. Variability as far
25 as breed is concerned. Studies have shown

1 there is variability as far as dog alert with
2 respect to that. Other environmental cues,
3 there might be interfering stuff that might be
4 present in the environment. Any cues that the
5 dog may receive from its handler. There's so
6 many variables.
7 Q Do you believe that drug detection dogs can be
8 reliable?
9 A Sorry, you're asking me -- please repeat that.
10 Q Sure. Do you believe that drug detection dogs
11 can be reliable?
12 A My opinion ---
13 BY MR. BURCH:
14 Can I just put a quick objection on the record
15 is that asking for a legal opinion and then
16 you can go ahead and answer, Dr. Poupko.
17 BY THE DEPONENT:
18 So from a scientific point of view, there may
19 be potential for a drug detecting dog to be
20 reliable, but it would involve a lot more than
21 what's done in most cases.
22 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23 Q What do you think would be required for a drug
24 detection dog to be reliable?
25 A Well, again I'm more concerned at this point

1 with the false alert, false positive, and that
2 if the dog was presented with a negative
3 control, let's say a dog alerts to currency,
4 right? A dog alerts to $252,140 currency,
5 then you would need a control, which would be
6 currency which was certified to be drug free,
7 in the amount or at least the number of bills
8 amounting to $252,140, and the dog -- the dog
9 should be able to differentiate, be able to
10 not alert to this drug-free currency. And
11 that would be of course in the exact same
12 environment that the dog is alerting to the
13 questionable currency.
14 Q So it's your opinion that for a drug dog alert
15 on $252,140 in United States currency to be
16 reliable, then law enforcement would have to
17 go out get $252,140 in U.S. currency, test it
18 make sure it's drug free, arrange it in the
19 same manner and place, and then deploy the dog
20 on both the U.S. currency at issue that was
21 seized and the currency that they obtained
22 that's clean; is that fair?
23 A Yeah. And of course, you know, it should be
24 very close in time to the dog being presented
25 with the currency that is in question. So

1 everything's got to be pretty much, you know,
2 the same. And even, you know, the number of
3 bills is going to be important as well.
4 Q You mean ---
5 A And the denominations -- and the
6 denominations, well, that could also be a
7 backup as well.
8 Q Why would the denominations be a backup?
9 A There's some variability from studies, studies
10 show that certain denominations tend to be
11 more contaminated than others.
12 Q So essentially you would require an exact
13 match in terms of number of bills and types of
14 denominations between the two sets of
15 currency?
16 A Yes, that's the way it's done in drug testing.
17 That's the way we do it in the laboratory. We
18 run a control, then we run a negative control,
19 and it's subjected to everything that the
20 sample that we're trying to determine there's
21 drug there or not, it's subjected to. And
22 it's handled in the exact same way.
23 Q Let's say you're testing currency in the lab.
24 What do you use as the negative control for a
25 $20 bill that you're testing?

1  A  You've got to have currency that's not been in
2     circulation.  But even so, I supposed there's
3     always a chance that somehow it got
4     contaminated because we know that most
5     currency in circulation, U.S. currency, is
6     contaminated with cocaine for example.  But it
7     has to be certified as drug free and that
8     would be your negative control.
9  Q  So your I guess opinion for what would be
10    required to establish a negative control with
11    the drug detection canine would be the same
12    for laboratory testing of currency,
13    essentially equal counterpart that has been
14    determined to be not in circulation and drug
15    free?
16 A  That's correct.  It's the same principle
17    essentially.  It's drug testing regardless of
18    the instrument.  We're using the dog in this
19    case as the instrument and we need to
20    determine whether that instrument's response
21    is reliable or not, particularly we're most
22    concerned with a false positive result.  But a
23    false negative is also in drug testing.
24 Q  Let's consider other scenarios.  Let's say
25    we're testing cocaine to see if cocaine, you

1     know, some white powder is cocaine.  What
2     would be the negative control for that?
3  A  Essentially you'd have to -- you'd have to run
4     something which is essentially in the same
5     matrix, in the same media or matrix, which was
6     certified to be drug free.  Sometimes it's
7     called a blank in the laboratory testing, and
8     the blank is subjected to everything that you
9     do for the sample that you're testing for.  So
10    if you extract it, you extract the blank as
11    well, test it in the same way.  You handle it
12    all in the same way.
13 Q  Well, that blank isn't cocaine; right?
14 A  No, obviously not because it's a negative
15    control.
16 Q  So what would ---
17 A  So for example, if you're testing urine you
18    have to have a urine sample that is certified
19    to be drug free or cocaine free.  If you're
20    testing blood same thing.  You're testing
21    saliva same thing, it has to have a control
22    and a control that is basically handled in the
23    same way.
24 Q  So it's your testimony that for example a
25    urine drug lab, whenever they test for the

1     presence of drugs they are also testing a
2     clean urine sample as a negative control?
3  A  No question.  From my experience over the
4     years in the various laboratories that I have
5     served in as a manager, supervisor, certifying
6     scientist, that's the way it's done.
7  Q  Where are they getting all these clean urine
8     samples?
9  A  Well, they have to get urine -- they have to
10    collect urine and then test it.  And if it
11    tests negative, then you can use it as a
12    negative control.  Sometimes it can be bought
13    commercially, some companies sell a certified
14    drug-free urine or blood or whatever it might
15    be.
16 Q  Well, if you test it and it tests negative,
17    what if that was a false negative?
18 A  If it consistently tests negative and you've
19    certified it, it was certified before you
20    started as negative, there's no reason to
21    think that it's a false negative.
22 Q  So you're essentially talking about like,
23    let's say, I've got a toxicology lab and I'm
24    testing urine drug samples, what you're
25    talking about is previous tests that have come

1     back negative can serve as negative controls;
2     is that right?
3  A  Yes.
4  Q  But those previous tests wouldn't be done, you
5     know, one to one at the same time as the
6     current sample at issue; right?  They would
7     have just been tests done in the past.
8  A  You would certified the control, the negative
9     control by testing it, and if indeed it tests
10    negative you use it as a control.  Then you
11    would run it when you test your sample, that
12    you want to know whether there is drug present
13    or not.  So coming into it, you've got to
14    certify negative control.
15 Q  So you would redo that essentially every time
16    you tested the sample?
17 A  Yes.  Yes, that's very important.
18 Q  I want to hop back to your resume.  I think
19    where we left off you had mentioned that you'd
20    done some teaching work at Florida
21    International and Southeastern College.  I
22    don't want to have to go through line by line
23    every single teaching position that you've
24    done, but are all the other teaching
25    experience that you have listed on your

1   resume?
2  A   Yes.
3  Q   And kind of the subject matters are listed as
4      well; right?
5  A   Yes.
6  Q   So no type of kind of academic teaching that's
7      not listed here?
8  A   Not that I can recall.
9  Q   What is your current job?
10 A   I'm a professor at Touro College located in
11     Jerusalem and I teach health sciences.  I'm
12     currently teaching anatomy and physiology,
13     nutrition and human development, this
14     semester.
15 Q   And in terms of your work experience, you
16     mentioned that I believe your resume lists you
17     were a quality assurance officer at Brooks Air
18     Force Base?
19 A   Yes, I was a civilian employee of the Air
20     Force drug testing laboratory.
21 Q   And you did that for about two years?
22 A   Little over two years.
23 Q   Can you tell me about that job, what did you
24     do specifically?
25 A   Essentially my responsibility as the

1   certifying scientist would be to review all
2  the results that were generated from the very
3  beginning that the sample was delivered to the
4  laboratory until given result was generated,
5  and to essentially sign off on it.  So that
6  was the certifying scientist aspect.  The
7  quality control officer was to institute
8  quality control procedures for the laboratory,
9  and to make sure that they were carried out
10 properly.  I did also inspections, internal
11 inspections from time to time as well in the
12 laboratory.
13 Q   For what types of tests were these?
14 A   These were urine tests.  These were Air Force
15     members that were tested for various reasons,
16     for a panel drugs of use such as cocaine,
17     marijuana, amphetamine, methamphetamine, LSD,
18     MDMA.  I don't recall the full list, I
19     mentioned amphetamine, methamphetamine.
20 Q   So Air Force service member would go pee in a
21     cup, that cup would get sent to the lab, that
22     would get tested and then you would look at
23     the results and make sure that they were --
24     and sign off as the certifying scientist that
25     the urine drug testing was done correctly; is

1   that accurate?
2  A   That was, yeah, the certifying scientist
3      aspect of it.  Yes.
4  Q   Did you ever operate the machines in the lab?
5  A   Yes I did.  In almost every laboratory that
6      I've worked in as either a manager or
7      supervisor or certifying scientist, I've
8      worked the instruments.  I've also done
9      research using the instruments for new
10     procedures, put new procedures in place.  And
11     I had to do some other general research in the
12     area.
13 Q   What types of machines were those?
14 A   Well, there's two types.  It's a two-tiered
15     process.  There's a screening which is an
16     immunological test which gives you a
17     preliminary result, and if it's positive then
18     it goes to be tested by gas chromatography-
19     mass spectrometry; we abbreviate that GC/MS.
20     And if it's positive -- it has to test
21     positive in both the screening and in the
22     confirmation which is GC/MS.
23 Q   The preliminary screening, was that like a
24     dipstick in a cup; was that a desktop
25     analyzer?  What type of preliminary screening

1   was ---
2  A   No, it was an instrument, an analyzer was used
3      in immunological test to test for the drug.
4      And if it tested positive, then it would go on
5      to be tested using GC/MS as the confirmation.
6  Q   Do you have any experience with the testing of
7      currency?
8  A   Yes, I've tested currency for cocaine.
9  Q   Could you tell me about that experience.
10 A   Well, there was one currency forfeiture case
11     that I recall where I collected currency from
12     various banks and brought it back to the
13     laboratory and tested the currency for
14     cocaine.
15 Q   What did you use to test the currency for
16     cocaine?
17 A   GC/MS.
18 Q   Any other experience testing currency?
19 A   There were some other cases, but I can't
20     recall specifics.
21 Q   Did you do the same type of methodology using
22     -- collecting the currency and then using
23     GC/MS?
24 A   No, we didn't do a screening, went straight to
25     the GC/MS.  Of course we had to extract the

1     bills, a methanol extraction, then a back
2     extraction, then we took that extract and we
3     analyzed it on the GC/MS.
4 Q   Tell me about that, what does doing the
5     extraction involve?
6 A   You use an organic solvent that is able to
7     extract out the cocaine which is on the
8     currency, if indeed it's there. There are
9     various solvents that you can use. As I
10    recall we used methanol at least initially.
11 Q   The IONSCAN that was performed in this case
12     was done on a sniff detection IONSCAN 500DT.
13     Have you ever operated one of those machines?
14 A   Yes, I have.
15 Q   How often?
16 A   I've had maybe three or four occasions, and it
17     was when I was at the military -- at the time
18     I was stationed at Fort Sam Houston in San
19     Antonio, so military police had an IONSCAN.
20     And I was interested in determining --
21     interested in testing currency in the general
22     circulation for the presence of cocaine.
23 Q   So when you were at Fort Sam Houston you used
24     sniff detection IONSCAN 500DT to test for the
25     presence of cocaine on currency in general

1     circulation?
2 A   Yeah, I think it may have been an earlier
3     model, maybe like a 400.
4 Q   But same general type of machine?
5 A   Yeah, essentially the same instrument.
6 Q   Was that in furtherance of some research that
7     you were doing?
8 A   Yes. It was a research project.
9 Q   Did that research project ever lead to
10    anything that was published?
11 A   No, unfortunately. As I said, three or four
12     times I used the instrument in testing, and at
13     some point, I think that the person that was
14     responsible left and there was no further
15     opportunity to use the instruments. So I
16     didn't get very far with the research project
17     because of that, ran into that difficulty.
18 Q   You were using that to test for cocaine;
19     right?
20 A   Yeah, I was looking for cocaine.
21 BY MR. JOHNSON:
22     We've been going about an hour and a half,
23     let's take a five-minute bathroom break.
24 (OFF THE RECORD)
25 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

1 Q   Dr. Poupko, Exhibit 3 is your report in this
2     case dated December 3, 2020. You have that or
3     a copy of your report in front of you?
4 A   Yes, I do.
5 (EXHIBIT NO. 3 INTRODUCED)
6 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
7 Q   When you did your report two of the case
8     materials that you mentioned you reviewed are
9     the opinion of Dr. Lareau and the opinion of
10    Dr. Rose, which were the Government's expert
11    witnesses in this case; is that right?
12 A   Yes.
13 Q   Do you have any opinions on, let's take first,
14     the opinion of Dr. Lareau?
15 A   Yes, I do.
16 Q   What are those opinions?
17 A   I don't agree with his conclusions.
18 Q   Could you be a little more specific?
19 A   Well, he addresses the IONSCAN results and the
20     IONSCAN is a preliminary test which needs
21     further confirmation, for example by GC/MS.
22     It is not quantitative. It was not designed
23     to be quantitative, and what he attempted to
24     do to make it quantitative is not acceptable
25     scientifically.

1 Q   Let's break that down. Why do you say it
2     needs further confirmation?
3 A   Well, again it is a preliminary screening test
4     and to definitively determine the presence of
5     drug a confirmation test is required, which is
6     a quantitative test, meets all the criteria of
7     a confirmation test.
8 Q   Why is it your opinion that a confirmation
9     test is required to definitively determine the
10    amount of drugs on the currency tested?
11 A   These are internationally accepted drug
12     testing standards. Every drug testing
13     laboratory has to conform to that.
14 Q   Any other basis?
15 A   Primarily it's not a quantitative test, that's
16     the main issue, as I see it.
17 Q   Why is the fact that an IONSCAN 500DT is not
18     as you call it a quantitative test an issue?
19 A   It goes to the issue of contamination with
20     currency in general circulation with cocaine
21     and some other drugs of abuse, so it would
22     require at least as a starting point a
23     quantitative test where you would have
24     basically some of the quantitative data
25     regarding currency in general circulation

1      versus the currency that you're testing, and
2      you don't have there.
3 Q  Is it your opinion that the IONSCAN used in
4      this case cannot distinguish between currency
5      in general circulation and currency that has
6      higher amounts of cocaine on it?
7 A  Yes.
8 Q  Why did you say it cannot distinguish between
9      them?
10 A  Because I said it's not a quantitative test
11      and we know that most -- somewhere between
12      two-thirds and up to 90 percent plus of the
13      currency in circulation is contaminated with
14      cocaine, so a positive result on the IONSCAN
15      doesn't really answer our question whether the
16      currency was in direct contact with controlled
17      substances such as cocaine.
18 Q  Is it your opinion that the IONSCAN in this
19      case gave the same result for each bundle of
20      currency tested?
21 A  In terms of the -- in terms of the response or
22      the signal, there were differences in the
23      numbers, but those numbers do not correspond
24      to actual quantities of drug.
25 Q  Why did you say that those numbers don't

1      correspond to actual quantities of drugs?
2 A  Because it's not a quantitative test, it was
3      never designed to be a quantitative test, it
4      was a test to give you a yes or no answer, and
5      that's basically what it's supposed to do. If
6      it's done properly it will give you something
7      that will give you a yes or no answer within
8      certain parameters.
9 Q  Did the IONSCAN in this case give a simple yes
10      or no answer for each bundle of currency
11      tested?
12 A  If you mean yes in terms of, you know, a
13      certain -- exceeding, let's say, a certain
14      cutoff level that the instrument is set for,
15      the answer is yes, but it doesn't tell you
16      anything about the quantity of drug that is
17      present.
18 Q  So it's your opinion that for each item tested
19      the IONSCAN gave the same answer in terms of
20      the level of specificity as to the amount of
21      the drug present?
22 A  Again, you know, it's giving you a -- giving
23      you a response which is telling you whether or
24      not the drug is present, and it served that
25      purpose. But it doesn't tell you how much is

1      really there, not quantitative.
2 Q  Sure. Do you know what all was tested in this
3      case?
4 A  Yeah, I have a list somewhere. I don't have
5      it memorized.
6 Q  Sure, that's not a memory test. I'll
7      represent to you that what was tested was two
8      bundles of currency, four out of the six
9      plastic bags that the currency was contained
10      in the Nike, Air Jordan sneaker box that the
11      bags of currency were then placed in, and the
12      interior of the black roller bag suitcase --
13      all that was placed in. So I'm trying to
14      understand your opinion on what the IONSCAN
15      results show, and what I understand your
16      testimony to be is that for each of those
17      tests the IONSCAN tells you the same degree of
18      specificity as to the amount of cocaine.
19 A  Specificity doesn't deal with amounts, it
20      deals with whether or not the drug is present
21      or not.
22 Q  Well, specificity in just general common use
23      of the word that, you know, bundle of currency
24      one that is tested and bundle of currency two
25      that is tested, is it your testimony that the

1      IONSCAN results tell you the same thing in
2      terms of the specific amount of cocaine on
3      each bundle tested?
4 A  No, it doesn't give you a specific amount of
5      cocaine, just tells you whether or not cocaine
6      is there.
7 Q  And my question to you isn't whether it gives
8      you a specific amount of cocaine. My question
9      to you is whether the IONSCAN results tell you
10      the same thing as to the specific amount of
11      cocaine on those bundles that were tested?
12 A  I'm sorry, I really don't understand what
13      you're asking.
14 Q  Sure. Can you look at the IONSCAN results for
15      bundle one and the IONSCAN results for bundle
16      two, and based on those results tell whether
17      or not there was more cocaine on, say, bundle
18      two than bundle one?
19 A  That would be very difficult, and you would
20      have to -- it would have to be a quantitative
21      test and it's not a quantitative test.
22 Q  I understand your opinion is that the IONSCAN
23      result is not a quantitative test as you ---
24 A  It's not my opinion -- it's not just my
25      opinion, it's the manufacturer's opinion;

1  Dr. Lareau mentions it, that it's not a
2  quantitative test.  Well known, it's not a
3  quantitative test.
4  Q  Dr. Poupko, my question to you is a simple
5  one.  I'll ask you to listen to the specific
6  question presented.  Can you, looking at the
7  specific IONSCAN results in this test, tell
8  whether or not there was more cocaine on the
9  second bundle tested than the first bundle
10  tested, or vice versa?
11  A  No.
12  Q  Have you looked at the IONSCAN results of this
13  test?
14  A  Yes, I have.
15  Q  Why do you say no?
16  A  As I said before, it's not a quantitative
17  test.  It is not designed to give you a
18  quantity, it just gives you a yes or no answer
19  based on the parameters that the instrument is
20  set up, which has to do with, you know, what
21  is the cutoff; what's the minimum amount that
22  would be considered to be a positive response.
23  Over and above that no.  It's like similar to
24  as I described for the laboratory test, the
25  two-tiered laboratory test, immunoassay

1  screening test, it's very similar to that in
2  terms of just giving you a yes or no answer.
3  Q  Do you have any other opinions on Dr. Lareau's
4  report in this case that we haven't talked
5  about generally?
6  A  In general, that's my opinion that I've
7  already expressed.
8  Q  So just to wrap this up, your opinions on
9  Dr. Lareau's report would be that you don't
10  agree with his conclusion and that you know,
11  the IONSCAN is not a quantitative test, and
12  essentially what he's doing in terms of his
13  conclusions isn't scientifically accurate; is
14  that fair?
15  A  I wouldn't disagree with everything that he
16  said.  I mean in terms of, you know, a
17  positive test on an IONSCAN is a good
18  screening, good preliminary result, although
19  it should be confirmed by more specific
20  methodology, which is quantitative.  So I
21  wouldn't disagree with characterizing the
22  results, given result as positive or negative.
23  Q  So you believe that IONSCANs can be reliable
24  in terms of giving positive and negative
25  results?

1  A  Yes, as long as it's done properly, it's
2  employed properly, the right procedures are
3  done.  For example, so make sure there's no
4  contamination, environmental contamination,
5  because it is a very sensitive instrument.
6  Q  In this case, Dr. Lareau opined that the right
7  procedures were done.  Do you have any
8  disagreement with that opinion?
9  A  No.  From what I've read, as far as the -- how
10  it was actually done, I wouldn't -- I wouldn't
11  have any problem with the conclusion that a
12  particular sample was positive or a particular
13  sample was negative.
14  Q  So no issues here with how law enforcement
15  used the machine and did the testing?
16  A  No, no issues.
17  Q  Let's look at your report.  Do you have that
18  in front of you?
19  A  Yes.
20  Q  In numbered paragraph one you start out with
21  "Several published studies demonstrate that
22  between 67 and a hundred percent of U.S.
23  banknotes"; you see that?
24  A  Yes.
25  Q  Which published studies are you referencing

1  there?
2  A  Well, actually I'm referencing a paper which
3  was a critical review of all the studies.  If
4  you want to know all the studies, then you'd
5  have to refer to my critical review called
6  "Drug Contamination of Currency and Canine
7  Alert," published in the Journal of Forensic
8  Sciences in 2018.
9  Q  If you will look at Exhibit 7.
10  A  Yes.
11  (EXHIBIT NO. 7 INTRODUCED)
12  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
13  Q  Is this the paper that you're referencing?
14  A  I'm sorry, what did you say, No. 7?
15  Q  Exhibit 7, yes.
16  A  Oh, Exhibit 7.
17  Q  Correct.
18  A  Okay.  I believe so, yes.
19  Q  And this is a paper by you, 2018, published in
20  the Journal of Forensic Sciences, titled "Drug
21  Contamination of U.S. Paper Currency and
22  Forensic Relevance of Canine Alert to Paper
23  Currency:  A Critical Review of the Scientific
24  Literature"; correct?
25  A  Yeah.  I can't take all the credit for it, I

1  mean there were two other authors.  I was the
2  primary first author.  There was Dr. Hearn and
3  Dr. Rossano.
4  Q  This is a paper that you coauthored; right?
5  A  Yeah.  I was the -- I was the primary --
6  primary author.
7  Q  And in it you review I guess the published
8  studies that were referenced in paragraph one
9  of your expert report in this case; right?
10  A  Correct.
11  Q  So if we wanted to know like which specific
12  studies you were referencing in paragraph one
13  of your expert report, you would look to the
14  journal article that's in Exhibit 7?
15  A  Correct.  If you -- there's a section that's
16  called review and analysis of scientific
17  literature on drug contamination of U.S.
18  currency in that paper.  Starts out with the
19  first page and goes on to part of the third
20  page.
21  Q  So long and short of it is that topic would be
22  discussed in this paper, and then there would
23  be citing references, and you can kind of
24  connect the dots there.
25  A  That's correct.

1  Q  There's several other references to studies in
2  your expert report.  For example, paragraph
3  four, "Studies demonstrate that cocaine
4  constantly generates methyl benzoate."  Is the
5  same principle applicable here, that if we
6  wanted to know what studies you're
7  referencing, the studies would be the ones
8  discussed in Exhibit 7?
9  A  You're referring to a specific reference in my
10  report, and if so, what number would that be?
11  Q  Sure.  Let's take for example paragraph four,
12  numbered paragraph four.
13  A  Okay.  Yes, so there's references three and
14  four specifically deal with that issue of
15  methyl benzoate.
16  Q  Gotcha.  So if you use the kind of parentheses
17  three and four or what's in the previous
18  paragraph two, that's referencing the --
19  specific references you listed in the expert
20  report?
21  A  Correct.
22  Q  Gotcha.  I want to get back to paragraph one
23  of your report.  You note that in the second
24  to last sentence, you note, "It is, however,
25  highly probable that it is a result of either

1  physical transfer of cocaine from relatively
2  few banknotes that have come in direct contact
3  with cocaine to otherwise erstwhile
4  uncontaminated banknotes, or a result of
5  transfer from contaminated currency counting
6  machines to erstwhile uncontaminated
7  banknotes," as the general reason why there is
8  currency contamination at a broad level; fair?
9  A  Yes.
10  Q  What do you base that conclusion on?
11  A  Well, it's highly unlikely with all the U.S.
12  currency in circulation, that all that
13  currency has come in direct contact with
14  controlled substances.  Also, there's some
15  evidence, some studies that have been done
16  regarding the currency counters in banks that
17  have shown to be contaminated with cocaine.
18  You know, it's as I said highly probable that
19  that's the mechanism.  I mean we don't know
20  definitively obviously, but it's highly
21  probable.  I can't think of another reasonable
22  mechanism.
23  Q  So it's either banknotes that have come in
24  direct contact with cocaine; i.e., someone
25  rolling up a bill and snorting coke would be

1  an example of that; right?
2  A  That would be one example, yeah.  Probably an
3  extremely small percentage that are direct
4  contact as you described.  Then those
5  contaminated bills come in contact with
6  erstwhile uncontaminated bills, contaminate
7  them.
8  Q  Then you concluded there that "Nevertheless,
9  there is a lack of data to definitively
10  distinguish between contaminated currency as a
11  result of direct contact with illicit cocaine,
12  and currency that became contaminated as a
13  result of contact with currency in direct
14  contact with the drug."
15  A  Yes, correct.
16  Q  Could you turn to Exhibit 6.
17  A  Which paper would that be?
18  (EXHIBIT NO. 6 INTRODUCED)
19  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
20  Q  Exhibit 6, this is the Jourdan.
21  A  Okay.
22  Q  Are you familiar with that article?
23  A  I have the paper here.
24  Q  If you have it in a different form other than
25  what's in Exhibit 6, that's fine too.

1  A  No, it's the same one.  I just need to -- I'd
2     like to get my copy of it.
3  Q  Sure, that's what I meant, feel free to look
4     at your copy versus the electronic one labeled
5     Exhibit 6.
6  A  Okay.
7  Q  Do you have that paper in front of you?
8  A  Yes.
9  Q  Are you familiar with this paper?
10 A  Yes.  Actually, I write about it in my
11    article.
12 Q  You anticipated my question.  What is your
13    understanding of the conclusions in this
14    paper?
15 A  First of all, he confirms -- the group
16    confirms that the very pervasive contamination
17    of U.S. currency with cocaine, testing many
18    samples over several years.  And then he
19    proposes an algorithm which could be used to
20    potentially distinguish between the
21    contamination of currency in the general
22    circulation versus contamination as a result
23    of direct contact with drug.
24 Q  So one of the things they do in this study is
25    they look at currency contamination across a

1     lot of different denominations, across a lot
2     of different -- 90 different locations in the
3     U.S. over long periods of time; fair?
4  A  Yes.
5  Q  And then they kind of determine, specifically
6     they state in the abstract "the level of
7     cocaine contamination was determined to
8     average 2.34 ng per bill across all
9     denominations, one, five, ten, twenty, fifty
10    and a hundred"; correct?
11 A  Yeah.  They're referring actually to
12    superficial cocaine on the surface of the
13    bill.  They didn't extract the bills.
14 Q  What do you mean by superficial cocaine on the
15    surface?
16 A  Cocaine that is on the surface that they can
17    remove with just swabbing or swiping.  That
18    sort of sampling technique.  It's a very small
19    percentage of the total cocaine in the bill,
20    probably on the order of about one-thousandth
21    of what's actually there.
22 Q  So you'd agree with me that the Jourdan study
23    used either gas chromatography or mass
24    spectrometry, or the liquid version of that?
25    LC/MS or GC/SM?

1  A  You're talking about the Jourdan study?
2  Q  Correct.
3  A  Yes.
4  Q  And I'll read to you from that abstract, they
5     note the extent of their cocaine contamination
6     was quantified by gas chromatography/mass
7     spectrometry or liquid chromatography/mass
8     spectrometry, and then he goes on, the level
9     of cocaine was determined and so on; correct?
10 A  Correct.  And by the way, as I recall, they
11    did use the IONSCAN as a screen, and what came
12    up positive they confirmed by GC, mass spec or
13    the liquid chromatography.  So they didn't
14    rely on the IONSCAN alone, it had to be
15    confirmed.
16 Q  So this study did the IONSCAN and then the
17    confirmation testing; right?
18 A  Yes.
19 Q  And they ultimately concluded to an average
20    level of cocaine contamination across
21    denominations in the country; right?
22 A  Yes.
23 Q  Then they also concluded that, and I'm quoting
24    from the abstract, "The levels of cocaine
25    contamination on currency submitted to the

1     Federal Bureau of Investigation laboratory in
2     criminal cases over the 1993 to 2001 time
3     frame had significantly higher contamination
4     than currency in general circulation";
5     correct?
6  A  Correct.  That's what they say.
7  Q  That's what they conclude in their study;
8     right?
9  A  Yes.  Well, that's their observation.
10 Q  And it sounds like your opinion is that this
11    study only picked up one one-thousandth of the
12    levels of the cocaine on bills; is that
13    correct?
14 A  Somewhere, you know, in that neighborhood
15    because what we generally find is averaging
16    out maybe a few micrograms of cocaine per
17    bill, and this is, you know, a little over two
18    nanograms and nanogram is one-thousandth of a
19    microgram.
20 Q  So I'm trying to understand what -- do you
21    think that study was inaccurate?
22 A  No, I don't think it was inaccurate.  It is
23    what it is, you know.  It's an analysis of the
24    currency, rather extensive analysis of U.S.
25    currency in the general circulation.  The

1       methodology is not the same methodology as all
2       the other studies of contamination of U.S.
3       currency in that it's only looking at what's
4       on the surface essentially with the swiped or
5       swabbed.
6 Q   And it's your opinion that if Jourdan and
7       company had looked at beyond what was on the
8       surface, the levels of cocaine would be
9       roughly a thousand times higher?
10 A   Roughly yes, based upon all the other studies
11       that have been done.
12 Q   What studies are those?
13 A   Those are the ones that I cited in my paper
14       under that section we just discussed, review
15       of analysis of scientific literature on drug
16       contamination of U.S. currency.
17 Q   So that would be the section of your paper
18       that kind of starts on Page 1, then goes to
19       Page 3?
20 A   Correct, part of Page 3.
21 Q   Let's turn to Paragraph 3 of your report. You
22       note that "The total number of banknotes in
23       this case as documented by the bank deposit
24       slip for the seized currency is 12,146
25       banknotes. Considering that the average level

1       of contamination per banknote is several
2       micrograms, it is reasonable to assume that
3       252,140 of currency in general circulation
4       contains at least a total of 15 milligrams of
5       cocaine"; right?
6 A   Yes. Considering the number of banknotes.
7 Q   Sure. Can you explain to me how you arrived
8       at that conclusion.
9 A   It's based upon the studies that we were just
10       talking about, contamination of U.S. currency
11       with cocaine, and overall the contamination
12       levels a few micrograms of cocaine per bill.
13       Multiply that by the number of bills and
14       that's pretty much what you come up with, at
15       least that number, at least 15 milligrams of
16       cocaine in 12,147 bills.
17 Q   Let's back that up. So in paragraph one you
18       note that between 67 and 100 percent of U.S.
19       banknotes in general circulation are
20       contaminated with cocaine; correct?
21 A   Yeah, I'm giving the full range. Most of the
22       data points to a lot closer to 90 percent.
23 Q   What percentage of the 12,147 banknotes in
24       this case did you consider were contaminated
25       when you arrived at that 15 milligram

1       calculation?
2 A   Well, as I said, the 67 percent is really --
3       is really an outlier and most of the data --
4       in fact, I have a table in my paper which
5       calculates all of the data on the
6       contamination. Most of the data shows at
7       least 90 percent contamination, most of the
8       studies. I mean this is not -- I'm not saying
9       a very specific amount, it's a general
10       ballpark figure in terms of a minimum amount,
11       at least 15 milligrams of cocaine.
12 Q   Right, and I'm trying to understand how you
13       got to that 15 milligrams. So did you -- I
14       mean I guess as a threshold question, did you
15       assume that a certain amount of the 12,147
16       banknotes were contaminated?
17 A   Assume 90 percent.
18 Q   So you assume 90 percent. So for whatever
19       number that would be, let's just -- I'm a
20       lawyer and obviously bad at math, let's say
21       that's 10,000. Then what level of cocaine per
22       banknote did you assume in making that
23       calculation?
24 A   I don't recall the specific, it might have
25       been five micrograms, might have been seven

1       micrograms. I think seven is probably the
2       most reasonable number to go with based upon
3       the studies, seven micrograms per bill. So if
4       you had 12,147, multiply that by seven, that
5       gives you 85,000 micrograms, which is 8500
6       milligrams, so it's well above 15, at least
7       15.
8 Q   So that would be 8,500 milligrams?
9 A   No, it would be 85 milligrams.
10 Q   Eighty-five.
11 A   In milligrams, yeah.
12 Q   So then you ---
13 A   Yeah, so even if it's 15 percent contamination
14       it's still way above 15 milligrams in the
15       total.
16 Q   Then you take your -- you take that number and
17       then you rely on a study by Furton and et al.
18       regarding the amount of methyl benzoate in
19       illicit cocaine; correct?
20 A   The percent of methyl benzoate on a weight-to-
21       weight basis in illicit cocaine.
22 Q   And methyl benzoate is what generates the
23       odor; correct?
24 A   Well, it may be more than -- there may be more
25       than one odorant that the dog alerts to.

1   There's some evidence to indicate that there
2   may be some unidentified highly volatile
3   substances that a dog alerts to besides methyl
4   benzoate. But certainly methyl benzoate is a
5   primary odorant that the dog alerts to.
6   Q   It's a gas with an odor; right?
7   A   It volatilizes, yeah, depending on the
8   temperature. Some if it's released into the
9   gaseous state, into the air.
10  Q   Take me through that, how does it volatilize?
11  A   Well, it has a certain vapor pressure and the
12  substance will volatilize based on its vapor
13  pressure and environmental factors. For
14  example, if the temperature is high in the
15  environment, it will be more likely to be
16  volatilized.
17  Q   So is this something that happens when the
18  bill -- let's assume we're talking about
19  currency that's contaminated with cocaine
20  here. Is this volatilization of the methyl
21  benzoate something that happens when the bill
22  is exposed to the air?
23  A   Yeah, it can -- basically yes, it's
24  volatilized means it is exposed to the air to
25  some certain extent.

1   Q   I'm just trying to understand, what triggers
2   that? Is it exposure to air; is it something
3   else? What's triggering this release of ---
4   A   It's the nature of methyl benzoate. No, it's
5   got a certain -- it's got a certain boiling
6   point, certain physical characteristics. And
7   as I said, depending on temperature it'll, you
8   know, volatilize either more, less into the
9   air. Some of it will be -- some of the
10  molecules will be in the gaseous state as
11  opposed to a liquid or solid state.
12  Q   Does methyl benzoate volatilize at a constant
13  rate?
14  A   In certain environmental conditions it will
15  volatilize yes, at a constant rate. But
16  dependent on the environmental conditions.
17  Q   So for example, if you had a bill that was in
18  a, you know, wine cellar or some type of
19  temperature-controlled room that didn't vary,
20  it would throughout time always give off the
21  same amount of methyl benzoate?
22  A   Yes. I mean as long as there is some way to
23  generate methyl benzoate. Methyl benzoate is
24  a breakdown product of the cocaine. So as
25  long as there's cocaine, there's going to be

1   methyl benzoate and it'll be generated at the
2   same rate.
3   Q   So eventually over time all the cocaine would
4   break down and there wouldn't be any more
5   methyl benzoate produced; is that right?
6   A   Yeah, I don't know how many years that would
7   take, but it's possible. Yes.
8   Q   And it's your opinion that, you know, as long
9   as the environmental factors stay the same,
10  that kind of breakdown is done at the same
11  rate?
12  A   As long as there's cocaine there to generate
13  the methyl benzoate, and the environmental
14  factors are the same, it'll volatilize at the
15  same rate.
16  Q   Other than temperature, what other
17  environmental factors influence the rate at
18  which cocaine volatilizes?
19  A   Humidity probably also is a factor, although
20  if any it's a small -- it's basically a small
21  factor. I mean it could also be environmental
22  pressure, barometric pressure could influence
23  the volatilization. It's kind of like water
24  boils -- water will boil, let's say, at a high
25  altitude at a much lower temperature than at

1   sea level for example.
2   Q   Any others?
3   A   No, those would probably be the major ones.
4   Q   If you could look at Exhibit 5, which are
5   photographs of the currency as it was packaged
6   in this case.
7   A   Okay, I'm going to have to pull them out.
8   (EXHIBIT NO. 5 INTRODUCED)
9   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
10  Q   Let me ask you this before you pull it out,
11  Dr. Poupko, have you ever seen any photographs
12  about how the currency was packaged in this
13  case?
14  A   In this case yes, I saw those photographs.
15  Q   Just let me know when you have that up in
16  front of you, Dr. Poupko.
17  A   Yes, I have the exhibit. I have the
18  photographs in front of me.
19  Q   If you could turn to the third pdf page, you
20  should see a picture of a plastic bag with
21  some bundled currency inside.
22  A   Yeah, I see the currency and I see plastic
23  surrounding it. Looks like it's been torn
24  open I believe. It's hard to tell.
25  Q   Then pdf page four of that, similar things,

1      you see the currency stacked together in
2      bundles; do you see that?
3  A   Yes.
4  Q   Does the currency's bundling have an effect on
5      the amount or rate at which it emits methyl
6      benzoate?
7  A   I would expect it would have an effect, but I
8      wouldn't be able to tell you how much of an
9      effect it has.  There's no studies really to
10     speak of as far as these materials, whether
11     plastic materials or even the stacking of one
12     bill next to another bill, how will that
13     affect the volatilization of methyl benzoate.
14     There's just no data on that, that I'm aware
15     of.
16  Q   But you would agree with me that it would
17     affect the rate at which it volatilizes?
18  A   I would expect that it would, yes.
19  Q   Both the bundling of the bills and the fact it
20     was wrapped in plastic bags?
21  A   Yeah, it depends on what you're comparing it
22     to.  I mean if you've got, you know,
23     individual bills that are spread out without
24     being bundled and without being packaged, you
25     know, you would expect the methyl benzoate to

1      volatilize more readily, sort of
2      configuration ---
3  Q   So if I took the bills and laid them out one
4      by one face up on a conference room table, you
5      would expect that they would volatilize, you
6      know, methyl benzoate more readily than if
7      they're all bundled together; right?
8  A   Yes.  But you also have to consider that the
9      concentration, air concentration, will be
10     reduced as you increase the amount of surface
11     area.  So the more you spread the bills out,
12     the more you get sort of a dilution factor in
13     terms of there being more air space that the
14     methyl benzoate is volatilizing in, or
15     volatilizing to.
16  Q   So if I understand that correctly, essentially
17     is it because there would be more surface area
18     of the bills exposed to the air that they
19     would volatilize more for that first part?
20  A   I would expect that, yes.
21  Q   Versus if they're bundled in stacks, then
22     obviously you know, the faces of the bills
23     that are in the middle of the bundle, they're
24     not being exposed to the air very much?
25  A   Yeah, I just can't tell you the extent of that

1      because as I said, there's a lack of studies
2      on this.  I was not able to find any studies
3      on this issue.
4  Q   Then I guess the second part of that you
5      mentioned though, is that you know, the wider
6      you would spread all these bills out, then
7      essentially there would be more air that
8      they're emitting methyl benzoate into, which
9      would you know, I guess kind of be a bigger
10     volume of air and therefore dilute the amount
11     over a wider space; is that correct?
12  A   Yeah.  Yeah, it's kind of like, let's say, an
13     air pollutant that's released into the air.
14     So at the site of its release you expect that
15     the concentration in the air would be very
16     high.  And as it dissipates further and
17     further in the environment, the concentration
18     is decreasing.
19  Q   In your report your kind of initial conclusion
20     is "The purported alert of the dog Ciro,
21     handler, drug detection team to 252,140 U.S.
22     currency and cocaine positive results by the
23     IONSCAN 500DT of samples of said currency does
24     not conclusively establish that said currency
25     was directly and recently exposed to illicit

1      cocaine and other controlled substances";
2      right?
3  A   Correct.
4  Q   Does it establish to any degree that the
5      currency was directly or recently exposed to
6      illicit cocaine?
7  A   Can't rule it out.  You can never rule it out,
8      but you can't rule it in on the basis of this
9      data.
10  Q   Do you think that the dog alert and cocaine
11     positive results by the IONSCAN are probative
12     evidence that the currency was exposed to
13     illicit cocaine?
14  A   I'm not really familiar with that legal term
15     "probative."
16  Q   I'm just using it in kind of the everyday
17     meaning of the word.  Do you think it makes it
18     more likely than otherwise that, you know,
19     there was cocaine exposure?
20  A   No, I wouldn't agree with that.
21  Q   So it's your opinion that the, you know, dog
22     alert and the IONSCAN, cocaine positive
23     results don't support the conclusion that the
24     currency was directly or recently exposed to
25     illicit cocaine at all?

1   A   That's correct.

2   Q   Just to be clear, that's zero, not one bit.

3   A   As I said, it doesn't, you know -- it doesn't
4       establish that the currency was in immediate
5       and direct contact with cocaine. It may have
6       or it may not have.

7   Q   I guess I'm just trying to use the term
8       conclusively establish in your report, and to
9       me, and correct me if I'm wrong, but it seems
10       like on the kind of scale of certainty that
11       conclusively establish would be at the far end
12       as a definite, right; i.e., you have 100
13       percent certainty that that happened?

14   A   No, I didn't really mean that that way, and I
15       don't think it means that.

16   Q   Then what do you mean by the term
17       "conclusively establish"?

18   A   Based upon the scientific principles, as far
19       as drug testing is concerned, I would not sign
20       off on this result as a positive result. If I
21       was a certified scientist, I would not sign
22       off on it as a positive result.

23   Q   So is that the I guess standard or prism that
24       you viewed the dog alert and cocaine results
25       of the IONSCAN 500DT for whether or not you

1       would sign off on it as a certifying
2       scientist?

3   A   Yes, because as I'd mentioned before, both of
4       these tests are designed to either give some
5       preliminary results as to presence of the
6       drug, cocaine in this case, or the IONSCAN
7       maybe go a little bit further in terms of more
8       comfortable with establishing that yes, there
9       is -- it is probable that a drug is there.
10       But in terms of quantitation doesn't tell you
11       anything, and therefore doesn't distinguish
12       between currency contamination, currency in
13       general circulation being contaminated, and
14       currency which was direct immediate contact
15       with cocaine.

16   Q   Then the ---

17   A   It's kind of like what I said in the beginning
18       about go to the doctor, so the doctor -- you
19       know, you tell the doctor, I have COVID, and
20       he says well, why do you think you have COVID,
21       because I got this you know, I got a headache
22       and I got a sore throat, and maybe I feel
23       chills; okay, that's interesting, maybe we
24       need to do further -- you know, look into this
25       further, and the doctor will maybe do an

1       examination and perhaps you know, look at your
2       throat, take your temperature; can't verify
3       whether or not you have a headache. So we've
4       gone basically from something relatively
5       subjective, and I said that the analogy I
6       think is a valid analogy to the dog, so worth
7       looking into, worth checking out. Certainly
8       he's not going to differentiate between COVID
9       and some other viral or bacterial infection
10       that presents in the same way, so you go
11       further, do the examination. But ultimately
12       the only way you're going to know is if you
13       have a test that will differentiate between
14       COVID and any other type of infection. You
15       know, that would be your gold standard. That
16       would be like your GC/MS test.

17   Q   So when you use the term "conclusively
18       establish" in your report, what you're
19       referencing is kind of the standard that you
20       would need to certify as a laboratory
21       certifying official; right?

22   A   Yes, and it's based upon my education, my
23       knowledge and my training in this field.

24   Q   And a necessary component of that would be
25       that you would need quantitative results;

1       right?

2   A   For confirmation yes, you would have to --
3       yes, you need a confirmation and a
4       confirmation must be quantitative.

5   Q   So put another way, can never be conclusively
6       established without that confirmation testing?

7   A   That's correct. And that's why for example
8       Jourdan in his studies did the IONSCAN, that
9       was his screen, then confirmed by GC/MS or LC,
10       liquid chromatography.

11   BY MR. JOHNSON:

12       Let's take five minutes, I might be about
13       done. Let me just look through my notes and
14       see if there's anything else I need to ask.

15   (OFF THE RECORD)

16   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

17   Q   You mentioned that you've testified as an
18       expert prior to this case; right?

19   A   I'm sorry, I didn't hear the end of the
20       sentence.

21   Q   Sure. You mentioned that you have prepared
22       expert reports and testified as an expert in
23       other cases prior to this one; right?

24   A   Yes.

25   Q   Have you ever had your opinions or testimony

1  excluded by a court?
2  A  I can think of at least one example of that,
3     yes.  It had to do with an alcohol testing
4     using an Intoxilyzer.  Judge wouldn't let me
5     testify about the Intoxilyzer because I wasn't
6     certified at the time on the Intoxilyzer.  It
7     goes back probably 30 years.
8  Q  Any other instances in which you've had your
9     expert opinions or testimony excluded by a
10    court?
11 A  No, not that I can think of.  No, usually when
12    I was qualified as an expert, I was qualified
13    as a forensic toxicologist and forensic
14    chemist.  Sometimes I testified as both, and
15    sometimes just as one.
16 Q  In your career as an expert witness have you
17    ever testified for the prosecution?
18 A  Yes.  In the years that I was at the Air Force
19    drug testing lab, I testified for the Air
20    Force and the courts martial on several
21    occasions.
22 Q  So that would have been in the JAG system?
23 A  Yes.  That would be when there was a positive
24    test and there was a courts martial or some
25    other legal proceeding.

1  Q  Was that part or kind of your job description
2     as -- I forget what your specific title was,
3     but was that part of your job description for
4     the Air Force was to testify?
5  A  Yes.
6  Q  You were kind of paid extra than your salary
7     to do it?
8  A  No, that was just part of my job.
9  Q  As a retained expert where you are paid, have
10    you ever testified for the prosecution?
11 A  Yes, but not that often.  As I mentioned,
12    early in my career were a lot of criminal
13    cases that were DUIs, DWIs, and I don't recall
14    ever testifying for the prosecution.  But
15    there may have been a couple of cases that I
16    did testify for the prosecution.  Then of
17    course all the civil cases I testified for
18    plaintiff or defendant depending on the
19    particular case.
20 Q  Would it be fair to say that most of your
21    retained expert work has been for the defense
22    in forfeiture or criminal cases?
23 A  Yes.
24 Q  Do you have like a ballpark percentage as what
25    that would be, 80/20, 90/10, 50/50?

1  A  I can't recall a case where I testified for
2     the Government in a currency forfeiture case.
3  BY MR. JOHNSON:
4     Before we go off the record, Dr. Poupko, one
5     of the things that we discussed at the outset
6     of this was since you are in Israel currently
7     and the court reporter can't swear you in
8     because she's in North Carolina, is that you
9     will be signing a declaration stating that
10    your testimony here was under oath and
11    truthful, and I have given your attorney a
12    sample of that declaration.  And we will then
13    make that declaration a deposition exhibit.
14    And I just wanted to make clear on the record
15    that that was going to be the kind of process
16    for getting this testimony under oath.  Ed,
17    does that comport with your understanding?
18 BY MR. BURCH:
19    Yes.
20 BY THE DEPONENT:
21    Yes, that was my understanding as well.
22 BY MR. JOHNSON:
23    Okay, with that I have nothing further and
24    will pass the witness.
25 BY MR. BURCH:

1     I don't have any questions.
2  BY MR. JOHNSON:
3     All right, Dr. Poupko, thank you for your time
4     today.
5  BY THE DEPONENT:
6     You're welcome.
7  (EXHIBIT NO. 4 DEEMED MARKED)
8  (PROCEEDINGS CONCLUDED AT APPROXIMATELY 10:50 A.M.
9  NEITHER COUNSEL NOR THE WITNESS REQUESTED TO READ
10 AND SIGN THE DEPOSITION.)

86

CERTIFICATE

I, Mai-Beth Ketch, CCR, CVR-M, Court Reporter
and Notary Public, do hereby certify that the
foregoing 85 pages are an accurate transcript of
the deposition of Jay M. Poupko, Ph.D., taken by me
and transcribed under my supervision.

I further certify that I am not financially
interested in the outcome of this action, a
relative, employee, attorney or counsel of any of
the parties, nor am I a relative or employee of
such attorney or counsel.

This is the 14th day of January, 2021.

_____

MAI-BETH KETCH, CCR, CVR-M

Notary Public No.: 19981410006

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)1

**A**

a.m 1:11
  85:8
abbreviate
  44:19
ability
  26:11
able 6:14
  29:1 34:2
  36:9,9
  46:6 74:8
  76:2
Absent 25:21
abstract
  63:6 64:4
  64:24
abuse 10:20
  10:24 11:8
  11:17 12:3
  49:21
abusing
  10:25 11:4
academic 9:2
  9:10 42:6
academic...
  9:17
acceptable
  48:24
accepted
  18:2 49:11
accomplish
  32:18
accurate
  30:16
  33:15 44:1
  55:13 86:5
action 86:9
actual 50:24
  51:1
address 28:4
addressed
  15:7
addresses
  48:19
affect 34:16
  74:13,17
afternoon
  3:19
ago 26:21

agree 24:13
  24:17 25:5
  48:17
  55:10
  63:22
  74:16
  77:20
AGREED 3:7
Agreement
  3:1
ahead 13:20
  35:16
air 42:17,19
  43:14,20
  52:10 70:9
  70:22,24
  71:2,9
  75:9,13,18
  75:24 76:7
  76:10,13
  76:13,15
  82:18,19
  83:4
AIRPORT 1:9
al 69:17
Albert 7:16
alcohol
  11:18 12:3
  12:20 82:3
alert 16:12
  16:13 17:1
  23:24 25:8
  25:12 26:1
  26:7 32:7
  33:12,25
  34:7 35:1
  36:1,10,14
  57:7,22
  76:20
  77:10,22
  78:24
alerted
  14:17
  23:10
  25:15,22
  31:8
alerting
  16:2,20
  25:20
  31:20,22

  36:12
alerts 25:3
  25:14 32:3
  32:6,21
  36:3,4
  69:25 70:3
  70:5
algorithm
  62:19
altitude
  72:25
altogether
  15:15
AMERICA 1:4
American
  10:16
amount 9:8
  30:3,13
  34:4,7
  36:7 49:10
  51:20
  52:18 53:2
  53:4,8,10
  54:21 68:9
  68:10,15
  69:18
  71:21 74:5
  75:10
  76:10
amounting
  36:8
amounts
  15:25 50:6
  52:19
amphetamine
  43:17,19
amphetam...
  11:9
analogy 80:5
  80:6
analysis
  58:16
  65:23,24
  66:15
analyzed
  46:3
analyzer
  44:25 45:2
anatomy
  11:23

  42:12
and/or 3:1
  86:21
animal 24:1
  24:2 34:13
answer 3:11
  6:9,16,17
  7:5 10:22
  13:20 21:5
  22:13
  31:24
  32:10,12
  35:16
  50:15 51:4
  51:7,10,15
  51:19
  54:18 55:2
anticipated
  62:12
Antonio
  46:19
APPEARANCES
  1:14
applicable
  59:5
apply 86:20
appropriate
  23:6
APPROXIM...
  1:7 85:8
area 7:24
  12:2 13:7
  26:19
  44:12
  75:11,17
areas 8:19
Arkansas
  15:1 27:4
arrange
  36:18
arrive 23:19
arrived 67:7
  67:25
article 2:14
  2:16 58:14
  61:22
  62:11
asbestos
  10:4
Asheville

  1:25 86:25
  86:25
asking 35:9
  35:15
  53:13
asks 21:22
aspect 43:6
  44:3
assistant
  1:16 3:25
associated
  8:8,11
  25:20
Association
  17:24
assume 67:2
  68:15,17
  68:18,22
  70:18
assuming
  26:1,4
assurance
  42:17
attempted
  48:23
attended
  1:13
attorney 4:1
  84:11
  86:10,12
Attorney's
  1:17
attorneys
  1:16 12:6
AUSAs 4:21
author 58:2
  58:6
authors 58:1
average 63:8
  64:19
  66:25
averaging
  65:15
Aviv 9:18
aware 74:14

**B**

B 27:23
back 14:2
  15:2 41:1

41:18
45:12 46:1
59:22
67:17 82:7
**backup** 37:7
37:8
**bacterial**
80:9
**bad** 4:15
68:20
**bag** 52:12
73:20
**bags** 52:9,11
74:20
**BAIN-CREED**
1:16
**ballpark**
68:10
83:24
**bank** 16:18
66:23
**banknote**
67:1 68:22
**banknotes**
56:23 60:2
60:4,7,23
66:22,25
67:6,19,23
68:16
**banks** 45:12
60:16
**barometric**
72:22
**Barry** 11:22
**base** 42:18
60:10
**based** 20:14
20:16
53:16
54:19
66:10 67:9
69:2 70:12
78:18
80:22
**basic** 5:21
**basically**
22:17
23:25
24:10 29:2
34:5 39:22

49:24 51:5
70:23
72:20 80:4
**basis** 49:14
69:21 77:8
**bathroom**
47:23
**Beecham**
11:14
**beginning**
22:14 43:3
79:17
**behalf** 1:13
1:18,22
**behave** 24:7
**behaviors**
25:19
**believe** 15:2
29:7 31:16
33:17
34:10 35:7
35:10
42:16
55:23
57:18
73:24
**BENJAMIN**
1:16
**benzoate**
59:4,15
69:18,20
69:22 70:4
70:4,21
71:4,12,21
71:23,23
72:1,5,13
74:6,13,25
75:6,14
76:8
**best** 6:23
**beyond** 66:7
**bigger** 76:9
**bill** 37:25
60:25 63:8
63:13,19
65:17
67:12 69:3
70:18,21
71:17
74:12,12

**bills** 36:7
37:3,13
46:1 61:5
61:6 63:13
65:12
67:13,16
74:19,23
75:3,11,18
75:22 76:6
**binary** 30:19
32:23 33:1
**biological**
24:1,4
34:13,16
**Biologicals**
10:16
**bit** 8:10
78:2 79:7
**black** 52:12
**blank** 39:7,8
39:10,13
**blood** 39:20
40:14
**boil** 72:24
**boiling** 71:5
**boils** 72:24
**Boltz** 20:8
**bond** 16:25
**bought** 40:12
**box** 52:10
**break** 7:2,5
22:13
23:20
47:23 49:1
72:4
**breakdown**
71:24
72:10
**breaking**
8:10
**breed** 34:25
**broad** 7:23
12:11 60:8
**Brooks** 42:17
**brought**
12:19
16:10
45:12
**Broward**
11:24

**bundle** 50:19
51:10
52:23,24
53:3,15,15
53:17,18
54:9,9
75:23
**bundled**
73:21
74:24 75:7
75:21
**bundles** 52:8
53:11 74:2
**bundling**
74:4,19
**Burch** 1:20
1:20 4:8
35:13
84:18,25
**Bureau** 65:1

—————————
**C**
**calculates**
68:5
**calculation**
68:1,23
**California**
1:21
**call** 49:18
**called** 13:5
20:7 22:20
39:7 57:5
58:16
**cancer** 8:21
8:22,24
**canine** 17:12
18:11
20:22 24:7
27:22
38:11 57:6
57:22
**canine's**
28:8
**canines**
14:24 18:8
27:7
**career** 82:16
83:12
**Carolina** 1:1
1:18 3:4

84:8
**carried** 43:9
**case** 2:10
4:2,21 5:1
5:4 12:9
13:24,24
14:19,21
18:23 19:5
19:19,23
20:2,7,19
20:22
24:12
38:19
45:10
46:11 48:2
48:7,11
50:4,19
51:9 52:3
55:4 56:6
58:9 66:23
67:24 73:6
73:13,14
79:6 81:18
83:19 84:1
84:2
**cases** 12:12
12:14,18
12:23,25
13:5,5,10
13:11,18
13:22,23
14:13,18
35:21
45:19 65:2
81:23
83:13,15
83:17,22
**categories**
19:19
**category**
14:2
**cause** 3:14
8:22
**CCR** 1:25 3:3
86:3,16
**cellar** 71:18
**certain** 9:8
21:19
24:20 30:3
37:10 51:8

51:13,13
68:15
70:11,25
71:5,5,6
71:14
**certainly**
26:12 29:3
70:4 80:7
**certainty**
78:10,13
**Certificate**
2:5 86:2
**certific...**
18:17,20
25:4,10
86:19
**certific...**
20:24
**certified**
24:10,19
24:21,23
32:5 36:6
38:7 39:6
39:18
40:13,19
40:19 41:8
78:21 82:6
**certify**
41:14
80:20 86:4
86:8
**certifying**
40:5 43:1
43:6,24
44:2,7
79:1 80:21
86:22
**chance** 38:3
**changes** 8:7
8:15
**characte...**
71:6
**characte...**
55:21
**Charlotte**
1:2,18
**CHARLOTT...**
1:8
**check** 17:2
**checking**

80:7
**chemical**
34:14,17
**chemicals**
8:22
**chemist**
82:14
**chemistry**
11:23
**chills** 79:23
**chromato...**
63:23
64:13
81:10
**chromato...**
44:18
**chromato...**
16:22
**chromato...**
64:6,7
**chromosomal**
8:8
**circulation**
16:3 32:5
38:2,5,14
46:22 47:1
49:20,25
50:5,13
60:12
62:22 65:4
65:25 67:3
67:19
79:13
**Ciro** 20:23
21:3,12
76:20
**Ciro's** 20:23
21:1,6
**cited** 66:13
**citing** 58:23
**City** 7:17
**civil** 1:2
3:5 12:17
83:17
**civilian**
42:19
**clarify** 6:24
**clean** 36:22
40:2,7
**clear** 20:10

78:2 84:14
**clinical**
11:15
**close** 36:24
**closer** 67:22
**coauthored**
58:4
**cocaine** 11:8
15:24,25
16:24
17:13
24:23 38:6
38:25,25
39:1,13,19
43:16 45:8
45:14,16
46:7,22,25
47:18,20
49:20 50:6
50:14,17
52:18 53:2
53:5,5,8
53:11,17
54:8 59:3
60:1,3,17
60:24
61:11
62:17 63:7
63:12,14
63:16,19
64:5,9,20
64:24
65:12,16
66:8 67:5
67:11,12
67:16,20
68:11,21
69:19,21
70:19
71:24,25
72:3,12,18
76:22 77:1
77:6,10,13
77:19,22
77:25 78:5
78:24 79:6
79:15
**coke** 60:25
**COLEMAN** 1:8
**collect**

40:10
**collected**
45:11
**collecting**
45:22
**College** 7:16
11:24
41:21
42:10
**collision**
12:18
**Columbia**
8:23 9:1,3
**come** 5:11
24:6 40:25
60:2,13,23
61:5 67:14
**comfortable**
79:8
**coming** 41:13
**commencing**
1:11
**commerci...**
40:13
**common** 52:22
**communic...**
22:10
**Community**
11:24
**companies**
12:4 40:13
**company** 66:7
**comparing**
74:21
**completely**
27:18
**complex** 24:5
**component**
80:24
**comport**
84:17
**concentr...**
75:9,9
76:15,17
**concerned**
34:25
35:25
38:22
78:19
**conclude**

65:7
**concluded**
61:8 64:19
64:23 85:8
**conclusion**
55:10
56:11
60:10 67:8
76:19
77:23
**conclusions**
48:17
55:13
62:13
**conclusi...**
76:24 78:8
78:11,17
80:17 81:5
**conditions**
71:14,16
**conduct** 27:1
**conducted**
15:1,12
**conference**
75:4
**configur...**
75:2
**confirma...**
44:22 45:5
48:21 49:2
49:5,7,8
64:17 81:2
81:3,4,6
**confirmed**
55:19
64:12,15
81:9
**confirms**
62:15,16
**conform**
49:13
**connect**
58:24
**connection**
6:7
**consider**
32:14,15
38:24
67:24 75:8
**considered**

54:22
**Considering**
66:25 67:6
**consiste...**
40:18
**constant**
71:12,15
**constantly**
59:4
**consulted**
12:8
**consulting**
11:25 12:1
12:2,5
**contact**
50:16 60:2
60:13,24
61:4,5,11
61:13,14
62:23 78:5
79:14
**contained**
52:9
**containing**
19:18
20:12
**contains**
67:4
**contaminate**
61:6
**contamin...**
37:11 38:4
38:6 50:13
60:5,17
61:5,10,12
67:20,24
68:16
70:19
79:13
**contamin...**
49:19 56:4
56:4 57:6
57:21
58:17 60:8
62:16,21
62:22,25
63:7 64:5
64:20,25
65:3 66:2
66:16 67:1

67:10,11
68:6,7
69:13
79:12
**contest** 7:1
**control**
16:14,16
16:17
23:18
24:11 29:8
29:14,16
29:18,21
32:20,21
34:4 36:3
36:5 37:18
37:18,24
38:8,10
39:2,15,21
39:22 40:2
40:12 41:8
41:9,10,14
43:7,8
86:21
**controlled**
8:2 12:15
12:16,24
23:15
28:15
50:16
60:14 77:1
**controls**
29:10,11
29:11,12
29:13 34:2
41:1
**conversely**
30:18
**copy** 18:3
48:3 62:2
62:4
**corona** 21:22
22:2,7,8
**correct** 5:1
5:2,4,5,23
7:13,14
18:11,14
18:15
19:24
20:12,13
24:15

25:16,23
26:2 27:13
27:25 28:1
30:20
31:19,25
32:24 33:2
33:3,5
38:16
57:17,24
58:10,15
58:25
59:21
61:15
63:10 64:2
64:9,10
65:5,6,13
66:20
67:20
69:19,23
76:11 77:3
78:1,9
81:7
**correctly**
21:11
43:25
75:16
**correspond**
50:23 51:1
**counsel** 1:13
3:8,8 85:9
86:10,12
**count** 5:18
**counterpart**
38:13
**counters**
60:16
**counting**
60:5
**country**
64:21
**couple** 83:15
**course** 15:20
36:11,23
45:25
83:17
**court** 1:1
6:3,11
82:1,10
84:7 86:3
**courts** 82:20

82:24
**COVID** 79:19
79:20 80:8
80:14
**credit** 57:25
**crime** 13:15
14:3,9,10
**criminal**
12:14,23
13:7 65:2
83:12,22
**criteria**
23:16
27:11,24
28:10,13
28:17,18
28:19,20
28:23 29:4
32:8 33:19
33:21 49:6
**critical**
2:14 26:21
57:3,5,23
**cross-At...**
6:7
**cues** 35:2,4
**cup** 43:21,21
44:24
**currency** 1:7
13:25
14:17
15:24 16:3
16:4,5,6
17:13 32:4
36:3,4,6
36:10,13
36:15,17
36:20,21
36:25
37:15,23
38:1,5,5
38:12 45:7
45:8,10,11
45:13,15
45:18,22
46:8,21,25
49:10,20
49:25 50:1
50:4,5,13
50:16,20

51:10 52:8
52:9,11,23
52:24 57:6
57:21,23
58:18 60:5
60:8,12,13
60:16
61:10,12
61:13
62:17,21
62:25
64:25 65:4
65:24,25
66:3,16,24
67:3,10
70:19 73:5
73:12,21
73:22 74:1
76:22,23
76:24 77:5
77:12,24
78:4 79:12
79:12,14
84:2
**currency's**
74:4
**current** 41:6
42:9
**currently**
42:12 84:6
**cutoff** 51:14
54:21
**cutting** 6:19
**CVR-M** 1:25
3:3 86:3
86:16

---

**D**

**DARREN** 1:7
**data** 49:24
61:9 67:22
68:3,5,6
74:14 77:9
**dated** 48:2
**day** 86:13
**deal** 52:19
59:14
**dealing**
12:24
23:25

deals 52:20
December
  1:11 48:2
declaration
  2:20 84:9
  84:12,13
decreasing
  76:18
deemed 2:19
  3:10,11
  85:7
defendant
  1:9,22 3:9
  83:18
defense
  83:21
definite
  78:12
definitive
  22:6 26:11
definiti...
  49:4,9
  60:20 61:9
degree 29:3
  29:6 52:17
  77:4
delivered
  43:3
demonstrate
  56:21 59:3
denomina...
  37:5,6,8
  37:10,14
  63:1,9
  64:21
department
  7:21 9:11
  10:17,18
depend 25:3
  25:9
dependent
  71:16
depending
  70:7 71:7
  83:18
depends 25:2
  74:21
deploy 36:19
DEPONENT
  19:2 35:17

84:20 85:5
Deponent's
  2:8,12
deposed 5:8
  5:13,15,16
deposit
  66:23
deposition
  1:6,12 3:2
  3:9 20:8
  28:6 84:13
  85:10 86:6
depositions
  3:2 20:6
described
  54:24 61:4
description
  83:1,3
designed
  21:8 48:22
  51:3 54:17
  79:4
desktop
  44:24
detect 24:1
  24:3
detecting
  14:16 15:9
  15:20
  21:15
  26:13,16
  35:19
detection
  14:23 15:8
  17:13 18:8
  18:13,14
  18:18
  20:22 21:2
  21:7,17
  22:15
  24:13,18
  27:6,22
  28:8 30:21
  35:7,10,24
  38:11
  46:12,24
  76:21
determin...
  30:5
determine

13:11 22:7
  22:18
  32:19
  37:20
  38:20 49:4
  49:9 63:5
determined
  38:14 63:7
  64:9
determining
  13:3 14:3
  46:20
development
  8:7,9,11
  8:14,14,16
  42:13
differences
  50:22
different
  15:24
  25:13
  27:17,18
  31:23
  61:24 63:1
  63:2,2
differen...
  36:9 80:8
  80:13
difficult
  53:19
difficulty
  47:17
dilute 76:10
dilution
  75:12
diploma 7:19
dipstick
  44:24
direct 2:4
  3:18 4:12
  7:12 19:4
  35:22
  47:25 48:6
  50:16
  57:12 60:2
  60:13,24
  61:3,11,13
  61:19
  62:23 73:9
  78:5 79:14

81:16
  86:21
direction
  21:19
directly
  18:20
  76:25 77:5
  77:24
disagree
  55:15,21
disagree...
  56:8
discussed
  58:22 59:8
  66:14 84:5
discussing
  17:9 18:7
  18:9
disserta...
  8:3,5,13
dissipates
  76:16
distinguish
  50:4,8
  61:10
  62:20
  79:11
DISTRICT 1:1
  1:1
DIVISION 1:2
doctor 9:4
  21:21,21
  22:1 79:18
  79:18,19
  79:25
document 2:1
  18:23 19:3
documented
  66:23
dog 14:16
  15:9,21
  21:2,7
  22:8,23
  23:10,24
  24:12,18
  24:23 25:1
  25:3,8,12
  25:14 26:5
  26:11,12
  31:7,20,22

31:23 32:3
  32:6,21,23
  33:5,12,13
  33:25 34:7
  34:8,24
  35:1,5,19
  35:24 36:2
  36:3,4,8,8
  36:12,14
  36:19,24
  38:18
  69:25 70:3
  70:5 76:20
  77:10,21
  78:24 80:6
dogs 15:4,13
  15:15 16:2
  16:8,10,20
  17:1 18:13
  18:15,18
  21:15,17
  22:15
  24:14,18
  26:7,12,13
  30:21
  31:17 35:7
  35:10
doing 6:5
  12:1,5,13
  13:13 14:8
  46:4 47:7
  55:12
dots 58:24
Dr 3:20,22
  4:3,11,13
  5:10,14
  8:11 10:21
  10:21
  17:17 19:8
  20:9 25:5
  35:16 48:1
  48:9,10,14
  54:1,4
  55:3,9
  56:6 58:2
  58:3 73:11
  73:16 84:4
  85:3
drop 22:19
drug 10:15

10:17,19
11:10,15
12:2,20
13:4,12
14:4,23
16:21 18:7
18:13,14
18:17
20:22 21:2
21:6,16
22:15,17
22:23
23:16,24
24:2,13,18
25:8,12,13
25:20
26:16 27:6
27:21,24
28:8,10
29:4,7
30:21 31:4
31:7,7,10
31:14,17
31:18 32:5
33:19 35:7
35:10,19
35:23 36:6
36:14,18
37:16,21
38:7,11,14
38:17,23
39:6,19,25
40:24
41:12
42:20
43:25 45:3
49:5,11,12
50:24
51:16,21
51:24
52:20 57:6
57:20
58:17
61:14
62:23
66:15
76:21
78:19 79:6
79:9 82:19
**drug-free**

36:10
40:14
**drugs** 8:1
9:24,25
10:20,24
11:8,17
24:3 25:13
25:16,22
25:24 26:2
26:5 31:24
32:2,19,20
33:13 40:1
43:16
49:10,21
51:1
**DUI** 13:5
**DUIs** 83:13
**DWI** 13:5
**DWIs** 83:13

**E**

**e-mail** 19:11
**earlier**
26:17 27:5
33:19 47:2
**early** 8:14
15:2 83:12
**Ed** 4:7 84:16
**education**
80:22
**EDWARD** 1:20
**effect** 12:22
74:4,7,9
**Eighty-five**
69:10
**Einstein**
7:16
**either** 10:8
44:6 59:25
60:23
63:23 71:8
79:4
**electronic**
62:4
**else's** 9:8
**embryo** 8:15
8:18
**embryos** 8:17
**emits** 74:5
**emitting**

76:8
**employed**
56:2
**employee**
42:19
**employees**
11:7,10,11
14:10
**employment**
10:2,8
**encounter**
10:2
**ended** 16:16
**endurance**
7:1
**enforcement**
15:5 36:16
56:14
**entertain**
22:2
**entitled**
17:11
**environment**
35:4 36:12
70:15
76:17
**environm...**
35:2 56:4
70:13
71:14,16
72:9,13,17
72:21
**equal** 38:13
**erstwhile**
60:3,6
61:6
**especially**
6:6
**ESQ** 1:15,16
1:20
**essentially**
30:15
37:12
38:13,17
39:3,4
40:22
41:15
42:25 43:5
47:5 55:12

66:4 75:16
76:7
**establish**
26:15 29:8
30:7 31:17
33:21 34:2
34:5 38:10
76:24 77:4
78:4,8,11
78:17
80:18
**established**
31:2,6
81:6
**establis...**
29:20 79:8
**et** 69:17
**etcetera**
11:9
**eventually**
72:3
**everyday**
77:16
**everythi...**
37:1
**evidence**
26:10,15
60:15 70:1
77:12
**exact** 15:14
36:11
37:12,22
**examination**
2:4 3:18
4:12 7:12
19:4 22:4
35:22
47:25 48:6
57:12
61:19 73:9
80:1,11
81:16
**example** 29:9
30:1 32:3
32:3,4
34:7,18
38:6 39:17
39:24
48:21 56:3
59:2,11

61:1,2
70:14
71:17 73:1
81:7 82:2
**exceeding**
51:13
**excellent**
21:4
**excluded**
82:1,9
**Excuse** 14:20
**exhibit** 2:7
2:9,11,13
2:15,17,19
7:8,11
18:22 19:1
19:5,13,17
48:1,5
57:9,11,15
57:16
58:14 59:8
61:16,18
61:20,25
62:5 73:4
73:8,17
84:13 85:7
**exhibits** 2:6
19:12
**expect** 74:7
74:18,25
75:5,20
76:14
**experience**
14:23,25
18:7,8
40:3 41:25
42:15 45:6
45:9,18
**expert** 4:25
5:3 12:7
48:10 58:9
58:13 59:2
59:19
81:18,22
81:22 82:9
82:12,16
83:9,21
**explain** 67:7
**exposed**
70:22,24

75:18,24
76:25 77:5
77:12,24
**exposure**
71:2 77:19
**expound** 27:8
**expressed**
55:7
**extensive**
65:24
**extent** 64:5
70:25
75:25
**extra** 83:6
**extract**
39:10,10
45:25 46:2
46:7 63:13
**extraction**
46:1,2,5
**extremely**
61:3

---
**F**

**face** 75:4
**faces** 75:22
**fact** 23:4,10
49:17 68:4
74:19
**factor** 72:19
72:21
75:12
**factors**
70:13 72:9
72:14,17
**fair** 6:10,18
6:24 7:6
21:14 25:8
28:5 36:22
55:14 60:8
63:3 83:20
**false** 16:17
25:24 26:1
32:7 36:1
36:1 38:22
38:23
40:17,21
**falsely**
16:20
31:20,22

**familiar**
23:17
61:22 62:9
77:14
**far** 6:5
34:24 35:1
47:16 56:9
74:10
78:11,18
**Fayettev...**
15:1,5
27:4
**Federal** 65:1
**feel** 6:22
62:3 79:22
**feeling**
21:25
**fellowship**
9:3
**feverish**
21:25
**field** 9:15
9:20 21:9
21:13,15
21:17
28:16,20
28:23 33:8
80:23
**fifty** 63:9
**figure** 68:10
**financially**
86:8
**find** 16:8
65:15 76:2
**finding**
19:10
**fine** 4:9
61:25
**finish** 13:20
**first** 5:22
9:2,9
22:17,18
23:20
29:23
48:13 54:9
58:2,19
62:15
75:19
**five** 15:15
19:22

24:25 63:9
68:25
81:12
**five-minute**
47:23
**Florida**
41:20
**focus** 9:13
**focused** 8:20
**followed**
3:10,11
**follows** 1:13
**Force** 42:18
42:20
43:14,20
82:18,20
83:4
**foregoing**
86:5,19
**forensic**
12:6 17:5
17:21,23
26:23 57:7
57:20,22
82:13,13
**forfeiture**
13:23
14:13
45:10
83:22 84:2
**forfeitures**
13:25
**forge** 4:19
**forget** 28:2
83:2
**form** 3:15
61:24
**formed** 5:3
**Fort** 46:18
46:23
**four** 24:25
25:13,15
46:16
47:11 52:8
59:3,11,12
59:14,17
73:25
**frame** 65:3
**Francisco**
1:21

**free** 6:22
16:21 32:6
36:6,18
38:7,15
39:6,19,19
62:3
**fresh** 16:4
16:17
**frog** 8:18
**front** 6:2
48:3 56:18
62:7 73:16
73:18
**full** 3:20
25:6,6
43:18
67:21
**furnished**
20:25
**further**
21:20 22:3
22:12 23:1
28:21
47:14
48:21 49:2
76:16,17
79:7,24,25
80:11
84:23 86:8
**furtherance**
47:6
**Furton** 69:17

---
**G**

**gas** 16:22
44:18
63:23 64:6
70:6
**gaseous** 70:9
71:10
**GC** 64:12
**GC/MS** 16:22
44:19,22
45:5,17,23
45:25 46:3
48:21
80:16 81:9
**GC/SM** 63:25
**general** 17:5
26:12

44:11
46:21,25
47:4 49:20
49:25 50:5
52:22 55:6
60:7 62:21
65:4,25
67:3,19
68:9 79:13
**generally**
18:7 21:14
24:18 55:5
65:15
**generate**
71:23
72:12
**generated**
43:2,4
72:1
**generates**
59:4 69:22
**getting** 40:7
84:16
**give** 6:16
12:11
22:23 27:7
32:4,9
51:4,6,7,9
53:4 54:17
71:20 79:4
**given** 16:11
26:12 30:2
43:4 55:22
84:11
**gives** 22:20
30:9,12
44:16 53:7
54:18 69:5
**giving** 16:16
31:23
32:23 33:6
51:22,22
55:2,24
67:21
**go** 5:21
13:12,14
13:20 14:2
16:8 21:21
22:5,21
28:7,7

35:16
36:17
41:22
43:20 45:4
69:2 79:7
79:18
80:10 84:4
goes 44:18
49:19
58:19 64:8
66:18 82:7
going 6:13
13:21 22:9
25:3,9
37:3 47:22
71:25 73:7
80:8,12
84:15
gold 80:15
good 3:19,19
6:5 21:4
21:18
22:15
55:17,18
Gotcha 59:16
59:22
Government
4:2,22
84:2
Governme...
48:10
graduate
7:20
graduated
9:4
ground 5:21
group 15:4
62:15
guess 3:19
15:17
16:14
18:24
33:24 38:9
58:7 68:14
76:4,9
78:7,23

―――― H ――――

half 47:22
handle 39:11

handled
37:22
39:22
handler
15:21
18:11
22:11 35:5
76:21
happened
4:16 78:13
happens
70:17,21
hard 6:13
73:24
hat 5:20
head 6:12
headache
21:25
79:21 80:3
health 7:22
9:19 42:11
hear 4:5,7
4:13,14
6:21 8:4
11:2 25:6
31:15
34:21
81:19
hearing 3:14
4:4,9
12:10
17:18
Hearn 58:2
helpful 6:18
heroin 11:9
hidden 16:9
hide 16:7
high 70:14
72:24
76:16
higher 50:6
65:3 66:9
highly 59:25
60:11,18
60:20 70:2
hold 18:25
19:10
Honestly
26:9
hop 41:18

Hopefully
19:11
hour 47:22
Houston
46:18,23
huh-uhs 6:12
human 8:17
42:13
Humidity
72:19
hundred 5:19
56:22
63:10

―――― I ――――

i.e 60:24
78:12
illicit
61:11
69:19,21
76:25 77:6
77:13,25
immediate
78:4 79:14
immunoassay
54:25
immunolo...
44:16 45:3
impact 20:18
important
37:3 41:17
inaccurate
65:21,22
incorrect
32:9,16,25
33:5
increase
75:10
independent
9:7
INDEX 2:2
indicate
70:1
individual
25:9 34:23
74:23
infected
22:7
infection
80:9,14

influence
72:17,22
information
19:18
initial 3:24
16:1 76:19
initially
46:10
inside 73:21
Insofar 21:8
inspect 14:5
inspection
13:16
inspections
43:10,11
instances
82:8
institute
8:24 9:19
43:7
instrument
24:9 38:18
38:19 45:2
47:5,12
51:14
54:19 56:5
instrume...
38:20
instruments
44:8,9
47:15
interested
46:20,21
86:9
interesting
79:23
interfering
35:3
interior
52:12
internal
43:10
Internat...
1:8 17:23
41:21
internat...
49:11
Internet
6:15
internship

9:6
Intoxilyzer
82:4,5,6
Introduced
2:7,9,11
2:13,15,17
7:11 19:1
48:5 57:11
61:18 73:8
investig...
28:21 65:1
involve
35:20 46:5
involved
13:2
IONSCAN
14:18
46:11,12
46:19,24
48:19,20
49:17 50:3
50:14,18
51:9,19
52:14,17
53:1,9,14
53:15,22
54:7,12
55:11,17
64:11,14
64:16
76:23
77:11,22
78:25 79:6
81:8
IONSCANs
55:23
Israel 84:6
issue 36:20
41:6 49:16
49:18,19
59:14 76:3
issues 56:14
56:16
it'll 71:7
72:1,14
item 17:10
51:18

―――― J ――――

J 1:15

**JAG** 82:22
**January**
86:13
**Jay** 1:7,12
3:22 86:6
**Jerusalem**
42:11
**job** 6:5 42:9
42:23 83:1
83:3,8
**Johnson** 1:15
2:4 3:18
3:25 4:6
4:12,20
7:12 19:4
35:22
47:21,25
48:6 57:12
61:19 73:9
81:11,16
84:3,22
85:2
**joint** 17:22
**Jordan** 52:10
**Jourdan** 2:16
61:20
63:22 64:1
66:6 81:8
**journal**
26:23 57:7
57:20
58:14
**judge** 3:14
6:2 82:4
**JUNE** 1:8
**jury** 6:2

― K ―
**keep** 5:18
**Ketch** 1:25
3:3 86:3
86:16
**kind** 6:6
12:11 14:1
21:20,25
22:9 27:19
27:22
30:18
33:18 42:3
42:6 58:23

59:16 63:5
66:18
72:10,23
76:9,12,19
77:16
78:10
79:17
80:19 83:1
83:6 84:15
**know** 6:14
7:2 16:16
21:3,22
22:25 23:6
24:19
25:17,18
25:21,22
26:9 27:20
29:2,22
30:4 32:6
33:15
36:23 37:1
37:2 38:4
39:1 41:5
41:12
50:11
51:12,22
52:2,23
54:20
55:10,16
57:4 58:11
59:6 60:18
60:19
65:14,17
65:23 71:8
71:18 72:6
72:8 73:15
74:22,25
75:6,22
76:5,9
77:18,21
78:3 79:19
79:21,24
80:1,12,15
**knowledge**
80:23
**known** 54:2

― L ―
**lab** 13:15
14:3,9,10

37:23
39:25
40:23
43:21 44:4
82:19
**labeled** 62:4
**laborato...**
11:15 40:4
**laboratory**
9:8 10:16
11:16
13:15 24:9
27:12,24
34:14,18
34:19
37:17
38:12 39:7
42:20 43:4
43:8,12
44:5 45:13
49:13
54:24,25
65:1 80:20
**lack** 61:9
76:1
**Lackey** 20:7
**lag** 6:6,15
**laid** 75:3
**Lareau** 20:9
48:9,14
54:1 56:6
**Lareau's**
55:3,9
**large** 14:17
**late** 13:22
**law** 1:20
15:4 36:16
56:14
**lawyer** 68:20
**LC** 81:9
**LC/MS** 63:25
**lead** 10:4
47:9
**left** 4:20
9:1 41:19
47:14
**legal** 35:15
77:14
82:25
**LENNARD** 1:8

**let's** 6:7
14:2 21:20
22:13
23:20
25:12
27:14 28:7
28:7,17,17
36:3 37:23
38:24,24
40:23
47:23
48:13 49:1
51:13
56:17
59:11
66:21
67:17
68:19,20
70:18
72:24
76:12
81:12
**level** 15:8
15:10 22:5
51:14,20
60:8 63:6
64:8,20
66:25
68:21 73:1
**levels** 64:24
65:12 66:8
67:12
**LI2314** 2:1
**line** 41:22
41:22
**linear** 30:1
**linearity**
30:8
**lines** 6:11
6:20
**liquid** 63:24
64:7,13
71:11
81:10
**list** 43:18
52:4
**listed** 7:21
17:7,10
41:25 42:3
42:7 59:19

**listen** 54:5
**lists** 19:22
42:16
**literature**
57:24
58:17
66:15
**little** 8:10
42:22
48:18
65:17 79:7
**live** 6:3
**LLP** 1:20
**located**
42:10
**locations**
63:2
**lockers** 16:9
16:10
**long** 56:1
58:21 63:3
71:22,25
72:8,12
**look** 4:9 7:8
18:22 22:3
25:1 43:22
53:14
56:17 57:9
58:13 62:3
62:25 73:4
79:24 80:1
81:13
**looked** 22:12
54:12 66:7
**looking** 19:9
23:1 47:20
54:6 66:3
80:7
**Looks** 73:23
**lot** 17:3
23:18
26:24
35:20 63:1
63:1 67:22
83:12
**lower** 72:25
**lowest** 15:10
34:6
**LSD** 43:17

**M**

M 1:7,12
3:24 86:6
machine 47:4
56:15
machines
44:4,13
46:13 60:6
Mai-Beth
1:25 3:3
86:3,16
main 13:9,9
49:16
major 28:13
73:3
making 68:22
managed
10:17
11:15
manager 40:5
44:6
manner 36:19
manuals
18:19
manufact...
53:25
marijuana
11:8 24:24
43:17
Marked 2:19
85:7
martial
82:20,24
mass 44:19
63:23
64:12
match 37:13
material
13:16 14:5
14:7 30:3
30:13 34:4
materials
2:10 18:23
19:6,20
20:1,3
48:8 74:10
74:11
math 68:20
matrix 39:5

39:5
matters 42:3
McDowell
86:25
MDMA 43:18
mean 9:23
23:3 26:3
27:15
28:10,24
30:9 31:4
31:7,11
37:4 51:12
55:16 58:1
60:19
63:14 68:8
68:14
71:22
72:21
74:22
78:14,16
meaning
77:17
meanings
27:18
means 70:24
78:15
86:21
meant 62:3
mechanism
60:19,22
media 39:5
medical 7:19
7:23 9:5
10:19
Medicine
7:16 9:11
10:11
medicines
8:1
meet 23:16
27:11,24
28:9,12,13
28:18
33:18
meeting
17:22 29:4
meets 28:20
49:6
member 43:20
members

43:15
memorized
52:5
memory 17:4
52:6
mentioned
12:23 14:4
14:12
16:19
22:14
23:21 27:4
27:7 31:16
33:9 34:12
41:19
42:16
43:19 48:8
76:5 79:3
81:17,21
83:11
mentioning
17:6
mentions
54:1
merits 23:1
28:21
met 32:8
methamph...
24:24
43:17,19
methanol
46:1,10
methodology
15:18
45:21
55:20 66:1
66:1
methyl 59:4
59:15
69:18,20
69:22 70:3
70:4,20
71:4,12,21
71:23,23
72:1,5,13
74:5,13,25
75:6,14
76:8
Miami 9:11
9:14,16
Michael 1:20

microgram
65:19
micrograms
65:16 67:2
67:12
68:25 69:1
69:3,5
middle 3:24
75:23
military
46:17,19
milligram
67:25
milligrams
67:4,15
68:11,13
69:6,8,9
69:11,14
mind 18:3
minimal
10:12
minimum
54:21
68:10
minute 19:10
minutes
81:12
model 47:3
molecular
8:7,15
molecules
71:10
Monday 1:11
money 16:18
16:20,21
16:23
morning 3:19
motion 3:12
motions 3:13
multiply
67:13 69:4

**N**

name 3:21,23
3:25
named 20:22
nanogram
65:18
nanograms
65:18

Narcotic
21:15
narcotics
14:6,16
15:8,20
26:13
nature 33:7
71:4
NC 86:25
necessarily
11:6
necessary
80:24
need 7:1
12:8,10
20:21
29:24,25
36:5 38:19
62:1 79:24
80:20,25
81:3,14
needed 28:14
needs 21:19
22:12
48:20 49:2
negative
16:23
22:19
29:12,13
29:15
32:21 36:2
37:18,24
38:8,10,23
39:2,14
40:2,11,12
40:16,17
40:18,20
40:21 41:1
41:1,8,10
41:14
55:22,24
56:13
neighbor...
65:14
NEITHER 85:9
never 18:11
18:13,14
18:17 51:3
77:7 81:5
Neverthe...

61:8
new 7:17,17
  44:9,10
ng 63:8
Nike 52:10
nods 6:12
North 1:1,18
  3:4 10:16
  84:8
Notary 2:5
  3:3 86:4
  86:17
note 59:23
  59:24 64:5
  66:22
  67:18
notes 17:2
  81:13
NOTICE 3:1
number 13:4
  15:14
  19:15
  24:14,16
  36:7 37:2
  37:13
  59:10
  66:22 67:6
  67:13,15
  68:19 69:2
  69:16
numbered
  56:20
  59:12
numbers
  50:23,23
  50:25
numerical
  30:10
numerous
  34:15
nutrition
  42:13

O

oath 2:20
  5:23 84:10
  84:16
object 23:11
objection
  3:10 35:14

objections
  3:12,15
observation
  65:9
observed
  14:11
obtained
  36:21
obviously
  22:2,10
  32:7,22
  39:14
  60:20
  68:20
  75:22
occasions
  13:14
  46:16
  82:21
Occupati...
  9:19
occur 8:15
odor 69:23
  70:6
odorant
  69:25 70:5
Office 1:17
officer
  42:17 43:7
Offices 1:20
official
  80:21
officially
  7:19
Oh 5:18 9:25
  57:16
okay 4:18
  6:19,25
  19:3,7,13
  19:16 33:1
  57:18
  59:13
  61:21 62:6
  73:7 79:23
  84:23
old 5:20
one-thou...
  63:20
  65:11,18
ones 59:7

66:13 73:3
open 14:9
  73:24
operate 44:4
operated
  46:13
opined 56:6
opinion
  12:19,21
  20:16 28:8
  35:12,15
  36:14 38:9
  48:9,9,14
  49:8 50:3
  50:18
  51:18
  52:14
  53:22,24
  53:25,25
  55:6 56:8
  65:10 66:6
  72:8 77:21
opinions 5:3
  12:9 13:1
  14:13,14
  20:12,14
  20:18 21:1
  21:6,12,13
  21:16 26:7
  27:21
  48:13,16
  55:3,8
  81:25 82:9
opportunity
  16:11
  47:15
opposed
  71:11
order 18:1
  23:18 24:3
  28:14
  63:20
organic 46:6
organiza...
  12:4
original
  15:11
Osteopathic
  10:10
outcome 86:9

outlier 68:3
outset 84:5
outside
  34:18
overall
  67:11
overview
  12:11
oxycodone
  10:25 11:5

P

P-O-U-P-K-O
  3:22
packaged
  16:18 73:5
  73:12
  74:24
page 58:19
  58:20
  66:18,19
  66:20
  73:19,25
pages 86:5
paid 83:6,15
panel 43:16
paper 16:1,5
  16:6,25
  17:1 26:20
  26:25 57:2
  57:13,19
  57:21,22
  58:4,18,22
  61:17,23
  62:7,9,14
  66:13,17
  68:4
paragraph
  56:20 58:8
  58:12 59:2
  59:11,12
  59:18,22
  66:21
  67:17
parameters
  51:8 54:19
parentheses
  59:16
part 27:23
  58:19

66:20
  75:19 76:4
  83:1,3,8
part-time
  11:20
particular
  23:11 24:7
  25:1 26:16
  34:8,8
  56:12,12
  83:19
particul...
  6:13 8:21
  9:21 38:21
parties
  86:11
pass 84:24
patient
  10:19 11:3
  22:4,9
patients
  11:6
pdf 73:19,25
pee 43:20
peer 17:25
  18:1,2
penalty 5:24
pending 7:4
people 9:24
  12:4
people's
  27:1
percent
  50:12
  56:22
  67:18,22
  68:2,7,17
  68:18
  69:13,20
  78:13
percentage
  61:3 63:19
  67:23
  83:24
performed
  46:11
periods 63:3
perjury 5:24
person 12:22
  47:13

pervasive
  62:16
Ph.D 1:7,12
  7:13,18
  8:19 86:6
pharmace...
  8:2
pharmaco...
  7:21,22,25
  9:12 10:11
  11:22
photographs
  2:18 73:5
  73:11,14
  73:18
physical
  13:16 60:1
  71:6
physiology
  8:6,13
  11:23
  42:12
pick 15:10
  29:1
picked 65:11
picture
  73:20
pilot 15:3
  27:3
place 36:19
  44:10
placed 16:10
  52:11,13
plain 15:25
  16:5,25
  17:1
plaintiff
  1:5,13,18
  3:8 83:18
plastic 52:9
  73:20,22
  74:11,20
play 24:6
please 3:20
  18:25
  19:10 35:9
plus 50:12
point 21:19
  22:1 23:10
  35:18,25

47:13
49:22 71:6
points 67:22
police 15:19
  46:19
pollutant
  76:13
poor 21:4
portion 3:11
position 9:2
  9:10,10
  10:9,10,15
  41:23
positive
  16:17
  22:21,24
  23:3,4,5,8
  23:9 25:25
  29:12,14
  29:16,17
  29:18,18
  33:23 34:2
  34:4 36:1
  38:22
  44:17,20
  44:21 45:4
  50:14
  54:22
  55:17,22
  55:24
  56:12
  64:12
  76:22
  77:11,22
  78:20,22
  82:23
possession
  12:15,24
possibility
  22:3
possible
  72:7
postdoct...
  9:3
potential
  11:10
  35:19
potentially
  62:20
Poupko 1:7

1:12 3:20
3:22 4:3
4:11,13
5:10,14
8:11 10:21
10:21
17:17 19:8
25:5 35:16
48:1 54:4
73:11,16
84:4 85:3
86:6
powder 39:1
preemplo...
  11:7
preliminary
  21:9 23:7
  23:19 27:6
  27:21 28:9
  30:23 31:1
  33:7,9,18
  33:25
  34:11
  44:17,23
  44:25
  48:20 49:3
  55:18 79:5
preparation
  19:23 20:2
prepared
  15:23
  20:11
  81:21
presence
  28:15 29:1
  40:1 46:22
  46:25 49:4
  79:5
present 35:4
  41:12
  51:17,21
  51:24
  52:20
presented
  36:2,24
  54:6
presents
  80:10
presiding
  3:13

pressure
  70:11,13
  72:22,22
presumably
  24:3 29:16
presume 23:9
presumption
  25:14
presumptive
  22:21,23
  23:3,5,8
pretty 37:1
  67:14
previous
  40:25 41:4
  59:17
Primarily
  12:6 14:16
  49:15
primary 58:2
  58:5,6
  70:5
principle
  38:16 59:5
principles
  78:18
prior 81:18
  81:23
prism 78:23
probable
  59:25
  60:18,21
  79:9
probably
  61:2 63:20
  69:1 72:19
  73:3 82:7
probative
  77:11,15
problem 4:10
  56:11
Procedure
  3:5
procedures
  43:8 44:10
  44:10 56:2
  56:7
proceeding
  82:25
proceedings

17:20 85:8
process
  18:21
  44:15
  84:15
produced
  18:24
  19:17 72:5
product
  71:24
professor
  42:10
program 29:9
project 47:8
  47:9,16
proper 29:8
properly
  43:10 51:6
  56:1,2
proporti...
  30:3,12
proposes
  62:19
propounded
  3:17
prosecution
  82:17
  83:10,14
  83:16
proteins 8:8
provided
  3:15 5:6
providing
  18:3
Public 2:5
  3:3 86:4
  86:17
publication
  15:3 17:4
publicat...
  17:11
published
  15:3 17:16
  17:17,19
  17:20
  26:20,22
  47:10
  56:21,25
  57:7,19
  58:7

pull 73:7,10
purported
  76:20
purpose
  51:25
PURSUANT 3:1
put 9:23
  16:6 35:14
  44:10 81:5

___ Q ___
qualified
  82:12,12
qualitative
  30:18,22
  30:23,25
  31:13 32:8
  32:13,14
  33:2,6
quality
  23:18
  24:11 29:8
  42:17 43:7
  43:8
quantified
  64:6
quantita...
  79:10
quantita...
  30:6,6,9
  30:15
  48:22,23
  48:24 49:6
  49:15,18
  49:23,24
  50:10 51:2
  51:3 52:1
  53:20,21
  53:23 54:2
  54:3,16
  55:11,20
  80:25 81:4
quantities
  13:3,12
  14:3 50:24
  51:1
quantity
  14:17
  30:10
  51:16

54:18
question 3:9
  3:16,16
  6:17,21,21
  7:4,5 15:7
  25:7 36:25
  40:3 50:15
  53:7,8
  54:4,6
  62:12
  68:14
question...
  36:13
questions
  85:1
quick 35:14
quoting
  64:23

___ R ___
ran 47:17
range 67:21
rate 71:13
  71:15 72:2
  72:11,15
  72:17 74:5
  74:17
rated 21:3
read 18:19
  56:9 64:4
  85:9
readily 75:1
  75:6
really 5:18
  14:9 25:17
  31:2 32:1
  32:17,17
  50:15 52:1
  53:12 68:2
  68:3 74:9
  77:14
  78:14
reason 15:11
  33:17
  40:20 60:7
reasonable
  60:21 67:2
  69:2
reasons
  33:11

43:15
recall 13:4
  14:8 15:14
  17:3 42:8
  43:18
  45:11,20
  46:10
  64:10
  68:24
  83:13 84:1
receive 35:5
received
  16:18
reconnect
  4:16
record 3:21
  35:14
  47:24
  81:15 84:4
  84:14
records
  20:24
redo 41:15
reduced
  75:10
refer 57:5
reference
  59:9
referenced
  58:8
references
  58:23 59:1
  59:13,19
referencing
  56:25 57:2
  57:13
  58:12 59:7
  59:18
  80:19
referring
  19:14 59:9
  63:11
refresh 17:4
regarding
  29:13
  49:25
  60:16
  69:18
regardless
  33:4 38:17

relation...
  34:3
relative
  86:10,11
relatively
  60:1 80:4
release 71:3
  76:14
released
  70:8 76:13
Relevance
  57:22
reliability
  21:1,6
reliable
  26:15
  28:14 35:8
  35:11,20
  35:24
  36:16
  38:21
  55:23
rely 33:22
  64:14
  69:17
remove 63:17
render 12:19
  12:21
rendering
  13:1 14:12
  14:14
repeat 5:10
  10:21,23
  35:9
rephrase
  6:23
report 2:12
  5:6 19:23
  20:2,4,12
  20:17 48:1
  48:3,7
  55:4,9
  56:17 58:9
  58:13 59:2
  59:10,20
  59:23
  66:21
  76:19 78:8
  80:18
REPORTED

1:25
reporter
  6:11 84:7
  86:3,22
Reporting
  1:25 86:25
reports
  81:22
represent
  4:1 52:7
represen...
  4:22
reproduc...
  86:20
REQUESTED
  85:9
require
  23:18
  37:12
  49:22
required 3:4
  19:18 29:7
  35:23
  38:10 49:5
  49:9
research
  8:20,21,25
  9:13 10:8
  10:12 44:9
  44:11 47:6
  47:8,9,16
residency
  9:5,6
respect 35:2
response
  30:2,12
  34:3 38:20
  50:21
  51:23
  54:22
responsi...
  42:25
responsible
  47:14
result 10:2
  16:17
  22:19 23:7
  23:19
  25:25
  27:21 28:9

32:13,15
32:16,16
33:1,6,15
33:23
38:22 43:4
44:17
50:14,19
53:23
55:18,22
59:25 60:4
61:11,13
62:22
78:20,20
78:22
**results** 16:2
27:6 30:22
30:24,25
31:13 33:4
34:11 43:2
43:23
48:19
52:15 53:1
53:9,14,15
53:16 54:7
54:12
55:22,25
76:22
77:11,23
78:24 79:5
80:25
**resume** 2:8
7:9,22
17:7,10
41:18 42:1
42:16
**RESUMED** 4:12
7:12 19:4
35:22
47:25 48:6
57:12
61:19 73:9
81:16
**retained**
4:25 83:9
83:21
**review** 2:14
12:20 20:1
20:23
26:22,24
26:25 43:1

57:3,5,23
58:7,16
66:14
**reviewed**
2:10 17:25
18:1,2
19:6,20,22
20:3,5,11
48:8
**right** 5:6
20:15
23:22
24:20 25:4
25:10
32:10,13
33:6,10,14
33:20 36:4
39:13 41:2
41:6 42:4
47:19
48:11 56:2
56:6 58:4
58:9 61:1
64:17,21
65:8 67:5
68:12 70:6
72:5 75:7
77:2 78:12
80:21 81:1
81:18,23
85:3
**roller** 52:12
**rolling**
60:25
**room** 71:19
75:4
**Rose** 48:10
**Rossano** 58:3
**roughly** 66:9
66:10
**rule** 18:23
19:19 77:7
77:7,8
**ruled** 3:13
**rules** 3:4,5
5:21
**run** 37:18,18
39:3 41:11
_____
**S**

**salary** 83:6
**saliva** 39:21
**Sam** 46:18,23
**sample** 29:10
37:20 39:9
39:18 40:2
41:6,11,16
43:3 56:12
56:13
84:12
**samples** 11:4
15:23 40:8
40:24
62:18
76:23
**sampling**
63:18
**San** 1:21
46:18
**Sansome** 1:21
**satisfac...**
21:4
**saw** 73:14
**saying** 68:8
**says** 7:19
79:20
**scale** 78:10
**scenarios**
38:24
**school** 9:5
9:11 10:10
15:22 16:7
**science** 7:23
**sciences**
7:20,23
17:5 26:23
42:11 57:8
57:20
**scientific**
26:14,18
35:18
57:23
58:16
66:15
78:18
**scientif...**
48:25
55:13
**scientist**
9:18 40:6

43:1,6,24
44:2,7
78:21 79:2
**screen** 64:11
81:9
**screening**
11:10
44:15,21
44:23,25
45:24 49:3
55:1,18
**sea** 73:1
**sealed** 16:19
**second** 54:9
59:23 76:4
**section**
58:15
66:14,17
**see** 10:25
11:4 19:20
21:10
38:25
49:16
56:23
73:20,22
73:22 74:1
74:2 81:14
**seen** 73:11
**seized** 1:7
36:21
66:24
**sell** 40:13
**semester**
42:14
**sense** 22:8
**sensitive**
22:22
23:14 27:8
27:9,11,14
27:17 28:3
28:25 56:5
**sensitivity**
15:9 17:12
34:6
**sent** 43:21
**sentence** 6:9
25:6 59:24
81:20
**Sergeant**
20:8

**serve** 41:1
**served** 40:5
51:24
**service** 1:25
43:20
86:25
**serving** 12:7
**set** 15:21
51:14
54:20
**Seth** 1:15
3:25 4:20
**sets** 37:14
**setting** 34:9
**seven** 68:25
69:1,3,4
**short** 58:21
**show** 29:25
37:10
52:15
**showed** 16:2
**shown** 34:25
60:17
**shows** 30:7
68:6
**sign** 43:5,24
78:19,21
79:1 85:10
**signal** 50:22
**signific...**
65:3
**signing** 84:9
**similar** 9:4
13:24
14:19,21
54:23 55:1
73:25
**simple** 51:9
54:4
**simply** 9:23
**single** 41:23
**site** 76:14
**six** 52:8
**slight** 4:10
**slip** 66:24
**small** 15:3
61:3 63:18
72:20,20
**SmithKline**
11:14

sneaker
  52:10
sniff 16:12
  46:12,24
snorting
  60:25
Society
  17:21
solid 71:11
solvent 46:6
solvents
  46:9
somewhat
  23:2
sore 21:24
  79:22
sorry 8:4
  11:2 13:19
  17:8,18
  24:16
  27:16 31:5
  31:12,15
  34:21 35:9
  53:12
  57:14
  81:19
sort 4:10
  22:5 63:18
  75:1,12
sounds 21:11
  27:20
  65:10
Southeas...
  10:10
  41:21
space 75:13
  76:11
speak 6:8
  74:10
speaks 32:1
spec 64:12
specific
  22:6,22
  23:14,21
  23:24
  24:14
  25:19 27:9
  27:10,16
  27:23
  30:10 31:4

31:7 48:18
53:2,4,8
53:10 54:5
54:7 55:19
58:11 59:9
59:19 68:9
68:24 83:2
specific...
  12:13
  21:12
  42:24
  59:14 63:5
specificity
  17:12 29:3
  29:4,6,13
  31:3,6,18
  33:10,22
  33:24
  51:20
  52:18,19
  52:22
specifics
  45:20
spectrom...
  16:23
  44:19
  63:24 64:7
  64:8
spelled 3:22
spiked 15:23
  15:24,25
spread 74:23
  75:11 76:6
stacked 74:1
stacking
  74:11
stacks 75:21
standard
  78:23
  80:15,19
standards
  49:12
start 19:5
  21:18
  22:15
  28:17,18
  29:22
  56:20
started
  11:20,25

14:12
40:20
starting
  13:22
  49:22
starts 6:10
  58:18
  66:18
state 3:20
  63:6 70:9
  71:10,11
statement
  25:5
States 1:1,4
  4:1,21
  36:15
stating 84:9
stationed
  46:18
stay 72:9
STIPULATED
  3:7
Stipulat...
  2:3 3:6
straight
  45:24
Street 1:17
  1:21 86:25
strike 3:12
  3:13
student 7:20
studies
  14:25 17:7
  17:11
  26:24 27:1
  34:25 37:9
  37:9 56:21
  56:25 57:3
  57:4 58:8
  58:12 59:1
  59:3,6,7
  60:15 66:2
  66:10,12
  67:9 68:8
  69:3 74:9
  76:1,2
  81:8
study 8:1
  15:3,6,11
  15:13,17

16:1,15
17:6,9,10
17:14,16
17:19,25
18:4,9,10
26:17,18
27:1,3
62:24
63:22 64:1
64:16 65:7
65:11,21
69:17
studying
  9:23
stuff 10:4
  35:3
subject 42:3
subjected
  37:19,21
  39:8
subjective
  80:5
submitted
  64:25
substance
  12:15
  24:22
  28:16 29:1
  70:12
substances
  8:2,23
  9:21 10:1
  11:18
  12:16,25
  24:15,16
  24:20,25
  26:4,8
  50:17
  60:14 70:3
  77:1
sufficient
  26:10
sufficie...
  28:25
suitcase
  52:12
Suite 1:17
  1:21
superficial
  63:12,14

supervision
  9:9 86:7
  86:22
supervisor
  40:5 44:7
support
  77:23
supposed
  38:2 51:5
sure 4:5
  5:18 7:7
  11:3 17:19
  18:5 19:11
  24:17 27:9
  27:19 28:7
  28:17
  31:13,16
  35:10
  36:18 43:9
  43:23 52:2
  52:6 53:14
  56:3 59:11
  62:3 67:7
  81:21
surface
  63:12,15
  63:16 66:4
  66:8 75:10
  75:17
surrounding
  73:23
swabbed 66:5
swabbing
  63:17
swear 84:7
swiped 66:4
swiping
  63:17
switched
  16:4,24
system 24:4
  34:16
  82:22

          T
table 7:5
  68:4 75:4
take 3:1
  6:12 7:2
  10:13

| | | | | |
|---|---|---|---|---|
| 27:14 | **tells** 52:17 | 49:15,18 | 12:20,21 | **think** 4:16 |
| 32:20 | 53:5 | 49:23 | 14:6,8,11 | 4:19 11:21 |
| 47:23 | **temperature** | 50:10 51:2 | 21:20 | 17:20,23 |
| 48:13 | 70:8,14 | 51:3,4 | 22:17,22 | 18:6 20:6 |
| 57:25 | 71:7 72:16 | 52:6 53:21 | 23:17 | 21:22 23:5 |
| 59:11 | 72:25 80:2 | 53:21,23 | 27:12,25 | 23:9,20 |
| 69:16,16 | **temperat...** | 54:2,3,7 | 28:10 29:5 | 26:10,14 |
| 70:10 72:7 | 71:19 | 54:13,17 | 29:7 30:11 | 35:23 |
| 80:2 81:12 | **ten** 63:9 | 54:24,25 | 30:13 | 40:21 |
| **taken** 1:12 | **tend** 37:10 | 55:1,11,17 | 33:19 | 41:18 47:2 |
| 3:2 86:6 | **term** 23:2,4 | 80:13,16 | 37:16,23 | 47:13 |
| **talk** 20:21 | 23:6,8 | 82:24 | 37:25 | 60:21 |
| **talked** 26:17 | 77:14 78:7 | **tested** 16:21 | 38:12,17 | 65:21,22 |
| 33:19 55:4 | 78:16 | 41:16 | 38:23,25 | 69:1 77:10 |
| **talking** 6:10 | 80:17 | 43:15,22 | 39:7,9,17 | 77:17 |
| 17:14 24:2 | **terms** 10:7 | 44:18 45:4 | 39:20,20 | 78:15 |
| 27:5 40:22 | 13:3 29:20 | 45:5,8,13 | 40:1,24 | 79:20 80:6 |
| 40:25 64:1 | 37:13 | 49:10 | 41:9 42:20 | 82:2,11 |
| 67:10 | 42:15 | 50:20 | 43:25 45:6 | **third** 58:19 |
| 70:18 | 50:21,21 | 51:11,18 | 45:18 | 73:19 |
| **taught** 10:11 | 51:12,19 | 52:2,7,24 | 46:21 | **thought** |
| 11:22,23 | 53:2 55:2 | 52:25 53:3 | 47:12 | 27:16 |
| **teach** 42:11 | 55:12,16 | 53:11 54:9 | 49:12,12 | **thousand** |
| **teaching** | 55:24 | 54:10 | 50:1 56:15 | 66:9 |
| 10:9 11:20 | 68:10 | **testified** | 62:17 | **three** 24:24 |
| 41:20,23 | 75:13 79:7 | 13:23 | 64:17 | 26:20,21 |
| 41:24 42:6 | 79:10 | 31:17 | 78:19 81:6 | 27:20 |
| 42:12 | **test** 21:9,9 | 81:17,22 | 82:3,19 | 46:16 |
| **team** 76:21 | 21:15,17 | 82:14,17 | **tests** 21:13 | 47:11 |
| **teams** 15:20 | 22:6 24:9 | 82:19 | 28:15 | 59:13,17 |
| **tech** 24:1 | 28:14,16 | 83:10,17 | 40:11,16 | **threshold** |
| **technical** | 28:20,23 | 84:1 | 40:18,25 | 68:14 |
| 23:2 | 29:9,10,14 | **testify** | 41:4,7,9 | **throat** 21:24 |
| **technique** | 29:17,18 | 12:10 82:5 | 43:13,14 | 79:22 80:2 |
| 63:18 | 29:23 30:1 | 83:4,16 | 52:17 79:4 | **till** 6:8 |
| **Tel** 9:18 | 30:6,7 | **testifying** | **thank** 18:6 | **time** 3:16 |
| **tell** 6:14 | 32:8 33:2 | 6:3 83:14 | 22:13 85:3 | 6:19,19 |
| 14:13 15:6 | 33:8 34:6 | **testimony** | **thereof** 3:11 | 7:2 11:24 |
| 21:21 | 34:13,14 | 5:22 20:8 | **thing** 7:3 | 15:23 |
| 30:15 | 34:17 | 20:9 21:10 | 16:12 | 16:11 |
| 33:12 | 36:17 | 39:24 | 22:18 24:8 | 36:24 41:5 |
| 42:23 45:9 | 39:11,25 | 52:16,25 | 29:23 | 41:15 |
| 46:4 51:15 | 40:10,16 | 81:25 82:9 | 39:20,21 | 43:11,11 |
| 51:25 53:1 | 41:11 | 84:10,16 | 53:1,10 | 46:17 63:3 |
| 53:9,16 | 44:16,20 | **testing** | **things** 10:4 | 65:2 71:20 |
| 54:7 73:24 | 45:3,3,15 | 10:15,17 | 19:22 | 72:3 82:6 |
| 74:8 75:25 | 46:24 | 10:19,20 | 27:20 | 85:3 |
| 79:10,19 | 47:18 | 10:24 11:3 | 29:24 | **times** 5:13 |
| **telling** | 48:20 49:3 | 11:7,16,16 | 62:24 | 5:14,17 |
| 51:23 | 49:5,6,7,9 | 11:17 | 73:25 84:5 | 47:12 66:9 |

title 83:2
titled 57:20
today 5:23
  85:4
topic 26:22
  58:21
torn 73:23
total 63:19
  66:22 67:4
  69:15
totally 9:7
Touro 42:10
toxic 8:22
  9:21 10:1
  11:18
toxicolo...
  82:13
toxicology
  9:15,20
  17:21,23
  40:23
Trade 1:17
trafficking
  12:16
trained
  18:13,14
  24:3,14,19
  25:1,12
  26:2,5,8
  26:13
  33:14
training
  20:23 25:2
  25:4,9
  80:23
transcribed
  86:7
transcript
  20:6 86:5
  86:19
transcripts
  20:10,15
  20:16,18
transfer
  60:1,5
trial 3:14
  12:10
triggering
  71:3
triggers

71:1
trouble 4:4
  19:9
truthful
  84:11
try 4:19 6:7
trying 32:18
  32:19
  37:20
  52:13
  65:20
  68:12 71:1
  78:7
turn 61:16
  66:21
  73:19
turned 16:19
twenty 63:9
two 11:21
  19:15
  26:21
  27:17,23
  29:11
  37:14
  42:21,22
  44:14 48:7
  52:7,24
  53:16,18
  58:1 59:18
  65:17
two-thirds
  50:12
two-tiered
  44:14
  54:25
type 12:4
  13:17 14:6
  31:4,7,9
  42:6 44:25
  45:21 47:4
  71:18
  80:14
types 9:13
  12:12,25
  13:6,9
  14:14
  25:13,15
  29:11
  37:13
  43:13

44:13,14
_____
U
U.S 1:7,16
  1:17 20:7
  36:17,20
  38:5 49:19
  56:22
  57:21
  58:17
  60:11
  62:17 63:3
  65:24 66:2
  66:16
  67:10,18
  76:21
uh-huhs 6:12
ultimate
  30:5
ultimately
  22:5 33:5
  64:19
  80:11
uncontam...
  60:4,6
  61:6
understand
  4:2,23
  5:22 6:20
  21:10
  52:14,15
  53:12,22
  65:20
  68:12 71:1
  75:16
understa...
  62:13
  84:17,21
unfortun...
  47:11
unidenti...
  70:2
United 1:1,4
  4:1,21
  36:15
University
  8:24 9:10
  9:14,18
  11:22
urine 39:17

39:18,25
  40:2,7,9
  40:10,14
  40:24
  43:14,25
use 15:13
  16:4,14
  21:16
  37:24
  40:11
  41:10
  43:16
  45:15 46:6
  46:9 47:15
  52:22
  59:16
  64:11 78:7
  80:17
usually
  82:11
_____
V
valid 80:6
validate
  29:23
validation
  29:25
vapor 70:11
  70:12
variability
  17:3 34:23
  34:24 35:1
  37:9
variables
  24:5 34:15
  34:20,22
  35:6
various 10:1
  29:24 40:4
  43:15
  45:12 46:9
vary 24:17
  71:19
vehicular
  12:18
verbal 6:16
verbally
  22:10
verify 80:2
versa 54:10

version
  63:24
versus 20:7
  50:1 62:4
  62:22
  75:21
vice 54:10
video 4:10
view 14:1
  28:22
  35:18
viewed 78:24
viral 80:9
visiting
  9:18
volatile
  70:2
volatili...
  70:20
  72:23
  74:13
volatilize
  70:10,12
  71:8,12,15
  72:14 75:1
  75:5,19
volatilized
  70:16,24
volatilizes
  70:7 72:18
  74:17
volatili...
  75:14,15
volume 76:10
vs 1:6
_____
W
wait 6:8
waived 3:17
want 22:18
  41:12,18
  41:22 57:4
  59:22
wanted 58:11
  59:6 84:14
wasn't 11:6
  82:5
water 72:23
  72:24
way 20:14

24:7 26:9
26:16 28:3
28:22
37:16,17
37:22
39:11,12
39:23 40:6
64:10
69:14
71:22
78:14
80:10,12
81:5
**we're** 23:25
24:2 26:4
34:12
37:20
38:18,21
38:25
70:18
**we've** 17:9
17:14 18:9
47:22 80:3
**weigh** 13:15
14:5
**weight** 69:21
**weight-to-**
69:20
**welcome** 85:6
**went** 14:2
45:24
**West** 1:17
**WESTERN** 1:1
**white** 39:1
**wider** 76:5
76:11
**wine** 71:18
**witness** 12:7
82:16
84:24 85:9
**witnesses**
48:11
**word** 52:23
77:17
**words** 27:17
**work** 9:7
10:3 11:25
12:1,5,6
15:19
41:20

42:15
83:21
**worked** 11:14
16:8 18:17
18:20 44:6
44:8
**working** 9:20
**workplace**
9:22,24
**worth** 32:11
80:6,7
**wouldn't**
25:21
28:12
32:14,15
34:17 41:4
55:15,21
56:10,10
72:4 74:8
77:20 82:4
**wrap** 55:8
**wrapped**
74:20
**write** 12:9
62:10
**wrong** 78:9
**wrote** 20:4
20:17
27:10

___

**X**

___

**Y**

**yeah** 11:6
12:8 19:9
25:24
33:21
36:23 44:2
47:2,5,20
52:4 57:25
58:5 61:2
63:11
67:21
69:11,13
70:7,23
72:6 73:22
74:21
75:25
76:12,12
**year** 9:17

**years** 12:17
26:20,21
40:4 42:21
42:22
62:18 72:6
82:7,18
**yes/no** 30:19
31:24
**yield** 30:21
30:23
**York** 7:17,17

___

**Z**

**zero** 78:2
**Zoom** 1:12,14
1:25

___

**0**

___

**1**

**1** 2:7 7:8,11
66:18
86:22
**10,000** 68:21
**10:50** 85:8
**100** 67:18
78:12
**111** 86:25
**12** 17:11
**12,146** 66:24
**12,147** 67:16
67:23
68:15 69:4
**12/3/20** 2:12
**14th** 86:13
**15** 67:4,15
67:25
68:11,13
69:6,7,13
69:14
**1650** 1:17
**19** 2:9
**1993** 65:2
**1994** 17:10
**19981410006**
86:17

___

**2**

**2** 2:9 18:22
19:1,5,17

**2.34** 63:8
**20** 37:25
**2001** 65:2
**2016** 1:8
**2018** 2:14
57:8,19
**2020** 1:11
48:2
**2021** 86:13
**21** 1:11
**227** 1:17
**252,140** 36:4
36:8,15,17
67:3 76:21
**252,140.00**
1:7
**26** 3:4 18:23
19:19
**27** 1:8
**28202** 1:18
**28801** 86:25

___

**3**

**3** 2:3,4,11
48:1,2,5
66:19,20
66:21
**3:18CV646**
1:2
**30** 3:4 82:7
**3500** 1:21

___

**4**

**4** 2:19 85:7
**400** 47:3
**48** 2:11

___

**5**

**5** 2:17 73:4
73:8
**50/50** 83:25
**500DT** 46:12
46:24
49:17
76:23
78:25
**57** 2:13

___

**6**

**6** 2:15 61:16

61:18,20
61:25 62:5
**61** 2:15
**67** 56:22
67:18 68:2

___

**7**

**7** 2:7,13
57:9,11,14
57:15,16
58:14 59:8
**73** 2:17

___

**8**

**8,500** 69:8
**8:03** 1:11
**80/20** 83:25
**80s** 13:22
**828-254-...**
86:26
**85** 2:19 69:9
86:5
**85,000** 69:5
**8500** 69:5
**862** 2:5 86:1

___

**9**

**90** 50:12
63:2 67:22
68:7,17,18
**90/10** 83:25
**90s** 15:2
**94104** 1:21



**Lareau Consulting Services LLC**
**Dr. Richard T. Lareau**
**Cell: 1-603-409-2106**

**www.LareauConsultingServices.com**
**email: Lareau@LareauConsultingServices.com**


Case Opinion of Dr. Richard T. Lareau
Lareau Consulting Services LLC

27 July 20, 2020


Case: US vs Darren Lenard Coleman

Under contract to: U.S. Attorney's Office Western District of North Carolina
Suite 1650, Carillon Building, 227 West Trade Street, Charlotte, NC 28202
Contract No: 15JA58-20_P-00000007


**1.0. Request for an Expert Report;** I have been requested, under contract, by U.S. Federal Attorneys AUSA Bain-Creed & AUSA Johnson, U.S. Attorney's Office Western District of North Carolina, to provide, if possible, an expert's report on the significance of the Ionscan 500DT IMS test results from this case.

**2.0 Qualifications;**

> a. I currently work as a technical consultant performing (1.) legal expert witness representation, (2.) meeting planning and Executive Director for Scientific Workshops, a Nonprofit Corporation of New Jersey, and (3.) technical consultant to small businesses developing next-generation detection equipment.

> b. Previously, a senior Research Chemist, U.S. Government Civil Service employment for approximately 35 years. Approximately 19 years with the Transportation Security Laboratory (TSL), DHS Science & Technology Director, and 15 years with the Army Research Laboratory, DOD. With DHS, I was mainly involved in explosives and drug detection systems, while with DOD I was involved with trace detection in electronic materials and devices.

> c. As Chief Scientist and the Applied Research & Development Division Director of the Transportation Security Laboratory, DHS S&T, I was the lead trace detection expert for the laboratory.

> d. Additionally, I spent approximately 10 years as the Subgroup Lead of the U. S. Governments, multiagency directed, Combating Terrorism Technical Support Office (CTTSO) / Technical Support Working Group (TSWG), in Washington DC. Main duties were to assist in general detection science and developmental programs for explosives, chemical agents, illicit drugs, etc.

> e. My PhD thesis work from Arizona State University was in the field of trace detection utilizing imaging mass spectrometry.

> f. I have published peer-reviewed journal articles, book chapters, patents, and have presented at numerous scientific conferences and workshops in the field of trace detection. To date I have over 150 publications. Currently I am working with Dr. Reno Debono, recently retired lead scientist from Smith Detection, Edgewood, MD, on a book chapter: "Trace Explosive Detection and Ion

2360 Lakewood Road, Ste. 3—Office 167, Toms River, NJ 08755    Ph. 603-409-2106    Email: Lareau@lareauconsultingservices.com



EXHIBIT
14

Mobility Spectrometry," in the upcoming 2nd Edition of "Counterterrorist Detection Techniques of Explosives."

g. I have taught short courses on trace detection and trace sampling at international conferences (2 Explosive Detection conference, as well as, a series of detection training workshops for Federal security screeners at TSL).

h. I am co-Organizers of 25<sup>+</sup> years of detection workshops, including the TED Workshop (Trace Explosives Detection workshops), CED Workshops (Concealed Explosives Detection workshops) and 2 international ISADE conferences (International Symposium on the Analysis and Detection of Explosives).

i. As a leading employee at the Transportation Security Laboratory, Atlantic City, New Jersey, I had extensive class and hands-on training on IMS systems from the major three manufacturers, and was involved in the Test & Evaluation of IMS systems for explosives and drugs. I have extensive training and use of the Smiths Detection Ionscan 500DT IMS system.

j. I have completed two previous legal expert witness cases, one involving a civilian fireworks accident and another a Federal case involving similar Ionscan 500DT drug detection evidence (Harrisburg, PA).

## 3.0 Background on IMS and the Smiths Detection Ionscan 500DT IMS system;

Ion mobility spectrometry (IMS) is an analytical technique used to separate and identify ionized molecules in the gas phase based on the ion's mobility in a carrier buffer gas. Though heavily employed for military or homeland security purposes, such as detecting illicit drugs and explosives, the technique also has many laboratory analytical applications, including the analysis of both small and large biomolecules (medical and pharmaceutical applications). IMS instruments are extremely sensitive stand-alone devices, often deployed in benchtop, handheld, or incorporated into or with other systems.

Perhaps ion mobility spectrometry's greatest strength is the speed at which separations occur—typically on the order of tens of milliseconds. This feature combined with its ease of use, low cost, relatively high sensitivity, and highly compact design has allowed IMS as a commercial product to be used as a routine tool for the field detection of explosives, drugs, and chemical weapons. Major manufacturers of IMS screening devices used in airports are Smiths Detection (formally Barringer Instruments), Leidos (formally L3, Implant Science Corp) and Rapiscan (formally Morpho Detection, GE Security Instruments, and Ion Track Instruments). The products used for explosives detection, are typically certified as ETD (Explosive Trace Detection systems) by the TSA.

In the pharmaceutical industry IMS is used in cleaning validations, demonstrating that reaction vessels are sufficiently clean to proceed with the next batch of pharmaceutical product. IMS is much faster and more accurate than other analytical measurement techniques, like HPLC and total organic carbon methods, which were previously used. IMS is also used for analyzing the composition of drugs produced, thereby finding a place in quality assurance and control.

As a research tool ion mobility is becoming more widely used in the analysis of biological materials, specifically, proteomics and metabolomics. For example, IMS-MS using MALDI as the ionization method has helped make advances in proteomics, providing faster high-resolution separations of protein pieces in analysis. (Northwest et al., n.d.) {Ref: *https://en.wikipedia.org/wiki/Ion-mobility_spectrometry*}

Outside of laboratory purposes, IMS has found great usage as a detection tool for hazardous substances. More than 40,000 IMS systems are in use worldwide in airports, border crossings, federal entrances to buildings, vehicle screening, etc., and in the USA, the US DOD has utilized more than 50,000 IMS devices in the field.

## 4.0 Procedures and Interpretation of Results from the Ionscan 500DT IMS

The use of Ion Mobility Spectrometry for security usage starts with verifying one has a contamination free facility to perform the IMS operation, followed by properly obtaining the sample. One typically would situate the IMS system in a room with little traffic, clutter and general dirtiness (a source of trace contamination). The system should be placed on a table that has been cleaned prior, with a solvent like isopropyl alcohol (rubbing alcohol), and system then plugged into house electrical power. The system normally requires approximately 30 minutes to warm up to READY or operational mode. The screener or tester would then verify the operation of the system with a blank sample (no ALARM), followed by a 'verific' or test sample (see discussion on Verification Method below), which should properly provide an alarm (e.g., TNT, xyz, etc.) (indicating an ALARM). After this pre-test, a blank sample or two are run to verify the system is clear of any residual from the prior sample spike, and ready for the next sample.

The sample is taken typically utilizing the Smiths Detection Ionscan 500DT sample swabs, which are a cloth-like material, inserted into the sample wand. The sample wand, shown in Figure 1, is a tool that allows one to sample the surface of a material, with a little downward pressure, and NOT have human contact with the sample swab itself; the sample swab, inside the sample wand, is inserted into the front loading area of the Ionscan 500DT, and the sample swab is clamped and sampled by the instrument.

Sampling of a surface, in this case currency, plastic bags used for wrapping of the currency bundles, or luggage that the currency was placed into, is simply an interaction of the sample swab with the material of interest. The contact between the two surfaces allows the swab to sample or grab minute particles (analyte of interest), which are invisible to the naked eye (< 100um in diameter). The analyte of interest normally is present on materials handled by someone contaminated with drugs on their fingers, or in an area that has airborne drug contamination present, like a drug lab or drug packing area. For drugs or explosives, it is nearly impossible to package an item that is 'trace level' clean. Most packages are made without the care of spreading contamination.

The Smiths Detection Ionscan 500DT starts its detection process with the entry of the sample swab into the system. Once placed inside the entrance area, it is clamped-down in place and a $200°C^+$ temperature desorption takes place; this is simply heating of the sample swab in a quick, i.e. few seconds, timeframe. This desorption step allows the particles on the surface, both the analyte particle of interest and any other particles on the surface, to evaporate from the surface in the form of gas molecules. In the case of the Ionscan 500DT, these molecules are then exposed to a Ni63 radiation source, which provides electrons to interact with the gas molecules, which form ions. This is not much different than what happens in an electric light bulb; inside the bulb is sealed gas molecules, which become excited into ions via the interaction of electrons from the hot filament inside, giving off light. In the case of most IMS, like with the Ionscan 500DT, there is an added gas, i.e., dopant gas, that also interacts to enhance the number of ions produced, and is varied depending upon the analyte of interest (explosives vs drugs, etc.), the charge of the ion, etc.

The ions are then accelerated to the ion mobility drift tube, where the ions then 'drift' or move down the series of concentric/charged rings, till they separate due to their mass or size, and run into the final detection plate at the end of the IMS tube. The detection or Faraday plate measures the amount of charge or current for each packet of ions, which then results in a measurement of analyte peaks vs time (typically in counts/sec or digital units). It should be noted that in the Ionscan 500DT, there are two IMS tubes, one for the positive ions and the other for the negative ions, however the detection for each is similar and calibrated. Most drugs are observed as positive ions, whereas most explosives are observed as negative ions.

The resultant spectrum or ion plasmagram is a graph of mobility (or size or identification of the analyte) vs time, and over a 5-10 second period, the IMS system collects many ion plasmagrams and averages them to one final resultant graph. The IMS detection systems have a detection library correlated with a mobility drift time and the ID of the species of interest: for example, for drug detection, there will be many species in the library, like Cocaine, Heroin, THC, etc., and many will have multiple peaks to be used to provide higher confidence in the ID of the species of interest. If the sample swab did not contain the programmed substance(s) in the library, above their set minimum alarm levels, the instrument will indicate a negative result (CLEAR or NO ALARM). The minimum alarm level (MAL) is defined as the minimum quantity of substance deposited on the sample swab that is required to generate an alarm on the instrument; this is typically preset by

the manufacture, and based on statistical laboratory experiments. Similarly, if the sample swab contained one or more of the programmed substances in the library, above their respective minimum alarm levels, then the instrument will give a positive result (ALARM), as well as display the detected substance and level. The minimum alarm levels are typically set at low nanograms or ion count levels, for each substance.

Additionally, it should be noted that sampling from the material in question (e.g., currency) to the sample swab is not a 100% efficient sampling process. First, one typically is sampling only part of the item, and secondly the sample swab will not pickup up all of the analyte on the item. Often, one can take a second or more samples from the same item, and still pickup analyte and have a detection. Hence, IMS detection is used as a presumptive tool, typically providing a non-quantitative indication of what is on the item; laboratory measurements of solvent extractions from surfaces, and measured by gas chromatography or mass spectrometry, is the usual lab method to obtain a quantitative measurement of the total amount of contamination on an item.

The above process can be visualized in the graphic shown in Figure 1.



Applications:
- Explosives detection on both luggage and people
- Detection of narcotics, CW, TIC's, etc.

- Substrate heated to vaporize particles
- Molecules are ionized by a weak radioactive source and drift through a weak electric field
- Particle time of flight is a distinct fingerprint, enabling detection

**Figure 1. A schematic drawing representing a Ionscan IMS tube.**

The Smiths Detection Ionscan 500DT, shown below in Figure 2, is manufactured by Smiths Detection, and is a presumptive field detection system for drugs and explosives. The end user typically would, upon procurement of the system, allow Smiths Detection to assist in setting up the library. The system can have only drug detection mode, or only explosives detection mode, or both. Within these library modes, the list can be modified to turn ON or OFF various substances.



Figure 2. Smiths Detection Ionscan 500DT, and Ionscan 500DT with system sampling wand, sample swabs and verific pen.

To ensure the Ionscan 500DT is working properly, there are a few checks the training operator should perform. First, running of blank (new and not performing surface sampling) is important to provide evidence that there is no carry-over from previous measurements while at the same time permits the instrument to perform a full system check and ensure it's processes are working properly.

The use of a Verification Method, or a Smiths Detection verific sample, is important to ensure the system's detection is working properly and its internal calibration is set correctly. For the Smiths Detection verification sample, it is typically a pen that one would rub onto a new sample swab, which contains verification substances typically of two non-controlled pharmaceutical compounds and two explosives compounds. The sample swab is then loaded into the Ionscan 500DT and system starts its verification measurement operation. The substances from the verification pen or sample must be detected by the Ionscan 500DT for the instrument to produce a 'Verific' alarm. The operator is trained to perform this verific test at least once a day, typically at the beginning of their operations or work shift, or whenever there might be need to restart the instrument or any other time to confirm its full operation. Smiths Detection normally programs their systems to require a verific test every 8 hours or after ever login of the system or after a thermal 'bake-out' (normally a overnight system cleaning process). If the verification test fails, i.e., no 'verific' alarms result, then the operators are trained to repeat the test, conduct basic cleaning or troubleshooting, or contact the manufacture for assistance.

After a real substance alarm, the operators are trained to discard the sample swab, discard and replace their gloves (if wearing gloves), and to perform a system clear-down by placing a new 'blank' sample swab into the instrument. Depending upon the level of the previous alarm, it may take more than one blank sample swab to reach the status that the system has returned to a READY state. In a few cases, where the previous substance overloaded the instrument, a 'bake-

out' process may be necessary. This is typically an 8-hour process, as it elevates the desorber and IMS tube to high temperatures for approximately 5 hours.

An example of a normal Smiths Detection Ionscan 500DT library for narcotics is (Mino, 2005):

- Amphetamine
- Cocaine
- Heroin
- Ketamine, MDA
- MDEA
- MDMA
- Methamphetamine
- PCP
- THC
- Procaine
- Fentanyl (and or it's many analogs, like Carfentanil, Sufentanil, Alfentanil, Remifentanil)
- Iorazepam
- 3-quinuclidinyl benzilate
- Etc.

The operator of an Ionscan 500DT should have received operational training from the manufacturer previously, and should have a daily procedure for operating the system in a proper fashion.

## 5.0 Reliability of the Results from the Ionscan 500DT IMS

A false alarm or false positive result occurs when an analyte other than that which is the programmed drug or explosive is detected in the same chemical channel as the programmed drug or explosive.

False alarm rates for negative or positive mode analysis is claimed to be <1% for narcotics and explosives, by Smiths Detection (Mino, 2005). This is approximately what I have observed when working with TSA, USCG, DOS, DOD, DOI, etc.

A nuisance alarm can occur when an analyte detected by the system and a legal substance or other analyte came from a legitimate source. An example of a nuisance alarm can be when one gets an NG alarm produced from a legal heart medicine, i.e. vasodilator medicine, in a NG channel; in this case, there is no presence of an illegal NG threat, but only of the same real NG ingredient from a legal source.

## 6.0 Samples tested by the Ionscan 500DT IMS for this case

Case documents provided include:

- DHS HSI report: "The encounter and seizure of $252,140 in US Currency from Darren Coleman at the Charlotte-Douglas International Airport on 6/27/16"

- Photos of DHS HSI evidence: USA000101 through USA000116

- Printouts from DHS HSI Smiths Detection Ionscan 500DT data; USA000091through USA000097

From the DHS HSI report, Special Agent Bass, TFO Brown and TFO Griffith conducted the trace detection IMS Ionscan 500DT sampling and analysis on (1.) two bundles of currency, (2.) four of the six plastic bags {correlating to the white,

red and black bag data}, (3.) a Nike Air Jordon sneaker box, and (4.) the interior of the black roller bag with orange trim. They then state that all the samples alarmed for cocaine, except for the "black roller bag with orange trim, which tested negative for narcotics and explosives." This negative result was not included in the data provided.

Section 9.0 below will address my interpretation of the actual Smiths Detection Ionscan 500DT data, from evidence USA000091through USA000097.

## 7.0 Operation of the Ionscan 500DT IMS on said date

The case reports indicate that HSI Special Agent William Bass and/or HIS Task Force Officer Griffith obtained the samples and operated the Ionscan 500DT system.

On 10 Feb 2020, I conducted a phone interview of SA William Bass to learn more of how he obtained the samples and operated the Ionscan instrument. The following are the key points I learned from this QA interview.

- Did both of the agents have training for the Ionscan 500DT operations, and by who? "Both had training from Smiths Detection on the operation of the Ionscan 500DT. They had training and were Smiths Detection certified."
- What protocol did the agents use for sampling and use of Ionscan 500DT instrument? "They learned a preparation, sampling and Ionscan operation procedures from Smiths Detection trainer."
- Specifically, what steps did the agents take in performing the sampling? "As operator, gloves were used, surrounding surfaces were cleaned (isopropanol), blanks and Verification swabs were run (successfully). The second person did all the sampling, again wearing gloves. After each and every hot sample (Alarm recorded), at least one blank swab was run."
- What were the conditions of the room utilized for the sampling and analysis? "The Ionscan instrument was operated in a separate clean small room that is secured and used by HSI officials only."
- What's the typical daily or weekly use of the Ionscan 500DT IMS system? "Use of this particular Ionscan 500DT instrument varied depending upon work load, but used infrequently."
- How exactly were samples taken from the currency? "Currency was taken out of the plastic bags and laid out on the table by one person. The second person held down the bills and swabbed, using the sampling wand and sampling swab, across multiple bills."
- Does the HSI have records on what the typical background levels would be for currency in the state of NC or GA? "No, they do not have any data on background levels from currency in any state."

From this interview, all my questions were answered to my satisfaction, and the procedures and steps used seemed to be satisfactory for this type of characterization utilizing an Ionscan 500DT.

## 8.0 Issue of General Contamination in US Currency Circulation

It is well known to the general population that most of the currency in the USA and worldwide is contaminated with low levels of drugs, from normal circulation (Aitken et al., 2017; Jourdan et al., 2013; Poupko et al., 2018; Sisco et al., 2018). Minute particles from illicit drugs are often sticky and persistent. The United States still uses mainly paper currency, vs some other countries, like Canada and European countries, are or have switched over from paper based to a polymer-based currency. There are no known publications or reports that indicate what the difference would be, but hypothetically, the paper-based materials would hold onto particle contaminations at a higher level than with the smoother polymer-based materials.

These older publications, referenced above, indicate sampling of currency from US bills in general circulation, have attempted to provide a quantitative level which remains on the bills. This provides a quantitative number; however, it is not directly correlated to the IMS Ionscan 500DT ion count levels which the instrument provides for each alarm.

From one of my previous Legal Expert Witness cases {Ref: Expert Witness Contract Number 15JA67-20-P-000000005, United States v. Maurice Lackey, Federal District Court, Middle District of Pennsylvania, AUSA Scott Ford, December 2019.}, I was able to utilize the State of Pennsylvania's National Guards Counterterrorism Units data for background levels. They referred to this data as "Casual Contact" date, which was a good statistical (n=480 total) sampling of currency from banks and casinos in 20 counties across Pennsylvania (24 samples each, for a total of 480 samples). They accumulated this data for Cocaine and Methamphetamines (i.e., 2 separate lists; see data attached as Addendum to this report). The data all come from similar Smiths Detection Ionscan 500DT's. For Cocaine, out of 480 samples, the average Casual Contact amount for Cocaine was 328.74 counts/sec (again, from the Maximum Amplitude of the IMS peak via the Ionscan 500DT ion plasmagram.). To be on the safe side, they then set anything higher than 500 counts/sec as their Minimum Alarm Level or threshold. The Smiths Detection Factory specification is typically set at 50-100 counts/sec, for a cocaine alarm, which is approximately 0.5 nanograms of cocaine {Refs – private communique with Smiths Detection technical experts, Ms. Lena Kim, Toronto, Canada}

## 9.0 Opinion resulting from review of the Ionscan 500DT IMS Data/Alarms from the Currency Sampled.

The first printout, evidence # USA000091, is the initial scan for the Verification run. As mentioned above in section 4.0; this is the correct FIRST sample to be presented to the Ionscan 500DT system, to ensure it is calibrated and working properly. This was performed on 06/27/2016 at 3:40PM (Sample ID 3181), according to the time stamp on this data printout. From the lower section of the printout, the key data to look at is the Alarm and Delta, or the variation of the peak from its known mobility number (Ko). All of the Delta numbers are low and hence within range of the associated peaks. This provides information that the system was working properly.

The next set of data, evidence # USA000092, is for the first sample taken from currency via the bundles {performed on 06/27/2016 at 3:56M (Sample ID 3210)}; according to discussion with SA William Bass, they properly opened the bundles and placed the currency out on a table, followed by sampling across the surface of many bills, and then sample swab loaded into the Ionscan 500DT to commence system analysis. This printout indicates a fairly strong alarm for cocaine (1394 counts/sec for CumA; CumA is the cumulative or addition of all the ion counts in the summed peaks), resulting in a 14% Alarm Rate.

Data from evidence # USA000093, is the second sample taken from currency via bundles {performed 06/27/2016 at 3:53PM (Sample ID 3206)}; this printout indicates a very strong alarm for cocaine (cocaine channel at 4702 counts/sec for CumA and cocaine High at 1334 counts/sec CumA), resulting in a 32% Alarm Rate.

Smiths Detection will often use more than one peak, for various reasons, but mainly to ensure detection is correct, and thereby does not miss any detections. In this case, there is the addition of the cocaine High peak, vs just the cocaine peak. Note that both have the same mobility value (Ko) and Drift Time values; this is because they are using the same measurement data, and running two different calculation algorithms on them. This is often added in to avoid a high peak that is so intense that it broadens the peak/peak height, and possibly shifts out of the detection window. Hence the cocaine High peak is utilizing a different calculation, whereby they use a FWHM (Full Width Half Maximum peak) shift with a baseline fit or normalization. This normalization reduces the large peak to a smaller and peak-fit/alarming size.

Date from Evidence # USA000094, is from the inside of the white bag {performed on 06/27/2016 at 4:46PM (Sample ID 3196)}. This implies that the screener, utilizing the sampling wand with a sample swab attached, sampled, by applying pressure to the wand, and sampling the inside surface of the white bag, while it was pressed against the table. In this case, there is a strong alarm for cocaine at 1476 counts/sec CumA, resulting in a 15% Alarm Rate.

Date from Evidence # USA000095, is from the inside of the red bag {performed on 06/27/2016 at 3:47PM (Sample ID 3199)}. This implies that the screener, utilizing the sampling wand with a sample swab attached, sampled, by applying pressure to the wand, and sampling the inside surface of the red bag, while it was pressed against the table. In this case, there is a strong alarm for cocaine at 1137 counts/sec CumA, resulting in a 12% Alarm Rate.

Date from Evidence # USA000096, is from the inside of the black bag {performed on 06/27/2016 at 3:49PM (Sample ID 3202)}. This implies that the screener, utilizing the sampling wand with a sample swab attached, sampled, by applying pressure to the wand, and sampling the inside surface of the black bag, while it was pressed against the table. In this case, there is a low alarm for cocaine at 409 counts/sec CumA, resulting in a 4% Alarm Rate.

Date from Evidence # USA000097, is from the inside of the Jordon Sneaker Box {performed on 06/27/2016 at 3:44PM (Sample ID 3193)}. This implies that the screener, utilizing the sampling wand with a sample swab attached, sampled, by applying pressure to the wand, and sampling the inside surface of the Jordon Sneaker Box, while it was pressed against the table. In this case, there is a low alarm for cocaine at 379 counts/sec CumA, resulting in a 5% Alarm Rate.

Note that the Alarm Rates indicated on each scan is not a quantitative amount on a 100% scale, but rather a percentage based on a calculation to indicate a percentage strength for the identified specie, i.e. cocaine, to the threshold minimum alarm levels {Ref: private communications with Dr. Reno Debono, recently retired Smiths Detection senior IMS expert}. Also, it is clear from the Sample ID numbers, that the operator properly ran at least one blank sample swab in between the hot or alarmed runs, and in some cases ran several.

Also, concerning the 'Casual Contact' limit, or common currency background amounts, discussed in Section 8.0 above, the data from USA000092 through USA000095 are significantly above the set 500 counts/sec level set, implying these are real and strong hits for cocaine on these surfaces. For the last two, USA000096 and USA000096, although they do present as cocaine alarms, they are below the background level set at 500 counts/sec. If one were to strictly followed Smiths Detection MAL alarm rates or the 'Casual Contact' background threshold for cocaine (328.74 counts/sec), then these two would also be considered real cocaine alarms.

## 10. Conclusion

The Smiths Detection Ionscan 500DT data provided for this case do indeed present high levels of cocaine on samples taken from the currency and several of the other packaging materials for the bundles of currency, over that which one might expect to see as background on typical US currency. Thus, under my expert opinion, I'd confirm that data USA000092 through USA000095 indicate real presence of high cocaine alarms.

I affirm that the statements made above are true to the best of my technical knowledge and represent my expert review and opinion of the case's Ionscan detection data:

Richard T. Lareau, Ph.D.
Lareau Consulting Services LLC

27 July 2020

Date Signed

2360 Lakewood Road, Ste. 3—Office 167, Toms River, NJ 08755    Ph. 603-409-2106    Email: Lareau@lareauconsultingservices.com

**11. References – the following are a few of the key peer-reviewed publications I used in this case report;**

Aitken, C. G. G., Wilson, A., Sleeman, R., Morgan, B. E. M., & Huish, J. (2017). Distribution of cocaine on banknotes in general circulation in England and Wales. *Forensic Science International, 270*(January), 261–266. https://doi.org/10.1016/j.forsciint.2016.10.017

Jourdan, T. H., Veitenheimer, A. M., Murray, C. K., & Wagner, J. R. (2013). The Quantitation of Cocaine on U.S. Currency: Survey and Significance of the Levels of Contamination. *Journal of Forensic Sciences, 58*(3), 616–624. https://doi.org/10.1111/1556-4029.12097

Mino, W. (2005). *Ionscan 500DT 2202 Lakeside Boulevard.* 22–24.

Northwest, P., Ion, H. A., Drift, I. A., & Combined, D. (n.d.). *Ion-mobility spectrometry.* 1–11.

Poupko, J. M., Hearn, W. L., & Rossano, F. (2018). Drug Contamination of U.S. Paper Currency and Forensic Relevance of Canine Alert to Paper Currency: A Critical Review of the Scientific Literature. *Journal of Forensic Sciences, 63*(5), 1340–1345. https://doi.org/10.1111/1556-4029.13755

Sisco, E., Najarro, M., & Burns, A. (2018). A snapshot of drug background levels on surfaces in a forensic laboratory. *Forensic Chemistry, 11*(September 2018), 47–57. https://doi.org/10.1016/j.forc.2018.09.001

*Other relevant publications;*

Jenkins, A J. "Drug contamination of US paper currency." *Forensic science international* vol. 121,3 (2001): 189-93. doi:10.1016/s0379-0738(01)00401-7

Oyler, J et al. "Cocaine contamination of United States paper currency." *Journal of analytical toxicology* vol. 20,4 (1996): 213-6. doi:10.1093/jat/20.4.213

Lavins, Eric S et al. "Cannabis (marijuana) contamination of United States and foreign paper currency." *Journal of analytical toxicology* vol. 28,6 (2004): 439-42. doi:10.1093/jat/28.6.439

Zuo, Yuegang et al. "An accurate and nondestructive GC method for determination of cocaine on US paper currency." *Journal of separation science* vol. 31,13 (2008): 2444-50. doi:10.1002/jssc.200800117

12. Addendum – Casual Contact IMS numbers from the Commonwealth of PA (attached and shown below).



DEPARTMENT OF MILITARY AND VETERANS AFFAIRS
PENNSYLVANIA NATIONAL GUARD
**COUNTERDRUG JOINT TASK FORCE**
Building 8-65, Ft. Indiantown Gap
Annville, PA 17003-5002

## Commonwealth of Pennsylvania 2017 Casual Contact

| County | Samples | Total MaxA | County Ave |
|---|---|---|---|
| Cameron | 24 | 1,425 | 59.38 |
| McKean | 24 | 645 | 26.88 |
| Potter | 24 | 0 | 0 |
| Tioga | 24 | 0 | 0 |
| Bradford | 24 | 6,706 | 279.42 |
| Sullivan | 24 | 1,951 | 81.29 |
| Lycoming | 24 | 3,301 | 137.54 |
| Lancaster | 24 | 8,562 | 357 |
| Butler | 24 | 9717 | 405 |
| Westmoreland | 24 | 12,514 | 521 |
| Allegheny | 24 | 11,515 | 480 |
| Beaver | 24 | 18,925 | 788.54 |
| West Chester | 24 | 16,552 | 689.67 |
| Westmoreland | 24 | 8691 | 362.13 |
| Washington | 24 | 11635 | 484.79 |
| Butler | 24 | 7158 | 298.25 |
| Mont (Pottstown) | 24 | 8725 | 363.54 |
| Mont (Horsham) | 24 | 8744 | 364.33 |
| Beaver | 24 | 10654 | 443.91 |
| Berks | 24 | 10377 | 432.38 |
| Total: | | | |
| Total MaxA: | 157797 | | |
| Total Sample: | 480 | | |
| Casual Contact: | 328.74 | | |

As of: 30 June 2017

**Above Table is the Casual Contact report for Cocaine, utilizing a Smiths Detection Ionscan 500DT**



DEPARTMENT OF MILITARY AND VETERANS AFFAIRS
PENNSYLVANIA NATIONAL GUARD
**COUNTERDRUG JOINT TASK FORCE**
Building 8-65, Ft. Indiantown Gap
Annville, PA 17003-5002

## Commonwealth of Pennsylvania 2017 Casual Contact
(Methamphetamine)

| County | Samples | Total MaxA | County Ave |
|---|---|---|---|
| Cameron | 24 | 0 | 0 |
| McKean | 24 | 0 | 0 |
| Potter | 24 | 0 | 0 |
| Tioga | 24 | 0 | 0 |
| Bradford | 24 | 162 | 6.75 |
| Sullivan | 24 | 0 | 0 |
| Lycoming | 24 | 0 | 0 |
| Beaver | 24 | 0 | 0 |
| Chester | 24 | 320 | 13.33 |
| Butler | 24 | 0 | 0 |
| Mont (Pottstown) | 24 | 692 | 28.83 |
| Mont (Horsham) | 24 | 2203 | 91.79 |
| Berks | 24 | 8080 | 336.67 |
| Total: | 312 | 11457 | 36.72 |
| Total MaxA: | 11457 | | |
| Total Sample: | 312 | | |
| Casual Contact: | 36.72 | | |

BOLTZ.KIMB Digitally signed by
ERLY.ANN.1 BOLTZ.KIMBERLY.A
236754672 Date: 2017.xx.xx
KIMBERLY BOLTZ
SFC, PAARNG
Technical Support NCOIC

BEARD.ETHAN. Digitally signed by
CHARLES.1037 BEARD.ETHAN.CHARLES.1037864869
B64869 Date: 2017.xx.xx
ETHAN BEARD
SFC, PAARNG
Technical Support Operator

As of: 30 June 2017

**Above Table is the Casual Contact report for Methamphetamine, utilizing a Smiths Detection Ionscan 500DT**



DEPARTMENT OF MILITARY AND VETERANS AFFAIRS
PENNSYLVANIA NATIONAL GUARD
**COUNTERDRUG JOINT TASK FORCE**
Building 8-65, Ft. Indiantown Gap
Annville, PA 17003-5002

# Commonwealth of Pennsylvania 2017 Casual Contact
## (COCAINE)

| County | Samples | Total MaxA | County Ave |
|---|---|---|---|
| Cameron | 24 | 1,425 | 59.38 |
| McKean | 24 | 645 | 26.88 |
| Potter | 24 | 0 | 0 |
| Tioga | 24 | 0 | 0 |
| Bradford | 24 | 6,706 | 279.42 |
| Sullivan | 24 | 1,951 | 81.29 |
| Lycoming | 24 | 3,301 | 137.54 |
| Lancaster | 24 | 8,562 | 357 |
| Butler | 24 | 9717 | 405 |
| Westmoreland | 24 | 12,514 | 521 |
| Allegheny | 24 | 11,515 | 480 |
| Beaver | 24 | 18,925 | 788.54 |
| West Chester | 24 | 16,552 | 689.67 |
| Westmoreland | 24 | 8691 | 362.13 |
| Washington | 24 | 11635 | 484.79 |
| Butler | 24 | 7158 | 298.25 |
| Mont (Pottstown) | 24 | 8725 | 363.54 |
| Mont (Horsham) | 24 | 8744 | 364.33 |
| Beaver | 24 | 10654 | 443.91 |
| Berks | 24 | 10377 | 432.38 |
| Total: | | | |
| Total MaxA: | 157797 | | |
| Total Sample: | 480 | | |
| Casual Contact: | 328.74 | | |

As of: 30 June 2017

# Commonwealth of Pennsylvania 2017 Casual Contact
### (Methamphetamine)

| County | Samples | Total MaxA | County Ave |
|---|---|---|---|
| Cameron | 24 | 0 | 0 |
| McKean | 24 | 0 | 0 |
| Potter | 24 | 0 | 0 |
| Tioga | 24 | 0 | 0 |
| Bradford | 24 | 162 | 6.75 |
| Sullivan | 24 | 0 | 0 |
| Lycoming | 24 | 0 | 0 |
| Beaver | 24 | 0 | 0 |
| Chester | 24 | 320 | 13.33 |
| Butler | 24 | 0 | 0 |
| Mont (Pottstown) | 24 | 692 | 28.83 |
| Mont (Horsham) | 24 | 2203 | 91.79 |
| Berks | 24 | 8080 | 336.67 |
| Total: | 312 | 11457 | 36.72 |
| Total MaxA: | 11457 | | |
| Total Sample: | 312 | | |
| Casual Contact: | 36.72 | | |

BOLTZ.KIMB Digitally signed by
ERLY.ANN.1 BOLTZ.KIMBERLY.A
NN.1236734672
236734672 Date: 2019.10.01
08:38:39 -04'00'
KIMBERLY BOLTZ
SFC, PAARNG
Technical Support NCOIC

BEARD.ETHAN. Digitally signed by
BEARD.ETHAN.CHARLES.1037864869
CHARLES.1037 DN: c=US, o=U.S. Government,
ou=DoD, ou=PKI, ou=USA,
864869 cn=BEARD.ETHAN.CHARLES.1037864869
Date: 2019.10.01 09:52:46 -04'00'
ETHAN BEARD
SFC, PAARNG
Technical Support Operator

As of: 30 June 2017

**Page 1**

                                                    1

          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                    CHARLOTTE DIVISION
                  CIVIL NO. 3:18CV646

UNITED STATES OF AMERICA,  :    **CIVIL ACTION**
                           :    **VIDEOTAPED**
          vs.              :    **REMOTE**
                           :    **DEPOSITION OF:**
APPROXIMATELY $252,140.00 IN :
US CURRENCY SEIZED FROM    :    **RICHARD LAREAU, Ph.D.**
DARREN LENNARD COLEMAN ON  :
JUNE 27, 2016 AT           :
CHARLOTTE-DOUGLAS          :
INTERNATION AIRPORT        :


                  DECEMBER 15, 2020
                    11:59 A.M.



C O M P U T E R I Z E D   T R A N S C R I P T  of

the stenographic notes of the proceedings in the

above-entitled matter as taken remotely by and before

COLLEEN M. VAUGHN, a Certified Court Reporter,

Certificate No. 30XI00124100, and Notary Public of

the State of New Jersey, on Tuesday, December 15,

2020, commencing at 11:59 in the forenoon.


-----------------------------------------------------
     Betty Spillane t/a SHORE REPORTING SERVICE, P.C.
              Certified Court Reporters
                   29 Tobago Avenue
               Toms River, New Jersey 08753
       Office (732) 349-2450 * Fax (732) 270-1151
                 ShoreReporting@aol.com

**Page 2**

1  A P P E A R A N C E S:

2

3  BENJAMIN BAIN-CREED, ESQUIRE

4      227 West Trade Street, Suite 1650

5      Charlotte, North Carolina  28202

6  Assistant United States Attorney

7

8  LAW OFFICES OF MICHAEL & BURCH, LLP

9  BY:  EDWARD BURCH, ESQUIRE, and

10      DAVID M. MICHAEL, ESQUIRE

11      One Sansome Street, Suite 3500

12      San Francisco, California  94104

13  Attorneys for Claimants, International Human Rights

14  Commission and Robert Shumake.

15

16  ALSO PRESENT:

17      SCOTT LINDENBAUM, Videographer

18

19

20

21

22      EXHIBIT
23        15
24

25

**Page 3**

1          --------------------------------

2  (By agreement of counsel, the signing, sealing and

3  certification of the depositions were waived, and all

4  objections, except as to the form of the questions,

5  were reserved to the time of trial.)

6          --------------------------------

7

8                  I N D E X

9  Witness                                      Page

10  RICHARD T. LAREAU, Ph.D.

11  By:  Mr. Burch ................................      6

12

13

14

15

16                  E X H I B I T S

17  No.  Description                          Ident.

18  1    Curriculum Vitae of Dr. Lareau ..........      4

19  2    Case Report 7/27/20 ....................      4

20  3    Ionscan results ........................      4

21  4    Six photographs ........................      4

22  5    Lackey transcript dated 12/3/19 .........      4

23  6    DHS Incident Report ....................      4

24

25

**Page 4**

1          (Prior to the commencement of the

2      deposition, exhibits were received and

3      marked for identification, and proceedings

4      then begin as follows:)

5

6          THE REPORTER:  As authorized by the

7  Supreme Court of New Jersey, before I swear in the

8  witness, I will ask Counsel to stipulate on the

9  record that due to the current National Emergency

10  pandemic, the court reporter may swear in the

11  deponent even though she is not in the physical

12  presence of the deponent, and that there is no

13  objection to that at this time, nor will there be an

14  objection to it at a future date.

15          MR. BAIN-CREED:  No.

16          MR. BURCH:  No objection.

17

18          THE VIDEOGRAPHER:  This is the video

19  operator speaking, Scott Lindenbaum, of Shore

20  Reporting.  Today's date is December 15, 2020.  The

21  time is now 11:59.  We are here to take the

22  videotaped deposition of Dr. Richard Lareau in the

23  matter of United States of America versus Coleman,

24  filed in the United States District Court for the

25  District of North Carolina, Charlotte Division.

1      Would counsel please voice identify
2  yourselves and state whom you represent?
3      MR. BURCH:  I'll go ahead and start.
4      MR. MICHAEL:  This is David Michael.
5  Go ahead.  This is David Michael.  I'm one of the
6  attorneys for the claimants and the firm that is
7  taking the deposition.
8      MR. BURCH:  And I'm Edward Burch,
9  B-U-R-C-H, representing also claimant, Robert
10 Shumake.
11     MR. BAIN-CREED:  And I'm Benjamin
12 Bain-Creed, B-A-I-N-C-R-E-E-D, representing the
13 United States.
14     THE VIDEOGRAPHER:  Would the court
15 reporter please swear in the witness?
16
17    R I C H A R D   T.   L A R E A U ,   Ph.D.,
18    Five Shorin Way, Manchester, New Jersey 08759,
19    having been first duly sworn according to
20    law, upon his oath, testified as follows:
21
22     MR. MICHAEL:  And just for the record
23 I'm only here observing.  So without noting at the
24 court reporter, I may just click off and Ed is going
25 to, Mr. Burch is going to conduct the deposition.  So

1  I may appear and disappear and then appear back, but
2  I don't think it's relevant to the deposition itself.
3      MR. BURCH:  Okay.  Everybody ready?
4      MR. BAIN-CREED:  Ed, can we, can we
5  just agree to preserve all objections except as to
6  form?
7      MR. BURCH:  Of course.
8      MR. BAIN-CREED:  Right.
9      MR. BURCH:  Sounds good.
10
11 EXAMINATION BY MR. BURCH:
12
13     Q.     Okay.  So let's see.  Dr. -- Dr.
14 Lareau, is that an appropriate way to address you?
15     A.     Yes.
16     Q.     Okay.  So we're here on this case
17 United States versus 252 some odd thousand dollars
18 regarding stemming from the seizure of -- of this
19 money from Darren Coleman in 2016.
20         Does this sound familiar to you?
21     A.     Yes.
22     Q.     Okay, good.
23         Have you been deposed before?
24     A.     I have not.  I've testified at a
25 federal trial, but not in a separate deposition

***LAREAU - Burch***

1  before.
2      Q.     Okay.  Well, so I'll just really
3  quickly go through a couple of, you know, kind of
4  background logistic kind of preliminary things, but
5  civil deposition you've just taken the oath.  You're
6  under oath.  So it's just like court in a sense that
7  you're under penalty of perjury.
8          Does that make sense?
9      A.     Yes.  Understood.
10     Q.     Okay.  And as a matter of being
11 efficient, it's best -- the court reporter is
12 obviously taking down every word that you say.  So we
13 shouldn't talk at the same time and so I will do my
14 best to let you finish all of the answers to the
15 questions, and just ask that, you know, you let me
16 finish my questions and we'll try not to speak over
17 each other.
18         Is that fair?
19     A.     Yes, it is.
20     Q.     Okay, great.
21         And another thing I like to kind of go
22 over at the beginning is that, you know, I'll
23 probably ask a fair amount of questions that I know
24 the answer to probably or they're very obvious
25 seeming to you, for example, but I just let the

***LAREAU - Burch***

1  deponent know that, you know, I'm making a record and
2  I wouldn't read necessarily too much into any
3  question, but at the same time if I ask a question
4  that's unclear, please definitely let me know so that
5  I can get you a good question that you understand
6  before you -- before you answer it.
7          Does that all make sense?
8      A.     Yes, it does.
9      Q.     Okay.  Now, before we get started with
10 the sort of nuts and bolts or the substance, I should
11 say, are you ill or on any medication or anything
12 like that, that would prevent you from understanding
13 questions or otherwise giving your best testimony
14 today?
15     A.     No.
16     Q.     Okay.
17     A.     I am healthy today.
18     Q.     Great.  Glad to hear it.
19         THE REPORTER:  Excuse me.  I didn't
20 hear you.
21     A.     I am healthy.  No problem.
22 BY MR. BURCH:
23     Q.     Okay.  So to start with, how many
24 times have you been retained to testify as an Ionscan
25 machine expert for a judicial case?

**LAREAU - Burch**

1     A.     One other as far as for a judicial
2  case, so it was the case in Harrisburg, Pennsylvania.
3     Q.     That's the <u>United States versus</u>
4  <u>Lackey</u>.  Is that right?
5     A.     Correct.  Yes.
6     Q.     Okay.  So I think that answers my
7  other question.  You've never testified on behalf of
8  a defendant or the defense in any kind of Ionscan
9  case?
10     A.     Not an Ionscan case, no.
11     Q.     Have you testified on -- sorry about
12  that.
13         Have you testified on behalf of the
14  defense in any type of case?  And let me be a little
15  bit more specific.  As an -- as an expert witness on
16  any kind of toxicology chemistry type of thing?
17     A.     So there's two cases; one that's closed
18  up now is a fireworks case where I was on the defense
19  side to help put together expert witness information
20  on, on the fireworks or the ingredients of it which
21  are explosive material.
22         And I'm currently on a Department of
23  Defense military explosive defense team where I'm the
24  expert witness for explosive materials.
25     Q.     Okay.  And what -- for the fireworks

**LAREAU - Burch**

1  Ionscan, but it's an IMS 500DT system.
2     Q.     Okay.  So what's -- what's a good
3  short way to call it for use so that we just are
4  consistent?
5     A.     Probably IMS is what it's known as.
6     Q.     IMS?  Okay.  I'll do my best to do
7  IMS.  I had it in my mind as Smiths, but I'll
8  say IMS.
9     A.     Whichever you're comfortable with.  I,
10  I can -- I'll know what you're referring to.
11     Q.     All right.  One of those two, I think
12  we'll get.
13         So with the IMS machine, tell me if
14  this is fair.  The basic way that it works is that an
15  operator is going to take a swab and they're going to
16  wipe it on something, and then they're going to place
17  that swab into the machine, the machine is going to
18  heat up, and it's going to give you a reading of some
19  numbers.  Is that fair?
20     A.     Yes.
21     Q.     Okay.  And so the numbers that the IMS
22  machine gives you are -- are what, what type of
23  measurement?
24     A.     Well, they're a measurement on an
25  alarm, let's say, of what a threat compound would be,

**LAREAU - Burch**

1  case, is that -- what court is that?
2     A.     That was a -- boy, in Michigan in
3  municipal court.  It was a civil case.
4     Q.     About what year; do you remember?
5     A.     Well, that for me that started in -- in
6  2019.  So all the work, all the parts I was involved
7  with were in the year 2019.
8     Q.     Okay.  And just for the record you
9  have a rough name of that case?
10     A.     I do not.  I would have to look it up
11  to find out what the actual name of the case was.
12     Q.     Okay.  Well, perhaps we can do
13  supplement if it becomes something that we'd really
14  need to know, but let's go ahead and move on.
15         Have you ever been approached by -- by
16  a district attorney or any kind of prosecutorial
17  agent, to be an expert witness for an Ionscan machine
18  or Ionscan results and declined to testify?
19     A.     No.
20     Q.     Okay.  So I kind of want to get into
21  this case a little bit more now.  In this case what
22  you gave your opinion on was what's called a Smiths
23  Ionscan machine.  Is that correct?
24     A.     That's correct.  Smiths Detection is a
25  manufacturer and it is a -- it's referred to as

**LAREAU - Burch**

1  so cocaine, methamphetamine, heroin, whatever it would
2  detect on, what explosive material.
3     Q.     Okay.
4     A.     The actual -- go ahead.
5     Q.     Well, I was just going to ask in this
6  case I'd sort of like to focus on the cocaine.  So
7  I'm going to say that like unless I -- unless I
8  specify otherwise I'm going to be asking about
9  cocaine in relation to the IMS machine.
10         So in the instance of cocaine, it --
11  do you have to set the IMS machine to -- to cocaine
12  to give -- to get some reading that will tell you
13  anything about cocaine?
14     A.     You as the operator don't have to set
15  anything.  The instrument, when it's sold from Smiths
16  Detection, will have an algorithm and typically
17  there's explosives and drugs, and in the drugs there
18  could be 20 or 40 compounds, cocaine being one of
19  them.  So it's already in there ready to alarm unless
20  your organization decides to shut those threats off,
21  but they are on.
22     Q.     I understand.  So if indeed,
23  hypothetically, you give it a -- some -- the operator
24  takes a swab, puts it in, gets a reading, cocaine
25  pops up, let's say it alarms for cocaine, is that an

**LAREAU - Burch**

1 accurate way to say it?

2     A.     Yes.  Correct.

3     Q.     Okay.  So it alarms for cocaine.

4 What -- it's going to spit out some numbers, correct?

5     A.     Yes.

6     Q.     What's the measurement of those

7 numbers that it's giving you?

8     A.     So it -- on the screen it would

9 probably just have a red alarm color to it, and it

10 would probably say cocaine and it may tell you, may or

11 may not tell you on the screen what the strength is

12 depending how it's set up.  There is a printout that

13 comes with those results if you print it out, and it's

14 stored with every alarm and on there it gives you more

15 details of what that cocaine alarm is.

16     Q.     Okay.  So in this case we did have

17 some numbers.  I'm skipping ahead a little bit, but

18 we did get -- we did some printouts in this

19 particular case, correct?

20     A.     That's correct.

21     Q.     And so we got some numbers there.

22     A.     Yes.

23     Q.     What numbers are we getting, did we

24 get in this case?

25     A.     Okay.  So there's a number of types of

**LAREAU - Burch**

1 numbers that come out.  There's a percent strength for

2 cocaine that could be 15, 20 percent of, of an alarm.

3 There's also if you look at any one of the printouts

4 there's a channel for cocaine, a channel for cocaine

5 high, and there are a number of -- there's a number of

6 sequence of numbers that are associated with that

7 printout from the drift time, the Delta, the

8 cumulative A, how many channels it alarmed on, et

9 cetera and its strength.

10     Q.     All right.  So -- well, let's see.

11 Let me go ahead and pull up -- maybe do it this way.

12 I'm going to pull up your case report.  I'm assuming

13 you have a copy of it there?

14     A.     I do, yes.

15     Q.     Okay.  So when we -- I'm going to skip

16 to page -- page 8, the top there and you talk

17 about -- the first printout, I wonder if we should

18 mark that.

19          MR. BAIN-CREED:  When you and David

20 sent me the exhibits for Dr. Lareau last night and

21 Dr. Rose, I E-mailed them late last night.  So Dr.

22 Lareau should have the E-mail from you with your

23 exhibit numbers.  So this would be number 2 on your

24 exhibit numbers.

25          MR. BURCH:  Oh, right.  Okay.  And I

**LAREAU - Burch**

1 mean, I guess -- well, maybe -- can I ask the court

2 reporter a question?

3          THE REPORTER:  Sure.

4          MR. BURCH:  What -- what -- what is

5 the best way for you in terms -- I kind of premarked.

6 I only have 1 through 6 on the exhibits.  In terms of

7 just marking them and introducing them, should I --

8 if we go out of order should I stick with my

9 numbering or do we just go in the chronological order

10 that they come up with?

11          THE REPORTER:  No.  I would stick with

12 the numbers that you gave them.

13          MR. BURCH:  Okay.  All right.

14          THE REPORTER:  And then I'll just list

15 them on the index page and I will mark them after the

16 deposition is over.

17          MR. BURCH:  All right.

18          THE REPORTER:  So I'm going to keep

19 with the numbers that you gave them.

20          MR. BURCH:  Okay.  I gotcha you.

21 BY MR. BURCH:

22     Q.     All right.  So we're on what I have

23 marked as number 2 and I'm on page 8 of that.  And,

24 Dr. Lareau, that section 9.0 there, it's sort of in

25 the middle of the page, you talk about your -- the

**LAREAU - Burch**

1 first printout essentially being a sort of blank or

2 to make sure the machine is working.  Is that

3 accurate?

4     A.     Yes.  It's called a verification run to

5 make sure the instrument is working properly.

6     Q.     Okay.  So the next one is the first

7 sample that they actually tested, which was the

8 currency, and if I skip to kind of the fifth line

9 there it talks about the sample gives you a 1394.

10 What is that measurement?

11     A.     I'm looking for where that number --

12 oh, all right.  I see it.  So that's under the cocaine

13 alarm and the 1394 is a cumulative digital number

14 which is supposed to represent counts per second of

15 how much strength has come up for cocaine under that

16 one peak.

17     Q.     Okay.  And if -- so then if we go to

18 what I've marked as number 3, which was the actual

19 results that the law enforcement officers provided,

20 correct?

21     A.     Yes.

22     Q.     Where do we -- and we see that, we see

23 that, presumably we see that 1394?

24     A.     Yes.  So if you're scrolling through

25 the Ionscan printouts the first one is verification.

**LAREAU - Burch**

1  The next one that comes up says bundles of currency,
2  and under that one toward the bottom last part of the
3  printout is the cocaine with a cumulative A 1394.
4  Q.      Okay.  That's I have a Bates number
5  there.  It's USA000092, correct?
6          I think I lost audio.
7  A.      Are you asking me or are you asking --
8  Q.      Dr. Lareau, I'm asking you the Bates
9  number that you see there at the bottom is basically
10  92, right, the bottom right?
11          MR. BAIN-CREED:  Dr. Lareau, the Bates
12  number is the number on the bottom right.
13          THE WITNESS:  Yeah.  I just found it.
14  Yes.
15          MR. BURCH:  Okay.  Just for the record
16  I want to make sure we're looking at the same thing.
17          THE WITNESS:  Yes, it is.
18  BY MR. BURCH:
19  Q.      Okay.  So I don't want to jump back to
20  the typical or proper use of an IMS machine.  Well,
21  let me ask one follow-up.  That's -- that's the --
22  those counts per second are what your opinion is
23  mostly focused on in this case when you get to your
24  ultimate opinion, that's what you're really looking
25  at, correct?

**LAREAU - Burch**

1  A.      Well, that's part of the data.  It is
2  looking at that, it's looking at the alarm strength,
3  which is actually calculated from the cocaine level
4  and take into consideration the background level,
5  noise level of the instrument.  So that in this
6  particular case it came up to, if you move to the top
7  of that printout you see cocaine 14 percent.
8  Q.      Okay.  And then I see at the bottom of
9  that first paragraph on your report that you talk
10  about the first sample, it says resulting in a 14
11  percent "Alarm Rate."
12  A.      That's right.
13  Q.      So that's the strength.  So those are
14  two different things that are being measured?
15  A.      It's just a different calculation.  So
16  one is looking at what the counts per second of the
17  Alzion peak is for that mass for cocaine.  The other
18  doing is calculation of taking that peak subtracting
19  out the background times 100, and it comes up to 14
20  percent.  And so it's -- it's the same data.  It's
21  just different ways of calculating it to show what the
22  alarm is compared to background.
23  Q.      I understand.
24          Okay.  So on a -- how hard does one,
25  does an operator or let me say it again.

**LAREAU - Burch**

1          How hard should an operator swipe any
2  particular sample to get a good readout on an IMS
3  machine?
4  A.      That's a great question.  The actual
5  value of it, I think and I was just writing a book
6  chapter on this around three to five new pressure
7  which goes across, which means nothing to most people.
8          The basic advantage of this instrument,
9  it's a sampling wand.  It's not just a piece of
10  material you're sampling with.  So there's a wand.
11  There's a number of reasons to use the wand, but also
12  part of the reason is it gives a little focal, little
13  ability to be able to push down on the material as
14  you're sampling.  So you don't have to put a lot of
15  strength on it, but you have to put a little bit of
16  strength as you're sampling off of a surface.
17  Q.      Okay.  And so does the amount of
18  pressure that the operator applies to any given
19  sample, would that affect the results you're going to
20  get?
21  A.      It could in the fact that if -- that it
22  will vary.  So if I'm pressing a little harder or a
23  little lighter then the number may vary a little.  It
24  doesn't take much to pick up one or two little
25  particles to give a reasonable alarm.

**LAREAU - Burch**

1          So, you know, you certainly don't want
2  to just dust like you're dusting at home with no
3  pressure.  You have to have a little bit of pressure
4  to it.
5  Q.      Okay.
6  A.      This is typically part of the training
7  that's Smiths Detection would employ when someone is
8  getting the instrument and being trained on how to
9  take sampling.
10  Q.      Okay.  So in, I think I'm going --
11  sorry if this is bouncing around a bit.  I'm going to
12  jump ahead to your ultimate opinion.  I'm going to
13  try in my words, I'm going to try to say what your
14  opinion is.  I want you to tell me if this is fair,
15  if there's anything inaccurate about it.
16          Ultimately, you look at the samples
17  and the readouts and you come to an opinion that the
18  252 some odd thousand dollars that we're talking
19  about in this case, it yielded a cocaine alarm at a
20  higher amount or at a higher strength than of what
21  you would expect from currency in general
22  circulation.
23          Is that a fair statement of what your
24  opinion is?
25  A.      Yes, it is.

**LAREAU - Burch**

1  Q.  Okay. And so is it -- I kind of did
2  the alternative. So is it the higher amount or is it
3  higher strength or does that even matter?
4  A.  It -- it probably doesn't matter
5  because they're both correlated to each other. So
6  it's a higher amount than you'd expect there. It's a
7  higher strength than you would ever expect there. So,
8  you know, they're almost similar terms, but yes. It's
9  certainly higher in either -- either word you want to
10  use than should be there in typical currency.
11  Q.  Okay. So this -- this opinion is
12  based from some casual contact data from the case in
13  Pennsylvania that you testified in, correct?
14  A.  Partially. It's -- it's -- it's based
15  on that, but it's also based on a number of references
16  I put into this report, meaning scientific
17  publications that have shown what the -- what a
18  quantitative level might be a currency. There's also
19  a couple of them have talked about IMS strengths in
20  the fact that if you're sampling and you see, you
21  know, two, three nanograms then that might be a
22  background level, but if you see something much larger
23  than that, then that's a real hit correlated to
24  something that's typically not supposed to be there, a
25  potential criminal activity or -- or cocaine strength

**LAREAU - Burch**

1  A.  Yes.
2  Q.  And is it a fair statement that the
3  other studies that he goes through show a
4  significantly higher amount of cocaine on currency
5  than what's in the Jourdan?
6  A.  No, I wouldn't state that. I would
7  state they have different approaches. So the other
8  papers are not using IMS or any correlation to IMS.
9  They're doing total concentration of extracting off
10  particles, all that contamination off of a currency,
11  and then quantitating with GS mass spec to come up
12  with quantitative numbers, and that's a valid way to
13  find out what that number is.
14  In the Jourdan case, they took data from
15  the FBI that had some of those numbers. They also
16  correlate IMS data, and showed a correlation to what
17  would be a background level, let's say in the United
18  States and they're saying around two to three
19  nanograms which is -- is a reasonable number. It
20  actually agrees with what's in this detection, sets
21  their instruments to. And then they correlated to
22  that the FBI study showing FBI studies of criminal
23  cases versus just general public cases.
24  Q.  Well, okay. So I'm doing my best as a
25  lawyer to follow the scientific stuff, but you said

**LAREAU - Burch**

1  that should never be there on common currency.
2  Q.  Okay. So what you're talking about
3  peer-reviewed published studies?
4  A.  Yeah. So if you go to the next page on
5  my report, I'm sorry, from that final page. So it's
6  the list of references on my page 10.
7  Q.  I'm with you.
8  A.  So the second one in particular by
9  Jourdan, Thomas Jourdan invokes was probably the most
10  statistical paper out there to date on U.S. currency.
11  They studied currency from, like 44 U.S. states and
12  have over 4,100 data points and did both qualitative
13  IMS, but also worked with the FBI on quantitative
14  numbers and it's a good reference that supports my
15  findings along with the background information from
16  the case in Pennsylvania. It's a little of both.
17  Q.  Okay. And I see that you have the
18  "Drug Contamination of U.S. Paper Currency"...by
19  Poupko there?
20  A.  Yes. Correct.
21  Q.  So you're familiar with that?
22  A.  Yes.
23  Q.  And aside from the Jourdan study,
24  Poupko goes through a number of other studies that
25  have found cocaine on currency in the United States?

**LAREAU - Burch**

1  that the Jourdan study gave you a background amount
2  of nanograms, correct?
3  A.  That's correct.
4  Q.  Okay. And so when we look at the IMS
5  machine results in this case, do we -- of a nanogram
6  amount reading on there on these pieces of paper that
7  are marked as number three?
8  A.  Right. So there is no -- not
9  nanograms. They have their as a percent strength or
10  in cumulative counts per second.
11  What this other study was they
12  correlated it and you can with IMS systems correlate
13  to concentration number, and Smiths Detection is done
14  the same thing. They set their back understand grow
15  of cocaine around 50 counts per second. That's based
16  out about half of a nanogram. That's from
17  conversations I've had with their experts. So you can
18  correlate it and these printouts and typically what is
19  used out in the field they just see alarm and alarm
20  strength, not a correlation to nanograms.
21  Q.  Okay. So you said something about you
22  had conversations with, I forget the terms you used,
23  conversations with somebody that gave you some
24  information that helped you put this together?
25  A.  Yes. So I have that in my report.

**LAREAU - Burch**

1  There are two experts from Smiths Detection that I
2  talk to. Actually a lot of it was for the previous
3  case in Pennsylvania, just so I had more information
4  on how the algorithms worked, meaning the printouts
5  and what every single part of it means, and so
6  that's -- that's what I was referring to, the two
7  experts from Smiths Detection. They are people who
8  know the ins and outs of the instrument and how the
9  algorithms, the alarms are set up and strengths and
10  the nitty details of the instrument from the
11  manufacturer.
12     Q.     Okay. And that's I want to say Lena
13  Kim was one of them, correct?
14     A.     Lena Kim was one, and Reno Debono was
15  the other, yes.
16     Q.     Okay. Well, I was going to get to
17  that a little bit later, but I guess since it came
18  up, what I did want to ask you about that is, is
19  there -- your references starting with the -- where
20  are we with that? Let's see if I can find it really
21  quick. What page is that on? Page 8. Pardon me.
22  Give me one second here.
23         Says your reference is to a private
24  communique with Smiths Detection technical experts,
25  Ms. Lena Kim, Toronto, Canada, right?

**LAREAU - Burch**

1     A.     That's correct.
2     Q.     Okay. So this communique, is there
3  any written memorialization of the communique?
4     A.     No. Only it was a verbal phone call
5  and I wrote some just a couple notes for numbers for
6  myself, but no -- no -- no written communication on
7  it.
8     Q.     Okay. But you do have notes that you
9  wrote for yourself. Did you retain them?
10     A.     Well, they're not really -- I wouldn't
11  say they're notes. I -- I took the -- the printouts
12  from the other case, like the -- either the printouts
13  of the IMS instrument or the casual contact numbers,
14  and I just wrote at the bottom, you know, the numbers
15  that Smiths Detection had set up to correlate what
16  they had set for a concentration or an alarm level,
17  and they're really --
18     Q.     Okay. So is it --
19     A.     Well, they're -- it was really a verbal
20  thing. Afterwards and I should have really,
21  afterwards I did not sit and write myself a report on
22  the conversation of it. I wasn't as organized then as
23  I think I am now.
24     Q.     Fair enough.
25         So I have the same questions then for,

**LAREAU - Burch**

1  I want to say his name is Reno? Correct me.
2     A.     Reno Debono, yes.
3     Q.     Okay. And so it's the same thing.
4  Well, let me just ask it this way. You got some
5  background information that informs on your opinion
6  from that person, correct?
7     A.     Doesn't inform on the opinion. It
8  helps me to understand what the parameters were to set
9  up for the detection of the instrument. So, you know,
10  as an example the Ko and the D time that's listed on
11  there, I believe I knew what it was, but I wanted to
12  talk with them to -- to know what every single part of
13  that printout was, because if I'm testifying as an
14  expert I should know everything that's on that
15  plasmagram, on that printout.
16     Q.     Okay. And so with Dr. Reno Debono,
17  let's see, the reference is to also private
18  communications?
19     A.     Right.
20     Q.     Do you have -- is there any written
21  memorialization of the private communications?
22     A.     There's not. I've been working with
23  Reno on a book chapter recently on trace detection and
24  IMS detection. And so I'm a trace detection expert.
25  He's a true IMS expert and together we've been going

**LAREAU - Burch**

1  back and -- and putting this chapter together that's
2  going to go into a book. So some of the background on
3  how the instrument, how the science works I've -- I've
4  gained and he's gained from me back and forth. So
5  those communications have all been really verbal in
6  the last six months just for putting this book chapter
7  together.
8     Q.     Okay. I'm going to go back to where I
9  think my organization was before and -- and take a
10  step back. You said, I believe you testified that
11  your opinion in part is informed by the data, the
12  casual contact data that you got from the
13  Pennsylvania case, correct?
14     A.     Yes, in part. Yes.
15     Q.     In part.
16         Okay. So this is a federal court case
17  in which you ultimately testified as an expert on the
18  IMS machine?
19     A.     Correct.
20     Q.     Okay. And it's this United States
21  Lackey that is referenced in your report?
22     A.     Yes.
23     Q.     Okay. And that -- so where did you
24  actually get -- let's see. There's a couple charts
25  at the end of your report, correct?

**LAREAU - Burch**

1    A.    Yes.

2    Q.    And so if I go -- let's -- let's kind
of get that established. So on page 12 I see
Commonwealth of Pennsylvania 2017 Casual Contact.

5    A.    Right.

6    Q.    So are you with me there?

7    A.    I am.

8    Q.    That is what you got from this
Pennsylvania case, correct?

10    A.    Yes. There's actually two pages, 12
and 13. 12 is actually the data for casual contact
background information for cocaine, where 13 is the
same kind of data but for meth. So I put that in
because they both were attached together.

15    Q.    And if I go to, it must be page --
what is that? Is it just a blowup on the -- on the
following page of the cocaine?

18    A.    It is. It is, correct.

19    Q.    Okay, good. That's what I thought.
So I will proceed on that.

21    Where are we? So if -- did you get
these from Sergeant Boltz?

23    A.    I -- I did. They come from the
Pennsylvania National Guard, and since then I've been
in contact with her and I've been trying to reach out

**LAREAU - Burch**

1  to the four commanders of the National Guard of the
United States to gather more background data.
Unfortunately, they've been too busy with this
pandemic, so I haven't received more data yet.

5    Q.    And so this chart that we're looking
at, I'm just going to go ahead and use the page 12
one that's a little bit smaller, since it's right
here, but Sergeant Boltz was personally responsible
for actually doing the samples and gathering the
data, correct?

11    A.    That's correct.

12    Q.    Okay. Her name is Sergeant Kimberly
Boltz; is that right?

14    A.    Yes. Yes.

15    Q.    Okay. And in that case <u>United States
versus Lackey</u> where you first got privy or hip to
this -- this data, Sergeant Boltz, you actually
listened to Sergeant Boltz testify about this chart?

19    A.    Yes.

20    Q.    Did you not?

21    A.    I did.

22    Q.    Okay. And you sort of already
answered my follow-up question, but the question was
did you have separate communications with her that
informs on how they got these casual contacts numbers

**LAREAU - Burch**

1  in this chart or is it all from the testimony?

2    A.    It's -- most of it's from the
testimony. I did talk to her while we were waiting
for the case, in the hallway, to get a little bit more
information about how they take their data and what
some of the numbers are on there.

7    She is -- she is a trained operator and
not a scientist or a technologist. So I know a lot
more details than she probably does, and so as an
example in her testimony she was talking, referring to
these as nanograms in her testimony, when in reality
they're counts per second or digital units just like
we looked at in the printout.

14    Q.    Okay. So I was actually going to ask
you about that. So you're saying that when she says
number of times in her testimony that the numbers on
this chart are nanograms you're saying that she's
wrong?

19    A.    Yeah. I mean, they're correlated to
nanograms. She -- she didn't realize 'cause I told
her later that they're not really nanograms. They're
taking from the same IMS charts like you showed
previously and so they're counts per second, they're
correlation to nanograms, but they're counts per
second.

**LAREAU - Burch**

1  It's still a hundred percent valid of
what she's testifying for, because she's trying to set
up what is a background or a casual background level
of currency that's out there for U.S. dollars.

5    Q.    Okay. So Sergeant Boltz from what I
understand and in her testimony, the way she went
about getting the samples and getting these numbers
is that she went around and got bills from different
places in each of these counties and she got 24 bills
from each county. Is that correct?

11    A.    That's correct.

12    Q.    Okay. And did she swab -- well, let
me say it this way. So she gets -- it's basically a
fairly simple arithmetic in the sense that, for
instance, if I take the first one Cameron County you
have 24 samples, and she gets a Total MaxA, which is
1425 to get a County Average of 59.38. So she
basically does 24 tests. She gets this total number
of MaxA, and then gives you an average in that last
column, correct?

21    A.    Correct.

22    Q.    Okay. So your understanding is that
that MaxA and the county average are counts per
second?

25    A.    Yes. Smiths Detection might refer to

**LAREAU - Burch**

1  it as digital units, but basically counts per second.
2       Q.     Okay.  So did Sergeant Boltz -- she
3  got 24 -- 24 bills, and each time she sampled she
4  swabbed one bill, correct?
5       A.     To the best of my knowledge, that's
6  correct.  Yes.
7       Q.     Okay.  So did you ever -- this
8  chart -- well, let me take it step by step.  This
9  chart doesn't give you the high or the low of any
10  sample, correct?
11      A.     That's correct.  That's right.  These
12  are totaled and averaged values.
13      Q.     And did -- do you ever get any -- any
14  data or information about the highs or the lows or
15  you only have what's on the chart?
16      A.     I only have what's on the chart.  I've
17  been after the real data.  I'm a scientist and like to
18  work with statistics, so I'm after the real data.  I
19  just haven't been able to get it yet.
20      Q.     Fair enough.  Excuse me.
21           But I did see in her testimony, and I
22  guess my question is do you recall that in fact she
23  testified that when she was doing these casual
24  contact tests, she often saw -- let me not say often.
25  She saw over a thousand come up from these casual

**LAREAU - Burch**

1  contacts, a reading of over a thousand come up,
2  correct?
3      A.     I don't recall that.  I'd have to go
4  back to the testimony and see if I could find that
5  part.
6      Q.     Well, I think I'm going to help you
7  and because I've got a note about it, let me see and
8  I have the transcripts marked as number 5.  So do you
9  have that and can you pull it up?
10      A.     I do have it.
11      Q.     Okay.  So let me -- let me open that
12  up.  So if we go to -- well, it's page 20 on the top
13  right, but I believe it might have been on day 2.  So
14  I'm trying to see.  It's page 35 of the PDF if that
15  makes any sense to you.
16      A.     Okay.
17      Q.     So I'm going to ask you to read that,
18  what's page 20 of the day 2 transcript starting at
19  line 19.  Are you finding it?
20      A.     I am finding it, yes.
21      Q.     Okay.  Okay.  Let me know when you're
22  finished.
23      A.     I am finished.
24      Q.     Okay.  So my -- when I read through
25  this transcript I understood that bit lines 19

**LAREAU - Burch**

1  through 23 with the context that came before it, is
2  that from these casual contact -- sorry, from these
3  casual contacts tests that she did, there were
4  oftentimes where a sample would give her a reading of
5  over a thousand, correct?
6      A.     So I am not certain whether she means
7  that or whether she's answering the question in
8  general what's the highest reading you've ever seen
9  from currency for cocaine.
10           I know -- well, I was probably nervous
11  too testifying, but she was nervous.  So I'm not
12  certain whether that really means from the background
13  casual contact study or just in general.  And it could
14  be from the casual contact.
15      Q.     And I don't know if this helps at all.
16  The next -- if you go to the very next page starting
17  at -- well, actually why don't you -- it's not so
18  long, so why don't you just go ahead and please read
19  that next page 21 for me.
20      A.     Okay.
21      Q.     And let me know when you're finished.
22      A.     Yes, I'm finished.
23      Q.     So I don't know if this is the -- I
24  don't know how I want to ask this, but she's
25  basically and if you look at line 12 through 16, I

**LAREAU - Burch**

1  guess she's asked a question about averages.
2      A.     Right.
3      Q.     And so, and she -- she kind of accedes
4  to the fact that, you know, if you have -- what's the
5  example he gives?  If you have five bills.
6      A.     Yup.
7      Q.     One of them alarms over a thousand,
8  other at zero, then you still get an average of 250.
9  So she -- well, I don't even know if there's a fair
10  question.
11           Does that influence your belief in
12  terms of whether or not she got a reading of over a
13  thousand for the casual contacts or not?
14      A.     Not necessarily.
15      Q.     Okay.
16      A.     More of a question of how does the
17  averaging work is what he was -- what he was after.
18      Q.     Okay.  Fair enough.
19           I'm going to just -- I -- I don't
20  think I can ask you to get inside her head, so I
21  think I'll move on.
22           And then in this -- in this particular
23  case I want to -- I'm sorry.  I'm trying to try to
24  find the right organization, but I want to get into
25  in this case you -- the machine was set to 500,

**LAREAU - Burch**

1 correct?
2     A.    Well, in this case the machine is set
3 up to whatever the Homeland Security had it set to or
4 Smiths Detection. So it -- it -- it may have been,
5 have an alarm setting of 50. It may have a setting of
6 500. I was just going by, you know, really high
7 numbers would be, you know, something that's over 500
8 just by going by the past case and look and just being
9 fair saying that a real high number is something
10 that's over 500.
11     You could still have a real cocaine hit
12 at 400 as an example and the system might alarm at
13 that. I'm not certain what it was set to. I would
14 guess it was probably set at 50 to 100 count alarm
15 level.
16     Q.    Okay. So this is -- this is perhaps
17 my only superficial understanding of -- of -- of the
18 machine, but if we stick to that page 21 of her
19 testimony, she talks about that -- she's asked about
20 her lowest threshold for casual contacts, and she
21 says it's anything but 50. Do you see that there?
22     A.    I do see that, yes.
23     Q.    And so, to me, the next line -- let me
24 just read this next question. She's asked -- I don't
25 know how could this -- sorry. She -- she -- I read

**LAREAU - Burch**

1 that and it says she set it to 50 and so if something
2 in actual value is below 50 it just shows up as a
3 zero on the machine and the machine doesn't alarm.
4 Is that fair?
5     A.    That's fair, yes.
6     Q.    Okay.
7     A.    And she didn't set it to 50. It's set
8 by Smiths Detection.
9     Q.    Ah, okay. Thank you for that
10 clarification.
11     So now I want to go back to the casual
12 contact chart, that page 12 of your report, and I
13 want to look at Potter County, the third county
14 there.
15     A.    Yup.
16     Q.    And again you have 24 samples and then
17 you have zero for the Total MaxA, and then zero for
18 the County Average.
19     A.    Right.
20     Q.    Now, is it possible that she did those
21 samples and in actuality the samples all had slightly
22 below 50 counts per second, but because it's set at
23 50 you basically just get a zero reading and you get
24 a zero for that line of the chart, correct?
25     A.    That's correct. In fact, technically,

**LAREAU - Burch**

1 it should say nondetect, not zero, because it's -- it
2 is where it's set for the instrument, which is set at
3 50.
4     Q.    Okay. So -- I'm sorry. And I'm sorry
5 if I'm asking this again, but was it set to 50 in
6 this case or is it set to something else in this
7 case?
8     A.    No. I think it is set at 50, but what
9 they're doing is when they take their samples and look
10 at their data at the National Guard, they look at the
11 backgrounds. Anything over 500 is a large cocaine
12 hit. So when law enforcement brings in samples as
13 they're getting samples from lots of places, in their
14 reports if it's less than 500 then they're going to
15 say, well, you know, you're getting close to the
16 background. It may not be that good for a case. If
17 you're over 500 it's a strong hit it's -- it's
18 cocaine, and that's that logic that they are using.
19     Q.    Okay. Sorry. Let's see. So I'm
20 looking back at the chart, but if you take -- I mean,
21 I think we've covered this in a roundabout way but
22 if, for instance, on any -- let me just pick one.
23 On -- let's just take the first one Cameron County.
24 You have this Total Max that's 1425, 1,425 and then
25 the County Average is 59.38.

**LAREAU - Burch**

1     I mean, it's possible because we don't
2 have the data, that you have a particularly high
3 reading on one sample, like far greater than 59, but
4 then the other samples are very low to give you that
5 average, correct?
6     A.    Yes. Mathematically that's very
7 possible.
8     Q.    And these are -- again, these are just
9 random bills that they grabbed from casinos and
10 banks, correct?
11     A.    That's correct. Yes.
12     Q.    Okay. All right.
13     A.    You know, and I think a lot of it was
14 from banks and from banks you can have some brand new
15 bills that maybe are packaged carefully and could
16 truly give you no counts, zero. Most have gone
17 through counting machines, and you will have some low
18 level of contamination of lots of things.
19     Q.    Okay. And this is exhaustive of the
20 samples that they got, I believe it's 20 counties from
21 Pennsylvania, correct?
22     A.    Correct. Yes.
23     Q.    And I noticed, not to give you a
24 geography quiz, but I noticed that Philadelphia is
25 not in there.

*LAREAU - Burch*

1    A.    Right. So, and I think that was in the
2  court statement that there are more than 20 counties
3  in Pennsylvania. I forgot how many there are in
4  reality. I think it was just they don't have enough
5  time to cover them all. So just looked at a map and
6  said we're going to cover these 20 and call it an
7  average across Pennsylvania.
8    Q.    And do you know if, excuse me, if any
9  big cities in Pennsylvania are represented in any of
10  these counties?
11    A.    Well, depends what you call big.
12  Certainly, Harrisburg is in one of these and West
13  Chester is a reasonable size. So there -- there are a
14  few larger cities in here, and there's a few counties
15  that are more farming areas.
16    Q.    Okay. And I saw that this is one of
17  the questions that you had asked the agents in this
18  case, but you don't have any of this type of data for
19  North Carolina, correct?
20    A.    Correct. I was trying to reach out for
21  this case, but also for my own education, across the
22  country for, you know, who has IMS instruments 'cause
23  not all National Guards do, and if they do who does
24  this casual contact type work, and I have not received
25  that answer, unfortunately, but I believe North

*LAREAU - Burch*

1  Carolina doesn't have an IMS instrument, at least that
2  was the belief when I was trying to check.
3    Q.    Okay. And do -- is there any -- do
4  you have data like this for any big city in the
5  United States?
6    A.    No. The only other data I have
7  before -- besides this is the data from the Thomas
8  Jourdan paper, scientific paper that -- that lists a
9  lot of the counts in nanograms for cocaine and other
10  contamination, like 4,200 samples.
11    Q.    Okay. So throughout the report, I
12  think a couple times you said that IMS machine is not
13  "quantitative" but ultimately you do convert to a
14  nanogram amount and maybe it's best to pull that up.
15    So -- on a computer that's not mine.
16  One moment. Bear with me. Okay. Oh, okay. I found
17  it. It's at page 8. That you ultimately say that
18  50 to 100 counts per second is approximately .5
19  nanograms of cocaine. To me, that's -- that's --
20  that's quantitative if you're able to do this
21  conversion, so --
22    MR. BAIN-CREED: Page 8. All right.
23  Where are you?
24    MR. BURCH: I'm at page 8 at the
25  bottom of the second paragraph there.

*LAREAU - Burch*

1    MR. BAIN-CREED: Okay. I see it.
2  Sorry. Got it.
3  BY MR. BURCH:
4    Q.    So, Dr. Lareau, to me, that's -- that
5  sounds quantitative if you're -- if you're taking
6  counts per second and then you're converting it to
7  nanograms.
8    What -- could you help explain what
9  you mean by the IMS being not quantitative if
10  ultimately --
11    A.    Yes.
12    Q.    -- it -- well, is that -- I mean,
13  yeah. Yeah. Go ahead. Just explain to me what if
14  you -- if you agree that there's attention there and
15  then let's start with that. Do you agree that
16  there's attention there to say it's not quantitative,
17  and then to go and convert it and make it
18  quantitative assessment?
19    A.    So what I stated is typically IMS the
20  way it's used in the field is not quantitative. It is
21  a strength of counts per second. Right? It's not a
22  quantitative number. You can make it, I call it
23  semi-quantitative. You can use standards and
24  reference it and look at the data and try to make it
25  into a semi-quantitative number, meaning I can say

*LAREAU - Burch*

1  nanogram.
2    In this particular case or this
3  particular sentence, I'm referencing Lena Kim in
4  Toronto, where they in their Toronto laboratory,
5  Smiths Detection laboratory set up in local standards
6  and put the standards on the swipe and looked at what
7  the strength would be quantitatively, and then they
8  took those numbers and used it to say that, okay, when
9  we say it's 50 on a counts per second that's
10  approximately equal to .5 nanograms.
11    So they did it with a standard, but I
12  would -- I would call this a semi-quantitative number,
13  meaning that it's referenced to a standard and it's a
14  quantitative number and it's done in a laboratory. So
15  you can do that. It's not -- IMS is not a -- I don't
16  know how to explain this, but it's not a very linear
17  technology. So you have to use standards very
18  carefully and correlate or calibrate your standards to
19  what the counts per second is per channel, let's say
20  cocaine channel.
21    Q.    Okay. So if I asked you to walk me
22  through mathematically that particular conversion, is
23  that something that you could do verbally or like I'm
24  trying to -- well, is that something you could do
25  verbally easily that I could understand?

*LAREAU - Burch*

1    A.    I can attempt to. It's -- it's easier

2  with a white board, but basically what they would do

3  is run their system, let's say, with a dollar bill

4  that just has contamination of cocaine on it, and they

5  get a peak and they say, okay, that's equal to 50

6  counts per second. Okay. Now, let's see how we can

7  make that equal to a quantitative number.

8          Then they would buy a standard. You

9  could buy standards from companies that have cocaine

10  in a solution and you dilute the solution, so I have

11  something that's maybe .1, .5, and one nanograms,

12  three bottles. It would run those three bottles by

13  depositing on the swab going through desorbing it.

14  IMS system comes up with a number. You take those

15  three numbers, the three values, .1, .5 and one, on a

16  straight line and you see where that corresponds to 50

17  counts per second. You line that up and say, oh, 50

18  counts per second on that line is exactly .5

19  nanograms. That's how they would do it in a lab.

20  Very similar to a calibration of a mass spectrometer

21  or liquid chromatography, other methods that are used.

22    Q.    Okay.

23    A.    It's not a practical method to do in

24  the field. It's just practical to do in the lab.

25    Q.    Okay. So am I understanding this

*LAREAU - Burch*

1  correctly that if 50 -- 50 to 100 counts a second per

2  cocaine alarm gives you half a nanogram of cocaine,

3  then am I right to conclude that wiping the surface

4  of a bill from these banks that end up in the

5  Pennsylvania chart, just -- just wiping the surface

6  quickly, is yielding nanogram amounts of cocaine?

7  Correct?

8    A.    Yes. Correct.

9    Q.    Okay.

10    A.    And that -- that agrees with the paper

11  I was referencing before, because they're saying that

12  most, I think they said 97 percent of currency had

13  somewhere around two and a half or three nanograms on

14  the bill. It doesn't mean all over the bill. It

15  means where they sampled, comes up with those numbers.

16  Just like in this case you're sampling a part of a

17  bill, not the total bill.

18    Q.    So in the Jourdan study that we talked

19  about earlier --

20    A.    Yes.

21    Q.    -- you're saying that they -- they

22  sampled just a portion of the bills that they got?

23    A.    Correct. Correct.

24    Q.    Okay.

25    A.    They sampled in a different way, but

*LAREAU - Burch*

1  they still used an IMS system.

2    Q.    And am I correct that they used a

3  vacuum?

4    A.    Yeah. And I've -- I've used one of

5  those, I hate to say it, about 15, 20 years ago. It

6  looks like a dust buster for vacuuming your house, and

7  you literally would go across the bill and any

8  particles that are there gets flown in that vacuum and

9  get stuck on the sample material and you just take

10  that sample material, put it into the instrument like

11  a paper trap swab and you put it into the instrument.

12  So the actual -- it's not a bad method and the actual

13  numbers aren't that far apart between vacuuming in

14  this swab or swipe-type sampling.

15    Q.    Okay. And hypothetically, if Sergeant

16  Boltz was correct that her chart is consistent -- the

17  numbers on her chart are in nanograms and not counts

18  per second, you would have pretty high nanogram

19  amounts on -- well, it speaks for itself. It would

20  be if she was correct you would have high nanogram

21  amounts on those bills that she found at casinos and

22  banks, correct, hypothetically?

23    A.    And that's why, another reason why it's

24  not nanograms. It's counts per second on that chart.

25    Q.    Okay. We talked about Dr. Reno

*LAREAU - Burch*

1  Debono, so I could skip that. Well, do I want to

2  skip that? Is there anything that I need to

3  understand about that? Let me find it real quick.

4  Bear with me.

5    A.    Page 9.

6    Q.    Yeah, okay. Page 9. Let's see. The

7  percentage based on a calculation to indicate…

8          So I'm sorry to make you do this, but

9  what -- what is different about what Dr. Debono was

10  telling you versus what Lena Kim told you?

11    A.    So I -- I asked him the specific

12  question, which I didn't gain before from Lena and

13  that's that on these printouts it says percent

14  strength, like 14 percent strength for cocaine, and I

15  wanted to make sure I knew the calculation, meaning

16  how do they come up with 14 percent versus counts per

17  second. And that's the conversation I had with him,

18  and he told me that they literally take the counts

19  that are there and they divide it by the counts per

20  second of a background level and multiply it times 100

21  to give a percentage.

22          So it's a little bit more complicated

23  than that in their mathematics, but it basically is a

24  way to come up with a percent strength, which most

25  people understand percent strength rather than a count

**LAREAU - Burch**

1  per second number.

2  Q.  Okay.

3  A.  And so they changed that to a percent

4  strength to help the people in the field understand

5  what it is, how it correlates.

6  Q.  Okay.  So Dr. Debono for purposes of

7  this report, he's talking about counts per second,

8  says percent strength; whereas with Lena Kim, she's

9  talking counts per second as it relates to nanograms,

10  correct?

11  A.  That's correct.

12  Q.  Okay.  I got it.  I'm actually proud

13  of myself for following this.

14  Let's see.  Where are we?  So I want

15  to start -- I want to talk a little bit -- I'm

16  getting rather close to the end just to give

17  everybody an idea.  I don't think I'm going to take

18  up the next full hour.

19  So talking about the results in this

20  case, the what I'll call the first sample, if I could

21  pull that up.  It's this.  We were looking at it

22  earlier.

23  A.  Yes.

24  Q.  It's the bundles.  This Smiths

25  Detection printout in Exhibit 3 that we have, Bates

**LAREAU - Burch**

1  stamp 92 on the bottom right.  That's the -- in your

2  report, I think you also call it the first sample or

3  the -- first sample.  Fair enough?  Are we on the

4  same page?

5  A.  Yes.

6  Q.  Okay.  So how -- you got -- your

7  understanding of how the tests were conducted in this

8  case is from the report and you also talked to Agent

9  Bass on the phone, correct?

10  A.  Yes.  I got permission from our

11  lawyers, Ben and Seth, to talk to Sergeant Bass

12  because I had questions on how they took the data,

13  because it may be important with the printed results.

14  Q.  Okay.  So is there -- if you go to

15  page 7 of your report, there's a number of -- oh,

16  yes, it's a phone interview.  So this is these

17  questions on page 7 of the report that you have the

18  question and then their responses, is that basically

19  exhaustive of the questions that you asked him on

20  this phone call?

21  A.  I believe so.

22  Q.  Okay.  So going back to the first

23  sample, the first sample which was the currency, how

24  many in the first sample we talked about yielded a

25  13 -- 1,394 counts per second, correct?

**LAREAU - Burch**

1  A.  Correct.

2  Q.  So how many -- how many bills did they

3  swab for that first sample?

4  A.  I'd have to go back to how they did it.

5  You know, I -- I'm not certain if I asked them that

6  question, whether they sampled one bill or they laid

7  them out like a deck of cards and sampled all ten at

8  once, so I can't really answer that.

9  Q.  Okay.  So if I look at -- if I'm on

10  page 8 and I'm -- and there's a paragraph in which

11  you're talking about the first sample, on that third

12  sentence it references that, I'll just read it,

13  "according to discussion with SA William Bass, they

14  properly opened the bundles and placed the currency

15  out on a table, followed by sampling across the

16  surface of many bills."

17  So he sampled -- he swabbed across

18  many bills then, correct?

19  A.  I -- I believe so.  But, again, I'm not

20  the one who did it.  So you're asking to confirm it's

21  multiple bills or one.  I think I either heard it or

22  assumed multiple bills.

23  Q.  Okay.  But in any event, your

24  information is you don't know how -- how many bills?

25  A.  Correct.

**LAREAU - Burch**

1  Q.  Okay.  And then I want to just go

2  through the same thing on the second sample of the

3  currency.  Do you know, is your information, do you

4  know is it different bills or the same bills for the

5  second sample?

6  A.  I think I was assuming it was another

7  bundle.  They had multiple bundles of bills.  I was

8  assuming it was a separate bundle of bills.

9  Q.  Okay.  And then do you know how many

10  bills they swabbed or swiped for that second sample?

11  A.  I do not.

12  Q.  Okay.  Would you expect to have if,

13  hypothetically, if someone had a bundle of bills that

14  had cocaine on it, let's say they all had equal

15  amounts of cocaine on them, each bill, if somebody

16  swabbed one of those bills and tested it, would you

17  expect that to have a smaller reading on the IMS

18  machine than if somebody had swiped all 20 of those

19  bills?

20  A.  That's a hard one to answer, because

21  you don't know what's on the other bills.  So it's

22  a -- it's a question of how much is on each bill and

23  how you're sampling it.

24  Q.  Okay.  But if each bill had the exact

25  same amount of cocaine, would you get a higher

**LAREAU - Burch**

1  reading by swabbing all 20 versus one?
2      A.      You should, yes.  If you sample
3  properly you should.
4      Q.      Okay.  And I know we've talked about
5  this and I know that you have said that Sergeant
6  Boltz is wrong -- is when she testified that the
7  chart was nanograms, your -- you believe that in fact
8  the chart is counts per second.  But, hypothetically,
9  if those numbers on the chart were nanograms, would
10 that affect your opinion in this case?
11      THE REPORTER:  We didn't get the
12 question.  You froze.
13      MR. BURCH:  Oh, okay.  I'll start
14 over.
15 BY MR. BURCH:
16      Q.      If the numbers on the Pennsylvania
17 chart, page 12 of your report, are -- were
18 hypothetically in fact nanogram amounts as Sergeant
19 Boltz testified, would that affect your opinion in
20 this case, Dr. Lareau?
21      A.      I -- I'm not -- it might, but at the
22 same point there's no way possible it could be
23 nanograms.  When you have these kind of numbers, some
24 of these numbers, if they were true in nanograms that
25 instrument would be overloaded and you wouldn't get

**LAREAU - Burch**

1  the similar type of results that she or you are
2  getting on these plasmagrams.
3      Q.      Okay.
4      A.      It would take a lot of cocaine or a lot
5  of whatever and jam it into one of these systems, the
6  system's probably going to have lots of trouble.  It
7  will alarm and tell you there's issues, but it won't
8  be able to give you a good number at that point.
9      Q.      Okay.  I'm trying to find one
10 particular thing here, so if you could bear with me.
11      I'm going to go to page 8 in the
12 second to last paragraph, it's talking about the
13 inside of the white bag.  I just wanted a -- a
14 clarification.  The second sentence says, "This
15 implies that the screener, utilizing the sampling
16 wand"...
17      The use of the word "implies" there,
18 is that -- am I understanding that that -- that you're
19 just saying that the -- his little notation you just
20 understood that when he says inside of the white bag,
21 you're assuming that he wiped with a swab inside of
22 the white bag?  Is that what that means?
23      A.      No.  I -- I knew he -- he sampled the
24 inside.  What I was doubting myself on, and that's why
25 I used the word imply, but I could now correct that.

**LAREAU - Burch**

1  It shouldn't be there, is on some of the Smiths
2  Detection instruments you -- you can take the swab by
3  your hand and sample things, like I could sample the
4  inside of a bag or I can use it with a wand on it.  It
5  turns out the 500DT is designed where you have no
6  choice, you have to use the wand.  So in this case the
7  word implied shouldn't be there.  The screener had to
8  use a sampling wand.
9      Q.      Okay.  I get it.  And that's then --
10      A.      Model -- in newer models actually have
11 a choice of using a wand or not a wand, and I wasn't
12 certain whether that was modified with the 500DT, but
13 I verified it.  It's not.  So the 500DT has to have a
14 wand use in it.
15      Q.      Okay.  And I think you might have said
16 that implies maybe one other time or two -- one other
17 time?  Yeah, one other time, but same for the second
18 time you used it, it was just that same thing,
19 correct?
20      A.      Right.  Yes.
21      Q.      Okay.  All right.  Can Smiths
22 Detection -- sorry.
23      Can the IMS machine that we've been
24 talking about that was used in this case, can it have
25 false positives?

**LAREAU - Burch**

1      A.      It can.  Sure.
2      Q.      What would cause -- well, and is that
3  just a glitch in the machine or are there other
4  causes of a false positive?
5      A.      There's -- there's other causes and
6  it -- and it depends per species as to what the
7  likelihood of it is.  It's basically if there's
8  something else that's out there as a chemical in the
9  environment, you know, that -- that you could sample
10 and it gives a peak very similar to where the cocaine
11 peak is, then that can cause an alarm that's a false
12 alarm.
13      In -- in the case of -- there's a couple
14 of types of false alarms.  I'll give you an example.
15 I'm more -- I'm more familiar in this with explosives
16 than -- than narcotics, but in explosives NG is one of
17 the channels for nitroglycerin that could be in
18 dynamite and stuff, so it could alarm, but people know
19 that that channel has a high possibility of other
20 types of NG that are not illegal.  As an example
21 nitroglycerin that's in heart medicine and in fact
22 PETN, which is an explosive, could alarm also for a
23 heart medicine that's used in the UK, not in the
24 United States.  So things like that, they question the
25 person to find out what that false alarm or nuisance

**LAREAU - Burch**

1 alarm can be.
2       In drug detection you could certainly
3 get some. There's -- there's not a lot of these
4 occurrences in cocaine or meth-type channels but, you
5 know, it's -- anything is possible.
6       MR. BURCH: Okay. I think I am done,
7 but I would request if everybody is okay with it, if I
8 just take two minutes to go over a couple notes and
9 get back on the record in just about two minutes. Is
10 that all right?
11       MR. BAIN-CREED: Hey, Ed, can you give
12 me five because there's some kind of noise out at the
13 street of my house, and it will give me a chance to
14 check it out for a second?
15       MR. BURCH: Oh, yeah. Perfect. So I
16 have 14 after. Well, I'll just make sure to be back
17 on by 19 after.
18       MR. BAIN-CREED: Sounds good.
19       MR. BURCH: Okay, thanks.
20       THE VIDEOGRAPHER: The time is 1:14.
21 We'll now go off the video record.
22       The time is 1:19. We'll now go back
23 on the video record.
24       MR. BURCH: Okay. So I'm sorry to go
25 back on, because I actually don't have any other

**LAREAU - Burch**

1 questions, but perhaps, I don't know, maybe Ben has
2 follow-up. So maybe it's appropriate to go back on
3 the record.
4       MR. BAIN-CREED: Hey, Ed, I don't. I
5 do not have any follow-up, so I'm good.
6       MR. BURCH: Okay. So I guess that's
7 it, and Dr. Lareau is off the hook now.
8       THE VIDEOGRAPHER: The time is 1:19.
9 We have now completed the deposition.
10       (Deposition concluded at 1:19 p.m.)
11       *  *  *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       C E R T I F I C A T E
2
3       I, COLLEEN M. VAUGHN, a Certified
4 Court Reporter and Notary Public of the State of New
5 Jersey, certify that the foregoing is a true and
6 accurate Computerized Transcript of the Remote
7 Videotaped Deposition of RICHARD T. LAREAU, Ph.D.,
8 who was first duly sworn by me.
9
10       I further certify that I am neither
11 attorney, of counsel for, nor related to or employed
12 by any of the parties to the action in which the
13 Depositions are taken, and further that I am not a
14 relative or employee of any attorney or counsel
15 employed in this case, nor am I financially
16 interested in the action.
17
18
19
20       /s/ COLLEEN M. VAUGHN, C.C.R., C.C.T.
21
22
23 Dated: December 15, 2020
24 My Commission Expires on February 26, 2021
25 Certificate No. 30XI00124100

**$**

**$252,140.00** [1] - 1:6

**/**

**/s** [1] - 59:20

**0**

**08759** [1] - 5:18

**1**

**1** [4] - 3:18, 15:6, 45:11, 45:15
**1,394** [1] - 50:25
**1,425** [1] - 39:24
**10** [1] - 22:6
**100** [5] - 18:19, 37:14, 42:18, 46:1, 48:20
**11:59** [3] - 1:11, 1:20, 4:21
**12** [7] - 29:3, 29:10, 29:11, 30:6, 35:25, 38:12, 53:17
**12/3/19** [1] - 3:22
**13** [3] - 29:11, 29:12, 50:25
**1394** [4] - 16:9, 16:13, 16:23, 17:3
**14** [6] - 18:7, 18:10, 18:19, 48:14, 48:16, 57:16
**1425** [2] - 32:17, 39:24
**15** [6] - 1:11, 1:19, 4:20, 14:2, 47:5, 59:23
**16** [1] - 35:25
**1650** [1] - 2:4
**19** [3] - 34:19, 34:25, 57:17
**1:14** [1] - 57:20
**1:19** [3] - 57:22, 58:8, 58:10

**2**

**2** [5] - 3:19, 14:23, 15:23, 34:13, 34:18
**20** [10] - 12:18, 14:2, 34:12, 34:18, 40:20, 41:2, 41:6,

**47:5, 52:18, 53:1**
**2016** [2] - 1:7, 6:19
**2017** [1] - 29:4
**2019** [2] - 10:6, 10:7
**2020** [4] - 1:11, 1:20, 4:20, 59:23
**2021** [1] - 59:24
**21** [2] - 35:19, 37:18
**227** [1] - 2:4
**23** [1] - 35:1
**24** [6] - 32:9, 32:16, 32:18, 33:3, 38:16
**250** [1] - 36:8
**252** [2] - 6:17, 20:18
**26** [1] - 59:24
**27** [1] - 1:7
**270-1151** [1] - 1:24
**28202** [1] - 2:5
**29** [1] - 1:23

**3**

**3** [3] - 3:20, 16:18, 49:25
**30XI00124100** [2] - 1:18, 59:25
**349-2450** [1] - 1:24
**35** [1] - 34:14
**3500** [1] - 2:11
**3:18CV646** [1] - 1:2

**4**

**4** [7] - 3:18, 3:19, 3:20, 3:21, 3:22, 3:23
**4,100** [1] - 22:12
**4,200** [1] - 42:10
**40** [1] - 12:18
**400** [1] - 37:12
**44** [1] - 22:11

**5**

**5** [7] - 3:22, 34:8, 42:18, 44:10, 45:11, 45:15, 45:18
**50** [19] - 24:15, 37:5, 37:14, 37:21, 38:1, 38:2, 38:7, 38:22, 38:23, 39:3, 39:5, 39:8, 42:18, 44:9, 45:5, 45:16, 45:17, 46:1
**500** [7] - 36:25, 37:6, 37:7, 37:10, 39:11, 39:14,

39:17
**500DT** [4] - 11:1, 55:5, 55:12, 55:13
**59** [1] - 40:3
**59.38** [2] - 32:17, 39:25

**6**

**6** [3] - 3:11, 3:23, 15:6

**7**

**7** [2] - 50:15, 50:17
**7/27/20** [1] - 3:19
**732** [2] - 1:24

**8**

**8** [8] - 14:16, 15:23, 25:21, 42:17, 42:22, 42:24, 51:10, 54:11

**9**

**9** [2] - 48:5, 48:6
**9.0** [1] - 15:24
**92** [2] - 17:10, 50:1
**94104** [1] - 2:12
**97** [1] - 46:12

**A**

**A.M** [1] - 1:11
**ability** [1] - 19:13
**able** - 19:13, 33:19, 42:20, 54:8
**above-entitled** [1] - 1:16
**accedes** [1] - 36:3
**according** [2] - 5:19, 51:13
**accurate** [3] - 13:1, 16:3, 59:6
**action** [2] - 59:12, 59:16
**ACTION** [1] - 1:4
**activity** [1] - 21:25
**actual** [7] - 10:11, 12:4, 16:18, 19:4, 38:2, 47:12
**actuality** [1] - 38:21
**address** [1] - 6:14
**advantage** [1] - 19:8
**affect** [3] - 19:19,

53:10, 53:19
**afterwards** [2] - 26:20, 26:21
**agent** [1] - 10:17
**Agent** [1] - 50:8
**agents** [1] - 41:17
**ago** [1] - 47:5
**agree** [3] - 6:5, 43:14, 43:15
**agreement** [1] - 3:2
**agrees** [2] - 23:20, 46:10
**ahead** [10] - 5:3, 5:5, 10:14, 12:4, 13:17, 14:11, 20:12, 30:6, 35:18, 43:13
**AIRPORT** [1] - 1:8
**Alarm** [1] - 18:11
**alarm** [26] - 11:25, 12:19, 13:9, 13:14, 13:15, 14:2, 16:13, 18:2, 18:22, 19:25, 20:19, 24:19, 26:16, 37:5, 37:12, 37:14, 38:3, 46:2, 54:7, 56:11, 56:12, 56:18, 56:22, 56:25, 57:1
**alarmed** [1] - 14:8
**alarms** [5] - 12:25, 13:3, 25:9, 36:7, 56:14
**algorithm** [1] - 12:16
**algorithms** [2] - 25:4, 25:9
**almost** [1] - 21:8
**ALSO** [1] - 2:16
**alternative** [1] - 21:2
**Alzion** [1] - 18:17
**America** [1] - 4:23
**AMERICA** [1] - 1:4
**amount** [10] - 7:23, 19:17, 20:20, 21:2, 21:6, 23:4, 24:1, 24:6, 42:14, 52:25
**amounts** [5] - 46:6, 47:19, 47:21, 52:15, 53:18
**answer** [5] - 7:24, 8:6, 41:25, 51:8, 52:20
**answered** [1] - 30:23
**answering** [1] - 35:7
**answers** [2] - 7:14,

9:6
**apart** [1] - 47:13
**appear** [2] - 6:1
**applies** [1] - 19:18
**approached** [1] - 10:15
**approaches** [1] - 23:7
**appropriate** [2] - 6:14, 58:2
**APPROXIMATELY** [1] - 1:6
**areas** [1] - 41:15
**arithmetic** [1] - 32:14
**aside** [1] - 22:23
**assessment** [1] - 43:18
**Assistant** [1] - 2:6
**associated** [1] - 14:6
**assumed** [1] - 51:22
**assuming** [4] - 14:12, 52:6, 52:8, 54:21
**AT** [1] - 1:7
**attached** [1] - 29:14
**attempt** [1] - 45:1
**attention** [2] - 43:14, 43:16
**attorney** [3] - 10:16, 59:11, 59:14
**Attorney** [1] - 2:6
**attorneys** [1] - 5:6
**Attorneys** [1] - 2:13
**audio** [1] - 17:6
**authorized** [1] - 4:6
**Avenue** [1] - 1:23
**Average** [3] - 32:17, 38:18, 39:25
**average** [5] - 32:19, 32:23, 36:8, 40:5, 41:7
**averaged** [1] - 33:12
**averages** [1] - 36:1
**averaging** [1] - 36:17

**B**

**background** [17] - 7:4, 18:4, 18:19, 18:22, 21:22, 22:15, 23:17, 24:1, 27:5, 28:2, 29:12, 30:2, 32:3, 35:12, 39:16, 48:20
**backgrounds** [1] -

39:11
**bad** [1] - 47:12
**bag** [4] - 54:13, 54:20, 54:22, 55:4
**Bain** [1] - 5:12
**BAIN** [12] - 2:3, 4:15, 5:11, 6:4, 6:8, 14:19, 17:11, 42:22, 43:1, 57:11, 57:18, 58:4
**Bain-Creed** [1] - 5:12
**BAIN-CREED** [12] - 2:3, 4:15, 5:11, 6:4, 6:8, 14:19, 17:11, 42:22, 43:1, 57:11, 57:18, 58:4
**BAINCREED** [1] - 5:12
**banks** [5] - 40:10, 40:14, 46:4, 47:22
**based** [5] - 21:12, 21:14, 21:15, 24:15, 48:7
**basic** [2] - 11:14, 19:8
**Bass** [3] - 50:9, 50:11, 51:13
**Bates** [4] - 17:4, 17:8, 17:11, 49:25
**bear** [3] - 42:16, 48:4, 54:10
**becomes** [1] - 10:13
**begin** [1] - 4:4
**beginning** [1] - 7:22
**behalf** [2] - 9:7, 9:13
**belief** [2] - 36:11, 42:2
**below** [2] - 38:2, 38:22
**Ben** [2] - 50:11, 58:1
**Benjamin** [1] - 5:11
**BENJAMIN** [1] - 2:3
**best** [8] - 7:11, 7:14, 8:13, 11:6, 15:5, 23:24, 33:5, 42:14
**Betty** [1] - 1:22
**between** [1] - 47:13
**big** [3] - 41:9, 41:11, 42:4
**bill** [12] - 33:4, 45:3, 46:4, 46:14, 46:17, 47:7, 51:6, 52:15, 52:22, 52:24
**bills** [23] - 32:8, 32:9, 33:3, 36:5, 40:9, 40:15, 46:22, 47:21,

51:2, 51:16, 51:18, 51:21, 51:22, 51:24, 52:4, 52:7, 52:8, 52:10, 52:13, 52:16, 52:19, 52:21
**bit** [12] - 9:15, 10:21, 13:17, 19:15, 20:3, 20:11, 25:17, 30:7, 31:4, 34:25, 48:22, 49:15
**blank** [1] - 16:1
**blowup** [1] - 29:16
**board** [1] - 45:2
**bolts** [1] - 8:10
**Boltz** [10] - 29:22, 30:8, 30:13, 30:17, 30:18, 32:5, 33:2, 47:16, 53:6, 53:19
**book** [4] - 19:5, 27:23, 28:2, 28:6
**bottles** [2] - 45:12
**bottom** [8] - 17:2, 17:9, 17:10, 17:12, 18:8, 26:14, 42:25, 50:1
**bouncing** [1] - 20:11
**boy** [1] - 10:2
**brand** [1] - 40:14
**brings** [1] - 39:12
**bundle** [3] - 52:7, 52:8, 52:13
**bundles** [4] - 17:1, 49:24, 51:14, 52:7
**burch** [1] - 5:25
**BURCH** [28] - 2:8, 2:9, 4:16, 5:3, 5:8, 5:9, 6:3, 6:7, 6:9, 6:11, 8:22, 14:25, 15:4, 15:13, 15:17, 15:20, 15:21, 17:15, 17:18, 42:24, 43:3, 53:13, 53:15, 57:6, 57:15, 57:19, 57:24, 58:6
**Burch** [2] - 3:11, 5:8
**buster** [1] - 47:6
**busy** [1] - 30:3
**buy** [2] - 45:8, 45:9
**BY** [7] - 2:9, 6:11, 8:22, 15:21, 17:18, 43:3, 53:15

## C

**C.C.R** [1] - 59:20
**C.C.T** [1] - 59:20
**calculated** [1] - 18:3
**calculating** [1] - 18:21
**calculation** [4] - 18:15, 18:18, 48:7, 48:15
**calibrate** [1] - 44:18
**calibration** [1] - 45:20
**California** [1] - 2:12
**Cameron** [2] - 32:15, 39:23
**Canada** [1] - 25:25
**cards** [1] - 51:7
**carefully** [2] - 40:15, 44:18
**Carolina** [4] - 2:5, 4:25, 41:19, 42:1
**CAROLINA** [1] - 1:1
**case** [52] - 6:16, 8:25, 9:2, 9:9, 9:10, 9:14, 9:18, 10:1, 10:3, 10:9, 10:11, 10:21, 12:6, 13:16, 13:19, 13:24, 14:12, 17:23, 18:6, 20:19, 21:12, 22:16, 23:14, 24:5, 25:3, 26:12, 28:13, 28:16, 29:9, 30:15, 31:4, 36:23, 36:25, 37:2, 37:8, 39:6, 39:7, 39:16, 41:18, 41:21, 44:2, 46:16, 49:20, 50:8, 53:10, 53:20, 55:6, 55:24, 56:13, 59:15
**Case** [1] - 3:19
**cases** [3] - 9:17, 23:23
**casinos** [2] - 40:9, 47:21
**casual** [16] - 21:12, 26:13, 28:12, 29:11, 30:25, 32:3, 33:23, 33:25, 35:2, 35:3, 35:13, 35:14, 36:13, 37:20, 38:11, 41:24

**Casual** [1] - 29:4
**causes** [2] - 56:4, 56:5
**certain** [5] - 35:6, 35:12, 37:13, 51:5, 55:12
**certainly** [4] - 20:1, 21:9, 41:12, 57:2
**Certificate** [2] - 1:18, 59:25
**certification** [1] - 3:3
**Certified** [3] - 1:17, 1:23, 59:3
**certify** [2] - 59:5, 59:10
**cetera** [1] - 14:9
**chance** [1] - 57:13
**changed** [1] - 49:3
**channel** [5] - 14:4, 44:19, 44:20, 56:19
**channels** [3] - 14:8, 56:17, 57:4
**chapter** [4] - 19:6, 27:23, 28:1, 28:6
**CHARLOTTE** [2] - 1:2, 1:8
**Charlotte** [2] - 2:5, 4:25
**CHARLOTTE-DOUGLAS** [1] - 1:8
**chart** [19] - 30:5, 30:18, 31:1, 31:17, 33:8, 33:9, 33:15, 33:16, 38:12, 38:24, 39:20, 46:5, 47:16, 47:17, 47:24, 53:7, 53:8, 53:9, 53:17
**charts** [2] - 28:24, 31:22
**check** [2] - 42:2, 57:14
**chemical** [1] - 56:8
**chemistry** [1] - 9:16
**Chester** [1] - 41:13
**choice** [2] - 55:6, 55:11
**chromatography** [1] - 45:21
**chronological** [1] - 15:9
**circulation** [1] - 20:22
**cities** [2] - 41:9, 41:14
**city** [1] - 42:4
**CIVIL** [2] - 1:2, 1:4

**civil** [2] - 7:5, 10:3
**claimant** [1] - 5:9
**Claimants** [1] - 2:13
**claimants** [1] - 5:6
**clarification** [2] - 38:10, 54:14
**click** [1] - 5:24
**close** [2] - 39:15, 49:16
**closed** [1] - 9:17
**cocaine** [47] - 12:1, 12:6, 12:9, 12:10, 12:11, 12:13, 12:18, 12:24, 12:25, 13:3, 13:10, 13:15, 14:2, 14:4, 16:12, 16:15, 17:3, 18:3, 18:7, 18:17, 20:19, 21:25, 22:25, 23:4, 24:15, 29:12, 29:17, 35:9, 37:11, 39:11, 39:18, 42:9, 42:19, 44:20, 45:4, 45:9, 46:2, 46:6, 48:14, 52:14, 52:15, 52:25, 54:4, 56:10, 57:4
**Coleman** [2] - 4:23, 6:19
**COLEMAN** [1] - 1:7
**COLLEEN** [3] - 1:17, 59:3, 59:20
**color** [1] - 13:9
**column** [1] - 32:20
**comfortable** [1] - 11:9
**commanders** [1] - 30:1
**commencement** [1] - 4:1
**commencing** [1] - 1:20
**Commission** [2] - 2:14, 59:24
**common** [1] - 22:1
**Commonwealth** [1] - 29:4
**communication** [1] - 26:6
**communications** [4] - 27:18, 27:21, 28:5, 30:24
**communique** [3] - 25:24, 26:2, 26:3
**companies** [1] - 45:9

**compared** [1] - 18:22
**completed** [1] - 58:9
**complicated** [1] - 48:22
**compound** [1] - 11:25
**compounds** [1] - 12:18
**computer** [1] - 42:15
**Computerized** [1] - 59:6
**concentration** [3] - 23:9, 24:13, 26:16
**conclude** [1] - 46:3
**concluded** [1] - 58:10
**conduct** [1] - 5:25
**conducted** [1] - 50:7
**confirm** [1] - 51:20
**consideration** [1] - 18:4
**consistent** [2] - 11:4, 47:16
**Contact** [1] - 29:4
**contact** [11] - 21:12, 26:13, 28:12, 29:11, 29:25, 33:24, 35:2, 35:13, 35:14, 38:12, 41:24
**contacts** [5] - 30:25, 34:1, 35:3, 36:13, 37:20
**Contamination** [1] - 22:18
**contamination** [4] - 23:10, 40:18, 42:10, 45:4
**context** [1] - 35:1
**conversation** [2] - 26:22, 48:17
**conversations** [3] - 24:17, 24:22, 24:23
**conversion** [2] - 42:21, 44:22
**convert** [2] - 42:13, 43:17
**converting** [1] - 43:6
**copy** [1] - 14:13
**correct** [62] - 9:5, 10:23, 10:24, 13:2, 13:4, 13:19, 13:20, 16:20, 17:5, 17:25, 21:13, 22:20, 24:2, 24:3, 25:13,

26:1, 27:1, 27:6, 28:13, 28:19, 28:25, 29:9, 29:18, 30:10, 30:11, 32:10, 32:11, 32:20, 32:21, 33:4, 33:6, 33:10, 33:11, 34:2, 35:5, 37:1, 38:24, 38:25, 40:5, 40:10, 40:11, 40:21, 40:22, 41:19, 41:20, 46:7, 46:8, 46:23, 47:2, 47:16, 47:20, 47:22, 49:10, 49:11, 50:9, 50:25, 51:1, 51:18, 51:25, 54:25, 55:19
**correctly** [1] - 46:1
**correlate** [5] - 23:16, 24:12, 24:18, 26:15, 44:18
**correlated** [5] - 21:5, 21:23, 23:21, 24:12, 31:19
**correlates** [1] - 49:5
**correlation** [4] - 23:8, 23:16, 24:20, 31:24
**corresponds** [1] - 45:16
**counsel** [4] - 3:2, 5:1, 59:11, 59:14
**Counsel** [1] - 4:8
**count** [2] - 37:14, 48:25
**counties** [5] - 32:9, 40:20, 41:2, 41:10, 41:14
**counting** [1] - 40:17
**country** [1] - 41:22
**counts** [31] - 16:14, 17:22, 18:16, 24:10, 24:15, 31:12, 31:23, 31:24, 32:23, 33:1, 38:22, 40:16, 42:9, 42:18, 43:6, 43:21, 44:9, 44:19, 45:6, 45:17, 45:18, 46:1, 47:17, 47:24, 48:16, 48:18, 48:19, 49:7, 49:9, 50:25,

53:8
**County** [6] - 32:15, 32:17, 38:13, 38:18, 39:23, 39:25
**county** [3] - 32:10, 32:23, 38:13
**couple** [7] - 7:3, 21:19, 26:5, 28:24, 42:12, 56:13, 57:8
**course** [1] - 6:7
**COURT** [1] - 1:1
**court** [10] - 4:10, 5:14, 5:24, 7:6, 7:11, 10:1, 10:3, 15:1, 28:16, 41:2
**Court** [5] - 1:17, 1:23, 4:7, 4:24, 59:4
**cover** [2] - 41:5, 41:6
**covered** [1] - 39:21
**CREED** [12] - 2:3, 4:15, 5:11, 6:4, 6:8, 14:19, 17:11, 42:22, 43:1, 57:11, 57:18, 58:4
**Creed** [1] - 5:12
**criminal** [2] - 21:25, 23:22
**cumulative** [4] - 14:8, 16:13, 17:3, 24:10
**currency** [17] - 16:8, 17:1, 20:21, 21:10, 21:18, 22:1, 22:10, 22:11, 22:25, 23:4, 23:10, 32:4, 35:9, 46:12, 50:23, 51:14, 52:3
**CURRENCY** [1] - 1:6
**Currency"...by** [1] - 22:18
**current** [1] - 4:9
**Curriculum** [1] - 3:18

### D

**Darren** [1] - 6:19
**DARREN** [1] - 1:7
**data** [26] - 18:1, 18:20, 21:12, 22:12, 23:14, 23:16, 28:11, 28:12, 29:11,

29:13, 30:2, 30:4, 30:10, 30:17, 31:5, 33:14, 33:17, 33:18, 39:10, 40:2, 41:18, 42:4, 42:6, 42:7, 43:24, 50:12
**date** [3] - 4:14, 4:20, 22:10
**Dated** [1] - 59:23
**dated** [1] - 3:22
**David** [3] - 5:4, 5:5, 14:19
**DAVID** [1] - 2:10
**Debono** [6] - 25:14, 27:2, 27:16, 48:1, 48:9, 49:6
**DECEMBER** [1] - 1:11
**December** [3] - 1:19, 4:20, 59:23
**decides** [1] - 12:20
**deck** [1] - 51:7
**declined** [1] - 10:18
**defendant** [1] - 9:8
**defense** [4] - 9:8, 9:14, 9:18, 9:23
**Defense** [1] - 9:23
**definitely** [1] - 8:4
**Delta** [1] - 14:7
**Department** [1] - 9:22
**deponent** [3] - 4:11, 4:12, 8:1
**deposed** [1] - 6:23
**depositing** [1] - 45:13
**deposition** [9] - 4:2, 4:22, 5:7, 5:25, 6:2, 6:25, 7:5, 15:16, 58:9
**Deposition** [2] - 58:10, 59:7
**DEPOSITION** [1] - 1:5
**Depositions** [1] - 59:13
**depositions** [1] - 3:3
**Description** [1] - 3:18
**designed** [1] - 55:5
**desorbing** [1] - 45:13
**details** [3] - 13:15, 25:10, 31:9
**detect** [1] - 12:2
**detection** [6] - 23:20, 27:9, 27:23, 27:24, 57:2
**Detection** [15] -

10:24, 12:16, 20:7, 24:13, 25:1, 25:7, 25:24, 26:15, 32:25, 37:4, 38:8, 44:5, 49:25, 55:2, 55:22
**DHS** [1] - 3:23
**different** [8] - 18:14, 18:15, 18:21, 23:7, 32:8, 46:25, 49:2, 52:4
**digital** [3] - 16:13, 31:12, 33:1
**dilute** [1] - 45:10
**disappear** [1] - 6:1
**discussion** [1] - 51:13
**District** [2] - 4:24, 4:25
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 10:16
**divide** [1] - 48:19
**Division** [1] - 4:25
**DIVISION** [1] - 1:2
**dollar** [1] - 45:3
**dollars** [3] - 6:17, 20:18, 32:4
**done** [3] - 24:13, 44:14, 57:6
**doubting** [1] - 54:24
**DOUGLAS** [1] - 1:8
**down** [2] - 7:12, 19:13
**Dr** [16] - 3:18, 4:22, 6:13, 14:20, 14:21, 15:24, 17:8, 27:16, 43:4, 47:25, 48:9, 49:6, 53:20, 58:7
**dr** [1] - 17:11
**drift** [1] - 14:7
**Drug** [1] - 22:18
**drug** [1] - 57:2
**drugs** [2] - 12:17
**due** [1] - 4:9
**duly** [2] - 5:19, 59:8
**dust** [2] - 20:2, 47:6
**dusting** [1] - 20:2
**dynamite** [1] - 56:18

### E

**E-mail** [1] - 14:22
**E-mailed** [1] - 14:21
**easier** [1] - 45:1
**easily** [1] - 44:25
**Ed** [4] - 5:24, 6:4, 57:11, 58:4

education [1] - 41:21
EDWARD [1] - 2:9
Edward [1] - 5:8
efficient [1] - 7:11
either [4] - 21:9, 26:12, 51:21
Emergency [1] - 4:9
employ [1] - 20:7
employed [2] - 59:11, 59:15
employee [1] - 59:14
end [3] - 28:25, 46:4, 49:16
enforcement [2] - 16:19, 39:12
entitled [1] - 1:16
environment [1] - 56:9
equal [4] - 44:10, 45:5, 45:7, 52:14
ESQUIRE [3] - 2:3, 2:9, 2:10
essentially [1] - 16:1
established [1] - 29:3
et [1] - 14:8
event [1] - 51:23
exact [1] - 52:24
exactly [1] - 45:18
EXAMINATION [1] - 6:11
example [7] - 7:25, 27:10, 31:10, 36:5, 37:12, 56:14, 56:20
except [2] - 3:4, 6:5
excuse [3] - 8:19, 33:20, 41:8
exhaustive [2] - 40:19, 50:19
exhibit [2] - 14:23, 14:24
Exhibit [1] - 49:25
exhibits [3] - 4:2, 14:20, 15:6
expect [5] - 20:21, 21:6, 21:7, 52:12, 52:17
expert [9] - 8:25, 9:15, 9:19, 9:24, 10:17, 27:14, 27:24, 27:25, 28:17
experts [4] - 24:17, 25:1, 25:7, 25:24
Expires [1] - 59:24
explain [3] - 43:8,

43:13, 44:16
explosive [5] - 9:21, 9:23, 9:24, 12:2, 56:22
explosives [3] - 12:17, 56:15, 56:16
extracting [1] - 23:9

**F**

fact [8] - 19:21, 21:20, 33:22, 36:4, 38:25, 53:7, 53:18, 56:21
fair [15] - 7:18, 7:23, 11:14, 11:19, 20:14, 20:23, 23:2, 26:24, 33:20, 36:9, 36:18, 37:9, 38:4, 38:5, 50:3
fairly [1] - 32:14
false [5] - 55:25, 56:4, 56:11, 56:14, 56:25
familiar [3] - 6:20, 22:21, 56:15
far [3] - 9:1, 40:3, 47:13
farming [1] - 41:15
Fax [1] - 1:24
FBI [4] - 22:13, 23:15, 23:22
February [1] - 59:24
federal [2] - 6:25, 28:16
few [2] - 41:14
field [4] - 24:19, 43:20, 45:24, 49:4
fifth [1] - 16:8
filed [1] - 4:24
final [1] - 22:5
financially [1] - 59:15
findings [1] - 22:15
finish [2] - 7:14, 7:16
finished [4] - 34:22, 34:23, 35:21, 35:22
fireworks [3] - 9:18, 9:20, 9:25
firm [1] - 5:6
first [19] - 5:19, 14:17, 16:1, 16:6, 16:25, 18:9, 18:10, 30:16, 32:15, 39:23,

49:20, 50:2, 50:3, 50:22, 50:23, 50:24, 51:3, 51:11, 59:8
five [3] - 19:6, 36:5, 57:12
Five [1] - 5:18
flown [1] - 47:8
focal [1] - 19:12
focus [1] - 12:6
focused [1] - 17:23
follow [5] - 17:21, 23:25, 30:23, 58:2, 58:5
follow-up [4] - 17:21, 30:23, 58:2, 58:5
followed [1] - 51:15
following [2] - 29:17, 49:13
follows [2] - 4:4, 5:20
FOR [1] - 1:1
foregoing [1] - 59:5
forenoon [1] - 1:20
forget [1] - 24:22
forgot [1] - 41:3
form [2] - 3:4, 6:6
forth [1] - 21:4
four [1] - 30:1
Francisco [1] - 2:12
FROM [1] - 1:6
froze [1] - 53:12
full [1] - 49:18
future [1] - 4:14

**G**

gain [1] - 48:12
gained [2] - 28:4
gather [1] - 30:2
gathering [1] - 30:9
general [4] - 20:21, 23:23, 35:8, 35:13
geography [1] - 40:24
given [1] - 19:18
glad [1] - 8:18
glitch [1] - 56:3
gotcha [1] - 15:20
grabbed [1] - 40:9
great [3] - 7:20, 8:18, 19:4
greater [1] - 40:3
grow [1] - 24:14
GS [1] - 23:11
Guard [3] - 29:24, 30:1, 39:10
Guards [1] - 41:23

guess [6] - 15:1, 25:17, 33:22, 36:1, 37:14, 58:6

**H**

half [3] - 24:16, 46:2, 46:13
hallway [1] - 31:4
hand [1] - 55:3
hard [3] - 18:24, 19:1, 52:20
harder [1] - 19:22
Harrisburg [2] - 9:2, 41:12
hate [1] - 47:1
head [1] - 36:20
healthy [2] - 8:17, 8:21
hear [2] - 8:18, 8:20
heard [1] - 51:21
heart [2] - 56:21, 56:23
heat [1] - 11:18
help [4] - 9:19, 34:6, 43:8, 49:4
helped [1] - 24:24
helps [2] - 27:8, 35:15
heroin [1] - 12:1
high [8] - 14:5, 33:9, 37:6, 37:9, 40:2, 47:18, 47:20, 56:19
higher [9] - 20:20, 21:2, 21:3, 21:6, 21:7, 21:9, 23:4, 52:25
highest [1] - 35:8
highs [1] - 33:14
hip [4] - 30:16
hit [4] - 21:23, 37:11, 39:12, 39:17
home [1] - 20:2
Homeland [1] - 37:3
hook [1] - 58:7
hour [1] - 49:18
house [2] - 47:6, 57:13
Human [1] - 2:13
hundred [1] - 32:1
hypothetically [6] - 12:23, 47:15, 47:22, 52:13, 53:8, 53:18

**I**

idea [1] - 49:17
Ident [1] - 3:17
identification [1] - 4:3
identify [1] - 5:1
ill [1] - 8:11
illegal [1] - 56:20
implied [1] - 55:7
implies [3] - 54:15, 54:17, 55:16
imply [1] - 54:25
important [1] - 50:13
IMS [33] - 11:1, 11:5, 11:6, 11:7, 11:8, 11:13, 11:21, 12:9, 12:11, 17:20, 19:2, 21:19, 22:13, 23:8, 23:16, 24:4, 24:12, 26:13, 27:24, 27:25, 28:18, 31:22, 41:22, 42:1, 42:12, 43:9, 43:19, 44:15, 45:14, 47:1, 52:17, 55:23
IN [2] - 1:1, 1:6
inaccurate [1] - 20:15
Incident [1] - 3:23
indeed [1] - 12:22
index [1] - 15:15
indicate.. [1] - 48:7
influence [1] - 36:11
inform [1] - 27:7
information [10] - 9:19, 22:15, 24:24, 25:3, 27:5, 29:12, 31:5, 33:14, 51:24, 52:3
informed [1] - 28:11
informs [2] - 27:5, 30:25
ingredients [1] - 9:20
inside [6] - 36:20, 54:13, 54:20, 54:21, 54:24, 55:4
instance [1] - 12:10, 32:15, 39:22
instrument [15] - 12:15, 16:5, 18:5, 19:8, 20:8, 25:8, 25:10, 26:13, 27:9, 28:3, 39:2,

42:1, 47:10,
47:11, 53:25
**instruments** [3] -
23:21, 41:22, 55:2
**interested** [1] -
59:16
**INTERNATION** [1] -
1:8
**International** [1] -
2:13
**interview** [1] - 50:16
**introducing** [1] -
15:7
**invokes** [1] - 22:9
**involved** [1] - 10:6
**lonscan** [9] - 3:20,
8:24, 9:8, 9:10,
10:17, 10:18,
10:23, 11:1, 16:25
**issues** [1] - 54:7
**itself** [2] - 6:2, 47:19

### J

**jam** [1] - 54:5
**Jersey** [5] - 1:19,
1:24, 4:7, 5:18,
59:5
**Jourdan** [8] - 22:9,
22:23, 23:5,
23:14, 24:1, 42:8,
46:18
**judicial** [2] - 8:25,
9:1
**jump** [2] - 17:19,
20:12
**JUNE** [1] - 1:7

### K

**keep** [1] - 15:18
**Kim** [6] - 25:13,
25:14, 25:25,
44:3, 48:10, 49:8
**Kimberly** [1] - 30:12
**kind** [15] - 7:3, 7:4,
7:21, 9:8, 9:16,
10:16, 10:20,
15:5, 16:8, 21:1,
29:2, 29:13, 36:3,
53:23, 57:12
**knowledge** [1] -
33:5
**known** [1] - 11:5
**Ko** [1] - 27:10

### L

**lab** [2] - 45:19, 45:24
**laboratory** [3] -
44:4, 44:5, 44:14
**Lackey** [4] - 3:22,
9:4, 28:21, 30:16
**laid** [1] - 51:6
**lareau** [1] - 17:11
**LAREAU** [3] - 1:6,
3:10, 59:7
**Lareau** [10] - 3:18,
4:22, 6:14, 14:20,
14:22, 15:24,
17:8, 43:4, 53:20,
58:7
**large** [1] - 39:11
**larger** [2] - 21:22,
41:14
**last** [6] - 14:20,
14:21, 17:2, 28:6,
32:19, 54:12
**late** [1] - 14:21
**LAW** [1] - 2:8
**law** [3] - 5:20, 16:19,
39:12
**lawyer** [1] - 23:25
**lawyers** [1] - 50:11
**least** [1] - 42:1
**Lena** [7] - 25:12,
25:14, 25:25,
44:3, 48:10, 49:8
**LENNARD** [1] - 1:7
**less** [1] - 39:14
**level** [11] - 18:3,
18:4, 18:5, 21:18,
21:22, 23:17,
26:16, 32:3,
37:15, 40:18,
48:20
**lighter** [1] - 19:23
**likelihood** [1] - 56:7
**LINDENBAUM** [1] -
2:17
**Lindenbaum** [1] -
4:19
**line** [8] - 16:8, 34:19,
35:25, 37:23,
38:24, 45:16,
45:17, 45:18
**linear** [1] - 44:16
**lines** [1] - 34:25
**liquid** [1] - 45:21
**list** [2] - 15:14, 22:6
**listed** [1] - 27:10
**listened** [1] - 30:18
**lists** [1] - 42:8
**literally** [2] - 47:7,

48:18
**LLP** [1] - 2:8
**local** [1] - 44:5
**logic** [1] - 39:18
**logistic** [1] - 7:4
**look** [11] - 10:10,
14:3, 20:16, 24:4,
35:25, 37:8,
38:13, 39:9,
39:10, 43:24, 51:9
**looked** [3] - 31:13,
41:5, 44:6
**looking** [9] - 16:11,
17:16, 17:24,
18:2, 18:16, 30:5,
39:20, 49:21
**looks** [1] - 47:6
**lost** [1] - 17:6
**low** [3] - 33:9, 40:4,
40:17
**lowest** [1] - 37:20
**lows** [1] - 33:14

### M

**machine** [23] - 8:25,
10:17, 10:23,
11:13, 11:17,
11:22, 12:9,
12:11, 16:2,
17:20, 19:3, 24:5,
28:18, 36:25,
37:2, 37:18, 38:3,
42:12, 52:18,
55:23, 56:3
**machines** [1] -
40:17
**mail** [1] - 14:22
**mailed** [1] - 14:21
**Manchester** [1] -
5:18
**manufacturer** [2] -
10:25, 25:11
**map** [1] - 41:5
**mark** [2] - 14:18,
15:15
**marked** [5] - 4:3,
15:23, 16:18,
24:7, 34:8
**marking** [1] - 15:7
**mass** [3] - 18:17,
23:11, 45:20
**material** [6] - 9:21,
12:2, 19:10,
19:13, 47:9, 47:10
**materials** [1] - 9:24
**mathematically** [2] -
40:6, 44:22
**mathematics** [1] -

48:23
**matter** [5] - 1:16,
4:23, 7:10, 21:3,
21:4
**Max** [1] - 39:24
**MaxA** [4] - 32:16,
32:19, 32:23,
38:17
**mean** [7] - 15:1,
31:19, 39:20,
40:1, 43:9, 43:12,
46:14
**meaning** [5] - 21:16,
25:4, 43:25,
44:13, 48:15
**means** [6] - 19:7,
25:5, 35:6, 35:12,
46:15, 54:22
**measured** [1] -
18:14
**measurement** [4] -
11:23, 11:24,
13:6, 16:10
**medication** [1] -
8:11
**medicine** [2] -
56:21, 56:23
**memorialization** [2] -
26:3, 27:21
**meth** [2] - 29:13,
57:4
**meth-type** [1] - 57:4
**methamphetamine**
[1] - 12:1
**method** [2] - 45:23,
47:12
**methods** [1] - 45:21
**MICHAEL** [4] - 2:8,
2:10, 5:4, 5:22
**Michael** [2] - 5:4, 5:5
**Michigan** [1] - 10:2
**middle** [1] - 15:25
**might** [7] - 21:18,
21:21, 32:25,
34:13, 37:12,
53:21, 55:15
**military** [1] - 9:23
**mind** [1] - 11:7
**mine** [1] - 42:15
**minutes** [2] - 57:8,
57:9
**model** [1] - 55:10
**models** [1] - 55:10
**modified** [1] - 55:12
**moment** [1] - 42:16
**money** [1] - 6:19
**months** [1] - 28:6
**most** [6] - 19:7,
22:9, 31:2, 40:16,
46:12, 48:24

**mostly** [1] - 17:23
**move** [3] - 10:14,
18:6, 36:21
**multiple** [3] - 51:21,
51:22, 52:7
**multiply** [1] - 48:20
**municipal** [1] - 10:3
**must** [1] - 29:15

### N

**name** [4] - 10:9,
10:11, 27:1, 30:12
**nanogram** [9] -
24:5, 24:6,
42:14, 44:1, 46:2,
46:6, 47:18,
47:20, 53:18
**nanograms** [24] -
21:21, 23:19,
24:2, 24:9, 24:20,
31:11, 31:17,
31:20, 31:21,
31:24, 42:9,
42:19, 43:7,
44:10, 45:11,
45:19, 46:13,
47:17, 47:24,
49:9, 53:7, 53:9,
53:23, 53:24
**narcotics** [1] - 56:16
**National** [5] - 4:9,
29:24, 30:1,
39:10, 41:23
**necessarily** [2] -
8:2, 36:14
**need** [2] - 10:14,
48:2
**nervous** [2] - 35:10,
35:11
**never** [2] - 9:7, 22:1
**new** [2] - 19:6, 40:14
**New** [5] - 1:19, 1:24,
4:7, 5:18, 59:4
**newer** [1] - 55:10
**next** [9] - 16:6, 17:1,
22:4, 35:16,
35:19, 37:23,
37:24, 49:18
**NG** [2] - 56:16,
56:20
**night** [2] - 14:20,
14:21
**nitroglycerin** [2] -
56:17, 56:21
**nitty** [1] - 25:10
**NO** [1] - 1:2
**noise** [2] - 18:5,
57:12

**nondetect** [1] - 39:1
**North** [4] - 2:5, 4:25, 41:19, 41:25
**NORTH** [1] - 1:1
**Notary** [2] - 1:18, 59:4
**notation** [1] - 54:19
**note** [1] - 34:7
**notes** [5] - 1:15, 26:5, 26:8, 26:11, 57:8
**nothing** [1] - 19:7
**noticed** [2] - 40:23, 40:24
**noting** [1] - 5:23
**nuisance** [1] - 56:25
**number** [33] - 13:25, 14:5, 14:23, 15:23, 16:11, 16:13, 16:18, 17:4, 17:9, 17:12, 19:11, 19:23, 21:15, 22:24, 23:13, 23:19, 24:7, 24:13, 31:16, 32:18, 34:8, 37:9, 43:22, 43:25, 44:12, 44:14, 45:7, 45:14, 49:1, 50:15, 54:8
**numbering** [1] - 15:9
**numbers** [33] - 11:19, 11:21, 13:4, 13:7, 13:17, 13:21, 13:23, 14:1, 14:6, 14:23, 14:24, 15:12, 15:19, 22:14, 23:12, 23:15, 26:5, 26:13, 26:14, 30:25, 31:6, 31:16, 32:7, 37:7, 44:8, 45:15, 46:15, 47:13, 47:17, 53:9, 53:16, 53:23, 53:24
**nuts** [1] - 8:10

**O**

**oath** [3] - 5:20, 7:5, 7:6
**objection** [3] - 4:13, 4:14, 4:16
**objections** [2] - 3:4, 6:5
**observing** [1] - 5:23

**obvious** [1] - 7:24
**obviously** [1] - 7:12
**occurrences** [1] - 57:4
**odd** [2] - 6:17, 20:18
**OF** [4] - 1:1, 1:4, 1:5, 2:8
**Office** [1] - 1:24
**officers** [1] - 16:19
**OFFICES** [1] - 2:8
**often** [2] - 33:24
**oftentimes** [1] - 35:4
**ON** [1] - 1:7
**once** [1] - 51:8
**one** [45] - 2:11, 5:5, 9:1, 9:17, 11:11, 12:18, 14:3, 16:6, 16:16, 16:25, 17:1, 17:2, 17:21, 18:16, 18:24, 19:24, 22:8, 25:13, 25:14, 25:22, 30:7, 32:15, 33:4, 36:7, 39:22, 39:23, 40:3, 41:12, 41:16, 42:16, 45:11, 45:15, 47:4, 51:6, 51:20, 51:21, 52:16, 52:20, 53:1, 54:5, 54:9, 55:16, 55:17, 56:16
**open** [1] - 34:11
**opened** [1] - 51:14
**operator** [8] - 4:19, 11:15, 12:14, 12:23, 18:25, 19:1, 19:18, 31:7
**opinion** [13] - 10:22, 17:22, 17:24, 20:12, 20:14, 20:17, 20:24, 21:11, 27:5, 27:7, 28:11, 53:10, 53:19
**order** [2] - 15:8, 15:9
**organization** [3] - 12:20, 28:9, 36:24
**organized** [1] - 26:22
**otherwise** [2] - 8:13, 12:8
**outs** [1] - 25:8
**overloaded** [1] - 53:25
**own** [1] - 41:21

**P**

**P.C** [1] - 1:22
**p.m** [1] - 58:10
**packaged** [1] - 40:15
**page** [32] - 14:16, 15:15, 15:23, 15:25, 22:4, 22:5, 22:6, 25:21, 29:3, 29:15, 29:17, 30:6, 34:12, 34:14, 34:18, 35:16, 35:19, 37:18, 38:12, 42:17, 42:22, 42:24, 48:5, 48:6, 50:4, 50:15, 50:17, 51:10, 53:17, 54:11
**Page** [1] - 3:9
**pages** [1] - 29:10
**pandemic** [2] - 4:10, 30:4
**paper** [6] - 22:10, 24:6, 42:8, 46:10, 47:11
**Paper** [1] - 22:18
**papers** [1] - 23:8
**paragraph** [4] - 18:9, 42:25, 51:10, 54:12
**parameters** [1] - 27:8
**pardon** [1] - 25:21
**part** [11] - 17:2, 18:1, 19:12, 20:6, 25:5, 27:12, 28:11, 28:14, 28:15, 34:5, 46:16
**partially** [1] - 21:14
**particles** [3] - 19:25, 23:10, 47:8
**particular** [9] - 13:19, 18:6, 19:2, 22:8, 36:22, 44:2, 44:3, 44:22, 54:10
**particularly** [1] - 40:2
**parties** [1] - 59:12
**parts** [1] - 10:6
**past** [1] - 37:8
**PDF** [1] - 34:14
**peak** [6] - 16:16, 18:17, 18:18, 45:5, 56:10, 56:11
**peer** [1] - 22:3
**peer-reviewed** [1] - 22:3

**penalty** [1] - 7:7
**Pennsylvania** [14] - 9:2, 21:13, 22:16, 25:3, 28:13, 29:4, 29:9, 29:24, 40:21, 41:3, 41:7, 41:9, 46:5, 53:16
**people** [5] - 19:7, 25:7, 48:25, 49:4, 56:18
**per** [31] - 16:14, 17:22, 18:16, 24:10, 24:15, 31:12, 31:23, 31:24, 32:23, 33:1, 38:22, 42:18, 43:6, 43:21, 44:9, 44:19, 45:6, 45:17, 45:18, 46:1, 47:18, 47:24, 48:16, 48:19, 49:1, 49:7, 49:9, 50:25, 53:8, 56:6
**percent** [15] - 14:1, 14:2, 18:7, 18:11, 18:20, 24:9, 32:1, 46:12, 48:13, 48:14, 48:16, 48:24, 48:25, 49:3, 49:8
**percentage** [2] - 48:7, 48:21
**perfect** [1] - 57:15
**perhaps** [3] - 10:12, 37:16, 58:1
**perjury** [1] - 7:7
**permission** [1] - 50:10
**person** [2] - 27:6, 56:25
**personally** [1] - 30:8
**PETN** [1] - 56:22
**Ph.D** [3] - 1:6, 3:10, 59:7
**Philadelphia** [1] - 40:24
**phone** [4] - 26:4, 50:9, 50:16, 50:20
**photographs** [1] - 3:21
**physical** [1] - 4:11
**pick** [2] - 19:24, 39:22
**piece** [1] - 19:9
**pieces** [1] - 24:6
**place** [1] - 11:16
**placed** [1] - 51:14
**places** [2] - 32:9,

39:13
**plasmagram** [1] - 27:15
**plasmagrams** [1] - 54:2
**point** [2] - 53:22, 54:8
**points** [1] - 22:12
**pops** [1] - 12:25
**portion** [1] - 46:22
**positive** [1] - 56:4
**positives** [1] - 55:25
**possibility** [1] - 56:19
**possible** [5] - 38:20, 40:1, 40:7, 53:22, 57:5
**potential** [1] - 21:25
**Potter** [1] - 38:13
**Poupko** [2] - 22:19, 22:24
**practical** [2] - 45:23, 45:24
**preliminary** [1] - 7:4
**premarked** [1] - 15:5
**presence** [1] - 4:12
**PRESENT** [1] - 2:16
**preserve** [1] - 6:5
**pressing** [1] - 19:22
**pressure** [4] - 19:6, 19:18, 20:3
**presumably** [1] - 16:23
**pretty** [1] - 47:18
**prevent** [1] - 8:12
**previous** [1] - 25:2
**previously** [1] - 31:23
**print** [1] - 13:13
**printed** [1] - 50:13
**printout** [1] - 13:12, 14:7, 14:17, 16:1, 17:3, 18:7, 27:13, 27:15, 31:13, 49:25
**printouts** [8] - 13:18, 14:3, 16:25, 24:18, 25:4, 26:11, 26:12, 48:13
**private** [3] - 25:23, 27:17, 27:21
**privy** [1] - 30:16
**problem** [1] - 8:21
**proceed** [1] - 29:20
**proceedings** [2] - 1:15, 4:3
**proper** [1] - 17:20
**properly** [3] - 16:5,

51:14, 53:3
**prosecutorial** [1] -
10:16
**proud** [1] - 49:12
**provided** [1] - 16:19
**public** [1] - 23:23
**Public** [2] - 1:18,
59:4
**publications** [1] -
21:17
**published** [1] - 22:3
**pull** [5] - 14:11,
14:12, 34:9,
42:14, 49:21
**purposes** [1] - 49:6
**push** [1] - 19:13
**put** [9] - 9:19, 19:14,
19:15, 21:16,
24:24, 29:13,
44:6, 47:10, 47:11
**puts** [1] - 12:24
**putting** [2] - 28:1,
28:6

Q

**qualitative** [1] -
22:12
**quantitating** [1] -
23:11
**quantitative** [16] -
21:18, 22:13,
23:12, 42:13,
42:20, 43:5, 43:9,
43:16, 43:18,
43:20, 43:22,
43:23, 43:25,
44:12, 44:14, 45:7
**quantitatively** [1] -
44:7
**questions** [11] - 3:4,
7:15, 7:16, 7:23,
8:13, 26:25,
41:17, 50:12,
50:17, 50:19, 58:1
**quick** [2] - 25:21,
48:3
**quickly** [2] - 7:3,
46:6
**quiz** [1] - 40:24

R

**random** [1] - 40:9
**Rate** [1] - 18:11
**rather** [2] - 48:25,
49:16
**reach** [2] - 29:25,
41:20

**read** [7] - 8:2, 34:17,
34:24, 35:18,
37:24, 37:25,
51:12
**reading** [12] - 11:18,
12:12, 12:24,
24:6, 34:1, 35:4,
35:8, 36:12,
38:23, 40:3,
52:17, 53:1
**readout** [1] - 19:2
**readouts** [1] - 20:17
**ready** [2] - 6:3,
12:19
**real** [6] - 21:23,
33:17, 33:18,
37:9, 37:11, 48:3
**reality** [2] - 31:11,
41:4
**realize** [1] - 31:20
**really** [13] - 7:2,
10:13, 17:24,
25:20, 26:10,
26:17, 26:19,
26:20, 28:5,
31:21, 35:12,
37:6, 51:8
**reason** [2] - 19:12,
47:23
**reasonable** [3] -
19:25, 23:19,
41:13
**reasons** [1] - 19:11
**received** [4] - 4:2,
30:4, 41:24
**recently** [1] - 27:23
**record** [9] - 4:9,
5:22, 8:1, 10:8,
17:15, 57:9,
57:21, 57:23, 58:3
**red** [1] - 13:9
**refer** [1] - 32:25
**reference** [4] -
22:14, 25:23,
27:17, 43:24
**referenced** [2] -
28:21, 44:13
**references** [4] -
21:15, 22:6,
25:19, 51:12
**referencing** [2] -
44:3, 46:11
**referred** [1] - 10:25
**referring** [3] - 11:10,
25:6, 31:10
**regarding** [1] - 6:18
**related** [1] - 59:11
**relates** [1] - 49:9
**relation** [1] - 12:9
**relative** [1] - 59:14

**relevant** [1] - 6:2
**REMOTE** [1] - 1:5
**Remote** [1] - 59:6
**remotely** [1] - 1:16
**Reno** [6] - 25:14,
27:1, 27:2, 27:16,
27:23, 47:25
**report** [16] - 14:12,
18:9, 21:16, 22:5,
24:25, 26:21,
28:21, 28:25,
38:12, 42:11,
49:7, 50:2, 50:8,
50:15, 50:17,
53:17
**Report** [2] - 3:19,
3:23
**Reporter** [2] - 1:17,
59:4
**REPORTER** [7] -
4:6, 8:19, 15:3,
15:11, 15:14,
15:18, 53:11
**reporter** [5] - 4:10,
5:15, 5:24, 7:11,
15:2
**Reporters** [1] - 1:23
**Reporting** [1] - 4:20
**reports** [1] - 39:14
**represent** [2] - 5:2,
16:14
**represented** [1] -
41:9
**representing** [2] -
5:9, 5:12
**request** [1] - 57:7
**reserved** [1] - 3:5
**responses** [1] -
50:18
**responsible** [1] -
30:8
**resulting** [1] - 18:10
**results** [9] - 3:20,
10:18, 13:13,
16:19, 19:19,
24:5, 49:19,
50:13, 54:1
**retain** [1] - 26:9
**retained** [1] - 8:24
**reviewed** [1] - 22:3
**Richard** [1] - 4:22
**RICHARD** [3] - 1:6,
3:10, 59:7
**Rights** [1] - 2:13
**River** [1] - 1:24
**Robert** [2] - 2:14,
5:9
**rose** [1] - 14:21
**rough** [1] - 10:9
**roundabout** [1] -

39:21
**run** [3] - 16:4, 45:3,
45:12

S

**SA** [1] - 51:13
**sample** [25] - 16:7,
16:9, 18:10, 19:2,
19:19, 33:10,
35:4, 40:3, 47:9,
47:10, 49:20,
50:2, 50:3, 50:23,
50:24, 51:3,
51:11, 52:2, 52:5,
52:10, 53:2, 55:3,
56:9
**sampled** [8] - 33:3,
46:15, 46:22,
46:25, 51:6, 51:7,
51:17, 54:23
**samples** [13] -
20:16, 30:9, 32:7,
32:16, 38:16,
38:21, 39:9,
39:12, 39:13,
40:4, 40:20, 42:10
**sampling** [12] -
19:9, 19:10,
19:14, 19:16,
20:9, 21:20,
46:16, 47:14,
51:15, 52:23,
54:15, 55:8
**San** [1] - 2:12
**Sansome** [1] - 2:11
**saw** [3] - 33:24,
33:25, 41:16
**science** [1] - 28:3
**scientific** [3] -
21:16, 23:25, 42:8
**scientist** [2] - 31:8,
33:17
**SCOTT** [1] - 2:17
**Scott** [1] - 4:19
**screen** [2] - 13:8,
13:11
**screener** [2] - 54:15,
55:7
**scrolling** [1] - 16:24
**sealing** [1] - 3:2
**second** [39] - 16:14,
17:22, 18:16,
22:8, 24:10,
24:15, 25:22,
31:12, 31:23,
31:25, 32:24,
33:1, 38:22,
42:18, 42:25,
43:6, 43:21, 44:9,

44:19, 45:6,
45:17, 45:18,
46:1, 47:18,
47:24, 48:17,
48:20, 49:1, 49:7,
49:9, 50:25, 52:2,
52:5, 52:10, 53:8,
54:12, 54:14,
55:17, 57:14
**section** [1] - 15:24
**Security** [1] - 37:3
**see** [29] - 6:13,
14:10, 16:12,
16:22, 16:23,
17:9, 18:7, 18:8,
21:20, 21:22,
22:17, 24:19,
25:20, 27:17,
28:24, 29:3,
33:21, 34:4, 34:7,
34:14, 37:21,
37:22, 39:19,
43:1, 45:6, 45:16,
48:6, 49:14
**seeming** [1] - 7:25
**SEIZED** [1] - 1:6
**seizure** [1] - 6:18
**semi** [3] - 43:23,
43:25, 44:12
**semi-quantitative**
[3] - 43:23, 43:25,
44:12
**sense** [5] - 7:6, 7:8,
8:7, 32:14, 34:15
**sent** [1] - 14:20
**sentence** [3] - 44:3,
51:12, 54:14
**separate** [3] - 6:25,
30:24, 52:8
**sequence** [1] - 14:6
**Sergeant** [11] -
29:22, 30:8,
30:12, 30:17,
30:18, 32:5, 33:2,
47:15, 50:11,
53:5, 53:18
**set** [24] - 12:11,
12:14, 13:12,
24:14, 25:9,
26:15, 26:16,
27:8, 32:2, 36:25,
37:2, 37:3, 37:13,
37:14, 38:1, 38:7,
38:22, 39:2, 39:5,
39:6, 39:8, 44:5
**Seth** [1] - 50:11
**sets** [1] - 23:20
**setting** [2] - 37:5
**Shore** [1] - 4:19
**ShoreReporting @**

**aol.com** [1] - 1:25
**Shorin** [1] - 5:18
**short** [1] - 11:3
**show** [2] - 18:21, 23:3
**showed** [2] - 23:16, 31:22
**showing** [1] - 23:22
**shown** [1] - 21:17
**shows** [1] - 38:2
**Shumake** [2] - 2:14, 5:10
**shut** [1] - 12:20
**side** [1] - 9:19
**significantly** [1] - 23:4
**signing** [1] - 3:2
**similar** [4] - 21:8, 45:20, 54:1, 56:10
**simple** [1] - 32:14
**single** [2] - 25:5, 27:12
**sit** [1] - 26:21
**six** [1] - 28:6
**Six** [1] - 3:21
**size** [1] - 41:13
**skip** [4] - 14:15, 16:8, 48:1, 48:2
**skipping** [1] - 13:17
**slightly** [1] - 38:21
**smaller** [2] - 30:7, 52:17
**Smiths** [17] - 10:22, 10:24, 11:7, 12:15, 20:7, 24:13, 25:1, 25:7, 25:24, 26:15, 32:25, 37:4, 38:8, 44:5, 49:24, 55:1, 55:21
**sold** [1] - 12:15
**solution** [2] - 45:10
**someone** [2] - 20:7, 52:13
**somewhere** [1] - 46:13
**sorry** [13] - 9:11, 20:11, 22:5, 35:2, 36:23, 37:25, 39:4, 39:19, 43:2, 48:8, 55:22, 57:24
**sort** [5] - 8:10, 12:6, 15:24, 16:1, 30:22
**sound** [1] - 6:20
**sounds** [2] - 6:9, 43:5, 57:18
**speaking** [1] - 4:19
**speaks** [1] - 47:19
**spec** [1] - 23:11
**species** [1] - 56:6

**specific** [2] - 9:15, 48:11
**specify** [1] - 12:8
**spectrometer** [1] - 45:20
**Spillane** [1] - 1:22
**spit** [1] - 13:4
**stamp** [1] - 50:1
**standard** [3] - 44:11, 44:13, 45:8
**standards** [6] - 43:23, 44:5, 44:6, 44:17, 44:18, 45:9
**start** [5] - 5:3, 8:23, 43:15, 49:15, 53:13
**started** [2] - 8:9, 10:5
**starting** [3] - 25:19, 34:18, 35:16
**State** [2] - 1:19, 59:4
**state** [3] - 5:2, 23:6, 23:7
**statement** [3] - 20:23, 23:2, 41:2
**states** [1] - 22:11
**States** [13] - 2:6, 4:23, 4:24, 5:13, 6:17, 9:3, 22:25, 23:18, 28:20, 30:2, 30:15, 42:5, 56:24
**STATES** [2] - 1:1, 1:4
**statistical** [1] - 22:10
**statistics** [1] - 33:18
**stemming** [1] - 6:18
**stenographic** [1] - 1:15
**step** [3] - 28:10, 33:8
**stick** [3] - 15:8, 15:11, 37:18
**still** [4] - 32:1, 36:8, 37:11, 47:1
**stipulate** [1] - 4:8
**stored** [1] - 13:14
**straight** [1] - 45:16
**street** [1] - 57:13
**Street** [2] - 2:4, 2:11
**strength** [22] - 13:11, 14:1, 14:9, 16:15, 18:2, 18:13, 19:15, 19:16, 20:20, 21:3, 21:7, 21:25, 24:9, 24:20, 43:21, 44:7, 48:14, 48:24,

48:25, 49:4, 49:8
**strengths** [2] - 21:19, 25:9
**strong** [1] - 39:17
**stuck** [1] - 47:9
**studied** [1] - 22:11
**studies** [4] - 22:3, 22:24, 23:3, 23:22
**study** [6] - 22:23, 23:22, 24:1, 24:11, 35:13, 46:18
**stuff** [2] - 23:25, 56:18
**substance** [1] - 8:10
**subtracting** [1] - 18:18
**Suite** [2] - 2:4, 2:11
**superficial** [1] - 37:17
**supplement** [1] - 10:13
**supports** [1] - 22:14
**supposed** [2] - 16:14, 21:24
**Supreme** [1] - 4:7
**surface** [4] - 19:16, 46:3, 46:5, 51:16
**swab** [10] - 11:15, 11:17, 12:24, 32:12, 45:13, 47:11, 47:14, 51:3, 54:21, 55:2
**swabbed** [4] - 33:4, 51:17, 52:10, 52:16
**swabbing** [1] - 53:1
**swear** [3] - 4:7, 4:10, 5:15
**swipe** [3] - 19:1, 44:6, 47:14
**swipe-type** [1] - 47:14
**swiped** [2] - 52:10, 52:18
**sworn** [2] - 5:19, 59:8
**system** [5] - 11:1, 37:12, 45:3, 45:14, 47:1
**system's** [1] - 54:6
**systems** [2] - 24:12, 44:5

| T |
| --- |

**t/a** [1] - 1:22
**table** [1] - 51:15
**talks** [1] - 16:9,

37:19
**team** [1] - 9:23
**technical** [1] - 25:24
**technically** [1] - 38:25
**technologist** [1] - 31:8
**technology** [1] - 44:17
**ten** [1] - 51:7
**terms** [5] - 15:5, 15:6, 21:8, 24:22, 36:12
**tested** [2] - 16:7, 52:16
**testified** [11] - 5:20, 6:24, 9:7, 9:11, 9:13, 21:13, 28:10, 28:17, 33:23, 53:6, 53:19
**testify** [1] - 8:24, 10:18, 30:18
**testifying** [3] - 27:13, 32:2, 35:11
**testimony** [10] - 8:13, 31:1, 31:3, 31:10, 31:11, 31:16, 32:6, 33:21, 34:4, 37:19
**tests** [4] - 32:18, 33:24, 35:3, 50:7
**THE** [15] - 1:1, 1:1, 4:6, 4:18, 5:14, 8:19, 15:3, 15:11, 15:14, 15:18, 17:13, 17:17, 53:11, 57:20, 58:8
**they've** [1] - 30:3
**third** [2] - 38:13, 51:11
**Thomas** [2] - 22:9, 42:7
**thousand** [7] - 6:17, 20:18, 33:25, 34:1, 35:5, 36:7, 36:13
**threat** [1] - 11:25
**threats** [1] - 12:20
**three** [9] - 19:6, 21:21, 23:18, 24:7, 45:12, 45:15, 46:13
**threshold** [1] - 37:20
**throughout** [1] - 42:11
**Tobago** [1] - 1:23
**today** [2] - 8:14, 8:17
**today's** [1] - 4:20

**together** [6] - 9:19, 24:24, 27:25, 28:1, 28:7, 29:14
**Toms** [1] - 1:24
**took** [4] - 23:14, 26:11, 44:8, 50:12
**top** [3] - 14:16, 18:6, 34:12
**Toronto** [3] - 25:25, 44:4
**Total** [3] - 32:16, 38:17, 39:24
**total** [2] - 23:9, 32:18, 46:17
**totaled** [1] - 33:12
**toward** [1] - 17:2
**toxicology** [1] - 9:16
**trace** [2] - 27:23, 27:24
**Trade** [1] - 2:4
**trained** [2] - 20:8, 31:7
**training** [1] - 20:6
**transcript** [3] - 3:22, 34:18, 34:25
**Transcript** [1] - 59:6
**transcripts** [1] - 34:8
**trap** [1] - 47:11
**trial** [2] - 3:5, 6:25
**trouble** [1] - 54:6
**true** [3] - 27:25, 53:24, 59:5
**truly** [1] - 40:16
**try** [5] - 7:16, 20:13, 36:23, 43:24
**trying** [8] - 29:25, 32:2, 34:14, 36:23, 41:20, 42:2, 44:24, 54:9
**Tuesday** [1] - 1:19
**turns** [1] - 55:5
**two** [13] - 9:17, 11:11, 18:14, 19:24, 21:21, 23:18, 25:1, 25:6, 29:10, 46:13, 55:16, 57:8, 57:9
**type** [8] - 9:14, 9:16, 11:22, 41:18, 41:24, 47:14, 54:1, 57:4
**types** [3] - 13:25, 56:14, 56:20
**typical** [2] - 17:20, 21:10
**typically** [5] - 12:16, 20:6, 21:24, 24:18, 43:19

## U

**U.S** [4] - 22:10, 22:11, 22:18, 32:4
**UK** [1] - 56:23
**ultimate** [2] - 17:24, 20:12
**ultimately** [5] - 20:16, 28:17, 42:13, 42:17, 43:10
**unclear** [1] - 8:4
**under** [5] - 7:6, 7:7, 16:12, 16:15, 17:2
**understood** [3] - 7:9, 34:25, 54:20
**unfortunately** [2] - 30:3, 41:25
**UNITED** [2] - 1:1, 1:4
**United** [13] - 2:6, 4:23, 4:24, 5:13, 6:17, 9:3, 22:25, 23:17, 28:20, 30:2, 30:15, 42:5, 56:24
**units** [2] - 31:12, 33:1
**unless** [3] - 12:7, 12:19
**up** [39] - 9:18, 10:10, 11:18, 12:25, 13:12, 14:11, 14:12, 15:10, 16:15, 17:1, 17:21, 18:6, 18:19, 19:24, 23:11, 25:9, 25:18, 26:15, 27:9, 30:23, 32:3, 33:25, 34:1, 34:9, 34:12, 37:3, 38:2, 42:14, 44:5, 45:14, 45:17, 46:4, 46:15, 48:16, 48:24, 49:18, 49:21, 58:2, 58:5
**US** [1] - 1:6
**USA000092** [1] - 17:5
**utilizing** [1] - 54:15

## V

**vacuum** [2] - 47:3, 47:8
**vacuuming** [2] - 47:6, 47:13

**valid** [2] - 23:12, 32:1
**value** [2] - 19:5, 38:2
**values** [2] - 33:12, 45:15
**vary** [2] - 19:22, 19:23
**VAUGHN** [3] - 1:17, 59:3, 59:20
**verbal** [3] - 26:4, 26:19, 28:5
**verbally** [2] - 44:23, 44:25
**verification** [2] - 16:4, 16:25
**verified** [1] - 55:13
**versus** [8] - 4:23, 6:17, 9:3, 23:23, 30:16, 48:10, 48:16, 53:1
**video** [3] - 4:18, 57:21, 57:23
**Videographer** [1] - 2:17
**VIDEOGRAPHER** [4] - 4:18, 5:14, 57:20, 58:8
**VIDEOTAPED** [1] - 1:4
**videotaped** [1] - 4:22
**Videotaped** [1] - 59:7
**Vitae** [1] - 3:18
**voice** [1] - 5:1
**vs** [1] - 1:5

## W

**waiting** [1] - 31:3
**waived** [1] - 3:3
**walk** [1] - 44:21
**wand** [9] - 19:9, 19:10, 19:11, 55:4, 55:6, 55:8, 55:11, 55:14
**wand"..** [1] - 54:16
**ways** [1] - 18:21
**West** [2] - 2:4, 41:12
**WESTERN** [1] - 1:1
**whereas** [1] - 49:8
**whichever** [1] - 11:9
**white** [4] - 45:2, 54:13, 54:20, 54:22
**William** [1] - 51:13
**wipe** [1] - 11:16
**wiped** [1] - 54:21
**wiping** [2] - 46:3,

46:5
**Witness** [1] - 3:9
**WITNESS** [2] - 17:13, 17:17
**witness** [6] - 4:8, 5:15, 9:15, 9:19, 9:24, 10:17
**wonder** [1] - 14:17
**word** [5] - 7:12, 21:9, 54:17, 54:25, 55:7
**words** [1] - 20:13
**works** [2] - 11:14, 28:3
**write** [1] - 26:21
**writing** [1] - 19:5
**written** [3] - 26:3, 26:6, 27:20
**wrote** [3] - 26:5, 26:9, 26:14

## Y

**year** [2] - 10:4, 10:7
**years** [1] - 47:5
**yielded** [2] - 20:19, 50:24
**yielding** [1] - 46:6
**yourself** [1] - 26:9
**yourselves** [1] - 5:2
**yup** [2] - 36:6, 38:15

## Z

**zero** [8] - 36:8, 38:3, 38:17, 38:23, 38:24, 39:1, 40:16



December 19, 2019

**MEMORANDUM FOR CERTIFIED BSA RECORD REQUESTOR**

**FROM:**                Jeffrey D. Anderson
                              Chief
                              Law Enforcement Support Section

**SUBJECT:**            Certification of Search for FinCEN Form 107,
                              Registration of Money Services Business

As the federal government agency with primary responsibility for maintaining reports filed pursuant to the Bank Secrecy Act, 31 U.S.C. §5311, *et seq.*, the Financial Crimes Enforcement Network has conducted a diligent search for any FinCEN Form 107, Registration of Money Services Business under its control that relate to:

                        **SUBJECT:**   ROBERT SAMUEL SHUMAKE
                        **DOB:**       07/29/1968
                        **SSN:**       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

The above search of our records found no such forms filed by, or on behalf of, the above listed individual from 01/01/2001 through 12/16/2019.





December 19, 2019

**MEMORANDUM FOR CERTIFIED BSA RECORD REQUESTOR**

**FROM:**          Jeffrey D. Anderson
                   Chief
                   Law Enforcement Support Section

**SUBJECT:**       Certification of Search for FinCEN Form 107,
                   Registration of Money Services Business

As the federal government agency with primary responsibility for maintaining reports filed pursuant to the Bank Secrecy Act, 31 U.S.C. §5311, *et seq.*, the Financial Crimes Enforcement Network has conducted a diligent search for any FinCEN Form 107, Registration of Money Services Business under its control that relate to:

> **SUBJECT:**   DARREN LENNARD COLEMAN
> **DOB:**        08/09/1968
> **SSN:**        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

The above search of our records found no such forms filed by, or on behalf of, the above listed individual from 01/01/2001 through 12/16/2019.

USA001542



December 19, 2019

**MEMORANDUM FOR CERTIFIED BSA RECORD REQUESTOR**

**FROM:**           Jeffrey D. Anderson
                     Chief
                     Law Enforcement Support Section

**SUBJECT:**      Certification of Search for FinCEN Form 107,
                     Registration of Money Services Business

As the federal government agency with primary responsibility for maintaining reports filed pursuant to the Bank Secrecy Act, 31 U.S.C. §5311, *et seq.*, the Financial Crimes Enforcement Network has conducted a diligent search for any FinCEN Form 107, Registration of Money Services Business under its control that relate to:

          **SUBJECT:**   INTERNATIONAL HUMAN RIGHTS COMMISSION

The above search of our records found no such forms filed by, or on behalf of, the above listed entity from 01/01/2001 through 12/16/2019.

USA001542



# State of North Carolina
### OFFICE OF THE COMMISSIONER OF BANKS

ROY COOPER
GOVERNOR

RAY GRACE
COMMISSIONER OF BANKS

November 12, 2019

**CONFIDENTIAL**

Via Email (william.v.bass@ice.dhs.gov)
Special Agent William V. Bass
Department of Homeland Security
3700 Arco Corporate Drive
Suite 300
Charlotte, NC 28273

     RE:    International Human Rights Commission (IHRC)

Dear Special Agent Bass:

    I am responding to Ms. Kuylen's letter of October 29, 2019, a copy of which is attached, requesting the licensing information for the International Human Rights Commission (IHRC). The North Carolina Office of the Commissioner of Banks (NCCOB) has no records for this company. I also checked the Nationwide Multistate Licensing System & Registry (https://www.nmlsconsumeraccess.org/), and IHRC is not registered.

    As requested, NCCOB will treat your inquiry as confidential pursuant to N.C. Gen. Stat. § 53C-2-7(d) and 53-208.59.

    Should you have questions or need additional information, please contact Angela Maynard at 919-733-4242 or amaynard@nccob.gov.

                Sincerely,

                Katherine M.R. Bosken
                Deputy Commissioner
                Division of Legal Affairs

USA001529



EXHIBIT
17



USA000102



USA000103



USA000104



USA000105



USA000109



USA000112



USA000113



USA000115



# smiths detection
bringing technology to life

IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006
======================================
            STATUS: PASS
--------------------------------------
Sample: 3181 Date: 06/27/2016 3:40:37 PM
Sample type: VERIFICATION
Method: 54772 N/E RevK
Analysis type: VERIFICATION
--------------------------------------
            ALARM
_VERIFI(
--------------------------------------
Absolute Pressure (kPa): 101.02
Different. Press. (kPa): 0.00
Drift Flow (cc/min): 300
--------------------------------------
Tube 1
Calibrant amplitude (du): 1084
Calibrant delta (us): -38
Calibrant position (us):
Drift temperature (C): 250
Inlet temperature (C): 265
Cal Block temperat. (C): 78
Polarity: Pos.
High voltage (V): 1570
--------------------------------------
Tube 2
Calibrant amplitude (du): 484
delta (us): -65
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 65
Polarity: Neg.
High voltage (V): 1809
======================================
--------------------------------------
Comments:

--------------------------------------

| Tube/ | # | Amp | | Ko | |
| Channel | | CumA | Delta | | DTime |
|---|---|---|---|---|---|
| 1 _V-2 | 14 | 3571 | 526 | 17 | 1.2145 14.447 |
| 1 _V-3 | 14 | 4176 | 411 | 19 | 1.1010 15.936 |
| 2 _Ver-NO3 | 21 | 6703 | 468 | 3 | 1.9320 9.799 |
| 2 _Ver-PC | 6 | 1130 | 233 | -18 | 1.1505 16.455 |
| 2 _Ver-PN | 21 | 4252 | 489 | -7 | 1.1020 17.180 |
| 2 _Ver-T | 29 | 6779 | 456 | 3 | 1.4510 13.047 |

Auth.:_____



EXHIBIT
18

*Bundles*
*of*
*Currency*

# smiths detection

bringing technology to life

IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006
========================================
              STATUS: ALARM
========================================
Sample: 3210 Date: 06/27/2016 3:56:15 PM
Sample type: NORMAL
Method: 54772 N/E RevK
Analysis type: NORMAL
------------------------------------------
              ALARM
Cocaine      14%
------------------------------------------
Absolute Pressure (kPa): 101.02
Different. Press. (kPa): 0.00
Drift Flow (cc/min): 299
========================================
Tube 1
Calibrant amplitude (du): 1082
Calibrant delta (us): -39
Calibrant position (us):
Drift temperature (C): 250
Inlet temperature (C): 265
Cal Block temperat. (C): 78
Polarity: Pos.
High voltage (V): 1570
------------------------------------------
Tube 2
Calibrant amplitude (du): 435
delta (us): -71
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 65
Polarity: Neg.
High voltage (V): 1809
========================================
------------------------------------------
Comments:

------------------------------------------
========================================
Tube/      #     Amp      Ko
  Channel      CumA    Delta      DTime
========================================
1 Cocaine  11 1394  258   6  1.1600 15.124
Auth.:_____

USA000092

*Bundles*
*of*
*Currency*

# smiths detection
bringing technology to life

IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006
=======================================
               STATUS: ALARM
=======================================
Sample: 3206 Date: 06/27/2016 3:53:58 PM
Sample type: NORMAL
Method: 54772 N/E RevK
Analysis type: NORMAL
- - - - - - - - - - - - - - - - - - - - - - - - -
                  ALARM
Cocaine      32%
- - - - - - - - - - - - - - - - - - - - - - - - -
Absolute Pressure (kPa): 101.02
Different. Press. (kPa): 0.01
Drift Flow (cc/min): 299
=======================================
Tube 1
Calibrant amplitude (du): 1090
Calibrant delta (us): -36
Calibrant position (us):
Drift temperature (C): 249
Inlet temperature (C): 265
Cal Block temperat. (C): 78
Polarity: Pos.
High voltage (V): 1571
- - - - - - - - - - - - - - - - - - - - - - - - -
Tube 2
Calibrant amplitude (du): 465
delta (us): -70
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 65
Polarity: Neg.
High voltage (V): 1810
=======================================
- - - - - - - - - - - - - - - - - - - - - - - - -
Comments:
- - - - - - - - - - - - - - - - - - - - - - - - -
=======================================
Tube/       #      Amp        Ko
  Channel       CumA    Delta      DTime
=======================================
1 CocHigh   2 1334  717   31  1.1600 15.127
1 Cocaine  24 4702  519   18  1.1600 15.127
Auth.:_____

USA000093

*inside white bag*

# smiths detection
bringing technology to life

IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006

=========================================
                STATUS: ALARM
=========================================
Sample: 3196 Date: 06/27/2016 3:46:20 PM
Sample type: NORMAL
Method: 54772 N/E RevK
Analysis type: NORMAL
-----------------------------------------
                ALARM
Cocaine      15%
-----------------------------------------
Absolute Pressure (kPa): 101.02
Different. Press. (kPa): 0.00
Drift Flow (cc/min): 300
=========================================
Tube 1
Calibrant amplitude (du): 1082
Calibrant delta (us): -35
Calibrant position (us):
Drift temperature (C): 250
Inlet temperature (C): 265
Cal Block temperat. (C): 77
Polarity: Pos.
High voltage (V): 1570
-----------------------------------------
Tube 2
Calibrant amplitude (du): 444
delta (us): -68
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 64
Polarity: Neg.
High voltage (V): 1810
=========================================
-----------------------------------------
Comments:

-----------------------------------------
=========================================

| Tube/ | # | Amp | | Ko | |
| Channel | | CumA | Delta | | DTime |
|---|---|---|---|---|---|
| 1 Cocaine | 11 | 1476 | 266 | 6  1.1600 | 15.127 |

Auth.:_____

USA000094



*inside*
*Red*
*bag*

# smiths detection
bringing technology to life

```
IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006
=============================================
            STATUS: ALARM
=============================================
Sample: 3199 Date: 06/27/2016 3:47:48 PM
Sample type: NORMAL
Method: 54772 N/E RevK
Analysis type: NORMAL
---------------------------------------------
              ALARM
Cocaine    12%
---------------------------------------------
Absolute Pressure (kPa): 101.01
Different. Press. (kPa): 0.00
Drift Flow (cc/min): 300
=============================================
Tube 1
Calibrant amplitude (du): 1081
Calibrant delta (us): -34
Calibrant position (us):
Drift temperature (C): 249
Inlet temperature (C): 265
Cal Block temperat. (C): 78
Polarity: Pos.
High voltage (V): 1571
---------------------------------------------
Tube 2
Calibrant amplitude (du): 441
delta (us): -68
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 64
Polarity: Neg.
High voltage (V): 1810
=============================================
---------------------------------------------
Comments:

---------------------------------------------
=============================================
Tube/      #     Amp      Ko
 Channel       CumA    Delta      DTime
=============================================
1 Cocaine  10 1137  229    9  1.1600 15.129
Auth.:_____
```

USA000095

*Inside black bag*

# smiths detection
bringing technology to life

```
IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006
================================================
              STATUS: ALARM
================================================
Sample: 3202 Date: 06/27/2016 3:49:49 PM
Sample type: NORMAL
Method: 54772 N/E RevK
Analysis type: NORMAL
------------------------------------------------
               ALARM
Cocaine      4%
------------------------------------------------
Absolute Pressure (kPa): 101.03
Different. Press. (kPa): 0.00
Drift Flow (cc/min): 299
================================================
Tube 1
Calibrant amplitude (du): 1084
Calibrant delta (us): -37
Calibrant position (us):
Drift temperature (C): 250
Inlet temperature (C): 265
Cal Block temperat. (C): 78
Polarity: Pos.
High voltage (V): 1570
------------------------------------------------
Tube 2
Calibrant amplitude (du): 445
delta (us): -70
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 64
Polarity: Neg.
High voltage (V): 1809
================================================
------------------------------------------------
Comments:

------------------------------------------------
================================================
Tube/      #     Amp        Ko
 Channel      CumA    Delta        DTime
================================================
1 Cocaine  6  409  102  15  1.1600 15.127
Auth.:_____
```

USA000096



*Inside Jordan Box*

# smiths detection
bringing technology to life

```
IONSCAN Model: 500DT  S/N: 54772
Release:  500DT_3.04.017
Deployment date: 08/24/2006
======================================
             STATUS: ALARM
======================================
Sample: 3193 Date: 06/27/2016 3:44:21 PM
Sample type: NORMAL
Method: 54772 N/E RevK
Analysis type: NORMAL
--------------------------------------
             ALARM
Cocaine      5%
--------------------------------------
Absolute Pressure (kPa): 101.02
Different. Press. (kPa): 0.00
Drift Flow (cc/min): 299
======================================
Tube 1
Calibrant amplitude (du): 1078
Calibrant delta (us): -36
Calibrant position (us):
Drift temperature (C): 249
Inlet temperature (C): 265
Cal Block temperat. (C): 78
Polarity: Pos.
High voltage (V): 1571
--------------------------------------
Tube 2
Calibrant amplitude (du): 443
delta (us): -69
position (us):
Drift temperature (C): 110
Inlet temperature (C): 245
Cal Block temperat. (C): 64
Polarity: Neg.
High voltage (V): 1809
======================================
--------------------------------------
Comments:

--------------------------------------
======================================
Tube/       #     Amp      Ko
  Channel       CumA    Delta      DTime
======================================
1 Cocaine   4   379  128   0  1.1600 15.129
Auth.:_____
```

USA000097